UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re Monosodium Glutamate Antitrust Litigation

Civil File No. 00-MDL-1328 (PAM)

**MEMORANDUM AND ORDER**

---

This matter is before the Court on Plaintiffs' Application for Attorneys' Fees. In that Application, Plaintiffs' counsel asks for fees in the amount of 1/3 of the settlement fund, and costs of slightly less than $2 million. The settlement fund stands at $81.4 million plus interest. According to Plaintiffs' counsel, the total fee award they seek is $27.1 million.

The notice to the class about the proposed settlement distribution stated that the attorneys would seek no more than 1/3 of the settlement fund. No class members have objected to the proposed fee award.

**DISCUSSION**

Determining the amount of an award of attorneys' fees is a matter committed to the discretion of the Court. Blum v. Stetson, 465 U.S. 886, 896-97 (1984). The general rule is that "a litigant or a lawyer who recovers a common fund for the benefit of person other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). Because there is a conflict of interest between the attorneys and the class members with respect to apportionment of the settlement fund, a fee request is subject to heightened judicial scrutiny. In re Flight Transp. Corp. Sec. Litig., 685 F. Supp. 1092, 1094 (D. Minn. 1987) (Weiner, J.). The theory behind attorneys'

FEB 10 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

Plaintiffs are a class of purchasers of these flavor enhancers who made purchases from January 1, 1990, through November 1, 1999. Defendants are all of the major manufacturers of flavor enhancers and include corporations headquartered throughout Asia.

This litigation has been pending for nearly three years. Plaintiffs have secured settlements from all but two Defendants and have a sizable settlement fund to their credit. Plaintiffs also have secured the cooperation of two Defendants, who have provided significant information about the alleged conspiracy. The only remaining Defendants, Cheil Jedang Corporation ("Cheil"), a South Korean corporation, and its United States subsidiary, CJ America, Inc. ("CJ America") now ask the Court to limit Plaintiffs' case by dismissing some claims and barring some damages claims.

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### A. Motion to Bar pre-1995 Claims on Statute of Limitations Grounds

The class period listed in the class certification Order is from January 1, 1990, through November 1, 1999. Defendants contend that Plaintiffs are barred from seeking damages for any alleged conspiracy prior to October 13, 1995, four years before they filed their Complaint in this matter. The Sherman Act provides in pertinent part that "[any] action to enforce any cause of action under [the Act] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Plaintiffs contend that the four-year statute of limitations must be tolled because of Defendants' alleged fraudulent concealment of the conspiracy.

If Plaintiffs can show that Defendants fraudulently concealed the alleged conspiracy, there is no dispute that the statute of limitations can be tolled during the period of the concealment. See In re Wirebound Boxes Antitrust Litig., 128 F.R.D. 262, 265-66 (D. Minn. 1989) (Murphy, J.). In order to prevail on their claim of fraudulent concealment, Plaintiffs must prove that: (1) Defendants concealed Plaintiffs' cause of action; (2) Plaintiffs failed to

discover the cause of action; and (3) Plaintiffs exercised due diligence in attempting to discover the claim. In re Milk Prods. Antitrust Litig., 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997) (Magnuson, J.). At the summary judgment stage, the Court examines whether Plaintiffs have raised a genuine issue of material fact on each of the elements of their fraudulent concealment claim.

1. Law of the case

Defendants first contend that the issue of fraudulent concealment has been decided against Plaintiffs in this case and may not be revisited. In October 2001, Plaintiffs sought to amend their Complaint to include allegations of price-fixing stretching back into the 1980s. The Special Master rejected Plaintiffs' attempt, finding that Plaintiffs' amendment would be futile because their allegations of fraudulent concealment as to this time period were inadequate as a matter of law. (Mar. 15, 2002, Order at 2.) Plaintiffs did not appeal this ruling.

Plaintiffs assert that the Special Master's ruling does not mean that they have no claim for fraudulent concealment. They point out that the Special Master was considering only the allegations of concealment made in the proposed amended complaint, that the Special Master's role in this litigation is limited to nondispositive matters, and that his ruling is not binding on this Court. The Court agrees. While Special Master Borg considered the same elements of fraudulent concealment now before the Court, he did so in a different procedural posture. His Order does not preclude Plaintiffs from claiming fraudulent concealment.

2. Acts of concealment

The question to be decided here is what quantum of proof is necessary to make out a claim for fraudulent concealment. Special Master Borg held that Plaintiffs had failed to show fraudulent concealment because their allegations were "conduct in furtherance of the conspiracy and should not be considered the basis for fraudulent concealment." (Id.) Plaintiffs argue that this so-called "separate and apart" standard is too strict. According to Plaintiffs, courts in this District have adopted a more middle-of-the-road standard whereby a plaintiff may demonstrate fraudulent concealment by showing acts of concealment that may include acts involved in the antitrust violation itself. (Pl.'s Opp'n Mem. at 12 (citing Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 122 (4th Cir. 1995).) Plaintiffs label this intermediate standard the "affirmative acts" standard. In addition, some courts have adopted an even more lenient standard, called the "self-concealing" standard, that allows a plaintiff to proceed with a fraudulent concealment claim merely on proof of a self-concealing antitrust violation. (Id. at n.24 (citing, inter alia, In re Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000).) The Eighth Circuit has not spoken on this issue.

While it may be true that other judges in this District have adopted the "affirmative acts" standard, this Court has adopted the "separate and apart" standard. See In re Milk Prods., 84 F. Supp. 2d at 1022 ("Plaintiffs must make 'specific allegations of affirmative acts taken solely to conceal a price-fixing conspiracy.'") (quoting In re Wirebound Boxes, 128

F.R.D. at 266). Fraudulent concealment of a conspiracy encompasses something more than the acts involved in the conspiracy itself, which is by nature a crime of secrecy and cover-up. In order to prevail on their fraudulent concealment claim, Plaintiffs must show acts, other than the acts constituting the conspiracy, that demonstrate fraudulent concealment of that conspiracy.

Plaintiffs claim that they have met this "separate and apart" standard. They point to evidence that Defendants falsified travel and expense reports, used secret codes, orchestrated price increases to avoid arousing customers' suspicions, allocated customers, communicated by phone so as not to leave a "paper trail," and gave false reasons for price increases.[2] Defendants challenge the weight that should be given this evidence, but weighing the evidence is not a matter for summary judgment. Ultimately, Plaintiffs have identified enough evidence of fraudulent concealment to survive Defendants' Motion. Assuming the jury finds Plaintiffs' evidence of concealment credible, Plaintiffs have met their burden to establish acts of concealment sufficient to raise a claim for fraudulent concealment.

3. Due diligence

Defendants also contend that Plaintiffs' fraudulent concealment claim fails because Plaintiffs did not exercise due diligence in the pursuit of their claims. Even if Plaintiffs can prove a multitude of acts taken in furtherance of the alleged fraudulent concealment,

---

[2] Plaintiffs' reliance on the fact that alleged conspiracy meetings took place outside the United States is misplaced. Defendants are, in the main, corporations headquartered outside the U.S. Thus, it is no surprise that meetings involving these Defendants took place overseas, and this is simply not evidence of attempts to conceal the conspiracy from customers.

Plaintiffs will be unsuccessful in tolling the statute of limitations unless they can also show that they were reasonably diligent in attempting to discover the existence of the underlying conspiracy. See In re Milk Prods., 84 F. Supp. 2d at 1022; Klehr v. A.O. Smith Corp., 521 U.S. 179, 194-95 (1997). The Court must examine whether there were activities that would have "excite[d] the attention" of Plaintiffs and required further inquiry of them. In re Milk Prods., 84 F. Supp. 2d at 1024.

Defendants assert that the well-publicized investigations into the alleged conspiracy in the sale of lysine should have excited Plaintiffs' attention. In particular, they point to newspaper and trade journal articles in 1995 and 1996 that mention the government's investigation into the lysine conspiracy. Most of those articles also mention that the investigation was spilling over into other food additives. One article about Defendant Archer Daniels Midland's ("ADM") involvement in the lysine conspiracy mentions that ADM also "aggressively" entered the market for MSG and a list of other products. This is the only article to mention MSG specifically. Defendants also claim that one of Plaintiffs' class representatives testified that the market for MSG and nucleotides was not competitive. (Bruckner Aff. Ex. 16 at 159, 170-71 (Feldmar Dep.).) According to Defendants, this evidence taken together shows that Plaintiffs did not exercise due diligence in the investigation of their claims and thus may not claim fraudulent concealment to toll the statute of limitations.

Defendants argued at the hearing that the Court should carefully consider the opinion

in In re Aluminum Phosphide Antitrust Litigation, 905 F. Supp. 1457 (D. Kan. 1995). In that case, the court held that the plaintiffs had failed to raise a genuine issue of fact about their diligence in pursuing their claims, and the court therefore granted summary judgment to the defendants. Id. at 1471. However, the evidence of the plaintiffs' knowledge of the conspiracy in that case was much stronger than it is here. There, one plaintiff performed a marketing and purchasing survey on the very product at issue and concluded that the price was high and that, as she testified, something was "seriously wrong in the market." Id. Moreover, there was evidence that purchasers of aluminum phosphide had contacted the plaintiffs' counsel many years before suit was actually file concerning antitrust issues in the aluminum phosphide market. Id.

Here, the evidence that Defendants contend should have "excited the attention" of Plaintiffs is evidence of conspiracies in other products, not in MSG or nucleotides. The fact that the government was investigating alleged conspiracies into some food additives does not, as a matter of law, mean that any purchaser of any food additive is on notice of the potential for a conspiracy in sale of the product he or she purchases. Defendants cite a litany of cases finding that antitrust plaintiffs failed to exercise due diligence. However, each of those cases the evidence that should have excited the plaintiffs' attention was evidence of price-fixing in the product at issue. There is no such evidence in this case.

Moreover, Defendants take out of context some of the testimony of Mr. Feldmar, one the class representatives. Looking at his testimony as a whole and in the light most favorable

to Plaintiffs, issues of fact remain as to whether he indeed suspected or should have suspected that the MSG and nucleotides market was fixed. Resolution of the conflicts in his testimony is a matter for the jury. For the purposes of this Motion, Plaintiffs have succeeded in raising a genuine issue of fact about their claim of fraudulent concealment. Defendants' Motion is denied.

### B. Motion to Dismiss Claims Against CJ America for Participation in Alleged Nucleotides Conspiracy

Defendants assert that Plaintiffs have adduced no evidence that CJ America participated in any way in the alleged nucleotides conspiracy. According to Defendants, CJ America is completely separate from its parent company, Cheil, so that any evidence as to Cheil cannot be transmuted into evidence against CJ America. Plaintiffs respond that there is evidence that CJ America directly participated in the alleged conspiracy relating to nucleotides, and that in any event, CJ America is controlled by Cheil and functioned as a mere instrumentality for Cheil in carrying out the objectives of the conspiracy in the United States.

The question for the purposes of these Motions is whether Plaintiffs have come forward with evidence demonstrating the existence of a genuine issue of fact for trial. Defendants challenge the credibility of Plaintiffs' evidence and the weight that the Court should afford that evidence, but examination of the veracity of the evidence is not proper on summary judgment. Taking Plaintiffs' evidence in the light most favorable to them, a reasonable jury could conclude that CJ America participated in the alleged conspiracy either

directly or through Cheil. Plaintiffs' allegations regarding CJ America's participation in the alleged nucleotide conspiracy will be allowed to proceed.

### C. Motion to Bar Claims for Damages Arising Out of Post-1997 Nucleotide Sales

Defendants claim that Plaintiffs have no evidence that the alleged conspiracy was in place after 1997. Plaintiffs present evidence that, if believed, shows a conspiracy that lasted until 1999. Once again, Defendants' arguments concern the weight and the veracity of Plaintiffs' evidence. If the jury believes Defendants that the conspiracy lasted only until 1997 at the latest and that prices after 1997 were not fixed or stabilized, then the jury will not award damages for purchases made after 1997. Summary judgment is not appropriate on this issue.

### D. Motion to Bar All Damages Claims Arising Out of MSG Sales

This Motion essentially contends that Plaintiffs have no evidence of a conspiracy to fix the price of MSG during the class period. Defendants assert that the only evidence in the case indicates that there may have been a conspiracy as to nucleotides during a portion of the class period, but that the documents and testimony are silent as to MSG. Plaintiffs explain that the alleged MSG conspiracy was so entrenched by 1990, having begun as early as 1969, that the conspirators had no reason to discuss MSG. By contrast, nucleotides were not invented until the late 1980s, and thus the conspirators were still forming the boundaries of the conspiracy relating to nucleotides during the class period.

Plaintiffs have come forward with voluminous evidence of a conspiracy during the

class period, at least some of which relates to MSG. Whether the evidence ultimately shows that there was an agreement to fix the price of MSG and/or nucleotides during the class period will depend on the weight the jury gives to the evidence. On summary judgment, Plaintiffs have met their burden to demonstrate that fact questions remain as to the existence of the conspiracy they allege.

**CONCLUSION**

Genuine issues of material fact remain to be resolved on all of the questions raised by Defendants in their various Motions. Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Partial Summary Judgment Barring Pre-1995 Damages (Clerk Doc. No. 294) is **DENIED**;
2. Defendant CJ America's Motion for Partial Summary Judgment on Claims Related to Nucleotides (Clerk Doc. No. 317) is **DENIED**;
3. Defendants' Motion for Partial Summary Judgment Barring Post-1997 Damages as to Nucleotides and Barring Damages as to MSG (Clerk Doc. No. 319) is **DENIED**; and
4. Defendants' Motions to Strike (Clerk Doc. Nos. 301, 340, 342) are **DENIED**.

Dated: Feb. 6, 2003

Paul A. Magnuson
United States District Court Judge