**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Inquivosa S.A.; Petbowe Chemtrade Corp.; Plus Sun Co., Ltd.; MCC Menssing Chemiehandel & Consultants GmbH; and Newco Trading Co., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Ajinomoto Co., Inc., Ajinomoto USA, Inc.; Orsan S.A.; Cheil Jedang Corp.; C.J. America, Inc.; Miwon Co., Ltd.; Daesang America, Inc.; Takeda Chemical Industries, Ltd.; Kyowa Hakko Kogyo Co., Ltd.; Vedan Enterprises Group f/k/a Tung Hai Fermentation Industrial Corp.; Archer Daniels Midland Co.; Ve Wong Corp.; Wei Chuan Foods Corp.; Yamasa Corp.; and Asahi Kasei Corp.

Defendants.

MDL 00-1328

**CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs, by and through their undersigned attorneys, bring this action on behalf of themselves and all others similarly situated for damages under the antitrust laws of the United States against the above-named defendants, and demand a trial by jury. For their Consolidated and Amended Class Action Complaint against Defendants, Plaintiffs allege the following:

## NATURE OF THE CASE

1. Plaintiffs bring this class action against Defendants Ajinomoto Co., Inc.; Ajinomoto USA, Inc.; Orsan S.A.; Cheil Jedang Corp.; C.J. America, Inc.; Miwon Co., Ltd.; Daesang America, Inc.; Takeda Chemical Industries Ltd.; Kyowa Hakko Kogyo Co., Ltd.; Vedan Enterprises Group f/k/a Tung Hai Fermentation Industrial Corp.; Archer Daniels Midland Co.; Ve Wong Corp.; Wei

Chuan Foods Corp.; Yamasa Corp.; and Asahi Kasei Corp. (collectively "Defendants") under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

2. This action arises from a conspiracy to raise, fix and maintain prices, and unreasonably restrain trade for the sale of Monosodium Glutamate ("MSG") and Nucleotides by the Defendants, which caused supra-competitive U.S. and worldwide prices for MSG and Nucleotides. Nucleotides are naturally occurring flavor enhancers found in many plant and animal cells. MSG is the most common of these flavor enhancers.

## JURISDICTION AND VENUE

3. Plaintiffs bring this action under the Sherman Act § 1 (15 U.S.C. § 1) and the Clayton Act, § § 4 and 16 (15 U.S.C. § § 15 and 26) to obtain injunctive relief and recover damages and their lawsuit's costs, including reasonable attorneys' fees, against Defendants for injuries resulting from Defendants' and their Co-Conspirators' Sherman Act violations.

4. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1337 and 15 U.S.C. § § 1, 15, 22 and 26, because the effect of Defendants' conspiracy on U.S. commerce gave direct rise to Plaintiffs' antitrust claims and injuries.

5. Venue is proper in this district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391.

6. Each Defendant has transacted business in the United States, done an act in the United States, or caused an anticompetitive effect in the United States by an act done elsewhere.

## DEFINITIONS

7. As used in this Complaint:

a. "Class Period" is the period beginning at least as early as January 1, 1984 through November 1, 1999;

b. "MSG" means Monosodium Glutamate; and

c. "Nucleotides" means Disodium Inosinate ("DSI" a/k/a "IMP"), Disodium Guanylate ("DSG" a/k/a "GMP"), and I+G (the combination of DSI and DSG).

**PLAINTIFFS**

8. Plaintiff Inquivosa S.A. is a foreign corporation with its principal place of business located in Caracas, Venezuela. Inquivosa S.A. purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

9. Plaintiff Petbowe Chemtrade Corp. is a foreign corporation with its principal place of business located in Manila, Philippines. Petbowe Chemtrade Corp. purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

10. Plaintiff Plus Sun Co., Ltd. is a foreign corporation with its principal place of business located in Taiwan. Plus Sun Co., Ltd. purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

11. Plaintiff MCC Menssing Chemiehandel & Consultants GmbH is a foreign corporation with its principal place of business located in Hamburg, Germany. MCC Menssing Chemiehandel & Consultants GmbH purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

12. Plaintiff Newco Trading Company is a Korean corporation with its principal place of business located in Seoul, South Korea. Newco Trading Company purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

**DEFENDANTS**

13. Defendant Ajinomoto Company, Inc. ("Ajinomoto Co.") is a Japanese corporation with its principal place of business located in Tokyo, Japan. Ajinomoto Co. is the world's largest producer of MSG. Ajinomoto Co. manufactured, sold and/or distributed MSG and Nucleotides throughout the world, including in the United States directly or through its subsidiaries or affiliates

during the time period relevant to this action. Ajinomoto Co. directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

14. Defendant Ajinomoto USA, Inc. ("Ajinomoto USA") is a New York corporation with its principal place of business located in Teaneck, New Jersey. Ajinomoto USA, which is a wholly-owned subsidiary of Defendant Ajinomoto Co., sold or distributed MSG and Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Ajinomoto USA has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

15. Defendant Orsan S.A. ("Orsan") is a French corporation with its principal place of business located in Paris, France. Orsan manufactured, sold and/or distributed MSG and/or Nucleotides in Europe and in other parts of the world during the time period relevant to this action. Orsan has set prices and allocated markets for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

16. Defendant Cheil Jedang Corporation ("Cheil Jedang") is a Korean corporation with its principal place of business located in Seoul, South Korea. Cheil Jedang is named herein as successor-in-interest to Cheil Foods and Chemicals, Inc. ("Cheil"), and is liable for Cheil's actions as alleged in this Complaint. Cheil Jedang or Cheil manufactured, sold and/or distributed MSG and Nucleotides throughout the world, including in the United States during the time period relevant to this action.

Cheil Jedang directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

17. Defendant C.J. America, Inc. ("CJ America") is a New Jersey corporation with its principal place of business located in Ridgefield Park, New Jersey. CJ America, which is a wholly-owned subsidiary of Defendant Cheil Jedang, sold or distributed MSG and Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. CJ America has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

18. Defendant Miwon Company Ltd. ("Miwon Co.") is a Korean corporation with its principal place of business located in Seoul, South Korea. Miwon Co. manufactured, sold and/or distributed MSG and Nucleotides throughout the world, including in the United States directly or through its subsidiaries or affiliates during the time period relevant to this action. Miwon Co. directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

19. Defendant Daesang America, Inc., f/k/a Miwon America, Inc. ("Daesang") is a New Jersey corporation with its principal place of business located in Hackensack, New Jersey. Daesang manufactured, sold and/or distributed MSG and Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Daesang has set prices and

allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

20. Defendant Takeda Chemical Industries Ltd. ("Takeda Chemical") is a Japanese corporation with its principal place of business located in Osaka, Japan. Takeda Chemical manufactured, sold and/or distributed MSG and Nucleotides throughout the world, including in the United States directly or through its subsidiaries or affiliates during the time period relevant to this action. Takeda Chemical directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

21. Defendant Kyowa Hakko Kogyo Co., Ltd. ("Kyowa") is a Japanese company with its principal place of business located in Tokyo, Japan. Kyowa manufactured, sold and/or distributed MSG and Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Kyowa directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

22. Defendant Vedan Enterprises Group f/k/a Tung Hai Fermentation Industrial Corporation ("Tung Hai") is a Taiwanese corporation with its principal place of business located in Taichung Hsien, Taiwan. Tung Hai manufactured, sold and/or distributed MSG and/or Nucleotides in various parts of the world, including in the United States during the time period relevant to this

action. Tung Hai directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

23. Defendant Archer Daniels Midland Company ("ADM") is a Delaware corporation with its principal place of business located in Decatur, Illinois. ADM manufactured, sold and/or distributed MSG in various parts of the world, including in the United States during the time period relevant to this action. ADM directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

24. Defendant Ve Wong Corporation ("Ve Wong") is a Taiwanese corporation with its principal place of business located in Taipei, Taiwan. Ve Wong manufactured, sold and/or distributed MSG and/or Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Ve Wong directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

25. Defendant Wei Chuan Foods Corporation ("Wei Chuan") is a Taiwanese corporation with its principal place of business located in Taipei, Taiwan. Wei Chuan manufactured, sold and/or distributed MSG and/or Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Wei Chuan directly and through affiliates that it

controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

26. Defendant Yamasa Corporation ("Yamasa") is a Japanese corporation with its principal place of business located in Chiba, Japan. Yamasa manufactured, sold and/or distributed MSG and/or Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Yamasa directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

27. Defendant Asahi Kasei Corporation ("Asahi Kasei") is a Japanese corporation with its principal place of business located in Tokyo, Japan. Asahi Kasei manufactured, sold and/or distributed MSG and/or Nucleotides throughout the world, including in the United States directly or through its subsidiaries or affiliates during the time period relevant to this action. Asahi Kasei directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

## CO-CONSPIRATORS

28. Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint (the "Co-Conspirators") have participated in the violations of the federal

antitrust laws for which Plaintiffs seek relief, and have performed acts and made statements in furtherance thereof.

## CRIMINAL PLEAS/INFORMATION

29. In September 1999, the Antitrust Division of the United States Department of Justice (the "Justice Department") announced that Takeda Chemical was cooperating in an investigation by the Justice Department into the food flavor enhancers industry.

30. In August 2001, Defendant Ajinomoto Co. agreed to plead guilty to criminal charges brought by the United States for its participation in a conspiracy to violate the U.S. antitrust laws for Nucleotides sold or distributed in the U.S. Ajinomoto Co. admitted participating in a conspiracy that began as early as July 1992 and continued until at least August 1996. In addition, a federal grand jury in Dallas indicted Mr. Tamon Tanabe, a Japanese citizen and executive of Ajinomoto Co., for participating in the same conspiracy. Mr. Tanabe remains a fugitive from justice.

31. In August 2001, Defendant Cheil Jedang agreed to plead guilty to criminal charges brought by the United States for its participation in a conspiracy to violate U.S. antitrust laws for Nucleotides sold or distributed in the U.S. Cheil Jedang admitted to participating in a conspiracy that began as early as July 1992 and continued until at least August 1996.

32. In August 2001, Daesang Japan, Inc., an affiliate of Defendant Miwon Co., Ltd., ("Miwon Co.") and Daesang America, Inc., f/k/a Miwon America, Inc. ("Daesang"), agreed to plead guilty to criminal charges brought by the United States for its participation in a conspiracy to violate the U.S. antitrust laws for Nucleotides sold or distributed in the U.S. Daesang Japan, Inc. admitted participating in a conspiracy that began as early as July 1992 and continued until at least August 1996.

33. Defendant Takeda Chemical cooperated with and produced evidence to the United States government in its investigation of an antitrust conspiracy related to Nucleotides and other food flavor enhancers sold or distributed in the U.S. in exchange for a reduced penalty in the Vitamins Antitrust Litigation.

34. In December 2002, the European Commission fined Ajinomoto Co., Cheil Jedang Corp. and Daesang Corp. respectively € 15.54 million, € 2.74 million and € 2.28 million each for participating in a price-fixing cartel in Nucleotides. Takeda Chemical Industries Ltd. was also found to be part of the cartel, but it was granted full immunity from fines for revealing the existence of the illegal agreement to the Commission. A European Union press release in December 2002 stated that, "according to the evidence in the Commission's possession, Ajinomoto, Takeda, Cheil and Daesang operated a cartel for nine years until 1998 during which they agreed to fix 'target' prices, implement concerted price increases, allocate customers, as well as exchange information on sales figures." Moreover, the "documents found by the Commission leave no doubt about the intent to rig the market."

**FACTS**

35. MSG is the sodium salt of the naturally occurring amino acid, L-glutamic acid. MSG has been manufactured since 1909 and is the largest volume commercially produced amino acid salt in the world. MSG is sold as a fine white crystal substance and, when added to foods, provides a similar flavoring function as the glutamate that occurs naturally in food. MSG is used, inter alia, as a flavor enhancer in gravies, sauces, meats, poultry, seafood, Asian cuisine, soup stocks and bases, snacks, and prepared vegetables, among other things. All references to MSG in this complaint include the product L-glutamic acid.

36. Nucleotides are naturally occurring flavor enhancers found in many plants and animal cells. IMP and GMP are nucleotide-based flavor enhancers for food and create the same taste effect as MSG. IMP is found naturally in meat, poultry and fish. GMP is the dominant taste component in mushrooms. IMP and GMP are commercially produced by fermenting glucose. IMP and GMP are often used to avoid glutamate-based flavor enhancers like MSG. IMP and GMP often are used in conjunction with MSG, and when so used they extend and multiply the flavoring effect of MSG.

37. IMP and GMP are "stand-alone" flavor enhancers, but often are combined to create a powerful flavor enhancer called "I+G."

38. I+G may be used as an alternative to MSG, or it may be combined with MSG. When I+G and MSG are combined, the result is a synergistic effect which dramatically increases the flavor-enhancing effect of MSG. For example, a combination of 95% MSG and 5% I+G intensifies flavor enhancement by a factor of five. Thus, less MSG is required to create the desired flavor enhancement.

39. Beginning in at least as early as January 1, 1984 and continuing through at least November 1, 1999, Defendants and their Co-Conspirators engaged in an over-arching worldwide conspiracy to raise, fix, stabilize, and maintain worldwide MSG and Nucleotide prices. Their cartel operated on a global basis and affected the prices in every part of the worldwide market for MSG and Nucleotides. Defendants entered into agreements with each other and with other MSG and Nucleotide manufacturers, determined what price each should charge for MSG and Nucleotides inside and outside the U.S., and decided how much market share each company should have.

40. Defendants and their Co-Conspirators worked together to achieve a balanced world market price for MSG and Nucleotides. Defendants worked to achieve this goal in part by agreeing among themselves to purchase MSG and/or Nucleotides from each other in exchange for cooperation

in setting a balanced world price for MSG and Nucleotides that was high enough for everyone to receive a financial benefit in every part of the world. Defendants' and their Co-Conspirators' unlawful price fixing and market allocation affected U.S. commerce and gave rise to Plaintiffs' antitrust claim and injuries.

41. MSG and Nucleotides are commodities in that there is a high degree of fungibility within the product groups. MSG and Nucleotide manufacturers are located worldwide, with the majority of production capacity residing in Europe and Southeast Asia. These factors indicate that there is a worldwide geographic market for MSG and Nucleotides where price movements in one geographic sub-market are necessarily linked to all other markets.

42. U.S. and foreign MSG and Nucleotide sub-markets are integrated and interconnected, such that prices paid by foreign purchasers are inextricably bound up with prices charged in the U.S. Given MSG and Nucleotides' commodity nature and worldwide flow, MSG and Nucleotide prices charged by Defendants and their Co-Conspirators in countries other than the U.S. are in parity and highly correlated with U.S. MSG and Nucleotide prices.

43. Given MSG and Nucleotide's worldwide flow, Defendants and their Co-Conspirators' knew that their conspiracy would not succeed unless they coordinated their prices and market shares in markets across the world, specifically including fixing U.S. MSG and Nucleotide prices and allocating U.S. MSG and Nucleotide market shares. Defendants and their Co-Conspirators knew that without an agreement affecting U.S. commerce, foreign-based MSG and Nucleotide purchasers would have arbitraged, purchasing MSG and Nucleotides at competitive U.S. prices and exporting them into their home countries. Arbitrage from the U.S. would have defeated Defendants and their Co-Conspirators' attempts to fix prices and allocate market shares in other countries worldwide. Hence, Defendants and their Co-Conspirators' worldwide MSG and Nucleotide price fixing

conspiracy necessarily had to include the U.S. and, thus, any anticompetitive effects that occurred in the U.S. necessarily would have also been felt by foreign MSG and Nucleotide purchasers.

44. Defendants' explicit agreements to fix worldwide MSG and Nucleotide prices and to allocate worldwide MSG and Nucleotides markets violated the Sherman Act's substantive provisions because it directly, substantially, and foreseeably affected U.S. commerce, and the effect on U.S. commerce gave rise to Plaintiffs' antitrust injuries. Indeed, the U.S. Government's Sherman Act claim resulted in the aforementioned guilty pleas, while U.S. MSG and Nucleotide direct purchasers' Clayton Act claims resulted in a civil class action lawsuit, captioned *In Re Monosodium Glutamate Antitrust Litigation*, MDL No. 1328, which was consolidated and transferred on March 2, 2000 to the U.S. District Court for the District of Minnesota, and subsequently settled.

## <u>CLASS ACTION ALLEGATIONS</u>

45. Plaintiffs bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class:

> All persons (excluding federal, state and local governmental entities and political subdivisions, and Defendants, their respective parents, subsidiaries and affiliates) who directly purchased MSG or Nucleotides during the period beginning at least as early as January 1, 1984 through November 1, 1999, for delivery outside the United States from any of the Defendants or their affiliates or their Co-Conspirators.

46. Plaintiffs do not know the exact size of the Class since such information is exclusively in the control of Defendants. However, due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members, and that they are sufficiently numerous and geographically dispersed so that joinder of all Class members is impracticable.

47. Plaintiffs' claims are typical of the claims of the members of the Class, because Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants and their Co-Conspirators as alleged in this Complaint.

48. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. In addition, Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

49. Questions of law and fact common to members of the Class predominate over any questions which may affect only individual members. Common questions of law and fact include:

a. whether Defendants and their Co-Conspirators engaged in an over-arching worldwide conspiracy to raise, fix and maintain prices of MSG or Nucleotides sold throughout the United States and foreign nations;

b. whether Defendants and their Co-Conspirators engaged in an over-arching worldwide conspiracy to allocate among themselves customers of MSG or Nucleotides throughout the United States and foreign nations;

c. whether Defendants and their Co-Conspirators engaged in an over-arching worldwide conspiracy to establish quotas among Defendants and their Co-Conspirators for sales of MSG or Nucleotides throughout the United States and foreign nations;

d. whether Defendants and their Co-Conspirators engaged in an over-arching worldwide conspiracy to refrain from submitting bids, or to submit collusive, non-competitive, and rigged bids to supply MSG or Nucleotides to various customers located throughout the United States and foreign nations;

e. whether Defendants' and their Co-Conspirators' conduct constitutes a violation of the Sherman Act, 15 U.S.C. § 1;

f. whether Defendants' and their Co-Conspirators' practices were designed to have, and in fact did have, a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States;

g. the duration and extent of the over-arching worldwide conspiracy alleged in this Complaint;

h. whether Defendants and their Co-Conspirators took steps to conceal their conspiracy;

i. whether the alleged over-arching worldwide conspiracy had an impact on the Plaintiffs and other Class Members; and

j. the appropriate measure of damages by which the conduct of Defendants and their Co-Conspirators injured all members of the Class.

50. Class treatment is superior to any alternatives for the fair and efficient adjudication of the controversy alleged in this Complaint. Class treatment will permit a large number of similarly situated persons around the world to prosecute common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. There are no difficulties likely to be encountered in the management of this Class action that would preclude its maintenance as a Class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

## VIOLATIONS ALLEGED

51. Beginning at least as early as 1984 and continuing thereafter through 1999, Defendants and their Co-Conspirators engaged in a continuing combination and conspiracy with respect to the

sale of MSG and Nucleotides in unreasonable restraint of trade and commerce, in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

52. The combination and conspiracy alleged in this Complaint consisted of a continuing agreement, understanding and concert of action by Defendants and their Co-Conspirators, the substantial terms of which were to raise, fix and maintain at artificially high and non-competitive levels the prices at which they sold MSG and Nucleotides in the United States and throughout the world. Defendants' activities comprised an over-arching worldwide conspiracy to raise, stabilize and maintain the price of MSG and Nucleotides. Defendants and their Co-Conspirators also agreed to allocate among themselves the volume of sales of MSG and Nucleotides and allocate customers of MSG and Nucleotides in the United States and throughout the world.

53. For the purpose of forming and effectuating their combination and conspiracy, Defendants and their Co-Conspirators have done those things that they combined and conspired to do, including, among other things:

a. participated in meetings and conversations in the United States and elsewhere to discuss the prices and volume of MSG and Nucleotides sold throughout the world, including in the United States;

b. agreed, during those meetings and conversations or elsewhere, to charge prices at certain levels and otherwise to artificially increase and maintain prices of MSG and Nucleotides sold throughout the world, including in the United States knowing and intending that in order to artificially increase and maintain prices of MSG and Nucleotides in markets throughout the world, they needed to fix and maintain prices for MSG and Nucleotides in the United States;

c. agreed, during those meetings and conversations or elsewhere, to allocate among themselves customers of MSG and Nucleotides throughout the world, including in the United States;

d. monitored the world market price and allocated sales and policed the compliance of their Co-Conspirators, including through arrangements to financially penalize any Co-Conspirator that failed to maintain the world market price and/or sold more than their allocated share;

e. issued price announcements and price quotations in accordance with the agreements reached; and

f. agreed to conceal and keep secret their illegal agreement.

**INJURY TO PLAINTIFFS AND THE CLASS**

54. Among others, Defendants and their Co-Conspirators' conduct, combination, and conspiracy had the following effects:

a. U.S. MSG and Nucleotide prices were fixed, raised, maintained, and stabilized at artificial and non-competitive levels;

b. Worldwide MSG and Nucelotide prices were fixed, raised, maintained, and stabilized at artificial and non-competitive levels; and

c. Because of Defendants' conspiracy's U.S. effect, Plaintiffs and the Class Members were deprived of free and open competition for their MSG and Nucleotide purchases.

55. During the Class Period, Plaintiffs purchased MSG and Nucleotides from Defendants and others. Plaintiffs paid more for MSG and Nucleotides than they would have paid absent Defendants and their Co-Conspirators' illegal conduct, combination, and conspiracy to harm U.S. and worldwide commerce. Plaintiffs suffered injuries-in-fact when they paid inflated MSG and Nucleotide

prices, and Defendants' conspiracy to fix MSG and Nucleotide prices and allocate MSG and Nucleotide markets around the world caused Plaintiffs' injuries-in-fact.

56. Defendants' price fixing and market allocation significantly and adversely affected customers both outside the U.S. and customers within the U.S., and the conspiracy's adverse foreign effect was dependent on its adverse U.S. effect. Indeed, these effects comprised a necessary link in creating Plaintiffs' foreign injuries. The U.S. effect of Defendants' conduct was necessary to achieve Plaintiffs' injuries abroad because: (1) without Defendants' conspiracy's adverse U.S. effect – higher U.S. MSG and Nucleotide prices – Defendants and their Co-Conspirators could not have maintained their international price fixing arrangement, and Plaintiffs would not have suffered their foreign injuries; and (2) if the conspiracy had not affected the U.S. sub-market, Plaintiffs and other foreign MSG and Nucleotide purchasers would have obtained product from the U.S. sub-market at competitive prices.

57. Defendants and their Co-Conspirators' illegal conduct, combination and conspiracy's U.S. effect directly injured Plaintiffs; Plaintiffs' damages claims are not speculative; allowing Plaintiffs to recover does not risk duplicative recovery; and Plaintiffs' damages will not require complicated apportionment.

## FRAUDULENT CONCEALMENT

58. Throughout the Class Period, Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

59. Defendants and their Co-Conspirators engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

60. Defendants' wrongful conduct as alleged in this Complaint was carried out in part through means and methods which were designed and intended to avoid detection, and which in fact

successfully precluded detection. Although Plaintiffs exercised due diligence throughout the Class Period, they could not have discovered Defendants' unlawful scheme and conspiracy at any earlier date, because of Defendants' effective, affirmative, and fraudulent concealment of their activities.

61. The Defendants and their Co-Conspirators actively, intentionally and fraudulently concealed the existence of the combination and conspiracy from Plaintiffs by one or more of the following affirmative acts, including acts in furtherance of the conspiracy:

a. covert meetings in which the prices, sales, volumes of sales and markets for MSG and Nucleotides were discussed and agreed;

b. allocating secretly among themselves customers and contracts for the sale of MSG and Nucleotides;

c. intentionally submitting inflated bids to customers to make other bids appear legitimate;

d. intentionally bidding purportedly on a competitive basis when in fact such bidding was the result of the collusion;

e. instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

f. participating in meetings and conversations to monitor and enforce adherence to the agreed-on prices and market shares; and

g. establishing a system to jointly monitor whether the agreed-on world market price was being maintained.

62. Another method by which Defendants fraudulently concealed their wrongful conduct from Plaintiffs and other members of the Class was by issuing or causing to be issued a series of statements to the public and to Plaintiffs and other members of the Class, which falsely attributed

price increases for MSG and Nucleotides to factors other than Defendants' illegal scheme and wrongful conduct.

63. Additionally, Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs by providing false bids to customers in order to conceal their customer allocation scheme and other wrongful conduct.

64. Although Plaintiffs exercised all due diligence during the Class Period, Plaintiffs and the members of the Class had no knowledge of Defendants' antitrust violations until September 9, 1999, when the Justice Department publicly announced that Defendant Takeda Chemical was cooperating in an antitrust investigation in the food flavor enhancers industry, and Plaintiffs, through their counsel, conducted their own investigation.

65. Although Plaintiffs exercised all due diligence during the Class Period, Plaintiffs and the members of the Class could not possibly have discovered Defendants' unlawful scheme and conspiracy before September 1999 because of the successful deceptive practices and techniques of secrecy employed by Defendants and their Co-Conspirators to avoid detection of, and to affirmatively and fraudulently conceal, their wrongful conduct. Because Defendants' affirmative and fraudulent concealment as alleged herein was effective, there were no circumstances before September 1999 which should have led Plaintiffs to suspect the existence of Defendants' illegal price-fixing scheme.

66. Plaintiffs have exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having a reasonable suspicion of the existence of Defendants' conspiracy alleged herein, and by seeking discovery as to the matters asserted herein, to the extent permitted by law. Plaintiffs did not discover their cause of action earlier than September 9, 1999, because Defendants' fraudulent concealment of their conspiracy was effective.

67. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their Co-Conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## COUNT I
## ANTITRUST CLAIMS

68. Plaintiffs incorporate the allegations described in Paragraphs 1 through 67 above as if fully set forth herein.

69. During the Class Period, Defendants continuously and uninterruptedly manufactured, sold and shipped MSG and Nucleotides in U.S. interstate and worldwide commerce. Defendants received payment for their MSG and Nucleotides across state and national boundaries.

70. The manufacture of MSG and Nucleotides is a billion dollar per year industry worldwide. The conspiracy involving MSG and Nucleotides has affected billions of dollars of worldwide commerce.

71. Defendants' price fixing and market allocation agreement occurred in and had a direct, substantial and reasonably foreseeable anticompetitive effect on U.S. commerce, which U.S. effect was necessary for Defendants to cause Plaintiffs' antitrust injuries abroad.

72. As a proximate result of Defendants' price fixing and market allocation agreement, MSG and Nucleotide sales in the U.S. were illegally restrained, and as a result of this effect, Plaintiffs were injured by being precluded from purchasing competitively-priced MSG and Nucleotides.

73. Plaintiffs and the Plaintiff Class seek damages for these injuries, and any other relief that the Court deems necessary and appropriate.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that:

1. The Court determines that this action may be maintained as a class action under Rule Fed. R. Civ. P. 23(b)(3), that Plaintiffs are adequate and appropriate representatives of the Class, and that reasonable notice of this action be given to the Class;

2. The unlawful combination and conspiracy alleged in this Complaint be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act;

3. Defendants be preliminarily and permanently enjoined from continuing the unlawful combination or conspiracy alleged in this Complaint;

4. Plaintiffs and the Class recover damages, as provided by law, that Defendants jointly and severally be held liable for the damages suffered by Plaintiffs and the Class, and that judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be trebled in accordance with the antitrust laws;

5. Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

6. Plaintiffs and the Class be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of all issues so triable.

Dated: November 15, 2004

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

s/ Heidi M. Drewes-Silton
Richard A. Lockridge (#64117)
Patricia A. Bloodgood (#157673)
Heidi M. Drewes-Silton (#025759X)
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
(612) 339-6900

HEINS MILLS & OLSON, P.L.C.

s/ Susan E. MacMenamin
Samuel D. Heins (#43576)
Susan E. MacMenamin (#0304396)
3550 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 338-4605

**PLAINTIFFS' CO-LEAD COUNSEL**

Michael D. Hausfeld
Paul T. Gallagher
Brian A. Ratner
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500 West
Washington, D.C. 20005-3964
(202) 408-4600

Joseph Goldberg
FREEDMAN BOYD DANIELS HOLLANDER GOLDBERG & CLINE, P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
(505) 842-9960

Howard J. Sedran
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600

Martin D. Chitwood
Craig G. Harley
CHITWOOD & HARLEY
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
(404) 873-3900

Donald L. Perelman
Roberta D. Liebenberg
FINE KAPLAN & BLACK
1845 Walnut Street, 23rd Floor
Philadelphia, PA 19103
(215) 567-6565

Mark A. Griffin
Lynn L. Sarko
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900

Jared B. Stamell
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, NY 10006-1404
(212) 566-4047

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Ste. 1700
San Francisco, CA 94111
(415) 217-6810

Ira N. Richards
TRUJILLO RODRIGUEZ & RICHARDS, LLC
226 W. Rittenhouse Square
The Penthouse
Philadelphia, PA 19103
(215) 731-9004

Robert N. Kaplan
Richard J. Kilsheimer
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980

Joseph M. Patane
LAW OFFICES OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
(415) 563-7200

Marc H. Edelson
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA 18901
(215) 230-8043

Karl L. Cambronne
CHESTNUT & CAMBRONNE, P.A.
3700 Campbell Mithun Tower
222 South Ninth Street
Minneapolis, MN 55402
(612) 339-7300

Linda P. Nussbaum
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
150 East 52nd Street
30th Floor
New York, NY 10022-6017
(212) 838-7797

Steven A. Kanner
MUCH SHELIST FREED DENENBERG & AMENT, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606-1615
(312) 521-2000

Andrew B. Sacks
SACKS, WESTON, SMOLINSKY, ALBERT, & LUBER
510 Walnut Street
Suite 400
Philadelphia, PA 19106
(215) 925-8200

Steven J. Greenfogel
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
117 South 17th Street
22nd Floor - Architects Building
Philadelphia, PA 19103
(215) 564-5182

**COUNSEL FOR PLAINTIFFS**