UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: MONOSODIUM GLUTAMATE ANTITRUST LITIGATION | Civil 00-MD-1328 (PAM) |
| This Document Relates to: | |
| Inquivosa S.A.; Petbowe Chemtrade Corp.; Plus Sun Co., Ltd.; and Menssing Chemiehandel & Consultants GmbH (MCC), on behalf of all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Ajinomoto Company, Inc.; Orsan S.A.; Cheil Jedang Corporation; C.J. America, Inc.,: Miwon Co., Ltd.; Daesang America, Inc.; Takeda Chemical Industries Ltd.; Kyowa Hakko Kogyo; and Tung Hai Fermentation Industrial Corp., n/k/a Vedan Enterprises Group,<br><br>Defendants. | Civil 03-2997 (PAM)<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT** |

Defendants CJ Corp., f/k/a Cheil Jedang Corporation, and CJ America, Inc. (collectively referred to herein as "Cheil") move this Court to enforce a settlement agreement in this matter that Cheil and Co-Lead Counsel for the putative class agreed to on June 19, 2003. *See* the Declarations of Barry F. McNeil, Ronald W. Breaux, David B. Reece, and Ju Myung Hwang which are submitted contemporaneously herewith.

## I.
## OVERVIEW

Cheil and Plaintiffs in this case entered a settlement agreement on June 19, 2003. The agreement was disclosed in open Court with Plaintiffs' counsel's explicit consent and without objection and is recounted in a written document counsel for both parties executed. Surprisingly, Plaintiffs now seek to renege on the agreement that they both confirmed on repeated occasions (to opposing counsel, to this Court, and to the MDL Panel) and documented. Their argument is that they should be released from the agreement they announced, confirmed and signed merely because they did not receive a courtesy copy of a signed version of the document. Absolutely no law supports such an assertion. The parties' agreement is binding, and Cheil simply asks this Court to require Plaintiffs to abide by the agreement they made.

## II.
## FACTS

### A. The parties agreed to a binding settlement agreement in June 2003.

On May 1, 2003, the law firms of Heins Mills & Olson, P.L.C. ("Heins Mills") and Lockridge Grindal Nauen P.L.L.P. ("Lockridge Grindal") (collectively referred to as "Plaintiffs' counsel") filed a putative class action complaint on behalf of foreign direct purchasers of MSG and nucleotides ("*Inquivosa*" or "the foreign purchaser action").[1] On May 14, 2003, pursuant to the local procedures of the District of Minnesota, the foreign purchaser action was consolidated with MDL No. 1328.[2] On November 5, 2003, the

---

1 *See* Declaration of David Reece at ¶ 17 ("Reece Dec."), and Exhibit 1 to the Reece Dec.

2 *See* Reece Dec. at ¶ 18, and Exhibit 2 to the Reece Dec.

Court appointed Plaintiffs' counsel as co-lead counsel in the foreign purchaser action. At the time that the foreign purchaser action was filed, Heins Mills and Lockridge Grindal were already serving as co-lead counsel for a class of domestic direct purchasers of those same products in *In re Monosodium Glutamate Antitrust Litigation*, MDL Docket No. 1328 ("domestic purchaser action").[3]

A mediation in the domestic purchaser action took place on June 19, 2003 in Minneapolis, Minnesota at the offices of Dorsey & Whitney LLP.[4] Lawyers for both sides attended, as well as multiple Cheil employees with settlement authority. Special Master John Borg presided over the mediation.[5]

Because the Cheil defendants wanted any settlement to bring as much closure to the food flavor enhancer litigation as possible, it was important for Cheil to settle both the domestic and foreign direct purchaser claims at the same time. Consequently, during the domestic purchaser mediation, the Cheil defendants proposed that the parties also discuss a settlement of the foreign purchaser action.[6] Ultimately, the parties reached separate agreements on both actions.[7]

The material terms of the *Inquivosa* settlement agreement reached on June 19, 2003 have never been disputed; instead, the only argument presented by Plaintiffs is that they should not be held to the agreed-upon terms because they did not receive a courtesy copy of the final, signed documentation of that agreement. The undisputed terms are:

---

[3] *See* Reece Dec. at ¶ 19, and Exhibit 2 to the Reece Dec.

[4] *See* Declaration of Barry F. McNeil at ¶ 4 ("McNeil Dec.").

[5] *Id.*

[6] *See* McNeil Dec. at ¶ 5; *see also* Declaration of Ju Myung Hwang at ¶ 5 ("Hwang Dec.").

[7] *Id.*

Upon occurrence of two contingencies, Cheil would, in exchange for a worldwide release of claims based on direct purchases of MSG and nucleotides, pay $1 million to Plaintiffs and provide cooperation to Plaintiffs as part of Plaintiffs' attempts to pursue claims against other defendants. Stated generally, the contingencies that triggered the parties' obligations were (1) that Plaintiffs' complaint survive a Rule 12(b)(6) motion to dismiss and (2) that the Court certify a class as sought in Plaintiffs' complaint. At the June 2003 mediation session, both parties expressly informed the other that they accepted the terms of that agreement.[8]

## B. The parties have repeatedly reiterated and confirmed the June 2003 settlement.

### 1. In July 2003, Cheil asked for, and received, explicit confirmation from Plaintiffs' counsel of the terms of settlement.

On July 2, 2003, Cheil's counsel set the agreement out on paper and forwarded that document to Plaintiffs' counsel.[9] Because of Plaintiffs' counsel's request that the agreement be kept for the time being in an informal format, the initial documentation was provided in the form of a letter.[10] Plaintiffs have never alleged that the July 2 letter misstated the agreement in any way.

In fact, Plaintiffs' counsel explicitly confirmed the accuracy of the July 2, 2003 letter. Because it was important for Cheil to ensure that both parties recognized that the foreign purchaser action had been settled before the domestic action settlement

---

8 *See* McNeil Dec. at ¶¶ 5-6, Hwang Dec. at ¶ 5, and Declaration of Ronald W. Breaux at ¶ 5 ("Breaux Dec.").

9 *See* McNeil Dec. at ¶ 7, and Exhibit 1 to the McNeil Dec., which is a true and correct copy of that correspondence.

10 *Id.*

agreement was presented to the Court for possible preliminary approval, Cheil's counsel contacted Plaintiffs' counsel to inquire about the status of the July 2 documentation.[11] In response, Sam Heins, co-lead counsel for Plaintiffs, telephoned Barry McNeil, Cheil's lead counsel, on July 15, 2003.[12] At the outset of that conversation, Mr. McNeil reminded Mr. Heins that, from Cheil's viewpoint, the domestic and foreign purchaser lawsuits were inextricably intertwined.[13] Mr. Heins responded that he understood that was Cheil's position and confirmed that the letter documentation forwarded on July 2 accurately recounted the agreement reached in Minnesota.[14] Relying on this express confirmation, Mr. McNeil authorized Plaintiffs' counsel to proceed with presenting the domestic purchaser settlement for preliminary approval.[15]

After that conversation, counsel for the parties continued the process of documenting the agreement. This involved multiple conversations among counsel for both parties about the formatting of the settlement and efforts to wordsmith several components, but not a single conversation (or even comment) about whether an agreement had in fact been reached.[16]

**2. On November 5, 2003, the settlement was announced in open court.**

Because it was undisputed that the parties had reached an agreement, Ron Breaux, an attorney representing Cheil, informed Plaintiffs' co-lead counsel that he planned to

---

11 *See* Breaux Dec. at ¶ 7; McNeil Dec. at ¶ 8.

12 *See* McNeil Dec. at ¶¶ 8-9.

13 *Id.* at ¶ 9.

14 *Id.*

15 *Id.*

16 *See* Reece Dec. at ¶ 7; Breaux Dec. at ¶ 8.

inform the Court during a status conference scheduled for November 5, 2003 that Cheil had reached a settlement agreement with Plaintiffs in the foreign purchaser action.[17] At the courthouse before the hearing, Mr. Heins discussed that issue with Mr. Breaux.[18] Far from questioning whether there was an agreement, Mr. Heins agreed that it was appropriate to inform the Court that a settlement had been reached, but advised Mr. Breaux that, because of a recently-filed competing foreign purchaser action in the Southern District of New York, Mr. Breaux should not say much about the timetable under which the parties would submit the agreement to the Court for approval.[19] Mr. Heins also explained the basis for that recommendation: he was concerned that the attorney representing the plaintiffs in the competing class action might attempt to challenge the then pending request of Plaintiffs' counsel to be co-lead counsel in the *Inquivosa* action.[20] Mr. Heins suggested that the parties should wait until after the Court entered an order appointing lead counsel before filing papers related to our settlement.

During the hearing, which involved significant discussion related to how the foreign purchaser action should proceed, Mr. Breaux honored Mr. Heins' request and only informed the Court that the Cheil defendants had reached a settlement agreement in the foreign purchaser action, but did not discuss the timing of when the parties would submit the settlement for approval.[21] At least four lawyers representing Plaintiffs entered

---

[17] *See* Breaux Dec. at ¶ 9.

[18] *Id.* at ¶ 10.

[19] *Id.* at ¶ 11.

[20] *Id.* at ¶ 12.

[21] *Id.* at ¶¶ 13-14, and attached Exhibit 1 to the Breaux Dec. at page 13-14, which is a true and correct copy of the transcript of the November 5, 2003 status conference.

appearances at the hearing. None objected to that statement; none sought to clarify that the settlement agreement needed any additional action by Cheil for completion; in fact, none sought to limit that statement in any way.[22]

After the hearing, counsel for Cheil met with several of Plaintiffs' counsel, including Sam Heins and Dick Lockridge, and discussed, among other things, the putative class action brought on behalf of foreign direct purchasers of MSG and nucleotides that had been recently filed in the Southern District of New York.[23] Again, everybody acted in accordance with the shared understanding that a settlement had been reached, and not a single person expressed any question about the existence of an agreement or whether additional steps were needed to implement that agreement.

**3. In March 2004, both parties executed a written document memorializing the agreement.**

During November and December 2003, the parties finalized the documentation of the agreement. On December 12, 2003, David Reece, one of the attorneys representing Cheil, forwarded revised documentation to the office of Joe Bruckner, one of Plaintiffs' attorneys.[24] In January 2004, Mr. Reece spoke with Mr. Bruckner by telephone to inquire as to the status of the papers.[25] Mr. Bruckner stated that he agreed the papers were appropriate and that he was waiting to hear back from Sam Heins' office.[26] On January 22, 2004, Mr. Reece and Mr. Bruckner spoke again by telephone. Mr. Bruckner

---

22 *Id.*

23 *See* Breaux Dec. at ¶ 15; *see* Reece Dec. at ¶ 10.

24 *See* Reece Dec. at ¶ 11.

25 *Id.* at ¶ 12.

26 *Id.*

confirmed that Plaintiffs' counsel agreed with the papers Mr. Reece had forwarded on December 12, 2003. Mr. Bruckner and Mr. Reece briefly discussed the appropriateness of removing what was then paragraph 31 of the settlement agreement that was to be attached to the "Letter Agreement."[27] Mr. Reece informed Mr. Bruckner that he would forward finalized "clean copies" of the documents to Mr. Bruckner and wait to receive the executed copies from Plaintiffs' counsel.[28] He did so on February 20, 2004.[29] On February 23, 2004, Mr. Bruckner sent a copy of the letter agreement fully executed by both of Plaintiffs' counsel, but that copy had several inadvertent formatting problems.[30] Mr. Reece informed Mr. Bruckner's office of those errors, and Mr. Bruckner sent a corrected copy of the written documentation again fully executed by both of Plaintiffs' counsel on March 1, 2004.[31] Barry McNeil, counsel for Cheil, executed the letter agreement on March 12, 2004.[32]

**4. The settlement agreement was reiterated multiple times in the notification to the MDL Panel.**

As noted above, in October 2003, a second purported foreign purchaser action was filed in the Southern District of New York by different Plaintiffs' counsel ("the New York action"). On November 10, 2003, CJ America filed a Notice of Related Action with the MDL Panel because the New York action was a "tag-along" action to this case.[33]

---

27 *Id.* at ¶ 13.

28 *Id.*

29 *Id.* at ¶ 14.

30 *Id.* at ¶ 15.

31 *Id.* at ¶ 16.

32 *See* McNeil Dec. at ¶ 11, and Exhibit 2 to the McNeil Dec., which is a true and correct copy of the agreement.

33 *See* Reece Dec. at ¶ 20, and Exhibit 4 to the Reece Dec.

On January 27, 2004, the plaintiffs in the New York action notified the Panel and interested parties that they opposed consolidation of the New York action with the other federal food flavor enhancer actions in the District of Minnesota.[34] Likewise, on January 20, 2004, the New York action plaintiffs filed a motion to transfer *Inquivosa* to the Southern District of New York and consolidate it with the New York action.[35] CJ America, Daesang America, and the *Inquivosa* plaintiffs all filed papers opposing transfer of *Inquivosa* to the Southern District of New York and supporting consolidation of the New York action with the remaining federal food flavor enhancer actions in the District of Minnesota.[36]

On February 16, 2004, CJ America informed the MDL Panel that Cheil and the *Inquivosa* plaintiffs had entered a settlement agreement in *Inquivosa*.[37] Plaintiffs' counsel here (Messrs. Heins, Lockridge and Bruckner), as counsel affected by the MDL proceeding, were copied on that brief.[38] Once again, Plaintiffs' counsel did not question that second public announcement of the *Inquivosa* settlement. Indeed, Plaintiffs' counsel filed MDL materials on March 3, 2004 that did not contradict that disclosure, thus once again confirming that the parties had reached a settlement agreement.[39]

On March 2, 2004, the day Cheil's counsel received the March 1, 2004 memorialization of the *Inquivosa* settlement agreement from Plaintiffs' counsel, Cheil

---

34 *See* Reece Dec. at ¶ 21, and Exhibit 5 to the Reece Dec.

35 *See* Reece Dec. at ¶ 22, and Exhibit 6 to the Reece Dec.

36 *See* Reece Dec. at ¶¶ 22, 23, 24 and 25, and Exhibits 7, 8, 9 and 10 to the Reece Dec.

37 *See* Exhibit 8 to the Reece Dec. at p. 11, n.39.

38 *See Id.* at Proof of Service.

39 *See* Reece Dec. at ¶ 27, and Exhibit 11 to the Reece Dec.

made a third public announcement of the fact of settlement. In its response to the New York plaintiffs' attempt to vacate a conditional transfer order transferring the New York action to the District of Minnesota, Cheil reiterated to the MDL Panel that it had entered a settlement agreement in *Inquivosa* by incorporating the same announcement it made in its earlier MDL pleading.[40] Again, Plaintiffs' counsel were copied on that brief and did not object to that statement in any way, despite their obligation to inform the Panel of any development in the litigation that might impact the Panel's decision.[41]

## III.
## ARGUMENT AND AUTHORITIES

Despite the repeated instances in which both parties have clearly and explicitly expressed their understanding that the parties had entered into a settlement agreement, and despite the overwhelming judicial preference in favor of settlements, Plaintiffs now seek to dishonor their agreement. For any one of multiple reasons, Plaintiffs' argument has no basis in fact or in law. There is simply no basis to permit Plaintiffs to repudiate a settlement agreement that has been repeatedly confirmed by the parties, announced in open court and other judicial pleadings, fully recounted in a writing signed by both parties, and relied on by Cheil.

---

[40] *See* Reece Dec. at ¶ 28, and Exhibit 12 to the Reece Dec., at p. 3; *also see* Reece Dec. at ¶ 29, and Exhibit 13 to the Reece Dec., at p. 3, n.4.

[41] *Id.*

## A. The parties had an enforceable settlement agreement in June 2003.

"[A] written agreement is not a prerequisite to the enforcement of a settlement."[42] Likewise, even if an oral contract previously reached is to be reduced to writing, enforcement is not dependent upon execution of the written document.[43] "If the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract …."[44] Under such circumstances, the oral contract will be considered binding absent a party's declaring its intention not to be bound until the signing of the formal agreement.[45]

To constitute a full and enforceable oral settlement, there must only be such a definite offer and acceptance that it can be said that there has been a meeting of the minds or manifestation of assent on the essential, or material, terms of the agreement.[46] The fact

[42] *Schumann v. Northtown Ins. Agency, Inc.*, 452 N.W.2d 482, 483 (Minn. App. 1990); *see Sabri v. Sabri*, C4-99-1844, 2000 WL 1051970, at *2 (Minn. App. Aug. 1, 2000) ("A settlement agreement need not be in writing and will be enforced when the facts show that the required contractual elements have been met."); *Johnson v. Sitzmann*, 413 N.W.2d 541, 544-45 (Minn. App. 1987) (holding that oral acceptance of settlement offer was enforceable even where party subsequently refused to sign written agreement), *review denied* (Minn. Dec. 22, 1987); *Erickson v. Lindstrom*, No. CX-93-443, 1993 WL 318923, at *1 (Minn. App. Aug. 24, 1993) ("[T]he trial court properly found the parties' settlement was valid and enforceable although it was never reduced to a writing."); *Big Fish Records, Inc. v. Christianson*, No. CX-97-94, 1997 WL 396218, at *1 (Minn. App. July 15, 1997) ("It is not essential that a settlement agreement be in writing; an oral agreement will be enforced when the facts demonstrate that the required contractual elements have been met.").

[43] *Asbestos Products, Inc. v. Healy Mechanical Contractors, Inc.*, 235 N.W.2d 807, 809 (Minn. 1975); *Massee v. Gibbs*, 210 N.W. 872, 873 (Minn. 1926).

[44] *Massee*, 210 N.W. at 873; *see also Asbestos Products*, 235 N.W.2d at 809 (stating that "[w]here the parties have assented to all the essential terms of the contract and proceed to perform in reliance upon it, the mere reference to a future contract in writing will not negative the existence of the present, binding contract").

[45] *TNT Properties, Ltd. v. Tri-Star Developers LLC*, 677 N.W.2d 94, 100 (Minn. App. 2004).

[46] *Jallen v. Agre*, 264 Minn. 369, 373 (1963); *Simmons, Inc. v. Koronis Parts, Inc.*, No. 00-1984ADMRLE, 2002 WL 1347401, at *2 (D. Minn. June 18, 2002).

that details may remain for later discussion and agreement cannot be used to abrogate an otherwise valid agreement.[47]

That this agreement is legally enforceable can best be seen by reviewing case that enforces settlement agreements in situations far less clear than is the case here. For example, in *Worthy v. McKesson Corp.*,[48] the Eighth Circuit enforced an oral settlement agreement against a plaintiff who argued that the agreement was unenforceable because he never consented to many of the terms that were outlined in the written draft of the agreement. After the plaintiff filed suit, the parties entered into an oral settlement agreement resolving the plaintiff's employment discrimination claim.[49] The defendant then began the process of preparing formal settlement documents reflecting the terms of the oral agreement.[50] In the meantime, the plaintiff consulted a different attorney, who advised him that he should not have settled the case.[51] The plaintiff attempted to back out of the settlement and refused to sign the written documents.[52] He claimed, *inter alia*, that no mutual assent existed because he never agreed to many of the terms in the written draft of the agreement.[53] However, the Eighth Circuit affirmed the district court's order enforcing the agreement, reasoning:

---

47 *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1027 (D. Minn. 2003) (citations and internal quotation marks omitted); *see Hill v. Okay Constr. Co.*, 252 N.W.2d 107, 114 (Minn. 1977) (reasoning that, for a contract to be specifically enforced, the parties need not have agreed on every possible point; instead, the law requires only that the parties' intent as to fundamental terms be reasonably certain); *Wendland v. Blaine*, No. C4-88-1074, 1988 WL 113749, at *4 (Minn. App. Nov. 01, 1988) (same).

48 756 F.2d 1370 (8th Cir. 1985).

49 *Id.* at 1372.

50 *Id.*

51 *Id.*

52 *Id.*

53 *Id.* at 1372-73.

> As to the general release of all claims, … the district court properly found this was [orally] agreed to by [the plaintiff]. As to other terms, we do not believe they are so significant that they can be used to abrogate the agreement. "[T]he fact that the parties left insubstantial matters for later negotiation … does not vitiate the validity of the agreement reached." Here, all material terms were [orally] agreed to by the parties.[54]

Such a result is all the more compelling here, where the settlement agreement was announced in open court without objection and in fact with explicit advance consent of Plaintiffs' counsel. *See, e.g., Visiting Nurse Association, St. Louis v. VNAHealthcare, Inc.*, 347 F.3d 1052 (8th Cir. 2003) (enforcing settlement agreement, noting in particular that the parties had contacted the court to cancel a hearing because the parties believed there was a settlement).

**B. Settlement is further required because Plaintiffs confirmed and ratified the agreement on multiple occasions, including in open court.**

As explained above, after entering the settlement agreement in June 2003, Plaintiffs ratified and confirmed it on multiple occasions:

- First, Plaintiffs explicitly ratified the agreement in a July 15, 2003 telephone conversation and in subsequent communications with Cheil's counsel.

---

[54] *Id*. at 1373; *see also Visiting Nurse Association, St. Louis v. VNAHealthcare, Inc.*, 347 F.3d 1052 (8th Cir. 2003); *Mueller v. Guardian Life Ins. Co*., 143 F.3d 414 (8th Cir. 1998) (enforcing oral settlement agreement despite the fact that the terms were not reduced to writing and one party disputed that its attorney had the authority to settle); *Worthy v. McKesson Corp*., 756 F.2d 1370 (8th Cir. 1985) (refusing to set aside oral settlement agreement on the basis that one party did not knowingly agree to its terms and that his attorney did not have authority to settle, and reasoning that the underlying motive for the defendant in attempting to get out of the agreement was that is was disadvantageous to him); *Fedders Corp. v. David Distributing Co*., 710 F.2d 452 (8th Cir. 1983) (enforcing oral settlement agreement despite one party's claim that its attorney did not have authority to settle); *Transclean Corp. v. Motorvac Techs., Inc.*, No. 01-287, 2002 WL 31185886 (D. Minn. Sept. 30, 2002) (enforcing oral settlement agreement despite the defendants' contention that there was no agreement on material terms, counsel did not intend to be bound prior to execution of written agreement, and plaintiffs imposed a condition precedent that never occurred); *Bergstrom v. Sears, Roebuck & Co*., 532 F. Supp. 923 (D. Minn. 1982) (enforcing oral settlement agreement despite the defendant's contention that the oral agreement was contingent upon execution of a written memorial of the agreement, that defendant's counsel did not have authority to enter into the agreement, and that the agreement was not complete enough to be enforced).

- Plaintiffs further confirmed and ratified the settlement agreement when Plaintiffs' Co-Lead Counsel agreed that it was appropriate to disclose the settlement to the Court and then did not object when that disclosure was made before this Court and in subsequent judicial pleadings; and

- Plaintiffs confirmed and ratified the agreement yet again in March 2004 when Plaintiffs' Co-Lead Counsel executed a written document memorializing the settlement agreement.

These facts are even more compelling than those in which courts have routinely enforced settlement agreements.[55] Here, not only has Plaintiffs' counsel repeatedly confirmed settlement to Cheil, but also explicitly authorized Cheil's counsel to disclose the settlement to this Court. Plaintiffs' attempt to renege on that agreement simply cannot be squared with Plaintiffs' counsel's actions before this Court.

In fact, the doctrine of judicial estoppel precludes Plaintiffs' attempt to avoid this settlement agreement. To put it simply, Plaintiffs' current posture runs afoul of the most basic precept: a court is entitled to rely on representation made to it in open court by a party's counsel. Under the doctrine of judicial estoppel, where a party has made a statement on the record in open court, it may not later take a contrary position. *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001). *See also Leonard v. S.W. Bell Corp. Disability Income Plan*, 341 F.3d 696, 702 (8th Cir. 2003) ("The purpose of the doctrine of judicial estoppel is to protect the integrity of the judicial process…. In general, the doctrine of judicial estoppel operates to prohibit[] a party from taking inconsistent positions in the same or related litigation.").

[55] *See, e.g.*, *St. Paul Police Federation v. City of St. Paul*, No. A03-2010, 2004 WL 1381696 (Minn. App. June 22, 2004) (enforcing a settlement agreement that was reached and then memorialized in a letter from one party to the other); *Schulte v. LeClaire*, No. C7-99-1000, 2000 WL 16302 (Minn. App. Jan. 11, 2000) (finding a valid settlement agreement where the parties both manifested assent to the oral agreement and one party later sent the other a letter confirming in writing the terms of the oral agreement).

This precept applies with full force in this setting, as clearly illustrated by a case raising very similar facts. In *Correia v. DeSimone*, 614 N.E.2d 1014 (Mass. App. 1993), the parties announced in open court that they had reached a settlement, and one party later tried to repudiate it. *Id*. at 1015. The trial court enforced the settlement agreement, and the appellate court affirmed that decision, reasoning:

> "The primary concern of the doctrine of judicial estoppel is to protect the integrity of the judicial process." *That concern would be ill served if those intimately involved in that process, litigants, attorneys, and judges, could not rely on declarations of settlement made to the court*…. It defies logic and fundamental principles of fairness to allow a represented party who has sought justice in a forum to contradict and undermine an agreement it reached and acknowledged in that same forum, especially [if] the judge [or] other litigants appear to have relied on that acknowledgement.

*Id*. at 1016 (quoting *United States v. Levasseur*, 846 F.2d 786, 792 (1st Cir.1988) (emphasis added).

The same reasoning applies here, and Plaintiffs should not be permitted to play "fast and loose with the courts" by "deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. at 750 (citations and internal quotation marks omitted). Enforcement of judicial estoppel to preclude the plaintiffs from disavowing the existence of the agreement is necessary to "protect the essential integrity of the judicial process." *Id*. (internal quotation marks omitted).

Plaintiffs' ratification and confirmation of this settlement agreement did not end with this announcement in open court. The strong policy considerations discussed above are further implicated by the fact that, after this announcement in open court, Plaintiffs'

Co-Lead Counsel executed the signed documentation. They have no basis at all to claim there was no settlement.[56]

Finally, Plaintiffs' legal argument is made even more bizarre given that what Plaintiffs now claim to be an "offer" was actually correspondence that Cheil's counsel had forwarded to Plaintiffs' counsel that was then put on Plaintiffs' letterhead. Thus, if anything, it was *Cheil* who had reason to wait for confirmation from Plaintiffs' counsel, a confirmation it received yet again on March 1, 2004 when it received the letter signed by both Plaintiffs' Co-Lead Counsel.

**C. Plaintiffs' claims are merely an improper attempt to escape the terms of the valid agreement.**

The true motivation behind Plaintiffs' attack on the settlement agreement is that Plaintiffs' counsel now believes they should have struck a better deal. The law properly rejects such attempts. A recent case from this district reflects this disapproval. In *Transclean Corp. v. Motorvac Technologies*,[57] the defendant, Motorvac orally offered to settle with Transclean. Transclean rejected the offer but made two counteroffers.[58] Motorvac's counsel called and verbally represented to Transclean's attorney that Motorvac accepted the offer.[59] Transclean's counsel sent an e-mail the same day confirming the earlier-reached agreement.[60] When the parties attempted to reduce the

---

[56] *Schmakel v. Schmakel*, C0-99-1629, 2000 WL 557970, at *2 (Minn. App. 2000) (When parties reduce the terms of their agreement to writing, "[a] party who signs [the written] contract is bound by it unless the other party has reason to know that the party signing the contract did not read or understand its content.")

[57] No 01-287, 2002 WL 31185886 (D. Minn. Sept. 30, 2002). The party seeking to avoid the settlement in that case, curiously enough, was also represented by Heins Mills & Olson, Plaintiffs' counsel in this case. *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

agreement to writing, plaintiffs indicated that Motorvac's counsel had orally accepted the terms of a draft Transclean sent to Motorvac.[61] In response, Transclean's counsel represented that he "could not have done so, because the terms of the [draft] were unacceptable to Motorvac."[62] Motorvac's counsel then informed Transclean that it "would no longer entertain the proposed settlement," forcing the plaintiff to file a motion requesting that the Court enforce the agreement.[63]

In asserting that the settlement agreement was unenforceable, Motorvac's counsel argued that no valid settlement agreement was ever formed.[64] However, the Court rejected Motorvac's argument, finding that all material terms were agreed upon.[65] It concluded that the only material terms of the agreement were (a) that Motorvac would pay the plaintiffs $1,001,207, that (b) in exchange, the plaintiffs would dismiss their patent infringement suit against Motorvac, and (c) that Motorvac would not receive a going forward license.[66]

Motorvac contended that other material terms existed that the parties never successfully agreed upon, such as which machines would be released and whether Motorvac would be permitted to contest the validity of Transclean's patents in the future.[67] However, the Court concluded,

---

61 *Id.*

62 *Id.*

63 *Id.*

64 *Id.* at 8.

65 *Id.*

66 *Id.*

67 *Id.*

> [d]espite MotorVac's claims that these issues were 'deal breakers,' the record shows that such terms were not actually material. These issues were not discussed before plaintiffs made their settlement offer, and nothing indicates that MotorVac was especially concerned with these terms after it accepted, until plaintiff filed the motion to enforce the settlement.[68]

MotorVac'c counsel additionally claimed that it could not be bound by the agreement because "it did not intend for it to be bound until a writing was signed."[69] The Court rejected this argument, however, finding that "[t]he actions of MotorVac's counsel … demonstrated an intent to be immediately bound," because MotorVac's counsel "did not qualify the acceptance in any way," and in fact "requested that plaintiffs immediately send a written confirmation of the offer and acceptance."[70]

As in *Transclean*, there can be no doubt that both parties here intended to be and are bound by the settlement agreement reached in June 2003 and memorialized in a document signed by both parties in March 2004.

**D. The law rightly favors enforcement of the settlement agreement between Cheil and the foreign direct purchasers.**

"A [federal] district court has the inherent power to summarily enforce a settlement agreement as a matter of law …."[71] Here, that power is particularly strong because Minnesota courts have uniformly recognized that "[s]ettlement of disputes without litigation is highly favored, and such settlements will not be lightly set aside by

---

68 *Id.*

69 *Id.* at *9.

70 *Id.*

71 *Gatz v. Southwest Bank of Omaha,* 36 F.2d 1089, 1095 (8th Cir. 1988); *Simmons, Inc. v. Koronis Parts, Inc.*, No. 00-1984ADMRLE, 2002 WL 1347401, at *2 (D. Minn. June 18, 2002) ("It is well-established that a district court possesses the inherent or equitable power summarily to enforce an agreement to settle a case pending before it.").

the courts."[72] Thus, "[s]ettlement agreements are presumed to be valid in Minnesota," and to defeat such an agreement, a party must "present[] to the court sufficient evidence to overcome that presumption."[73] Because of Minnesota's broad policy in favor of settlement agreements, when a dispute over enforcement of a settlement agreement arises, Minnesota courts overwhelmingly find in favor of the party seeking to enforce the agreement.[74] As explained above, Plaintiffs seek to flout these well-founded policies by seeking to repudiate a settlement they have ratified in both written documents and in open court.

Finally, enforcement of this settlement agreement is further required because Cheil relied on Plaintiffs' explicit confirmation and ratification of the settlement agreement. Plaintiffs knew, because they were expressly informed, that Cheil required confirmation that the foreign purchaser settlement was finalized before Cheil would agree that the domestic purchaser settlement could be presented for preliminary approval. The law properly prohibits Plaintiffs from giving that confirmation and then repudiating it after

---

72 *Johnson v. St. Paul Ins. Co.*, 305 N.W.2d 571, 573 (Minn. 1981); *JCB Properties, LLC*, No. C9-99-172, 1999 WL 561937, at *1 (Minn. App. Aug. 3, 1999) ("The settling of lawsuits without trial is highly favored and will not be lightly set aside by the courts."); *Beach v. Anderson*, 417 N.W.2d 709, 711-12 (Minn. App. 1988), *review denied* (Minn. Mar. 23, 1988) ("Settling suits without trial is greatly favored, and such agreements will not lightly be set aside by Minnesota courts."); *First State Bank v. McNally*, No. CX-02-726, 2002 WL 31749164, at *2 (Minn. App. Dec. 10, 2002) ("Settlement agreements are highly favored….").

73 *Skalbeck v. Agristor Leasing*, 384 N.W.2d 209, 210 (Minn. App. 1986); *Johnson*, 305 N.W.2d at 573. ("The party seeking to avoid a settlement has the burden of showing sufficient grounds for its vacation.").

74 The cases illustrating this point are legion. For a representative sample of cases with facts similar to this one, *see TNT Properties, Ltd. v. Tri-Star Developers LLC*, 677 N.W.2d 94 (Minn. App. 2004) (enforcing a settlement agreement despite one party's assertion that there was no mutual assent); *Pietsch v. Darling*, No. C0-99-1632, 2000 WL 369388 (Minn. App. 2000) (enforcing settlement agreement despite one party's claim that he did not manifest his assent to the agreement); *Big Fish Records, Inc. v. Christianson*, No. CX-97-94, 1997 WL 396218, at *1 (Minn. App. July 15, 1997) (enforcing an oral settlement agreement and rejecting one party's contention that the agreement would become effective only when signed); *Bougie by Bougie v. Hickerson*, No. C6-91-712, 1991 WL 210017 (Minn. App. Oct. 22, 1991) (enforcing settlement agreement despite one party's contention that the offer to settle was withdrawn and therefore there was no agreement).

Cheil acted in reliance on it. *See, e.g.*, *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981); *Johnson v. Sitzman*, 413 N.W.2d 541, 545 (Minn. Ct. App. 1987) (estopping an employee from asserting he did not settle his claims with employer).

## IV.
## CONCLUSION

Cheil and Plaintiffs entered an enforceable settlement agreement, and Plaintiffs' belated attempt to re-write that reality in the apparent hopes of striking a new bargain falls squarely within the type of action that has repeatedly and properly been rejected. Such a rejection is especially called for here, where the parties have both signed a document memorializing the terms of the agreement, the parties have never disputed the terms of the agreement, and Plaintiffs' efforts are premised on their complaint that they never received a courtesy copy of the final signed paper. Moreover, this attempt, grounded in a willful disregard for the clear facts related to the settlement, has unnecessarily increased the nature and expense of this litigation. In these circumstances,

it is proper for the Court to award Cheil the fees and expenses it has been forced to expend in order to enforce an agreement both parties know exists.[75]

Dated: December 29, 2004.

s/Skip Durocher
Skip Durocher (#0208966)
DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Telecopier: (612) 340-2807

Barry F. McNeil
Texas State Bar No. 13829500
Ronald W. Breaux
Texas State Bar No. 02937200
David B. Reece
Texas State Bar No. 24002810
HAYNES AND BOONE, LLP
901 Main Street, Suite 3100
Dallas, TX 75202-3789
Telephone: (214) 651-5000
Telecopier: (214) 651-5940

**ATTORNEYS FOR DEFENDANT CJ CORP., F/K/A CHEIL JEDANG CORPORATION, AND CJ AMERICA, INC.**

[75] 28 U.S.C. § 1927; *see, e.g.*, *Kramer v. Boeing Co*., 134 F.R.D. 256 (D. Minn. 1991) (awarding attomeys' fees to the defendant under § 1927 on account of the plaintiffs' attorney breaching the terms of a valid settlement agreement, which caused the defendant to have to file a motion to enforce the settlement agreement); *Ullmann v. Olwine, Connelly, Chase, O'Donnell & Weyher*, 123 F.R.D. 559 (S.D. Ohio 1987), *aff'd*, 857 F.2d 1475 (6th Cir. 1988) (awarding over $6,000 in attorneys' fees under § 1927 to the defendant after the defendant succeeded on a motion to enforce the settlement agreement).