# Exhibit 1
# to
# Declaration of
# David B. Reece

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Inquivosa S.A.; Petbowe Chemtrade Corp.; Plus Sun Co., Ltd.; and Menssing Chemiehandel & Consultants GmbH (MCC), on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Ajinomoto Company, Inc.; Orsan S.A.; Cheil Jedang Corporation; C.J. America, Inc.; Miwon Co., Ltd.; Daesang America, Inc.; Takeda Chemical Industries Ltd.; Kyowa Hakko Kogyo; and Tung Hai Fermentation Industrial Corp., n/k/a Vedan Enterprises Group,<br><br>Defendants. | MDL 00-1328 (PAM/JGL)<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>RECEIVED<br>03 MAY -1 PM 4:09<br>CLERK, U.S. DIST. COURT<br>MINNEAPOLIS |

Plaintiffs, by and through their undersigned attorneys, bring this action on behalf of themselves and all others similarly situated for damages under the antitrust laws of the United States against the above-named defendants, and demand a trial by jury. For their Class Action Complaint against Defendants, Plaintiffs allege the following:

## NATURE OF THE CASE

1. Plaintiffs bring this class action against Defendants Ajinomoto Company, Inc.; Orsan S.A.; Cheil Jedang Corporation; C.J. America, Inc.; Miwon Co., Ltd.; Daesang America, Inc.; Takeda Chemical Industries Ltd.; Kyowa Hakko Kogyo; and Tung Hai Fermentation Industrial Corp., n/k/a Vedan Enterprises Group (collectively "Defendants") under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

## JURISDICTION AND VENUE

2. Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, to recover damages and costs of suit, including reasonable attorneys' fees, against Defendants for injuries sustained by Plaintiffs and the members of the Class by reason of Defendants' violations of Section One of the Sherman Act, 15 U.S.C. § 1, as alleged in this Complaint. Jurisdiction is conferred upon this Court by 15 U.S.C. §§ 15(a) and 26, and by 28 U.S.C. § 1337.

3. Venue is proper in this district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391.

4. Each Defendant has transacted business in the United States, done an act in the United States, or caused an anticompetitive effect in the United States by an act done elsewhere.

## DEFINITIONS

5. As used in this Complaint:

1. "Class Period" is the period beginning at least as early as 1984 through 1999;

2. "MSG" means Monosodium Glutamate; and

3. "Nucleotides" means Disodium Inosinate ("DSI" a/k/a "IMP"), Disodium Guanylate ("DSG" a/k/a "GMP"), and I+G (the combination of DSI and DSG).

## PLAINTIFFS

6. Plaintiff Inquivosa S.A. is a foreign corporation domiciled in Caracas, Venezuela. Inquivosa S.A. purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

7. Plaintiff Petbowe Chemtrade Corp. is a foreign corporation domiciled in Manila, Philippines. Petbowe Chemtrade Corp. purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

8. Plaintiff Plus Sun Co., Ltd. is a foreign corporation domiciled in Taiwan. Plus Sun Co., Ltd. purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

9. Plaintiff Menssing Chemiehandel & Consultants GmbH (MCC) is a foreign corporation domiciled in Hamburg, Germany. Menssing Chemiehandel &

Consultants GmbH (MCC) purchased MSG and/or Nucleotides directly from one or more of the Defendants during the applicable Class Period.

**DEFENDANTS**

10. Defendant Ajinomoto Company, Inc. ("Ajinomoto Co.") is a Japanese corporation with its principal place of business located at 15-1, Kyobashi 1-Chome, Chuo-ku, Tokyo 104-8315, Japan. Ajinomoto Co. is the world's largest producer of MSG. Ajinomoto Co. manufactured, sold or distributed MSG and Nucleotides throughout the world, including in the United States directly or through its subsidiaries or affiliates during the time period relevant to this action. Ajinomoto Co. directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

11. Defendant Orsan S.A. ("Orsan") is a French corporation with its principal place of business located at 48 r Nesle, 80190 Mesnil Saint Nicaise, France. Orsan is owned in whole or in part by Defendant Ajinomoto Co. Orsan manufactured, sold or distributed MSG and Nucleotides in Europe and in other parts of the world during the time period relevant to this action. Orsan has set prices and allocated markets for MSG and Nucleotides pursuant to illegal agreements, and those

practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

12. Defendant Cheil Jedang Corp. ("Cheil Jedang") is a Korean corporation with its principal place of business at 500, 5ga, Namdaemoon-ro Chung-gu, Seoul, South Korea. Cheil Jedang is named herein as successor-in-interest to Cheil Foods and Chemicals, Inc. ("Cheil"), and is liable for Cheil's actions as alleged in this Complaint. Cheil Jedang or Cheil manufactured, sold or distributed MSG and Nucleotides throughout the world, including in the United States during the time period relevant to this action. Cheil Jedang directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

13. Defendant C.J. America, Inc. ("CJ America") is a New Jersey corporation with its principal place of business at 105 Challenger Road, 4th Floor, Ridgefield Park, New Jersey 07660-0511. CJ America, which is a wholly-owned subsidiary of Defendant Cheil Jedang, sold or distributed MSG and Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. CJ America has set prices and allocated markets worldwide

for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

14. Defendant Miwon Company Ltd. ("Miwon Co.") is a Korean corporation with its principal place of business at 96-48 Shinsul Dong, Tongdaemun-gu, Seoul, South Korea 130-110. Miwon Co. manufactured, sold or distributed MSG and Nucleotides throughout the world, including in the United States directly or through its subsidiaries or affiliates during the time period relevant to this action. Miwon Co. directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

15. Defendant Daesang America, Inc., f/k/a Miwon America, Inc. ("Daesang") is a New Jersey corporation with its principal place of business at One University Plaza, #407, Hackensack, New Jersey 07601. Daesang manufactured, sold or distributed MSG and Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Daesang has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct,

substantial and reasonably foreseeable adverse impact on commerce within the United States.

16. Defendant Takeda Chemical Industries Ltd. ("Takeda Chemical") is a Japanese corporation with its principal place of business at 1-1 Doshomachi 4-chome, Chuo-ku, Osaka 540-8645, Japan. Takeda Chemical manufactured, sold or distributed MSG and Nucleotides throughout the world, including in the United States directly or through its subsidiaries or affiliates during the time period relevant to this action. Takeda Chemical directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

17. Defendant Kyowa Hakko Kogyo Co., Ltd. ("Kyowa") is a Japanese company with its principal place of business at 1-6-1 Ohtemachi, Chiyoda-ku, Tokyo 100-8185, Japan. Kyowa manufactured, sold or distributed MSG and Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Kyowa directly and through affiliates that it controls, and through actions in this country and internationally, has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and

those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

18. Defendant Tung Hai Fermentation Industrial Corp., n/k/a Vedan Enterprises Group ("Tung Hai") is a Taiwan corporation with its principal place of business at 65 Hsin An Road, Shalu, Taichung Hsien, Taiwan. Tung Hai manufactured, sold or distributed MSG and Nucleotides in various parts of the world, including in the United States during the time period relevant to this action. Tung Hai has set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements, and those practices were designed to have and in fact did have a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States.

## CO-CONSPIRATORS

19. Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint (the "Co-Conspirators") have participated in the violations of the federal antitrust laws for which Plaintiffs seek relief, and have performed acts and made statements in furtherance thereof.

## BACKGROUND

20. Nucleotides are naturally occurring flavor enhancers found in many plants and animal cells. The most common of these flavor enhancers is monosodium glutamate ("MSG") which has been manufactured since 1909. Shortly thereafter, the

nucleotide 5'-inosinate ("DSI" or "IMP") was found. IMP has flavor-enhancing properties similar to MSG. In 1960, 5-guanylate ("DSG" or "GMP") was discovered.

21. MSG is the sodium salt of the naturally occurring amino acid, L-glutamic acid. MSG is the largest volume commercially produced amino acid salt in the world. MSG is sold as a fine white crystal substance and, when added to foods, provides a similar flavoring function as the glutamate that occurs naturally in food. MSG is used, *inter alia*, as a flavor enhancer in gravies, sauces, meats, poultry, seafood, Asian cuisine, soup stocks and bases, snacks, and prepared vegetables, among other things. All references to MSG in this complaint include the product L-glutamic acid.

22. IMP and GMP are nucleotide-based flavor enhancers for food, and create the same taste effect as MSG. IMP is found naturally in meat, poultry and fish. GMP is the dominant taste component in mushrooms. IMP and GMP are commercially produced by fermenting glucose. IMP and GMP are alternatives for people seeking to avoid glutamate-based flavor enhancers like MSG. IMP and GMP often are used in conjunction with MSG, and when so used they extend and multiply the flavoring effect of MSG.

23. IMP and GMP are "stand-alone" flavor enhancers, but often are combined to create a powerful flavor enhancer called "I+G."

24. I+G may be used as an alternative to MSG, or it may be combined with MSG. When I+G and MSG are combined, the result is a synergistic effect which dramatically increases the flavor-enhancing effect of MSG. For example, a combination of 95% MSG and 5% I+G intensifies flavor enhancement by a factor of five. Thus, less MSG is required to create the desired flavor enhancement.

25. In the early to mid-1990s, health and safety concerns began to arise concerning thc use of MSG in foods. "Chinese restaurant syndrome" was the term coined to describe various adverse physical reactions attributed to the consumption of MSG. Despite medical reports certifying the safety of MSG, the demand for MSG in the United States began to level off. As a result, there was an oversupply of MSG, yet MSG prices rose.

26. As a result of these health claims regarding MSG, Defendants began to promote alternatives to MSG, including IMP and GMP, and the combination I+G.

27. Demand for IMP and GMP has increased significantly in the last 10 years. Much of the increased demand resulted from the concerns over certain side effects of MSG. Since IMP and GMP do not cause similar side effects, many producers have turned to these Nucleotides either to lessen the amount of MSG used in their products, or to replace MSG completely in foods that contain glutamate.

28. Another driving force of demand for these Nucleotides has been the growth in the food products market during the relevant period herein. IMP and GMP

are used to smooth out the texture of reduced fat foods which have been growing in popularity since the early 1990s. Another change in the last decade has been the increased desire for processed or convenience foods. These products commonly contain IMP and GMP.

29. Defendants set their prices for MSG and Nucleotides using standard price lists, press releases, and announcements in trade publications.

## CRIMINAL PLEAS/INFORMATION

30. In September 1999, the Antitrust Division of the United States Department of Justice (the "Justice Department") announced that Takeda Chemical was cooperating in an investigation by the Justice Department into the food flavor enhancers industry.

31. In August 2001, Defendant Ajinomoto Co. agreed to plead guilty to criminal charges brought by the United States for its participation in a conspiracy to violate the U.S. antitrust laws for Nucleotides sold or distributed in the U.S. Ajinomoto Co. admitted participating in a conspiracy that began as early as July 1992 and continued until at least August 1996. In addition, a federal grand jury in Dallas indicted Mr. Tamon Tanabe, a Japanese citizen and executive of Ajinomoto Co., for participating in the same conspiracy. Mr. Tanabe remains a fugitive from justice.

32. In August 2001, Defendant Cheil Jedang agreed to plead guilty to criminal charges brought by the United States for its participation in a conspiracy to

violate U.S. antitrust laws for Nucleotides sold or distributed in the U.S. Cheil Jedang admitted to participating in a conspiracy that began as early as July 1992 and continued until at least August 1996.

33. In August 2001, Daesang Japan, Inc., an affiliate of Defendant Miwon Co., Ltd., ("Miwon Co.") and Daesang America, Inc., f/k/a Miwon America, Inc. ("Daesang America"), agreed to plead guilty to criminal charges brought by the United States for its participation in a conspiracy to violate the U.S. antitrust laws for Nucleotides sold or distributed in the U.S. Daesang Japan, Inc. admitted participating in a conspiracy that began as early as July 1992 and continued until at least August 1996.

34. Defendant Takeda Chemical cooperated with and produced evidence to the United States government in its investigation of an antitrust conspiracy related to Nucleotides and other food flavor enhancers sold or distributed in the U.S. in exchange for a reduced penalty in the Vitamins Antitrust Litigation.

35. In addition, in December 2002, the European Commission fined Ajinomoto Co., Cheil Jedang Corp. and Daesang Corp. respectively € 15.54 million, € 2.74 million and € 2.28 million each for participating in a price-fixing cartel in Nucleotides. Takeda Chemical Industries Ltd. was also found to be part of the cartel, but it was granted full immunity from fines for revealing the existence of the illegal agreement to the Commission.

## CLASS ACTION ALLEGATIONS

36. Plaintiffs bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class:

> All persons (excluding federal, state and local governmental entities and political subdivisions, and Defendants, their respective parents, subsidiaries and affiliates) who directly purchased MSG or Nucleotides during the period beginning at least as early as 1984 through 1999, outside the United States from any of the Defendants or their affiliates or their Co-Conspirators.

37. Plaintiffs do not know the exact size of the Class since such information is exclusively in the control of Defendants. However, due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members, and that they are sufficiently numerous and geographically dispersed so that joiner of all Class members is impracticable.

38. Plaintiffs' claims are typical of the claims of the members of the Class, because Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants and their Co-Conspirators as alleged in this Complaint.

39. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class. In addition, Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

40. Questions of law and fact common to members of the Class predominate over any questions which may affect only individual members. Common questions of law and fact include:

(a) whether Defendants and their Co-Conspirators engaged in a combination or conspiracy to raise, fix and maintain prices of MSG or Nucleotides sold throughout the United States and foreign nations;

(b) whether Defendants and their Co-Conspirators engaged in a combination or conspiracy to allocate among themselves customers of MSG or Nucleotides throughout the United States and foreign nations;

(c) whether Defendants and their Co-Conspirators engaged in a combination or conspiracy to establish quotas among Defendants and their Co-Conspirators for sales of MSG or Nucleotides throughout the United States and foreign nations;

(d) whether Defendants and their Co-Conspirators engaged in a combination or conspiracy to refrain from submitting bids, or to submit collusive, non-competitive, and rigged bids to supply MSG or Nucleotides to various customers located throughout the United States and foreign nations;

(e) whether Defendants' conduct constitutes a violation of the Sherman Act, 15 U.S.C. § 1;

(f) whether Defendants' practices were designed to have, and in fact did have, a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States;

(g) the duration and extent of the combination or conspiracy alleged in this Complaint;

(h) whether the alleged combination or conspiracy had an impact on the Plaintiffs and other Class Members; and

(i) the appropriate measure of damages by which the conduct of Defendants and their Co-Conspirators injured all members of the Class.

41. Class treatment is superior to any alternatives for the fair and efficient adjudication of the controversy alleged in this Complaint. Class treatment will permit a large number of similarly situated persons around the world to prosecute common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. There are no difficulties likely to be encountered in the management of this Class action that would preclude its maintenance as a Class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

**TRADE AND COMMERCE**

42. The trade and commerce relevant to this action are the purchase and sale around the world and in the United States of MSG and Nucleotides.

43. The market for the manufacture and sale of MSG and Nucleotides is global in scope. MSG and Nucleotides produced by Defendants or their Co-Conspirators in one region of the world (e.g., Japan or Brazil) frequently are exported to another region of the world (e.g., United States or Europe) for sale. The domestic and foreign markets for the production, sale and pricing of MSG and Nucleotides are interrelated. Defendants and their Co-Conspirators recognized that interrelationship and the unitary nature of the global market in setting MSG and Nucleotides prices

and allocating customers and geographic territories. Defendants and their Co-Conspirators knew that some Class Members purchased MSG and Nucleotides for different regions in the world (e.g., United States and Europe), and thus they conspiratorially set prices and allocated customers' business among themselves in such a way as to discourage, impair or prevent some customers from being able to purchase MSG or Nucleotides in, for example, Europe at a cheaper price than they could purchase those products in the United States, or vice versa. Defendants and their Co-Conspirators kept MSG and Nucleotide prices artificially high in various regions of the world, including the United States and Europe, to ensure that purchasers could not purchase MSG or Nucleotides at lower prices in, for example, Europe to avoid paying conspiratorially set prices in the United States. Defendants' and their Co-Conspirators' MSG and Nucleotides conspiratorial pricing outside the United States made possible their cartelization, had a direct, substantial and reasonably foreseeable effect on commerce in the United States, and resulted in artificially higher conspiratorial prices and injury to Plaintiffs and others outside the United States.

44. During the Class Period, Plaintiffs and members of the Class purchased MSG and Nucleotides directly from the Defendants or their Co-Conspirators, and paid prices that were artificially inflated and fixed as a result of Defendants' conspiratorial conduct.

45. Defendants and their Co-Conspirators are located in various countries around the world and in various states throughout the United States.

46. During the Class Period, Defendants sold substantial amounts of MSG and Nucleotides in the United States across state lines in a continuous and uninterrupted flow of interstate commerce.

47. The activities of Defendants and their Co-Conspirators that are the subject of this Complaint were within the flow of, and substantially affected, interstate trade and commerce.

48. Among other unreasonable restraints on interstate trade and commerce, Defendants' combination and conspiratorial conduct artificially raised the price of MSG and Nucleotides, and deprived Plaintiffs and other members of the Class of the benefits of free and open competition in the market for MSG and Nucleotides.

## VIOLATIONS ALLEGED

49. Beginning at least as early as 1984 and continuing thereafter through 1999, Defendants and their Co-Conspirators engaged in a continuing combination and conspiracy with respect to the sale of MSG and Nucleotides in unreasonable restraint of trade and commerce, in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

50. In September 1999, the Antitrust Division of the United States Department of Justice (the "Justice Department") announced that Takeda Chemical

was cooperating in an investigation by the Justice Department into the food and flavor enhancers industry.

51. The combination and conspiracy alleged in this Complaint consisted of a continuing agreement, understanding and concert of action by Defendants and their Co-Conspirators, the substantial terms of which were to raise, fix and maintain at artificially high and non-competitive levels the prices at which they sold MSG and Nucleotides in the United States and throughout the world. Defendants and their Co-Conspirators also agreed to allocate among themselves the volume of sales of MSG and Nucleotides and allocate customers of MSG and Nucleotides in the United States and throughout the world.

52. For the purpose of forming and effectuating their combination and conspiracy, Defendants and their Co-Conspirators have done those things that they combined and conspired to do, including, among other things:

> 1. participated in meetings and conversations to discuss the prices and volume of MSG and Nucleotides sold throughout the world, including in the United States;
>
> 2. agreed, during those meetings and conversations or elsewhere, to charge prices at certain levels and otherwise to artificially increase and maintain prices of MSG and Nucleotides sold throughout the world, including in the United States;
>
> 3. agreed, during those meetings and conversations or elsewhere, to allocate among themselves customers of MSG and Nucleotides throughout the world, including in the United States;

4. monitored the allocated sales and policed the compliance of their Co-Conspirators, including through arrangements to financially penalize any Co-Conspirator that sold more than their allocated share;

5. issued price announcements and price quotations in accordance with the agreements reached; and

6. agreed to conceal and keep secret their illegal agreement.

## EFFECTS

53. Defendants' combination and conspiracy has had, and will continue to have, the following effects:

1. Defendants' wrongful combination and conspiratorial conduct had a direct, substantial and reasonably foreseeable effect on commerce in the United States;

2. Prices for MSG and Nucleotides sold by Defendants and their Co-Conspirators were artificially fixed, raised, stabilized, and maintained at artificially high and non-competitive levels in the United States and throughout the world;

3. Plaintiffs and the members of the Class paid prices for MSG and Nucleotides directly to Defendants and their Co-Conspirators that were artificially raised, fixed and inflated as a result of the combination and conspiratorial conduct of Defendants and their Co-Conspirators;

4. Plaintiffs and the other members of the Class were deprived of the benefits of free and open competition in the purchase of MSG and Nucleotides;

5. Price competition in the sale of MSG and Nucleotides was restrained, suppressed and eliminated; and

6. Defendants' wrongful conduct as alleged in this Complaint gives rise to a claim under Section One of the Sherman Act in that direct purchasers of MSG and Nucleotides in the United States have suffered actual or threatened injury as a result of the effects in the United States of Defendants' wrongful conduct.

54. As a proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class purchased MSG or Nucleotides directly from Defendants and their Co-Conspirators at higher prices than they would have paid but for Defendants' anti-competitive conduct, have been injured in their business or property as a result thereof, and have suffered damages in an amount presently undetermined.

## FRAUDULENT CONCEALMENT

55. Throughout the Class Period, Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

56. Defendants and their Co-Conspirators engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

57. Defendants' wrongful conduct as alleged in this Complaint was carried out in part through means and methods which were designed and intended to avoid detection, and which in fact successfully precluded detection. Although Plaintiffs exercised due diligence throughout the Class Period, they could not have discovered Defendants' unlawful scheme and conspiracy at any earlier date, because of Defendants' effective, affirmative, and fraudulent concealment of their activities.

58. The Defendants and their Co-Conspirators actively, intentionally and fraudulently concealed the existence of the combination and conspiracy from

Plaintiffs by one or more of the following affirmative acts, including acts in furtherance of the conspiracy:

(a) covert meetings in which the prices, sales, volumes of sales and markets for MSG and Nucleotides were discussed and agreed;

(b) allocating secretly among themselves customers and contracts for the sale of MSG and Nucleotides;

(c) intentionally submitting inflated bids to customers to make other bids appear legitimate;

(d) intentionally bidding purportedly on a competitive basis when in fact such bidding was the result of the collusion;

(e) instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy; and

(f) participating in meetings and conversations to monitor and enforce adherence to the agreed-on prices and market shares.

Another method by which Defendants fraudulently concealed their wrongful conduct from Plaintiffs and other members of the Class was by issuing or causing to be issued a series of statements to the public and to Plaintiffs and other members of the Class, which falsely attributed price increases for MSG and Nucleotides to factors other than Defendants' illegal scheme and wrongful conduct.

59. Additionally, Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs by providing false bids to customers in order to conceal their customer allocation scheme and other wrongful conduct.

60. Although Plaintiffs exercised all due diligence during the Class Period, Plaintiffs and the members of the Class had no knowledge of Defendants' antitrust violations until September 9, 1999, when the Justice Department publicly announced that Defendant Takeda Chemical was cooperating in an antitrust investigation in the food flavor enhancers industry, and Plaintiffs, through their counsel, conducted their own investigation.

61. Although Plaintiffs exercised all due diligence during the Class Period, Plaintiffs and the members of the Class could not possibly have discovered Defendants' unlawful scheme and conspiracy before September 1999 because of the successful deceptive practices and techniques of secrecy employed by Defendants and their Co-Conspirators to avoid detection of, and to affirmatively and fraudulently conceal, their wrongful conduct. Because Defendants' affirmative and fraudulent concealment as alleged herein was effective, there were no circumstances before September 1999 which should have led Plaintiffs to suspect the existence of Defendants' illegal price-fixing scheme.

62. Plaintiffs have exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having a reasonable suspicion of the existence of Defendants' conspiracy alleged herein, and by seeking discovery as to the matters asserted herein, to the extent permitted by law. Plaintiffs did not

discover their cause of action earlier than September 9, 1999, because Defendants' fraudulent concealment of their conspiracy was effective.

63. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their Co-Conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## COUNT I

## ANTITRUST CLAIMS

64. Plaintiffs incorporate the allegations described in Paragraphs 1 through 62 above as if fully set forth herein.

65. During the relevant time, Defendants sold and shipped substantial quantities of MSG and/or Nucleotides in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants received payment for such products across state and national boundaries. Defendants' activities, and the sale of their products, have both taken place, and have had a substantial anticompetitive effect upon, interstate commerce within the United States and foreign commerce.

66. Defendants' anticompetitive activities and their effects are in violation of both the Sherman and Clayton Acts.

67. Defendants' anticompetitive activities and their effects have caused injury to the Plaintiff Classes both inside the United States and in foreign nations.

68. Defendants' wrongful conduct as alleged in this Complaint has had a direct, substantial and reasonably foreseeable effect on commerce within the United States, in that direct purchasers of MSG and Nucleotides in the United States paid more for MSG and Nucleotides during the relevant time period than they would have in the absence of Defendants' wrongful conduct, and accordingly, have suffered actual or threatened injury to their business or property as a result of Defendants' wrongful conduct.

69. Plaintiffs and the members of the Class have been injured in their business or property as a result of Defendants' wrongful conduct in that during the relevant time period they paid prices for MSG and Nucleotides directly to Defendants and their Co-Conspirators that were artificially raised, fixed and inflated as a result of the conspiracy among Defendants and their Co-Conspirators.

70. Plaintiffs and the Plaintiff Class seek damages for these injuries, and any other relief that the Court deems necessary and appropriate.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that:

1. The Court determine that this action may be maintained as a class action under Rule Fed. R. Civ. P. 23(b)(3), that Plaintiffs are adequate and appropriate

representatives of the Class, and that reasonable notice of this action be given to the Class;

2. The unlawful combination and conspiracy alleged in this Complaint be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act;

3. Defendants be preliminarily and permanently enjoined from continuing the unlawful combination or conspiracy alleged in this Complaint;

4. Plaintiffs and the Class recover damages, as provided by law, that Defendants jointly and severally be held liable for the damages suffered by Plaintiffs and the Class, and that judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be trebled in accordance with the antitrust laws;

5. Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

6. Plaintiffs and the Class be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 30, 2003

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

Richard A. Lockridge (#64117)
W. Joseph Bruckner (#147758)
Heidi M. Drewes-Silton (#025759X)
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
(612) 339-0981

HEINS MILLS & OLSON, P.L.C.

Samuel D. Heins (#43576)
Daniel E. Gustafson (#202241)
Karla M. Gluek (#238399)
3550 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
(612) 338-4605

Joseph Goldberg
FREEDMAN BOYD DANIELS HOLLANDER GOLDBERG & CLINE, P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
(505) 842-9960

Howard J. Sedran
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600

Martin Chitwood
Craig Harley
CHITWOOD & HARLEY
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
(404) 873-3900

Donald L. Perelman
Roberta D. Liebenberg
FINE KAPLAN & BLACK
1845 Walnut Street, 23rd Floor
Philadelphia, PA 19103
(215) 567-6565

Mark A. Griffin
Lynn Lincoln Sarko
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900

Jared B. Stamell
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, NY 10006-1404
(212) 566-4047

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Ste. 1700
San Francisco, CA 94111
(415) 217-6810

Robert N. Kaplan
Richard J. Kilsheimer
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980

Joseph M. Patane
LAW OFFICES OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
(415) 563-7200

Marc H. Edelson
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA 18901
(215) 230-8043

Ira N. Richards
TRUJILLO RODRIGUEZ & RICHARDS, LLC
226 W. Rittenhouse Square
The Penthouse
Philadelphia, PA 19103
(215) 731-9004

**COUNSEL FOR PLAINTIFFS**