UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re: MONOSODIUM GLUTAMATE ANTITRUST LITIGATION

Civil 00-MD-1328 (PAM)

This Document Relates to:

Inquivosa S.A.; Petbowe Chemtrade Corp.; Plus Sun Co., Ltd.; and MCC Menssing Chemiehandel & Consultants GmbH, and Newco Trading Co., on behalf of all others similarly situated,

Plaintiffs,

v.

Ajinomoto Co., Inc.; Ajinomoto USA, Inc.; Orsan S.A.; Cheil Jedang Corp.; C.J. America, Inc.; Miwon Co., Ltd.; Daesang America, Inc.; Takeda Chemical Industries, Ltd.; Kyowa Hakko Kogyo Co., Ltd.; Vedan Enterprises Group, f/k/a/ Tung Hai Fermentation Industrial Corp.; Archer Daniels Midland Co.; Ve Wong Corp.; Wei Chuan Foods Corp.; Yamasa Corp.; and Asahi Kasei Corp.,

Defendants.

Civil 03-2997 (PAM)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND STANDING**

Defendants Ajinomoto Co. Inc., Ajinomoto U.S.A., Inc., Takeda Pharmaceutical Company Limited f/k/a Takeda Chemical Industries, Ltd., Kyowa Hakko Kogyo Co., Ltd., and Archer Daniels Midland Company (collectively "Defendants") respectfully submit that the Consolidated and Amended Class Action Complaint dated November 15, 2004, ("Amended Complaint") should be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). In addition, the Amended Complaint should be dismissed for failure to state a claim upon which relief can be granted, under Rule 12(b)(6), because it does not allege cognizable antitrust injury and antitrust standing.

Plaintiffs seek an unprecedented expansion of the reach of U.S. antitrust law, contrary to a century of Sherman Act case law, to all the limiting principles the Supreme Court articulated in F. Hoffman-La Roche Ltd. v. Empagran, S.A., 124 S. Ct. 2359 (2004), and to the very specific requirements of the Foreign Trade Antitrust Improvements Act. They seek to transform this Court into a "world court" and to mire it in a worldwide, fact-bound economic inquiry just to establish subject matter jurisdiction. For all the reasons explained below, the foreign Plaintiffs and their proposed class of exclusively foreign purchasers must seek a remedy elsewhere, where their injuries occurred. The American antitrust laws focus on injuries that are directly tied to U.S. commerce, and do not presume to impose their precepts on every other country.

## SUMMARY OF THE ALLEGED CLAIM

Plaintiffs are foreign corporations with principal places of business in Venezuela, the Philippines, Taiwan, Germany and South Korea. According to the Amended Complaint, Plaintiffs are attempting to sue on behalf of themselves and all purchasers of monosodium glutamate ("MSG") or nucleotides outside the United States from any of the named defendants or "co-conspirators" from January 1, 1984, through November 1, 1999. Am. Com. ¶ 45. They

allege "a conspiracy to raise, fix and maintain prices" for MSG and nucleotides by the Defendants. Am. Com. ¶ 2. Plaintiffs' complaint "piggybacks" on United States government actions against certain Defendants for antitrust violations related to nucleotide sales in the United States, Am. Com. ¶¶ 29-33, and a previous class action suit brought by all United States direct purchasers of MSG and nucleotides, Am. Com. ¶ 44. The critical difference here, however, is that Plaintiffs are attempting to sue in the United States under United States antitrust laws for sales that took place anywhere in the world except the United States.[1]

Plaintiffs allege "an over-arching worldwide conspiracy" to fix the prices of MSG and nucleotides. Am. Com. ¶¶ 39-43. They assert that "Defendants entered into agreements with each other and with other MSG and Nucleotide manufacturers, determined what price each should charge for MSG and Nucleotides inside and outside the United States, and decided how much market share each company should have." Am. Com. ¶ 39. While acknowledging that "MSG and Nucleotide manufacturers are located worldwide" and that there are various "sub-markets" for these products, Plaintiffs claim that the sub-markets are "interconnected, such that prices paid by foreign purchasers are inextricably bound up with prices charged in the U.S." Am. Com. ¶¶ 41-42. The Plaintiffs contend that there is a "worldwide flow" of these products, and that "without an agreement affecting U.S. commerce, foreign-based MSG and Nucleotide purchasers would have arbitraged, purchasing MSG and Nucleotides at competitive U.S. prices and exporting to their home countries." Am. Com. ¶ 43. Plaintiffs never assert, however, that

[1] The Defendants bringing this motion are a subset of the 15 entities named as defendants in the Amended Complaint. Several of the 15 either have not been served or otherwise will fail to appear. This highlights one reason why subject matter jurisdiction is justly not available here, and shows some small part of the difficulty and complexity this case would involve if it could go forward. Conceptually, plaintiffs are seeking to hold any defendants who do participate in these U.S. proceedings responsible not only for their own purely foreign sales in every country except the U.S., but also (because of joint and several liability) for the foreign sales of defendants who refuse to defend. Such joint accountability under American antitrust law may be appropriate for sales in the U.S. (which are not at issue here), but to extend it to foreign sales made by foreign firms to foreign customers would be truly extraordinary. Practically, this same failure to appear also illustrates the problems of discovery and proof, which would only be magnified were this case ever to be litigated on the class basis that Plaintiffs plead.

they or any of the class members they propose to represent have purchased or attempted to purchase in the U.S. market. The sole connection between Plaintiffs' claimed injuries and anti-competitive effects in the U.S., according to the Amended Complaint, is this prevention of hypothetical arbitrage.[2]

Thus, Plaintiffs' allegations mirror the allegations that could be made in any case brought by foreign purchasers (a) asserting a price cartel in a purported worldwide market or (b) asserting price fixing in a non-worldwide market that nonetheless consisted of the United States and at least one or more foreign countries. There is nothing distinctive about the foreign purchaser claims here that would set them apart from alleged foreign purchaser claims in any other U.S.-and-foreign price cartel case.

In addition to the factual allegations summarized above, Plaintiffs include "boilerplate" language that tracks that of the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA"), one of the governing statutes in this case. See, e.g., Am. Com. ¶¶ 3-27 (alleging that each defendant's practices had "a direct, substantial and reasonably foreseeable adverse impact on commerce within the United States"); Am. Com. ¶ 4 ("the effect of Defendants' conspiracy on U.S. commerce gave direct rise to Plaintiffs' antitrust claims and injuries"). However, Plaintiffs cannot meet the FTAIA's factual predicates merely by parroting the language of the statute in their Amended Complaint. See Young v. City of St. Charles, 244 F.3d 623, 627 (8th Cir. 2001) ("[t]o avoid dismissal, a complaint must allege facts . . . and not merely

[2] Plaintiffs explain this same, single alleged connection multiple times in the Amended Complaint. See, e.g., Am. Com. ¶ 56 ("the conspiracy's adverse foreign effect was dependent on its adverse U.S. effect" and "these [U.S.] effects comprised a necessary link in creating Plaintiffs' foreign injuries" because "if the conspiracy had not affected the U.S. sub-market, Plaintiffs and other foreign MSG and Nucleotide purchasers would have obtained product from the U.S. sub-market at competitive prices"); Am. Com. ¶ 71 (the "U.S. effect was necessary for Defendants to cause Plaintiffs' antitrust injuries abroad"); Am. Com. ¶ 72 ("as a result of this [U.S.] effect, Plaintiffs were injured by being precluded from purchasing competitively-priced MSG and Nucleotides").

legal conclusions"). As explained below, the factual allegations in the Amended Complaint do not satisfy the requirements of the FTAIA, nor do they establish antitrust standing.

## ARGUMENT

### I. UNDER THE FTAIA, THIS COURT LACKS SUBJECT MATTER JURISDICTION TO CONSIDER PLAINTIFFS' CLAIM

The FTAIA is a "jurisdiction stripping" statute that clarified crucial, threshold requirements for invoking the power of United States courts to resolve antitrust issues. United Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942, 951 (7th Cir. 2003) (en banc). First, the statute sets out a general rule that the Sherman Act "shall not apply" to foreign trade or commerce (other than import trade or commerce, which is not at issue in this case). 15 U.S.C. § 6a; F. Hoffman-La Roche Ltd. v. Empagran, S.A., 124 S. Ct. 2359, 2364-65 (2004); see also Den Norske Stats Oljeselskap As v. Heeremac Vof, 241 F.3d 420, 426 (5th Cir. 2001). Next, the statute brings a strictly limited subset of such conduct back within the reach of the Sherman Act if two requirements are met: (1) the anticompetitive conduct "has a direct, substantial, and reasonably foreseeable effect" on either domestic trade or commerce (§ 6(a)(1)(A)) or U.S. export trade or commerce (§ 6(a)(1)(B)), and (2) "such effect gives rise to a claim" under the Sherman Act (§ 6(a)(2)).[3] Id. Plaintiffs, who bear the burden of establishing subject matter

[3] The FTAIA provides, in relevant part, that:

> Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect –
> (A) on trade or commerce which is not trade or commerce with foreign nations [*i.e.*, domestic trade or commerce], or on import trade or import commerce with foreign nations; or
> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States [*i.e.*, on an American export competitor]; and
> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a; Empagran, 124 S. Ct. at 2364-65 (alterations in opinion).

jurisdiction, United Phosphorous, 322 F.3d at 946, must demonstrate that these requirements have been met early in the litigation, for without subject matter jurisdiction a U.S. court cannot intervene in the controversy in any way. See Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 388 F.3d 337, 345-46 (D.C. Cir. 2004). As the United Phosphorus opinion explains:

> The extraterritorial scope of our antitrust laws touches our relations with foreign governments, and . . . it is prudent to tread softly in this area. . . . Treating the matter as one of subject matter jurisdiction reduces the potential for offending the economic policies of other nations. In short, [the] FTAIA limits the power of the United States courts (and private plaintiffs) from nosing about where they do not belong.

322 F.3d at 952.

Plaintiff foreign purchasers attempt to show that their claims meet the FTAIA's requirements because (1) Defendants' conduct allegedly had "a direct, substantial, and reasonably foreseeable effect" on domestic commerce and (2) that effect allegedly gave rise to Plaintiffs' claim.[4] See, e.g., Am. Com. ¶¶ 4, 13-27, 44, 71-72. As a matter of law, however, the factual allegations pled in Plaintiffs' Amended Complaint do not establish those two necessary prerequisites for subject matter jurisdiction.[5]

### A. Empagran And Its Principles Of Statutory Interpretation Compel A Dismissal In This Case

The Supreme Court's recent interpretation of the FTAIA in Empagran is of critical importance here. In Empagran, the Supreme Court held that plaintiffs who cannot show that (1)

[4] Plaintiffs' Amended Complaint nowhere seeks to invoke the provisions of the FTAIA that apply to import commerce or to the export commerce of an American competitor.

[5] Defendants bring this motion to dismiss as a facial, rather than a factual, motion to dismiss for lack of subject matter jurisdiction. See Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (distinguishing between facial and factual attacks under Rule 12(b)(1)). "[B]ecause jurisdiction is a threshold question, judicial economy demands that the issue be decided at the outset[.]" Id. at 729. Here, the most expeditious and economical way to determine the Court's lack of jurisdiction is on the face of the pleadings, as a matter of law. Defendants also contest Plaintiffs' ability to prove the truth of their factual allegations related to jurisdiction, particularly their allegations of a worldwide market and easy arbitrage from the U.S. into every single foreign nation, and would bring a factual motion if necessary. But the complexity and magnitude of such an evidentiary hearing in cases like the present one is one of the very reasons why Congress could not have intended the FTAIA exception to encompass such disputes. See infra Point I E.

a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce (2) gave rise to their own claims cannot use the FTAIA to gain access to the U.S. courts. 124 S. Ct. at 2366-72. That holding and the clear principles of statutory interpretation that the Supreme Court specified for reading the FTAIA dictate here that Plaintiffs' claim does not belong in this court.

The Court in Empagran first determined that foreign purchasers complaining about an alleged worldwide price-fixing cartel (involving American and foreign companies) that injured those purchasers overseas triggered the FTAIA and its general rule that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or commerce) with foreign nations[.]" 124 S. Ct. at 2365-66. Because the claims of Plaintiffs here—foreign companies who purchased MSG and nucleotides in wholly foreign transactions—are indistinguishable from those asserted in Empagran, the Supreme Court's ruling on this threshold issue clearly establishes that Plaintiffs' claims are barred unless they can satisfy the requirements of the FTAIA.[6]

The Court then turned to the statute's requirements. It resolved a split among the Courts of Appeals for the Second, Fifth, and D.C. Circuits by holding that in order to satisfy the FTAIA, the plaintiff before the court must be asserting its own claim that complies with the statute's requirements. 124 S. Ct. at 2366-72. Thus, subsection 2 cannot be fulfilled by an allegation that some other party has been injured by a "direct, substantial, and reasonably foreseeable" U.S. effect and would have a claim, as the Second and D.C. Circuits had erroneously concluded.[7]

---

[6] As Empagran emphasizes, the FTAIA "lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach. It then brings [some] such conduct back within the Sherman Act's reach *provided that* the conduct [satisfies] *both*" of the statute's requirements. 124 S. Ct. at 2365 (emphasis in original).

[7] See Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 315 F.3d 338, 352 (D.C. Cir. 2003) ("[w]e hold that the words 'a claim' in subsection 2 of [the] FTAIA refer to a private action . . . the plaintiff must allege that some private person or entity has suffered actual or threatened injury as a result of the U.S. effect" of the defendant's conduct);

The Plaintiffs in Empagran made an alternative argument to the Supreme Court, but the D.C. Circuit had not ruled on that alternative claim and it was unclear whether it had even been preserved. The Court therefore remanded to the D.C. Circuit to address plaintiffs' contention that the FTAIA was satisfied because "the anticompetitive conduct's domestic effects were linked to [their] foreign harm." 124 S. Ct. at 2372. The plaintiffs asserted that "the sellers could not have maintained their international price-fixing arrangement" without an adverse domestic effect, which prevented hypothetical arbitrage. Id. This "alternative" argument parallels the argument advanced by Plaintiffs here.

Significantly, the Supreme Court did not hold, or even suggest, that if such a "link" were established, subject matter jurisdiction would exist under the FTAIA. To the contrary, the Court's detailed articulation of the principles of statutory interpretation that control in reading the FTAIA and its discussion of the FTAIA's purposes, when applied to this case, dictate dismissal of Plaintiffs' Amended Complaint.

As the Court stressed, any ambiguity in the FTAIA must be construed to avoid unreasonable interference with the laws of other nations and each nation's ability independently to regulate its own commercial affairs. 124 S. Ct. at 2366-70. Moreover, any approach to determining access to U.S. courts must be simple and expeditious, without procedural costs and delays that "themselves threaten interference with a foreign nation's ability to maintain the integrity of its own antitrust enforcement system." Id. at 2369. In addition, the Court recognized that Congress intended "the FTAIA to clarify, perhaps to limit, but not *to expand* in any significant way, the Sherman Act's scope as applied to foreign commerce." Id. (emphasis in original). The act must be interpreted in light of the types of cases seen before 1982, and not to

Kruman v. Christie's Int'l PLC, 284 F.3d 384, 400 (2d Cir. 2002) (holding that "a claim" does not mean "the plaintiff's claim").

bring about a sudden expansion of the role of U.S. courts. Id. at 2369-71. Indeed, the Court stated that Congress sought explicitly "to *release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm." Id. at 2367 (emphasis in original). Thus, a correct reading of the FTAIA "furthers the statute's basic purposes, it properly reflects considerations of comity, and it is consistent with Sherman Act history." Id. at 2372.

Plaintiffs ask this Court to violate each of those fundamental principles. Accepting Plaintiffs' foreign purchaser claims would require this Court to ignore historical limits on the Sherman Act's reach and to expand its scope well beyond pre-1982 case law. See infra Point C. Allowing this claim would trample on comity concerns and unreasonably interfere with foreign governments' own enforcement efforts. See infra Point D. In addition, such an interpretation would mire this Court and federal courts across the country in myriad jurisdictional mini-trials, involving complex economic analyses, before the Court could either dismiss a case or take any steps in the underlying action. See infra Point E. To let this case in the courthouse door would eviscerate Empagran. Instead, the principles articulated in Empagran require that this action be dismissed.

### B. As Empagran Recognized, Plaintiffs' Alleged Link Between Domestic Effect And Their Foreign Claim Amounts To A Mere "But For" Condition

At the outset, the nature of the Plaintiffs' current alleged basis for coming within the FTAIA's requirements, and thus triggering subject matter jurisdiction, bears emphasis. Like the plaintiffs in Empagran, Plaintiffs here initially pursued their claims without alleging any connection between a purported domestic effect of the asserted global wrongdoing and their own foreign injuries. In Newco Trading Co. v. Ajinomoto Co., filed as No. 03 CV 8217 in the Southern District of New York and now consolidated in the present case, the Plaintiff Korean corporation specifically relied upon the Second Circuit's now-overruled interpretation in Kruman

that a plaintiff could satisfy subsection 2 of the FTAIA based solely on the potential claim of others whose injuries were caused by a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce. See Newco Complaint, dated Oct. 16, 2003, ¶ 2; supra note 7. Similarly, when the original Inquivosa complaint was filed, Plaintiffs sued solely on behalf of foreign purchasers but relied upon an alleged "claim" by domestic purchasers, not Plaintiffs' own claim, to attempt to comply with subsection 2 of the FTAIA. See Inquivosa Complaint, dated April 30, 2003, ¶ 53(6) ("Defendants' wrongful conduct as alleged in this Complaint gives rise to a claim under Section One of the Sherman Act in that direct purchasers of MSG and Nucleotides in the United States have suffered actual or threatened injury as a result of the effects in the United States of Defendants' wrongful conduct") (emphasis added).

Now that the Supreme Court has rejected that initial theory, Plaintiffs have changed their description of the very same cartel and cause of action to allege, for the first time, some interdependence between domestic impact and the basis for their claim. Their claim can be stretched only so far, however, and the allegations of a connection are indirect. Plaintiffs seek to pursue the same "alternative" theory advanced by the plaintiffs in Empagran. As the Supreme Court summarized, this theory rests on only a "but for" relationship between higher domestic prices and the ability to sustain price-fixing abroad, by preventing possible arbitrage:

> Respondents argue, in the alternative, that the foreign injury was not independent. Rather, they say, the anticompetitive conduct's domestic effects were linked to that foreign harm. Respondents contend that, because vitamins are fungible and readily transportable, without an adverse domestic effect (*i.e.*, higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury. They add that this "but for" condition is sufficient to bring the price-fixing conduct within the scope of the FTAIA's exception.

124 S. Ct. at 2372; see also Empagran, 388 F.3d at 339 (the Supreme Court declined to decide "whether this 'but for' condition is sufficient" to satisfy the FTAIA's requirements; the D.C. Circuit on remand will decide that question as a matter of law).

In this case, the foreign purchasers' claim is not that the domestic effect itself caused the foreign injury and claim they are asserting. They do not, nor could they, allege facts showing that foreign price-fixing simultaneously or directly results from Americans having to pay higher fixed prices. Rather, Plaintiffs allege that Defendants' agreements and actions concerning price and market share in each Plaintiff's foreign sub-markets caused the limited choices and supra-competitive prices they paid there. Am Com. ¶¶ 51-53. The alleged U.S. effect was simply one necessary condition for the purported worldwide conspiracy to succeed, because a break in prices here would have allegedly opened up a cheaper U.S. supply for Plaintiffs – though Plaintiffs do not allege any prior participation in the U.S. market. See Am. Com. ¶ 56 ("these [adverse U.S.] effects comprised a necessary link in creating Plaintiffs' foreign injuries"). Indeed, under Plaintiffs' theory the domestic effect in each and every country worldwide is linked to and a condition of its present injury and claim. It is this indirect, attenuated connection to U.S. anti-competitive effects that Plaintiffs urge as the basis for subject matter jurisdiction. They are wrong, as a matter of law.

### C. Plaintiffs' Reading Of The FTAIA Stretches Its Language, Ignores Historical Limits On The Sherman Act's Reach, And Finds No Support In Pre-1982 Case Law

The FTAIA allows jurisdiction here only if (1) Defendants' conduct had "a direct, substantial, and reasonably foreseeable effect" on domestic commerce and (2) "such effect gives rise to a claim" by Plaintiffs under the Sherman Act. The Court, therefore, must construe "such effect gives rise to" and "a claim" (i.e., the proper reach of the Sherman Act) to determine

whether Plaintiffs' allegations satisfy subsection 2. As Empagran instructs, Congress's purpose in clarifying, perhaps limiting, but not extending the Act's reach into novel foreign applications, constrains interpretation of the statute. 124 S. Ct. at 2369.

Neither the words "gives rise to a claim" nor core causation principles in antitrust law allow a mere indirect "but for" condition to fulfill subsection 2. Moreover, before 1982, foreign purchasers were not in the U.S. courts litigating claims like the present one, where the only link to U.S. injury comes from the prevention of hypothetical arbitrage. For these reasons alone, the Court should rule that it lacks subject matter jurisdiction to hear this case.

### 1. "Gives Rise To" And "Claim" Require Direct And Fundamental Causation

"Gives rise to" is an active construction that connotes direct and original causation. See American Heritage Dictionary of the English Language (4th ed. 2000) ("give rise to: To be the cause or origin of; bring about") (emphasis added).[8] The alleged fixed prices for MSG and nucleotides in the U.S. did not "give rise" to the fixed prices Plaintiffs allege they paid overseas. Even if the elevated U.S. prices may have prevented a collapse of the asserted foreign cartel and thus been one necessary condition for it, the U.S. prices were not the source or the cause of the alleged foreign price-fixing.

The Fifth Circuit, the only court of appeals that has construed "gives rise to" in relation to an alleged global market-allocation and price-fixing conspiracy, faced allegations on all fours with Plaintiffs' and rejected those as insufficient. Den Norske, 241 F.3d at 427. In Den Norske, an opinion cited with approval by the Supreme Court in Empagran, the plaintiff Norwegian oil company sued providers of heavy-lift barge services, which plaintiff used solely in the North

[8] The American Heritage definition is available at http://www.bartleby.com/61/55/G0135500.html. Similarly, Merriam Webster Online defines "give rise to" as "to be the cause or source of: PRODUCE." See http://www.m-w.com.

Sea. The plaintiff alleged that "the market for heavy-lift services in the world is a single, unified, global market" and that defendants were able to maintain their overall monopolistic pricing only by maintaining it in the U.S. (and elsewhere). Id. at 425. The Fifth Circuit held:

> Based on the language of Section 2 of the FTAIA, the effect on United States commerce – in this case, the higher prices paid by United States companies for heavy-lift services in the Gulf of Mexico – must give rise to the claim that Statoil asserts against the defendants. That is, Statoil's injury must stem from the effect of higher prices for heavy-lift services in the Gulf. We find no evidence that this requirement is met here. . . . [W]hile we recognize that there may be a connection and an interrelatedness between the high prices paid for services in the Gulf of Mexico and the high prices paid in the North Sea, the FTAIA requires more than a "close relationship" between the domestic injury and the plaintiff's claim; it demands that the domestic effect "gives rise" to the claim.

Id. at 427 (emphasis added). The court emphasized that "[t]he assumed existence of a single, unified, global conspiracy does not relieve Statoil of its burden" of satisfying subsection 2 of the FTAIA. Id. at 427 n.24.[9]

Especially in this FTAIA setting, where Congress articulated a general rule of exclusion from U.S. jurisdiction and then carved out a narrow set of circumstances that must be met before U.S. courts can act, a weak "but for" link must fail. To allow such a minimal connection – all that Plaintiffs can muster here – to satisfy subsection 2 would undermine the FTAIA's general rule and the targeted focus of subsection 1. Indeed, subsection 2's explicit requirement that the alleged domestic effect must give rise to the plaintiff's "claim" demands that Plaintiffs be able to satisfy general principles of causation and standing in antitrust law—which permit the Sherman Act's broad remedies to be invoked only by those injured directly and immediately by the anticompetitive behavior that the Act was meant to address (here, the "direct, substantial, and

---

[9] The Fifth Circuit made clear that, with allegations like those in Den Norske or here, customers in domestic, U.S. commerce (whether American or foreign) could sue for Sherman Act violations, but customers hurt by the alleged global conspiracy in foreign commerce could not. Id. at 427. "[O]ur reading produces the precise result intended by Congress – that '[f]oreign purchasers should enjoy the protection of our antitrust laws *in the domestic marketplace*, just as our citizens do.' H.R. Rep. No. 97-686, at 10-11." Id. at n.23 (emphasis in opinion). See also id. at 428 n.25.

reasonably foreseeable effect" on U.S. commerce required by subsection 1). Because Plaintiffs alleged injuries do not meet these requirements, Plaintiffs are unable to establish that the U.S. effect gives rise to a justiciable "claim" here.

As early as 1910, the Third Circuit rejected potential Sherman Act claimants because their injury was "indirect, remote, and consequential." Loeb v. Eastman Kodak Co., 183 F. 704, 709 (3rd Cir. 1910) (quoted with approval in Associated Gen. Contractors of California, Inc. v. California State Counsel of Carpenters, 459 U.S. 519, 533-34 (1983)). "An antitrust violation may be expected to cause ripples of harm to flow . . .; but 'despite the broad wording of § 4 [of the Clayton Act] there is a point beyond which the wrongdoer should not be held liable.'" Blue Shield of Virginia, Inc. v. McCready, 457 U.S. 465, 476-77 (1982) (citation omitted). In Associated General, the Supreme Court definitively rejected "but for" causation and "consequential" harms in antitrust claims. See Associated Gen., 459 U.S. at 545 ("allegations of consequential harm," even where buttressed by an intent to harm, "are insufficient as a matter of law"); Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992) ( in Associated Gen., "we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well"). See also Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977); infra at Point II.

The FTAIA's requirements of "gives rise to" and "claim," because of those terms and their larger context in the FTAIA and the Sherman Act, cannot be satisfied by Plaintiffs' allegations that an effect on U.S. commerce was a mere "but for" condition—simply one factor out of many others, including far more direct alleged causes of Plaintiffs' foreign injuries. Even if taken as true, the allegations of the Amended Complaint simply do not establish that an effect

on U.S. commerce sufficient to meet subsection 1 was the fundamental source of Plaintiffs' injuries. The U.S. effect thus did not "give rise to" any "claim" by Plaintiffs.

### 2. Congress Did Not Contemplate Foreign Purchasers Suing In The U.S. For Treble Damages In Cases Like This One

As the Fifth Circuit concluded, "[a]ny reading of the FTAIA authorizing jurisdiction over Statoil's [or Plaintiffs' foreign purchaser] claims would open United States courts to global claims on a scale never intended by Congress." Den Norske, 241 F.3d at 431. Before 1982, when Congress acted to clarify or limit (but not expand) the Sherman Act's application to foreign commerce through the FTAIA, Empagran, 124 S. Ct. at 2369, cases like this one were unheard of. Plaintiffs can cite no pre-1982 precedents for strictly foreign purchasers maintaining an antitrust action in U.S. courts, based only on hypothetical arbitrage as a link to U.S. injury from a global or multinational conspiracy.[10] Thus, the 1982 Congress could not have contemplated and did not intend that the FTAIA would radically expand the reach of the Sherman Act by paving the way for such cases. See id. at 2369-71 (relying on pre-1982 case law as essential FTAIA interpretive tool).

Indeed, as of today, there is no decision that remains good law allowing such an action. Plaintiffs in Empagran, here, and in a few other purported foreign purchaser class actions now in the courts are futilely trying to establish a first. Yet the fact that such a "first" – over twenty years after enactment of the FTAIA, and over a century after the enactment of the Sherman Act – has never yet succeeded shows just how radical and unfounded Plaintiffs' position is. See, e.g., Empagran, supra; Den Norske, supra; In re Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d 702,

[10] By contrast, a rare U.S. antitrust case that was successfully brought by a foreign corporation for foreign injury, Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research and Engineering Co., No. 75 Civ. 5828-CSH, 1977 WL 1353 (S.D.N.Y. Jan. 18, 1977), involved foreign harm that was directly caused by and that occurred simultaneously with a domestic restraint on trade (foreclosure of competition in design and engineering services) in the U.S. See id. at *2-3. Through a coercive reciprocal dealing agreement, the plaintiff was allegedly forced to employ one U.S. consultant over another, to its immediate detriment in Italy. That kind of single-act, instantaneous causation where a domestic restraint means foreign injury is wholly distinct from the allegations here.

714-16 (D. Md. 2001) (rejecting foreign purchasers' claims based on Microsoft's alleged worldwide monopoly); Eurim-Pharm GmbH v. Pfizer, Inc., 593 F. Supp. 1102, 1106-07 (S.D.N.Y. 1984) (rejecting German purchasers' U.S. suit based on alleged worldwide price-fixing and market allocation conspiracy). Our courts have consistently agreed that the power and resources of U.S. courts should not be invoked to remedy foreign purchaser claims with thin, merely abstract connections to American commerce, such as those asserted here.

**D. U.S. Jurisdiction Would Unreasonably Interfere With Foreign Sovereigns And Harm The International Comity That Empagran Carefully Protected**

"[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." Murray v. Schooner Charming Betsy, 2 Cranch 64, 118 (1804). Here, the problem is not simply that U.S. law – the FTAIA and the whole of the Sherman Act – does not provide for this kind of suit, or that U.S. courts have all the work they can handle with suits that are authorized by U.S. law. An equally significant problem arises because subject matter jurisdiction in this Court would unjustifiably wreak havoc with other nations' antitrust enforcement systems.

As the Supreme Court made clear in Empagran, "in today's highly interdependent commercial world" it is particularly necessary to write and interpret American law to respect other sovereigns' own enforcement schemes, so that "the potentially conflicting laws of different nations work together in harmony." 124 S. Ct. at 2366. In fact, in enacting the FTAIA, Congress cited with approval the "increased sensitivity of other nations to antitrust considerations and cartel activity" and advocated "encourag[ing] our trading partners to take more effective steps to protect competition in their markets." H.R. Rep. No. 97-686 at 14, reprinted in 1982 U.S.C.C.A.N. 2487, 2498-99. Far from indicating an intent to take over enforcement outside the United States, the legislative record shows a heightened concern for

international comity and for avoiding the backlash that overzealous extraterritorial use of our antitrust laws would produce. Comments of Hon. Peter W. Rodino, Jr. (Chairman) at Hearing on H.R. 2326 before House Subcomm. on Monopolies and Commercial Law of the Comm. on the Judiciary, 97th Cong., Mar. 26, 1981, at 1. The legislative history notes that foreign or domestic plaintiffs will continue to be able to sue for domestic harms imposed by international cartels, but in no way indicates an intent to grant new jurisdiction over loosely-connected foreign harms from those same cartels. H. Rep. No. 97-686 at 10, 1982 U.S.C.C.A.N. at 2495.

This Court should thus preserve the appropriate balance struck by the FTAIA – where direct and substantial effects occur in domestic commerce and immediately create a Sherman Act violation, the American courts are open to remedy it; but where there is only an indirect "link" or "necessary condition" joining a domestic effect and a violation asserted by foreign purchasers based upon foreign conduct, another nation clearly has a more direct interest and American courts should abstain from "legal imperialism." See Empagran, 124 S. Ct. at 2369. Any broader reading of the FTAIA exception would swallow the rule, and create the very same danger of a flood of foreign disputes being litigated here that the Supreme Court attempted to prevent in Empagran. "'[A] Malaysian customer could . . . maintain an action under United States law in a United States court against its own Malaysian supplier, another cartel member, simply by noting that'" the market for the product at issue was interconnected and that arbitrage from the U.S. would have destroyed the cartel. Cf. Empagran, 124 S. Ct. at 2367 (quoting P. Areeda & H. Hovenkamp, Antitrust Law ¶ 273 at 51-52 (Supp. 2003)). As the leading antitrust treatise recently emphasized: "[T]he forbearance of one cartel member from cutting price or shipping into another cartel member's territory is necessary to the functioning of *every* cartel. To interpret 'linkage' of foreign and domestic injury this broadly would . . . undermine[] the entirety of the

Court's opinion" in Empagran. P. Areeda & H. Hovenkamp, Antitrust Law ¶ 273b at S-12 (Special Supp. 2004) (emphasis in original).

Although many nations have adopted and enforce antitrust laws, their substantive provisions differ. Empagran at 2368. And "even where nations agree about primary conduct, say price fixing, they disagree dramatically about appropriate remedies." Id. Plaintiffs are in this Court precisely because their home countries do not allow private treble damages suits as a means of redressing violations. With only a tenuous link to U.S. harms and interests, however, the Court should not allow private foreign entities to come here and "bypass their own less generous remedial schemes, thereby upsetting a balance of competing considerations that their own domestic antitrust laws embody." Id.

One of the prime competing considerations that the Supreme Court in Empagran highlighted is the effective use of prosecutorial amnesty programs to ferret out price-fixing cartels. Id. Because the most difficult aspect of enforcing legal rules against price-fixing cartels is detection, both foreign and U.S. enforcement authorities are focused on creating incentives for wrongdoers themselves to come forward. Foreign countries and the United States agree that permitting foreign purchasers injured by international cartels to pursue private treble-damages remedies in this country would undermine enforcement efforts both here and abroad by creating a much higher potential civil cost and thereby diminishing the incentives for gaining prosecutorial amnesty from criminal charges by exposing a cartel. See, e.g., Br. for Fed'l Republic of Germany et al., Br. for Gov't of Japan, Br. for Gov't of Canada, & Br. for United States as Amici Curiae in Empagran. As the Supreme Court concluded, because antitrust enforcement is complex and international comity concerns are strong, a simple claim that

"increased deterrence" will result from treble damages awarded to foreign purchasers cannot justify imposing American law abroad. 124 S. Ct. at 2372.

Plaintiffs' own allegations of a purported 15-year conspiracy indicate that detection, not merely the potential for after-the-fact damages, is a key concern for enforcement efforts. Moreover, Plaintiffs themselves describe a situation in which the United States' public and private interests in detecting and punishing alleged antitrust injuries have now been amply fulfilled. Plaintiffs allege that one defendant's cooperation with the Justice Department exposed this cartel, that four of the named defendants have been criminally prosecuted in the U.S., and that U.S. direct purchasers have pursued and settled a federal class action in this Court. Am. Com. ¶¶ 29-34, 44. In addition, indirect purchasers have sued under state law. At the same time, the interests of other jurisdictions in enforcing their own competition laws have been vindicated as well. Plaintiffs themselves note that the European Commission has extracted large fines from defendants. Id. ¶34. Further suits seeking additional remedies have also been brought in foreign courts. See, e.g., Bona Foods Ltd. v. Ajinomoto U.S.A., Inc., No. 37708, Super. Ct. of Justice, Ontario, Canada.

Plaintiffs thus can offer no justification why their action should proceed in United States courts, under United States laws, in contravention of: the dictates of the FTAIA; the Supreme Court's reasoning in Empagran; the position of the U.S. and foreign governments (as disclosed in their Supreme Court amici briefs); and principles of international comity and antitrust injury. All of those sources draw clear boundaries between those plaintiffs who may look to U.S. antitrust laws and courts for their remedies, and those who must look to the laws of the jurisdictions in which they suffered their own injuries for any remedy. Here, the question of whether these Plaintiffs can obtain a remedy for their alleged foreign injuries is, simply put, an issue to be

resolved by the competition laws of the jurisdiction in which they were injured. It is axiomatic that "American antitrust laws do not regulate the competitive conditions of other nations' economies." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 (1986). Plaintiffs are not permitted to seek a "windfall" of treble damages under United States antitrust laws—and to occupy the limited resources of U.S. courts—merely because they are unsatisfied with the laws and courts of their own jurisdictions.

### E. Evidentiary Jurisdiction Hearings On Whether A Global Or International Market And An Actual Risk of Arbitrage Exist Would Impose Unworkable Delay And Complexity

There is yet another reason why Plaintiffs' jurisdictional assertions must fail. As the Supreme Court stressed in Empagran, the threshold inquiry in Sherman Act cases cannot be "too complex to prove workable." 124 S. Ct. at 2368. That threshold analysis must allow courts to resolve whether to take jurisdiction over a claim "simply and expeditiously." See id. at 2369. Moreover, the FTAIA sought to promote '"certainty in assessing the applicability of American antitrust law to international business transactions and proposed transactions.'" Turicentro, S.A. v. American Airlines, Inc., 303 F.3d 293, 301 n.6 (3d Cir. 2002) (quoting H.R. Rep. No. 97-686, reprinted in 1982 U.S.C.C.A.N. at 2494). In addition to all of the above flaws in Plaintiffs' invocation of U.S. antitrust law, even assuming their allegations are true, the jurisdictional inquiry that would have to take place to prove that those allegations are true is voluminous, subject to the uncertain, competing claims of experts, and wholly unworkable. Moreover, if Plaintiffs' interpretation of the FTAIA prevails, this same, burdensome threshold inquiry would be required in every case where a plaintiff invoked the theory of jurisdiction that Plaintiffs here champion—the weak "link" of hypothetical arbitrage – and that theory would be alleged in any foreign purchaser price-fixing case involving a "global" or U.S.-plus-foreign market.

Defendants bring the current motion to dismiss based on the face of the complaint—that is, Defendants contend that even if Plaintiffs' allegations are assumed to be true, subject matter jurisdiction does not exist. But if Plaintiffs' allegations were held facially sufficient, that would not end the matter. It would remain Plaintiffs' burden to prove that their allegations are true – that there is in fact subject matter jurisdiction over their claims – and this Court's obligation to "weigh the evidence" to determine whether jurisdiction has been established. See United Phosphorous, 322 F.3d at 946; Titus v. Sullivan, 4 F.3d 590, 593 n.1 (8th Cir. 1993).

Plaintiffs have alerted this Court to just how searching an inquiry would be required to determine jurisdiction if Plaintiffs' reading of the FTAIA prevailed. During the status conference on October 29, 2004, Plaintiffs handed up to the Court a page-long list of proposed discovery "that would be relevant to show that the foreign purchasers (non-US) of MSG and nucleotides would have been affected by a global cartel to fix prices of MSG and nucleotides in the U.S." Plaintiffs' Oct. 29, 2004, Submission. Plaintiffs' counsel explained that "we have put before the Court a list of discovery matters which we are – understand from our economics expert will illuminate the question of whether this particular conspiracy, in fact, falls within the ambit of surviving actions under the statute." Tr. of Oct. 29, 2004, Status Conference At 3. Plaintiffs' list seeks detailed information related to the worldwide production, by every producer (not just the named defendants), of MSG and nucleotides for every year since 1990, detailed information about price in every country, by month and year, since 1990, and production and sales information that is just as sweeping. While Plaintiffs include "duties, tariffs, and taxes" in all countries, and transportation costs to past "markets," they neglect to mention that they would also have to gather information about potential expansion of the U.S. market, as well as potential shipping and other costs from the U.S. to each foreign country, to prove that their hypothesized

arbitrage from this country to all other worldwide markets could and would have occurred, absent the cartel's U.S. effects. See Plaintiffs' Oct. 29, 2004, Submission. Plaintiffs omit many other facts that may have to be taken into consideration, such as demand conditions in each and every country and currency exchange rates.

In an evidentiary hearing after all this preliminary discovery, Plaintiffs would have to attempt to prove – through experts, other witnesses, and documents discussing hundreds of different countries and their economic conditions, and in opposition to Defendants' contrary evidence – the single, worldwide market for these products that they claim exists. The Court, meanwhile, would be enmeshed in the "enormous complexities of market definition," FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 430-31 (1990), where "fuzziness" is "inherent," United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 360 n.37 (1963), simply to determine subject matter jurisdiction and begin the litigation. See Osborn, 918 F.2d at 729 (jurisdiction should "be decided at the outset" and, for defendants contesting the factual basis for jurisdiction, "the proper course is to request an evidentiary hearing on the issue"); Titus, 4 F.3d at 593 (same). This case, and all the many others that would follow, are headed toward a mammoth evidentiary hearing – and much uncertainty about whether a particular claim will ultimately go forward or be rejected – if allegations like Plaintiffs' are found to be legally sufficient to survive a subject matter jurisdiction challenge on the face of the complaint.

Such massive evidentiary detours and uncertainty about who really has viable claims cannot be what Congress envisioned. As discussed above, the FTAIA and the Supreme Court's reading of it aim to continue past limits on the U.S. courts' jurisdiction, promote certainty, and ensure a simple and workable approach. They emphasize international comity concerns and the targeted, United States focus of our antitrust laws. To accept Plaintiffs' allegations as legally

sufficient would be to flout the statute's purposes and the Court's close analysis of its proper interpretation.

## II. UNDER ESTABLISHED ANTITRUST STANDING PRINCIPLES, PLAINTIFFS FAIL TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

This Court should also dismiss Plaintiffs' Amended Complaint on a second ground, because Plaintiffs lack antitrust standing. See, e.g., Turicentro, 303 F.3d at 307 (rejecting complaint under the FTAIA and as a matter of standing); Den Norske, 241 F.3d at 431 n.32 (holding that plaintiffs' claims were barred for lack of standing as well as lack of subject matter jurisdiction). Without the required standing to bring suit, Plaintiffs fail to state a claim and their Amended Complaint should be rejected under Rule 12(b)(6).

Congress did not intend '"to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."' Associated Gen., 459 U.S. at 543 (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n.14 (1972)). Antitrust standing requires more than the constitutional minimum under Article III and excludes claims where the injury alleged is too removed from the core antitrust harm, the injury is not of the kind our antitrust laws were meant to address, or more directly affected parties will adequately serve as "private attorneys general" to enforce U.S. public interests. See Associated Gen., 459 U.S. at 538-45; II P. Areeda & H. Hovenkamp, Antitrust Law ¶ 335a-d, at 286-93 (2d ed. 2000). Here, Plaintiffs' harms (a) are too remote from any direct impact on U.S. commerce, (b) seek a remedy for losses from foreign transactions in foreign commerce, not the type of injury U.S. law addresses, and (c) need not be remedied to trigger vigorous private enforcement efforts. These considerations all overlap with considerations discussed above because the American antitrust scheme aims to be a consistent whole. Plaintiffs' allegations, on the other hand, attempt to disrupt the consistent

approach of U.S. courts over many decades and to exponentially expand the availability of private treble damages claims.

Plaintiffs' pleading of an indirect "interconnection" or a mere "but for" relationship between anti-competitive impact on U.S. commerce and their injuries is inadequate to confer standing. See Associated Gen., 459 U.S. at 545; Holmes, 503 U.S. at 268; supra at 13. Given the "strong interest . . . 'in keeping the scope of complex antitrust trials within judicially manageable limits," Associated Gen., 459 U.S. at 543, indirect and tangential consequences can rarely support a claim. See Reading Indus., Inc. v. Kennecott Copper Corp., 631 F.2d 10, 14 (2d Cir. 1980) (discussing need to exclude "claims based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change"). In this case, not only would a jurisdictional hearing be extraordinarily complex, but so would any attempt at proving and calculating damages for unknown numbers of claimants all over the globe – if Plaintiffs were allowed to go forward, established liability, and then had to prove how every niche of the world economy for food enhancers would have been different over a multi-year period and what each foreign purchaser should recover. Instead, the federal antitrust laws in this circumstance limit the potential damages to direct purchasers in U.S. commerce, and those purchasers have already recovered huge sums.

Certainly here, where Plaintiffs allege remote harms and those harms affected foreign corporations operating solely in foreign commerce, their claim is beyond the bounds of antitrust standing. "American antitrust laws do not regulate the competitive conditions of other nations' economies." Matsushita Electric, 475 U.S. at 582 (rejecting claim where purported conspiracy aimed to fix and raise prices in Japan, and at the same time to lower prices in the U.S. and

attempt a domestic monopoly). The antitrust laws' zone of interests is "protection of *American* consumers and *American* exporters, not foreign consumers or producers." IA P. Areeda and H. Hovenkamp, Antitrust Law § 272h, at 358 (2000) (emphasis in original). Foreign persons who "enter[] our commercial markets" are treated like domestic persons in the same position. Pfizer, Inc. v. Government of India, 434 U.S. 308, 318 (1978). But injuries to foreign entities occurring "exclusively in foreign markets . . . are not of the type Congress intended to prevent through the [FTAIA] or the Sherman Act." Turicentro, 303 F.3d at 307; see also Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d at 715 (noting that "nothing" in the antitrust statutes or their legislative history says anything "about protecting foreign purchasers in foreign markets").

In de Atucha v. Commodity Exch., Inc., 608 F. Supp. 510 (S.D.N.Y. 1985), an Argentinean plaintiff pled a claim with a remote link and a foreign context similar to Plaintiffs' claim here. The Argentinean investor had been injured in transactions on the London Metals Exchange, one part of what he alleged was a "world silver market." 608 F. Supp. at 513. He contended that anti-competitive manipulation of the American silver market led to his losses overseas. The court found that de Atucha lacked standing, because of the indirect causal relationship, the difficulty of calculating damages, and the London location of de Atucha's own transaction. "[N]otwithstanding the economic interaction between the United States and London" sub-markets of the alleged global marketplace, the court "conclude[d] that Congress did not contemplate recovery under the antitrust laws by an individual who traded, and was injured entirely outside of United States commerce." Id. at 518. As in the present case, the plaintiff's alleged relationship between his injury and U.S. effects was "too attenuated to allow the antitrust claim, and further, [any] recovery for such [a foreign] injury would not accurately reflect congressional intent." Id.

Plaintiffs are not the claimants that belong in a U.S. court complaining about this cartel. The proper private plaintiffs, American or foreign direct purchasers in the U.S. market, have sued for treble damages and extracted very meaningful sums in settlement. This is a clear case where "[t]he existence of an identifiable class of persons whose self interest . . . motivate[s] them to vindicate the public interest in antitrust enforcement" erodes any argument that a more remote group, like Plaintiffs, serves some public role. Associated Gen., 459 U.S. at 542. The U.S. purchasers sued for all losses in U.S. commerce and had the ability to recover for three times those actual losses. Yet Plaintiffs now try to stretch well-established standing requirements to get in the door for large recoveries untethered to U.S. commerce. Antitrust law, however, maintains strict standing hurdles, and Plaintiffs have failed to cross them. They have failed to allege a direct injury of the type the American laws were meant to address.

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss the Amended Complaint should be granted.

Dated: February 17, 2005

HENSON & EFRON, P.A.

By: s/Joseph T. Dixon, Jr.
Joseph T. Dixon, Jr. (#23139)
Scott A. Neilson (#239951)
220 South Sixth Street, Suite 1800
Minneapolis, Minnesota 55402-4503
Telephone: (612) 339-2500
Telecopier: (612) 339-6364

- and -

William L. Greene (#198730)
Douglas R. Boettge (#237292)
LEONARD STREET AND DEINARD
Professional Association
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
Telephone: (612) 335-1500
Telecopier: (612) 335-1657

- and -

A. Paul Victor
James F. Lerner
Christopher V. Roberts
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Telecopier: (212) 310-8007

Attorneys for Kyowa Hukko Kogyo Co., Ltd.

Lawrence Byrne
Lance Croffoot-Suede
Ruth E. Harlow
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Telecopier: (212) 354-8113

Attorneys for Takeda Pharmaceutical Company Limited f/k/a Takeda Chemical Industries, Ltd.

Richard A. Duncan (#192983)
Craig S. Coleman (# 325491)
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopier: (612) 766-1600

- and -

John E. Schmidtlein
John L. Cuddihy
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Telecopier: (202) 434-5029

Attorneys for Defendant Archer Daniels Midland Company

Michael A. Lindsay (#163466)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-7819
Telecopier: (612) 340-2868

- and -

Michael R. Lazerwitz
Steven Kaiser
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 974-1500
Telecopier: (202) 974-1999

Attorneys for Ajinomoto Co., Inc. and Ajinomoto U.S.A., Inc.