**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Inquivosa S.A.; Petbowe Chemtrade Corp.; Plus Sun Co., Ltd., MCC Menssing Chemiehandel & Consultants GmbH; and Newco Trading Co., on behalf of themselves and all others similarly situated,

MDL 00-1328

Plaintiffs,

v.

Ajinomoto Co., Inc.; Ajinomoto USA, Inc.; Orsan S.A.; Cheil Jedang Corp.; C.J. America, Inc.; Miwon Co., Ltd.; Daesang America, Inc.; Takeda Chemical Industries, Ltd.; Kyowa Hakko Kogyo Co., Ltd.; Vedan Enterprises Group f/k/a Tung Hai Fermentation Industrial Corp.; Archer Daniels Midland Co.; Ve Wong Corp.; Wei Chuan Foods Corp.; Yamasa Corp.; and Asahi Kasei Corp.

Defendants.

# PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND STANDING

## INTRODUCTION

Foreign purchasers brought this antitrust action against Defendants for their participation in an acknowledged global conspiracy to fix prices and allocate markets of flavor enhancers – Monosodium Glutamate ("MSG") and Nucleotides. Defendants[1] now move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

[1] Ajinomoto Co., Inc., Ajinomoto U.S.A., Inc., Takeda Pharmaceutical Company Limited f/k/a Takeda Chemical Industries, Ltd., Kyowa Hakko Kogyo Co., Ltd., Archer Daniels Midland Co., Cheil Jedang Corp. n/k/a CJ Corp., and CJ America, Inc. filed the motion at issue and will be referred to collectively herein as "Defendants."

This case is a classic example of a hard core conspiracy to raise prices in a global product market. As alleged in Plaintiffs' Amended Complaint and set forth in evidence already produced in the domestic litigation, MSG and Nucleotides are sold in a worldwide market where price movements in one geographic sub-market are linked to all other markets. Consolidated and Amended Class Action Complaint, November 15, 2004 ("Am. Compl."). Had the conspirators attempted to increase prices only in certain geographic areas, like Europe or Southeast Asia, market forces would have directed companies like Plaintiffs to purchase MSG and Nucleotides in the United States. Therefore, Defendants had to fix United States prices in order to overcharge customers throughout the world and fix prices throughout the world in order to overcharge customers in the United States.

This economic reality thus requires a response of the Unites States antitrust laws to Defendants' unlawful conspiracy. American antitrust law works on the principle that conspirators' anticipated sanctions must exceed their potential profits in order for deterrence to be effective. A purely domestic antitrust conspiracy can be deterred from operating in this country by the prospect of sanctions that exceed anticipated domestic profits. However, by all accounts, U.S. antitrust sanctions alone will not successfully deter anticompetitive conduct in this country by global cartelists because domestic profits will only be a fraction of the cartel's worldwide profits and the scope of worldwide civil sanctions will never come close to these worldwide profits. Recognizing this fact, Congress in the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a, expressly preserved Sherman Act jurisdiction over foreign Plaintiffs' claims, like those here, that arise from the direct, substantial, and reasonably foreseeable effects on U.S. commerce of Defendants' unlawful conduct. And last year, the Supreme Court in *F. Hoffmann-LaRoche, Ltd. v. Empagran, S.A.*, 124 S. Ct. 2359 (2004)

("Empagran") specifically left open the possibility that Sherman Act jurisdiction would extend to claims, like those here, where the foreign Plaintiffs' injuries arose from the U.S. effects of Defendants' conduct and were not independent of those effects.

Applying the established standard that courts at this early stage should accept uncontroverted allegations as true, Plaintiffs submit that they have more than met their burden of establishing rights to sue under the FTAIA. Similarly, because the factors that courts take into account in determining standing under the Sherman Act are the same factors that are relevant to jurisdiction under the FTAIA, Plaintiffs have shown that they have standing to pursue their claims.

## STATEMENT OF FACTS

In the Amended Complaint, Plaintiffs have properly pleaded the link between their injuries and the conspiracy's domestic effects. This properly alleged and direct link is neither "thin" nor "abstract," and the Defendants have not offered a single item of evidence contradicting Plaintiffs' claims. Defendants weakly predicate their motion in a conclusory fashion solely on legal arguments that highlight Plaintiffs' perceived failure to assert that class members purchased or attempted to purchase in the U.S. market or make factual allegations that are distinctive from any run of the mill U.S.-and-foreign price cartel case or that consist of non-"boilerplate" FTAIA language. Memorandum of Law in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Standing ("Defs. Br.") at 3.

Plaintiffs have alleged that Defendants are MSG and Nucleotide producers and their affiliates, and Plaintiffs are foreign purchasers who paid cartel prices for the MSG and Nucleotides Defendants sold. Am. Compl. ¶ 39. Defendants together set prices and allocated markets worldwide for MSG and Nucleotides pursuant to illegal agreements. *Id.* ¶¶ 13-27.

Indeed, Defendants' cartel consisted of a worldwide agreement "to fix 'target' prices, implement concerted price increases, allocate customers, as well as exchange information on sales figures." *Id.* ¶ 34. Moreover, the documents produced in the domestic litigation and the "documents found by the [European] Commission leave no doubt about the intent [of defendants] to rig the market." *Id.*[2]

As alleged in Plaintiffs' Amended Complaint, this conspiracy was truly a textbook example of a worldwide cartel. Defendants worked together to achieve a balanced world market price for MSG and Nucleotides by agreeing to purchase MSG and/or Nucleotides from each other in exchange for cooperation in setting a balanced world price for MSG and Nucleotides that was high enough for everyone to receive a financial benefit in every part of the world. *Id.* ¶ 40. MSG and Nucleotides are commodities in that there is a high degree of fungibility within the product groups. *Id.* ¶ 41. MSG and Nucleotide manufacturers are located worldwide, with the majority of production capacity residing in Europe and Southeast Asia. *Id.* These factors show that there was a worldwide geographic market for MSG and Nucleotides where price movements in one geographic sub-market are necessarily linked to all other markets. *Id.* The U.S. and foreign MSG and Nucleotide sub-markets are integrated and interconnected, such that prices paid by foreign purchasers are inextricably bound up with prices charged in the U.S. *Id.* ¶ 42. Defendants realized that because of the ready flow of MSG and Nucleotides among manufacturers and purchasers throughout the worldwide market, they would not be able to

---

[2] Among the documents cited in a European Commission press release, was a meeting report submitted by a co-conspirator, which stated that: "everyone was thanked for their co-operation during 1995 which resulted in the effective implementation of Nucleotide price increases and everyone was asked to continue their co-operation in 1996 so as to further increase the Nucleotide prices. [] all participants showed their agreement by nodding or saying words to that effect." *See* Exhibit 1 attached to Affidavit of Heidi M. Silton which is submitted in support of this memorandum.

maintain price increases or market allocations in one area (such as the United States or Europe) unless they did the same in another. *Id.* ¶ 43.

Defendants' conduct in forming, maintaining, and implementing their global conspiracy exerted direct and substantial effects on United States trade and commerce, as they foresaw, without regard to where particular transactions happened to occur. *Id.* ¶¶ 40, 44. The conspiracy inflated the prices paid by purchasers of MSG and Nucleotides everywhere in the world, including in the United States. *Id.* ¶¶ 39-44.

Defendants Ajinomoto, Cheil Jedang and Daesang were ultimately indicted by the U.S. government and pled guilty to participating in "a conspiracy to suppress and eliminate competition by fixing the price of and allocating customers for Nucleotides sold in the United States and *elsewhere*." *See e.g.*, Plea Agreement, *U.S. v. Ajinomoto Co., Inc.*, Crim. No. 301-CR-279-M, (N.D. Tex.), Aug. 27, 2001, p. 2, Ex. 2 (emphasis added). Defendants also paid criminal fines of approximately $9,000,000 in the United States and € 20,560,000 million in Europe, and have settled civil lawsuits with U.S. Plaintiffs for approximately $123,000,000. Even the approximately $132,000,000 in total U.S. criminal and civil sanctions Defendants have now paid is likely dwarfed by their profits during the 1980s and 1990s. Thus, although Defendants were apprehended and prosecuted aggressively, if they prevail in this Court against Plaintiffs' so-called "piggybacking" claims, they will walk away with substantial net profits as a direct consequence of their conduct in this country.

## STANDARD OF REVIEW

In considering a motion to dismiss under Rules 12(b)(1) and 12(b)(6), "the court must construe the amended complaint in the light most favorable to the plaintiffs, and the allegations in their complaint must be accepted as true." *Ossman v. Diana Corp.*, 825 F. Supp. 870, 879-80

(D. Minn. 1993) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (per curiam) *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir 1982); and *Hughes v. Rowe*, 449 U.S. 5, 10 (1980) (per curiam)); *see also Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir. 1994). "In addition, the court must resolve any ambiguities concerning the sufficiency of the plaintiffs' claims in favor of the plaintiffs, and give the plaintiffs 'the benefit of every reasonable inference' drawn from the . . . allegations in their complaint." *Id.* at 880 (citing *Hughes*, 449 U.S. at 10; and *Cruz v. Beto*, 405 U.S. 319, 322 (1972); and quoting *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963)). Thus, the "court may dismiss . . . [the plaintiffs'] complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); and citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Moreover, because the legal issue presented by Defendants' motion – whether Plaintiffs' claims arise from the conspiracy's domestic effects –intertwines with the issues of causation and damages, this Court should be especially reluctant to dismiss at this stage of the case.

**THE *EMPAGRAN* DECISION**

Pursuant to the Supreme Court's decision in *Empagran*, in order to establish jurisdiction under the FTAIA, Plaintiffs must establish that the U.S. effects of Defendants' conduct give rise to their claims, *i.e.*, they must demonstrate a causal connection between the two. Defendants cannot seriously dispute that this causation is present here: they pled guilty in this country to a worldwide conspiracy that included deliberately fixing U.S. prices to extract cartel profits from Plaintiffs abroad, and purposely and directly preventing Plaintiffs from buying MSG and Nucleotides from the United States through market division and customer allocations.

Defendants' motion shows a misunderstanding and misapplication of the Supreme Court's holding in *Empagran*. Although recognizing that the D.C. Circuit's reading of FTAIA's language might be the "more natural" one, 124 S. Ct. at 2372, the Supreme Court found that Defendants' reading was permitted by the statute and was supported by considerations of comity and by pre-FTAIA case law. It held that the language "a claim" should be read to mean "the plaintiff's claim," and thus that the Sherman Act did not extend to foreign plaintiffs' claims for injuries that were *independent of* the effects of defendants' conspiracy on the United States. The Court did *not* adopt defendants' view of antitrust standing, leaving undisturbed the D.C. Circuit's holdings on that issue.[3]

Most significantly, the Supreme Court did *not* resolve the ultimate question of whether Sherman Act jurisdiction extends to plaintiffs' claims. Instead, its holding was limited to an assumed factual scenario on plaintiffs' case, one in which the foreign and domestic effects of Defendants' conduct were *independent* of one another. The Court repeatedly went out of its way to emphasize that it was *not* deciding whether jurisdiction would be proper in a case in which those effects were linked—specifically, in which the direct, substantial, and foreseeable effects of unlawful conduct *gave rise to* the plaintiff's claim. Indeed, the Court made at least two dozen references to "independently caused foreign injury," or something similar, and made numerous statements emphasizing the narrowness of its holding.[4]

---

[3] The D.C. Circuit had rejected defendants' arguments that plaintiffs lacked antitrust standing and had not suffered antitrust injury. The Court held that, in fact, plaintiffs' injuries were precisely the type the antitrust laws were designed to prevent, and that, because plaintiffs' claims were direct and not speculative and because no "more appropriate plaintiffs" existed who could more efficiently bring claims for the same harms, plaintiffs were "proper plaintiffs" under the standards established by *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983); *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 315 F.3d 338, 357-360 (D.C. Cir. 2003).

[4] *See* 124 S. Ct. at 2363 ("To clarify: The issue before us concerns . . . (3) an independent foreign effect giving rise to the claim."); *id.* at 2366 ("Because the underlying antitrust action is complex, potentially raising questions not directly at issue here, we reemphasize that we base our decision upon the following: . . . the adverse foreign effect is

The Supreme Court remanded the case to the D.C. Circuit to consider plaintiffs' market linkage theory in the first instance. The D.C. Circuit first requested briefing on whether the theory was properly pled and preserved and on what the appropriate procedural approach should be. The Court subsequently held that plaintiffs had indeed pled the facts necessary to support their argument and had preserved the argument throughout the litigation; and it requested merits briefing on the legal sufficiency of the causal relationship that plaintiffs had alleged between the U.S. and foreign harms of Defendants' conspiracy. *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 388 F.3d at 342-43, 345. Merits briefing was completed on March 3, 2005 and oral argument has been set for April 20, 2005.

By limiting its holding to a point of statutory interpretation in an assumed factual scenario, the Supreme Court shunned a bright line rule and struck a practical balance that closed the door on many potential Sherman Act claims, including Section 2 and "rule of reason" claims, as well as price-fixing cases which predominantly arise in regional, not global markets. At the same time, the Supreme Court left the door open for a discrete class of Sherman Act cases, like this one, where Plaintiffs can establish a direct and substantial link between their injuries and the conspiracy's anticompetitive domestic effects.

---

independent of any adverse domestic effect."); *id.* at 2367 ("We thus repeat the basic question: Why is it reasonable to apply this law to conduct that is significantly foreign *insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim*?" (emphasis in original)); *id.* at 2370 (distinguishing *Industria Siciliana Asfalti, Bitumi, S.p.A v. Exxon Research & Engineering Co.*, 1977 WL 1353 (S.D.N.Y. 1977)); *id.* at 2372 ("We have assumed that the anticompetitive conduct here independently caused foreign injury. . . . Respondents argue, in the alternative, that the foreign injury was not independent. . . . The Court of Appeals, however, did not address this argument, and, for that reason, neither shall we.") (citation omitted).

## ARGUMENT

### I. Plaintiffs Pleaded The Link Between The Conspiracy's Illegal Domestic Effects And Their Injuries.

As set forth above, Plaintiffs clearly pleaded the link that the *Empagran* decision contemplated as a basis for satisfying the FTAIA. In paragraphs 39-43 and 59 of the Amended Complaint, Plaintiffs specifically allege that their injuries directly arose from the U.S. effects of Defendants' conduct:

- Beginning in at least as early as January 1, 1984 and continuing through at least November 1, 1999, Defendants and their Co-Conspirators engaged in an over-arching worldwide conspiracy to raise, fix, stabilize, and maintain worldwide MSG and Nucleotide prices. Their cartel operated on a global basis and affected the prices in every part of the worldwide market for MSG and Nucleotides. Defendants entered into agreements with each other and with other MSG and Nucleotide manufacturers, determined what price each should charge for MSG and Nucleotides inside and outside the U.S., and decided how much market share each company should have. Am. Compl. ¶ 39.

- Defendants and their Co-Conspirators worked together to achieve a balanced world market price for MSG and Nucleotides. Defendants worked to achieve this goal in part by agreeing among themselves to purchase MSG and/or Nucleotides from each other in exchange for cooperation in setting a balanced world price for MSG and Nucleotides that was high enough for everyone to receive a financial benefit in every part of the world. Defendants and their Co-Conspirators' unlawful price-fixing and market allocation affected U.S. commerce and gave rise to Plaintiffs' antitrust claim and injuries. *Id.* ¶ 40.

- MSG and Nucleotides are commodities in that there is a high degree of fungibility within the product groups. MSG and Nucleotide manufacturers are located worldwide, with the majority of production capacity residing in Europe and Southeast Asia. These factors indicate that there is a worldwide geographic market for MSG and Nucleotides where price movements in one geographic sub-market are necessarily linked to all other markets. *Id.* ¶ 41.

- U.S. and foreign MSG and Nucleotide sub-markets are integrated and interconnected, such that prices paid by foreign purchasers are inextricably bound up with prices charged in the U.S. Given MSG and Nucleotides' commodity nature and worldwide flow, MSG and Nucleotide prices charged by Defendants and their Co-Conspirators in countries other than the U.S. are in parity and highly correlated with U.S. MSG and Nucleotide prices. *Id.* ¶ 42.

- Given MSG and Nucelotide's worldwide flow, Defendants and their Co-Conspirators knew their conspiracy would not succeed unless they coordinated their prices and market shares in markets across the world, specifically including fixing U.S. MSG and Nucleotide prices and allocating U.S. MSG and Nucleotide market shares. Defendants and their Co-Conspirators knew that without an agreement affecting U.S. commerce, foreign-based MSG and Nucleotide purchasers would have arbitraged, purchasing MSG and Nucleotides at competitive U.S. prices and exporting them into their home countries. Arbitrage from the U.S. would have defeated Defendants and their Co-Conspirators' attempts to fix prices and allocate market shares in other countries worldwide. Hence, Defendants and their Co-Conspirators' worldwide MSG and Nucleotide price fixing conspiracy necessarily had to include the U.S., and thus, any anticompetitive effects that occurred in the U.S. necessarily would have also been felt by foreign MSG and Nucleotide purchasers. *Id.* ¶ 43.

- Defendants' price fixing and market allocation significantly and adversely affected customers both outside the U.S. and customers within the U.S., and the conspiracy's adverse foreign effect was dependent on its adverse U.S. effect. Indeed, these effects comprised a necessary link in creating Plaintiffs' foreign injuries. The U.S. effect of Defendants' conduct was necessary to achieve Plaintiffs' injuries abroad because: (1) without Defendants' conspiracy's adverse U.S. effect – higher U.S. MSG and Nucleotide prices – Defendants and their Co-Conspirators could not have maintained their international price fixing arrangement, and Plaintiffs would not have suffered their foreign injuries; and (2) if the conspiracy had not affected the U.S. sub-market, Plaintiffs and other foreign MSG and Nucleotide purchasers would have obtained product from the U.S. sub-market at competitive prices. *Id.* ¶ 56.

Although Defendants have not provided any evidence to dispute the above allegations in the Amended Complaint, documents produced in the domestic litigation and put before this Court firmly support Plaintiffs' claims.

## II. Plaintiffs' Injuries Arose From The U.S. Effects Of Defendants' Conduct.

As shown above, Plaintiffs pleaded that prices in the United States were inextricably intertwined with the prices Plaintiffs paid. *See supra* 9-10. Plaintiffs pleaded that Defendants' efforts to fix MSG and Nucleotide prices in the United States and limit trade between the United States and other countries enabled them to extract cartel profits from Plaintiffs abroad because MSG and Nucleotides are fungible and easily transportable commodities that are traded on a global market. *See id.* As a matter of fundamental economics, this means that Plaintiffs' injuries

arose from the U.S. effects of Defendants' unlawful conduct. Defendants refer to these factual claims as "contested," Defs. Br. at 5 n.5, but provide no actual reason to doubt them; in any event, at this procedural stage, that a claim is "contested" is an argument *against* dismissal. Plaintiffs thus satisfy the Supreme Court's interpretation of the FTAIA in *Empagran*.

As alleged in the Amended Complaint, "MSG and Nucleotides are commodities in that there is a high degree of fungibility within the product groups" and "manufacturers are located worldwide." Am. Compl. ¶ 41. The market for MSG and Nucleotides is clearly global. As a result, because of the ready flow of MSG and Nucleotides among manufacturers and purchasers throughout this global market, Defendants would not be able to maintain price increases or market and customer allocations in one geographic area unless they did the same across the globe. *See supra* at 9-10. Thus, the competitive price for each MSG and Nucleotide sold is in parity worldwide. And, in order to succeed in charging super-competitive prices, would-be conspirators must either fix the price throughout the world, or create barriers to global commerce in MSG and Nucleotides. Law and Economics Profs. *Empagran Amicus Br.* at 2, Ex.3.

Defendants did both in this case, engaging in a far-reaching worldwide price-fixing conspiracy that set a super-competitive world price for MSG and Nucleotides, and entering market and customer allocation agreements that prevented MSG and Nucleotides from being traded in certain regions. Defendants' cartel would have collapsed due to arbitrageurs' undercutting of the cartel's prices if they had not controlled the United States MSG and Nucleotide trade.[5]

[5] *See* Stiglitz & Orszag *Empagran Amicus Br.* at 4, Ex. 4. ("[A] large international cartel in a global market will typically have to include the United States — even assuming some probability of detection and disgorgement of U.S.-based profits — or risk having its foreign profits undermined by arbitrage from trade between the U.S. market and the cartelized foreign markets."); *see* Economics Profs. *Empagran Amicus Br.* at 6, Ex. 5.

Therefore, Defendants' unlawful conduct directly prevented Plaintiffs from being able to purchase MSG and Nucleotides from the United States. Plaintiffs' injuries thus *arose* from the U.S. effects of Defendants' conduct and were not "independent" of these effects. *See Empagran*, 124 S. Ct. at 2363.

Defendants cannot credibly dispute their knowledge of this global interrelationship and the deliberate nature of their actions: Defendants included the United States in the cartel (notwithstanding the risk of both criminal prosecution and liability to U.S. consumers) *precisely in order* to extract cartel profits from purchasers around the world without risk of arbitrage. Moreover, even if Defendants were correct to characterize the relationship between Defendants' price-fixing in the United States and Plaintiffs' injury as "indirect" or "speculative," they offer no reason why their market division and customer allocation agreements are insufficient to support jurisdiction.[6] Defendants' only argument that is even relevant to the significance of the market division scheme is their observation that Plaintiffs did not actually attempt to buy from the United States. Defs. Br. at 2-3. But to suggest that U.S. jurisdiction should turn on whether Plaintiffs made a futile attempt to buy from the United States, when Defendants' own illegal agreements *prevented* them from doing so, is untenable.

## III. Permitting Plaintiffs' Claims Is Consistent With The FTAIA's Text.

The FTAIA provides for a Sherman Act claim when unlawful conduct has a "direct, substantial, and reasonably foreseeable" effect on U.S. trade or commerce, and that effect "gives rise to [the plaintiff's] claim" (which is plainly the case here, *see supra* Part II). Defendants attempt to construe the language "gives rise to" in such a way as to raise the bar so high that no foreign plaintiff could ever meet it. They argue that "gives rise to" means that Plaintiffs' claims

[6] These agreements – a restraint on U.S. export commerce – directly prevented Plaintiffs from purchasing MSG and Nucleotides from the United States.

(which are discussed only in a conclusory fashion without one citation from Plaintiffs' complaint) should fail because: such claims do not allege that "the U.S. prices were . . . the source or the cause of the alleged foreign price-fixing"; "a weak 'but for' link must fail"; "[p]laintiffs are unable to establish that the U.S. effect gives rise to a justiciable 'claim' here"; and Plaintiffs' allegations simply do not establish that "an effect on U.S. commerce sufficient to meet subsection 1 was the fundamental source of Plaintiffs' injuries." Defs. Br. at 11-14.

### A. "Gives Rise To" Simply Requires Causation, A Standard That Is Clearly Met Here.

Defendants are right that the phrase "gives rise to" connotes some degree of causation or origination. *See* American Heritage Dictionary of the English Language (4th ed. 2000) ("give rise to: To be the cause or origin of; bring about."). The Supreme Court has interpreted similar language to impose a causation requirement. *See United States Indus./Fed. Sheet Metal, Inc.* v. *Director*, 455 U.S. 608, 615 (1982) ("arising out of . . . refers to injury causation").

Although few courts have addressed the degree of causation required by the exact phrase "gives rise to," in a number of cases courts have interpreted that phrase's converse: "arising out of" [7] or "arising from."[8] These courts have applied a variety of different tests for causation, but have generally concluded that "arising" implies but-for causation or some other form of

[7] For instance, courts interpreting "arising out of" in insurance contracts have generally found that but-for causation, or some other connection less exacting than proximate causation, is required. *See SFH, Inc. v. Millard Refrigerated Servs, SFH, Inc.* v. *Millard Refrigerated Servs. Inc.*, 339 F.3d 738, 743 (8th Cir. 2003); *Federal Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 804 (10th Cir. 1998); *Red Ball Motor Freight, Inc. v. Employers Mut. Liability Ins. Co.*, 189 F.2d 374, 378 (5th Cir. 1951). Nor is this broad interpretation limited to insurance cases. *See, e.g., Lanier v. American Bd. of Endodontics*, 843 F.2d 901, 909 (6th Cir. 1988); *see also Hamilton v. United Healthcare of La. Inc.*, 310 F.3d 385, 391 (5th Cir. 2002); *Williams v. Imhoff*, 203 F.3d 758, 765-66 (10th Cir. 2000); *Ballard* v. *Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995); *In re Oil Spill by Amoco Cadiz off Coast of France on March 16, 1978*, 699 F.2d 909, 915 (7th Cir. 1983).

[8] The D.C. and Fifth Circuits have consistently used the "arise from" formulation, recognizing that the two phrases are converse formulations of the same relationship. *See e.g., Empagran*, 315 F.3d at 344, 347, 353; *id.* at 362 (Henderson, J. Dissenting); *Den Norske Stats Oljeselskap As v. HeereMac v.o.f.,* 241 F.3d 420, 451 (5th Cir. 2001) *cert denied sub nom Statoil ASA v. HeereMac v.o.f.,* 122 S. Ct. 1059 (2002) ("*Statoil*").

connection less demanding than proximate causation. Defendants admit as much, spinning that "direct and fundamental" causation is the test.

Notably, the only lower court squarely to resolve the question following the Supreme Court's opinion in *Empagran* (which Defendants fail to mention) has held that where foreign plaintiffs injured abroad *do* assert a causal connection between the U.S. effects of defendants' conduct and their injuries, the FTAIA provides for jurisdiction over their claims. *See MM Global Servs. v. Dow Chem. Co.*, 329 F. Supp. 2d 337, 342 (D. Conn. 2004) ("The complaint properly alleges that the defendants' conduct had an effect on competition in and from the United States and the plaintiffs were injured [in India] as a result of that effect. Accordingly, dismissal for failure to satisfy § 6a(2) is inappropriate.").[9]

Defendants rely heavily on *Den Norske Stats Oljeselskap As v. HeereMac v.o.f.*, 241 F.3d 420 (5th Cir. 2001) *cert denied sub nom Statoil ASA v. HeereMac v.o.f.*, 534 U.S. 1127 (2002) (hereinafter "*Statoil")*, a case defendants say is "on all fours" with Plaintiffs' case. In *Statoil,* the Fifth Circuit implemented an "arise from" test; *Supra* at 13 n. 8, *infra* at 15-16,. Although the Court found that the plaintiffs had not met that test, the facts in *Statoil* vary greatly from those here. *Statoil* did not involve fungible, easily transportable goods traded on a global market at a single world market price. It involved the market for heavy-lift barges, "immense vessels" of which "[o]nly six or seven…exist in the world." *Statoil,* 241 F.3d at 422. Defendants highlight the *Statoil* Court's emphasis on the Plaintiffs' allegation of a "single, unified, global conspiracy", Defs. Br. at 12, but Plaintiffs here do not suggest that such an allegation by itself is sufficient to overcome a motion to dismiss. On the contrary, facts demonstrating a causal relationship

[9] Defendants' writ of mandamus in *MM Global* was denied on February 17, 2005. *See* Ex. 6.

between the U.S. effects and the Plaintiffs' injury must be alleged. Such facts were not alleged in *Statoil,* but clearly have been alleged in the Amended Complaint. *Id.* at 427; *Supra* at 8-9. [10]

Furthermore, as the Supreme Court observed in *Empagran*, *Statoil* involved a case where the plaintiff suffered their foreign injury "independent of domestic harm," *Empagran*, 124 S. Ct. at 2364. Defendants' notion that the Supreme Court endorsed the entirety of the *Statoil* opinion, Defs. Br. at 11 ("cited with approval by the Supreme Court in Empagran"), is negated by the further fact that the Supreme Court mentioned *Statoil* only twice—first to recognize the split between the Fifth and Second Circuits in applying the FTAIA and, second, to quote *Statoil's* statement that "[w]e have found no case in which jurisdiction was found in a case like this—where a foreign plaintiff is injured in a foreign market with no injuries arising from the anticompetitive effect on a United States market." *Id*. at 2369. As we have shown above, that description would not apply to the present case.

### B. Jurisdiction Over *All* Claims Arising From The U.S. Effects Of Defendants' Unlawful Activities Is Permitted By The FTAIA's Text, Not Just Those Arising In Domestic Commerce.

Despite Defendants' suggestions to the contrary, the FTAIA's text makes jurisdiction turn on the *cause* of a plaintiff's injury, not the *location* of that injury or of a plaintiffs' *transactions*. Thus, the standard unsuccessfully advanced by defendants in *Empagran* and echoed by Defendants here[11]—that the FTAIA should be read to permit lawsuits only for injuries

[10] Although plaintiffs alleged in *Statoil* that the market for heavy-lift services was a unified global market, they never articulated any link between the price of heavy lift services in the Gulf of Mexico and other regions. Thus, the court held that the plaintiffs failed to show that their injury stemmed from the effect of higher prices paid by United States companies for heavy-lift services in the Gulf of Mexico. *Id.* at 427.

[11] *See, e.g.*, Defs. Br. at 12 n. 9 ("The Fifth Circuit made clear that, with allegations like those in Den Norske or here, customers *in domestic, U.S. commerce* (whether American or foreign) could sue for Sherman Act violations, but customers hurt by the alleged global conspiracy *in foreign commerce* could not" internal citations omitted); *id.* at 2-3 ("Plaintiffs never assert . . . that they or any of the class members they propose to represent have purchased or attempted to purchase in the U.S. market."); *id.* at 4 ("[T]he statute sets out a general rule that the Sherman Act 'shall not apply' to foreign trade or commerce (other than import trade or commerce, which is not at issue in this

arising from particular transactions that took place "in domestic, U.S. commerce"—has no textual foundation. Defs. Br. at 12 n. 9. Such an approach would make jurisdiction turn on the location of *particular transactions*—a location that in a worldwide market results from mere chance. This illogical approach has already been rejected by the D.C., Second and Fifth Circuits. *Empagran*, 315 F.3d at 344 (citing *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 398 (2d Cir. 2002), and *Statoil*, 241 F.3d at 426).

And as *Statoil* demonstrates, there is no inconsistency between the Court's conclusion that "a claim" in the FTAIA meant "the plaintiff's claim" and the notion that the conduct prohibited by the Sherman Act is the *conspiracy* and not individual *transactions*.[12] *See* 241 F.3d at 427 n.22 (articulating "the proper inquiry" under its ruling to be whether, "*regardless of the situs of the plaintiffs' injury*,…that injury arises from the anticompetitive effects on United States commerce". (emphasis added)).

The geographic locus of a Plaintiff's injury, or of the particular transactions at issue, simply has no bearing on whether the U.S. effects of Defendants' conduct "gives rise to" Plaintiff's claim; "gives rise to" is language of causation, not location. Nor can the FTAIA or Sherman Act's structure and purpose be squared with a transaction-by-transaction approach. Indeed, the Supreme Court has repeatedly recognized that Sherman Act jurisdiction extends to international cartels that harm U.S. commerce, whose conduct is in all relevant respects indistinguishable from Defendants'. *See, e.g.*, *Timken Roller Bearing Co. v. United States*, 341

---

case)."); *id.* at 10 ("Plaintiffs do not allege any prior participation in the U.S. market"); *id.* at 11 ("[T]he U.S. prices were not the source or the cause of the alleged foreign price-fixing.").

[12] Even though the plaintiffs alleged a worldwide conspiracy, the Fifth Circuit in *Statoil* held the suit there was barred by the FTAIA. But again *Statoil* differed importantly from *Empagran* and this case, because the kind of product at issue was not traded on a global market. *See* VED P. NANDA & DAVID K. PANSIUS, 1 Litigation of International Disputes in U.S. Courts 231, § 5:13 (2003), Ex. 7.

U.S. 593, 595 (1951); *United States v. Nat'l Lead Co.*, 332 U.S. 319 (1947). *Nothing* in Section 1 turns on the locus of Plaintiffs' injury.

A location or transaction-focused approach also undermines the fundamental purpose of the antitrust laws to protect competition by targeting anticompetitive conspiracies, rather than isolated instances of anticompetitive conduct in furtherance of those conspiracies.[13] *See Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991) (holding that "the essence of any violation . . . is the illegal agreement itself—rather than any overt acts performed in furtherance of it"). The U.S. government, in its International Antitrust Guidelines, has recognized as much. *See* U.S. D.O.J. Antitrust Enforcement Guidelines for International Operations § 3.121 (1995), Ex. 8 (quoting *Summit Health*, 500 U.S. at 330-31).[14]

Nor did Congress, in passing the FTAIA, deem the locus of particular transactions important to the lawfulness of a course of conduct. *See* Report on the Foreign Trade Antitrust Improvements Act of 1982, H.R. Rep. No. 97-686, at 17a (1982) ("H.R. Rep. 97-686"), Ex. 9 ("The *conduct* has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad.") (emphasis in original). In drafting the FTAIA, Congress specifically rejected proposals that *would* have limited "antitrust liability only to those persons injured within the United States." Foreign Trade Antitrust Improvements Act: Hearings on H.R. 2326 Before the SubComm. On Monopolies and Commercial Law of the House Comm. On the Judiciary, 97th Cong. at 109 (1981) ("Hearings on H.R. 2326") (statement of Martin F.

---

[13] Courts have long recognized, in applying the antitrust laws, that the market for a particular product frequently is not defined by geographic boundaries. "[T]he relevant competitive market . . . is of course the area in which respondents and the other . . . producers effectively compete." *Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 331-32 (1961) (citations omitted).

[14] This rule under the Sherman Act mirrors the principle that, if a conspiracy has a sufficient nexus to this country, U.S. law applies despite the fact that *all* the overt acts in furtherance thereof were committed overseas. *See United States* v. *Wright-Barker*, 784 F.2d 161, 168 (3d cir. 1986) (citing cases); *see also*, *e.g.*, *United States* v. *Plummer*, 221 F.3d 1298 (11th Cir. 2000).

Connor, General Electric Co.), Ex.10.[15] And the House Report also rejected this view. *See* H.R. Rep. 97-686 at 20a, Ex. 9 (stating that while "the 'effect' providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws, [*t*]*his does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States*.").

Defendants neglect to mention this legislative history which leaves open the door for claims like Plaintiffs', arguing instead, without textual or legal support, that Congress did not intend such a "radical" expansion of the Sherman Act. Defs. Br. at 14.

### IV. Deterrence of Global Cartels Like The MSG Cartel Serves A Fundamental Purpose Of The Sherman Act.

Defendants' policy concerns are meritless. As the Supreme Court has recognized, foreign Plaintiffs' antitrust claims are critical components of the Sherman Act's deterrence scheme and are thus crucial to protect American consumers. Global conspiracies that target and harm the United States bring profits to conspirators throughout the world, and a failure to force conspirators to disgorge those worldwide profits would simply encourage unlawful behavior. *See Pfizer, Inc. v. Government of India*, 434 U.S. 308, 315 (1978); *see also Empagran*, 315 F.3d at 356-57; Stiglitz & Orszag *Empagran Amicus Br.* at 3-5, Ex. 3.[16]

---

[15] *See, e.g.*, The Foreign Trade Antitrust Improvements Act: Hearings on S. 795 Before the Comm. on the Judiciary, 97th Cong. at 130 (1981), Ex. 11 (Business Roundtable) (proposing: "If conduct involving trade or commerce with foreign nations does directly, substantially, and foreseeably restrain trade or commerce within the United States, then the parties engaging in such conduct shall be liable *only for any injury so occurring within the United States* by reason of such restraints." (emphasis added)).

[16] Although the Supreme Court did not deem deterrence considerations dispositive in cases in which a foreign plaintiff's injury is *independent* of the U.S. effects of defendants' conduct, *see Empagran*, 124 S. Ct. at 2372, those considerations are far more significant where those U.S. effects *cause* the foreign injury. *See infra* at 56-59. The defendants downplaying of deterrence considerations overlooks the fact that the Court made abundantly clear that its analysis did not apply to such cases. *See supra* at 6-7 & n.4. Furthermore, as demonstrated throughout this opposition, jurisdiction over plaintiffs' claims is not justified *only* because of the likelihood of increased deterrence.

The result Defendants seek would undermine the overarching "goal of sanctioning cartel conduct," namely, "general deterrence, *i.e.*, to deter others from engaging in the offending conduct." James M. Griffin, Dep. Ass't A.G., Address Before the British Institution of International & Comparative Literature Second Annual Conference on International & Comparative Competition Law: Trends and Tensions (May 2002) ("Griffin Speech"), at 6, Ex. 12. And in particular, despite Defendants' contrary protestations, it would undermine the purpose of civil enforcement under the Clayton Act, which is to "enlist private plaintiffs in the work of detecting, punishing, and thereby deterring wrongdoing."[17] Phillip Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv. L. Rev. 1127, 1127 (1976).[18]

Specifically, in this case, although Defendants have already paid over $132,000,000 in U.S. civil and criminal sanctions for the harms they inflicted on the United States, their total profits during the 1980s and 1990s surely exceed these penalties many times over. Thus, if Plaintiffs' suit is barred, Defendants' net profit as a result of their global cartel will be enormous and will encourage the many other as yet undetected cartels to continue.[19] Foreign nations' cartel enforcement cannot be expected to fill this gap; the OECD has recently concluded that

[17] Recent legislation substantially mitigates any concern that allowing foreign claims would undermine enforcement. That legislation, which the Supreme Court did not consider, provides conspirators with an additional incentive to cooperate with government officials by reducing their civil exposure from treble to single damages. *See* Assistant Attorney General for Antitrust R. Hewitt Pate, Issues Statement on Enactment of Antitrust Criminal Penalty Enforcement and Reform Act of 2004. Ex. 13 ("the detrebling provision of the Act removes a major disincentive for submitting amnesty applications, encouraging the exposure of more cartels, and making the [Department of Justice] Division's Corporate Leniency Program even more effective.").

[18] *See also* Kurt Rudolf Murow & Harry Maurer, Webs of Power: International Cartels and the World Economy 226 (1982), Ex. 14 (observing that private enforcement is crucial to cartel detection); Scott D. Hammond, Dir. Of Crim. Enf., (Sept. 12, 2000), at 8, Ex. 15 (noting that "cartel members did not fear detection by U.S. or foreign antitrust authorities. In fact, they literally laughed at the very idea of it.").

[19] *See* William J. Kolasky, Antitrust Compliance Programs: The Government Perspective, Speech before the Corporate Compliance 2002 Conference, PLI, at 4-5 (July 12, 2002) (Deputy Ass't A.G., Antitrust Div., DOJ), Ex. 16 (explaining the difficulty of detecting international cartels); OECD, Report on the Nature and Impact of Hard Core Cartels and Sanctions Against Cartels Under National Competition Laws, DAFFE/COMP (2002)7, at 3 (Apr. 9, 2002), Ex. 17 (stating that as few as one-seventh of all international cartels are detected).

"larger sanctions are required to achieve effective deterrence" against cartels. OECD, Hard Core Cartels 3 (2002), Ex. 17. *See also* Int'l Comp. Pol'y Adv. Comm., Final Rep't to the A.G. (2000) at 16, Ex. 18 (observing that "overall anticartel enforcement levels around the world remain fairly low outside the United States"); Griffin Speech, *supra*, at 6-7, Ex. 12 (observing that past studies found that actual fines imposed were "less than 1% of the level necessary to deter cartel conduct. While fines have increased significantly [since then,] they are not now and never will be anywhere near the optimal fine level established by those studies.").

An extremely important purpose of the antitrust laws is the deterrence of international cartels. "[O]ne of the express goals when the Sherman Act was passed in 1890 was to combat the trusts and cartels which, as Senator Sherman put it, were 'imported from abroad.'" James A. Rahl, Foreign Trade Antitrust Improvements Act, Hrgs. Before the Subcomm. on Monopolies and Commercial Law of the Committee on the Judiciary of the House of Reps., 97th Cong., 1st Sess. at 42 (1981), Ex. 19. That purpose was preserved in the FTAIA, which did not limit claims against global cartels.[20]

## V. The Policy Considerations Articulated In *Empagran* Support Jurisdiction Over Plaintiffs' Claims.

The Supreme Court avoided reaching the merits of the *Empagran* plaintiffs' worldwide market argument, but several aspects of its rationales support Plaintiffs' argument here. The Court offered "two main reasons" for its decision. 124 S. Ct. at 2366. First, it determined that Congress passed the FTAIA against the background of existing Sherman Act case law, which had not permitted suits by plaintiffs for independent foreign injuries. Second, it found that interpreting the FTAIA to encompass foreign plaintiffs' claims even when their injuries were

[20] *See* H.R. Rep. 97-686 at 13a, Ex. 9; 1A Areeda et al., ¶ 272i n.69 ("*Of course*, [the FTAIA] was *not* intended to cover the situation of a foreign cartel targeting United States markets." (emphases added)); *see also* Barry E. Hawk, International Antitrust Policy and the 1982 Acts, 51 Fordham L. Rev. 201, 220 (1982), Ex. 20; 1 Barry E. Hawk, United States, Common Market and International Antitrust, at 177-78 (Supp. 1996-1), Ex. 21.

independent of the U.S. effects of a conspiracy would risk interfering with foreign nations' interests and thus might threaten international comity. But the analysis the Court applied as to both factors leads to the opposite result here: as the Court specifically recognized, Congress *was* aware of existing Sherman Act cases in which foreign plaintiffs' injuries *were* caused by the U.S. effects of defendants' conduct; and it is "reasonable" for the United States to exercise jurisdiction over foreign plaintiffs' claims that arise from the harm defendants inflicted on U.S. markets, dissipating any comity concerns.

### A. Pre-FTAIA Case Law Supports Plaintiffs' Claims.

Pre-FTAIA case law supports Plaintiffs' reading of the Sherman Act. The Supreme Court stated that case law did not support jurisdiction "in these circumstances"—namely, the circumstances the Court had *assumed* to be present, *i.e.*, foreign injury that was wholly independent of the U.S. effects of defendants' conduct. 124 S. Ct. at 2369-71. The Court went out of its way, however, to avoid reaching the circumstances presented by the case on remand. Indeed, the Court – cross-referencing plaintiffs' "alternative" argument – specifically distinguished *Industria Siciliana*, 1977 WL 1353 (S.D.N.Y. Jan. 18, 1977), on the grounds that in that case the foreign injury and U.S. effects were not "independent."

Defendants' efforts to distinguish *Industria Siciliana* fail. Defendants' market division and price-fixing "directly caused" Plaintiffs' injury, *see* Defs. Br. at 14 n. 10, just as in that case, and just as there, Defendants did not profit from the exclusion of American competitors (per market division) in and of itself, but rather from the resulting higher prices they were able to charge Plaintiffs. Defendants further claim that the unlawful conduct in question in that case, a reciprocal dealing agreement, was a "single-act" transaction involving foreign harm that "was directly caused by and that occurred simultaneously with a domestic restraint on trade." *Id.* Not

only was this "distinction" not mentioned by the Supreme Court, but this case also involves such simultaneous harm. Finally, the *Industria* court expressly deemed the plaintiff's participation in U.S. export commerce not particularly "meaningful," 1977 WL 1353 at *14, and specifically held that it was irrelevant that the plaintiff's injury was "borne by a foreign corporation which does not directly engage in import from or export to the United States," *id.* at *11.

Most importantly, one very significant pre-FTAIA case, one Defendants fail to even mention, affirmatively endorsed in the legislative record, stands for the proposition that foreign plaintiffs' claims for injuries suffered abroad are cognizable if they arise from the U.S. effects of defendants' unlawful conduct. *Pfizer,* 434 U.S. at 320. *Pfizer* is *still* binding law, as nothing in *Empagran* undermined its reasoning. This alone is a reason to reject Defendants' motion, for it is irreconcilable with *Pfizer*: a refusal to permit recovery by foreign Plaintiffs except for injuries suffered from purchases "in the U.S. market" would lead to precisely the degree of underdeterrence *Pfizer* was concerned with avoiding. As the Court explained:

> The fact that Congress' foremost concern in passing the antitrust laws was the protection of Americans does not mean that it intended to deny foreigners a remedy when they are injured by antitrust violations. Treble-damages suits by foreigners who have been victimized by antitrust violations clearly may contribute to the protection of American consumers.

434 U.S. at 314. Congress expressly adopted the *Pfizer* deterrence rationale when it passed the FTAIA. *See* H.R. REP. 97-686 at 10a, Ex. 9; *see also Empagran*, 315 F.3d at 356-57.[21]

### B. U.S. Jurisdiction Over Plaintiffs' Claims Does Not Offend Comity.

The fact that Defendants open their comity section with a citation to a case from *1804* demonstrates the weakness of their arguments in the context of claims that arise from the U.S

[21] Whether or not the plaintiff in *Pfizer* made purchases in the United States was a fact that was wholly irrelevant to Congress when it expressly relied on the *Pfizer* deterrence rationale in passing the FTAIA. *See* H.R. REP. 97-686 at 10a, Ex. 9 (citing *Pfizer* for the proposition that it does not matter, for the purposes of determining whether U.S. antitrust laws reach certain conduct, "if some purchasers take title abroad").

effects of an international cartel's conduct. A jurisdictional standard that encompasses Plaintiffs' claims is completely consistent with comity considerations, as the Supreme Court's analysis makes clear. Though policy concerns cannot trump the plain text of a statute, the Court did apply the notion of "prescriptive comity" as a doctrine to resolve a point the statute left ambiguous: whether "gives rise to *a* claim" in 15 U.S.C. 6(a)(2) means "give rise to *the plaintiff's* claim" or, instead, "gives rise to *any* claim" under the Sherman Act. The Court resolved that question in defendants' favor, but the remainder of the statute is unambiguous. Because the meaning of the statute is clear, comity is irrelevant.

But even if there were some ambiguity in the statute, such that this Court could resort to prudential doctrines of comity in order to resolve it, the Supreme Court's comity analysis—particularly, its use of a "reasonableness" standard turning on the degree of U.S. interest in a case—*supports* jurisdiction here. Comity concerns are simply insignificant because there are no substantive conflicts of law concerning hard-core cartel behavior.[22] And, the mere fact that multiple nations may have overlapping jurisdiction over defendants' cartel is not a conflict either, and raises no comity concerns. Restatement (Third) of Foreign Relations Law § 403 cmt. d.[23]

To be sure, not all nations provide for the same remedies available to civil litigants in U.S. courts, including treble damages. But nothing in the Supreme Court's opinion suggests that

[22] Defendants' conduct is unlawful "in all major industrialized countries and many others." Eleanor M. Fox, *Harmonization of Law and Procedures in a Globalized World: Why, What, and How*?, 60 ANTITRUST L.J. 593, 597 (1991), Ex. 22. For example, the recommendations of the United Nations Conference on Trade and Development "include a provision condemning cartels," and the OECD has similarly issued a similar condemnation of hard-core cartels. Ex. 18; *see also* Ex. 23 ("For decades, there were vigorous disputes in international fora about whether it made sense to prohibit cartel behavior by private firms. That debate has been resolved, in this country and elsewhere.").

[23] Only direct *conflicts* between the substantive requirements of two states' laws require limiting the prescriptive jurisdiction of one of the states—that is, "only when one state requires what another prohibits, or where compliance with the regulations of two states exercising jurisdiction consistently with this section is otherwise impossible." Restatement (Third) of Foreign Relations Law § 403 cmt. e.

*any* inconsistency between remedies available under United States and foreign law means the U.S. law should *never* be interpreted to encompass Plaintiffs' claims. To the contrary, the Supreme Court expressly limited its invocation of comity to a class of cases where "foreign conduct . . . *causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim*." 124 S. Ct. at 2367 (emphasis in original).

That comity concern does not arise here, where the U.S. effects of Defendants' conduct *gave rise to* Plaintiffs' injury. It is more than reasonable to apply U.S. antitrust law to foreign injuries that arise from Defendants' efforts to fix prices in the U.S. market.[24]

The difference between this case (in which the domestic effects give rise to the foreign injury) and the assumed factual scenario the Supreme Court considered (in which the foreign injury is independent) is critical to the outcome of the Court's "reasonableness" test. In cases in which defendants' U.S. conduct does *not* give rise to the plaintiff's foreign injury, the potential availability of foreign profits does not provide a clear incentive for conspirators to engage in unlawful behavior with respect to the United States. In cases like this one, where the U.S.-related conduct *is* necessary in order to realize the foreign profit, conspirators will decide whether to include the United States by weighing the potential liability to U.S. consumers versus their *worldwide* profits—because the conspiracy could not succeed anywhere unless it includes the U.S. In the latter case only, a serious underdeterrence problem would result: conspirators' incentive to include the United States in their scheme would be enormous unless the U.S. liability scheme is expanded to reach foreign plaintiffs' claims.

[24] Indeed the Supreme Court's decision to remand the case, as well as its sanctioning of *Industria Siciliana*, show that it harbored no concerns about United States courts exercising jurisdiction under such circumstances. *See also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) ("It is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."); *see also* Restatement (Third) of Foreign Relations Law § 415(2).

Such cases constitute a small subset of potential international antitrust claims. Only in cases involving commodities like MSG and Nucleotides—fungible in nature but difficult to make, with high entry barriers to the market, and easily transportable internationally—is cartelization even a possibility. *See supra* at 8-12. Coordination of activity internationally is difficult and requires participants to go to great lengths to maintain secrecy. *See supra* at 3 n.2. And in other kinds of cases—such as those involving cartels in strictly geographic markets, or those involving other kinds of anti-competitive conduct—the requirement that the domestic effects of defendants' conduct "give rise to" foreign plaintiffs' claims would raise a jurisdictional barrier.[25]

To the extent that Plaintiffs' worldwide market argument would invite a significant number of claims against defendants like those here—*i.e.*, against the members of global hard-core cartels who targeted the U.S. market in an effort to ensure their ability to extract cartel profits abroad—that is simply the cost of perpetrating a worldwide conspiracy that it is fair to expect such defendants to bear. Plaintiffs, not the Defendants, were the victims of this cartel.

But even among such claims, several readily available procedural mechanisms would enable U.S. courts to filter out those that have the least significant U.S. nexuses or that are the most properly heard by other nations' courts. These include the doctrine of *forum non conveniens*, *see Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), and, in response to comity concerns regarding the availability of treble damages, the option to make only single damages available.[26]

---

[25] For instance, a European plaintiff challenging the merger of two European companies is extremely unlikely to be able to prove the necessary causal connection, even if the merger also has effects on U.S. consumers. *See also Sniado v. Bank Austria AG*, 378 F.3d 210 (2d Cir. 2004) (affirming dismissal where plaintiff had failed to allege a causal connection between the U.S. effects of a European price-fixing conspiracy and his injury).

[26] Other procedural protections for defendants in international antitrust cases include limits on personal jurisdiction, district court discretion to limit discovery, and prudential and separation-of powers considerations such as the act of

### C. Allowing Plaintiffs' Claims Would Not Burden U.S. Courts.

Defendants next assert that if courts were required to determine, for jurisdictional purposes, whether Plaintiffs' claims arose from the U.S. effects of their conduct, the result would cause "unworkable delay and complexity." Defs. Br. at 19. Such an assertion is both inconsistent with the text of the FTAIA and insupportable in fact. Implementing the standard Plaintiffs *have* proposed would involve only *one* question—whether the causal relationship required by the FTAIA is present.

First, this suit would place no substantial strain on judicial resources, because it was filed as a companion case to the claims of U.S. Plaintiffs, who were also direct purchasers and who challenged the identical conspiracy. The facts to be proven, and the discovery to be taken, are overwhelmingly the same in the two cases. Thus, much of the work has already been done. Furthermore, hard-core cartel cases require no special inquiry into foreign economic conditions or law, because they involve *per se* antitrust violations. *See* 1 Hawk, *supra*, at 286 (Supp. 1996-1), Ex. 21.

Second, asking foreign plaintiffs to plead the geographic scope of the relevant market will not impose any unusual burden on the courts. In fact, courts already require plaintiffs to make and prove such allegations in Sherman Act cases, such as attempted monopolization and rule-of-reason cases. *See, e.g., Morganstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994) ("The geographic market encompasses the geographic area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition"); *see also Minn. Ass'n of Nurse Anesthetists v. Unity Hospital*, 5 F. Supp. 2d 694, 707 (D. Minn. 1998)

---

state doctrine. *See* R. Edward Price, *Foreign Blocking Statutes and The GATT: State Sovereignty and the Enforcement of U.S. Economic Laws Abroad*, 28 GW J. Int'l L. Econ. 315, 318-20 (1995), Ex. 24 (explaining that each of these doctrines takes into account the "interests of foreign sovereigns and international comity").

(same); *see also Pocono Invitational Sports Camp, Inc. v.* NCAA, 317 F. Supp. 2d 569, 586 (E.D. Pa. 2004) ("The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks."). There is therefore no reason to believe that requiring Plaintiffs to define the relevant geographic market would impose any undue burden on the courts.

Next, permitting jurisdiction over claims like Plaintiffs' would not implicate any of the Supreme Court's objections to case-by-case *comity* inquiries such as the nature of foreign states' antitrust regimes and the policy consequences (*e.g.*, deterrence and international relations) of interfering with them. 124 S. Ct. at 2369. And, as previously described, district court judges are always free to dismiss cases on the basis of the doctrine of *forum non conveniens*.[27] *See supra* at 26.

Answering the essential question—whether the U.S. effects of Defendants' conduct caused Plaintiffs' injury—would be quite easy in comparison to many other inquiries that are routine in antitrust cases. The only plaintiffs likely to be able to plead the facts necessary to establish such a causal connection would be those injured by worldwide hard-core cartels; in such cases, the court would simply have to determine whether the product sold in a worldwide market is the type susceptible to arbitrage. A few manageable factual determinations would be dispositive—whether the goods are fungible in nature and whether they are readily transportable at a cost that is a low percentage of their price; and whether the prices of the goods charged in countries other than the U.S. are in parity and highly correlated with U.S. prices. Defendants

[27] *Forum non conveniens* is a well-established doctrine wholly distinct from the question of U.S. jurisdiction over particular categories of claims (instead concerning whether a court in a given case should choose to *exercise* the jurisdiction it has).

have not seriously disputed any of these facts here—they were clearly well aware of them when they orchestrated their conspiracy.

Moreover, these inquiries would not even have to be undertaken in most international antitrust cases. If plaintiffs do not allege the necessary facts to establish causation, jurisdictional discovery will be unnecessary. Of that small subset of global cartel cases wherein plaintiffs *do* allege the necessary facts, most or all (including this one) will be suits that follow domestic criminal prosecutions and lawsuits. In such cases, most or all of the relevant facts will have already been conclusively determined, for market definition is an important part of the merits of most antitrust cases.[28] And in cases where market definition issues have not been determined in prior proceedings, the parties may very well stipulate to them, as they already frequently do.

Using a list of requested discovery handed to the Court during the October 29, 2004 Status Conference that included "duties, tariffs, and taxes" and "transportation costs," Defendants assert that to establish jurisdiction in their case, a court would also be required to consider, among other things, such factors as, *e.g.*, potential expansion of the U.S. market, shipping and other costs from the U.S. to each foreign country, demand conditions in each and every country, and currency exchange rates. Defs. Br. at 19-21. Defendants do not seriously try to explain which of these factors (whether on Plaintiffs' discovery list or not) would be relevant, nor do they cite any support for their concern about how addressing such factors will prove overly burdensome and unworkable. But to the extent that the District Court's jurisdictional inquiry is complicated by the geographic scope of Defendants' conspiracy, *Plaintiffs* can hardly be faulted: the risk of being subject to this kind of proceeding is simply a risk Defendants assumed when they chose to operate an illegal and harmful cartel.

[28] It is worth noting that the issues Defendants claim will simply be too overwhelming for courts to decide are the very issues that juries routinely decide in antitrust trials.

## VI. Plaintiffs Have Antitrust Standing To Bring Their Claims.

Plaintiffs plainly meet the requirements of antitrust standing and antitrust injury. Plaintiffs' injuries are "of the type the antitrust laws were designed to prevent": namely, the payment of supracompetitive prices. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986). The Supreme Court has never defined antitrust injury in terms of the injury's *location*—its *nature* is what is critical. In *Pfizer*, the Supreme Court squarely rejected defendants' argument that injury to foreign Defendants is not what the antitrust laws were "intended to prevent" (and likewise its basically identical argument that Plaintiffs are outside "the zone of interests" of the antitrust laws, Defs. Br. at 24). *Pfizer* made clear that Congress chose to give foreign plaintiffs a remedy for injuries suffered abroad as a *means* of accomplishing the antitrust laws' goal of protecting Americans.

The analysis in *Empagran* also strongly implies that there are no special standing requirements – apart from those applicable to antitrust plaintiffs generally – limiting plaintiffs who meet the requirements of the FTAIA. *See supra* at 6 & n.3. By definition, the FTAIA limits claims to those that arise from a conspiracy's domestic effects, and thus there is no reason for a duplicative inquiry into the same factors that courts use in their standing inquiries – "[t]he causal connection between the alleged antitrust violation and the harm to the Plaintiff" and "[w]hether the injury was of a type that Congress sought to redress with the antitrust laws." *Minn. Mining & Mfg. Co. v. Appleton Papers Inc.*, 35 F. Supp. 2d 1138, 1146-1147 (D. Minn.) (quoting *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983)). A close reading of Defendants' arguments reveals that they, in effect, concur – admitting that the standing question turns on the relationship "between [plaintiffs'] injury and U.S. effects." Defs. Br. at 24. That is precisely the same question posed by the FTAIA.

Nevertheless, Defendants argue at length that this Court should deny standing even if it concludes that Plaintiffs meet the requirements of the FTAIA. Defendants cite the Supreme Court's various cases restricting antitrust recovery for indirect or speculative injuries. These requirements are sometimes formulated as a proximate causation test. *See, e.g.*, *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). But as Plaintiffs have established, Plaintiffs plainly meet that standard: their injury is direct and not speculative, *id.*, and was specifically *intended* by Defendants.[29] Ultimately, proximate causation turns not on any technical definition but rather on whether making a particular defendant liable to a particular Plaintiff is *fair* in practice under the circumstances. *Id.*; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535-37 & nn.32-34 (1983).

Defendants remarkably assert that Plaintiffs should not be "complaining about this cartel" even though they set out to cause and profit from Plaintiffs' injuries. Defs. Br. at 25. Defendants did not cause Plaintiffs' injuries by accident, much less by some remote and unpredictable series of events. They rigged U.S. prices and interfered with U.S. commerce so that they could extract cartel profits worldwide, *i.e.*, from Plaintiffs—this fact is indisputable, and Defendants pled guilty to it. *See supra* at 5. And—in contrast to *Associated General*, wherein the court held that a truly remote injury could not support standing even if that injury were intended[30]—Plaintiffs' injury arose *directly* from Defendants' actions *and* from the U.S.

---

[29] Defendants strangely assert that Plaintiffs' pleading of an "indirect interconnection" between anti-competitive impact on U.S. commerce and their injuries is inadequate to confer standing. But this mischaracterizes Plaintiffs' argument: Plaintiffs allege that Defendants' conspiracy barred them from buying MSG or Nucleotides from sellers in the U.S. That is as direct a link as is possible—one step—both between Defendants' *conduct* and their injury (as is relevant to antitrust standing) and between the U.S. *effects* of that conduct and their injury (as is relevant to the FTAIA causation requirement).

[30] In *Associated General*, although holding that defendant's intent is not a "panacea" that can save a plaintiff's standing to assert a wholly speculative injury, the Court recognized that it was nonetheless an important consideration that in *many* cases would alone be sufficient to support standing. 459 U.S. at 537 n.35.

effects of those actions: Plaintiffs directly bought overpriced MSG and Nucleotides from Defendants abroad, because Defendants' conspiracy prevented them from buying competitively priced MSG and Nucleotides from the United States.

In addition to Supreme Court cases, Defendants premise their arguments on inapposite decisions. In *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 297 (3d Cir. 2002), the court found that the conspiracy did not cause "any injury which was felt in the U.S. or which affected the American economy in any way" (quotation omitted). The *Turicentro* court specifically highlighted the distinction between the allegations before it and the allegations in *Carpet Group Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62 (3d Cir. 2000) where the plaintiffs' harm was "inextricably intertwined with the defendants' wrongdoing," *Turicentro* at 307, observing that the antitrust laws apply to the latter sort of conduct, not the former. *Id.* at 305.

And, in *de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 518 (S.D.N.Y. 1985), the court found that the relationship between plaintiff's alleged injury on the London Metal Exchange and the defendants' alleged violation on the United States silver exchanges (separate markets) was too attenuated to allow plaintiff's antitrust claim. Clearly, such an indirect situation does not apply here, where Plaintiffs are direct purchasers who have been overcharged by the Defendants as part of a global conspiracy that included the United States.

Finally, permitting foreign Plaintiffs' claims for injuries caused by a global cartel's anticompetitive activities targeting the United States is essential for another reason. In such cases, there is no more direct or "efficient enforcer" who could bring a claim against Defendants that would force them to disgorge their overseas profits; indeed, Plaintiffs are the only available enforcers. Domestic direct purchasers' suits cannot account for the harm done to, and unlawful profits gained from, overseas consumers. *See Empagran*, 315 F.3d at 359. And any domestic

*indirect* purchaser who might have bought MSG or Nucleotides from overseas victims such as Plaintiffs would be a *less* direct Plaintiff whose suit would be barred by established principles of antitrust standing. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 737-38 (1977). Meanwhile, there is no domestic competitor company who could sue, *see*, *e.g.*, *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U.S. 100, 124-25 (1969); because Defendants cartelized all MSG and Nucleotide suppliers, all of the U.S. companies that could have been *competitors* are in fact *co-conspirators*.[31] Thus, antitrust standing principles dictate that foreign direct purchasers' claims be permitted; otherwise, harm to them and to U.S. indirect purchasers who buy from them would go unremedied, permitting violators to "retain the fruits of their illegality." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968).

Accordingly, if this Court concludes that Plaintiffs' claims survive Defendants' FTAIA challenge then it should summarily reject Defendants' standing arguments as duplicative.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion.

[31] Thus, there are no other available plaintiffs who could sue for the harm defendants did to U.S. export commerce. As the Supreme Court recognized, the FTAIA expressly preserved the availability of international antitrust claims in cases wherein U.S. export commerce is harmed. *Empagran*, 124 S. Ct. at 2364. Here, Defendants indisputably interfered with and harmed U.S. export commerce. *See supra* at 8-12.

Dated: March 17, 2005

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

s/ Heidi M. Silton
Richard A. Lockridge (#64117)
Heidi M. Silton (#025759X)
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

HEINS MILLS & OLSON, P.L.C.

s/ Samuel D. Heins
Samuel D. Heins (#43576)
Susan E. MacMenamin (#0304396)
3550 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 338-4605
Fax: (612) 338-4692

**PLAINTIFFS' CO-LEAD COUNSEL**

Michael D. Hausfeld
Paul T. Gallagher
Brian A. Ratner
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500 West
Washington, D.C. 20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

Joseph Goldberg
FREEDMAN BOYD DANIELS HOLLANDER GOLDBERG & CLINE, P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
Tel: (505) 842-9960
Fax: (505) 842-0761

Howard J. Sedran
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 963-0600
Fax: (215) 963-0838

Martin D. Chitwood
Craig G. Harley
CHITWOOD & HARLEY
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: (404) 873-3900
Fax: (404) 876-4476

Donald L. Perelman
Roberta D. Liebenberg
FINE KAPLAN & BLACK
1845 Walnut Street, 23rd Floor
Philadelphia, PA 19103
Tel: (215) 567-6565
Fax: (215) 568-5872

Mark A. Griffin
Lynn L. Sarko
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384

Jared B. Stamell
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, NY 10006-1404
Tel: (212) 566-4047
Fax: (212) 566-4061

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Ste. 1700
San Francisco, CA 94111
Tel: (415) 217-6810
Fax: (415) 217-6813

Ira N. Richards
TRUJILLO RODRIGUEZ & RICHARDS, LLC
226 W. Rittenhouse Square
The Penthouse
Philadelphia, PA 19103
Tel: (215) 731-9004
Fax: (215) 731-9044

Robert N. Kaplan
Richard J. Kilsheimer
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

Joseph M. Patane
LAW OFFICES OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
Tel: (415) 563-7200
Fax: (415) 346-0679

Marc H. Edelson
EDELSON & ASSOCIATES LLC
45 West Court Street
Doylestown, PA 18901
Tel: (215) 230-8043
Fax: (215) 230-8735

Karl L. Cambronne
CHESTNUT & CAMBRONNE, P.A.
3700 Piper Jaffray Tower
222 South Ninth Street
Minneapolis, MN 55402
Tel: (612) 339-7300
Fax: (612) 339-2940

Linda P. Nussbaum
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022-6017
Tel: (212) 838-7797
Fax: (212) 838-7745

Steven A. Kanner
MUCH SHELIST FREED DENENBERG
AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606-1615
Tel: (312) 521-2000
Fax: (312) 521-2100

Andrew B. Sacks
SACKS, WESTON, SMOLINSKY,
ALBERT, & LUBER
510 Walnut Street
Suite 400
Philadelphia, PA 19106
Tel: (215) 925-8200
Fax: (215) 925-0508

Steven J. Greenfogel
MEREDITH COHEN GREENFOGEL
& SKIRNICK, P.C.
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Tel: (215) 564-5182
Fax: (215) 569-0958

**COUNSEL FOR PLAINTIFFS**