# EXHIBIT 4

FindLaw
WWW.FINDLAW.COM

No. 03-724

IN THE

# Supreme Court of the United States

F. HOFFMAN-LAROCHE, LTD., *et al.*,

*Petitioners*,

v.

EMPAGRAN S.A., *et al.*,

*Respondents*.

*On Writ of Certiorari*
*to the United States Court of Appeals*
*for the District of Columbia Circuit*

**BRIEF OF *AMICI CURIAE* ECONOMISTS JOSEPH E. STIGLITZ AND PETER R. ORSZAG IN SUPPORT OF RESPONDENTS**

ERIK S. JAFFE
*Counsel of Record*
ERIK S. JAFFE, P.C.
5101 34th Street, N.W.
Washington, D.C. 20008
(202) 237-8165

EDMUND W. SEARBY
SCOTT & SCOTT, LLC
33 River Street
Chagrin Falls, OH 44022
(440) 247-8200

MARY BOIES
BOIES & MCINNIS
Village Green
P.O. Box 67
Bedford, NY 10506
(914) 234-3700

*Counsel for Amici Curiae*

March 15, 2004

## TABLE OF CONTENTS

**Pages**

TABLE OF CONTENTS ........................................................ i

TABLE OF AUTHORITIES ................................................. ii

INTEREST OF *AMICI CURIAE* ........................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................................ 2

ARGUMENT ........................................................................ 6

I. ANTITRUST POLICY DEPENDS ON DETERRING THE "SUPREME EVIL" OF HARD-CORE CARTELS. .................. 6

II. DETERRING GLOBAL CARTELS REQUIRES ELIMINATING EXPECTED GLOBAL PROFITS. ................... 8

III. INADEQUATE DETERRENCE OF GLOBAL CARTELS UNDERMINES DETERRENCE OF DOMESTIC PARTICIPATION IN SUCH CARTELS. ............................... 12

IV. STRENGTHENING DETERRENCE OF GLOBAL CARTELS PROTECTS U.S. CONSUMERS. ........................ 18

V. COUNTER-ARGUMENTS DO NOT OUTWEIGH THE INCREASED DETERRENCE FROM ALLOWING SUITS ON FOREIGN TRANSACTIONS. ...................................... 21

CONCLUSION ..................................................................... 29

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Empagran S.A.* v. *F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338 (CADC 2003) .............................................. 16, 20

*Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501 (1947)..................... 24

*Pfizer, Inc.* v. *Government of* India, 434 U.S. 308 (1978)................................................................ 15, 21

*Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235 (1981) ................ 24

*Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, -- U.S. --, 124 S. Ct. 872 (2004)................................................................... 6, 24

**Other Authorities**

Antitrust Division, DOJ, *Status Report: An Overview of Recent Developments in the Antitrust Division's Criminal Enforcement Program* (Feb. 2004) (available at http://www.usdoj.gov/atr/public/guidelines/202531 .pdf)........................................................................ 27

Antitrust Division, DOJ, *Status Report: International Cartel Enforcement* (Feb. 2002) (available at http://www.usdoj.gov/atr/public/criminal/9939.pdf)......... 13

THURMAN ARNOLD, FAIR FIGHTS AND FOUL (1951) ............... 7

Jonathan B. Baker, *The Case for Antitrust Enforcement*, J. ECON. PERSPECTIVES 27 (Fall 2003).......... 6

Gary S. Becker, *Crime and Punishment: An Economic Approach*, J. POL. ECON. 169 (Mar.-Apr. 1968) .................. 7

Dennis W. Carlton, *The Proper Role for Antitrust in an International Setting*, Keynote Address, Second Annual Conf. of the Int'l Competition Network (June 25, 2003) ........................................ 7, 13, 19

Simon J. Evenett, Margaret C. Levenstein, and Valerie Y. Suslow, *International Cartel Enforcement: Lessons from the 1990s*, 24 WORLD ECONOMY 1221 (2001) .......................... 8, 15, 17

Harry First, *The Vitamins Case: Cartel Prosecutions and the Coming of International Competition Law*, 68 ANTITRUST L.J. 711 (2001) ....... 10, 23

ANDREW I. GAVIL, WILLIAM E. KOVACIC, & JONATHAN B. BAKER, ANTITRUST LAW IN PERSPECTIVE: CASES, CONCEPTS AND PROBLEMS IN COMPETITION POLICY (2002) .......................................... 8

Scott D. Hammond, *When Calculating The Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?*, Speech presented at the Fifteenth Ann. Nat'l Inst. on White Collar Crime, ABA Crim. Justice Sect. (Mar. 8, 2001) (available at http://www.usdoj.gov/atr/public/speeches/7647.pdf)........ 27

IMF, DIRECTION OF TRADE STATS. YEARBOOK (2002) ......... 13

IMF, INTERNATIONAL FIN. STATS. YEARBOOK (2002) .......... 13

IMF, *World Economic Outlook* (September 2003) (available at http://www.imf.org/external/pubs/ft/weo/2003/02/pdf/appendix.pdf)............................................................ 14

International Competition Policy Advisory Comm. to the Attorney General and Ass't Attorney General for Antitrust, *Final Report* (2000).................. 10, 20

William J. Kolasky, *Antitrust Compliance Programs: The Government Perspective*, Speech presented at the Corporate Compliance 2002 Conference, PLI (July 12, 2002) (available at http://www.usdoj.gov/atr/public/speeches/11534.pdf) .......... 13, 16

Margaret Levenstein, Valerie Suslow & Lynda Oswald, *International Price-Fixing Cartels and Developing Countries: A Discussion of Effects and Policy Remedies*, William Davidson Working Paper No. 538 (The William Davidson Inst., U. Mich. Bus. Sch., Feb. 2003) .......... 11

OECD Council, *Recommendation Concerning Effective Action Against Hard Core Cartels* (March 25, 1998 – C(98)35/FINAL) (available at http://webdomino1.oecd.org/horizontal/oecdacts.nsf/Display/287EEB70E8B80915C1256E5800028BA4?OpenDocument) .......... 6

OECD, FIGHTING HARD-CORE CARTELS: HARM, EFFECTIVE SANCTIONS AND LENIENCY PROGRAMMES (2002) .......... 27

OECD, *Hard Core Cartels – Harm and Effective Sanctions* (Policy Brief, May 2002) .......... 11, 22

OECD, HARD CORE CARTELS: RECENT PROGRESS AND CHALLENGES AHEAD (2003) .......... 4, 8, 9, 26

OECD, *The Doha Development Agenda: Tariffs and Trade* (Policy Brief, Aug. 2003) .......... 13

S. 1797, 108th Cong., 1st Sess. § 103, 149 CONG. REC. S13520 (2003) (text at http://www.theorator.com/bills108/s1797.html) .......... 29

Steven C. Salop & Lawrence J. White, *Private Antitrust Litigation: An Introduction and Framework*, in PRIVATE ANTITRUST LITIGATION: NEW EVIDENCE, NEW LEARNING (Lawrence J. White, ed., 1988) .......... 24

Spencer Weber Waller, *Anticartel Cooperation*, in ANTITRUST GOES GLOBAL: WHAT FUTURE FOR TRANSATLANTIC COOPERATION? (S. Evenett, A. Lehmann, and B. Steil, eds., 2000) .......... 17

IN THE

# Supreme Court of the United States

F. HOFFMAN-LAROCHE, LTD., *et al.*,

*Petitioners*,

v.

EMPAGRAN S.A., *et al.*,

*Respondents*.

*On Writ of Certiorari*
*to the United States Court of Appeals*
*for the District of Columbia Circuit*

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are economists with a long history of involvement in public policy. They are interested in this matter based on their professional and public concern that antitrust policy be based on sound economics and on recognition of the interaction between domestic and foreign components of global cartels.

Joseph E. Stiglitz is Professor of Economics at Columbia University and the co-winner of the 2001 Nobel Prize in Economic Sciences. Previously, Dr. Stiglitz served as the World Bank's Chief Economist and Senior Vice President for Development Economics and, before that, as the Chairman of

[1] This brief is filed with the written consent of all parties. No counsel for a party authored this brief in whole or in part, nor did any person or entity, other than *Amici* or their counsel, make a monetary contribution to the preparation or submission of this brief.

the President's Council of Economic Advisers. In 1979, the American Economic Association awarded Dr. Stiglitz its biennial John Bates Clark Award, given to the economist under 40 who has made the most significant contributions to economics. His work has also been recognized through his election as a fellow to the National Academy of Sciences, the American Academy of Arts and Sciences, and the American Philosophical Society, as well as his election as a corresponding fellow of the British Academy.

Peter R. Orszag is the Joseph A. Pechman Senior Fellow in Economic Studies at The Brookings Institution. Dr. Orszag is co-editor of AMERICAN ECONOMIC POLICY IN THE 1990S (2002), co-author of PROTECTING THE AMERICAN HOMELAND (2003), and co-author of SAVING SOCIAL SECURITY (2004). He previously served as Special Assistant to the President for Economic Policy at the White House and as Senior Economist and Senior Adviser on the President's Council of Economic Advisers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* are economists with policy experience. This brief addresses the economic and policy rationales for allowing foreigners harmed by global cartels to file suits in the United States. While this brief does not directly address the legal arguments concerning the jurisdictional scope of the U.S. antitrust laws, insofar as those laws do not expressly forbid the types of suit at issue in this case, such suits would substantially further the economic and policy goals that lie at the heart of U.S. antitrust law and thus they should be permitted if at all possible under the governing statutes. The economic and policy rationales for allowing such suits include:

(1) cartels are the "supreme evil of antitrust," and deterring them is one of the most fundamental policy objectives of federal antitrust laws;

(2) effective deterrence of the formation of international cartels requires that the total expected penalty

(which is equal to the probability of detection and conviction multiplied by the penalty) be at least equal to aggregate profits from the collusive activity, so deterrence of global cartels requires penalties that at least equal the global profits from colluding; and

(3) failing to provide an effective deterrent against global cartels undermines protection against antitrust abuses within the United States itself.

A deterrence perspective thus suggests that it would substantially further the underlying goals of U.S. antitrust law to allow private civil suits by foreign plaintiffs in the United States, even when such suits seek recovery based on foreign transactions by the global cartel. Such suits would help to protect American consumers against the potential harms of international cartels that have a not insignificant anticompetitive effect in the United States.

A cartel arises when producers agree either to limit production or to fix prices. That type of conspiracy is widely regarded as the most destructive form of antitrust violation. Given the substantial economic costs associated with cartels and the practical difficulties in detecting them, sound policy lying at the heart of federal antitrust law involves preventing them from forming in the first place. The federal antitrust laws therefore attempt to deter harmful cartel behavior by imposing severe penalties, both criminal and civil, on those found guilty. The effectiveness of such deterrence depends on the expected penalty, which in turn is determined by the probability of detection and conviction multiplied by the size of the penalty if convicted.

Global cartels are estimated to impose costs amounting to many billions of dollars per year on consumers in the United States and abroad. To deter such cartels efficiently, it is imperative that the expected penalty reflect the *global* activities of the cartel. The scope of the penalty should correspond to the full scope of the cartel.

The relevant expected penalty depends on the sum of the expected penalties in each nation. If that aggregate expected punishment is smaller than the sum of the profits garnered in each nation, deterrence of the global cartel is inadequate and consumers everywhere will be harmed. Despite recent progress in strengthening penalties against cartels abroad (which may in part reflect a response to relatively more effective antitrust policies in the United States), sanctions on a global basis "are, on the whole, still inadequate." ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, HARD CORE CARTELS: RECENT PROGRESS AND CHALLENGES AHEAD 3 (2003) ("HARD CORE CARTELS").

Insufficient deterrence of global cartels hurts consumers in the United States as well as abroad. The reason is that a large international cartel in a global market will typically have to include the United States – even assuming some probability of detection and disgorgement of U.S.-based profits – or risk having its *foreign* profits undermined by arbitrage from trade between the U.S. market and the cartelized foreign markets. Insufficiently deterring cartels in global markets thus can be harmful to U.S. consumers, even if the expected penalty within the United States would be sufficient to deter a purely domestic cartel that directly profited only from U.S. transactions. Global cartels would continue to operate in the United States even at a potential expected loss from such operations because such a cartel must typically include the United States within its scope of operations in order to survive.

The result of such interdependence between U.S. operations and a cartel's foreign profits is that the deterrent required to prevent a global cartel from including the United States is generally larger than the deterrent required to prevent a purely domestic cartel from forming. Because an international cartel will look to its total expected profits from all markets, foreign profits generally can be used to subsidize necessary U.S. operations in order to maximize total global

profits even where such U.S. operations, viewed in isolation, would be unprofitable alone. This conclusion is strengthened by the recognition that international cartels are particularly difficult to detect and prosecute. Assuming a lower probability of successfully detecting and convicting in each and every market a cartel operating in international markets relative to the probability of detection and conviction for a purely domestic cartel operating in a single market, the penalty conditional on conviction must be increased just to provide the same level of deterrence against harm imposed solely in the United States itself.

Failing to penalize global cartels for the harm they impose and profits they reap abroad thus would undermine one of the most fundamental objectives of the U.S. antitrust laws – using deterrence to discourage cartel formation in the United States. Adopting a more expansive view of the jurisdictional reach of U.S. antitrust laws, on the other hand, would raise the total expected penalty, relative to the penalty based solely on U.S. transactions. Such an increased penalty would more effectively offset the synergistic international profits generated by inclusion of the United States in the cartel's scope. The result would be more effective deterrence against global cartels operating in the United States, along with more effective deterrence abroad.

In summary, the Supreme Court has correctly emphasized the paramount role of the antitrust laws in deterring collusion, as opposed merely to providing recovery to injured parties. Such a deterrence perspective underscores the benefits of a more expansive view regarding the applicability of federal antitrust laws to global cartels that affect U.S. economic welfare.

Failing to allow private suits by foreign plaintiffs harmed by global cartels that also operate in the United States, even when such claims involve the foreign losses imposed by the global cartel, would undermine the efficacy of the antitrust

laws in protecting American consumers against the evils of cartels.

## ARGUMENT

### I. ANTITRUST POLICY DEPENDS ON DETERRING THE "SUPREME EVIL" OF HARD-CORE CARTELS.

A bedrock premise of U.S. antitrust law is that cartels represent a fundamental economic evil that the federal government can and should prevent. Cartels increase prices above competitive levels, thereby transferring resources from consumers to the colluders and typically impeding economic efficiency. This Court has correctly referred to collusion as "the supreme evil of antitrust." *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, -- U.S. --, 124 S. Ct. 872, 879 (2004). The Organisation for Economic Cooperation and Development ("OECD") concurs: "[H]ard core cartels are the most egregious violations of competition law." OECD Council, *Recommendation Concerning Effective Action Against Hard Core Cartels* (March 25, 1998 – C(98)35/FINAL) (available at http://webdomino1.oecd.org/-horizontal/oecdacts.nsf/Display/287EEB70E8B80915C1256-E5800028BA4?OpenDocument).

In addition to transferring wealth from customers to the colluding firms, cartels can undermine economic efficiency in two ways: They generate a static welfare loss from artificially inflating the price of a good, and they cause a dynamic loss from the diminution of competitive pressures and innovation. Estimates suggest that just the static deadweight efficiency loss from the global vitamins cartel alone could amount to $50 million to $100 million *per year* in the United States. Jonathan B. Baker, *The Case for Antitrust Enforcement*, J. ECON. PERSPECTIVES 27, 43 (Fall 2003).

Given the substantial costs that cartels impose on consumers and economic efficiency, economists have long ar-

gued that public policy should be designed to prevent the cartels from occurring in the first place. As one leading antitrust economist has emphasized, "[i]t is obvious that there can be a large gain to society from preventing such cartels, rather than waiting until they form, uncovering them and punishing the participants." Dennis W. Carlton, *The Proper Role for Antitrust in an International Setting*, Keynote Address, Second Annual Conf. of the Int'l Competition Network, at 3 (June 25, 2003) (Prof. Economics, U. Chicago).

Antitrust laws attempt to deter cartels by imposing substantial penalties on firms convicted of colluding. The primary economic benefit from those antitrust penalties is not their *ex post* effect in providing compensation to those injured by cartels, but rather their *ex ante* effect in deterring the collusion in the first place. From an economic policy perspective, the antitrust laws should be interpreted primarily as a mechanism for averting collusive activity. The antitrust statutes are the "most effective brake against the cartelization of industry." THURMAN ARNOLD, FAIR FIGHTS AND FOUL 120 (1951).

The strength of the deterrence depends on the *expected* penalty, which is equal to the probability of detection and conviction (p) multiplied by the fine if convicted (F). To dissuade cartels from forming, the expected penalty (pF) must be at least equal to the cartel's expected profits.

Any given expected penalty (pF), and thus any given level of deterrence, can be obtained through various combinations of p and F. In the presence of enforcement costs (including the costs of gathering evidence and prosecuting cases), the optimal structure of sanctions is a small p combined with a large F. This approach deters colluders with minimal administrative costs. Gary S. Becker, *Crime and Punishment: An Economic Approach*, J. POL. ECON. 169, 183-184 (Mar.-Apr. 1968) (deterrence of the risk-neutral and risk-averse).

In the United States, the sanctions imposed on colluding firms can include criminal fines and the possibility of impris-

onment for executives. In addition, private parties can be awarded up to three times the amounts by which they were injured. This treble damages multiple compensates for a detection and conviction probability (p) that is well under one. The difficulty of detecting, let alone convicting, cartels is reflected in the fact that many of them persist for years, if not decades, without antitrust intervention. For example, one study found an average duration of international cartels in the 1990s of six years; some had persisted for two decades before being stopped. Simon J. Evenett, Margaret C. Levenstein, and Valerie Y. Suslow, *International Cartel Enforcement: Lessons from the 1990s*, 24 WORLD ECONOMY 1221, 1226 (2001). The vitamins cartel that is the focus of the immediate case operated for a full decade.

Given a probability of detection and conviction that is well under one, the treble damages remedy is seen as a rough approximation to the optimal fine F. ("Some believe that as few as one in six or seven cartels are detected and prosecuted, implying a multiple of at least six. A multiple of three is more commonly cited, however." OECD, HARD CORE CARTELS, at 27; *see also* ANDREW I. GAVIL, WILLIAM E. KOVACIC, & JONATHAN B. BAKER, ANTITRUST LAW IN PERSPECTIVE: CASES, CONCEPTS AND PROBLEMS IN COMPETITION POLICY 1044 (2002).) As discussed below, the probability of detection and conviction for a global cartel may be even lower than for a purely domestic cartel, requiring a higher fine in order to provide an effective deterrent.

## II. DETERRING GLOBAL CARTELS REQUIRES ELIMINATING EXPECTED GLOBAL PROFITS.

In recent years, very large global cartels have increasingly attracted the attention of antitrust authorities. In addition to the vitamins cartel, other well-known international cartels have affected markets in lysine, graphite electrodes, and carbonless paper. Based on a survey of such cases, the OECD estimates that the "total harm from cartels is significant in-

deed, surely amounting to many billions of dollars each year." OECD, HARD CORE CARTELS, at 9.

To deter global cartels, the expected penalty must be at least equal to the *global* profits generated by the cartel. The relevant expected penalty depends on the sum of the expected penalties in each nation. If that aggregate expected punishment is less than the sum of the increased profits captured from consumers in each nation, collusion in *all* nations will be inadequately deterred.

For simplicity, assume that the world comprises two countries (country A and country B) with open trade between them. Consider what expected penalty is then required to deter a global cartel that operates in both countries. Assume that the collusive activities generate $50 of profits both in country A and in country B, for a total of $100 globally. The expected sanctions in A and B combined must then total at least $100 to deter the global cartel. If the total global expected sanctions are less than $100, the cartel will form.

In particular, even if country A imposes an expected penalty of $50 (equal to the profit generated from consumers in country A), the global cartel would not be deterred in the absence of a $50 expected penalty in country B. The total profits earned by the cartel ($100) would exceed the total expected penalties ($50); as a result, the cartel would not be deterred and consumers in both country A and country B would be harmed.

The conclusion is that, even if a given expected penalty in a specific country were sufficient to deter a purely domestic cartel from forming, the expected penalty may be insufficient to deter a global cartel from forming. Deterring a global cartel efficiently requires that the *global* expected penalty equal the global gain to the cartel.

This perspective underscores the importance of examining the strength of antitrust systems in other countries to evaluate whether global cartels are likely to be deterred by global ex-

pected penalties under current conditions. Historically, the United States has been one of the few nations in the world with strong antitrust enforcement: "For many decades, the United States stood almost alone in the world in its commitment to antitrust enforcement * * *." International Competition Policy Advisory Comm. to the Attorney General and Ass't Attorney General for Antitrust, *Final Report* 185 (2000) ("*ICPAC Final Report*").

Other industrialized economies have recently strengthened penalties against cartels, which may in part reflect a response to the effectiveness of U.S. policies:

> Although U.S. antitrust enforcement has been criticized for being aggressively unilateral, it has, in fact, stimulated positive responses from other jurisdictions. Indeed, it is difficult to believe that we would see the international flowering of interest in antitrust * * * had the United States not asserted its jurisdiction over international competition matters in the first place.

Harry First, *The Vitamins Case: Cartel Prosecutions and the Coming of International Competition Law*, 68 ANTITRUST L.J. 711, 732 (2001).

Despite recent progress in improving antitrust protections abroad, however, severe weaknesses remain. The OECD recently has undertaken a multi-year study of the cartel laws in its member countries, which showed that:

1. The antitrust laws in most OECD countries allow for large fines against colluding firms, but the fines actually imposed are often modest.
2. Individuals can be fined in less than half of the OECD countries. Between 1996 and 2000, only four OECD countries imposed such fines.
3. Individuals can be imprisoned for collusive activities in a minority of OECD nations. Between 1996 and 2000, only the United States and Can-

ada actually imprisoned individuals for their cartel-related activities.

4. Fewer than half of OECD countries permit the recovery of damages by victims of cartels. This is a common practice only in the United States, and the maximum permissible recovery amount is often more modest abroad.

OECD, *Hard Core Cartels – Harm and Effective Sanctions* 3 (Policy Brief, May 2002) ("*Hard Core Cartels Policy Brief*").

The OECD reached a firm conclusion: "Available data indicate that sanctions actually imposed have not reached the optimal level for deterrence. * * * [I]t must be concluded that, while there is a distinct, if uneven trend toward more rigorous sanctions in cartel cases, available data indicate that larger sanctions are required to achieve effective deterrence." OECD, *Hard Core Cartels Policy Brief*, at 3.

Furthermore, the strength of anti-cartel enforcement outside the OECD is generally much weaker than within the OECD. As one recent study noted,

> there has been little activity on the part of developing country governments or developing country consumers to respond to these [international] cartels even after they have been shown to exist. * * * There are a variety of reasons – legal, political, and economic – why this may be the case. But * * * a lack of impact on developing countries is probably not one.

Margaret Levenstein, Valerie Suslow & Lynda Oswald, *International Price-Fixing Cartels and Developing Countries: A Discussion of Effects and Policy Remedies*, William Davidson Working Paper No. 538, at 3 (The William Davidson Inst., U. Mich. Bus. Sch., Feb. 2003). High fixed costs of bringing antitrust actions mean that even if a developing country had the administrative and legal framework with which to bring antitrust actions, were recovery limited to damage within the country, it would not be economically

practicable to bring antitrust actions. Efficient deterrence requires the concentration of antitrust actions in the economies most affected.

*Amici*'s conclusion is that current global sanctions are simply insufficient to deter global cartels.

## III. INADEQUATE DETERRENCE OF GLOBAL CARTELS UNDERMINES DETERRENCE OF DOMESTIC PARTICIPATION IN SUCH CARTELS.

The lack of an effective deterrent against international cartels imposes harm not just on the global economy, but also on the U.S. economy. An international cartel's decision to operate in the United States will be based not solely on the domestic costs and benefits of such operation, but on the synergistic *international* costs and benefits of U.S. operations. Ensuring sufficient deterrence of international conspiracies is thus sound policy even from the more constricted perspective of maximizing the welfare of the American public, in addition to the broader perspective of maximizing global welfare.

The hypothetical example from the previous section illustrates the point. Since the expected penalty in country A is equal to the harm imposed on consumers in country A, would not the cartel be deterred from operating in country A? The answer is often no, since a prospective cartel in a tradable good may have to operate in both countries to succeed in raising prices in either country.

To see why, suppose the cartel operates only in country B. Then the price for the good would be higher in country B than country A, and arbitrageurs would ship the good from country A (where it can be purchased at the competitive market price) to country B (where it sells above that competitive market price). The arbitrage would undermine the cartel's market power in country B, driving down the price in country B. The basic conclusion is that in global markets, the cartel must

generally operate in *both* country A and country B to be successful.

While the existence of trading frictions, such as transportation costs and tariffs, might allow a higher price in country B even absent cartel operations in country A, such costs tend to be modest for the types of goods that have been cartelized in the recent past (including, for example, vitamins and lysine). Tariffs on industrial goods have been declining, and will average only about four percent by 2005. OECD, *The Doha Development Agenda: Tariffs and Trade* 2 (Policy Brief, Aug. 2003). Freight and insurance costs for industrialized countries tend to be under 5 percent on a value-weighted basis. IMF, INTERNATIONAL FIN. STATS. YEARBOOK 1039 (2002) (2001 data showing U.S. imports on a CIF (cost-insurance-freight) basis and an FOB (free-on-board) basis, with the difference representing transportation costs of 3.3%); *id.* at 499 (same for Germany showing 2.8% costs); *id.* at 1031 (1997 data for United Kingdom showing 2.2% costs); IMF, DIRECTION OF TRADE STATS. YEARBOOK 3 (2002) (2001 data for world imports showing 3.6% average costs). Even if trading costs were *twice* as large as these estimates, such costs would be much smaller than the price mark-ups associated with many international cartels.[2]

---

[2] The international lysine cartel is alleged to have raised prices by 70 percent in its first six months of operation, and the international vitamins cartel supposedly raised the price of Vitamin C by over 30 percent. Antitrust Division, DOJ, *Status Report: International Cartel Enforcement* 1-2 (Feb. 2002) (available at http://www.usdoj.gov/atr/public/criminal/9939.pdf); Carlton, *The Proper Role for Antitrust*, at 3 (Vitamin C prices raised over 50 percent). Some multinational cartels have even resulted in price mark-ups as high as 100 percent. William J. Kolasky, *Antitrust Compliance Programs: The Government Perspective*, Speech presented at the Corporate Compliance 2002 Conference, Practising Law Institute, at 3 (July 12, 2002) (Deputy Ass't A.G., Antitrust Div., DOJ) (available at http://www.usdoj.gov/atr/public/speeches/11534.pdf).

The smaller the trading frictions, the more international the relevant market and the more necessary it will be for a global cartel to include the United States within its operations. *Amici*'s conclusion is that real-world frictions are (almost by definition) too small in global markets to allow a cartel to exclude major trading partners while sustaining the types of price increases that are the objective of international cartels. In particular, because of the relative size of the U.S. economy, cartels in global markets thus often will have to operate in the United States, regardless of whether U.S. operations will generate independent prospective gains, in order to be successful. (The United States represents a substantial share of the world market for many types of goods and services. U.S. Gross Domestic Product represented approximately 21 percent of world-wide GDP in 2002. IMF, *World Economic Outlook* 164 (September 2003) (Table A) (available at http://www.imf.org/external/pubs/ft/weo/2003/02/pdf/appendix.pdf).

Inadequate deterrence of cartels in low-friction global markets on an international basis thus implies inadequate deterrence of such cartels within the United States. In other words, in evaluating the deterrent to international cartels operating in the United States, it is invalid to compare the expected penalty for harm imposed solely on U.S. consumers to the expected profit that the cartel could earn solely from U.S. consumers. The reason is that preventing arbitrage from the U.S. market may be a lynchpin to the success of the global conspiracy as a whole. Even if the expected penalty for harm caused in the United States were equal to or greater than the expected profits earned within the United States, the cartel could still have an incentive to operate in the United States in order to facilitate profits abroad. Cartel operations in the U.S. thus can have the effect of sustaining higher cartel prices and profits abroad, separate and apart from the expected gains from U.S. transactions alone.

The challenge of deterring a global cartel is also highlighted by other incentives for the cartel to include an additional market within its scope. Including one more market in the global cartel may strengthen the ability of the cartel to prevent defection. As the number of national markets in which a global cartel operates increases, "each cartel member can be more successfully deterred from cheating on the cartel agreement in *any one market* by the threat of retaliation by other members in *all the markets* in which the cartel operates." Evenett, *et al.*, 24 WORLD ECONOMY at 1237 (emphasis in original). In other words, the addition of one more market may expand the ability of the cartel to discipline its members in other markets. Again, the conclusion is that the typical deterrent rule applied in a purely domestic setting may not be sufficient to deter a global cartel from entering the domestic market, and operations in the domestic market can have the effect of sustaining cartel discipline, and hence profits, in operations abroad.

The courts have recognized the adverse effects on domestic markets from insufficiently deterring global cartels. For example, this Court concluded in *Pfizer, Inc.* v. *Government of India* that

> [i]f foreign plaintiffs were not permitted to seek a remedy for their antitrust injuries, persons doing business both in this country and abroad might be tempted to enter into anticompetitive conspiracies affecting American consumers in the expectation that the illegal profits they could safely extort abroad would offset any liability to plaintiffs at home. If, on the other hand, potential antitrust violators must take into account the full costs of their conduct, American consumers are benefited by the maximum deterrent effect of treble damages upon all potential violators.

434 U.S. 308, 315 (1978) (footnote omitted).

The United States Court of Appeals for the D.C. Circuit reached a similar conclusion below:

> Even assuming, *arguendo*, that the antitrust laws are only intended to protect selfish national interests, suits by foreign purchasers harmed solely by a conspiracy's foreign effects are necessary to protect U.S. commerce from global conspiracies. * * * [I]f foreign plaintiffs could not enforce the antitrust laws with respect to the foreign effects of anticompetitive behavior, global conspiracy would be under-deterred, since the perpetrator might well retain the benefits that the conspiracy accrued abroad. There would be an incentive to engage in global conspiracies, because, even if the conspirator has to disgorge his U.S. profits in suits by domestic plaintiffs, he would very possibly retain his foreign profits, which may make up for his U.S. liability.

*Empagran S.A.* v. *F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 356 (CADC 2003).

The adverse effect on U.S. economic welfare is exacerbated because global cartels, once they form, are particularly difficult to detect and prosecute. As one Justice Department official has emphasized, "The most startling characteristic of the multinational cartels we have prosecuted is how cold blooded and bold they are. * * * [T]hey went to great lengths to cover up their actions – such as using code names with one another, meeting in secret venues around the world, creating false 'covers' – *i.e.*, facially legal justifications – for their meetings, using home phone numbers to contact one another, and giving explicit instructions to destroy any evidence of the conspiracy." William J. Kolasky, *Antitrust Compliance Programs: The Government Perspective*, Speech before the Corporate Compliance 2002 Conference, PLI, at 4-5 (July 12, 2002) (Deputy Ass't A.G., Antitrust Div., DOJ) (available at http://www.usdoj.gov/atr/public/speeches/11534.pdf).

The relatively low probability of detecting and convicting a global cartel (compared to a purely domestic one) makes the formation of such cartels more likely. As a result, the absence of an effective global deterrent further undermines protection against antitrust abuses within the United States itself.

Several features of international cartels make detection and conviction especially challenging. First, cartel members can meet and retain records outside the jurisdiction of U.S. authorities. As a result, it may be difficult for U.S. antitrust agencies to obtain the information necessary to prosecute a cartel. Indeed, the failure of the United States government in the early 1990s to obtain a criminal conviction against participants in an alleged international cartel in industrial diamonds is commonly attributed to the difficulties in compelling evidence from foreign nationals. Spencer Weber Waller, *Anticartel Cooperation*, in ANTITRUST GOES GLOBAL: WHAT FUTURE FOR TRANSATLANTIC COOPERATION? 104 (S. Evenett, A. Lehmann, and B. Steil, eds., 2000). Although the United States has entered into various cooperative arrangements with authorities in other countries, those agreements typically do not require the sharing of all information nor do they compel foreign witnesses to cooperate fully with U.S. investigations. Some observers believe that impediments to prosecuting international cartels can almost eliminate the probability of detection and conviction. Evenett, *et al.*, 24 WORLD ECONOMY at 1237.

Second, even with full information sharing and cooperation among international authorities, the nature of international markets and legal systems may impede enforcement efforts. Differences in reporting requirements and legal frameworks across nations, the ability of cartel members to use official export and import data to monitor activities of other members, and the use of trade associations to disguise cartel meetings, complicate the ability of antitrust authorities to pursue global cartels relative to purely domestic ones. Moreover, the seemingly innocuous use of national bounda-

ries to mask collusive agreements to divide world markets is a particular challenge: It would be extremely difficult to detect a cartel that operated by dividing a global market into exclusive national markets.

Those factors tend to reduce the probability of detection and conviction (p) for a global cartel relative to a purely domestic one. As a result, the penalty conditional on conviction (F) for global cartels must be increased, relative to the fine imposed on a purely domestic cartel that exerts an equally adverse effect on the domestic market, just to provide the same level of deterrence (pF) against harm imposed solely in the United States itself. For any given level of profits generated in domestic markets, the fine imposed on a global cartel should be higher than the fine imposed on a purely domestic cartel to offset the lower probability of detection and conviction of the international cartel. Allowing suits in the United States to recover based upon international, rather than merely domestic, profits would be a significant step in raising the expected penalty to an international cartel for operating in the United States. In the absence of such a higher fine, deterrence of cartels in U.S. markets would, in general, be less effective against cartels that also operate in other nations.

The fundamental point is that ineffective worldwide antitrust deterrence facilitates the creation of global cartels that operate both abroad and in the United States and that are then difficult to detect and convict, which in turn means that they are more likely to be formed in the first place. Insufficient deterrence against the global harm caused by an international cartel can thus eviscerate efforts to protect U.S. markets from the adverse effects of collusion.

## IV. STRENGTHENING DETERRENCE OF GLOBAL CARTELS PROTECTS U.S. CONSUMERS.

In an ideal world, without transactions costs, every nation would impose a consistent set of sanctions against cartels and

international agreements would ensure full comity among them. The ultimate policy goal should be to pursue this ideal by raising antitrust standards around the world. The United States should seek to have other countries institute antitrust laws that allow for both criminal and civil prosecution, and also seek to have other countries institute treble damage awards. Such an international system would deter global cartels more efficiently than the presently fragmented system.

This ideal world is far from today's reality. International sanctions remain too weak to deter global cartels. For the foreseeable future, alternative mechanisms are therefore necessary. One practical method of improving the protection of U.S. consumers against international conspiracies is to allow foreign parties to sue for private damages in U.S. courts, even when such suits arise from the foreign effects of a global cartel that also operates in the United States. Adopting a more expansive view of the jurisdictional reach of U.S. antitrust laws would raise the total expected penalty, relative to expected profits, from what would obtain if the penalty were based solely on U.S. transactions. The result would be more effective deterrence against global cartels operating in the United States, along with more effective deterrence abroad.

Both economists and the courts have recognized the deterrence value of allowing foreign plaintiffs to sue in domestic courts. For example,

> suppose only country A has an antitrust law. A cartel sells to consumers in countries A and B. In order to deter the cartel from forming, a penalty that deprives the cartel of at least its total profits is required. Yet that can only occur if someone who has standing to sue in country A can collect for the overcharges to consumers in country B.

Carlton, *The Proper Role for Antitrust*, at 3-4. Similarly, the D.C. Court of Appeals wrote that, "[a]llowing suits by those injured solely in foreign commerce, where the anticompetitive

conduct also harmed U.S. commerce, forces the conspirator to internalize the full costs of his anticompetitive conduct." 315 F.3d at 356. Indeed, the legislative history of the Foreign Trade Antitrust Improvements Act indicates that "to deny foreigners a recovery could under some circumstances so limit the deterrent effect of United States antitrust law that defendants would continue to violate our laws, willingly risking the smaller amount of damages payable only to injured domestic persons." H.R. REP. No. 686, 97th Cong., 2d Sess., at 10 (1982).

The Department of Justice can already base its criminal fee calculation on *global* cartel sales in certain situations. *ICPAC Final Report* at 169 n. 24. Yet the whole structure of antitrust laws in a domestic setting reflects an understanding that criminal fines and penalties, by themselves, are not sufficient to deter cartel activity. The primary motivation for the treble damages provision is precisely to ensure sufficient deterrence of collusion. To ensure a parallel degree of deterrence against global cartels requires that not only criminal, but also civil, fines be based on the cartel's global sales.

Finally, note that the distinction between "domestic" effects and "foreign" effects at best assumes importance only when viewing the antitrust laws from the perspective of recovery to victims; it is not a particularly illuminating distinction when viewing the antitrust laws from the perspective of deterrence, which is the proper way to view them from an economic policy perspective. From a deterrence perspective, the fact that the injuries are suffered by foreign consumers in low-friction global markets is not important, because those injuries are still an effect of the cartel's inclusion of the U.S. market as a means of sustaining its global control. In *Pfizer,* the Court recognized this point, warning against "deny[ing] foreigners a remedy when they are injured by antitrust violations" and observing that "[t]reble-damages suits by foreigners who have been victimized by antitrust violations clearly

may contribute to the protection of American consumers." 434 U.S. at 314.

*Amici*'s conclusion is that allowing private suits in the United States by foreign plaintiffs against global cartels would further the purposes of the U.S. antitrust laws by helping to protect American consumers against the harms of international cartels with a not insignificant anticompetitive effect in the United States. This benefit would accrue to American consumers, furthermore, even when such claims stem from the foreign effect of the global cartel conduct. It would also help to protect consumers abroad against the adverse effects of cartels.

## V. COUNTER-ARGUMENTS DO NOT OUTWEIGH THE INCREASED DETERRENCE FROM ALLOWING SUITS ON FOREIGN TRANSACTIONS.

Others, including the Department of Justice, *see, e.g.*, Brief of United States as *Amicus Curiae* at 19-21, appear to have reached a different judgment on the policy merits. In this section, we briefly discuss the various objections.

The principal policy counterarguments against *Amici*'s view is that allowing private suits by foreign plaintiffs could induce excessive deterrence, that it could cause undue administrative burdens, and that it could reduce deterrence (to the extent it reduces the attractiveness of the Justice Department's corporate amnesty program). None of these concerns is sufficient to outweigh the benefits of more aggressive action to combat international cartels:

1. The risk in international markets is clearly under-deterrence, not over-deterrence, of global cartels.
2. Administrative burdens would arise only when a global cartel affected commerce in the United States, and such administrative burdens could be mitigated by appropriate safeguards against

frivolous lawsuits. Furthermore, it is possible that increased deterrence, by preventing the illegal conduct in the first place, would lead to a decline in administrative burdens, rather than an increase.

3. The Justice Department's speculation that incentives for participation in the corporate amnesty program could be so weakened that the overall effect would be *reduced* deterrence against cartels is inconsistent with policy recommendations made by the OECD and others to strengthen private civil penalties against global cartels in other countries. In any case, the effect is ambiguous theoretically, and a dramatic adverse effect seems unlikely. In *Amici*'s view, the net effect of increasing civil penalties on global cartels that operate in the United States would undoubtedly be increased deterrence and better protection of consumer welfare in the United States.

Some observers are concerned that allowing private suits in the United States for the foreign effects of global cartels could lead to excessive deterrence, as firms were held liable in multiple jurisdictions for such foreign effects. In practice, however, the current risk is under-deterrence, not over-deterrence. As noted above, the OECD has exhaustively studied global cartels and concluded that "available data indicate that larger sanctions are required to achieve effective deterrence." OECD, *Hard Core Cartels Policy Brief*, at 3. As one observer has noted:

> [T]he current round of international cartel enforcement suggests that * * * major international corporations are more willing than we might otherwise have thought to engage in anticompetitive behavior. In the vitamins cartel prosecution, for example, the informations indicate that representatives of Roche were engaging in price-fixing discussions on vitamins at the very same time that

> the company was entering a guilty plea in the citric acid cartel case.

First, 68 ANTITRUST L.J. at 731.

It seems extremely unlikely that allowing private suits in the United States based on the foreign transactions of global cartels with anticompetitive effects in the United States would dramatically shift the balance of risks toward over-deterrence. Indeed, given the difficulty of detecting and convicting global cartels, it is not even clear that allowing such suits in the United States would be sufficient to deter global cartels adequately. But such suits would certainly be a step in the right direction.

As for any potential over-deterrence from duplicative suits or recoveries, existing or additional limits on such duplication would minimize any potential danger. For example, it might be reasonable to limit suits in the United States when foreign transactions had already been adjudicated abroad. Foreign courts also could limit suits that had already been the subject of legal action here. Likewise, damages paid in initial suits could be credited against available damages in subsequent suits either here or abroad, thus ensuring a maximum of treble damages in all jurisdictions for private cases.[3] The possibility of double recoveries is a commonly confronted and resolved issue, and established legal rules, including claim preclusion, exist in all jurisdictions to avoid such double recoveries.

Finally, because the treble damages standard is already applied and accepted for unlawful transactions within the United States without significant concern about over-deterrence, any claimed concern with potential over-deterrence from extending access to U.S. courts to foreign

---

[3] The requisite coordination could be facilitated through bodies such as the International Competition Network, an international organization devoted to improving coordination of national antitrust policies.

plaintiffs seems misplaced and inconsistent at best. If rigorous private enforcement and treble damages indeed over-deter certain behavior, then it makes little sense to selectively over-deter domestic transactions rather than to maintain a level playing field between firms with predominately U.S. operations and firms with substantial foreign operations.

A second concern raised by opponents of broad U.S. antitrust jurisdiction is that even if the private suits were helpful in deterring global cartels, they may impose excessive administrative costs on the U.S. legal system. Although administrative burdens may increase, any such increase seems likely to be a small price to pay for the benefits of discouraging the "supreme evil of antitrust: collusion." *Verizon*, -- U.S. at --, 124 S. Ct. at 879. Any potential increase in administrative burdens would be mitigated by the possibility that foreign plaintiffs could simply join suits filed by domestic plaintiffs, as had originally occurred in this case. And administrative burdens would be reduced further by the ordinary application of *forum non conveniens* principles, which would effectively remedy any genuine burden on the U.S. courts. *See Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235 (1981); *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501 (1947).

Furthermore, it is worth noting that the net effect of allowing private suits in the United States for foreign effects of international conspiracies may ultimately be a reduction, not increase, in the administrative burden on the courts. To be sure, the initial direct effect of allowing such suits may be an increase in administrative burden. But to the extent that the increased deterrent is effective, the number of global cartels would decline and thus the administrative burden may decline. A higher level of deterrence may result in a smaller number of cases. *See* Steven C. Salop & Lawrence J. White, *Private Antitrust Litigation: An Introduction and Framework*, in PRIVATE ANTITRUST LITIGATION: NEW EVIDENCE, NEW LEARNING 19-21 (Lawrence J. White, ed., 1988) (discussing "Laffer curve of litigation").

The bottom line is that the fear of frivolous lawsuits in the United States should elicit a set of reasonable protections against abuse (such as requiring that the global cartel had imposed a not insignificant anticompetitive effect in the United States, that the market be characterized by relatively low trading frictions, and perhaps by applying a credit for foreign penalties when computing damages based on foreign effects), rather than prohibiting all suits based on foreign effects. As emphasized above, such suits can help to strengthen deterrence against global cartels operating in the United States.

A final economic policy concern has been raised by the Department of Justice, which argues that allowing private suits in the United States for foreign effects would undermine the efficacy of its corporate amnesty program. Under the program, the first corporation in a cartel to cooperate with the antitrust authorities may be provided protection from prosecution. Any individuals who come forward with a corporation that applies for amnesty may also receive immunity.

The Justice Department argument is that the corporate leniency program provides amnesty only from *criminal* prosecution, not civil penalties. The larger civil penalties that could arise if private civil suits were allowed for foreign transactions, according to the argument, would attenuate incentives for conspirators to participate in the corporate leniency program, which would in turn undermine anti-cartel activities. Justice argues that the net effect is weakened deterrence.

Several points are worth underscoring with regard to this argument. First, note that the concern here is that allowing private suits would trigger a *reduction* in deterrence, which is in considerable tension with the supposed concerns regarding over-deterrence.

Second, the Justice Department argument would logically apply to *any* increase in private civil sanctions on global cartels, regardless of whether those sanctions were applied by

U.S. courts or foreign courts. Under the Justice Department's argument, any increase in private civil sanctions imposed on a global cartel should so discourage participation in the corporate amnesty program as to diminish overall deterrence. That conclusion would apply to increasing civil sanctions imposed by foreign courts, which are not waived under our corporate amnesty program, as well as to sanctions imposed by U.S. courts. Yet the OECD has firmly concluded that countries should consider "increasing fines that are imposed against organisations for participating in [a] cartel to a level that approaches three times the gain to the cartel." OECD, HARD CORE CARTELS, at 46. Such a recommendation would be counterproductive if the Justice Department view were correct.[4]

Third, the empirical relevance of the argument depends in large part on why firms participate in the corporate amnesty program. If the dominant concern among firms considering participation in the program is the avoidance of criminal fines and imprisonment of executives, even relatively large increases in civil penalties may have little adverse effect on participation incentives.[5]

---

[4] In addition to the direct deterrence effect of raising the penalty (F) in the expected penalty (pF), there can also be interactive effects between (p) and (F) themselves, whereby the increased amount of civil recovery creates greater incentives for private parties to uncover illegal behavior in the first place, thus increasing the probability of discovery and conviction (p) as well.

[5] The view that the threat of criminal penalties is the primary motivation for participation in corporate amnesty programs does not necessarily imply that civil penalties play a small role in deterring collusion in the first place. Firms initially considering whether to engage in collusive activity may approach the decision from a perspective closer to risk-neutral, profit-maximizing behavior, in which expected civil penalties can play a critical role. However, executives fearful of being prosecuted after the cartel has commenced may exhibit more risk aversion, and the threat of criminal prosecution may then weigh particularly heavily in their decision-making. Such differences in risk assessment over time may be espe-

Several sources suggest that avoiding criminal prosecution and possible imprisonment is the most important factor in motivating participation in the amnesty programs. For example, the director of criminal enforcement at the Antitrust Division emphasizes that "monetary cost savings may not be the most important consideration when the freedom of individuals is hanging in the balance." Scott D. Hammond, *When Calculating The Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?*, Speech presented at the Fifteenth Ann. Nat'l Inst. on White Collar Crime, ABA Crim. Justice Sect., at 13 (Mar. 8, 2001) (Dir. Crim. Enf., Antitrust Div., DOJ) (available at http://www.usdoj.gov/atr/public/speeches/7647.pdf). The OECD similarly argues that "[t]he opportunity to avoid individual liability or criminal penalty may be a significant factor in encouraging early co-operation." OECD, FIGHTING HARD-CORE CARTELS: HARM, EFFECTIVE SANCTIONS AND LENIENCY PROGRAMMES 25 (2002).

Foreign firms also face the threat of criminal prosecution, and their incentives to participate in the corporate amnesty program may also be determined primarily by that threat. Since fiscal year 2001, roughly one-third of the individual defendants in Department of Justice cartel cases have been foreign nationals. Foreign defendants from Canada, Germany, Switzerland, Sweden, and France have served prison sentences in U.S. jails for violating U.S. antitrust laws. Antitrust Division, DOJ, *Status Report: An Overview of Recent Developments in the Antitrust Division's Criminal Enforcement Program* 3 (Feb. 2004) (available at http://www.usdoj.gov/atr/public/guidelines/202531.pdf).

Given the paramount importance of avoiding criminal prosecution, especially for the executives themselves, any indirect effect from increased civil liability of reducing the in-

---

cially salient with regard to corporate executives who become aware of or are hired after the conspiracy has already commenced.

centive to seek amnesty seems unlikely to be powerful enough to offset the direct increase in deterrence from allowing private suits for the foreign transactions of a global cartel. Indeed, the logic of the Justice Department's view that any indirect effect of civil penalties through the corporate amnesty program outweighs the direct effect of such penalties in deterring collusion would suggest *reducing* overall civil penalties in purely domestic cases in order to bolster deterrence. The absence of such a proposal is at least suggestive that the Justice Department recognizes the potency of civil treble damages in deterring collusion.

Fourth, even if civil fines were an empirically important factor in determining participation in the corporate amnesty program, the effect may be the *opposite* of what the Justice Department supposes. In particular, assume that whether firms participate in the corporate amnesty program depends on not just the direct gain to the corporation (which may reflect a balancing of criminal penalties avoided and civil costs incurred), but also the costs imposed on its competitors that are members of the cartel. By raising the costs imposed on competitors, allowing private suits for foreign effects may increase the incentive for firms to participate in the amnesty program.[6]

Finally, if the antitrust authorities believe that the failure to waive civil penalties results in substantial diminution of the incentives to participate in the corporate amnesty program, the conclusion should not be to avoid the proper level of civil

---

[6] More specifically, assume that each firm in a cartel faces an identical criminal penalty, that they differ in their civil exposures, and that all firms are financially sound enough that the complications arising from joint and several liability are not relevant. Then the firm with the smallest civil liability would generally have the strongest incentive to participate in the amnesty program, in part because of the relatively larger civil costs that would then be imposed on its competitors. If private suits for foreign effects were allowed, this firm may have an even stronger incentive to participate in the amnesty program.

penalties in the aggregate. Instead, the appropriate policy response would involve mechanisms for waiving some or all of the civil penalties for firms that participate in the amnesty program, as has been proposed in the Antitrust Criminal Penalty Enhancement and Reform Act of 2003, S. 1797, 108th Cong., 1st Sess. § 103, 149 CONG. REC. S13520 (2003) (text at http://www.theorator.com/bills108/s1797.html). If civil penalties were waived for participants in the amnesty program, increasing the total civil penalties that would otherwise apply (*e.g.*, by allowing suits for foreign transactions) would *strengthen* incentives to participate in the program. (*Amici* are not necessarily recommending this course of action, but merely pointing out that it represents an alternative, and preferable, policy response if the Justice Department's hypothesis regarding the net effect of strengthened aggregate civil penalties is correct.

*Amici*'s conclusion is that from the perspective of maximizing U.S. economic welfare and furthering the fundamental goals of U.S. antitrust law, none of the policy concerns discussed in this section are sufficient to offset the gains from increasing the aggregate penalties imposed on firms convicted of participating in international cartels.

## CONCLUSION

From a public policy perspective, private suits by foreign plaintiffs should be allowed in the United States, even when such claims involve the foreign transactions of global cartel conduct, as long as the international cartel has or is likely to have a not insignificant anticompetitive effect in the United States. Given the interdependent nature of global cartels operating in low-friction international markets, such foreign transactions are as much a consequence of including the United States in the cartel as are domestic transactions. And deterring such foreign transactions is essential to deterring U.S. inclusion in the cartel.

For the foregoing reasons, the decision of the U.S. Court of Appeals for the D.C. Circuit should be affirmed.

Respectfully Submitted,

ERIK S. JAFFE
*Counsel of record*
ERIK S. JAFFE, P.C.
5101 34th Street, N.W.
Washington, D.C. 20008
(202) 237-8165

EDMUND W. SEARBY
SCOTT & SCOTT, LLC
33 River Street
Chagrin Falls, OH 44022
(440) 247-8200

MARY BOIES
BOIES & MCINNIS
Village Green
P.O. Box 67
Bedford, NY 10506
(914) 234-3700

*Counsel for Amici Curiae*

Dated: March 15, 2004.