# EXHIBIT 8

# ANTITRUST ENFORCEMENT GUIDELINES FOR INTERNATIONAL OPERATIONS

Issued by:

THE U.S. DEPARTMENT OF JUSTICE
and
THE FEDERAL TRADE COMMISSION

April, 1995

## TABLE OF CONTENTS

**1 INTRODUCTION**

**2 ANTITRUST LAWS ENFORCED BY THE AGENCIES**
- 2.1 SHERMAN ACT
- 2.2 CLAYTON ACT
- 2.3 FEDERAL TRADE COMMISSION ACT
- 2.4 HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT OF 1976
- 2.5 NATIONAL COOPERATIVE RESEARCH AND PRODUCTION ACT
- 2.6 WEBB-POMERENE ACT
- 2.7 EXPORT TRADING COMPANY ACT OF 1982
- 2.8 OTHER PERTINENT LEGISLATION
  - 2.81 WILSON TARIFF ACT
  - 2.82 ANTIDUMPING ACT OF 1916
  - 2.83 TARIFF ACT OF 1930
    - 2.831 COUNTERVAILING DUTIES
    - 2.832 ANTIDUMPING DUTIES
    - 2.833 SECTION 337
  - 2.84 TRADE ACT OF 1974
    - 2.841 SECTION 201
    - 2.842 SECTION 301
- 2.9 RELEVANT INTERNATIONAL AGREEMENTS
  - 2.91 BILATERAL COOPERATION AGREEMENTS
  - 2.92 INTERNATIONAL GUIDELINES AND RECOMMENDATIONS

**3 THRESHOLD INTERNATIONAL ENFORCEMENT ISSUES**
- 3.1 JURISDICTION
  - 3.11 JURISDICTION OVER CONDUCT INVOLVING IMPORT COMMERCE
    - ILLUSTRATIVE EXAMPLE A

3.12 JURISDICTION OVER CONDUCT INVOLVING OTHER FOREIGN COMMERCE
3.121 JURISDICTION IN CASES UNDER SUBSECTION 1(A) OF THE FTAIA
ILLUSTRATIVE EXAMPLE B
ILLUSTRATIVE EXAMPLE C
3.122 JURISDICTION IN CASES UNDER SUBSECTION 1(B) OF THE FTAIA
ILLUSTRATIVE EXAMPLE D
ILLUSTRATIVE EXAMPLE E
3.13 JURISDICTION WHEN U.S. GOVERNMENT FINANCES OR PURCHASES
ILLUSTRATIVE EXAMPLE F
ILLUSTRATIVE EXAMPLE G
3.14 JURISDICTION UNDER SECTION 7 OF THE CLAYTON ACT
ILLUSTRATIVE EXAMPLE H
3.2 COMITY
ILLUSTRATIVE EXAMPLE I
ILLUSTRATIVE EXAMPLE J
3.3 EFFECTS OF FOREIGN GOVERNMENT INVOLVEMENT
3.31 FOREIGN SOVEREIGN IMMUNITY
3.32 FOREIGN SOVEREIGN COMPULSION
ILLUSTRATIVE EXAMPLE K
3.33 ACTS OF STATE
3.34 PETITIONING OF SOVEREIGNS
ILLUSTRATIVE EXAMPLE L
3.4 ANTITRUST ENFORCEMENT AND INTERNATIONAL TRADE REGULATION
ILLUSTRATIVE EXAMPLE M
ILLUSTRATIVE EXAMPLE N

**4 PERSONAL JURISDICTION AND PROCEDURAL RULES**
4.1 PERSONAL JURISDICTION AND VENUE
4.2 INVESTIGATORY PRACTICE RELATING TO FOREIGN NATIONS
4.22 HART-SCOTT-RODINO: SPECIAL FOREIGN COMMERCE RULES

---

U.S. DEPARTMENT OF JUSTICE
ANTITRUST ENFORCEMENT

# GUIDELINES FOR INTERNATIONAL OPERATIONS

April 1995

## 1. INTRODUCTION

For more than a century, the U.S. antitrust laws have stood as the ultimate protector of the competitive process that underlies our free market economy. Through this process, which enhances consumer choice and promotes competitive prices, society as a whole benefits from the best possible allocation of resources.

Although the federal antitrust laws have always applied to foreign commerce, that application is particularly important today. Throughout the world, the importance of antitrust law as a means to ensure open and free markets, protect consumers, and prevent conduct that impedes competition is becoming more apparent. The Department of Justice ("the Department") and the Federal Trade Commission ("the Commission" or "FTC") (when referred to collectively, "the

Agencies"), as the federal agencies charged with the responsibility of enforcing the antitrust laws, thus have made it a high priority to enforce the antitrust laws with respect to international operations and to cooperate wherever appropriate with foreign authorities regarding such enforcement. In furtherance of this priority, the Agencies have revised and updated the Department's 1988 Antitrust Enforcement Guidelines for International Operations, which are hereby withdrawn.[1]

The 1995 Antitrust Enforcement Guidelines for International Operations (hereinafter "Guidelines") are intended to provide antitrust guidance to businesses engaged in international operations on questions that relate specifically to the Agencies' international enforcement policy.[2] They do not, therefore, provide a complete statement of the Agencies' general enforcement policies. The topics covered include the Agencies' subject matter jurisdiction over conduct and entities outside the United States and the considerations, issues, policies, and processes that govern their decision to exercise that jurisdiction; comity; mutual assistance in international antitrust enforcement; and the effects of foreign governmental involvement on the antitrust liability of private entities. In addition, the Guidelines discuss the relationship between antitrust and international trade initiatives. Finally, to illustrate how these principles may operate in certain contexts, the Guidelines include a number of examples.

As is the case with all guidelines, users should rely on qualified counsel to assist them in evaluating the antitrust risk associated with any contemplated transaction or activity. No set of guidelines can possibly indicate how the Agencies will assess the particular facts of every case. Persons seeking more specific advance statements of enforcement intentions with respect to the matters treated in these Guidelines should use the Department's Business Review procedure,[3] the Commission's Advisory Opinion procedure,[4] or one of the more specific procedures described below for particular types of transactions.

## 2. ANTITRUST LAWS ENFORCED BY THE AGENCIES

Foreign commerce cases can involve almost any provision of the antitrust laws. The Agencies do not discriminate in the enforcement of the antitrust laws on the basis of the nationality of the parties. Nor do the Agencies employ their statutory authority to further non-antitrust goals. Once jurisdictional requirements, comity, and doctrines of foreign governmental involvement have been considered and satisfied, the same substantive rules apply to all cases. The following is a brief summary of the laws enforced by the Agencies that are likely to have the greatest significance for international transactions.

### 2.1 Sherman Act

Section 1 of the Sherman Act, 15 U.S.C. 1, sets forth the basic antitrust prohibition against contracts, combinations, and conspiracies "in restraint of trade or commerce among the several States or with foreign nations." Section 2 of the Act, 15 U.S.C. 2, prohibits monopolization, attempts to monopolize, and conspiracies to monopolize "any part of trade or commerce among the several States or with foreign nations." Section 6a of the Sherman Act, 15 U.S.C. 6a, defines the jurisdictional reach of the Act with respect to non-import foreign

commerce.

Violations of the Sherman Act may be prosecuted as civil or criminal offenses. Conduct that the Department prosecutes criminally is limited to traditional per se offenses of the law, which typically involve price-fixing, customer allocation, bid-rigging or other cartel activities that would also be violations of the law in many countries. Criminal violations of the Act are punishable by fines and imprisonment. The Sherman Act provides that corporate defendants may be fined up to $10 million, other defendants may be fined up to $350,000, and individuals may be sentenced to up to 3 years imprisonment.5 The Department has sole responsibility for the criminal enforcement of the Sherman Act. In a civil proceeding, the Department may obtain injunctive relief against prohibited practices. It may also obtain treble damages if the U.S. government is the purchaser of affected goods or services.6 Private plaintiffs may also obtain injunctive and treble damage relief for violations of the Sherman Act.7 Before the Commission, conduct that violates the Sherman Act may be challenged pursuant to the Commission's power under Section 5 of the Federal Trade Commission Act, described below.

**2.2 Clayton Act**

The Clayton Act, 15 U.S.C. 12 et seq., expands on the general prohibitions of the Sherman Act and addresses anticompetitive problems in their incipiency.8 Section 7 of the Clayton Act, 15 U.S.C. 18, prohibits any merger or acquisition of stock or assets "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."9 Section 15 of the Clayton Act empowers the Attorney General, and Section 13(b) of the FTC Act empowers the Commission, to seek a court order enjoining consummation of a merger that would violate Section 7. In addition, the Commission may seek a cease and desist order in an administrative proceeding against a merger under Section 11 of the Clayton Act, Section 5 of the FTC Act, or both. Private parties may also seek injunctive relief under 15 U.S.C. 26. Section 3 of the Clayton Act prohibits any person engaged in commerce from conditioning the lease or sale of goods or commodities upon the purchaser's agreement not to use the products of a competitor, if the effect may be "to substantially lessen competition or to tend to create a monopoly in any line of commerce."10 In evaluating transactions, the trend of recent authority is to use the same analysis employed in the evaluation of tying under Section 1 of the Sherman Act to assess a defendant's liability under Section 3 of the Clayton Act.11 Section 2 of the Clayton Act, known as the Robinson-Patman Act,12 prohibits price discrimination in certain circumstances. In practice, the Commission has exercised primary enforcement responsibility for this provision.

**2.3 Federal Trade Commission Act**

Section 5 of the Federal Trade Commission Act ("FTC Act") declares unlawful "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."13 Pursuant to its authority over unfair methods of competition, the Commission may take administrative action against conduct that violates the Sherman Act and the Clayton Act, as well as anticompetitive practices that do not fall within the

scope of the Sherman or Clayton Acts. The Commission may also seek injunctive relief in federal court against any such conduct under Section 13(b) of the FTC Act. Although enforcement at the Commission relating to international deceptive practices has become increasingly important over time, these Guidelines are limited to the Commission's antitrust authority under the unfair methods of competition language of Section 5.

**2.4 Hart-Scott-Rodino Antitrust Improvements Act of 1976**

Title II of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), 15 U.S.C. 18a, provides the Department and the Commission with several procedural devices to facilitate enforcement of the antitrust laws with respect to anticompetitive mergers and acquisitions.14 The HSR Act requires persons engaged in commerce or in any activity affecting commerce to notify the Agencies of proposed mergers or acquisitions that would exceed statutory size-of-party and size-of-transaction thresholds,15 to provide certain information relating to reportable transactions, and to wait for a prescribed period-15 days for cash tender offers and 30 days for most other transactions-before consummating the transaction.16 The Agency may, before the end of the waiting period, request additional information concerning a transaction (make a "Second Request") and thereby extend the waiting period beyond the initial one prescribed, to a specified number of days after the receipt of the material required by the Second Request--10 days for cash tender offers and 20 days for most other transactions.17

The HSR Act and the FTC rules implementing the HSR Act18 exempt from the premerger notification requirements certain international transactions (typically those having little nexus to U.S. commerce) that otherwise meet the statutory thresholds.19 Failure to comply with the HSR Act is punishable by court-imposed civil penalties of up to $10,000 for each day a violation continues. The court may also order injunctive relief to remedy a failure substantially to comply with the HSR Act. Businesses may seek an interpretation of their obligations under the HSR Act from the Commission.20

**2.5 National Cooperative Research and Production Act**

The National Cooperative Research and Production Act ("NCRPA"), 15 U.S.C. 4301-06, clarifies the substantive application of the U.S. antitrust laws to joint research and development ("R&D") activities and joint production activities. Originally drafted to encourage research and development by providing a special antitrust regime for research and development joint ventures, the NCRPA requires U.S. courts to judge the competitive effects of a challenged joint R&D or joint production venture, or a combination of the two, in properly defined relevant markets and under a rule-of- reason standard. The statute specifies that the conduct "shall be judged on the basis of its reasonableness, taking into account all relevant factors affecting competition, including, but not limited to, effects on competition in properly defined, relevant research, development, product, process, and service markets."21 This approach is consistent with the Agencies' general analysis of joint ventures.22

The NCRPA also establishes a voluntary procedure pursuant to which the Attorney General and the FTC may be notified of a joint R&D or production venture. The statute limits the monetary relief that may be obtained in private

civil suits against the participants in a notified venture to actual rather than treble damages, if the challenged conduct is within the scope of the notification. With respect to joint production ventures, the National Cooperative Production Amendments of 199323 provide that the benefits of the limitation on recoverable damages for claims resulting from conduct within the scope of a notification are not available unless

1. the principal facilities for the production are located within the United States or its territories, and

2. "each person who controls any party to such venture (including such party itself) is a United States person, or a foreign person from a country whose law accords antitrust treatment no less favorable to United States persons than to such country's domestic persons with respect to participation in joint ventures for production." 24

**2.6 Webb-Pomerene Act**
The Webb-Pomerene Act, 15 U.S.C. 61-65, provides a limited antitrust exemption for the formation and operation of associations of otherwise competing businesses to engage in collective export sales. The exemption applies only to the export of "goods, wares, or merchandise."25 It does not apply to conduct that has an anticompetitive effect in the United States or that injures domestic competitors of the members of an export association. Nor does it provide any immunity from prosecution under foreign antitrust laws.26 Associations seeking an exemption under the Webb-Pomerene Act must file their articles of agreement and annual reports with the Commission, but pre-formation approval from the Commission is not required.

**2.7 Export Trading Company Act of 1982**
The Export Trading Company Act of 1982 (the "ETC Act"), Pub. L. No. 97-290, 96 Stat. 1234, is designed to increase U.S. exports of goods and services. It addresses that goal in several ways. First, in Title II, it encourages more efficient provision of export trade services to U.S. producers and suppliers by reducing restrictions on trade financing provided by financial institutions.27 Second, in Title III, it reduces uncertainty concerning the application of the U.S. antitrust laws to export trade through the creation of a procedure by which persons engaged in U.S. export trade may obtain an export trade certificate of review ("ETCR").28 Third, in Title IV, it clarifies the jurisdictional rules applicable to non-import cases brought under the Sherman Act and the FTC Act.29 The Title III certificates are discussed briefly here; the jurisdictional rules are treated below in Section 3.1.

Export trade certificates of review are issued by the Secretary of Commerce with the concurrence of the Attorney General. Persons named in the ETCR obtain limited immunity from suit under both state and federal antitrust laws for activities that are specified in the certificate and that comply with the terms of the certificate. To obtain an ETCR, an applicant must show that proposed export conduct will:

1. result in neither a substantial lessening of competition or restraint of trade within the United States nor a substantial restraint of the export

trade of any competitor of the applicant;

2. not unreasonably enhance, stabilize, or depress prices in the United States of the class of goods or services covered by the application;

3. not constitute unfair methods of competition against competitors engaged in the export of the class of goods or services exported by the applicant; and

4. not include any act that may reasonably be expected to result in the sale for consumption or resale in the United States of such goods or services.30

Congress intended that these standards "encompass the full range of the antitrust laws," as defined in the ETC Act.31

Although an ETCR provides significant protection under the antitrust laws, it has certain limitations. First, conduct that falls outside the scope of a certificate remains fully subject to private and governmental enforcement actions. Second, an ETCR that is obtained by fraud is void from the outset and thus offers no protection under the antitrust laws. Third, any person that has been injured by certified conduct may recover actual (though not treble) damages if that conduct is found to violate any of the statutory criteria described above. In any such action, certified conduct enjoys a presumption of legality, and the prevailing party is entitled to recover costs and attorneys' fees.32 Fourth, an ETCR does not constitute, explicitly or implicitly, an endorsement or opinion by the Secretary of Commerce or by the Attorney General concerning the legality of such business plans under the laws of any foreign country.

The Secretary of Commerce may revoke or modify an ETCR if the Secretary or the Attorney General determines that the applicant's export activities have ceased to comply with the statutory criteria for obtaining a certificate. The Attorney General may also bring suit under Section 15 of the Clayton Act to enjoin conduct that threatens "a clear and irreparable harm to the national interest,"33 even if the conduct has been pre-approved as part of an ETCR.

The Commerce Department, in consultation with the Department, has issued guidelines setting forth the standards used in reviewing ETCR applications.34 The ETC Guidelines contain several examples illustrating application of the certification standards to specific export trade conduct, including the use of vertical and horizontal restraints and technology licensing arrangements. In addition, the Commerce Department's Export Trading Company Guidebook35 provides information on the functions and advantages of establishing or using an export trading company, including factors to consider in applying for an ETCR. The Commerce Department's Office of Export Trading Company Affairs provides advice and information on the formation of export trading companies and facilitates contacts between producers of exportable goods and services and firms offering export trade services.

**2.8 Other Pertinent Legislation**

**2.81 Wilson Tariff Act**
The Wilson Tariff Act, 15 U.S.C. 8-11, prohibits "every combination, conspiracy, trust, agreement, or contract" made by or between two or more persons or corporations, either of whom is engaged in importing any article from a foreign country into the United States, where the agreement is intended to restrain trade or increase the market price in any part of the United States of the imported articles, or of "any manufacture into which such imported article enters or is intended to enter." Violation of the Act is a misdemeanor, punishable by a maximum fine of $5,000 or one year in prison. The Act also provides for seizure of the imported articles.36

**2.82 Antidumping Act of 1916**
The Revenue Act of 1916, better known as the Antidumping Act, 15 U.S.C. 71-74, is not an antitrust statute, but its subject matter is closely related to the antitrust rules regarding predation. It is a trade statute that creates a private claim against importers who sell goods into the United States at prices substantially below the prices charged for the same goods in their home market. In order to state a claim, a plaintiff must show both that such lower prices were commonly and systematically charged, and that the importer had the specific intent to injure or destroy an industry in the United States, or to prevent the establishment of an industry. Dumping cases are more commonly brought using the administrative procedures of the Tariff Act of 1930, discussed below.

**2.83 Tariff Act of 1930**
A comprehensive discussion of the trade remedies available under the Tariff Act is beyond the scope of these Guidelines. However, because antitrust questions sometimes arise in the context of trade actions, it is appropriate to describe these laws briefly.

**2.831 Countervailing Duties**
Pursuant to Title VII.A of the Tariff Act,37 U.S. manufacturers, producers, wholesalers, unions, and trade associations may petition for the imposition of offsetting duties on subsidized foreign imports.38 The Department of Commerce's International Trade Administration ("ITA") must make a determination that the foreign government in question is subsidizing the imports, and in almost all cases the International Trade Commission ("ITC") must determine that a domestic industry is materially injured or threatened with material injury by reason of these imports.

**2.832 Antidumping Duties**
Pursuant to Title VII.B of the Tariff Act,39 parties designated in the statute (the same parties as in the countervailing duties provision) may petition for antidumping duties, which must be imposed on foreign merchandise that is being, or is likely to be, sold in the United States at "less than fair value" ("LTFV"), if the U.S. industry is materially injured or threatened with material injury by imports of the foreign merchandise. The ITA makes the LTFV determination, and the ITC is responsible for the injury decision.

**2.833 Section 337**
Section 337 of the Tariff Act, 19 U.S.C. 1337, prohibits "unfair methods of

competition and unfair acts in the importation of articles into the United States," if the effect is to destroy or substantially injure a U.S. industry, or where the acts relate to importation of articles infringing U.S. patents, copyrights, trademarks, or registered mask works.40 Complaints are filed with the ITC. The principal remedies under Section 337 are an exclusion order directing that any offending goods be excluded from entry into the United States, and a cease and desist order directed toward any offending U.S. firms and individuals.41 The ITC is required to give the Agencies an opportunity to comment before making a final determination.42 In addition, the Department participates in the interagency group that prepares recommendations for the President to approve, disapprove, or allow to take effect the import relief proposed by the ITC.

**2.84 Trade Act of 1974**

**2.841 Section 201**
Section 201 of the Trade Act of 1974, 19 U.S.C. 2251 et seq., provides that American businesses claiming serious injury due to significant increases in imports may petition the ITC for relief or modification under the so-called "escape clause." If the ITC makes a determination that "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article," and formulates its recommendation for appropriate relief, the Department participates in the interagency committee that conducts the investigations and advises the President whether to adopt, modify, or reject the import relief recommended by the ITC.

**2.842 Section 301**
Section 301 of the Trade Act of 1974, 19 U.S.C. 2411, provides that the U.S. Trade Representative ("USTR"), subject to the specific direction, if any, of the President, may take action, including restricting imports, to enforce rights of the United States under any trade agreement, to address acts inconsistent with the international legal rights of the United States, or to respond to unjustifiable, unreasonable or discriminatory practices of foreign governments that burden or restrict U.S. commerce. Interested parties may initiate such actions through petitions to the USTR, or the USTR may itself initiate proceedings.43 Of particular interest to antitrust enforcement is Section 301(d)(3)(B)(i)(IV), which includes among the "unreasonable" practices of foreign governments that might justify a proceeding the "toleration by a foreign government of systematic anticompetitive activities by enterprises or among enterprises in the foreign country that have the effect of restricting . . . access of United States goods or services to a foreign market."44 The Department participates in the interagency committee that makes recommendations to the President on what actions, if any, should be taken.

**2.9 Relevant International Agreements**
To further the twin goals of promoting enforcement cooperation between the United States and foreign governments and of reducing any tensions that may arise in particular proceedings, the Agencies have developed close relationships with antitrust and competition policy officials of many different countries. In

some instances, understandings have been reached with respect to notifications, consultations, and cooperation in antitrust matters.45 In other instances, more general rules endorsed by multilateral organizations such as the Organization for Economic Cooperation and Development ("OECD") provide the basis for the Agencies' cooperative policies. Finally, even in the absence of specific or general international understandings or recommendations, the Agencies often seek cooperation with foreign authorities.

**2.91 Bilateral Cooperation Agreements**

Formal written bilateral arrangements exist between the United States and the Federal Republic of Germany, Australia, and Canada.46 International antitrust cooperation can also occur through mutual legal assistance treaties ("MLATs"), which are treaties of general application pursuant to which the United States and a foreign country agree to assist one another in criminal law enforcement matters. MLATs currently are in force with over one dozen countries, and many more are in the process of ratification or negotiation. However, only the MLAT with Canada has been used to date to obtain assistance in antitrust investigations.47 The Agencies also hold regular consultations with the antitrust officials of Canada, the European Commission, and Japan, and have close, informal ties with the antitrust authorities of many other countries. Since 1990, the Agencies have cooperated closely with countries in the process of establishing competition agencies, assisted by funding provided by the Agency for International Development.

On November 2, 1994, President Clinton signed into law the International Antitrust Enforcement Assistance Act of 1994,48 which authorizes the Agencies to enter into antitrust mutual assistance agreements in accordance with the legislation.

**2.92 International Guidelines and Recommendations**

The Agencies have agreed with respect to member countries of the OECD to consider the legitimate interests of other nations in accordance with relevant OECD recommendations.49 Under the terms of a 1986 recommendation, the United States agency with responsibility for a particular case notifies a member country whenever an antitrust enforcement action may affect important interests of that country or its nationals.50 Examples of potentially notifiable actions include requests for documents located outside the United States, attempts to obtain information from potential witnesses located outside the United States, and cases or investigations with significant foreign conduct or involvement of foreign persons.

## 3. THRESHOLD INTERNATIONAL ENFORCEMENT ISSUES

**3.1 Jurisdiction**

Just as the acts of U.S. citizens in a foreign nation ordinarily are subject to the law of the country in which they occur, the acts of foreign citizens in the United States ordinarily are subject to U.S. law. The reach of the U.S. antitrust laws is not limited, however, to conduct and transactions that occur within the boundaries of the United States. Anticompetitive conduct that affects U.S. domestic or foreign commerce may violate the U.S. antitrust laws regardless of where such conduct occurs or the nationality of the parties involved.

Under the Sherman Act and the FTC Act, there are two principal tests for subject matter jurisdiction in foreign commerce cases. With respect to foreign import commerce, the Supreme Court has recently stated in Hartford Fire Insurance Co. v. California that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."51 There has been no such authoritative ruling on the scope of the FTC Act, but both Acts apply to commerce "with foreign nations" and the Commission has held that terms used by both Acts should be construed together.52 Second, with respect to foreign commerce other than imports, the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") applies to foreign conduct that has a direct, substantial, and reasonably foreseeable effect on U.S. commerce. 53

**3.11 Jurisdiction Over Conduct Involving Import Commerce**
Imports into the United States by definition affect the U.S. d omestic market directly, and will, therefore, almost invariably satisfy the intent part of the Hartford Fire test. Whether they in fact produce the requisite substantial effects will depend on the facts of each case.

---

**ILLUSTRATIVE EXAMPLE A54**

Situation:
A, B, C, and D are foreign companies that produce a product in various foreign countries. None has any U.S. production, nor any U.S. subsidiaries. They organize a cartel for the purpose of raising the price for the product in question. Collectively, the cartel members make substantial sales into the United States, both in absolute terms and relative to total U.S. consumption.

Discussion:
These facts present the straightforward case of cartel participants selling products directly into the United States. In this situation, the transaction is unambiguously an import into the U.S. market, and the sale is not complete until the goods reach the United States. Thus, U.S. subject matter jurisdiction is clear under the general principles of antitrust law expressed most recently in Hartford Fire. The facts presented here demonstrate actual and intended participation in U.S. commerce.55 The separate question of personal jurisdiction under the facts presented here would be analyzed using the principles discussed infra in Section 4.1.

---

**3.12 Jurisdiction Over Conduct Involving Other Foreign Commerce**
With respect to foreign commerce other than imports, the jurisdictional limits of the Sherman Act and the FTC Act are delineated in the FTAIA. The FTAIA amended the Sherman Act to provide that it:

shall not apply to conduct involving trade or commerce (other than import trade or commerce) with foreign nations unless

1. such conduct has a direct, substantial, and reasonably foreseeable effect:

A. on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

B. on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; 56

2. such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section.

The FTAIA uses slightly different statutory language for the FTC Act,57 but produces the same jurisdictional outcomes.

**3.121 Jurisdiction in Cases Under Subsection 1(A) of the FTAIA**
To the extent that conduct in foreign countries does not "involve" import commerce but does have an "effect" on either import transactions or commerce within the United States, the Agencies apply the "direct, substantial, and reasonably foreseeable" standard of the FTAIA. That standard is applied, for example, in cases in which a cartel of foreign enterprises, or a foreign monopolist, reaches the U.S. market through any mechanism that goes beyond direct sales, such as the use of an unrelated intermediary, as well as in cases in which foreign vertical restrictions or intellectual property licensing arrangements have an anticompetitive effect on U.S. commerce.

---

**ILLUSTRATIVE EXAMPLE B**

Situation:
As in Illustrative Example A, the foreign cartel produces a product in several foreign countries. None of its members has any U.S. production, nor do any of them have U.S. subsidiaries. They organize a cartel for the purpose of raising the price for the product in question. Rather than selling directly into the United States, however, the cartel sells to an intermediary outside the United States, which they know will resell the product in the United States. The intermediary is not part of the cartel.

Discussion:
The jurisdictional analysis would change slightly from the one presented in Example A, because not only is the conduct being challenged entered into by cartelists in a foreign country, but it is also initially implemented through a sale made in a foreign country. Despite the different test, however, the outcome on these facts would in all likelihood remain the same. The fact that the illegal conduct occurs prior to the import would trigger the application of the FTAIA. The Agencies would have to determine whether the challenged conduct had "direct, substantial and reasonably foreseeable effects" on U.S. domestic or import commerce. Furthermore, since "the essence of any violation of Section 1 [of the Sherman Act] is the illegal agreement itself--rather than the overt acts performed in furtherance of it,"58 the Agencies would focus on the potential harm that would ensue if the conspiracy were successful, not on whether the actual conduct in furtherance of the conspiracy had in fact the prohibited effect upon interstate or foreign commerce.

---

## ILLUSTRATIVE EXAMPLE C

**Situation:**

Variant (1):

Widgets are manufactured in both the United States and various other countries around the world. The non-U.S. manufacturers meet privately outside the United States and agree among themselves to raise prices to specified levels. Their agreement clearly indicates that sales in or into the United States are not within the scope of the agreement, and thus that each participant is free independently to set its prices for the U.S. market. Over time, the cartel members begin to sell excess production into the United States. These sales have the effect of stabilizing the cartel for the foreign markets. In the U.S. market, these "excess" sales are priced at levels below those that would have prevailed in the U.S. market but for the cartel, but there is no evidence that the prices are predatory. As a result of these events, several U.S. widget manufacturers curtail their production, overall domestic output falls, and remaining manufacturers fail to invest in new or improved capacity.

Variant (2):

Assume now that the cartel agreement specifically provides that cartel members will set agreed prices for the U.S. market at levels designed to soak up excess quantities that arise as a result of price increases in foreign markets. The U.S. price level is set at periodic meetings where each participant indicates how much it must off-load in this way. Thus, the cartel members sell goods in the U.S. market at fixed prices that undercut prevailing U.S. price levels, with consequences similar to those in Variant 1.

**Discussion:**

Variant (1):

The jurisdictional issue is whether the predictable economic consequences of the original cartel agreement and the independent sales into the United States are sufficient to support jurisdiction. The mere fact that the existence of U.S. sales or the level of U.S. prices may ultimately be affected by the cartel agreement is not enough for either Hartford Fire jurisdiction or the FTAIA.59 Furthermore, in the absence of an agreement with respect to the U.S. market, sales into the U.S. market at non-predatory levels do not raise antitrust concerns.60

Variant (2):

> The critical element of a foreign price-fixing agreement with direct, intended effects in the United States is now present. The fact that the cartel believes its U.S. prices are "reasonable," or that it may be exerting downward pressure on U.S. price levels, does not exonerate it.61 Variant 2 presents a case where the Agencies would need clear evidence of the prohibited agreement before they would consider moving forward. They would be particularly cautious if the apparent effects in the U.S. market appeared to be beneficial to consumers.

---

**3.122 Jurisdiction in Cases Under Subsection 1(B) of the FTAIA**
Two categories of "export cases" fall within the FTAIA's jurisdictional test. First, the Agencies may, in appropriate cases, take enforcement action against anticompetitive conduct, wherever occurring, that restrains U.S. exports, if

1. the conduct has a direct, substantial, and reasonably foreseeable effect on exports of goods or services from the United States, and
2. the U.S. courts can obtain jurisdiction over persons or corporations engaged in such conduct.62

As Section 3.2 below explains more fully, if the conduct is unlawful under the importing country's antitrust laws as well, the Agencies are also prepared to work with that country's authorities if they are better situated to remedy the conduct, and if they are prepared to take action that will address the U.S. concerns, pursuant to their antitrust laws.

Second, the Agencies may in appropriate cases take enforcement action against conduct by U.S. exporters that has a direct, substantial, and reasonably foreseeable effect on trade or commerce within the United States, or on import trade or commerce. This can arise in two principal ways. First, if U.S. supply and demand were not particularly elastic, an agreement among U.S. firms accounting for a substantial share of the relevant market, regarding the level of their exports, could reduce supply and raise prices in the United States.63 Second, conduct ostensibly export-related could affect the price of products sold or resold in the United States. This kind of effect could occur if, for example, U.S. firms fixed the price of an input used to manufacture a product overseas for ultimate resale in the United States.

---

**ILLUSTRATIVE EXAMPLE D**

**Situation:**
Companies E and F are the only producers of product Q in country Epsilon, one of the biggest markets for sales of Q in the world. E and F together account for 99 percent of the sales of product Q in Epsilon.64 In order to prevent a

competing U.S. producer from entering the market in Epsilon, E and F agree that neither one of them will purchase or distribute the U.S. product, and that they will take "all feasible" measures to keep the U.S. company out of their market. Without specifically discussing what other measures they will take to carry out this plan, E and F meet with their distributors and, through a variety of threats and inducements, obtain agreement of all of the distributors not to carry the U.S. product. There are no commercially feasible substitute distribution channels available to the U.S. producer. Because of the actions of E and F, the U.S. producer cannot find any distributors to carry its product and is unable to make any sales in Epsilon.

**Discussion:**
The agreement between E and F not to purchase or distribute the U.S. product would clearly have a direct and reasonably foreseeable effect on U.S. export commerce, since it is aimed at a U.S. exporter. The substantiality of the effects on U.S. exports would depend on the significance of E and F as purchasers and distributors of Q, although on these facts the virtually total foreclosure from Epsilon would almost certainly qualify as a substantial effect for jurisdictional purposes. However, if the Agencies believe that they may encounter difficulties in establishing personal jurisdiction or in obtaining effective relief, the case may be one in which the Agencies would seek to resolve their concerns by working with other authorities who are examining the transaction.

---

### ILLUSTRATIVE EXAMPLE E

**Situation:**
Companies P, Q, R, and S, organized under the laws of country Alpha, all manufacture and distribute construction equipment. Much of that equipment is protected by patents in the various countries where it is sold, including Alpha. The companies all belong to a private trade association, which develops industry standards that are often (although not always) adopted by Alpha's regulatory authorities. Feeling threatened by competition from the United States, the companies agree at a trade association meeting

1. to refuse to adopt any U.S. company technology as an industry standard, and

2. (2) to boycott the distribution of U.S. construction equipment.

The U.S. companies have taken all necessary steps to protect their intellectual property under the law of Alpha.

**Discussion:**
In this example, the collective activity impedes U.S. companies in two ways: their technology is boycotted (even if U.S. companies are willing to license their intellectual property) and they are foreclosed from access to distribution channels. The jurisdictional question is whether these actions create a direct, substantial, and reasonably foreseeable effect on the exports of U.S. companies. The mere fact that only the market of Alpha appears to be foreclosed is not

enough to defeat such an effect. Only if exclusion from Alpha as a quantitative measure were so de minimis in terms of actual volume of trade that there would not be a substantial effect on U.S. export commerce would jurisdiction be lacking. Given that this example involves construction equipment, a generally highly priced capital good, the exclusion from Alpha would probably satisfy the substantiality requirement for FTAIA jurisdiction. This arrangement appears to have been created with particular reference to competition from the United States, which indicates that the effects on U.S. exports are both direct and foreseeable.

---

**3.13 Jurisdiction When U.S. Government Finances or Purchases**
The Agencies may, in appropriate cases, take enforcement action when the U.S. Government is a purchaser, or substantially funds the purchase, of goods or services for consumption or use abroad. Cases in which the effect of anticompetitive conduct with respect to the sale of these goods or services falls primarily on U.S. taxpayers may qualify for redress under the federal antitrust laws.65 As a general matter, the Agencies consider there to be a sufficient effect on U.S. commerce to support the assertion of jurisdiction if, as a result of its payment or financing, the U.S. Government bears more than half the cost of the transaction. For purposes of this determination, the Agencies apply the standards used in certifying export conduct under the ETC Act of 1982, 15 U.S.C. 4011-21(1982).66

---

**ILLUSTRATIVE EXAMPLE F**

**Situation:**
A combination of U.S. firms and local firms in country Beta create a U.S.-based joint venture for the purpose of building a major pollution control facility for Beta's Environmental Control Agency ("BECA"). The venture has received preferential funding from the U.S. Government, which has the effect of making the present value of expected future repayment of the principal and interest on the loan less than half its face value. Once the venture has begun work, it appears that its members secretly have agreed to inflate the price quoted to BECA, in order to secure more funding.

**Discussion:**
The fact that the U.S. Government bears more than half the financial risk of the transaction is sufficient for jurisdiction. With jurisdiction established, the Agencies would proceed to investigate whether the apparent bid-rigging actually occurred.67

---

**ILLUSTRATIVE EXAMPLE G**

**Situation:**
The United States has many military bases and other facilities located in other countries. These facilities procure substantial goods and services from suppliers in the host country. In country X, it comes to the attention of the local U.S. military base commander that bids to supply certain construction services have

been rigged.

**Discussion:**
Sales made by a foreign party to the U.S. Government, including to a U.S. facility located in a foreign country, are within U.S. antitrust jurisdiction when they fall within the rule of Section 3.13. Bid-rigging of sales to the U.S. Government represents the kind of conduct that can lead to an antitrust action. Indeed, in the United States this type of behavior is normally prosecuted by the Department as a criminal offense. In practice, the Department has whenever possible worked closely with the host country antitrust authorities to explore remedies under local law. This has been successful in a number of instances.68

---

**3.14 Jurisdiction Under Section 7 of the Clayton Act** Section 7 of the Clayton Act applies to mergers and acquisitions between firms that are engaged in commerce or in any activity affecting commerce. The Agencies would apply the same principles regarding their foreign commerce jurisdiction to Clayton Section 7 cases as they would apply in Sherman Act cases.

---

**ILLUSTRATIVE EXAMPLE H**

**Situation:**
Two foreign firms, one in Europe and the other in Canada, account together for a substantial percentage of U.S. sales of a particular product through direct imports. Both firms have sales offices and are subject to personal jurisdiction in the United States, although neither has productive assets in the United States. They enter into an agreement to merge.

**Discussion:**
The express language of Section 7 of the Clayton Act reaches the stock and asset acquisitions of persons engaged in trade and commerce "with foreign nations".69 Thus, in assessing jurisdiction for this merger outside the United States the Agencies could establish U.S. subject matter jurisdiction based on its effect on U.S. imports. If the facts stated above were modified to show that the proposed merger would have effects on U.S. export commerce, as opposed to import trade, then in assessing jurisdiction under the Clayton Act the Agencies would analyze the question of effects on commerce in a manner consistent with the FTAIA: that is, they would look to see whether the effects on U.S. domestic or import commerce are direct, substantial, and reasonably foreseeable.70 It is appropriate to do so because the FTAIA sheds light on the type of effects Congress considered necessary for foreign commerce cases, even though the FTAIA did not amend the Clayton Act.

In both these situations, the Agencies would conclude that Section 7 jurisdiction technically exists. However, if effective relief is difficult to obtain, the case may be one in which the Agencies would seek to coordinate their efforts with other authorities who are examining the transaction.71

---

**3.2 Comity**

In enforcing the antitrust laws, the Agencies consider international comity. Comity itself reflects the broad concept of respect among co-equal sovereign nations and plays a role in determining "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation."[72] Thus, in determining whether to assert jurisdiction to investigate or bring an action, or to seek particular remedies in a given case, each Agency takes into account whether significant interests of any foreign sovereign would be affected.[73]

In performing a comity analysis, the Agencies take into account all relevant factors. Among others, these may include

1. the relative significance to the alleged violation of conduct within the United States, as compared to conduct abroad;
2. the nationality of the persons involved in or affected by the conduct;
3. the presence or absence of a purpose to affect U.S. consumers, markets, or exporters;
4. the relative significance and foreseeability of the effects of the conduct on the United States as compared to the effects abroad;
5. the existence of reasonable expectations that would be furthered or defeated by the action;
6. the degree of conflict with foreign law or articulated foreign economic policies;
7. the extent to which the enforcement activities of another country with respect to the same persons, including remedies resulting from those activities, may be affected; and
8. the effectiveness of foreign enforcement as compared to U.S. enforcement action.[74]

The relative weight that each factor should be given depends on the facts and circumstances of each case. With respect to the factor concerning conflict with foreign law, the Supreme Court made clear in Hartford Fire[75] that no conflict exists for purposes of an international comity analysis in the courts if the person subject to regulation by two states can comply with the laws of both. Bearing this in mind, the Agencies first ask what laws or policies of the arguably interested foreign jurisdictions are implicated by the conduct in question. There may be no actual conflict between the antitrust enforcement interests of the United States and the laws or policies of a foreign sovereign. This is increasingly true as more countries adopt antitrust or competition laws that are compatible with those of the United States. In these cases, the anticompetitive conduct in question may also be prohibited under the pertinent foreign laws, and thus the possible conflict would relate to enforcement practices or remedy. If the laws or policies of a foreign nation are neutral, it is

again possible for the parties in question to comply with the U.S. prohibition without violating foreign law.

The Agencies also take full account of comity factors beyond whether there is a conflict with foreign law. In deciding whether or not to challenge an alleged antitrust violation, the Agencies would, as part of a comity analysis, consider whether one country encourages a certain course of conduct, leaves parties free to choose among different strategies, or prohibits some of those strategies. In addition, the Agencies take into account the effect of their enforcement activities on related enforcement activities of a foreign antitrust authority. For example, the Agencies would consider whether their activities would interfere with or reinforce the objectives of the foreign proceeding, including any remedies contemplated or obtained by the foreign antitrust authority.

The Agencies also will consider whether the objectives sought to be obtained by the assertion of U.S. law would be achieved in a particular instance by foreign enforcement. In lieu of bringing an enforcement action, the Agencies may consult with interested foreign sovereigns through appropriate diplomatic channels to attempt to eliminate anticompetitive effects in the United States. In cases where the United States decides to prosecute an antitrust action, such a decision represents a determination by the Executive Branch that the importance of antitrust enforcement outweighs any relevant foreign policy concerns.76 The Department does not believe that it is the role of the courts to "second-guess the executive branch's judgment as to the proper role of comity concerns under these circumstances."77 To date, no Commission cases have presented the issue of the degree of deference that courts should give to the Commission's comity decisions.78 It is important also to note that in disputes between private parties, many courts are willing to undertake a comity analysis.79

---

**ILLUSTRATIVE EXAMPLE I**

**Situation:**
A group of buyers in one foreign country decide that they will agree on the price that they will offer to U.S. suppliers of a particular product. The agreement results in substantial loss of sales and capacity reductions in the United States.

**Discussion:**
From a jurisdictional point of view, the FTAIA standard appears to be satisfied because the effects on U.S. exporters presented here are direct and the percentage of supply accounted for by the buyers' cartel is substantial given the fact that the U.S. suppliers are "major." The Agencies, however, would also take into consideration the comity aspects presented before deciding whether or not to proceed.

Consistent with their consideration of comity and its obligations under various international agreements, the Agencies would ordinarily notify the antitrust authority in the cartel's home country. If that authority were in a better position to address the competitive problem, and were prepared to take effective action

to address the adverse effects on U.S. commerce, the Agencies would consider working cooperatively with the foreign authority or staying their own remedy pending enforcement efforts by the foreign country. In deciding whether to proceed, the Agencies would weigh the factors relating to comity set forth above. Factors weighing in favor of bringing such an action include the substantial and purposeful harm caused by the cartel to the United States.

---

**ILLUSTRATIVE EXAMPLE J**

**Situation:**
A and B manufacture a consumer product for which there are no readily available substitutes in ten different countries around the world, including the United States, Canada, Mexico, Spain, Australia, and others. When they decide to merge, it becomes necessary for them to file premerger notifications in many of these countries, and to subject themselves to the merger law of all ten.80

**Discussion:**
Under the 1986 OECD Recommendation, OECD countries notify one another when a proceeding such as a merger review is underway that might affect the interests of other countries. Within the strict limits of national confidentiality laws, agencies attempt to cooperate with one another in processing these reviews. This might extend to exchanges of publicly available information, agreements to let the other agencies know when a decision to institute a proceeding is taken, and to consult for purposes of international comity with respect to proposed remedial measures and investigatory methods. The parties can facilitate faster resolution of these cases if they are willing voluntarily to waive confidentiality protections and to cooperate with a joint investigation. At present, confidentiality provisions in U.S. and foreign laws do not usually permit effective coordination of a single international investigation in the absence of such waivers.

---

### 3.3 Effects of Foreign Government Involvement

Foreign governments may be involved in a variety of ways in conduct that may have antitrust consequences. To address the implications of such foreign governmental involvement, Congress and the courts have developed four special doctrines: the doctrine of foreign sovereign immunity; the doctrine of foreign sovereign compulsion; the act of state doctrine; and the application of the Noerr-Pennington doctrine to immunize the lobbying of foreign governments. Although these doctrines are interrelated, for purposes of discussion the Guidelines discuss each one individually.

### 3.31 Foreign Sovereign Immunity

The scope of immunity of a foreign government or its agencies and instrumentalities (hereinafter foreign government)81 from the jurisdiction of the U.S. courts for all causes of action, including antitrust, is governed by the Foreign Sovereign Immunities Act of 1976 ("FSIA").82 Subject to the treaties in place at the time of FSIA's enactment, a foreign government is immune from suit except where designated in the FSIA.83

Under the FSIA, a U.S. court has jurisdiction if the foreign government has:

a. waived its immunity explicitly or by implication,

b. engaged in commercial activity as described in the statute,

c. expropriated property in violation of international law,

d. acquired rights to U.S. property,

e. committed certain torts within the United States, or agreed to arbitration of a dispute.84

The commercial activities exception is a frequently invoked exception to sovereign immunity under the FSIA. Under the FSIA, a foreign government is not immune in any case:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.85

"Commercial activity of the foreign state" is not defined in the FSIA, but is to be determined by the "nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."86 In attempting to differentiate commercial from sovereign activity, courts have considered whether the conduct being challenged is customarily performed for profit87 and whether the conduct is of a type that only a sovereign government can perform.88 As a practical matter, most activities of foreign government-owned corporations operating in the commercial marketplace will be subject to U.S. antitrust laws to the same extent as the activities of foreign privately-owned firms.

The commercial activity also must have a substantial nexus with the United States before a foreign government is subject to suit. The FSIA sets out three different standards for meeting this requirement. First, the challenged conduct by the foreign government may occur in the United States.89 Alternatively, the challenged commercial activity may entail an act performed in the United States in connection with a commercial activity of the foreign government elsewhere.90 Or, finally, the challenged commercial activity of a foreign government outside of the United States may produce a direct effect within the United States, i.e., an effect which follows "as an immediate consequence of the defendant's . . . activity." 91

**3.32 Foreign Sovereign Compulsion**
Although U.S. antitrust jurisdiction extends to conduct and parties in foreign countries whose actions have the required effects on U.S. commerce, as discussed above, those parties may find themselves subject to conflicting

Case 0:00-md-01328-PAM-SRN Document 539-6 Filed 03/17/2005 Page 23 of 37

requirements from the other country (or countries) where they are located.92 Under Hartford Fire, if it is possible for the party to comply both with the foreign law and the U.S. antitrust laws, the existence of the foreign law does not provide any legal excuse for actions that do not comply with U.S. law. However, a direct conflict may arise when the facts demonstrate that the foreign sovereign has compelled the very conduct that the U.S. antitrust law prohibits.

In these circumstances, at least one court has recognized a defense under the U.S. antitrust laws, and the Agencies will also recognize it.93 There are two rationales underlying the defense of foreign sovereign compulsion. First, Congress enacted the U.S. antitrust laws against the background of well recognized principles of international law and comity among nations, pursuant to which U.S. authorities give due deference to the official acts of foreign governments. A defense for actions taken under the circumstances spelled out below serves to accommodate two equal sovereigns. Second, important considerations of fairness to the defendant require some mechanism that provides a predictable rule of decision for those seeking to conform their behavior to all pertinent laws. Because of the limited scope of the defense, the Agencies will refrain from enforcement actions on the ground of foreign sovereign compulsion only when certain criteria are satisfied. First, the foreign government must have compelled the anticompetitive conduct under circumstances in which a refusal to comply with the foreign government's command would give rise to the imposition of penal or other severe sanctions. As a general matter, the Agencies regard the foreign government's formal representation that refusal to comply with its command would have such a result as being sufficient to establish that the conduct in question has been compelled, as long as that representation contains sufficient detail to enable the Agencies to see precisely how the compulsion would be accomplished under local law.94 Foreign government measures short of compulsion do not suffice for this defense, although they can be relevant in a comity analysis.

Second, although there can be no strict territorial test for this defense, the defense normally applies only when the foreign government compels conduct which can be accomplished entirely within its own territory. If the compelled conduct occurs in the United States, the Agencies will not recognize the defense.95 For example, no defense arises when a foreign government requires the U.S. subsidiaries of several firms to organize a cartel in the United States to fix the price at which products would be sold in the United States, or when it requires its firms to fix mandatory resale prices for their U.S. distributors to use in the United States. Third, with reference to the discussion of foreign sovereign immunity in Section 3.31 above, the order must come from the foreign government acting in its governmental capacity. The defense does not arise from conduct that would fall within the FSIA commercial activity exception.

---

**ILLUSTRATIVE EXAMPLE K**

**Situation:**
Greatly increased quantities of commodity X have flooded into the world

market over the last two or three years, including substantial amounts indirectly coming into the United States. Because they are unsure whether they would prevail in an antidumping and countervailing duty case, U.S. industry participants have refrained from filing trade law petitions. The officials of three foreign countries meet with their respective domestic firms and urge them to "rationalize" production by cooperatively cutting back. Going one step further, one of the interested governments orders cutbacks from its firms, subject to substantial penalties for non- compliance. Producers from the other two countries agree among themselves to institute comparable cutbacks, but their governments do not require them to do so.

**Discussion:**
Assume for the purpose of this example that the overseas production cutbacks have the necessary effects on U.S. commerce to support jurisdiction. As for the participants from the two countries that did not impose any penalty for a failure to reduce production, the Agencies would not find that sovereign compulsion precluded prosecution of this agreement.96 As for participants from the country that did compel production cut-backs through the imposition of severe penalties, the Agencies would acknowledge a defense of sovereign compulsion.

---

### 3.33 Acts of State

The act of state doctrine is a judge-made rule of federal common law.97 It is a doctrine of judicial abstention based on considerations of international comity and separation of powers, and applies only if the specific conduct complained of is a public act of the foreign sovereign within its territorial jurisdiction on matters pertaining to its governmental sovereignty. The act of state doctrine arises when the validity of the acts of a foreign government is an unavoidable issue in a case.98

Courts have refused to adjudicate claims or issues that would require the court to judge the legality (as a matter of U.S. law or international law) of the sovereign act of a foreign state.99 Although in some cases the sovereign act in question may compel private behavior, such compulsion is not required by the doctrine.100 While the act of state doctrine does not compel dismissal as a matter of course, judicial abstention is appropriate in a case where the court must "declare invalid, and thus ineffective as a rule of decision in the U.S. courts, . . . the official act of a foreign sovereign."101

When a restraint on competition arises directly from the act of a foreign sovereign, such as the grant of a license, award of a contract, expropriation of property, or the like, the Agencies may refrain from bringing an enforcement action based on the act of state doctrine. For example, the Agencies will not challenge foreign acts of state if the facts and circumstances indicate that: (1) the specific conduct complained of is a public act of the sovereign, (2) the act was taken within the territorial jurisdiction of the sovereign, and (3) the matter is governmental, rather than commercial.

### 3.34 Petitioning of Sovereigns

Under the Noerr-Pennington doctrine, a genuine effort to obtain or influence action by governmental entities in the United States is immune from

application of the Sherman Act, even if the intent or effect of that effort is to restrain or monopolize trade.102 Whatever the basis asserted for Noerr-Pennington immunity (either as an application of the First Amendment or as a limit on the statutory reach of the Sherman Act, or both), the Agencies will apply it in the same manner to the petitioning of foreign governments and the U.S. Government.

---

**ILLUSTRATIVE EXAMPLE L**

**Situation:**
In the course of preparing an antidumping case, which requires the U.S. industry to demonstrate that it has been injured through the effects of the dumped imports, producers representing 75 percent of U.S. output exchange the information required for the adjudication. All the information is exchanged indirectly through third parties and in an aggregated form that makes the identity of any particular producer's information impossible to discern.

**Discussion:**
Information exchanged by competitors within the context of an antidumping proceeding implicates the Noerr- Pennington petitioning immunity. To the extent that these exchanges are reasonably necessary in order for them to prepare their joint petition, which is permitted under the trade laws, Noerr is available to protect against antitrust liability that would otherwise arise. On these facts the parties are likely to be immunized by Noerr if they have taken the necessary measures to ensure that the provision of sensitive information called for by the Commerce Department and the ITC cannot be used for anticompetitive purposes. In such a situation, the information exchange is incidental to genuine petitioning and is not subject to the antitrust laws. Conversely, were the parties directly to exchange extensive information relating to their costs, the prices each has charged for the product, pricing trends, and profitability, including information about specific transactions that went beyond the scope of those facts required for the adjudication, such conduct would go beyond the contemplated protection of Noerr immunity.

---

**3.4 Antitrust Enforcement and International Trade Regulation**
There has always been a close relationship between the international application of the antitrust laws and the policies and rules governing the international trade of the United States. Restrictions such as tariffs or quotas on the free flow of goods affect market definition, consumer choice, and supply options for U.S. producers. In certain instances, the U.S. trade laws set forth specific procedures for settling disputes under those laws, which can involve price and quantity agreements by the foreign firms involved. When those procedures are followed, an implied antitrust immunity results.103 However, agreements among competitors that do not comply with the law, or go beyond the measures authorized by the law, do not enjoy antitrust immunity. In the absence of legal authority, the fact, without more, that U.S. or foreign government officials were involved in or encouraged measures that would otherwise violate the antitrust laws does not immunize such arrangements.104

If a particular voluntary export restraint does not qualify for express or implied immunity from the antitrust laws, then the legality of the arrangement would depend upon the existence of the ordinary elements of an antitrust offense, such as whether or not a prohibited agreement exists or whether defenses such as foreign sovereign compulsion can be invoked.

---

### ILLUSTRATIVE EXAMPLE M

**Situation:**
Six U.S. producers of product Q have initiated an antidumping action alleging that imports of Q from country Sigma at less than fair value are causing material injury to the U.S. Q industry. The ITC has made a preliminary decision that there is a reasonable indication that the U.S. industry is suffering material injury from Q imported from Sigma. The Department of Commerce has preliminarily concluded that the foreign market value of Q imported into the United States by Sigma's Q producers exceeds the price at which they are selling Q in this country by margins of 10 to 40 percent. Sigma's Q producers jointly initiate discussions with the Department of Commerce that lead to suspension of the investigation in accordance with Section 734 of the Tariff Act of 1930, 19 U.S.C. 1673c. The suspension agreement provides that each of Sigma's Q producers will sell product Q in the United States at no less than its individual foreign market value, as determined periodically by the Department of Commerce in accordance with the Tariff Act. Before determining to suspend the investigation, the Department of Commerce provides copies of the proposed agreement to the U.S. Q producers, who jointly advise the Department that they do not object to the suspension of the investigation on the terms proposed. The Department also determines that suspension of the investigation would be in the public interest. As a result of the suspension agreement, prices in the United States of Q imported from Sigma rise by an average of 25 percent from the prices that prevailed before the antidumping action was initiated.

**Discussion:**
While an unsupervised agreement among foreign firms to raise their U.S. sales prices ordinarily would violate the Sherman Act, the suspension agreement outlined above qualifies for an implied immunity from the antitrust laws. As demonstrated here, the parties have engaged only in conduct contemplated by the Tariff Act and none of the participants have engaged in conduct beyond what is necessary to implement that statutory scheme.

---

### ILLUSTRATIVE EXAMPLE N

**Situation:**
The Export Association is a Webb-Pomerene association that has filed the appropriate certificates and reports with the Commission. The Association exports a commodity to markets around the world, and fixes the price at which all of its members sell the commodity in the foreign markets. Nearly 80 percent of all U.S. producers of the commodity belong to the Association, and on a world-wide level, the Association's members account for approximately 40 percent of annual sales.

**Discussion:**
The Webb-Pomerene Act addresses only the question of antitrust liability under U.S. law. Although the U.S. antitrust laws confer an immunity on such associations, the Act does not purport to confer immunity under the law of any foreign country, nor does the Act compel the members of a Webb- Pomerene association to act in any particular way. Thus, a foreign government retains the ability to initiate proceedings if such an association allegedly violates that country's competition law.

---

## 4. PERSONAL JURISDICTION AND PROCEDURAL RULES

### 4.1 Personal Jurisdiction and Venue

The Agencies will bring suit only if they conclude that personal jurisdiction exists under the due process clause of the U.S. Constitution.105 The Constitution requires that the defendant have affiliating or minimum contacts with the United States, such that the proceeding comports with "fair play and substantial justice."106

Section 12 of the Clayton Act, 15 U.S.C. 22, provides that any suit under the antitrust laws against a corporation may be brought in the judicial district where it is an inhabitant, where it may be found, or where it transacts business. The concept of transacting business is interpreted pragmatically by the Agencies. Thus, a company may transact business in a particular district directly through an agent, or through a related corporation that is actually the "alter ego" of the foreign party.107

### 4.2 Investigatory Practice Relating to Foreign Nations

In conducting investigations that require documents that are located outside the United States, or contacts with persons located outside the United States, the Agencies first consider requests for voluntary cooperation when practical and consistent with enforcement objectives. When compulsory measures are needed, they seek whenever possible to work with the foreign government involved. U.S. law also provides authority in some circumstances for the use of compulsory measures directed to parties over whom the courts have personal jurisdiction, which the Agencies may use when other efforts to obtain information have been exhausted or would be unavailing.108

Conflicts can arise, however, where foreign statutes purport to prevent persons from disclosing documents or information for use in U.S. proceedings. However, the mere existence of such statutes does not excuse noncompliance with a request for information from one of the Agencies.109 To enable the Agencies to obtain evidence located abroad more effectively, as noted in Section 2.91 above, Congress recently has enacted legislation authorizing the Agencies to negotiate bilateral agreements with foreign governments or antitrust enforcement agencies to facilitate the exchange of documents and evidence in civil and criminal investigations.110

### 4.22 Hart-Scott-Rodino: Special Foreign Commerce Rules

As noted above in Section 2.4, qualifying mergers and acquisitions, defined

both in terms of size of party and size of transaction, must be reported to the Agencies, along with certain information about the parties and the transaction, prior to their consummation, pursuant to the HSR Amendments to the Clayton Act, 15 U.S.C. 18a.

In some instances, the HSR implementing regulations exempt otherwise reportable foreign transactions.111 First, some acquisitions by U.S. persons are exempt. Acquisitions of foreign assets by a U.S. person are exempt when

i. no sales in or into the United States are attributable to those assets, or

ii. some sales in or into the United States are attributable to those assets, but the acquiring person would not hold assets of the acquired person to which $25 million or more of such sales in the acquired person's most recent fiscal year were attributable.112

Acquisitions by a U.S. person of voting securities of a foreign issuer are exempt unless the issuer holds assets in the United States having an aggregate book value of $15 million or more, or made aggregate sales in or into the United States of $25 million or more in its most recent fiscal year.113

Second, some acquisitions by foreign persons are exempt. An exemption exists for acquisitions by foreign persons if

i. the acquisition is of voting securities of a foreign issuer and would not confer control of a U.S. issuer having annual net sales or total assets of $25 million or more, or of any issuer with assets located in the United States having a book value of $15 million or more; or
ii. the acquired person is also a foreign person and the aggregate annual net sales of the merging firms in or into the United States is less than $110 million and their aggregate total assets in the United States are less than $110 million.114

In addition, an acquisition by a foreign person of assets located outside the United States is exempt. Acquisitions by foreign persons of U.S. issuers or assets are not exempt.

Finally, acquisitions are exempt if the ultimate parent entity of either the acquiring or the acquired person is controlled by a foreign state, and the acquisition is of assets located within that foreign state, or of voting securities of an issuer organized under its laws.115 The HSR rules are necessarily technical, and should be consulted rather than relying on the summary description herein.

---

**FOOTNOTES**

United States Department of Justice and Federal Trade Commission
ANTITRUST ENFORCEMENT GUIDELINES FOR INTERNATIONAL

OPERATIONS

April 1995

1 The U.S. Department of Justice and Federal Trade Commission Antitrust Guidelines for the Licensing of Intellectual Property (1995), the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines (1992), and the Statements of Antitrust Enforcement Policy and Analytical Principles Relating to Health Care and Antitrust, Jointly Issued by the U.S. Department of Justice and Federal Trade Commission (1994), are not qualified, modified, or otherwise amended by the issuance of these Guidelines.

2 Readers should separately evaluate the risk of private litigation by competitors, consumers and suppliers, as well as the risk of enforcement by state prosecutors under state and federal antitrust laws.

3 28 C.F.R. 50.6 (1994).

4 16 C.F.R. 1.1-1.4 (1994).

5 Defendants may be fined up to twice the gross pecuniary gain or loss caused by their offense in lieu of the Sherman Act fines, pursuant to 18 U.S.C. 3571(d) (1988 & Supp. 1993). In addition, the U.S. Sentencing Commission Guidelines provide further information about possible criminal sanctions for individual antitrust defendants in 2R1.1 and for organizational defendants in Chapter 8.

6 See 15 U.S.C. 4 (1988) (injunctive relief); 15 U.S.C. 15(a) (1988 & Supp. 1993) (damages).

7 See 15 U.S.C. 16, 26 (1988).

8 Under the Clayton Act, "commerce" includes "trade or commerce among the several States and with foreign nations." "Persons" include corporations or associations existing under or authorized either by the laws of the United States or any of its states or territories, or by the laws of any foreign country. 15 U.S.C. 12 (1988 & Supp. 1993).

9 15 U.S.C. 18 (1988). The asset acquisition clause applies to "person[s] subject to the jurisdiction of the Federal Trade Commission" under the Clayton Act.

10 15 U.S.C. 14 (1988).

11 See, e.g., Mozart Co. v. Mercedes-Benz of N. Am., Inc., 833 F.2d 1342, 1352 (9th Cir. 1987), cert. denied, 488 U.S. 870 (1988).

12 15 U.S.C. 13-13b, 21a (1988). The Robinson-Patman Act applies only to purchases involving commodities "for use, consumption, or resale within the United States." Id. at 13. It has been construed not to apply to sales for export. See, e.g., General Chem., Inc. v. Exxon Chem. Co., 625 F.2d 1231, 1234 (5th

Cir. 1980). Intervening domestic sales, however, would be subject to the Act. See Raul Int'l Corp. v. Sealed Power Corp., 586 F. Supp. 349, 351-55 (D.N.J. 1984).

13 15 U.S.C. 45 (1988 & Supp. 1993).

14 The scope of the Agencies' jurisdiction under Clayton 7 exceeds the scope of those transactions subject to the premerger notification requirements of the HSR Act. Whether or not the HSR Act premerger notification thresholds are satisfied, either Agency may request the parties to a merger affecting U.S. commerce to provide information voluntarily concerning the transaction. In addition, the Department may issue Civil Investigative Demands ("CIDs") pursuant to the Antitrust Civil Process Act, 15 U.S.C. 1311-1314 (1988), and the Commission may issue administrative CIDs pursuant to the Act of Aug. 26, 1994, Pub. L. No. 103-312, 7; 108 Stat. 1691 (1994). The Commission may also issue administrative subpoenas and orders to file special reports under Sections 9 and 6(b) of the FTC Act, respectively. 15 U.S.C. 49, 46(b) (1988). Authority in particular cases is allocated to either the Department or the Commission pursuant to a voluntary clearance protocol. See Antitrust & Trade Reg. Daily (BNA), Dec. 6, 1993, and U.S. Department of Justice and Federal Trade Commission, Hart-Scott-Rodino Premerger Program Improvements (March 23, 1995).

15 Unless exempted pursuant to the HSR Act, the parties must provide premerger notification to the Agencies if

1. the acquiring person, or the person whose voting securities or assets are being acquired, is engaged in commerce or any activity affecting commerce; and
2. 
   a. any voting securities or assets of a person engaged in manufacturing which has annual net sales or total assets of $10 million or more are being acquired by any person which has total assets or annual net sales of $100 million or more, or

   b. any voting securities or assets of a person not engaged in manufacturing which has total assets of $10 million or more are being acquired by any person which has total assets or annual sales of $100 million or more; or

   c. any voting securities or assets of a person with annual net sales or total assets of $100 million or more are being acquired by any person with total assets or annual net sales of $ 10 million or more;

   and
3. as a result of such acquisition, the acquiring person would hold

   15 percent or more of the voting securities or assets of the acquired person, or

a. an aggregate total amount of the voting securities and assets of the acquired person of $15 million. 15 U.S.C. 18a(a) (1988).

The size of the transaction test set forth in (3) must be read in conjunction with 16 C.F.R. 802.20 (1994). This Section exempts asset acquisitions valued at $15 million or less. It also exempts voting securities acquisitions of $15 million or less unless, if as a result of the acquisition, the acquiring person would hold 50 percent or more of the voting securities of an issuer that has annual net sales or total assets of $25 million or more. The HSR rules are necessarily technical, contain other exemptions, and should be consulted, rather than relying on this summary.

16 15 U.S.C. 18a(b) (1988 & Supp. 1993); 16 C.F.R. 803.1 (1994); see also 11 U.S.C. 363 (b)(2). 17 15 U.S.C. 18a(e) (1988). 18 16 C.F.R. 801-803 (1994). 19 16 C.F.R. 801.1(e), (k), 802.50-52 (1994). See infra at Section 4.22. 20 See 16 C.F.R. 803.30 (1994). 21 15 U.S.C. 4302 (1988 & Supp. 1993). 22 See, e.g., U.S. Department of Justice and Federal Trade Commission Antitrust Guidelines for the Licensing of Intellectual Property, 4 (1995); Statements of Antitrust Enforcement Policy and Analytical Principles Relating to Health Care and Antitrust, Jointly Issued by the U.S. Department of Justice and the Federal Trade Commission (1994), Statement 2 (outlining a four-step approach for joint venture analysis). See generally National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla., 468 U.S. 85 (1984); Federal Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447 (1986). See also Massachusetts Board of Registration in Optometry, 110 F.T.C. 549 (1988). 23 Pub. L. No. 103-42, 107 Stat. 117, 119 (1993). 24 15 U.S.C. 4306 (2) (Supp. 1993). 25 15 U.S.C. 61 (1988). 26 See, e.g., Cases 89/85, etc., A. Ahlstrom Osakeyhtio v. Commission ("Wood Pulp"), 1988 E.C.R. 5193, [1987-1988 Transfer Binder] Common Mkt. Rep. (CCH) 14,491 (1988). 27 See 12 U.S.C. 372, 635 a-4, 1841, 1843 (1988 & Supp. 1993) (Because Title II does not implicate the antitrust laws, it is not discussed further in these Guidelines.) 28 15 U.S.C. 4011-21 (1988 & Supp. 1993). 29 15 U.S.C. 6a (1988); 15 U.S.C. 45(a)(3) (1988). 30 15 U.S.C. 4013(a) (1988). 31 H.R. Rep. No. 924, 97th Cong., 2d Sess. 26 (1982). See 15 U.S.C. 4021(6). 32 See 15 U.S.C. 4016(b)(1) (1988) (injured party) and 4016(b)(4) (1988) (party against whom claim is brought). 33 15 U.S.C. 4016(b)(5) (1988); see 15 U.S.C. 25 (1988). 34 See Department of Commerce, International Trade Administration, Guidelines for the Issuance of Export Trade Certificates of Review (2d ed.), 50 Fed. Reg. 1786 (1985) (hereinafter "ETC Guidelines"). 35 U.S. Department of Commerce, International Trade Administration, The Export Trading Company Guidebook (1984). 36 15 U.S.C. 11 (1988). 37 See 19 U.S.C. 1671 et seq. (1988 & Supp. 1993), amended by Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). 38 Some alternative procedures exist under Tariff Act 701(c) for countries that have not subscribed to the World Trade Organization ("WTO") Agreement on Subsidies and Countervailing Measures or measures equivalent to it. 19 U.S.C. 1671(c) (1988 & Supp. 1993), amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). 39 See 19 U.S.C. 1673 et seq. (1988). 40 19 U.S.C. 1337 (1988), amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). 41 19 U.S.C. 1337(d), (f) (1988). 42 19 U.S.C. 1337(b)(2) (1988). 43 19 U.S.C. 2412 (a), (b) (1988), amended by the Uruguay Round Agreements

Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994); see also Identification of Trade Expansion Priorities, Exec. Order No. 12,901, 59 Fed. Reg. 10,727 (1994). 44 19 U.S.C. 2411(d)(3)(B)(i)(IV) (1988), amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994), 314(c). 45 Chapter 15 of the North American Free Trade Agreement ("NAFTA") addresses competition policy matters and commits the Parties to cooperate on antitrust matters. North American Free Trade Agreement Between the Government of the United States of America, the Government of Canada and the Government of the United Mexican States, 32 I.L.M. 605, 663 (1993), reprinted in H.R. Doc. No. 159, 103d Cong., 1st Sess. 712, 1170-1174 (1993). 46 See Agreement Relating to Mutual Cooperation Regarding Restrictive Business Practices, June 23, 1976, U.S.-Federal Republic of Germany, 27 U.S.T. 1956, T.I.S. No. 8291, reprinted in 4 Trade Reg. Rep. (CCH) 13,501; Agreement Between the Government of the United States of America and the Government of Australia Relating to Cooperation on Antitrust Matters, June 29, 1982, U.S.-Australia, T.I.A.S. No. 10365, reprinted in 4 Trade Reg. Rep. (CCH) 13,502; and Memorandum of Understanding as to Notification, Consultation, and Cooperation with Respect to the Application of National Antitrust Laws, March 9, 1984, U.S.-Canada, reprinted in 4 Trade Reg. Rep. (CCH) 13,503. The Agencies also signed a similar agreement with the Commission of the European Communities in 1991. See Agreement Between the Government of the United States of America and the Commission of the European Communities Regarding the Application of Their Competition Laws, Sept. 23, 1991, 30 I.L.M. 1491 (Nov. 1991), reprinted in 4 Trade Reg. Rep. (CCH) 13,504. However, on August 9, 1994, the European Court of Justice ruled that the conclusion of the Agreement did not comply with institutional requirements of the law of the European Union ("EU"). Under the Court's decision, action by the EU Council of Ministers is necessary for this type of agreement. See French Republic v. Commission of European Communities (No. C- 327/91) (Aug. 9, 1994). 47 Treaty with Canada on Mutual Legal Assistance in Criminal Matters, S. Treaty Doc. No. 28, 100th Cong., 2d Sess. (1988). 48 Pub. L. No. 103-438, 108 Stat. 4597 (1994). 49 See Revised Recommendation of the OECD Council Concerning Cooperation Between Member Countries on Restrictive Business Practices Affecting International Trade, OECD Doc. No. C(86)44 (Final) (May 21, 1986). The Recommendation also calls for countries to consult with each other in appropriate situations, with the aim of promoting enforcement cooperation and minimizing differences that may arise. 50 The OECD has 25 member countries and the European Commission takes part in its work. The OECD's membership includes many of the most advanced market economies in the world. The OECD also has several observer nations, which have made rapid progress toward open market economies. The Agencies follow recommended OECD practices with respect to all member countries. 51 113 S. Ct. 2891, 2909 (1993). In a world in which economic transactions observe no boundaries, international recognition of the "effects doctrine" of jurisdiction has become more widespread. In the context of import trade, the "implementation" test adopted in the European Court of Justice usually produces the same outcome as the "effects" test employed in the United States. See Cases 89/85, etc., Ahlstrom v. Commission, supra at note 26. The merger laws of the European Union, Canada, Germany, France, Australia, and the Czech and Slovak Republics, among others, take a similar approach. 52 In re Massachusetts Bd. of Registration in Optometry, 110 F.T.C.

598, 609 (1988). 53 15 U.S.C. 6a (1988) (Sherman Act) and 45(a)(3) (1988) (FTC Act). 54 The examples incorporated into the text are intended solely to illustrate how the Agencies would apply the principles articulated in the Guidelines in differing fact situations. In each case, of course, the ultimate outcome of the analysis, i.e. whether or not a violation of the antitrust laws has occurred, would depend on the specific facts and circumstances of the case. These examples, therefore, do not address many of the factual and economic questions the Agencies would ask in analyzing particular conduct or transactions under the antitrust laws. Therefore, certain hypothetical situations presented here may, when fully analyzed, not violate any provision of the antitrust laws. 55 See infra at Section 3.12. 56 If the Sherman Act applies to such conduct only because of the operation of paragraph (1)(B), then that Act shall apply to such conduct only for injury to export business in the United States. 15 U.S.C. 6a (1988). 57 See 15 U.S.C. 45(a)(3) (1988). 58 Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 330-31 (1991). 59 If the Agencies lack jurisdiction under the FTAIA to challenge the cartel, the facts of this example would nonetheless lend themselves well to cooperative enforcement action among antitrust agencies. Virtually every country with an antitrust law prohibits horizontal cartels and the Agencies would willingly cooperate with foreign authorities taking direct action against the cartel in the countries where the agreement has raised the price of widgets to the extent such cooperation is allowed under U.S. law and any agreement executed pursuant to U.S. law with foreign agencies or governments. 60 Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). 61 Cf. Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332 (1982); United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940); United States v. Trenton Potteries Co., 273 U.S. 392 (1927). 62 See U.S. Department of Justice Press Release dated April 3, 1992 (announcing enforcement policy that would permit the Department to challenge foreign business conduct that harms U.S. exports when the conduct would have violated U.S. antitrust laws if it occurred in the United States). 63 One would need to show more than indirect price effects resulting from legitimate export efforts to support an antitrust challenge. See ETC Guidelines, supra at note 34, 50 Fed. Reg. at 1791. 64 That E and F together have an overwhelmingly dominant share in Epsilon may or may not, depending on the market conditions for Q, satisfy the requirement of "substantial effect on U.S. exports" as required by the FTAIA. Foreclosure of exports to a single country, such as Epsilon, may satisfy the statutory threshold if that country's market accounts for a significant part of the export opportunities for U.S. firms. 65 Cf. United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 208 (1968) ("[A]lthough the fertilizer shipments were consigned to Korea and although in most cases Korea formally let the contracts, American participation was the overwhelmingly dominant feature. The burden of noncompetitive pricing fell, not on any foreign purchaser, but on the American taxpayer. The United States was, in essence, furnishing fertilizer to Korea. . . . The foreign elements in the transaction were, by comparison, insignificant."); United States v. Standard Tallow Corp., 1988-1 Trade Cas. (CCH) 67,913 (S.D.N.Y. 1988) (consent decree) (barring suppliers from fixing prices or rigging bids for the sale of tallow financed in whole or in part through grants or loans by the U.S. Government); United States v. Anthracite Export Ass'n, 1970 Trade Cas. (CCH) 73,348 (M.D. Pa. 1970) (consent decree) (barring price-fixing, bid-rigging, and market allocation in Army foreign aid program). 66 See ETC

Guidelines, supra at note 34, 50 Fed. Reg. at 1799-1800. The requisite U.S. Government involvement could include the actual purchase of goods by the U.S. Government for shipment abroad, a U.S. Government grant to a foreign government that is specifically earmarked for the transaction, or a U.S. Government loan specifically earmarked for the transaction that is made on such generous terms that it amounts to a grant. U.S. Government interests would not be considered to be sufficiently implicated with respect to a transaction that is funded by an international agency, or a transaction in which the foreign government received non-earmarked funds from the United States as part of a general government-to- government aid program. 67 Such conduct might also violate the False Claims Act, 31 U.S.C. 3729-3733 (1988 & Supp. 1993). 68 If, however, local law does not provide adequate remedies, or the local authorities are not prepared to take action, the Department will weigh the comity factors, discussed infra at Section 3.2, and take such action as is appropriate. 69 Clayton Act 1, 15 U.S.C. 12 (1988). 70 See supra at Section 3.121. 71 Through concepts such as "positive comity," one country's authorities may ask another country to take measures that address possible harm to competition in the requesting country's market. 72 Hilton v. Guyot, 159 U.S. 113, 164 (1895). 73 The Agencies have agreed to consider the legitimate interests of other nations in accordance with the recommendations of the OECD and various bilateral agreements, see supra at Section 2.9. 74 The first six of these factors are based on previous Department Guidelines. The seventh and eighth factors are derived from considerations in the U.S.-EC Antitrust Cooperation Agreement. See supra at note 46. 75 113 S. Ct. 2891, 2910. 76 Foreign policy concerns may also lead the United States not to prosecute a case. See, e.g., U.S. Department of Justice Press Release dated Nov. 19, 1984 (announcing the termination, based on foreign policy concerns, of a grand jury investigation into passenger air travel between the United States and the United Kingdom). 77 United States v. Baker Hughes, Inc., 731 F. Supp. 3, 6 n.5 (D.D.C. 1990), aff'd, 908 F.2d 981 (D.C. Cir. 1990). 78 Like the Department, the Commission considers comity issues and consults with foreign antitrust authorities, but the Commission is not part of the Executive Branch. 79 See, e.g., Timberlane Lumber Co. v. Bank of America, 549 F.2d 597 (9th Cir. 1976). 80 Not every country has compulsory premerger notification, and the events triggering duties to notify vary from country to country. 81 Section 1603 (b) of the Foreign Sovereign Immunities Act of 1976 defines an "agency or instrumentality of a foreign state" to be any entity "(1) which is a separate legal person, corporate or otherwise; and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof; and (3) which is neither a citizen of a State of the United States as defined in Section 1332(c) and (d) of [Title 28, U.S. Code], nor created under the laws of any third country." 28 U.S.C. 1603(b) (1988). It is not uncommon in antitrust cases to see state-owned enterprises meeting this definition. 82 28 U.S.C. 1602, et seq. (1988). 83 28 U.S.C. 1604 (1988 & Supp. 1993). 84 28 U.S.C. 1605(a)(1-6) (1988). 85 28 U.S.C. 1605(a)(2) (1988). 86 28 U.S.C. 1603(d) (1988). 87 See, e.g., Republic of Argentina v. Weltover, Inc., 112 S. Ct. 2160 (1992); Schoenberg v. Exportadora de Sal, S.A. de C.V., 930 F.2d 777 (9th Cir. 1991); Rush-Presbyterian-St. Luke's Medical Ctr. v. Hellenic Republic, 877 F.2d 574, 578 n.4 (7th Cir.), cert. denied, 493 U.S. 937 (1989). 88 See, e.g., Saudi Arabia v. Nelson, 113 S. Ct. 1471 (1993); de Sanchez v. Banco Central de Nicaragua,

770 F.2d 1385 (5th Cir. 1985); Letelier v. Republic of Chile, 748 F.2d 790, 797-98 (2d Cir. 1984), cert. denied, 471 U.S. 1125 (1985); International Ass'n of Machinists & Aerospace Workers v. Organization of Petroleum Exporting Countries, 477 F. Supp. 553 (C.D. Cal. 1979), aff'd on other grounds, 649 F.2d 1354 (9th Cir. 1981), cert. denied, 454 U.S. 1163 (1982). 89 28 U.S.C. 1603(e) (1988). 90 See H.R. Rep. No. 1487, 94th Cong., 2d Sess. 18-19 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6617-18 (providing as an example the wrongful termination in the United States of an employee of a foreign state employed in connection with commercial activity in a third country.) But see Filus v. LOT Polish Airlines, 907 F.2d 1328, 1333 (2d Cir. 1990) (holding as too attenuated the failure to warn of a defective product sold outside of the United States in connection with an accident outside the United States.) 91 Republic of Argentina, 112 S. Ct. at 2168. This test is similar to proximate cause formulations adopted by other courts. See Martin v. Republic of South Africa, 836 F.2d 91, 95 (2d Cir. 1987) (a direct effect is one with no intervening element which flows in a straight line without deviation or interruption), quoting Upton v. Empire of Iran, 459 F. Supp. 264, 266 (D.D.C. 1978), aff'd mem., 607 F.2d 494 (D.C. Cir. 1979). 92 Conduct by private entities not required by law is entirely outside of the protections afforded by this defense. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 706 (1962); United States v. Watchmakers of Switzerland Info. Ctr., Inc., 1963 Trade Cas. (CCH) 70,600 at 77,456-57 (S.D.N.Y. 1962) ("[T]he fact that the Swiss Government may, as a practical matter, approve the effects of this private activity cannot convert what is essentially a vulnerable private conspiracy into an unassailable system resulting from a foreign government mandate.") See supra at Section 3.2. 93 Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291 (D. Del. 1970) (defendant, having been ordered by the government of Venezuela not to sell oil to a particular refiner out of favor with the current political regime, held not subject to antitrust liability under the Sherman Act for an illegal group boycott). The defense of foreign sovereign compulsion is distinguished from the federalism-based state action doctrine. The state action doctrine applies not just to the actions of states and their subdivisions, but also to private anticompetitive conduct that is both undertaken pursuant to clearly articulated state policies, and is actively supervised by the state. See Federal Trade Comm'n v. Ticor Title Insurance Co., 112 S. Ct. 2169 (1992); California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980); Parker v. Brown, 317 U.S. 341 (1943). 94 For example, the Agencies may not regard as dispositive a statement that is ambiguous or that on its face appears to be internally inconsistent. The Agencies may inquire into the circumstances underlying the statement and they may also request further information if the source of the power to compel is unclear. 95 See Linseman v. World Hockey Ass'n, 439 F. Supp. 1315, 1325 (D. Conn. 1977). 96 As in all such cases, the Agencies would consider comity factors as part of their analysis. See supra at Section 3.2. 97 Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 421-22 n.21 (1964) (noting that other countries do not adhere in any formulaic way to an act of state doctrine). 98 See W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., 493 U.S. 400 (1990). 99 International Ass'n of Machinists and Aerospace Workers v. Organization of Petroleum Exporting Countries, 649 F.2d 1354, 1358 (9th Cir. 1981), cert. denied, 454 U.S. 1163 (1982). 100 See Timberlane, supra at note 79, 549 F.2d at 606-08. 101 Kirkpatrick, 493 U.S. at 405, quoting Ricaud v.

American Metal Co., 246 U.S. 304, 310 (1918). 102 See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965); California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508 (1972) (extending protection to petitioning before "all departments of Government," including the courts); Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., 113 S. Ct. 1920 (1993). However, this immunity has never applied to "sham" activities, in which petitioning "ostensibly directed toward influencing governmental action, is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." Professional Real Estate Investors, 113 S. Ct. at 1926, quoting Noerr, 365 U.S. at 144. See also USS-Posco Indus. v. Contra Costa Cty. Bldg. Constr. Council, AFL-CIO, 31 F.3d 800 (9th Cir. 1994). 103 See, e.g., Letter from Charles F. Rule, Acting Assistant Attorney General, Antitrust Division, Department of Justice, to Mr. Makoto Kuroda, Vice-Minister for International Affairs, Japanese Ministry of International Trade and Industry, July 30, 1986 (concluding that a suspension agreement did not violate U.S. antitrust laws on the basis of factual representations that the agreement applied only to products under investigation, that it did not require pricing above levels needed to eliminate sales below foreign market value, and that assigning weighted-average foreign market values to exporters who were not respondents in the investigation was necessary to achieve the purpose of the antidumping law). 104 Cf. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226 (1940) ("Though employees of the government may have known of those programs and winked at them or tacitly approved them, no immunity would have thereby been obtained. For Congress had specified the precise manner and method of securing immunity [in the National Industrial Recovery Act]. None other would suffice . . . ."); see also Otter Tail Power Co. v. United States, 410 U.S. 366, 378-79 (1973). 105 See also International Shoe Co. v. Washington, 326 U.S. 310 (1945); Asahi Metal Industry Co. Ltd. v. Superior Court, 480 U.S. 102 (1987). 106 Go-Video, Inc. v. Akai Elec. Co., Ltd., 885 F.2d 1406, 1414 (9th Cir. 1989); Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 418 (9th Cir. 1977). To establish jurisdiction, parties must also be served in accordance with the Federal Rules of Civil Procedure or other relevant authority. Fed. R. Civ. P. 4(k); 15 U.S.C. 22, 44. 107 See, e.g., Letter from Donald S. Clark, Secretary of the Federal Trade Commission, to Caswell O. Hobbs, Esq., Morgan, Lewis & Bockius, Jan. 17, 1990 (Re: Petition to Quash Subpoena Nippon Sheet Glass, et al., File No. 891-0088, at page 3) ("The Commission . . . may exercise jurisdiction over and serve process on, a foreign entity that has a related company in the United States acting as its agent or alter ego."); see also Fed. R. Civ. P. 4; Volkswagenwerk AG v. Schlunk, 486 U.S. 694, 707-708 (1988); United States v. Scophony Corp., 333 U.S. 795, 810-818 (1948). 108 For example, 28 U.S.C. 1783(a) (1988) authorizes a U.S. court to order the issuance of a subpoena "requiring the appearance as a witness before it, or before a person or body designated by it, of a national or resident of the United States who is in a foreign country, or requiring the production of a specified document or other thing by him," under circumstances spelled out in the statute. 109 See Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197 (1958). 110 International Antitrust Enforcement Assistance Act of 1994, Pub. L. No. 103-438, 108 Stat. 4597 (1994). 111 See 16 C.F.R. 802.50-52 (1994). 112 See 16 C.F.R. 802.50(a)

(1994). 113 See 16 C.F.R. 802.50(b) (1994). 114 See 16 C.F.R. 802.51 (1994).
115 See 16 C.F.R. 802.52 (1994).