# EXHIBIT 9

97TH CONGRESS 2d Session } HOUSE OF REPRESENTATIVES { REPORT No. 97-686

# FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT OF 1982

AUGUST 2, 1982.– Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. RODINO, from the Committee on the Judiciary, submitted the following

## REPORT

together with

## ADDITIONAL VIEWS

[To accompany H.R. 5285]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 5235) to amend the Sherman Act, the Clayton Act, and the Federal Trade Commission Act to exclude from the application of such Acts certain conduct involving exports, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

The amendments are as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SHORT TITLE

SECTION 1. This Act may be cited as the "Foreign Trade Antitrust Improvements Act of 1982".

AMENDMENT TO SHERMAN ACT

SEC. 2. The Sherman Act (15 U.S.C. 1 et seq.) is amended by inserting after section 6 the following new section:

"SEC. 7. This Act shall not apply to conduct involving trade or commerce (other than import trade or import commerce), with foreign nations unless—

"(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

"(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

"(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

"(2) such effect is the basis of the violation alleged under this Act. [page 2]

If this Act applies to such conduct only because of the operation of paragraph (1) (B), then this Act shall apply to such conduct only for injury to export business in the United States.".

AMENDMENT TO CLAYTON ACT

SEC. 3. Section 7 of the Clayton Act (15 U.S.C. 18) is amended by adding at the end thereof the following undesignated paragraph:

"This section shall not apply to the formation or operation of any joint ventured limited to commerce, other than import commerce, with foreign nations.".

AMENDMENT TO FEDERAL TRADE COMMISSION ACT

SEC. 4 Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)) is amended by adding at the end thereof the following new paragraph:

"(3) This subsection shall not apply to unfair methods of competition involving commerce with foreign nations (other than import commerce) unless—

"(A) such methods of competition have a direct, substantial, and reasonably foreseeable effect—

"(i) on commerce which is not commerce with foreign nations, or on import commerce with foreign nations; or

"(ii) on export commerce with foreign nations, of a person engaged in such commerce in the United States; and

"(B) such effect is the basis of the violation alleged under this subsection. If this subsection applies to such methods of competition only because of the operation of subparagraph (A)(ii), this subsection shall apply to such conduct only for injury to export business in the United States.".

Amend the title so as toread:

A bill to amend the Sherman Act, the Clayton Act, and the Federal Trade Commission Act to exclude from the application of such Acts certain conduct involving trade with foreign nations.

I. PURPOSE

H.R. 5235 is one of several bills introduced in the 97th Congress that seek to promote American exports. A number of considerations provide the basis for this legislation. First is the apparent perception among businessmen that American antitrust laws are a barrier to joint export activities that promote efficiencies in the export of American goods and services. Second, courts differ in their expression of the proper test for determining whether United States antitrust jurisdiction over international transactions exists. H.R. 5235 addresses these problems of perception and definition by clarifying the Sherman Act and the antitrust proscriptions of the Federal Trade Commission Act to make explicit their application only to conduct having a "direct,

substantial, and reasonably foreseeable effect" on domestic commerce or domestic exports. The bill will also clarify Section 7 of the Clayton Act to make explicit its inapplicability to the promotion and operation of export and foreign joint ventures.

Passage of H.R. 5235 will not be a panacea for the many problems that may be afflicting American export trade. Assertions that the antitrust laws have had any significant negative impact on exports are at best speculative. Nonetheless, H.R. 5235 will achieve several objectives. First, H.R. 5235 will encourage the business community to engage in efficiency producing joint conduct in the export of American goods and services. Second, enactment of a single, objective test—the "direct, substantial, and reasonably foreseeable effect" test—will serve as a simple and straightforward clarification of existing American law and the Department of Justice enforcement standards. A clear [page 3] benchmark will exist for businessmen, attorneys and judges as well as our trading partners.

II. SUMMARY OF THE REPORTED BILL

H.R. 5235, as reported, contains four sections. Section 1 sets forth the short title: the "Foreign Trade Antitrust Improvements Act of 1982." Section 2 amends the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, by adding a new Section 7 that makes the Sherman Act inapplicable to conduct involving trade or commerce with foreign nations, other than import transactions, unless there is a "direct, substantial, and reasonably foreseeable effect" on domestic or import commerce, or the export opportunities of a domestic person. Section 3 amends Section 7 of the Clayton Act, 15 U.S.C. § 18, to make it inapplicable to the formation or operation of joint ventures limited to commerce with foreign nations, other than import commerce. Section 4 amends the antitrust (*i.e.*, unfair methods of competition) aspect of Section 5 (a) of the Federal Trade Act, 15 U.S.C. § 45 (a), to conform to Section 5 of the FTC Act to the Sherman Act amendment contained in Section 2 of H.R. 5235.

## III. BACKGROUND

### A. PROCEDURAL HISTORY OF H.R. 5235

On March 4, 1981, Chairman Rodino and Congressman McClory introduced H.R. 2326, the Foreign Trade Antitrust Improvements Act of 1981, the forerunner of H.R. 5235. The bill was referred to the Committee on the Judiciary, and, in turn, to the Subcommittee on Monopolies and Commercial Law.

The Subcommittee held three days of hearings on the international application of the United States' antitrust laws, H.R. 2326, and related bills. Testifying on March 26, 1981, were Malcolm Baldridge, Secretary of Commerce; Professor Eleanor M. Fox of the New York University School of Law; Mr. A. Paul Victor of the law firm of Weil, Gotshal & Manges; Mr. David N. Goldsweig, an attorney experienced in international antitrust issues, practicing with the General Motors Corp.; and Professor James A. Rahl, Owen L. Coon, Professor of Law at Northwestern University. Testifying on April 8, 1981, were Mr. John H. Shenefield of the law firm of Milbank, Tweed, Hadley & McCloy and a former Assistant Attorney General in charge of the Antitrust Division of the United States Department of Justice; Mr. James R. Atwood of the law firm of Covington & Burling and former Deputy Assistant Secretary and Deputy Legal Adviser in the United States Department of State; and Mr. Martin F. Connor, Washington Corporate Counsel of the General Electric Co., who testified on behalf of the Business Roundtable. Finally, testifying on June 24, 1981, were Gordon O. F. Johnson, Chairman, LogEtronics, Inc.; Mr. Thomas M. Rees, a former Member of Congress and an attorney familiar with export issues; and Mr. Fred Emery, a former Director of the Federal Register.

On December 10, 1981, the Subcommittee unanimously approved an amendment to H.R. 2326 in the nature of a substitute, which was introduced as H.R. 5235, cosponsored by all twelve Members of the Sub-[page 4]committee. On May 18, 1982, by

unanimous voice vote, the full Committee reported H.R. 5235 with an amendment in the nature of a substitute.

### B. NEED FOR LEGISLATION

*1. Business perception that antitrust laws prohibit legitimate joint activity*

Some testimony in the hearing record suggests that the United States is doing well as an exporter and that whatever problems that might exist are not caused by our antitrust laws. *See e.g.*, Prepared statement of Professor James A. Rahl, dated March 26, 1981 ("Rahl Statement"), at 3–4.

This view is borne out by a July 1980 report to the Congress prepared by the Office of the United States Trade Representative and the Department of Commerce. The report found that the three government policies that most discourage United States exports are taxation of Americans employed abroad, uncertainties about enforcement of the Foreign Corrupt Practices Act, and export control regulations. The Report specifically stated that while antitrust laws were of concern of businessmen. "No specific instances were shown of these laws unduly restricting exports." Professor Rahl testified that, far from hindering our export efforts, American antitrust laws have been a major factor in ridding the world of many international cartels and enhancing domestic competition, both factors in improving our overall export performance. Rahl Statement at 7–9.

There is, however, evidence that a perception exists among businessmen, especially small businessmen, that antitrust law prohibits efficiency-enhancing joint export activities. For example, Secretary Baldridge testified that antitrust assurances were necessary to encourage small- and middle-sized exporters to increase their exports. Prepared Statement of Honorable Malcolm Baldrige, dated March 26, 1981, ("Baldrige Statement"), at 5–7; Hearing Transcript of March 26, 1981, at 44–45. Professor Fox, Mr. Victor, Mr. Goldsweig and Mr. Shenefield also acknowledged a perception of the

antitrust laws as a hindrance in joint export activities. Hearing Transcript of March 26,1981, at 51, 57; Prepared Statement of Professor Eleanor M. Fox, dated March 26, 1981 ('Fox Statement"), at 2–3; Prepared Statement of Mr. A. Paul Victor, dated March 26, 1981 ("Victor Statement"), at 3–4; Prepared Statement of Mr. David N. Goldsweig, dated March 26, 1981 ("Goldsweig Statement"), at 2; Prepared Statement of Mr. John H. Shenefield, dated April 8, 1981 ("Shenefield Statement"), at 1–2. As Mr. Shenefield stated, "[i]t is an article of orthodoxy in the business community that the antitrust laws stand as an impediment to the international competitive performance of the United States. Specifically, it is believed that the antitrust laws hinder our export performance. . . ." Shenefield Statement at 1–2. And the Section of Antitrust Law of the American Bar Association mentions the "*perception* of some American businessmen that the United States antitrust laws prohibit certain exporting activities. . . ." American Bar Association, Section of Antitrust Law, *Report to Accompany Resolutions Concerning Legislative Proposals to Promote Export Trading*, dated October 26, 1981 ("Antitrust Section Report") at 22 (emphasis in original). [page 5]

2. *Uncertainty in the Verbal Formulation of the Nature and Quantum of Effects That Are Necessary To Create Jurisdiction Under the Antitrust Laws*

The hearing record suggests a second, related problem—possible ambiguity in the precise legal standard to be employed in determining whether American antitrust law is to be applied to a particular transaction. Since Judge Learned Hand's opinion in *United States* v. *Aluminum Co. of America*, 148 F.2d 416, 443-44 (2d Cir. 1945), it has been relatively clear that it is the situs of the effects as opposed to the conduct, that determines whether United States antitrust law applies.[1] There remains, however, some disparity among

[1] *See Continental Ore Co. v. Union Carbide & Carbon Corp.* 370 U.S. 690, 704-05 (1962); *Steele v. Bulova Watch Co.* 344 U.S. 280 (1952).

judicial interpretations and between those interpretations and executive enforcement policy regarding the quantum and nature of the effects required to create jurisdiction.

*Alcoa* itself contemplated a test based upon whether the international transaction was intended to affect domestic commerce and whether it actually did so. 148 F.2d at 443–44. Following the lead of *Alcoa* and its subsequent judicial interpretations, the Department of Justice announced its view in 1977 that the United States antitrust laws should be applicable to an international transaction "when there is a substantial and foreseeable effect on the United States commerce," and that it would be a miscarriage of Congressional intent to apply the Sherman Act to "foreign activities which have no direct or intended effect on United States consumers or export opportunities. . . ." United States Department of Justice, Antitrust Division, *Antitrust Guide to International Operations* 6–7 (1977).

Recently, however, in private actions under the antitrust laws, the courts have arrived at different formulations of the nature and quantum of "effects" needed. For example, in *Todhunter-Mitchell & Co.* v. *Anheuser-Busch, Inc.*, 383 F. Supp. 586, 587 (E.D. Pa. 1074), the court looked to whether the conduct "directly affect[s] the flow of foreign commerce into or out of this country". In *Waldbaum* v. *Worldvision Enterprises, Inc.*, 1978–2 Trade Case (CCH) Para. 62,378, at 76,257 (S.D.N.Y. 1978), the court asked whether there were "anticompetitive effects in the United States. . . ." In *Industria Siciliana Asfalti, Bitumi, S.P.A.* v. *Exxon Research & Engineering Co., et al.*, 1977–1 Trade Cas. (CCH) Para. 61,256, at 70,784 (S.D.N.Y. 1977), the court required a showing of an "impact upon United States commerce." And, in *Dominious Americana Bohio* v. *Gulf & Western Industries, Inc.*, 473 F. Supp. 680, 687 (S.D.N.Y. 1979), the court stated that "it is probably not necessary for the effect on foreign commerce to be both substantial and direct as long as it is not *de minimus*." See also *Timberland Lumber Co.* 1. *Bank of America, N.T. & S .A.*, 549 F.2d 613 (9th Cir. 1976); *Mannington Mills,*

*Inc.* v. *Congoleum Corp.*, 595 F.2d 1287, 1291–92 (3rd Cir. 1979); *National Bank of Canada* v. *Interbank Card Ass'n.*, 666 F.2d 6, 8 (2d. Cir. 1981).

The precise effect of these varying formulations is disputed. Some commentators believe there are few, if any, differences in the results. An ABA Antitrust Section analysis has concluded that, despite the variations in wording, "there is, with rare exception, no *significant* [page 6] inconsistency between judicial precedents and the Justice Department's view of the effects test." Antitrust Section Report at 10 (emphasis in original).

Other commentators view the matter differently. For example, the Business Roundtable believes that "[j]udicial decisions are rife with inconsistencies regarding the types of effects on the domestic economy that must be demonstrated in order to establish U.S. antitrust jurisdiction over an international transaction." Prepared Statement of Mr. Martin F. Connor, dated April 8, 1981 ("Roundtable Statement"), at 6–7; *see* Goldsweig Statement at 2–6. The Roundtable goes on to note that "[t]he commentators are also divided on the correct test to apply. . . ." *Id.* at 7.

The Committee need not choose between these competing views to conclude that legislative clarification is appropriate. First, as a practical matter, businessmen and antitrust practitioners often consider American antitrust law an unnecessarily complicating factor in a fluid environment in which prompt decisionmaking may be critical. As the Business Roundtable has stated, "antitrust considerations typically enter the picture long before a business transaction is explored in depth. If these considerations indicate problems, the possible transaction may die on the drawing board well before negotiations are commenced." Roundtable Statement at 6; *see* Baldridge Statement at 6. A single, clear standard can reduce the amount of legal research and analysis that will be necessary to make an accurate

prediction to whether United States antitrust laws "indicate problems."

Second, even if different formulations have not led to divergent results, the possibility of divergence in results certainly exists. Presumably a *de minimus* standard creates a lower threshold than a "substantial effects" test. Indeed, in some cases a different result might not only be possible but compelled. Businessmen and antitrust counsel cannot safely ignore the current differences in formulation. *See* Goldsweig Statement at 4. H.R. 5235 will provide assurances against private plaintiff's successfully proposing different standards than those employed by the Department of Justice.

Finally, at a time when international trade plays an immense and increasingly important role in the economy, it is appropriate for Congress to formulate a standard to be applied uniformly throughout the federal judicial system. A single standard will allow consistent precedent to develop by providing more definite touchstones to guide the parties and the courts. As the Business Roundtable has concluded, "no legitimate purpose is served by perpetuating uncertainty on this fundamental question."

### CONGRESSIONAL RESPONSE

Over the past few years, public debate has focused on two approaches for removing uncertainty that may now exist concerning the jurisdiction of the United States antitrust laws. The first, embodied in various export trading company bills such as S. 734, H.R. 1648 and H.R. 1799 as introduced, contemplates an amendment to the Webb Pomerene Act, 15 U.S.C. §§ 61, *et seq.*, to provide a procedure whereby persons seeking to engage in joint export activity would apply to the Department of Commerce for antitrust certification. The Department, after inter-[page 7]agency consultation with the Department of Justice and the Federal Trade Commission, would issue applicants a certificate that purports to exempt designated joint activities from the antitrust laws. During the Subcommittee hearing process,

many of the witnesses criticized these "certification" proposals as excessively bureaucratic, ineffective, and even counterproductive. On July 27, 1982, the House passed H.R. 1799 with Committee amendments so that the bill does not amend the Pomerene Act and creates a certificate procedure in the Department of Justice. See. H.R. Rep. 97–637, pt. 2.

The second approach, a straightforward clarification of the antitrust laws, was originally embodied in H.R. 2326. H.R. 2326 contained only two substantive sections. The first provided that the Sherman Act "shall not apply to conduct involving trade or commerce with any foreign nation unless such conduct has a direct and substantial effect on trade or commerce within the United States or has the effect of excluding a domestic person from trade or commerce with such foreign nation." The second section provided that Section 7 of the Clatyon Act "shall not apply to joint ventures limited solely to export trading, in goods or services, from the United States to a foreign nation."

As Chairman Rodino stated in introducing the bill, H.R. 2326 would allow "American firms greater freedom when dealing internationally while reinforcing the fundamental commitment of the United States to a competitive domestic marketplace. . . . [T]he uncertainty of antitrust constraints has remained a strong concern of potential exporters; that concern is remedied by this bill." 127 Cong. Rec. H. 779 (daily ed. March 4, 1981). Mr. McClory, a co-author of this legislation, explained that H.R. 2326

> squarely addresses the complaint voiced by American exporters and potential exporters that their actions are inhibited by uncertainty regarding the scope and effect of our antitrust laws, and it does so without a bureaucratic apparatus which would confer antitrust immunity at an uncertain cost in Government redtape and possible anticompetitive domestic effects. By clarifying the law, it will especially help those

> small- and medium-size businesses which many are convinced have the greatest potential for making a significant contribution to the volume of our export trade.
>
> * * * * * * *
>
> This legislation will send to the export business community the clear signal that it appears to need in order for it to compete with greater confidence and freedom of action in the international marketplace, and it should also help to deter unjustified private and government actions against exporters. (*Id.*)

The specific purpose of the Sherman Act modification is:

> to more clearly establish when antitrust liability attaches to international business activities. The Sherman Act prohibits restraints of trade or commerce with foreign nations. [*See, e.g.*, Sections 1 & 2, 15 U.S.C. §§ 1 & 2, which apply to "trade or commerce among the several States or with foreign nations."] This bill will establish that restraints on export trade [page 8] only violate the Sherman Act if they have a direct and substantial effect on commerce within the United States or a domestic firm competing for foreign trade. ((*Id.*) (Remarks of Chairman Rodino).)

The modifications to Section 7 of the Clayton Act are necessary because:

> The Supreme Court has held that Section 7 of the Clayton Act applies to joint ventures when the participants form a separate corporation and purchase the new venture's stock. Section 7 prohibits acquisitions that may substantially lessen competition and attacks potentially anticompetitive market concentration in its incipiency. Businessmen must, therefore, exercise caution when forming such ventures. This bill would exempt joint ventures that are limited to export trading.
>
> This does not mean that export-related joint ventures are

free of all antitrust restrictions. They remain subject to the Sherman Act, but the stringent "incipiency" standard of section 7 would not apply. (*Id.*)

D. EVOLUTION OF H.R. 2326 TO H.R. 5235

During and after the hearings on H.R. 2326, a number of experts, after expressing strong support for its basic concepts, suggested improvements. As a result, the Subcommittee and the Committee made changes in the bill, the most important of which are discussed below.

*1. Inclusion of the Federal Trade Commission*

Several witnesses pointed out that, although H.R. 2326 would provide assurances against Sherman Act suits by the Department of Justice and private parties, it supplied no similar protection against actions brought by the Federal Trade Commission. Fox Statement at 6; Goldsweig Statement at 9–10; Shenefield Statement at 9; Roundtable Statement at 10–11. The amendment in the nature of a substitute that the Subcommittee approved in December, 1981, included a new section that made a change in Section 5(a) of the Federal Trade Commission Act parallel to that made in the Sherman Act. The Subcommittee amendment alters only the antitrust coverage of Section 5(a) of the FTC Act; the consumer protection jurisdiction of Section 5(a) is left untouched.

*2. Addition of the requirement that effects "reasonably foreseeable"*

Some witnesses and commentators also suggested the need to alter H.R. 2326 to make clear that the effects upon domestic commerce or a domestic export opportunity must be foreseeable:

> A significant source of business uncertainty when engaging in foreign commerce is the possibility that an unpredictable, remote or indirect impact on U.S. commerce, determined after the fact, could result in a firm being subjected to U.S. antitrust jurisdiction. The Justice Department in its *Antitrust Guide* takes the position that only "foreseeable" effects

on U.S. commerce should result in U.S. antitrust jurisdiction. *Accord, United States* v. *Aluminum Company of America*, 148 F.2d 416, 444 (2d. Cir. 1945) (Goldsweig Statement at [page 9] 11; *see* Shenefield Statement at 10; Roundtable Statement at 12–13).

Because the ultimate purpose of this legislation is to promote certainty in assessing the applicability of American antitrust law to international business transactions and proposed transactions, the Subcommittee amendment makes explicit that the effect on domestic commerce or export opportunities must be "reasonably foreseeable." The Subcommittee chose a formulation based on *foreseeability* rather than *intent* to make the standard an objective one and to avoid—at least at the jurisdictional stage—inquiries into the actual, subjective motives of defendants. An intent test might encourage ignorance of the consequences of one's actions, which in this context, would be an undesirable result.

The objective nature of the jurisdictional test is also evident from use of the term "reasonably," which was added through an amendment of Mr. Butler. "Reasonably" connotes not only objectivity, but practicality as well. The test is whether the effects would have been evident to a reasonable person making practical business judgments, not whether actual knowledge or intent can be shown.

This provision should free businessmen and their advisors from having to worry unduly about effects that are highly unlikely, but it does not permit them effectively to turn from the reasonably foreseeable consequences of their actions.

Once the effects of a course of conduct are felt, the test remains an objective one, but a defendant confronted with evidence that his past conduct has had direct and substantial effects within this country could not argue that continued effects of this type flowing from similar future conduct were not "reasonably foreseeable."

*3. Imports and Purely Foreign Transactions*

Some observers raised questions about the status of import transactions under H.R. 2326 and urged the Subcommittee to make clear that the legislation had no effect on the application of antitrust laws to imports. As Mr. Atwood stated, "it is important that there be no misunderstanding that import restraints, which can be damaging to American consumers, remain covered by the law." Prepared Statement of Mr. James R. Atwood, dated April 8, 1981. ("Atwood Statement"), at 14; *see* Rahl Statement at 10; Antitrust Section Report at 31. To remove any possible doubt, the Subcommittee amendment (H.R. 5235, as introduced) modified the legislation to make clear that it applied only to "export" trade.

The desirability of another change soon became apparent. The Subcommittee's "export" commerce limitation appeared to make the amendments inapplicable to transactions that were neither import nor export, *i.e.*, transactions within, between, or among other nations. *See, e.g., Pacific Seafarers, Inc.* v. *Pacific Far East Line, Inc.*, 404 F.2d 804 (D.C. Cir. 1968), *cert. denied*, 393 U.S. 1093 (1969).

A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws. Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions—that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect [page 10] on domestic commerce or a domestic competitor. The Committee amendment therefore deletes references to "export" trade, and substitutes phrases such as "other than import" trade. It is thus clear that wholly foreign transactions as well as export transactions are covered by the amendment, but that import transactions are not.

With these changes, H.R. 5235 achieves an important objective of freeing American-owned firms that operate entirely abroad or in United States export trade from the possibility of dual and conflicting

antitrust regulation. When their activities lack the requisite domestic effects, they can operate on the same terms, and subject to the same antitrust laws that govern their foreign-owned competitors. To be sure, if the foreign state in question has an antitrust regimen, American-owned firms must still comply. But no longer is there any possibility that, because of uncertainty growing out of American ownership, such firms will be subject to a different and perhaps stricter regimen of antitrust than their competitors of foreign ownership.

*4. Conduct Having a Foreign Impact*

The intent of the Sherman and FTC Act amendments in H.R. 5235 is to exempt from the antitrust laws *conduct* that does not have the requisite domestic effects. This test, however, does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct in the United States—*e.g.*, price fixing not limited to the export market—would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic. The *conduct* has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad. *Cf., e.g., Pfizer Inc., et al* v. *Government of India, et al*, 434 U.S. 308 (1978). Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do. Indeed, to deny them this protection could violate the Friendship, Commerce and Navigation treaties this country has entered into with a number of foreign nations.

There are other reasons for preserving the rights of foreign persons to sue under our laws when the conduct in question has a substantial nexus to this country. As the Supreme Court pointed out in *Pfizer, supra*, 434 U.S. at 314–315, to deny foreigners a recovery could under some circumstances so limit the deterrent effect of United States antitrust law that defendants would continue to violate our laws, willingly risking the smaller amount of damages payable only to injured domestic persons.

While H.R. 5235 preserves antitrust protections in the domestic marketplace for all purchasers, regardless of nationality or the situs of the business, a different result will obtain when the conduct is solely export-oriented. Thus, a price-fixing conspiracy directed solely to exported products or services, absent a spillover effect on the domestic marketplace (see pt. E(2), *infra*), would normally not have the requisite effects on domestic or import commerce. Foreign buyers injured by such export conduct would have to seek recourse in their home courts.

If such solely export-oriented conduct affects export commerce of another person doing business in the United States, both the Sherman and FTC Act amendments preserve jurisdiction insofar as there is injury to that person. Thus, a domestic exporter is assured a remedy [page 11] under our antitrust laws for injury caused by unlawful conduct of a competing United States exporter. But a foreign firm whose non-domestic operations were injured by the very same export oriented conduct would have no remedy under our antitrust laws. This result is assured by the Committee's inclusion of the final sentence in the Sherman and FTC Act amendments. It limits recovery for conduct that has no requisite domestic effects, other than the effects on the export commerce of another person doing business in the United States, to such person.

5. *Type of Domestic Impact*

As explained more fully (see pt. E(1), *infra*), in providing that the federal courts may assert the jurisdiction of the United States antitrust laws if conduct affects the export trade or export commerce "of a person engaged in such trade or commerce in the United States," the Committee does not intend to alter existing concepts of antitrust injury or antitrust standing. This bill only establishes the standards necessary for assertion of United States antitrust jurisdiction. The substantive antitrust issues on the merits of the plaintiffs' claim would remain unchanged.

For example, the mere fact that an exporter may be adversely affected in a financial sense by the activities of another would not necessarily man that he has sustained an injury for which he may recover under Section 4 of the Clayton Act. *See,* e.g., *Illinois Brick Co.* v. *State of Illinois*, 431 U.S. 720 (1977); *Brunswick Corp.* v. *Pueblo Bowl-O-Mat*, 429 U.S. 477 (1977).

For similar reasons, the domestic "effect" that may serve as the predicate for antitrust jurisdiction under the bill must be of the type that the antitrust laws prohibit. *See*, e.g., *National Bank of Canada* v. *Interbank Card Ass'n.* 666 F.2d 6, 8 (2d Cir. 1981). For example, a plaintiff would not be able to establish United States antitrust jurisdiction merely by providing a *beneficial* effect within the United States, such as increased profitability of some other company or increased domestic employment, when the plaintiff's damage claim is based on an extraterritorial effect on him of a different kind.

According to the International Law Section of the American Bar Association, the legislation as reported by the Subcommittee, before amendment by the Committee, could have been read as ignoring

> whether conduct has an adverse effect on competition. This result not only departs from the weight of scholarly opinion, but would produce perverse results. Under such an interpretation, conduct which has an anticompetitive effect which impinges only on defendants located in foreign nations and which has a neutral or procompetitive domestic effect would be subject to the antitrust laws. (American Bar Association, Section of International Law, *Report on Purposes and Provisions of H.R. 5235*, at 9.)

The Committee did not believe that the bill reported by the Subcommittee was intended to confer jurisdiction on injured foreign persons when that injury arose from conduct with no anticompetitive effects in the domestic marketplace. Consistent with this conclusion, the full Committee added language to the Sherman and FTC Act

amend[page 12]ments to require that the "effect" providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws. This does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States. As previously set forth, it is sufficient that the conduct providing the basis of the claim has had the requisite impact on the domestic or import commerce of the United States, or, in the case of conduct lacking such an impact, on an export opportunity of a person doing business in the United States.

6. *Clayton Act Amendments*

Some comments in the record suggest that the original amendment to Section 7 of the Clayton Act, as expressed in H.R. 2326, was susceptible to misinterpretation. As originally drafted, the amendment applied to "joint ventures limited solely to export trading. . . ." The concerns raised about this language centered on, first, whether the parents of the joint ventures would be included in the exemption; second, whether incidental activities necessary to engage in joint export activities would be covered by the exemption; and finally, whether export joint ventures that themselves entered into mergers or acquisitions might not be unintentionally exempted from the proscriptions of Section 7. *See* Antitrust Section Report at 32–33; Roundtable Statement at 17–18; Atwood Statement at 18.

The Committee amendment, which states that Section 7 of the Clayton Act "shall not apply to the formation or operation of any joint venture . . .", is intended to address all these concerns. First, by making clear that it is the *conduct* of *forming* and *operating* the joint venture and not the joint venture itself that is protected, the amendment removes any disparity between the joint venture and its parents and makes plain that joint ventures that engage in merger activity that joint ventures that engage in merger activity are not exempted are not exempted by the amendment. Second, by making clear that the operation of the joint venture falls within the amendment, and not merely

the exporting or foreign activity itself, the amendment affords protection to the incidental activities of the joint venture. In order to be exempted from Section 7 of the Clayton Act, however, the incidental activities must have a strong and direct relationship to the primary export or foreign activity.

The full Committee corrected another potential problem with the Subcommittee version of the Section 7 amendment, which was limited to joint ventures involved solely in export commerce. As reported by the full Committee, the amendment applies to commerce with foreign nations, other than import commerce. Thus, joint ventures involved solely with export commerce, or other forms of foreign commerce with no import nexus to the United States, will be outside the coverage of Section 7 of the Clayton Act. For example, a joint venture could not only export goods from the United States, but also produce or market goods in foreign nations, and still enjoy the exemption from the incipiency standard of the Clayton Act.

E. OTHER ISSUES

During the proceedings on H.R. 5235, two other significant issues were raised, which the Committee did not feel necessitated changes in the legislation. [page 13]

1. *Effect of Legislation and Current Law*

A very important question is the effect of the legislation on current antitrust law. It is the intent of the sponsors of the legislation and the Committee to address only the subject matter jurisdiction of United States antitrust law in this legislation. H.R. 5235 does not affect the legal standards for determining whether conduct violates the antitrust laws, and thus the substantial antitrust issues on the merits of a claim would remain unchanged.

Moreover, the bill is intended neither to prevent nor to encourage additional judicial recognition of the special international characteristics of transactions. If a court determines that the requirements for subject matter jurisdiction are met, this bill would have no effect on the

courts' ability to employ notions of comity, *see. e.g.*, *Timberlane Lumber Co.* v. *Bank of America*, 549 F.2d 1287 (3rd Cir. 1979), or otherwise to take account of the international character of the transaction. Similarly, the bill is not intended to restrict the application of American laws to extraterritorial conduct where the requisite effects exist or to the extraterritorial pursuit of evidence in appropriate cases. *See* Atwood Statement at 7 n. 7.

2. *International Cartels*

Probably the most important criticism of the legislative concept of H.R. 5235 came from Professor Rahl, who feared the legislation could be misinterpreted as a legislative approval for American firms to engage in the type of international cartel activity prevalent before World War II:

> [P]erhaps most unfortunate of all is the risk that this provision would encourage American firms not only to form cartels among themselves but to participate in foreign and international cartels. . . . Past experience indicates that a serious risk would then arise of a secret agreement to include the United States in the market allocation to round things out. (Rahl Statement at 11.)

The Committee, after weighing this and similar arguments carefully, does not believe the legislation will result in a rejuvenation of international cartels. Any major activities of an international cartel would likely have the requisite impact on United States commerce to trigger United States subject matter jurisdiction. For example, if a domestic export cartel were so strong as to have a "spillover" effect on commerce within this country—by creating a world-wide shortage or artificially inflated world-wide price that had the effect of raising domestic prices—the cartel's conduct would fall within the reach of our antitrust laws. Such an impact would, at least over time, meet the test of a direct, substantial and reasonably foreseeable effect on domestic commerce. The Committee would expect the Department of Justice and the Federal Trade Commission to continue their vigilance con-

cerning cartel activity and to use their enforcement powers appropriately.

In addition, the Committee recognized the increased sensitivity of other nations to antitrust considerations and cartel activity. By more precisely defining the subject matter jurisdiction of U.S. antitrust law, H.R. 5235 in no way limits the ability of a foreign sovereign to [page14] act under its own laws against an American-based export cartel having unlawful effects in its territory. Indeed, the clarified reach of our own laws could encourage our trading partners to take more effective steps to protect competition in their markets. *See* Atwood Statement at 6–8.

IV. THE PROVISIONS OF H.R. 5235

H.R. 5235, the Foreign Trade Antitrust Improvements Act of 1982, contains three substantive provisions that amend the Sherman Act, Section 7 of the Clayton Act and the antitrust aspects of Section 5(a) of the Federal Trade Commission Act to clarify the limits of these provisions in reaching certain export and foreign activities.

Section 1 of H.R. 5235 states the short title. Section 2 amends the Sherman Act, 15 U.S.C. § 1, *et seq.*, by adding a new Section 7 to the Sherman Act. The intent of the new Section 7 is to establish that the proscriptions of the Sherman Act do not apply to export or purely foreign commerce unless the conduct has a direct, substantial and reasonably foreseeable anticompetitive effect on domestic or import commerce, or a domestic export opportunity.

Section 3 of H.R. 5235 amends Section 7 of the Clayton Act, 15 U.S.C. § 18, to exempt the formation and operation of joint ventures limited to export or purely foreign trade. This Section is intended only to remove the "incipiency" standard of Section 7 of the Clayton Act.

Section 4 amends the Federal Trade Commission Act to make it clear that the antitrust proscriptions of Section 5(a), 15 U.S.C. 45 (a), apply only to methods of competition that have a direct, substantial and reasonably foreseeable effect on domestic or import commerce, or

a domestic export opportunity. This amendment is intended to parallel the Sherman Act amendment. As noted above, this amendment does not affect the FTC's consumer protection jurisdiction.

V. INFORMATION SUBMITTED PURSUANT TO RULES

1. *Budget Statement*

Clause 2(1) (3) (B) of House Rules XI is inapplicable because this legislation does not provide new budgetary authority or increased expenditures.

2. *Cost Estimate*

The Committee concurs with the estimate provided by the Congressional Budget Office and adopts that estimate as the cost estimate of the Committee for the purpose of clause 7(a) of House Rule XIII. Pursuant to clause 2(1)(3)(C) of House Rule XI, set out is the estimate of the Director of the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., May 27, 1982.*

HON. PETER W. RODINO, JR.,
*Chairman, Committee on the Judiciary, U.S. House of Representatives, Rayburn House Office Building, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed H.R. 5235, the Foreign Trade Antitrust Improvements Act of 1982, [page 15] as ordered reported by the House Committee on the Judiciary, May 18, 1982.

The bill amends the Sherman, Clayton, and Federal Trade Commission Acts in restating or limiting the extraterritorial reach of the U.S. antitrust laws. It is expected that no significant additional cost to the government will be insurred as a result of enactment of this legislation.

Sincerely,
ALICE M. RIVLIN, *Director.*

3. *Inflationary Impact Statement*

Pursuant to clause 2(1)(4) of House Rule XI, the Committee estimates that this bill will not have an inflationary impact on prices and costs in the operation of the national economy.

4. *Oversight Findings*

The Subcommittee on Monopolies and Commercial law of this Committee exercises oversight responsibilities with respect to the antitrust laws. The favorable consideration of this bill was recommended by the Subcommittee. The Subcommittee will monitor developments under this legislation.

No findings or recommendations of the Committee on Government Operations were received as referred to in House Rule XI, clause 2(1) (3) (D).

VI. CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (new matter is printed in italics, existing law in which no change is proposed is shown in roman):

SHERMAN ACT

* * * * * * *

SEC. 6. Any property owned under any contract or by any combination, or pursuant to any conspiracy (and being the subject thereof) mentioned in section one of this act, and being in the course of transportation from one State to another, or to a foreign country, shall be forfeited to the United States, and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure, and condemnation of property imported into the United States contrary to law.

*SEC. 7. This Act shall not apply to conduct involving trade or commerce (other than import trade or import commerce), with foreign nations unless—*

*(1) such conduct has a direct, substantial, and reasonably foreseeable effect—*

*(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or*

*(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and* [page 16]

*(2) such effect is the basis of the violation alleged under this Act.*

*If this Act applies to such conduct only because of the operation of paragraph (1)(B), then this Act shall apply to such conduct only for injury to export business in the United States.*

* * * * * * *

SECTION 7 OF THE CLAYTON ACT

SEC. 7. That no person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in activity affecting commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the

effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

This section shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce or in any activity affecting commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition.

Nor shall anything herein contained be construed to prohibit any common carrier subject to the laws to regulate commerce from aiding in the construction of branches or short lines so located as to become feeders to the main line of the company so aiding in such construction or from acquiring or owning all or any part of the stock of such branch lines, nor to prevent any such common carrier from acquiring and owning all or any part of the stock of a branch or short line constructed by an independent company where there is no substantial competition between the company owning the branch line so constructed and the company owning the main line acquiring the property or an interest therein, nor to prevent such common carrier from extending any of its lines through the medium of the acquisition of stock or otherwise of any other common carrier where there is no substantial competition between the company extending its lines and the company whose stock, property, or an interest therein is so acquired. [page 17]

Nothing contained in this section shall be held to affect or impair any right heretofore legally acquired: *Provided*, That nothing in this section shall be held or construed to authorize or make lawful anything heretofore prohibited or made illegal by the antitrust laws, nor to exempt any person from the penal provisions thereof or the civil remedies therein provided.

Nothing contained in this section shall apply to transaction duly consummated pursuant to authority given by the Civil Aeronautics Board, Federal Communications Commission, Federal Power Commission, Interstate Commerce Commission, the Securities and Exchange Commission in the exercise of its jurisdiction under section 10 of the Public Utility Holding Company Act of 1935, the United States Maritime Commission, or the Secretary of Agriculture under any statutory provision vesting such power in such Commission, Secretary, or Board.

*This section shall not apply to the formation or operation of any joint venture limited to commerce, other than import commerce, with foreign nations.*

---

SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT

Sec. 5. (a) (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

(2) The commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 18(f)(3), common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

*(3) This subsection shall not apply to unfair methods of competition involving commerce with foreign nations (other than import commerce) unless—*

*(A) such methods of competition have a direct, substantial, and reasonably foreseeable effect—*

# EXHIBIT 10

# FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT

LIBRARY OF CONGRESS
APR 4 1983
COPY
EXCHANGE AND GIFT DIVISION

## HEARINGS

BEFORE THE

SUBCOMMITTEE ON
MONOPOLIES AND COMMERCIAL LAW

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

NINETY-SEVENTH CONGRESS

FIRST SESSION

ON

## H.R. 2326

FOREIGN TRADE ANTITRUST
IMPROVEMENTS ACT

MARCH 26, APRIL 8, AND JUNE 24, 1981

**Serial No. 77**

Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE
99-996 O WASHINGTON : 1983

## COMMITTEE ON THE JUDICIARY

PETER W. RODINO, JR., New Jersey, *Chairman*

JACK BROOKS, Texas
ROBERT W. KASTENMEIER, Wisconsin
DON EDWARDS, California
JOHN CONYERS, JR., Michigan
JOHN F. SEIBERLING, Ohio
GEORGE E. DANIELSON, California
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
SAM B. HALL, JR., Texas
MIKE SYNAR, Oklahoma
PATRICIA SCHROEDER, Colorado
BILLY LEE EVANS, Georgia
DAN GLICKMAN, Kansas
HAROLD WASHINGTON, Illinois
BARNEY FRANK, Massachusetts

ROBERT McCLORY, Illinois
TOM RAILSBACK, Illinois
HAMILTON FISH, JR., New York
M. CALDWELL BUTLER, Virginia
CARLOS J. MOORHEAD, California
JOHN M. ASHBROOK, Ohio
HENRY J. HYDE, Illinois
THOMAS N. KINDNESS, Ohio
HAROLD S. SAWYER, Michigan
DAN LUNGREN, California
F. JAMES SENSENBRENNER, JR., Wisconsin
BILL McCOLLUM, Florida

ALAN A. PARKER, *General Counsel*
GARNER J. CLINE, *Staff Director*
FRANKLIN G. POLK, *Associate Counsel*

---

## SUBCOMMITTEE ON MONOPOLIES AND COMMERCIAL LAW

PETER W. RODINO, JR., New Jersey, *Chairman*

JACK BROOKS, Texas
DON EDWARDS, California
JOHN F. SEIBERLING, Ohio
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
BILLY LEE EVANS, Georgia

ROBERT McCLORY, Illinois
M. CALDWELL BUTLER, Virginia
TOM RAILSBACK, Illinois
CARLOS J. MOORHEAD, California
HENRY J. HYDE, Illinois

WARREN S. GRIMES, *Counsel*
GEORGE E. GARVEY, *Assistant Counsel*
FRANKLIN G. POLK, *Associate Counsel*
CHARLES E. KERN II, *Associate Counsel*

# CONTENTS

## HEARING HELD


| | Page |
|---|---|
| March 26, 1981 | 1 |
| April 8, 1981 | 67 |
| June 24, 1981 | 123 |


## WITNESSES


| | |
|---|---|
| Atwood, James R., partner, Covington & Burling | 83 |
| Prepared statement | 86 |
| Baldrige, Hon. Malcolm, Secretary, Department of Commerce | 6 |
| Prepared statement | 9 |
| Connor, Martin F., Washington corporate counsel, General Electric Co | 105 |
| Prepared statement | 106 |
| Emery, Fred, independent consultant on regulatory matters | 125 |
| Prepared statement | 136 |
| Fox, Eleanor, professor of law, New York University | 26 |
| Prepared statement | 28 |
| Goldweig, David, Esq., office of general counsel, General Motors Corp | 26 |
| Prepared statement | 37 |
| Johnson, Gordon, chairman of the board, Logetronics, Inc., Springfield, Va | 131 |
| Prepared statement | 132 |
| Rahl, James A., professor of law, Northwestern University | 26 |
| Prepared statement | 42 |
| Rees, Hon. Thomas M., attorney and businessman, and former Member of Congress | 125 |
| Prepared statement | 129 |
| Shenefield, John, partner, Milbank, Tweed, Hadley & McCloy | 68 |
| Prepared statement | 70 |
| Victor, A. Paul, Esq., Weil, Gotshal & Manges | 26 |
| Prepared statement | 32 |


## ADDITIONAL MATERIAL


| | |
|---|---|
| American Bar Association, prepared statement | 213 |
| Fox, Lawrence A., vice president, National Association of Manufacturers: | |
| Letter from | 184 |
| Prepared statement | 185 |
| McDermid, John F., general counsel, International Business Government Counsellors, Inc., prepared statement | 193 |
| National Machine Tool Builders' Association, prepared statement | 151 |
| Text of H.R. 2326 | 3 |
| Victor, A. Paul, chairman, International Trade Committee, letter from | 211 |

3. "Foreign nation." I suggest using the phrase "to a foreign nation or nations." Obviously, a venture should not lose the benefit of the bill simply because it serves several foreign markets rather than only one.

4. "Limited solely to export trade." This requirement may be unduly strict. In particular, a venture between two American firms may involve some foreign manufacturing or service facilities, as well as joint export efforts. Those foreign operations may complement the export trade or be quite independent of it. These purely foreign elements of the venture's operations should not deprive it of the exclusion under the bill. Clarification would be helpful because similar phrasing in the Webb-Pomerene Act ("solely trade or commerce in goods, wares, or merchandise exported") has been strictly construed.

5. Premerger notification. A parallel exemption should presumably be provided from section 7A of the Clayton Act, whose primary purpose was to facilitate enforcement against transactions that might violate section 7. This might be done in H.R. 2326 itself by an amendment to section 7A(c), or the Committee could recommend that the FTC and Justice Department provide the exemption by regulation under section 7A(d)(2)(B).

Mr. RODINO. Mr. Connor.

## TESTIMONY OF MARTIN F. CONNOR

Mr. CONNOR. I am pleased to appear on behalf of the Business Roundtable to express the Roundtable's views on H.R. 2326. I don't think anything I am going to say is going to break the consensus to which Mr. Atwood just referred.

I am simply going to hit the high points of the written testimony which has been submitted.

In defining the proper scope of this country's antitrust laws, we think it is important to remember that our antitrust laws are unique in that, in most parts of the world, conduct that we prohibit at home is encouraged or accepted.

For example, U.S. law condemns trade restraints except in regulated industries. In contrast, many socialist nations, even those in the free world, openly restrain or prohibit competition, and others regulate far larger segments of their economies than we do.

As Mr. Atwood said, we believe foreign market effects should be left to foreign law.

The Roundtable agrees with the sponsors of H.R. 2326 that there is uncertainty today about the actual reach of our antitrust laws in foreign commerce.

This uncertainty adversely affects the ability of American businesses to enter into international transactions that would be highly beneficial and to compete effectively with foreign companies for a share of world markets.

We would recommend, however, that the language of H.R. 2326 be clarified in certain specific respects. First, we would urge that the scope of the bill be broadened to cover all of the antitrust laws.

Second, we have recommended that the phrase "regardless of whether such conduct occurs within or outside of the United States" be inserted in the second line of the bill.

We don't think there should be any doubt it is the location of the effects which controls, not the location of the conduct.

Third, we recommend as others have done, that the formulation "directly, substantially and foreseeably restrains" be substituted for "has a direct and substantial effect on."

We recommend the addition of the requirement of foreseeability, as has already been done this morning, and we recommend that it be made clear that the domestic effects which we are talking about are restraints on commerce.

As presently drafted and as I think came out in some of the questioning of Mr. Shenefield, the bill is silent on the kind of effect which might trigger antitrust jurisdiction.

Fourth, we suggest deletion of the final clause in proposed section 7 which would make U.S. antitrust laws applicable when activity in foreign commerce "has the effect of excluding a domestic person from trade or commerce with foreign nations."

We believe this final clause is redundant and unnecessary.

A direct, substantial, and foreseeable restraint upon a domestic competitor, if otherwise illegal, would be picked up by the prior clause, as we urge the committee to amend it.

Moreover, this clause could be read as an expansion of existing substantive law. For example, existing law does not, per se, prohibit exclusion of a competitor. After all, every contract necessarily excludes a disappointed bidder.

Fifth, we urge the committee to clarify the intent of the legislation with respect to antitrust damage actions. As drafted, the bill probably precludes damage suits based on foreign effects of alleged antitrust violations. There is, however, some ambiguity on this score.

For example, a foreign purchaser of U.S exports could argue that the defendant's conduct had domestic as well as foreign effects and that the existence of some domestic effects creates a basis for a damage action based on the foreign effects as well.

While this argument would seem to be without merit, we strongly urge that it be foreclosed expressly.

We have recommended a new subsection (b) to the proposed section 7 which we believe would accomplish this purpose.

Sixth and finally, the bill contains in section 3 a proposed amendment to section 7 of the Clayton Act that would exempt joint ventures organized solely for export trade.

With respect to this provision, we recommend that the phrase "whose sales are limited to exporting goods or services from the United States to foreign nations" be substituted for the phrase "limited solely to export trading, in goods or services, from the United States to a foreign nation."

Our concern is with the term "limited solely."

The Business Roundtable warmly supports enactment of H.R. 2326.

Thank you, Mr. Chairman.

[The statement follows:]

STATEMENT OF MARTIN F. CONNOR, WASHINGTON CORPORATE COUNSEL, GENERAL ELECTRIC CO.

My name is Martin F. Connor, and I am Washington Corporate Counsel for General Electric Company. From 1963 through 1978 I was counsel to GE's industrial equipment business worldwide, with the greatest part of my activities directed at international transactions.

I am privileged to appear before you on behalf of the Business Roundtable to express the Roundtable's views on H.R. 2326, a bill to clarify the reach of the antitrust laws as they affect the foreign commerce of the United States. The Business Roundtable is an association of nearly 200 chief executive officers of major American companies. Most of these companies have substantial international business activities. The Roundtable's purpose is to examine public issues that affect the economy and to develop and present positions that reflect sound economic and social principles. The recently retired Chairman of the Board of General Electric, Reginald H. Jones, was a member of the Roundtable, and last year was its co-chairman. His successor as GE Chairman, John F. Welch, is now a member of the Roundtable and of its policy committee.

ROUNDTABLE SUPPORT FOR GOALS OF H.R. 2326

The Business Roundtable is pleased to report that it strongly supports the goals of this legislation. These goals, as we understand them, are to define and clarify the territorial scope of U.S. antitrust laws. The sponsors of this legislation have correctly observed that the international reach of these laws is uncertain, that this uncertainty has diminished export activity by American firms, and that the antitrust laws governing international transactions need to be clarified. We agree with these premises, and I can support them from my own business experience.

The bill's sponsors have also expressed their intention to limit the reach of antitrust liability to situations involving direct and substantial effects on our domestic consumers and businesses, to remove joint ventures engaged in export trading from the scope of Section 7 of the Clayton Act, and to reduce the potential for antitrust suits by foreign entities, including foreign governments. The Roundtable applauds all of these objectives.

REASONS FOR LIMITING APPLICABILITY OF U.S. ANTITRUST LAWS

In defining the proper scope of this country's antitrust laws, we think it is important to remember that our antitrust laws are unique in that, in most parts of the world, conduct that we prohibit at home is encouraged or accepted.

For example, U.S. law condemns trade restraints except in regulated industries. In contrast, many socialist nations, even those in the free world, openly restrain or prohibit competition, and others regulate far larger segments of their economies than we do. Even among countries with free economies, regulatory intervention is more pervasive, and administrative approval may be obtained to engage in otherwise anti-competitive conduct.

When foreign antitrust restrictions exist, they are far less stringent than in the United States. Substantial horizontal acquisitions are often approved in "the public interest," and vertical or conglomerate mergers are virtually unmolested. Practices such as resale price maintenance, restrictive patent licensing, and price discrimination are commonplace.

Similarly, foreign devotion to antitrust enforcement is less intense than in the United States. The amount of foreign antitrust litigation is trivial in comparison with the 1000 to 1500 antitrust cases filed in U.S. courts in each of the last ten years. No other nation of the world imposes the punitive sanction of treble damages on antitrust defendants. The combination of sanctions available in the United States, including criminal felony liability, parens patriae recoveries, class actions, and recovery of attorneys' fees is also unparalleled. In most nations with laws that resemble our antitrust laws, relief for private injury is unavailable, and criminal sanctions do not exist.

Not only do other trading nations of the world play by different rules, but they also have displayed growing hostility toward the extra-territorial reach of our antitrust laws. Many nations have laws on their books that prohibit cooperation with U.S. antitrust authorities, interfere with U.S. antitrust prosecutions and defenses, and negate the operation of our laws in their territories.

These gross disparities in economic systems raise fundamental questions of economic policy. Accepting the fact that our antitrust laws reflect a considered judgment about how businesses in the United States should treat American consumers and competitors, there is no imperative that justifies any longer—if it ever did—federal legislation declaring how our businesses should deal with overseas consumers or foreign competitors. Therefore, the Roundtable agrees with the premise of H.R. 2326 that there is no reason why our law should reach out to protect consumers in other nations whose governments have not chosen to protect their own nationals with competition statutes. In a pluralistic world, nations should be free to define their own domestic economic interests.

In this context, it is not only naive but futile to assume that U.S. antitrust laws can or will inject competition into foreign markets. The only way that this will occur is if foreign nations themselves adopt and apply antitrust laws to all those who enter their markets. The unilateral imposition of antitrust restraints on U.S. businesses engaged in foreign commerce simply disables U.S. firms from competing on an equal footing with their foreign counterparts.

Respect for these differences in legal and economic systems requires not only that our laws be well-defined, but also that they not be overly expansive in their reach. The Roundtable is committed to the proposition that our antitrust laws play a basic role in protecting the American free-enterprise system by helping to insure that consumers and businesses in this country receive the benefits of competition. Conversely, however, we see no reason why our laws should reach out to regulate transactions whose primary effects occur outside of our territory.

NEED FOR CLARIFICATION OF EXTRATERRITORIAL APPLICATION

The Roundtable shares the view of the sponsors of H.R. 2326, Chairman Rodino and Representative McClory, that there is considerable uncertainty about the actual reach of our antitrust laws in foreign commerce. This uncertainty adversely affects the ability of American businesses to enter into international transactions that would be highly beneficial and to compete effectively with foreign companies for a

share of world markets. These problems warrant clear congressional definition of the proper range and focus of our antitrust laws.

Proponents of the status quo sometimes assert that the case for legislative action has not been made because businesses have not stepped forward with an accounting of specific business opportunities that were aborted for antitrust reasons. It is not surprising, though, that businessmen have not often volunteered to recount examples of the restraining effects of antitrust law on their international activities.

For example, antitrust considerations typically enter the picture long before a business transaction is explored in depth. If these considerations indicate problems, the possible transaction may die on the drawing board well before negotiations are commenced. In these circumstances one cannot ascribe to antitrust a lost opportunity that was never developed to the point of possible consummation. In many cases, antitrust concerns may even preclude preliminary discussions to explore a transaction. Equally important is the natural reluctance of firms to admit that potential antitrust violations ever even crossed their minds.

Nevertheless, it is not difficult to pinpoint the general classes of intentional business transactions that are restricted by the threat of antitrust problems, but from which that threat should be eliminated. These would include joint ventures or other arrangements among exporters that may involve the allocation of territorial responsibilities or the establishment of common prices or other terms of trade, technology licenses that restrict sales by the contracting parties to particular countries or regions, and offshore acquisitions that permit U.S. firms to enter foreign markets.

Judicial decisions are rife with inconsistencies regarding the types of effects on the domestic economy that must be demonstrated in order to establish U.S. antitrust jurisdiction over an international transaction. For example, courts have variously stated that U.S. antitrust laws apply if the conduct "affects" U.S. commerce,[1] or if the conduct "directly and substantially" affects U.S. commerce,[2] or if the conduct occurs with "the intent to affect" U.S. commerce,[3] or if the conduct has a "direct and influencing effect" on U.S. commerce.[4]

The commentators are also divided on the correct test to apply in determining whether there is, properly, U.S. antitrust jurisdiction over international business transactions. One authority asserts that the requisite effects must be direct or substantial,[5] while another declares that liability may arise either if the conduct occurs in the course of U.S. foreign commerce or substantially affects either foreign or domestic commerce.[6] As the Court of Appeals for the 9th Circuit pointedly observed in *Timberlane Lumber Co.* v. *Bank of America*, 549 F. 2d 597, 610 (9th Cir. 1977): "American courts have firmly concluded that there is some extra territorial jurisdiction under the Sherman Act. Even among American courts and commentators, *there is no consensus on how far the jurisdiction should extend.*" (Emphasis added.)

The Business Roundtable submits that no legitimate purpose is served by perpetuating uncertainty on this fundamental question.

I do not wish to leave the impression that the risks and uncertainties of antitrust are the most important barrier to the ability of U.S. firms to seize overseas business opportunities. There are, of course, hosts of business uncertainties confronting a firm that is considering its foreign trade potential. Antitrust is only one of these barriers. But it is an obstacle that Congress has the power to wipe away with clarifying legislation. This unnecessary barrier to American participation in world trade

---

[1] *Thomsen* v. *Cayser*, 243 U.S. 66, 88 (1917); *United States* v. *Imperial Chemical Industries*, 100 F. Supp. 504, 592 (S.D.N.Y. 1951); *see* 15 U.S.C. § 1.

[2] E.g., *United States* v. *General Electric Co.*, 82 F. Supp. 753, 891 (D.N.J. 1949); *United States* v. *Watchmakers of Switzerland Information Center Inc.*, 1963 Trade Cases (CCH) ¶70,600 (S.D.N.Y. 1962); see J. Shenefield, Extraterritoriality and Antitrust—New Variations on a Familiar Theme (Dec. 10, 1980) (remarks before the International Law Institute).

[3] *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 443–445 (2d Cir. 1945); *cf.*, *Mannington Mills* v. *Congoleum Corp.*, 595 F. 2d 1287 (3d Cir. 1979).

[4] E.g., *United States Timken Roller Bearing Co.*, 83 F. Supp. 284, 309 (N.D. Ohio 1949), modified, 341 U.S. 593 (1951).

The high-water mark of judicial expansiveness in applying the Sherman Act to conduct in foreign commerce was the *Minnesota Mining* case. *United States* v. *Minnesota Mining & Mfg Co.*, 92 F. Supp. 947 (D. Mass. 1950). There, the court suggested that, even if concerted action in foreign commerce by U.S. businesses could not be shown to have any effects in the United States, it could in any event be condemned as a *per se* violation of the Sherman Act. The court speculated that coordination of efforts among the companies in foreign commerce might "reduce their zeal for competition inter sese in the American market." Id. at 963.

[5] I J. von Kalinowski, Antitrust Law & Trade Regulation § 5.02 (1980).

[6] J. Rahl, *Foreign Commerce Jurisdiction of the American Antitrust Laws*, 43 Antitrust L.J. 521, 523 (1974).

can be removed while leaving intact the protection that the antitrust laws afford to American businesses and consumers.

## OBJECTIVES OF LEGISLATIVE CLARIFICATION

In the Roundtable's view, legislative reform of existing law should achieve three essential purposes: First, any reform should specify that international transactions are not subject to U.S. antitrust jurisdiction except to the extent that the conduct has direct, substantial, and foreseeable anti-competitive effects in the United States by restraining trade in domestic commerce. Second, legislative reform should eliminate liability to foreign purchasers of products or services that are sold for export, leaving those purchasers to assert whatever legal rights their own governments have seen fit to create for conduct whose effects are felt within their territory. Third, legislation should eliminate other sources of liability, including government enforcement actions either by the Justice Department or the Federal Trade Commission, for injuries to foreign purchasers of U.S. exports.

These objectives, we believe, are consistent with the stated goals of the bill's sponsors. They are also consistent with the better views of legal authorities.

The requirements of "directness," "substantiality" and "foreseeability" as essential predicates for U.S. antitrust jurisdiction are presently embodied in the Justice Department's summary of controlling legal principles for evaluating international transactions.[7] Legislation like H.R. 2326 would refine and codify these fundamental principles and tests.

Although reform and clarification of the "domestic effects test" is crucial, it should be remembered that additional factors are and will continue to be considered in determining the propriety of asserting jurisdiction over international transactions and in assessing their lawfulness. As we understand it, H.R. 2326 is designed to establish minimum jurisdictional prerequisites. For example, in making these determinations, the federal courts would continue to consider the defendant's nationality, the relative interests of the United States and other nations that are affected by the transaction, the location of the conduct, and similar factors.[8]

In short, "direct, substantial, and foreseeable" United States effects should be essential—but, in a particular case, may be insufficient in light of the interests of international comity and of congressional intent—to warrant application of the U.S. antitrust laws.

For example, a limitation on potential liability so as to include only domestic effects is consistent with two sound and generally accepted propositions: our antitrust laws are fundamentally intended to protect U.S. consumers and business;[9] and standing to recover for injuries under the antitrust laws is limited to injuries of the type that the antitrust laws are intended to prevent.[10] As the Director of Policy Planning for the Justice Department's Antitrust Division recently stated, it is the Justice Department's enforcement philosophy "that it would be arrogant for the U.S. to attempt to protect foreigners abroad—that doing so is the responsibility of their governments."[11] Thus, there should be antitrust liability only to those persons injured within the United States by an antitrust violation.

## PROPOSED AMENDMENTS TO H.R. 2326

Although the Business Roundtable supports the announced objectives of H.R. 2326, we recommend that the language of the bill be changed in certain respects for the purpose of further clarifying its impact. The text of these proposed amendments is attached to this statement.

First, we urge that the scope of the bill be broadened to cover all of applicable antitrust laws, rather than simply the Sherman Act. While the Sherman Act is probably the most important of these laws in the international arena, remedial leg-

---

[7] See Department of Justice, Antitrust Guide for International Operations, Antitrust & Trade Reg. Rep. (BNA) No. 799 (Feb. 1, 1977); J. Shenefield, supra, note 2.

[8] See, e.g., *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976); *Mannington Mills, Inc. v. Congoleum Corp.*, supra, note 3; Restatement (Second) of Foreign Relations Law of the United States § 40 (1965).

[9] See R. Bork, The Antitrust Paradox, Ch. 2 (1978).

[10] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Chrysler Corp. v. Fedders Corp.*, No. 78-1287 (6th Cir., March 18, 1981), discussed in Antitrust & Trade Reg. Rep. (BNA) No. 1007, at A-17 (March 26, 1981).

[11] J. Davidow, Extraterritorial Antitrust: An American View (March 12, 1981) (remarks before the International Chamber of Commerce Conference on Extraterritorial Application of Competition Law).

islation should also cover the Clayton Act—including the pricing strictures of the Robinson-Patman Act—and the Federal Trade Commission Act. The bill's "domestic effects test" standard should be equally applicable to pricing practices and distribution agreements, which are dealt with under Sections 2 and 3 of the Clayton Act (Section 2 is the Robinson-Patman Act), and to the broad range of antitrust-type conduct covered by Section 5 of the Federal Trade Commission Act. To achieve this important change, we recommend that, in the proposed new Section 7 of the Sherman Act, the Committee substitute the language "Nothing in this Act, the Clayton Act, or Section 5 of the Federal Trade Commission Act shall apply. . . ." for the current language of the bill: "This Act"—meaning only the Sherman Act—"shall not apply. . . ."

Second, we urge that the phrase "regardless of whether such conduct occurs within or outside of the United States" be inserted in the second line of the bill after the word "nations." This language would assure that the "effects test" is a two-way street that is applied regardless of where the alleged conduct occurs. The location of the effects should control, not the location of the conduct.

To give an example, if two manufacturers decide to engage in joint selling efforts in the Mideast, this statute should serve to protect them from antitrust liability regardless of where they meet and agree to act together. It would be nonsensical for the statute to afford them protection if they meet and agree in London, but not if they meet in New York.

The bill embodies a philosophy that the antitrust laws are intended to protect the American economy from restraints, and the insertion suggested above makes that very clear. We are concerned that, without this clarification, the bill might be understood as applicable only when the conduct is overseas. Our language shows that the geographic focus is on effects.

Third, we recommend that the formulation "directly, substantially, and foreseeably restrains . . ." be substituted for "has a direct and substantial effect on. . . ." There are several reasons for this change. The requirement of "foreseeability" is added to incorporate the better view of existing law.[12] Any statute designed to stimulate American involvement in international trade by providing clear benchmarks for businessmen to follow should make the "foreseeability" of any domestic consequences an essential ingredient in the assertion of U.S. antitrust jurisdiction. This focuses the inquiry on a practical question that the businessman and his counsel can evaluate in assessing a proposed transaction.

In addition, the proposed language makes clear that the "domestic effects" with which the bill is concerned are "restraints" on commerce in the United States. As presently drafted, the bill is quite ambiguous on the kinds of "effects" that might trigger U.S. antitrust jurisdiction. The proposed amendment will avoid any contention that something like financial benefit to the U.S. exporter is a direct and substantial domestic "effect" that invokes the antitrust laws—a self-defeating interpretation that should be foreclosed.

In applying this "domestic effects" test, we would expect the courts to continue to look to the economic substance of the transaction, not just to its form. Thus, for example, the evaluation of the domestic effects of a sale would not be controlled by the technicalities of contract law. If a foreign purchaser buying from a U.S. company elects to use a U.S. purchasing agent here whose role is limited to transshipping the goods abroad, the effects of that transaction will be felt abroad, not here. It would make no difference, for purposes of U.S. antitrust jurisdiction, that title to the goods may pass in the United States before the actual export.

Fourth, we suggest deletion of the final clause in proposed Section 7 of the Sherman Act as it is now drafted. That clause would make U.S. antitrust laws applicable when activity in foreign commerce "has the effect of excluding a domestic person from trade or commerce with foreign nations." To the extent that this type of activity would be actionable at all as a matter of substantive antitrust law, the additional language is redundant. A direct, substantial, and foreseeable restraint upon a domestic competitor, if otherwise illegal, would be picked up by the prior clause, as we urge the Committee to amend it.

As drafted, however, the second clause may suggest an unwarranted expansion of existing law. For example, existing law does not, per se, prohibit exclusion of a competitor. After all, every contract necessarily excludes a disappointed bidder. It is often said, therefore, that the antitrust laws protect competition, not competitors.[13]

---

[12] See *United States* v. *Aluminum Co. of America, supra*, note 3, 148 F.2d at 444; Department of Justice, Antitrust Guide for International Operations, supra, note 7.

[13] E.g., *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc., supra*, note 10, 429 U.S. at 489.

Not even exclusions by joint industry action are per se illegal. Instead, such exclusions are judged by the "rule of reason," which permits a group to exclude a competitor for good reasons, such as his production of shoddy or unsafe merchandise. The Sherman Act deals with this conduct under the general category of restraints, not separately. The clause that we urge the Committee to delete might create needless and unfortunate uncertainty regarding the impact of the bill on this settled body of substantive law.

The codification of the "domestic effects" test raises an important question of policy on which the Roundtable urges close consideration. As presently drafted, the bill may leave American-owned companies doing business abroad without protection when they are the victims of anti-competitive conduct launched from within the United States. We note that the sponsors of H.R. 2326 emphasized that the antitrust laws are designed to protect American consumers and American businesses. It appears that, as drafted, H.R. 2326 would exclude from antitrust relief a United States company with a manufacturing facility in Europe that bought price-fixed components or services from an American company engaged in a conspiracy. Whether it is consistent with American treaty obligations to allow the U.S. company to sue in those circumstances, when a foreign manufacturer could not, is an issue on which we take no position. Where American companies are involved in both ends of an export transaction, however, there is special basis to make our laws applicable, and less reason to object that application of our antitrust laws is an unwarranted encroachment on foreign prerogatives.

The Committee should carefully consider, therefore, whether American-owned companies making off-shore or overseas purchases, or purchases for their own export, should be excluded from antitrust protection. If the Committee concludes that it is desirable and proper to have U.S. antitrust laws applicable in this setting, then we would suggest adding appropriate language to achieve that objective.

Fifth, we urge the Committee to clarify the intent of the legislation with respect to antitrust damage actions. As drafted, the bill probably precludes damage suits based on alleged antitrust violations that injure foreign purchasers or consumers of U.S. exports. This conclusion would appear to follow both from the proposed limitation of the antitrust laws to domestic competitive effects and from the rule that antitrust damages are only available to compensate for injuries that the antitrust laws were intended to prevent.[14] However, the present bill leaves room for unnecessary ambiguity.

For example, a foreign purchaser of U.S. exports could argue that the defendant's conduct had domestic as well as foreign effects and that the existence of some domestic effects creates a basis for a damage action based on the foreign effects as well. While this argument would seem to be without merit under prevailing doctrine, we strongly urge that it be foreclosed expressly. Accordingly, we recommend the following additional language as a new subsection to proposed Section 7: "(b) If conduct involving trade or commerce with foreign nations does directly, substantially, and foreseeably restrain trade or commerce within the United States, then the parties engaging in such conduct shall be liable only for any injury so occurring within the United States by reason of such restraints."

The Roundtable views this clarification as important if this bill is to effectuate its premise and to protect American exporters. Our language would provide adequate deterrence against restraints that have substantial domestic effects, since anyone suffering an antitrust injury here could sue for treble damages. There seems to be no legitimate reason to confer a derivative right to sue on foreign purchasers—who are not within the zone of protection intended by U.S. antitrust laws—simply because domestic purchasers or competitors—who are the intended beneficiaries of these laws—would have a right to sue.

In this connection, we note that this provision would be fully consistent with the standard treaties of friendship, commerce and navigation ("FCN" treaties). Our proposed clarification does not turn on the citizenship or nationality of the protected plaintiff, but rather on the geographic location of the alleged injury. Thus, there is no basis for a claim of discriminatory treatment.

Moreover, these FCN treaties typically guarantee foreign nationals no more than access to U.S. courts, but expressly provide that the foreign national's substantive rights, if any, turn exclusively on the terms of the U.S. legislation.[15] Significantly,

---

[14] *See id.*

[15] See, e.g., 1954 FCN Treaty Between the United States and West Germany, Art. VI(1), 7 U.S.T. 1839, 1845, T.I.A.S. 3593. See also, *Maiorano* v. *Baltimore & O.R.R.*, 213 U.S. 268, 274 (1909) (establishing this distinction in construing an FCN treaty with Italy).

many recent FCN treaties refer expressly to antitrust enforcement, but recognize that what each nation "deems appropriate" in this area is controlled "by its legislation." [16] Thus, the limitation defined in a new subsection (b) would be quite in keeping with international arrangements. It would simply implement the Executive Branch's position "that it would be arrogant for the U.S. to attempt to protect foreigners abroad—that doing so is the responsibility of their governments." [17]

If the Committee also decides to protect American firms engaged in off-shore purchases, in accordance with the discussion on pages 14–15 above, then appropriate modification should be made to our proposed subsection (b) to permit damage recovery for that injury as well.

Sixth and finally, the bill contains in section 3 a proposed amendment to Section 7 of the Clayton Act that would exempt joint ventures organized solely for export trade. With respect to this provision, we recommend that the phrase "whose sales are limited to exporting goods or services from the United States to foreign nations" be substituted for the phrase "limited solely to export trading, in goods or services, from the United States to a foreign nation." Our concern is with the term "limited solely." Any U.S. joint venture established to engage inexport sales of goods or services is likely to have some domestic activities as an integral part of its export trade: for example, purchasing supplies or services for use in its export business. This incidental domestic activity should not make the incipiency tests of Section 7 applicable, when the joint venture's sole business purpose is to engage in exports. Our proposal would more accurately reflect this intended scope of the exemption.

With these changes, and with consideration by the Committee of possible protection of American-owned companies doing business abroad, the Business Roundtable would enthusiastically support enactment of H.R. 2326. We would do so, not only because such legislation would remove unnecessary barriers to business opportunities abroad, but also because we are sure that these revisions of current law would not adversely affect American consumers or competitors at home.

ROUNDTABLE SUPPORT FOR RELATED PENDING BILLS

In supporting H.R. 2326 with the changes that we propose, we want to emphasize that, in the Roundtable's view, H.R. 2326 should not be taken as a substitute for other necessary legislation dealing with promotion of international trade and with refinement of the applicability of U.S. antitrust laws to that trade. Since a major objective of the proposed legislation is to remove unnecessary uncertainty and ambiguity, we believe that the bill should not be viewed as a substitute for other, specific solutions to particular problems.

The Roundtable believes, for example, that H.R. 2326 is a complement to, rather than a substitute for, H.R. 1648, the Export Trade Act, including Title II of that bill. That bill would permit U.S. businesses to come together and organize themselves into export trade associations, for the purpose of conducting joint business efforts in export trade. Under the licensing procedure that would be established by that bill, they could get advance government certification that the activities of their association would be exempt from the application of the antitrust laws. H.R. 2326 complements H.R. 1648 because it would provide similar protection for export transactions and related activity when U.S. firms elect, because of the nature and volume of their involvement in foreign commerce, not to establish an export trade association or to go through the licensing procedure.

While H.R. 1648 is directed at some of the same problems that underlie H.R. 2326, it deals with a narrower class of transactions, but ones in which the horizontal relationship among the participants may prompt prudent businessmen to seek extra assurance about the propriety of their conduct before engaging in joint export trade. Government certification under H.R. 1648 would provide that assurance.

While the Roundtable opposes unnecessary bureaucracy, the procedural requirements of H.R. 1648 have been subjected to careful development. In our view, it is desirable to make these alternate procedures available to those businesses who find

[16] E.g., FCN Treaty with West Germany, *supra*, note 15, Art. XVIII(1) at 1858–59; 1951 FCN Treaty with Israel, Art. XVIII(1), 5 U.S.T. 550, 569, T.I.A.S. 2948; 1950 FCN Treaty with Ireland, Art. XXI(3), 1 U.S.T. 787, 801, T.I.A.S. 2155.

[17] Remarks of J. Davidow, supra, note 11. It is also worth noting that both the Justice Department and the State Department have testified that legislation to bar foreign governments from bringing suits under U.S. antitrust laws would be compatible with U.S. treaty obligations. Hearings on the Clayton Act Amendments of 1978 before the Subcomm. on International Economic Policy and Trade of the House Comm. on International Relations, 95th Cong., 2d Sess. 12–13 (1978) (testimony of Deputy Assistant Attorney General Ewing and Deputy Legal Advisory Marks.).

it desirable to act through a licensed export association. The additional level of certainty available to such associations may be especially important to smaller exporters, who may shy away from arrangements that would otherwise have to rest solely on complicated legal opinions about the probable effects of the transaction.

Similarly, H.R. 2326 is no substitute for *H.R. 2812*, legislation to modify the *Pfizer* v. *India* decision.[18] That case held, as the Committee will recall, that foreign sovereign governments may recover treble damages under U.S. antitrust law even though the U.S. government itself is limited to recovering single damages and even though the foreign sovereign nation does not outlaw the conduct about which it complains and does not afford reciprocal judicial rights to the U.S. government. The bill that has been introduced to deal with that unexpected expansion of the U.S. antitrust laws, H.R. 2812, focuses directly and effectively on the *Pfizer* decision and on its effect on pending litigation.

The Roundtable strongly supports the efforts to restore the status quo ante by enactment of legislation that overturns the *Pfizer* decision. We believe that such legislation should operate immediately, as H.R. 2812 would. Enactment of H.R. 2326 might achieve the same result, especially if the bill clearly forecloses suits by foreign purchasers, as our proposed Section 7(b) would. As a controlling legislative definition of U.S. antitrust jurisdiction, H.R. 2326 would probably have immediate application to any cases pending on the date of its enactment. However, the *Pfizer* bill, H.R. 2812, leaves no room for doubt on these issues.

CONCLUSION

On the basis of these recommendations, therefore, the Business Roundtable expresses its strong support for enactment of H.R. 2326, with appropriate amendments, and commends the bill's sponsors, especially the Chairman and the Ranking Republican Member, for their leadership.

Mr. RODINO. Mr. Connor, in your written statement you propose that a section (b) be added to H.R. 2326 to limit recovery to "injury so caused within the United States."

Mr. CONNOR. Yes, Mr. Chairman.

Mr. RODINO. Let me pose this situation to you. If a German manufacturer purchased goods in the United States for shipment to Germany and the price of the goods had been fixed by U.S. competitors, first of all, would there be an injury caused within the United States?

Mr. CONNOR. Presumably there could have been an injury caused in the United States by a price-fixing conspiracy. We could assume there was not, on the other hand, too.

Mr. RODINO. If not, where did the injury occur?

Mr. CONNOR. If there is no effect in the United States the injury would have occurred in Germany.

Mr. RODINO. In Germany?

Mr. CONNOR. Yes.

Mr. RODINO. What if a consumer buys goods from an American firm that doesn't engage in export activities and pays for the goods and takes possession in the United States, and if that firm is party to a price-fixing conspiracy that didn't distinguish between foreign and domestic? What if he takes the goods abroad and what if he uses them in the United States?

Mr. CONNOR. I think the logic of our position would be to say if the transaction were a U.S. commercial transaction, if this were a purchase in the United States under U.S. law, there might be effects in the United States and these should be actionable.

If this were a German transaction, if the injury occurred in Germany, it would not be actionable under our proposal.

[18] *Pfizer, Inc.* v. *Government of India*, 434 U.S. 308 (1978).

# EXHIBIT 11

# THE FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT

LIBRARY OF CONGRESS
4
MAR 18 1982
COPY
EXCHANGE & GIFT DIVISION

## HEARING

U.S. Congress. Senate.

BEFORE THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

NINETY-SEVENTH CONGRESS

FIRST SESSION

ON

## S. 795

A BILL TO AMEND THE SHERMAN ACT AND THE CLAYTON ACT TO EXCLUDE FROM THE APPLICATION OF SUCH ACTS CERTAIN CONDUCT INVOLVING EXPORTS

JUNE 17, 1981

**Serial No. J–97–31**

Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE
87-671 O WASHINGTON : 1982

## COMMITTEE ON THE JUDICIARY

STROM THURMOND, South Carolina, *Chairman*

CHARLES McC. MATHIAS, JR., Maryland
PAUL LAXALT, Nevada
ORRIN G. HATCH, Utah
ROBERT DOLE, Kansas
ALAN K. SIMPSON, Wyoming
JOHN P. EAST, North Carolina
CHARLES E. GRASSLEY, Iowa
JEREMIAH DENTON, Alabama
ARLEN SPECTER, Pennsylvania

JOSEPH R. BIDEN, JR., Delaware
EDWARD M. KENNEDY, Massachusetts
ROBERT C. BYRD, West Virginia
HOWARD M. METZENBAUM, Ohio
DENNIS DECONCINI, Arizona
PATRICK J. LEAHY, Vermont
MAX BAUCUS, Montana
HOWELL HEFLIN, Alabama

VINTON DEVANE LIDE, *Chief Counsel*
QUENTIN CROMMELIN, JR., *Staff Director*

# CONTENTS

| | Page |
|---|---|
| Text of S. 795 | 3 |

**OPENING STATEMENT OF COMMITTEE MEMBERS**

| | |
|---|---|
| Chairman Strom Thurmond | 1 |
| Senator Charles McC. Mathias, Jr | 23 |

**CHRONOLOGICAL LIST OF WITNESSES**

| | |
|---|---|
| Baxter, Hon. William F., Assistant Attorney General, Antitrust Division, U.S. Department of Justice | 5 |
| Unger, Hon. Sherman E., General Counsel, U.S. Department of Commerce | 7 |
| Pitofsky, Robert, Esq., professor of law, Georgetown University Law Center, and counsel, Arnold & Porter | 23 |
| Davidow, Joel, Esq., Mudge, Rose, Guthrie & Alexander, New York, N.Y | 26 |
| Fogt, Howard W., Jr., Esq., Foley, Lardner, Hollabaugh & Jacobs, Washington, D.C. | 30 |
| Victor, A. Paul, Esq., Weil, Gotshal & Manges, New York, N.Y | 78 |
| Joelson, Mark R., Esq., Wald, Harkrader & Ross, Washington, D.C | 80 |
| Angoff, Jay, Esq., Public Citizens Congress Watch, Washington, D.C | 83 |

**ALPHABETICAL LISTINGS AND MATERIALS SUBMITTED**

| | |
|---|---|
| Angoff, Jay, Esq.: | |
| Testimony | 82 |
| Prepared statement | 106 |
| Baxter, Hon. William F.: | |
| Testimony | 5 |
| Prepared statement | 12 |
| Proposed amendment to S. 734 | 10 |
| Davidow, Joel, Esq.: | |
| Testimony | 26 |
| Prepared statement | 50 |
| Fogt, Howard W., Jr., Esq.: | |
| Testimony | 30 |
| Prepared statement | 57 |
| Joelson, Mark R., Esq.: | |
| Testimony | 80 |
| Prepared statement | 97 |
| Pitofsky, Robert, Esq.: | |
| Testimony | 23 |
| Prepared statement | 37 |
| Unger, Hon. Sherman E.: | |
| Testimony | 7 |
| Prepared statement | 18 |
| Victor, A. Paul, Esq.: | |
| Testimony | 78 |
| Prepared statement | 87 |

**APPENDIX**

| | |
|---|---|
| Letter from witness Howard W. Fogt, Jr., with reference to a Common Market investigation | 116 |
| Prepared statement of The Business Roundtable | 117 |

# APPENDIX

FOLEY, LARDNER, HOLLABAUGH & JACOBS
1775 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D. C. 20006
TELEPHONE (202) 862-5300

JOHN W. BYRNES
MARCUS A. HOLLABAUGH
EPHRAIM JACOBS
PETER B. EDELMAN
DOUGLAS V. RIGLER
JOHN F. GRAYBEAL
JACK L. LAHR
HOWARD W. FOGT, JR.
LINDA HELLER KAMM
F. ANTHONY MAIO
JAMES N. BIERMAN
MICHAEL FISCHER
LESLIE C. SMITH
JAY H. VARON
CATHERINE S. KLARFELD
PAUL E. COONEY
DENNIS A. HENIGAN
JANE A. GOLDEN
THOMAS A. STROUP
CAROL S. LOTTMAN
MICHAEL R. BROMWICH

IN MILWAUKEE, WISCONSIN
FOLEY & LARDNER
FIRST WISCONSIN CENTER
777 EAST WISCONSIN AVENUE
MILWAUKEE, WIS. 53202
TELEPHONE (414) 271-2400
TELEX 26-819
(FOLEY LARD MIL)

IN MADISON, WISCONSIN
FOLEY & LARDNER
POST OFFICE BOX 1497
FIRST WISCONSIN PLAZA
1 SOUTH PINCKNEY STREET
MADISON, WIS. 53701
TELEPHONE (608) 257-5035

June 17, 1981

The Honorable Strom Thurmond
Chairman
Committee on the Judiciary
United States Senate
2226 Dirksen Senate Office
Building
Washington, DC 20510

Re: S.795 and Related Export Trade Legislation

Dear Chairman Thurmond:

During the course of testimony by Joel Davidow at the June 17, 1981 hearing on S.795, he made reference to a Common Market investigation of my client, the Phosphate Rock Export Association. Since, in my view, the record on that matter was left unclear, I would appreciate this letter being included in the record so that any questions concerning this matter can be resolved.

On July 12, 1976, the Commission of the European Communities instituted an investigation to determine whether Phosrock had infringed Articles 85 and 86 of the Treaty of Rome. In the course of that investigation, the Association supplied certain information which had been requested by the Commission. In August, 1976, the Commission formally requested that consultations be held on this matter between the Government of the United States and the Commission of the European Communities. Those consultations were held during the fall of 1976. In March, 1977, the Commission requested further information about Phosrock which was voluntarily supplied. No further proceedings in this investigation have occurred, and we understand that several years ago it was closed.

I hope this information will be of assistance to the Committee in developing a complete record in this matter.

Sincerely yours,

Howard W. Fogt, Jr.

Howard W. Fogt, Jr.

STATEMENT OF

THE BUSINESS ROUNDTABLE

On S. 795

The Business Roundtable is pleased to submit its views on S. 795, a bill to clarify the reach of the antitrust laws as they affect the foreign commerce of the United States. The Business Roundtable is an association of nearly 200 chief executive officers of major American companies. The Roundtable's purpose is to examine public issues that affect the economy and to develop and present positions that reflect sound economic and social principles. Since most of the companies represented by Roundtable members have substantial international business activities, S. 795 addresses an area of major interest.

ROUNDTABLE SUPPORT FOR GOALS OF S. 795

The Business Roundtable is pleased to report that it strongly supports the goals of this legislation. These goals, as we understand them, are to define and clarify the territorial scope of U.S. antitrust laws. The sponsors of this legislation have correctly observed that the international reach of these laws is uncertain, that this uncertainty has diminished export activity by American firms, and that the antitrust laws governing international transactions need to be clarified. We agree with these premises, and our members have confirmed them in their own business experience.

The bill's sponsors have also expressed their intention to limit the reach of antitrust liability to situations involving direct and substantial effects on our domestic consumers and businesses, to remove joint ventures engaged in export trading from the scope of Section 7 of the Clayton Act, and to reduce the potential for antitrust suits by foreign entities, including foreign governments. The Roundtable applauds all of these objectives. We suggest that

they can be fulfilled by passage of this bill, with the amendments that we propose.

REASONS FOR LIMITING APPLICABILITY OF U.S. ANTITRUST LAWS

In defining the proper scope of this country's antitrust laws, we think that it is important to remember that our antitrust laws are unique in that, in most parts of the world, conduct that we prohibit at home is encouraged or accepted.

For example, U.S. law condemns trade restraints except in regulated industries. In contrast, many socialist nations, even those in the free world, openly restrain or prohibit competition, and others regulate far larger segments of their economies than we do. Even among countries with free economies, regulatory intervention is more pervasive, and administrative approval may be obtained to engage in otherwise anti-competitive conduct.

When foreign antitrust restrictions exist, they are far less stringent than in the United States. Substantial horizontal acquisitions are often approved in "the public interest," and vertical or conglomerate mergers are virtually unmolested. Practices such as resale price maintenance, restrictive patent licensing, and price discrimination are commonplace.

Similarly, foreign devotion to antitrust enforcement is less intense than in the United States. The amount of foreign antitrust litigation is trivial in comparison with the 1000 to 1500 antitrust cases filed in U.S. courts in each of the last ten years. No other nation of the world imposes the punitive sanction of treble damages on antitrust defendants. The combination of sanctions available in the United States, including criminal felony liability, _parens patriae_ recoveries, class actions, and recovery of

attorneys' fees is also unparalleled. In most nations with laws that resemble our antitrust laws, relief for private injury is unavailable, and criminal sanctions do not exist.

Not only do other trading nations of the world play by different rules, but they also have displayed growing hostility toward the extra-territorial reach of our antitrust laws. Many nations have laws on their books that prohibit cooperation with U.S. antitrust authorities, interfere with U.S. antitrust prosecutions and defenses, and negate the operation of our laws in their territories.

These gross disparities in economic systems raise fundamental questions of economic policy. Accepting the fact that our antitrust laws reflect a considered judgment about how businesses in the United States should treat American consumers and competitors, there is no imperative that justifies any longer -- if it ever did -- federal legislation declaring how our businesses should deal with overseas consumers or foreign competitors. Therefore, the Roundtable agrees with the premise of S. 795 that there is no reason why our law should reach out to protect consumers in other nations whose governments have not chosen to protect their own nationals with competition statutes. In a pluralistic world, nations should be free to define their own domestic economic interests.

In this context, it is not only naive but futile to assume that U.S. antitrust laws can or will inject competition into foreign markets. The only way that this will occur is if foreign nations themselves adopt and apply antitrust laws to all those who enter their markets. The unilateral imposition of antitrust restraints on U.S. businesses engaged in foreign commerce simply disables U.S. firms from competing on an equal footing with their foreign counterparts.

Respect for these differences in legal and economic systems requires not only that our laws be well-defined, but also that they not be overly expansive in their reach. The Roundtable is committed to the proposition that our antitrust laws play a basic role in protecting the American free-enterprise system by helping to insure that consumers and businesses in this country receive the benefits of competition. Conversely, however, we see no reason why our laws should reach out to regulate transactions whose primary effects occur outside of our territory.

NEED FOR CLARIFICATION OF EXTRATERRITORIAL APPLICATION

The Roundtable shares the view of the sponsors of S. 795 and its House counterpart, H.R. 2326, that there is considerable uncertainty about the actual reach of our antitrust laws in foreign commerce. This uncertainty adversely affects the ability of American businesses to enter into international transactions that would be highly beneficial and to compete effectively with foreign companies for a share of world markets. These problems warrant clear congressional definition of the proper range and focus of our antitrust laws.

It is interesting that, although Assistant Attorney General Baxter's recent statement before this Committee supporte the propriety of legislative clarification in this field, he suggested that the business community's concerns may be "largely unfounded."1/ We believe, though, that Attorney General Smith was closer to the mark when he recently called for a "broad reassessment of our antitrust enforcement practices concerning international commerce." The Attorney General recognized:

> "In many instances, the government's pursuit of too narrow a view of competition has actually impeded American firms' efforts to compete internationally."2/

Proponents of the *status quo* sometimes assert that the case for legislative action has not been made because businesses have not stepped forward with an accounting of specific business opportunities that were aborted for antitrust reasons. It is not surprising, though, that businessmen have not often volunteered to recount examples of the restraining effects of antitrust law on their international activities.

For example, antitrust considerations typically enter the picture long before a business transaction is explored in depth. If these considerations indicate problems, the possible transaction may die on the drawing board well before negotiations are commenced. In these circumstances one cannot clearly ascribe to antitrust a lost opportunity that was never developed to the point of possible consummation. In many cases, antitrust concerns may even preclude preliminary discussions to explore a transaction. Equally important is the natural reluctance of firms to admit that potential antitrust violations ever even crossed their minds.

Nevertheless, it is not difficult to pinpoint the general classes of international business transactions that are restricted by the threat of antitrust problems, but from which that threat should be eliminated. These would include joint ventures or other arrangements among exporters that may involve the allocation of territorial responsibilities or the establishment of common prices or other terms of trade, technology licenses that restrict sales by the contracting parties to particular countries or regions, and offshore acquisitions that permit U.S. firms to enter foreign markets.

Judicial decisions are rife with inconsistencies regarding the types of effects on the domestic economy that must be demonstrated in order to establish U.S. antitrust jurisdiction over an international transaction. For example,

courts have variously stated that U.S. antitrust laws apply if the conduct "affects" U.S. commerce,3/ or if the conduct "directly and substantially" affects U.S. commerce,4/ or if the conduct occurs with "the intent to affect" U.S. commerce,5/ or if the conduct has a "direct and influencing effect" on U.S. commerce.6/

The commentators are also divided on the correct test to apply in determining whether there is, properly, U.S. antitrust jurisdiction over international business transactions. One authority asserts that the requisite effects must be direct or substantial,7/ while another declares even more sweepingly that liability may arise if either the conduct occurs in the course of U.S. foreign commerce or substantially affects either foreign or domestic commerce.8/ As the Court of Appeals for the 9th Circuit pointedly observed in Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 610 (9th Cir. 1977):

> "American courts have firmly concluded that there is some extra territorial jurisdiction under the Sherman Act. Even among American courts and commentators, there is no consensus on how far the jurisdiction should extend." (Emphasis added.)

The Business Roundtable submits that no legitimate purpose is served by perpetuating uncertainty on this fundamental question.

The Roundtable does not wish to create the impression that the risks and uncertainties of antitrust are the most important barrier to the ability of U.S. firms to seize overseas business opportunities. There are, of course, hosts of business uncertainties confronting a firm that is considering its foreign trade potential. Antitrust is only one of these barriers. But it is an obstacle that Congress has the power to wipe away with clarifying legislation. This unnecessary barrier to American participation in world trade can be

removed while leaving intact the protection that the antitrust laws afford to American businesses and consumers.

OBJECTIVES OF LEGISLATIVE CLARIFICATION

In the Roundtable's view, legislative reform of existing law should achieve three essential purposes:

> First, any reform should specify that international transactions are not subject to U.S. antitrust jurisdiction except to the extent that the conduct has direct, substantial, and foreseeable anti-competitive effects in the United States by restraining trade in domestic commerce.
>
> Second, legislative reform should eliminate liability to foreign purchasers of products or services that are sold for export, leaving those purchasers to assert whatever legal rights their own governments have seen fit to create for conduct whose effects are felt within their territory.
>
> Third, legislation should eliminate other sources of liability, including government enforcement actions either by the Justice Department or the Federal Trade Commission, for injuries to foreign purchasers of U.S. exports.

These objectives, we believe, are consistent with the stated goals of the bill's sponsors. They are also consistent with the better view of legal authorities.

The requirements of "directness," "substantiality" and "foreseeability" as essential predicates for U.S. antitrust jurisdiction are presently embodied in the Justice Department's

summary of controlling legal principles for evaluating international transactions.[9/] Legislation like S. 795 would refine and codify these fundamental principles and tests, and would thus establish a stable set of statutory principles on which businessmen and their counsel can rely.

As we understand it, S. 795 is designed to establish minimum jurisdictional prerequisites. Although reform and clarification of the "domestic effects test" is crucial, it should be remembered that additional factors are and will continue to be considered in determining the propriety of actually asserting jurisdiction over international transactions and in assessing their lawfulness. For example, in making these determinations, the federal courts would continue to consider the defendant's nationality, the relative interests of the United States and other nations that are affected by the transaction, the location of the conduct, and similar factors.[10/]

In short, "direct, substantial, and foreseeable" effects on domestic commerce should be essential -- but, in a particular case, may be insufficient in light of the interests of international comity and of congressional intent -- to warrant application of the U.S. antitrust laws.

## PROPOSED AMENDMENTS TO S. 795

Although the Business Roundtable strongly supports the announced objectives of S. 795, we recommend that the language of the bill be changed in certain respects for the purpose of further clarifying its impact. The text of these proposed amendments is attached to this statement.

First, we urge that the scope of the bill be broadened to cover all of applicable antitrust laws, rather than simply the Sherman Act. While the Sherman Act is probably the most important of these laws in the interna-

tional arena, remedial legislation should also cover the Clayton Act -- including the pricing strictures of the Robinson-Patman Act -- and the Federal Trade Commission Act. The bill's "domestic effects test" should be equally applicable to pricing practices and distribution agreements, which are dealt with under Sections 2 and 3 of the Clayton Act (Section 2 is the Robinson-Patman Act), and to the broad range of antitrust-type conduct covered by Section 5 of the Federal Trade Commission Act. To achieve this important change, we recommend that, in the proposed new Section 7 of the Sherman Act, the Committee substitute the language "Nothing in this Act, the Clayton Act, or Section 5 of the Federal Trade Commission Act shall apply. . . ." for the current language of the bill: "This Act" -- meaning only the Sherman Act -- "shall not apply. . . ."

Second, we urge that the phrase "regardless of whether such conduct occurs within or outside of the United States" be inserted in the second line on page 2 of the bill after the word "nation." This language would assure that the "effects test" is a two-way street that is applied regardless of where the alleged conduct occurs. The location of the effects should control, not the location of the conduct.

To give an example, if two manufacturers decide to engage in joint selling efforts in the Middle East, this statute should serve to protect them from antitrust liability regardless of where they meet and agree to act together. It would be nonsensical for the statute to afford them protection if they meet and agree in London, but not if they meet in New York, or vice versa.

The bill embodies a philosophy that the antitrust laws are intended to protect the American economy from restraints, and the insertion suggested above would make that

very clear. We are concerned that, without this clarification, the bill might be understood as applicable only when the conduct is overseas or only when the conduct is domestic. Our language shows that the geographic focus is on the effects of the conduct in question.

Third, we recommend that the formulation "directly, substantially, and foreseeably restrains . . ." be substituted for "has a direct and substantial effect on . . ." (in lines 3 and 4 of page 2). There are several reasons for this change. The requirement of "foreseeability" is added to incorporate the better view of existing law.[11/] Any statute designed to stimulate American involvement in international trade by providing clear benchmarks for businessmen to follow should make the "foreseeability" of any domestic consequences an essential ingredient in the assertion of U.S. antitrust jurisdiction. This focuses the inquiry on a practical question that the businessman and his counsel can evaluate in assessing a proposed transaction.

In addition, the proposed language makes clear that the "domestic effects" with which the bill is concerned are "restraints" on commerce in the United States. As presently drafted, the bill is quite ambiguous on the kinds of "effects" that might trigger U.S. antitrust jurisdiction. The proposed amendment would avoid any contention that something like financial benefit to the U.S. exporter is a direct and substantial domestic "effect" that invokes the antitrust laws -- a self-defeating interpretation that should be foreclosed.

In our view, a jurisdictional inquiry into the location of the "restraint" would not require a trial of the merits of the case. The issue on the merits would be whether a restraint on competition was unreasonable, but it should be possible for the court to decide, as a preliminary matter, whether the alleged restraint affected domestic commerce. If

the plaintiff cannot satisfy the threshold burden of showing that it did, then the lawfulness of the defendant's conduct should not be at issue at all. Thus, the Roundtable believes that it is both desirable and practical to substitute the term "restrains" for "has an effect."

In applying this "domestic restraint" test, we would expect the courts to continue to look to the economic substance of the transaction, not just to its form. Thus, for example, the evaluation of the domestic effects of a sale would not be controlled by the technicalities of contract law. If a foreign purchaser buying from a U.S. company elects to use a U.S. purchasing agent here whose role is limited to trans-shipping the goods abroad, the effects of that transaction would be felt abroad, not here. It would make no difference, for purposes of U.S. antitrust jurisdiction, that title to the goods may pass in the United States before the actual export.

Fourth, we suggest deletion of the final clause in proposed Section 7 of the Sherman Act as it is now drafted (lines 4-6 on page 2). That clause would make U.S. antitrust laws applicable whenever activity in foreign commerce "has the effect of excluding a domestic person from trade or commerce with foreign nations." To the extent that this type of activity would be actionable at all as a matter of substantive antitrust law, the additional language is redundant. A direct, substantial, and foreseeable restraint upon a domestic competitor, if otherwise illegal, would be picked up by the prior clause, as we urge the Committee to amend it.

As drafted, however, the second clause may suggest an unwarranted expansion of existing law. For example, existing law does not, *per se*, prohibit exclusion of a competitor. After all, every contract necessarily excludes a disappointed bidder. It is often said, therefore, that the antitrust laws protect competition, not competitors.12/

Not even exclusions by joint industry action are per se illegal. Instead, such exclusions are judged by the "rule of reason," which permits a group to exclude a competitor for good reasons, such as his production of shoddy or unsafe merchandise. The Sherman Act deals with this conduct under the general category of restraints, not separately. The clause that we urge the Committee to delete might create needless and unfortunate uncertainty regarding the impact of the bill on this settled body of substantive law.

The Roundtable is aware of some suggestions to broaden the last clause of proposed Section 7.13/ These suggestions, however, focus on the problems inherent in speaking about "excluding" a domestic person from commerce, and they do not come to grips with the more basic objection to the second clause in proposed Section 7. Any reference to effects on "domestic persons" or "domestic competitors" in this statute is unnecessary and mischievous: unnecessary, because the principal clause adequately covers anti-competitive restraints felt in the United States; and mischievous, because the novel concept of a "domestic competitor" or "domestic person" will inject new confusion and distortion. The second clause should be deleted entirely.

Any decision by the Committee to retain a distinct provision that makes U.S. antitrust jurisdiction hinge upon the effect on a "domestic person" would raise a related and important question of policy on which the Roundtable would urge close consideration. As presently drafted, the bill may leave American-owned companies doing business abroad without protection when they are the victims of anti-competitive conduct launched from within the United States. We note that the sponsors of S. 795 emphasized that the antitrust laws are designed to protect American consumers and American businesses. It appears that, as drafted, S. 795 would exclude from anti-

trust relief a United States company with a manufacturing facility in Europe that bought price-fixed components or services from an American company engaged in a conspiracy. Whether it would be consistent with American treaty obligations to allow the U.S. company to sue in those circumstances, when a foreign manufacturer could not, is an issue on which we take no position. Where American companies are involved in both ends of an export transaction, however, there would be special basis to make our laws applicable, and less reason to object that application of our antitrust laws would be an unwarranted encroachment on foreign prerogatives.

The Committee should carefully consider, therefore, whether American-owned companies making off-shore or overseas purchases, or purchases for their own export, should be excluded from antitrust protection. If the Committee concludes that it is desirable and proper to have U.S. antitrust laws applicable in this setting, then we would suggest adding appropriate language to achieve that objective.

Fifth, we urge the Committee to clarify the intent of the legislation with respect to antitrust damage actions. As drafted, the bill probably precludes damage suits based on alleged antitrust violations that injure foreign purchasers or consumers of U.S. exports. This conclusion would appear to follow both from the proposed limitation of the coverage of the Sherman Act to domestic anti-competitive effects and from the rule that antitrust damages are only available to compensate for injuries that the antitrust laws were intended to prevent.[14/] However, the present bill leaves room for unnecessary ambiguity.

For example, a foreign purchaser of U.S. exports could argue that the defendant's conduct had domestic as well as foreign effects and that the existence of some domestic effects creates a basis for a damage action

based on the foreign effects as well. While this argument would seem to be without merit under prevailing doctrine, we strongly urge that it be foreclosed expressly. Accordingly, we recommend the following additional language as a new subsection to proposed Section 7, to be inserted after line 6 on page 2.

> "(b) If conduct involving trade or commerce with foreign nations does directly, substantially, and foreseeably restrain trade or commerce within the United States, then the parties engaging in such conduct shall be liable only for any injury so occurring within the United States by reason of such restraints."

The Roundtable views this clarification as important if this bill is to effectuate its premise and to protect American exporters. Our language would provide adequate deterrence against restraints that have substantial domestic effects, since anyone suffering an antitrust injury here could sue for treble damages. There seems to be no legitimate reason to confer a derivative right to sue on foreign purchasers (who are not within the zone of protection intended by U.S. antitrust laws), simply because domestic purchasers or competitors (who are the intended beneficiaries of these laws) would have a right to sue.

A limitation on potential civil liability so as to include only domestic effects -- but not the foreign effects as well -- would be consistent with two sound and generally accepted propositions: our antitrust laws are fundamentally intended to protect U.S. consumers and business;[15] and standing to recover for injuries under the antitrust laws is limited to injuries of the type that the antitrust laws are intended to prevent.[16] As the Director of Policy Planning for the Justice Department's Antitrust Division recently stated, it is the Justice Department's enforcement philosophy "that it would be arrogant for the U.S. to attempt to protect

foreigners abroad -- that doing so is the responsibility of their governments."[17/] Thus, there should be antitrust liability only to those persons injured within the United States by an antitrust violation.

In this connection, we note that the proposed new subsection (b) would be fully consistent with the standard treaties of friendship, commerce and navigation ("FCN" treaties). Our proposed clarification does not turn on the citizenship or nationality of the protected plaintiff, but rather on the geographic location of the alleged injury. Thus, there is no basis for a claim of discriminatory treatment.

Moreover, these FCN treaties typically guarantee foreign nationals no more than access to U.S. courts, but expressly provide that the foreign national's substantive rights, if any, turn exclusively on the terms of the U.S. legislation.[18/] Significantly, many recent FCN treaties refer expressly to antitrust enforcement, but recognize that what each nation "deems appropriate" in this area is controlled "by its legislation."[19/] Thus, the limitation defined in a new subsection (b) would be quite in keeping with international arrangements. It would simply implement the Executive Branch's position "that it would be arrogant for the U.S. to attempt to protect foreigners abroad -- that doing so is the responsibility of their governments."[20/]

If the Committee also decides to protect American firms engaged in off-shore purchases, in accordance with the discussion on pages 15-16 above, then appropriate modification should be made to our proposed subsection (b) to permit damage recovery for that injury as well.

<u>Sixth</u> and finally, the bill contains in section 3 a proposed amendment to Section 7 of the Clayton Act that would exempt joint ventures organized solely for export trade. With respect to this provision, we recommend that the

phrase "whose sales are limited to exporting goods or services from the United States to foreign nations" be substituted on pages 9-11 of page 2 for the phrase "limited solely to export trading, in goods or services, from the United States to a foreign nation."

Our concern is with the term "limited solely." Any U.S. joint venture established to engage in export sales of goods or services is likely to have some domestic activities as an integral part of its export trade: for example, purchasing supplies or services for use in its export business. This incidental domestic activity should not make the incipiency tests of Section 7 applicable, when the joint venture's sole business purpose is to engage in exports. Our proposal would more accurately reflect this intended scope of the exemption.

CONCLUSION

With these changes, and with consideration by the Committee of possible protection of American-owned companies doing business abroad, the Business Roundtable would enthusiastically support enactment of S. 795. We would do so, not only because such legislation would remove unnecessary barriers to business opportunities abroad, but also because we are sure that these revisions of current law would not adversely affect American consumers or competitors at home.

# # #

THE BUSINESS ROUNDTABLE STATEMENT

FOOTNOTES

1/ Testimony of Assistant Attorney General William F. Baxter Before the Senate Judiciary Committee Concerning S. 795, June 17, 1981, at 1.

2/ Remarks of Attorney General William French Smith Before the Business Council, May 9, 1981, at 11.

3/ Thomsen v. Cayser, 243 U.S. 66, 88 (1917); United States v. Imperial Chemical Industries, 100 F. Supp. 504, 592 (S.D.N.Y. 1951); see 15 U.S.C. § 1.

4/ E.g., United States v. General Electric Co., 82 F. Supp. 753, 891 (D.N.J. 1949); United States v. Watchmakers of Switzerland Information Center Inc., 1963 Trade Cases (CCH) ¶ 70,600 (S.D.N.Y. 1962); see J. Shenefield, Extraterritoriality and Antitrust - New Variations on a Familiar Theme (Dec. 10, 1980) (remarks before the International Law Institute).

5/ United States v. Aluminum Co. of America, 148 F.2d 416, 443-445 (2d Cir. 1945); cf., Mannington Mills v. Congoleum Corp., 595 F.2d 1287 (3d Cir. 1979).

6/ E.g., United States Timken Roller Bearing Co., 83 F. Supp. 284, 309 (N.D. Ohio 1949), modified, 341 U.S. 593 (1951).

The high-water mark of judicial expansiveness in applying the Sherman Act to conduct in foreign commerce was the Minnesota Mining case. United States v. Minnesota Mining & Mfg. Co., 92 F. Supp. 947 (D. Mass. 1950). There, the court suggested that, even if concerted action in foreign commerce by U.S. businesses could not be shown to have any effects in the United States, it could in any event be condemned as a per se violation of the Sherman Act. The court speculated that coordination of efforts among the companies in foreign commerce might "reduce their zeal for competition inter sese in the American market." Id. at 963.

7/ I J. von Kalinowski, Antitrust Law & Trade Regulation § 5.02 (1980).

8/ J. Rahl, Foreign Commerce Jurisdiction of the American Antitrust Laws, 43 Antitrust L.J. 521, 523 (1974).

9/ See Department of Justice, Antitrust Guide for International Operations, Antitrust & Trade Reg. Rep. (BNA) No. 799 (Feb. 1, 1977); J. Shenefield, supra, note 4.

10/ See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962); Timberlane Lumber Co. v. Bank of America, 549 F.2d 597 (9th Cir. 1976); Mannington Mills, Inc. v. Congoleum Corp., supra, note 5; Restatement (Second) of Foreign Relations Law of the United States § 40 (1965).

11/ See United States v. Aluminum Co. of America, supra, note 5, 148 F.2d at 444; Department of Justice, Antitrust Guide for International Operations, supra, note 9.

12/ E.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

13/ See, e.g., Statement of Robert Pitofsky Before the Senate Judiciary Committee on S. 795, at 10-12.

14/ See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra, note 12.

15/ See R. Bork, The Antitrust Paradox, Ch. 2 (1978).

16/ Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); Chrysler Corp. v. Fedders Corp., No. 78-1287 (6th Cir., March 18, 1981), discussed in Antitrust & Trade Reg. Rep. (BNA) No. 1007, at A-17 (March 26, 1981).

17/ J. Davidow, Extraterritorial Antitrust: An American View (March 12, 1981) (remarks before the International Chamber of Commerce Conference on Extraterritorial Application of Competition Law).

18/ See, e.g., 1954 FCN Treaty Between the United States and West Germany, Art. VI(1), 7 U.S.T. 1839, 1845, T.I.A.S. 3593. See also, Maiorano v. Baltimore & O.R.R., 213 U.S. 268, 274 (1909) (establishing this distinction in construing an FCN treaty with Italy).

19/ E.g., FCN Treaty with West Germany, supra, note 18, Art. XVIII(1) at 1858-59; 1951 FCN Treaty with Israel, Art. XVIII(1), 5 U.S.T. 550, 569, T.I.A.S. 2948; 1950 FCN Treaty with Ireland, Art. XXI(3), 1 U.S.T. 787, 801, T.I.A.S. 2155.

20/ Remarks of J. Davidow, supra, note 17.

It is also worth noting that both the Justice Department and the State Department have testified that legislation to bar foreign governments from bringing suits under U.S. antitrust laws would be compatible with U.S. treaty obligations. Hearings on the Clayton Act Amendments of 1978 before the Subcomm. on International Economic Policy and Trade of the House Comm. on International Relations, 95th Cong., 2d Sess. 12-13 (1978) (testimony of Deputy Assistant Attorney General Ewing and Deputy Legal Advisory Marks).

This Committee recently relied on this testimony in concluding that legislation to restrict the antitrust standing of one category of foreign purchasers -- foreign governments -- is consistent with United States treaties. See S. Rep. No. 97-78, 97th Cong., 1st Sess. at 10-11 (1981), favorably reporting S. 816, a bill to modify the result of the Supreme Court's decision in Pfizer, Inc. v. Government of India, 434 U.S. 308 (1978).

THE BUSINESS ROUNDTABLE
PROPOSED AMENDMENTS TO S. 795

SEC. 2. The Sherman Act (15 U.S.C. et seq.) is amended by inserting after section 6 the following new section:

"SEC. 7. (a) [This-Act-shall-not-apply] Nothing in this Act, the Clayton Act, or Section 5 of the Federal Trade Commission Act shall apply to conduct involving trade or commerce with [any] foreign nations, regardless of whether such conduct occurs within or outside of the United States, unless such conduct [has-a-direct-and-substantial-effect-on] directly, substantially, and foreaseeably restrains trade or commerce within the United States [or-has-the-effect-of-excluding a-domestic-person-from-trade-or-commerce-with-such-foreign nation]."

"(b) If conduct involving trade or commerce with foreign nations does directly, substantially, and foreseeably restrain trade or commerce within the United States, the parties engaging in such conduct shall be liable only for the injury so occurring within the United States."

SEC. 3. Section 7 of the Clayton Act (15 U.S.C. 18) is amended by adding at the end thereof the following:

"This section shall not apply to joint ventures [limited-solely-to-export-trading,-in-goods-or-services, from-the-United-States-to-a-foreign-nation] whose sales are limited to exporting goods or services from the United States to foreign nations."