# EXHIBIT 12

British Institute Of International & Comparative Law
Second Annual Conference On International And Comparative Competition Law:
Trends And Tensions

# Key Challenges In Public Enforcement Against International Cartels

By
James M. Griffin, Deputy Assistant Attorney General
United States Department of Justice, Antitrust Division

## I. Introduction

I am delighted to be here today to share with you some of our experiences in the United States in the criminal investigation and prosecution of cartels -- experiences that convince us that fighting cartels must be a priority of all competition law enforcement agencies around the world. I can assure you that enforcement of our criminal antitrust laws against cartels -- be they domestic or international -- that prey on American businesses and consumers is one of the highest priorities of the Antitrust Division. Cartels cannot and will not be permitted to act with impunity at the expense of American businesses and consumers. I know that Margaret Bloom and John Fingleton are equally determined to protect British and Irish businesses and consumers from the harm that can be inflicted by cartels and to aggressively investigate and prosecute those that are found to be operating in England and Ireland.

Today I want to talk first about what I see as the major challenge facing us as competition law enforcers, particularly as we investigate and prosecute international cartels in criminal regimes. Second, I will mention what I believe to be the most significant recent accomplishment in the fight against international cartels. Finally, I will outline some of the reasons we believe that individual penalties, particularly prison sentences, provide the optimal deterrent to cartel conduct.

## II. Major Challenge In Investigating And Prosecuting International Cartels

Let me begin with a word about the significance of international anti-cartel enforcement. None of us need government statistics to convince us that the Irish, U.K., and U.S. economies are becoming increasingly globalized. The manifestations of increased export and import trade are observable everywhere in our daily lives. While this increased trade has many benefits, the openness in trade also creates more opportunities for international cartels to flourish at the expense of our businesses and consumers. Faced with this growing challenge, the Division in 1993 stepped up its own enforcement efforts to ensure that international cartels are not free to prey on Americans with impunity. A few of our enforcement statistics demonstrate just how global our trade and commerce, the cartels that prey upon that trade and commerce, and our efforts to detect and deter those cartels have become.

A comparison of the Division's criminal docket last year with those of previous years demonstrates its continued emphasis on cracking international cartels that target U.S. businesses and consumers. While ten years ago, the Antitrust Division only opened a few investigations of suspected international cartel activity, today there are over 30 grand juries around the country investigating suspected international cartel activity. Similarly, ten years ago, the Division filed only two cases against foreign-based companies, both involving domestic conspiracies, and did not bring a single case against a foreign individual defendant. Moreover, in the four preceding years, the Division did not bring a single case against either a foreign firm or a foreign national. By comparison, nearly *70 percent* of the companies charged by the Division last year were foreign-based firms, and roughly *33 percent* of the individual defendants were foreign nationals. The Division has convicted foreign executives from Germany, Belgium, The Netherlands, England, France, Switzerland, Italy, Sweden, Canada, Mexico, Japan, and South Korea for violating U.S. antitrust laws. Moreover, executives from Canada, France, Germany, Switzerland, and Sweden have submitted to U.S. jurisdiction and served prison sentences in the United States for antitrust crimes.

While these results certainly are gratifying, much remains to be done. And what we have learned over the past several years is that the greatest challenge to the continued successful investigation and prosecution of international cartels — particularly in a criminal regime — is obtaining sufficient evidence to charge and to convict those individuals and firms that engage in international cartels. In the first place, cartels are secret conspiracies. Cartel members simply do not broadcast to the world that they have met and agreed to limit output and raise prices. On the contrary, cartel members go to great lengths to avoid detection of their fraudulent conduct. More often than not, even the customers of the cartel members are unaware that they are being victimized. These characteristics of a cartel make it one of the most difficult white collar crimes to investigate and prosecute. In addition, evidence of an international cartel may be located in several different jurisdictions throughout the world and sufficient evidence to successfully prosecute the cartel may not be found in any one jurisdiction. With all these hurdles to overcome, I think it is clear why I say that obtaining sufficient evidence to charge and to convict those individuals and firms that engage in international cartels is the public enforcement authority's greatest challenge.

Even so, it is evident from the statistics quoted above that we have found some ways to obtain evidence of a cartel, even though that evidence is located outside the reach of our own search warrants and grand jury subpoenas. Among the methods available to us are Mutual Legal Assistance Treaties, government-to-government requests for assistance through the exercise of domestic compulsory process to obtain foreign located evidence, Letters Rogatory, border watches, and informal cooperation between enforcement officials. Of all the tools available to us, perhaps the most significant source of foreign-located evidence is the Division's Corporate Leniency Policy. The Division's Corporate Leniency Program -- which provides for a complete pass from prosecution for companies and their executives who are the first to come forward, cooperate, and meet the program's other requirements -- has played a major role in cracking the majority of the international cartels that the Division has prosecuted.

Indeed, many now view the Leniency Policy not so much as absolution for the guilty, but rather as the anti-cartel enforcers' most potent weapon. The extraordinary success of this program has generated widespread interest around the world. As a result, we have consulted with a number of foreign governments in drafting and implementing effective leniency programs in their jurisdictions.

The adoption of effective leniency programs by foreign antitrust enforcers has a direct impact on the Division's efforts to prosecute international cartels, because the existence of an effective leniency policy in another jurisdiction may influence whether an organization comes forward under the leniency program in the United States. In some cases, companies which have exposure in multiple jurisdictions for their cartel conduct may want simultaneously to seek immunity in the jurisdictions where they are at risk. If differences exist in the respective leniency programs such that a company believes that it can not be assured of immunity in the jurisdiction where it faces the greatest, or even just significant, exposure, then it may decide against reporting its conduct anywhere, thus depriving all enforcement authorities of ready access to evidence perhaps scattered around the world. Nowhere is the need for convergence in leniency programs more important than between the U.S. and the European Commission ("EC") leniency programs. Until recently, there have been significant differences in the application of our respective leniency programs. Fortunately, these differences, and the concerns that they have raised, are ending.

## III. <u>Most Significant Recent Accomplishment In Fight Against Cartels</u>

In discussing what I believe to be the most significant recent advancement in the fight against international cartels, you might think that I would point to some of the Division's FY01 prosecution highlights as the most significant accomplishments of the year. You probably expect me to list the fact that the Division obtained more than $280 million in criminal fines, the second highest fine total in the Division's history, with the average corporate fine topping $18 million; or the fact that the average jail sentence last year increased to 15 months as the most significant accomplishment of last year. While the high fines and rising jail sentences in Division cases garner much of the recent public attention surrounding anti-cartel enforcement, it is the recent actions of antitrust authorities abroad -- one in particular -- which will have the biggest impact on how international cartels are investigated, prosecuted, and defended in the United States and around the world. Because I believe that our most daunting challenge is gathering sufficient evidence, regardless of where it is located, to prosecute international cartels, it follows that a significant advancement in our ability to obtain such evidence would be viewed by me as a major step forward in anti-cartel enforcement. Early this year the EC took such a step.

On February 13, 2002, the EC adopted a new leniency policy to replace its 1996 Notice on the Non-Imposition or Reduction of Fines in Cartel Cases ("1996 Notice"). The revised program establishes a far more transparent and predictable policy than its predecessor and brings the EC's program closely in line with the Division's Corporate Leniency Policy. In fact, in greatly reducing the amount of discretion involved in

assessing amnesty applications and in creating the opportunity for companies to qualify for full immunity after an investigation has begun, the blockbuster revisions are similar to the ones made by the Division when we expanded our program in August 1993. Let me mention just a few of the important provisions of the new EC leniency program.

- Complete immunity from fines goes to the first member of a cartel to inform the EC of an undetected cartel by providing sufficient information to allow the EC to launch an inspection on the premises of the suspected companies.
- Even after the EC begins an investigation, full immunity may still be available if the company provides sufficient evidence to enable the EC to establish an infringement.
- The previous band or sliding scale reduction in fines for the first company to report cartel conduct was abandoned in favor of an automatic, full 100% immunity grant.
- The new policy provides for prompt written notification to a leniency applicant as to whether it conditionally qualifies for full immunity.
- The revised program does not exclude from full immunity those cartel members that played an instigating or determining role, rather it simply requires that the leniency applicant not have taken steps "to coerce other undertakings to participate in the infringement."

The EC's new program provides increased transparency, predictability, certainty, and a bigger prize (100% immunity from fines) to the first company to qualify under the leniency program. These attributes will serve as a powerful new inducement to create a race to Brussels every time the EC reveals one of its investigations with the execution of dawn raids or corporate counsel discovers an infringement through a corporate compliance program.

In addition, with a flurry of cases announced at the end of last year, the EC set the stage for its new leniency program by demonstrating a clear commitment to rewarding companies who are the first to come forward and report cartel activity, while at the same time imposing heavy fines on those who engage in cartel activity and do not provide timely cooperation. Until November 2001, the EC had never granted full 100% immunity to a company that came forward and cooperated pursuant to its 1996 Leniency Notice. The EC then did it twice within a month, and it did so in two of the biggest cartel matters ever prosecuted by the EC.

The first 100% leniency grant was awarded in the EC's investigation of the worldwide vitamin cartel.[1] The French corporation, Aventis S.A., was granted full immunity in regard to its participation in the vitamin A and E cartels after being the first company to cooperate with the EC in these matters. On November 21, 2001, the EC fined eight companies a total of more than 850 million euro for participating in cartels affecting vitamin products, including fines of 462 million euro against F. Hoffmann-La Roche AG ("HLR") and 296 million euro against BASF AG.[2] Aventis, which has previously announced its acceptance into the Division's leniency program, likely avoided hundreds of millions of dollars in fines in the U.S. and Europe as a result of its decision to come forward and seek leniency. In addition, unlike both HLR and BASF, which had three of their high-level European executives serve time in U.S. prisons, the officers, directors and employees of Aventis received non-prosecution protection in exchange for their cooperation with the Division.

Shortly after the vitamin immunity decision was announced, the EC announced its second-ever grant of full immunity to Sappi Limited (South Africa) after the company came forward and supplied information on a price-fixing cartel in the European carbonless paper market.[3] While Sappi, which was identified by the EC as one of the three largest companies in the cartel, paid nothing in fines, the EU imposed fines against ten other companies totaling over 310 million euro, including a 184 million euro fine against Arjo Wiggins Appleton, the alleged leader of the cartel.

The EC's timing in announcing these cases on the eve of the introduction of its revised leniency program could not be more telling of its commitment to the transparency and predictability embodied in its new leniency program. While the new program on paper is a tremendous improvement in terms of the level of transparency that it provides to potential leniency applicants, the real test is how it is implemented, which is why these recent cases are so important. They demonstrate that the EC is committed to fairly rewarding leniency applicants who are the first to report cartel activity with full immunity. This signal was clearly sent even before the new policy went into effect.

I have no doubt that the EC's message, together with the revised leniency program, will lead to a substantial increase in the number of firms reporting international cartel activity to both authorities. The cooperation provided by leniency applicants will

[1]Press Release, European Commission, Commission Imposes Fines on Vitamin Cartels 4 (November 21, 2001). Commission press releases are available at http://europa.eu.int/rapid/start/cgi/guesten.ksh.

[2]The Division's prior prosecution of the vitamin cartel has resulted, to date, in the conviction of 10 corporations and 12 individuals, the imposition of nearly $900 million in fines, and the incarceration of 11 vitamin executives.

[3]Press Release, European Commission, Commission Fines Ten Companies for Carbonless Paper Cartel 4 (December 20, 2001).

result in both authorities obtaining evidence of cartels, regardless of the location of that evidence, which neither authority on its own easily could have obtained. The EC's new leniency program is a significant new addition to the international cartel prosecutor's arsenal of weapons, and I believe it will prove to be the most significant achievement in the fight against international cartels in the past several years.

## IV. Most Effective Sanctions

In light of the bold initiative by the UK government in introducing criminal penalties for individuals engaged in hard core cartel conduct, I would be remiss if I did not say a few words to this audience about what we in the U.S. believe to be the most effective sanction against cartel conduct. I will begin with the obvious. You will not be surprised at what I have to say.

First, one cannot talk about the most effective sanction without a clear understanding of the effect one intends to achieve by the imposition of the sanction. The goals of sanctions -- particularly incarceration -- generally are said to be retribution, societal protection, rehabilitation, specific deterrence, and general deterrence. It is generally agreed that, in most cases, the only relevant goals of sanctions against cartels are retribution and general deterrence and, between those, general deterrence is by far the most important. So, I begin with the proposition that the goal of sanctioning cartel conduct is general deterrence, *i.e.*, to deter others from engaging in the offending conduct.

In the 1980s a number of scholarly articles were written addressing the adequacy, or lack of adequacy, of corporate fines as a deterrent to cartel conduct.[4] The beginning hypothesis was that in order to achieve optimal deterrent effect, corporate fines would have to be more than the anticipated gain from engaging in the cartel divided by the risk of detection. The risk of detection in the United States (at the time by far the most active anti-cartel enforcement jurisdiction in the world) was estimated to be between 13% and 17%. The estimated increase in price resulting from cartel conduct was 10% (a figure we now generally regard as low), which was estimated to result in a 5% increase in corporate profit resulting from the cartel. Finally, the average length of a cartel was determined to be six years (a figure we also now consider to be low). The optimal fine was then calculated to be 187% of the commerce affected by the cartel. Such a fine would have bankrupted over 60% of the firms convicted of cartel conduct in the U.S. during the period. The actual fines imposed were found to be less than 1% of the level necessary to deter cartel conduct. While fines have increased significantly since these studies were conducted — both in dollar

---

[4]A number of those articles are mentioned and nicely summarized in a recent paper authored by Wouter P.J. Wils, "Does The Effective Enforcement Of Articles 81 And 82 EC Require Not Only Fines On Undertakings But Also Individual Penalties, In Particular Imprisonment?" (Address before 2001 EU Competition Law & Policy Workshop/Proceedings, Robert Schuman Centre For Advanced Studies, European University Institute, available at http://www.iue.it/RSC/competition2001/Wils.pdf).

amounts and as a percentage of affected commerce — they are not now and never will be anywhere near the optimal fine level established by those studies. Not surprisingly, these studies and articles reached the conclusion that the imposition of corporate fines alone is not a sufficient deterrent to cartel conduct, a conclusion with which we wholeheartedly agree.

In considering, what penalty would be most effective in achieving the goal of deterring others from engaging in the offending conduct, we should keep in mind that the conduct we want to deter is the deliberate, rationale conduct of individuals acting in pursuit of corporate gain and their own advancement in knowing and intentional disregard of the law. That being so, it seems intuitive that corporate fines alone would not be the most effective deterrent to cartel conduct. Even individual fines coupled with corporate fines would not seem to be sufficient. In most instances, a corporation could simply reimburse the individual executive for the fine imposed, thereby rendering the individual penalty little more than an increase in the corporate penalty. Therefore, the two together would need to be at least the size of the optimal fine, *i.e.*, 187% of effected commerce, and that is not going to happen anytime soon.

The nature of the conduct also suggests that it maybe uniquely deterrable. That is, because the infringement results from the deliberate, rationale conduct of individuals motivated not "by desperation or need, but by arrogance and greed," the introduction of an extremely distasteful variable outside the familiar parameters of cost-benefit analysis may well cause executives to forego opportunities to "swindle the unsuspecting public."[5] While there are no studies of which I am aware that have attempted to quantify the general deterrence value of prison sentences in cartel cases, it is generally accepted that such sentences do, in fact, deter. While it is not possible to quantify the undetected, *i.e.*, cartel behavior that does not occur because deterred by the perceived risk of incarceration, it seems clear that when the risk of jail is introduce into the equation, the conventional businessman's risk/reward analysis breaks down, and that it is that break down which is critical to the effective deterrence of antitrust crime.

I will close with two brief anecdotes that I think nicely illustrate this point. Donald Baker, a former Assistant Attorney General in charge of the Antitrust Division, now a prominent member of the antitrust bar in the United States, tells the following story about a senior executive of one of his clients. This senior executive was committed to adherence to the antitrust laws and to the success of the company's antitrust compliance program. He also was in favor of criminal penalties for those who engage in cartels because he believed that the threat of jail was the only penalty that would clearly focus the full attention of the individual on the potential consequences of his actions. As he explained to Baker:

[5]George B. Daniels, U.S. District Court Judge, Sentencing Hearing - April 22, 2002, U.S. v. Taubman, (S.D.N.Y.).

"So long as you are only talking about money, the company can at the end of the day take care of me - but once you begin talking about taking away my liberty, there is nothing that the company can do for me."

Finally, I can tell you, from my own 25 years experience in prosecuting individuals engaged in cartels, that I have listened to many lawyers tell me that their individual clients would gladly pay a much higher fine than we were going to recommend the court impose if only we would drop our recommendation that the court sentence the client to jail. On the other hand, I have never heard one lawyer tell me that his or her client would spend a few extra days in jail if we would lower our fine recommendation. It may not be proof positive, but it's enough for me, at least, to conclude that relatively short, but fairly certain, jail sentences have the potential to deter hard core cartel conduct in a way that no corporate or individual fine — regardless of amount — ever can.

# EXHIBIT 13

# Department of Justice

FOR IMMEDIATE RELEASE
WEDNESDAY, JUNE 23, 2004
WWW.USDOJ.GOV

AT
(202) 514-2008
TDD (202) 514-1888

## ASSISTANT ATTORNEY GENERAL FOR ANTITRUST, R. HEWITT PATE, ISSUES STATEMENT ON ENACTMENT OF ANTITRUST CRIMINAL PENALTY ENHANCEMENT AND REFORM ACT OF 2004

**WASHINGTON, D.C.** -- R. Hewitt Pate, Assistant Attorney General for Antitrust, issued the following statement today after President Bush signed into law H.R. 1086, which includes the Antitrust Criminal Penalty Enhancement and Reform Act of 2004. The Act increases the maximum Sherman Act corporate fine to $100 million, the maximum individual fine to $1 million, and the maximum Sherman Act jail term to 10 years. The Act also enhances the incentive for corporations to self report illegal conduct by limiting the damages recoverable from a corporate amnesty applicant, that also cooperates with private plaintiffs in their damage actions against remaining cartel members, to the damages actually inflicted by the amnesty applicant's conduct.

"This law will greatly enhance one of the Division's core missions, its anti-cartel enforcement program. The increase in criminal penalties will bring antitrust penalties in line with those for other white collar crimes and will ensure the penalties more accurately reflect the enormous harm inflicted by cartels in today's marketplace. The detrebling provision of the Act removes a major disincentive for submitting amnesty applications, encouraging the exposure of more cartels, and making the Division's Corporate Leniency Program even more effective. The enhanced enforcement measures provided for by the Act will aid in the continued successful detection, prosecution, punishment, and deterrence of hard core cartel activity, further protecting free and open competition."

###

04-432

# EXHIBIT 14

# Webs of Power

## International Cartels and the World Economy

Kurt Rudolf Mirow and Harry Maurer

HOUGHTON MIFFLIN COMPANY · BOSTON
1982

voluntary.[13] Finally, George Ball argues in a famous 1967 article, "Cosmocorp: The Importance of Being Stateless," that the world community should draw up a set of supranational laws to govern the behavior of TNCs. Ball goes so far as to suggest that TNCs be incorporated, or chartered, under the auspices of a world agency, making them literally "stateless." His basic rationale for this plan is that it would make the world a less problematic place for TNCs because they would be subject to only one set of rules and thus would be freed from the vicissitudes of differing national legal systems.[14]

Much more to our liking is the agency proposed by the economist Sigmund Timberg, which differs from most of the others in that it would focus specifically on antitrust questions (rather than the entire realm of TNC investment abroad) and would possess one all-important attribute: enforcement power.[15] Timberg is convinced that effective harmonization of national approaches to antitrust is impossible and that consultation between nations is of limited use. Instead he proposes an international convention, or treaty, which would be designed and dominated by the major nations of the West (as is the United Nations), which control the bulk of world trade and would hardly consign real power to an agency in which the Third World plays a major role. The agency created under the treaty would have strong subpoena power in the signatory nations so that it could acquire all the data it needs for inquiries. The agency would also make the determination as to whether accepted global antitrust standards have been violated and *must have the authority to enforce its decisions* (although national governments might be legally bound under the treaty to carry out enforcement themselves). An international high court would be the final judge of all appeals.

This is an ambitious program indeed. But the simple fact is that anything less would have slight impact on cartels. Any information-gathering agency would be shackled without the power to force countries or companies to turn over germane data. There would be some value in a treaty whereby nations agreed upon general principles to guide investment by TNCs and the policies governments should follow toward them; but in the realm of antitrust, as long as the treaty agency is limited to suggestions for voluntary reforms, it would have as much chance of stamping out cartelization as the United Nations does of stamping out war. As for George Ball's advocacy of an international commercial legal code, complete with world incorporation of TNCs, we agree with Barnet and Muller when they call it an attempt "to legitimize most of what global corporations are now doing by establishing minimal and largely unenforceable limits on their power to penetrate all national borders in the process of private global planning."[16]

Thus the only problem with Timberg's plan is that it cannot be imple-

mented. Political realities make it utopian, at least in the near future. The moment one raises the notion of an international body with the power to force its members to obey specific laws, one must confront some very difficult questions: Who will choose the officers of the agency who will exercise such power? How will they be shielded from political pressure? (One obvious way would be to appoint the authorities — and especially the judges of the last court of appeal — to very long terms; but this only sharpens the tension surrounding the previous question.) How could the agency punish a country that blatantly refused to accede to its dictates? Such dilemmas, of course, account for the impotence of the United Nations. No doubt they could be solved, given the requisite political will; but a great many years are likely to pass before the industrial nations develop such a will.

In the meantime, something probably would be better than nothing. Even an agency devoted solely to collecting and evaluating publicly available material on international antitrust matters would be useful, and even one empowered to study specific cases and make unenforceable rulings might serve as a forum to put political pressure on miscreants. Publicity is what cartels abhor above all else, and such an agency would generate publicity. Also, bodies that *do* have effective power, such as the U.S. Justice Department or the EEC Commission, tend to follow up each other's actions, as in the dyestuffs cartel case, which was first investigated in Europe and then in the United States, or the quinine case, which proceeded in the reverse manner. Similarly, an international body might feed its material to interested parties who would make use of it.

In general, however, we believe that the idea of an international agency offers little hope for real regulation of cartels, at least in the short term. Much more effective will be antitrust activity on the part of individual nations, or bilateral agreements to work together in the exchange of information and the prosecution of cases. Therefore, we will now evaluate the anticartel efforts of the nation famous for having the most fearsome antitrust apparatus in the world: the United States.

## Antitrust in the United States

At first glance, U.S. antitrust law would seem to provide an adequate weapon to combat international cartels, at least insofar as they directly affect this country. The fundamental legislation, the Sherman Act of 1890 and the Clayton Act of 1914, both cover foreign trade; in the words of the former, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, *or*

*with foreign nations* is declared to be illegal" (italics added). And through a series of court decisions, the most significant (as regards international cartels) coming in the *American Tobacco* (1911), *Alcoa* (1945), and *Alkasso* (1949) cases, the law acquired effective "extraterritorial reach."[17] Very few U.S. corporations today would be so foolhardy as to sign a formal cartel agreement with foreign firms. The agreements registered in the various European countries usually contain a standard clause exempting the U.S. market from their provisions. Yet, as we have shown, despite the fact that American and foreign companies demonstrate a healthy fear of the Sherman Act and the Department of Justice, cartels abound. The law is not entirely toothless; merely, some teeth are missing.

First is the prosaic problem that cripples so many agencies charged with protecting the public's interest: acute lack of manpower and money. In 1980 the entire budget of the Antitrust Division of the Justice Department was $44 million, less than many single TNCs spend for legal services annually. The Foreign Commerce Section of the division consisted of only twenty-two lawyers. Even with other attorneys from the division helping with trial work, this small band is hardly equipped to investigate the range of antitrust matters involving foreign trade. As a result, the number of "foreign" cases filed is low, despite the burgeoning importance of the TNCs and the increasing amount of their business that is conducted overseas. The Federal Trade Commission, the other agency responsible for enforcing the competition laws, pursues very few international antitrust cases.

Short-handed in general, the Justice Department's Antitrust Division chooses to stress "domestic" rather than "foreign" violations, partly because of the official conviction that the American public benefits more "per dollar of litigation" from domestic cases.[18] Certainly another factor, though, is the sheer difficulty of bringing international cartel cases. We have observed that U.S. authorities, when investigating foreign firms, often meet resistance from the firms' home countries; indeed, some countries have made it a crime to turn over commercial information in response to judicial orders from abroad (see Chapters 4 and 7). Even if sufficient data could be obtained to win a conviction, the remedies or penalities often cannot be imposed on a recalcitrant foreign firm backed by its government.[19] The high sensitivity to American "bullying" often displayed by nations with different antitrust attitudes must always be taken into account, making antitrust pursuits a matter of extreme delicacy.[20] The State Department must be consulted as to the foreign policy implications of every case brought by the Foreign Commerce Section, and, although the former chief of the section, Wilbur L. Fugate, has stated that State Department objections never quashed a case, he has also admitted that when necessary the division "looks a bit harder at the facts of the case."[21]

The results of "looking a bit harder" can be disturbing, as illustrated by the uranium cartel case. In Chapter 5 we described how Gulf Oil was allowed to plead nolo contendere to a misdemeanor and was fined the laughable sum of $40,000 for its Canadian subsidiary's part in the cartel. The investigating attorneys in the Antitrust Division had unanimously recommended a felony prosecution, but the forces arrayed against such a move were formidable. In the course of the investigation, both Canada and Australia passed laws denying the Justice Department access to documents. The Canadians also intervened directly at the highest levels: Secretary of State Henry Kissinger apparently met with the Canadian minister of external affairs, and President Carter and Prime Minister Pierre Elliot Trudeau reportedly discussed the case at two meetings. Canada attempted to keep the issue on a purely political plane, representing the case as a violation of its sovereign right to conduct trade as it wished rather than a legitimate inquiry under U.S. law into the possibly criminal behavior of a U.S. company. The State Department, too, was known to be horrified by the investigation. Justice Department lawyers knew very well what they were up against. In April 1978, the deputy assistant attorney general, Joe Sims, wrote, "To decide to bring a prosecution creates a possibility that we will have an interagency confrontation with other parts of our Government, including State." He added, "Given the merits here, that is a fight we might very well lose. In either event, the division's position as a relative 'untouchable' might be damaged and that could in the long run impair future enforcement efforts."[22]

Foreign opposition is not the only imposing obstacle the Antitrust Division faces in bringing a cartel case. *Domestic* political factors are often as important, especially when the cartel involves huge U.S. corporations whose support or hostility can make or break careers of government officials at home. The outstanding example, of course, is the oil industry. Ever since the first Standard Oil decision in 1911, the industry has compiled an amazing record of surviving antitrust cases, both domestic and international, practically unscathed. The dismal story of the only major oil cartel case filed in this country* has already been recounted in Chapter 4. It is necessary to add only that, to complement their financial power over elections, their hold on key senators and representatives, and their immense propaganda resources, the oil companies in the cartel case availed themselves of a special protective armor that has proved most useful ever

* An earlier case against twenty-two major oil firms, involving mostly domestic abuses, was settled in 1941 by meaningless consent decrees. And a 1973 complaint against eight majors, including all the Seven Sisters except BP, is apparently headed for a similar fate. The FTC staff originally argued that breakup of the firms was the best remedy for their pattern of "collusive actions." In 1980 the FTC backed away from that stand and proposed "conduct remedies" that would theoretically force the majors to operate more competitively. We find it improbable that the Reagan administration will prosecute the case vigorously.

since: the "national security" argument. Pointing out that they produced and controlled the nation's industrial lifeblood, the companies argued that to disclose any inconvenient information — about their secret arrangements in the Middle East, for example — would get them in trouble with host countries, which would be bad for the United States. The argument was devastatingly effective. "How can you try a case when your adversary keeps claiming that to reveal what you seek would violate the national security, especially when the court and the executive branch go along?" complained one lawyer who worked on the case.[23]

Even if a cartel case makes its way through the mine fields of domestic and foreign resistance and ends in a conviction, is it likely to have a substantial and lasting impact? In too many cases the answer is no. The penalties applied to violations of U.S. antitrust laws are usually so petty that the crime pays off whether or not the criminal is caught. Until 1974 the maximum fine for violating the Sherman Act was $50,000; in that year it was raised to $1 million, but even that figure often represents a tiny percentage of the extra profits earned through illegal practices. Only on the rarest occasions are executives convicted of felony violations; and, although the law provides for prison terms, they are almost never imposed.[24] The treble-damage provisions of the Sherman Act, under which plaintiffs in private antitrust suits may collect three times what they have lost because of illegal business practices, have proven innocuous because of the high cost and difficulty of proving the exact amount of losses. Even in the most open-and-shut cases the parties usually settle out of court for a fraction of the claim.

The light fines and rarity of prison sentences handed down in antitrust cases stem from the fact that the courts, like most other institutions in the United States, do not take white-collar crimes seriously. Many judges have shown open hostility to antitrust prosecutions, regarding them as stupid harassment of businessmen by means of antiquated and unrealistic laws.[25] The courts are largely responsible for the overwhelming recourse by defendants to nolo contendere pleas as a painless way of settling criminal cases. This greatly weakens the deterrent effect of antitrust laws because of various crucial differences between such a plea and a guilty plea or conviction. The first is that judges mete out milder penalties to defendants who plead nolo and thus do not require protracted trials. The second is that a nolo plea keeps evidence out of the court and thus out of the press. But perhaps most important is that a guilty plea constitutes prima facie evidence in any civil treble-damage suit that might arise, whereas a nolo contendere plea does not. In other words, the plaintiffs in a private suit against a company that has pleaded nolo contendere to antitrust offenses *must prove guilt all over again,* which is often very hard to do; the plaintiffs do not always have access to the evidence presented to the grand jury

that brought the criminal indictment, nor do they have the government's broad subpoena and investigatory powers to develop the evidence. Justice Department prosecutors, well aware of these facts, often protect against nolo pleas and demand a full trial; but they are almost always overruled by judges.[26]

Finally, antitrust cases are often gutted by the Justice Department itself, usually by means of the consent decree. The great majority of cases brought by the Antitrust Division are civil suits seeking "to prevent and restrain" violations of the law, and they are ended by consent decrees in which the defendants, without admitting any past violations, agree not to commit any further breaches of the laws under which they were charged. This dubious exercise was lampooned by antitrust economist Richard Posner in a 1970 article:

> It is extremely common for the Department in price-fixing cases to obtain a decree that, stripped of the redundancies that are dear to lawyers, merely forbids further price fixing. Since the illegality of price fixing under the Sherman Act is well established, and directly punishable as a crime, the purpose of such an injunction is not immediately obvious.[27]

The Justice Department insists that consent decrees achieve the same effect as a conviction after trial but without the immense expenditures of time and money a trial requires. This claim can be challenged on a number of grounds. Consent decrees afford guilty firms the same advantages as nolo contendere pleas, including the fact that consent decrees cannot be used as prima facie evidence in private suits. And consent decrees tend to be unenforceable. The department at present cannot hope to keep track of whether companies are complying. There are more than a thousand operative consent decrees on file, whereas the Antitrust Division has only a handful of attorneys to monitor them.[28] Lacking any strict program to ensure that terms of the decree are met, the department and the public find themselves back where they started.

Laws do not hold back history, and the history of capitalist economies is the gradual self-destruction of competition and spread of market control. Small wonder, then, that the government legally entrusted with maintaining competition is divided against itself. Virtually all U.S. officials, elected and otherwise, praise the bracing virtues of competition and the benefits it has brought the country; yet those whose paeans to the competitive system are most passionate are also the greatest champions of the multinationals that have smothered it forever. And we cannot expect this political fact to change. As long as the great oligopolies dominate the American economy, the government will not wholeheartedly devote energy and resources to antitrust. To be sure, there does remain an antitrust constituency, enough resentment against overgrown corporate power to keep the

Antitrust Division in business — underfunded, understaffed, and understandably timid, but still struggling. Today, however, the political tides are flowing against antitrust — witness the 1980 law sharply restricting the scope of FTC inquiries and subjecting its decisions to congressional review. In the foreseeable future, barring some cataclysmic transforming of public opinion, antitrust enforcement will continue to be what it has long been: a holding action against irreversible economic forces.

It is thus unlikely that the U.S. government will go far in pressuring other nations to halt cartelization, simply because it lacks the political will to do so. The TNCs and their divisions of world commerce are too well established and have too many powerful backers. Certainly the Justice Department is to be congratulated for reaching a few bilateral agreements on antitrust matters, which at least extend its holding action to the international arena. But the political weakness of antitrust within the United States is exacerbated when foreign affairs become involved. For similar reasons, we do not foresee the Justice Department turning more of its attention to restrictive practices in foreign commerce, as we believe it should. The connection between international cartels and American standards of living has not yet been widely grasped; so there is little political impulse for the Antitrust Division to begin the extremely difficult, costly, and lengthy work needed just to understand the subtler methods of cartels.

Yet, short of major new initiatives involving foreign commerce, there still is much that could be done at home. The antitrust laws need to be reformed and enforcement needs to be tightened. The Antitrust Procedures and Penalties Act of 1974 made some good changes, notably the increases in maximum fines, the increase in maximum jail sentences from one year to three, and the upgrading of a Sherman Act violation from a misdemeanor to a felony. (It is worth pausing to reflect on the fact that, until 1974, a burglar who stole a TV set had committed a felony, whereas an executive who directed a conspiracy whereby consumers were robbed of millions had committed a misdemeanor.) But many experts feel the 1974 law did not improve matters substantially. In fact, there is such dissatisfaction with the present state of affairs that further antitrust reforms are not a political pipedream.

What should the reforms be? Among the most pressing needs is to increase financial penalties for violations of the antitrust laws and to *make the fines vary to fit the crime.* The $1-million maximum fine now in effect may seem large, but it is hardly a compelling deterrent. In the North Atlantic shipping case, for example, seven firms were fined $5,450,000, the highest criminal antitrust penalty ever imposed. Yet the cartel had controlled a 60 percent share of the North Atlantic trade for five years, and every year the total freight billings on those routes amounted to $1 billion.[29] Even if the companies' collusion increased their take by only 1 percent, a ridiculously conservative estimate, the cartel scheme netted them

$30 million in extra profits, more than five times the fine. In such cases, the penalties should be linked to the firms' earnings. Elzinga and Breit, whose *The Antitrust Penalties* is one of the most comprehensive studies of the subject, recommend "antitrust violations be penalized by a mandatory fine of 25 percent of the firm's pretax profits for every year of anticompetitive activity."[30] Stiffer penalties for recidivists could also be instituted.

The question of prison sentences seems clear-cut as well: they should be serious and, more to the point, mandatory in some cases. Some experts argue that society does not benefit from incarcerating highly skilled businessmen whose productive capabilities are thereby wasted.[31] Others point out that it is hard to pinpoint responsibility for corporate crime; middle-level henchmen tend to be jailed while their bosses go free,[32] and prison terms in reality have no deterrent effect because of judges' notorious reluctance to jail upstanding members of the business community.[33] However, the latter objection would be disposed of were prison terms mandatory in cases when individuals had committed willful violations. The terms need not be so long that juries would hesitate to convict; the certainty of having to enter prison would be enough. This threat of the special disgrace that a stay in jail brings would have such a deterrent effect that society would reap benefits far outweighing the occasional social costs of incarcerating the criminals. As for the objection that high corporate officers remain invulnerable, the Ralph Nader Study Group on Antitrust Enforcement has suggested that a strong law be passed imposing criminal liability on individuals who know (or, we would add, should have known) about antitrust crimes but fail to stop or report them.[34]

The government's methods of settling most criminal and civil antitrust cases is also badly in need of reform. The law should be changed so that nolo contendere pleas would be prima facie evidence in private treble-damage suits. The entire consent decree process must be reexamined. The 1974 antitrust act takes a step toward making consent decrees less arbitrary; the Justice Department may no longer simply hand them down like an oracle, but must file a "public impact statement" describing the basic facts of the case, the reasons for which the particular remedy was chosen, and the alternative remedies considered. But the statements offer few details; so the public remains largely in the dark. More important, the decrees still are negotiated in secret, as part of a purely *administrative* process, shielded from public influence. Since consent decrees can shape the future of entire industries, this lack of public review means that the Justice Department is single-handedly making economic policy for the country.[35] Mark Green, in *The Closed Enterprise System,* advocates that all proposed consent decrees be subject to an adversary hearing under the auspices of the Federal Trade Commission. Interested parties could challenge any flaws they detected, after which "the consent decree, together with an FTC report suggesting modifications, would then be forwarded to

the court."[36] Along with this valuable reform, defendants should be made to pay the costs of monitoring consent decrees and should submit periodic detailed reports on their compliance. In addition, the Justice Department should insist on clauses in most consent decrees allowing them to be used as prima facie evidence in private treble-damage suits.

On the other hand, more than a few experts think that private suits should be discarded altogether as an antitrust remedy. They argue that such suits clog the courts — more than 1000 per year were being filed in the early 1970s — and are so costly and cumbersome as to be a highly wasteful enforcement method.[37] Also, critics warn that many of the private suits are filed on purely spurious grounds by lawyers working on contingency fees. These lawyers, it is said, can force innocent firms to settle out of court because the firms, although convinced of the suit's spurious nature, cannot take even the slim chance that they would be convicted by a jury and slapped with stupendous treble damages.

We are not convinced, however, that the failings of private suits outweigh the benefits. Admittedly, the treble-damage figure is arbitrary (why not four times the amount? or ten?); granted, too, spurious suits are a real problem, and the upsurge of cases clogs the courts and makes the Antitrust Division's task more complicated. But deterrence is again our main concern. When Congress included the treble-damage provision in the Sherman Act, its goal was to give the private sector an incentive to enforce the antitrust laws so that both public and private energies would be engaged in maintaining competition. This remains a sound idea. Many more violations are likely to be detected if private parties have an interest in doing so than if government agencies, with their meager budgets, shoulder the burden alone. The treble-damage system will continue to be untidy and somewhat wasteful of time and money and will even produce the occasional bad decision, but we believe its deterrent effect to be strong and worth preserving. Certain reforms could at least mitigate its problems. For example, if plaintiffs were liable for hefty court costs in cases they lost, the number of spurious suits would certainly decline. Then, too, methods can be found to streamline antitrust cases. One proposal is to grant the opposing parties a fixed period before trial to agree upon a narrative of the basic facts of the case. The trial could then concentrate on the points in genuine dispute rather than lingering for weeks or months, as is now often done, over the presentation of facts that both sides agree to be true. The Nader study group suggests that, in cases in which the government has already proved a violation, triple damages immediately be assessed and placed in a special fund; private claimants would then simply have to show that they had been damaged rather than prove the violation all over again in a lengthy trial.[38]

Most of the reforms detailed above would have their main impact on purely domestic violations, of course. Cartel activity affecting the U.S.

market will not be eliminated until the Antitrust Division makes the decision and obtains the resources to pursue the international aspects of antitrust much more vigorously. But, insofar as enforcement of the antitrust laws within the United States becomes swifter, surer, and severer, the possible penalties for cartel activity might begin to offset the potential gains. The reforms, in short, would make the United States a much more risky place for cartels to operate.

## The Patent System

The United States' defenses against cartels would also be strengthened by reform of another set of laws: the patent system. As long ago as 1931, William Meinhardt, who, as the founder of the Phoebus light bulb cartel, presumably knew whereof he spoke, wrote that carefully knit webs of patents and licenses formed the "cornerstone" of many international cartels.[39] The wave of anticartel reformers active in the years following World War II recognized this fact, and all felt that the patent system demanded revisions. But the postwar spread of antitrust legislation was not accompanied by any substantial changes in the West's approach to patent law; and the result, as we have shown, was that cartels resorted more and more to the camouflage provided by restrictive patent and license agreements.

In the United States, the government's power to issue patents and thereby grant inventors a legal monopoly for a fixed period of time (now seventeen years) is established by the Constitution. But neither that document nor the patent laws (the basic code was enacted in 1870 and revised in 1952) spell out the extent of the patentee's power under his patent rights. Therefore, since the passage of the Sherman Act in 1890, there has been constant tension between the patent and antitrust laws. On the one hand, patent laws grant the patent holder ill-defined rights to restrain trade — to dictate who can produce, use, and/or sell the invention and under what conditions. On the other hand, the antitrust laws, in equally vague language, prohibit virtually all restraints of trade. The result of this conflict has been endless legal skirmishing over what kinds of conditions patentees may impose when they grant licenses. Questionable conditions include a panoply of favorite cartel devices: minimum price resale provisions; territorial restrictions; import or export prohibitions; "grant-back" clauses (licensees must turn all improvements on the patent over to the patentee); "tie-in" clauses (licensees, as part of the agreement, pledge to buy goods not covered by the patent from the patentee); package licensing (licensees are forced to buy an entire block of patents rather than the specific ones they want); field-of-use restrictions (which limit the ways the licensee may use the patent); and certain forms of patent pools.

In the absence of legislation specifically governing these practices, the

# EXHIBIT 15

# DEPARTMENT OF JUSTICE

## THE 3RD NORDIC COMPETITION POLICY CONFERENCE

## FIGHTING CARTELS - WHY AND HOW?

## LESSONS COMMON TO DETECTING AND DETERRING CARTEL ACTIVITY

**By**

**Scott D. Hammond**
**Director Of Criminal Enforcement**
**U.S. Department of Justice**
**Antitrust Division**

**Presented at**

**Modern Museum**
**Stockholm, Sweden**

**September 12, 2000**

# LESSONS COMMON TO DETECTING AND DETERRING CARTEL ACTIVITY

## I. Introduction

It is a pleasure to be here and to share with you the United States' experiences in detecting and deterring cartel activity. In discussing these two topics -- detection and deterrence -- I will focus on our experience with our Corporate Leniency Program, or as it is also known, the Corporate Amnesty Program ("Amnesty Program"). The Amnesty Program has been largely responsible for uncovering the majority of the large international cartels that we have recently prosecuted. Its success has already led a number of countries -- such as Canada, the United Kingdom, Germany, and France -- as well as the European Union to develop their own programs with still other countries considering whether to follow. From our perspective, the Amnesty Program is unquestionably the most important investigative tool available for detecting and cracking cartel activity. The success of the Amnesty Program also provides an appropriate lesson on deterrence, the second topic on the agenda. That is because the bedrock principles that apply to effectively *preventing* cartels are also at the core of implementing a successful amnesty program for *detecting* cartel activity once it does occur.

I will focus today on three hallmarks for both a successful Amnesty Program and an enforcement program that deters cartel activity. First, one's antitrust laws must provide the threat of stiff sanctions for those who participate in hardcore cartel activity. Second, antitrust authorities must cultivate a law enforcement environment in which business executives perceive a significant risk of detection by antitrust authorities if they either enter into, or continue to engage in, cartel activity. Third,

antitrust authorities must provide transparency, to the greatest

extent possible, throughout the anti-cartel enforcement program so that prospective cooperating parties can predict with a high degree of certainty their treatment following cooperation. These three major cornerstones -- stiff potential penalties, heightened fear of detection, and transparency in enforcement policies -- are at the heart of both our Amnesty Program and our deterrence efforts.

## II. The Corporate Amnesty Program

Before I address these three principles, I need to share with you some background information on how the Amnesty Program was developed and how it works in order to put its impact into perspective. The original version of our Amnesty Program actually dates back to 1978. Under that program, violators who came forward and reported their illegal activity before an investigation was underway were *eligible* to receive a complete pass from criminal prosecution. The grant of amnesty, however, was not automatic and the Division retained a great deal of prosecutorial discretion in the decision making process. Unfortunately, for reasons that I will discuss in more detail a little later, it became clear over time that this program was flawed. It resulted in relatively few amnesty applications and did not lead to the detection of a single international cartel.

In 1993, the Antitrust Division dramatically expanded its Amnesty Program to increase the opportunities and raise the incentives for companies to report criminal activity and cooperate with the Division. The Amnesty Program was revised in three major respects. First, the policy was changed to ensure that amnesty is *automatic* if there is no pre-existing investigation. That is, if a corporation comes forward prior to an investigation and meets the program's requirements, the grant of amnesty is

certain and is not subject to the exercise of prosecutorial discretion. Second, the Division created an alternative amnesty, whereby amnesty is available even if cooperation begins *after* an investigation is underway. Third, if a corporation qualifies for automatic amnesty, then all directors, officers, and employees who come forward with the corporation and agree to cooperate also receive automatic amnesty. (See attached Corporate Leniency Policy). One aspect of the program that did not change is that amnesty applies only to criminal sanctions, and firms accepted into the Amnesty program are required, where possible, to make full restitution to their victims in the United States.

Because of the novelty and uniqueness of this policy, it took some time before the private bar and business community gained confidence in the program. However, over the last five years, the results have been staggering. There has been more than a ten-fold increase in amnesty applications during this time frame. Moreover, in the last two years alone, cooperation from amnesty applications have resulted in scores of convictions and well over $1 billion in fines. More than anything else, the expansion of the Amnesty Program has been responsible for the success that we have had in cracking international cartels.

## III. The Threat Of Severe Sanctions

Treating Cartel Activity As A Crime. With that background, I want to address the first element common to both deterring cartel activity and creating a successful Amnesty Program and that is the threat of severe sanctions for violators. In the United States, hardcore cartel activity -- such as price-fixing, bid-rigging, and customer and market allocation agreements -- is a felony violation of our criminal laws, and both corporations and individuals may be held liable. Corporations risk heavy criminal fines with the maximum potential fine being the greatest of $10 million, twice the gross gain to the cartel, or

twice the gross loss suffered by the victims of the conspiracy. The maximum sentence for individuals is three years imprisonment and a fine which is the greatest of $350,000, twice the gross gain to the cartel, or twice the gross loss suffered by the victims of the conspiracy.

Of course, the United States is in the minority, albeit a growing one, in treating hardcore cartel activity as a crime and prosecuting offending corporations and individuals as criminals. I will not take this opportunity to explore all of the arguments in favor of prosecuting cartel activity criminally except to make the following point relevant to the discussion on deterrence. Based on our experience, there is no greater deterrent to the commission of cartel activity than the risk of imprisonment for corporate officials. Corporate fines alone are simply not sufficient to deter many would-be offenders. For example, in some cartels, such as the graphite electrode cartel, individuals personally pocketed millions of dollars as a direct result of their criminal activity. A corporate fine alone, no matter how punitive, is unlikely to deter such individuals.

The Perceived Risks Must Outweigh The Potential Rewards. While there is no current consensus as to whether cartels should be prosecuted criminally, there should be no dispute that cartel activity will not be deterred if the potential penalties are perceived by firms and their executives as outweighed by the potential rewards. If the potential sentences are not sufficiently punitive, then the potential sanctions will merely be seen as a cost of doing business. Just as the loss of one's liberty will certainly not be viewed in this manner, a heavy corporate fine may also send a powerful deterrent message. To this end, we have recently "upped the ante" by obtaining record-breaking fines against firms who engage in cartel activity. At the time the Amnesty Program was revised in 1993, the highest antitrust fine ever obtained in the United States was less than $3 million. Today, fines of $10 million or

more have become almost commonplace with more than 30 imposed in the last five years. In fact, the Division has obtained fines of $100 million or more against five corporate defendants, including a $500 million fine against F. Hoffmann-La Roche (HLR) for its participation in the worldwide vitamin cartel. This dramatic leap in the level of criminal fines, however, is more than just a reflection of our aggressive approach for deterring cartel activity. Rather, because fines in the United States are based in large part on a company's sales in the United States affected by the conspiracy, the record fine levels demonstrate the mammoth size of the international cartels that we have been uncovering, largely through the amnesty program; cartels that simply dwarf the domestic conspiracies that we have previously encountered.

The prosecution of HLR in the vitamin investigation also offers some sobering insight as to the risks companies are willing to take in order to profit from cartel activity and to how inadequate fines may be to ensure specific, let alone, general deterrence. In 1997, two years before HLR's participation in the vitamin conspiracy was exposed, HLR was investigated and convicted of participating in a separate international cartel in the citric acid industry. The firm entered into a plea agreement, agreed to cooperate, and was ordered to pay a $14 million fine -- which at the time was the third largest antitrust fine ever obtained in the United States. As part of its cooperation, HLR was told of the Division's then-covert investigation into the vitamin industry and offered the opportunity to cooperate. The Division interviewed two top executives from HLR who participated in the citric acid conspiracy and who also had dual responsibilities in HLR's vitamin business. HLR and its top executives denied to investigators any knowledge of, or participation in, a vitamin cartel. Of course, we would later learn that HLR had, in fact, engaged in a decade-long, worldwide vitamin cartel, and

continued to lead that cartel even after it pled guilty in the citric acid investigation and learned that its vitamin business was under investigation. Instead of being deterred, top-level HLR executives orchestrated false statements to enforcement authorities, took steps to further conceal the firm's illegal activities, and continued to lead the world's other producers in a global cartel. This decision will end up costing HLR well over a billion dollars in criminal fines and civil settlements. In addition, three European executives from HLR, including the two executives who blew their opportunity to come clean in the citric acid investigation, served time in U.S. prisons for their participation in the vitamin conspiracy. Clearly, the $14 million fine in the citric acid prosecution was not nearly enough to deter HLR or its top executives from continuing to participate in the vitamin cartel. Time will tell if the $500 million fine and jail sentences for the HLR executives will.

Corporate Amnesty Can Mean Zero Fines and No Jail. Of course, the Amnesty Program offers companies and their executives an alternative to these potentially harsh sentences. If a company detects an antitrust violation before we do, it has to chose whether to report the violation and seek leniency or to remain silent and hope for the best. When we revised our Amnesty Program, we sweetened the carrot by increasing the opportunities and incentives for companies to self report and cooperate. At the same time, our recent record of successful prosecutions and heavy sentences has sharpened the stick for companies who risk the alternative path.

The question is often raised as to whether an Amnesty Program will work in a jurisdiction where there is no individual liability and, therefore, no possibility of incarceration for culpable executives. Clearly, the opportunity to avoid imprisonment for corporate officials is a major inducement for firms to seek amnesty. However, in my opinion, an Amnesty Program can still succeed if the threat

of heavy fines is significant enough. This belief is supported by our experience with foreign-based firms who have sought and obtained amnesty in international cases at a rate almost equal to their domestic counterparts. For example, the worldwide vitamin cartel was cracked by the cooperation provided by French-based Rhône-Poulenc SA .[1] The company made the decision to come forward even though the culpable French executives resided outside of the United States and our extradition treaty with France does not cover antitrust offenses. So, the opportunity to avoid incarceration for its culpable executives was probably not the major inducement to Rhône-Poulenc's decision to come forward, but rather the desire to avoid a criminal conviction and heavy fine for the corporation. And, indeed, while Rhône-Poulenc paid zero dollars in fines, its principal co-conspirators, HLR and BASF, paid fines of $500 million and $225 million, respectively.

## IV. <u>Fear Of Detection</u>

<u>Building A Strong Enforcement Record</u>. Of course, if firms perceive the risk of being caught by antitrust authorities as very small, then stiff maximum penalties will not be sufficient to deter cartel activity. Likewise, if cartel members do not fear detection, they will not be inclined to report their wrongdoing to authorities in exchange for leniency. Therefore, antitrust authorities must cultivate a law enforcement environment in which business executives perceive

a significant risk of detection by antitrust authorities if they either enter into, or continue to engage in,

---

[1]The Division has a policy of treating the identity of amnesty applicants as a confidential matter, much like the treatment afforded to confidential informants. However, confidentiality is not required in this case with respect to Rhône-Poulenc's amnesty status, because the company has already issued a press release announcing its acceptance into the Amnesty Program.

cartel activity.

For example, think back to the tapes of the lysine cartel meetings that you watched yesterday. At the time of these meetings, there had been virtually no international cartel prosecutions in the United States, and the revised Amnesty Program was in its infancy. The cartel members took precautions like setting up bogus trade association meetings, creating false documents, and staggering their arrival times at meetings in order to conceal their scheme. It was plain, however, that the cartel members did not fear detection by U.S. or foreign antitrust authorities. In fact, they literally laughed at the very idea of it.

Well, times have changed. In 1993, when the lysine investigation was underway, there were only a handful of Division investigations of alleged international cartel activity. By comparison, the Division currently has roughly *30* grand juries investigating suspected international cartel activity. Similarly, at the time of the lysine investigation, less than 2 percent of our corporate defendants were foreign-based, as compared to nearly 50 percent of our corporate defendants last year. These investigations are uncovering massive cartels and leading to record fines. For example, in the 10 years prior to 1993, the Division obtained, on average, less than *$30 million* in criminal fines annually. The Division's total fines imposed over the last three fiscal years increased from $205 million in FY 1997, to $267 million in FY 1998, to $1.1 billion in FY 1999. Well over 95 percent of these fines were imposed in connection with investigations of international cartel activity.

<u>The Race To The Courthouse</u>. So, have the $100 million-plus fines had a deterrent effect by either stifling the formation of cartels or disbanding them if they already exist? There is no way to quantify the number of cartels that are deterred before they are ever formed, but we are witnessing how our enforcement efforts are influencing cartels that already exist. To put it plainly, cartel

members are starting to sweat, and the Amnesty Program feeds off that panic.

The more anxious a company is that its cartel participation may be discovered by the government, the more likely it is to report its wrongdoing in exchange for amnesty. The promise of zero dollars in fines and immunity for culpable executives looms large. Of course, amnesty is only available to the first one in the door. If you are second, even if only by a matter of a few hours, which has happened on a number of occasions, the second firm and all of its culpable executives will be subject to full prosecution.

The "winner-take-all" race dynamic leads to tension and mistrust among the cartel members. For example, consider a scenario where five members of a cartel are scheduled to hold an emergency meeting. When the meeting starts there is an empty seat at the table -- one of the conspirators has not returned calls and has unexpectedly not arrived at the meeting. Red flags go up. One of the cartel members at the meeting starts to get nervous. Has the missing cartel member had a change of heart and abandoned the cartel? Has he gone to the Feds? Or, did he just miss his plane? In this environment, with the risk of detection and the stakes so high, who can you trust? Or consider the very common situation when a cartel first learns that its under investigation. Each member of that cartel knows that any of its co-conspirators can be the first to come forward in exchange for total amnesty and seal the fate of the rest. Imagine the vulnerability of being in that position and asking yourself, "Can I really trust my competitors?"

The Safe Harbors Are Shrinking. Of course, antitrust authorities in Europe and around the world share the credit for the heightened fear of detection by those who are engaging in, or are considering, cartel activity. This conference has already highlighted many of the changes in antitrust

laws, the enforcement victories, and the commitment to anti-cartel enforcement that is taking hold throughout the world, so I will not try and summarize them here. Suffice to say, the world is changing, antitrust authorities are working more closely together than ever, and the safe harbors for cartel activity are shrinking.

However, if you needed any more proof of how significantly attitudes have changed toward anti-cartel enforcement or how seriously the risks are now perceived by the international business community, consider the case of the six high-level European executives from HLR and BASF who led their companies' decade-long participation in the worldwide vitamin cartel. Each of these foreign executives voluntarily traveled to the United States to plead guilty and to serve time in a U.S. prison. They were all citizens of either Switzerland or Germany, residing abroad, with no family or other ties to the United States. Therefore, the United States courts had no personal jurisdiction over any of these individuals so long as they did not set foot on U.S. soil. Moreover, the United States does not have an extradition treaty with either Switzerland or Germany covering antitrust offenses. And so, you may wonder why did these six international executives agree to leave their families behind, submit to the jurisdiction of a U.S. court, agree to plead guilty, cooperate with our investigation, and serve time in a U.S. jail? I am sure there are many diverse and intensely personal reasons why these individuals arrived at the decisions they made. However, I'm convinced that all of these executives were driven, in large part, by the recognition that Europe and the rest of the world are changing their attitudes toward cartel activity. They did not want to live their lives as international fugitives in this changing world.

The risk is too great. To me, this is the best indication that cartel members are getting the message.

## V. Transparency In Enforcement Policies

Transparency In Enforcement Maximizes Cooperation. The third and final hallmark of both an effective Amnesty Program and an anti-cartel enforcement program is the need for transparency. Self reporting and cooperation from offenders have been essential to our ability to detect and prosecute cartel activity. Cooperation from violators, in turn, has been dependent upon our readiness to provide transparency, to the greatest extent possible, throughout our anti-cartel enforcement program. If prospective cooperating parties cannot predict, with a high degree of certainty, their treatment following cooperation, then they are less likely to come forward.

Transparency must include not only explicitly stated standards and policies but also clear explanations of prosecutorial discretion in applying those standards and policies. The Division has sought to provide transparency in the following enforcement areas: (1) transparent standards for opening investigations; (2) transparent standards for deciding whether to file criminal charges; (3) transparent prosecutorial priorities; (4) transparent policies on the negotiation of plea agreements; (5) transparent policies on sentencing and calculating fines; and (6) transparent application of our Amnesty Program.[2] With the time I have remaining, I will address how transparency is critical to an effective Amnesty Program.

Transparency In The Amnesty Program. The Division has a written Amnesty Policy and has

[2]For a more detailed discussion on transparency in enforcement with references to Antitrust Division public statements in each of the areas outlined above, see, "Transparency In Enforcement Maximizes Cooperation From Antitrust Offenders," by Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, before Fordham Corporate Law Institute (October 15, 1999).

published a number of papers in order to clarify the Division's application of its Corporate Amnesty Program.[3] In addition, representatives from the Division regularly speak about the Amnesty Program before national and international bar associations, trade groups, other law enforcement agencies, and the media. However, in order for an Amnesty Program to work, you need to do more than just publicize your policies and educate the public. You have to be willing to make the ultimate sacrifice for transparency - the abdication of prosecutorial discretion.

The Division's Amnesty Program by its nature is transparent because we have eliminated, to a great extent, the exercise of prosecutorial discretion in its application. If a corporation comes forward prior to an investigation and meets the program's requirements, the grant of amnesty is automatic and is not subject to the exercise of prosecutorial discretion. For those in the audience who are not current or former government officials, I can assure you that this is a very difficult thing to do. We have had to swallow hard on a number of amnesty applicants that we would have much preferred to prosecuted. However, remember we had roughly 15 years of experience with an Amnesty Program that was designed to maintain a greater degree of prosecutorial discretion, and it simply did not work. Prospective amnesty applicants come forward in direct proportion to the predictability and certainty of whether they will be accepted into the program. Uncertainty in the qualification process will kill an amnesty program.

---

[3]See e.g., "The Corporate Leniency Policy: Answers To Recurring Questions," speech by Gary R. Spratling, before ABA Antitrust Section 1998 Spring Meeting (April 1, 1998); "Making Companies An Offer They Shouldn't Refuse," speech by Gary R. Spratling, before Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (February 16, 1999).

## VI. Conclusion

In closing, the formula for a successful anti-cartel enforcement program should include equal parts of stiff potential penalties, high detection rates, and transparent enforcement policies. This recipe will serve to prevent most companies from ever engaging in cartel activity. However, when cartels are formed, we have found that the Amnesty Program, with its lure of leniency in exchange for self reporting and full cooperation, is the most effective investigative tool for cracking cartel activity.

## CORPORATE LENIENCY POLICY

The Division has a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions. "Leniency" means not charging such a firm criminally for the activity being reported. (The policy also is known as the corporate amnesty or corporate immunity policy.)

### A. Leniency Before an Investigation Has Begun

Leniency will be granted to a corporation reporting illegal activity before an investigation has begun, if the following six conditions are met:

1. At the time the corporation comes forward to report the illegal activity, the Division has not received information about the illegal activity being reported from any other source;

2. The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

3. The corporation reports the wrongdoing with candor and completeness and provides full,

continuing and complete cooperation to the Division throughout the investigation;

4. The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

5. Where possible, the corporation makes restitution to injured parties; and

6. The corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or originator of, the activity.

B. **<u>Alternative Requirements for Leniency</u>**

If a corporation comes forward to report illegal antitrust activity and does not meet all six of the conditions set out in Part A, above, the corporation, whether it comes forward before or after an investigation has begun, will be granted leniency if the following seven conditions are met:

1. The corporation is the first one to come forward and qualify for leniency with respect to the illegal activity being reported;

2. The Division, at the time the corporation comes in, does not yet have evidence against the company that is likely to result in a sustainable conviction;

3. The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

4. The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation;

5. The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

6. Where possible, the corporation makes restitution to injured parties; and

7. The Division determines that granting leniency would not be unfair to others, considering the

nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward.

In applying condition 7, the primary considerations will be how early the corporation comes forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of, the activity. The burden of satisfying condition 7 will be low if the corporation comes forward before the Division has begun an investigation into the illegal activity. That burden will increase the closer the Division comes to having evidence that is likely to result in a sustainable conviction.

C. **Leniency for Corporate Directors, Officers, and Employees**

If a corporation qualifies for leniency under Part A, above, all directors, officers, and employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will receive leniency, in the form of not being charged criminally for the illegal activity, if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation. If a corporation does not qualify for leniency under Part A, above, the directors, officers, and employees who come forward with the corporation will be considered for immunity from criminal prosecution on the same basis as if they had approached the Division individually.

D. **Leniency Procedure**

If the staff that receives the request for leniency believes the corporation qualifies for and should be accorded leniency, it should forward a favorable recommendation to the Office of Operations, setting forth the reasons why leniency should be granted. Staff should not delay making such a recommendation until a fact memo recommending prosecution of others is prepared. The Director of

Operations will review the request and forward it to the Assistant Attorney General for final decision. If the staff recommends against leniency, corporate counsel may wish to seek an appointment with the Director of Operations to make their views known. Counsel are not entitled to such a meeting as a matter of right, but the opportunity will generally be afforded.

Issued August 10, 1993

# EXHIBIT 16

# DEPARTMENT OF JUSTICE

## Antitrust Compliance Programs: The Government Perspective

Address by

**William J. Kolasky**[1]
**Deputy Assistant Attorney General**
**Antitrust Division**
**U.S. Department of Justice**

Before the

**Corporate Compliance 2002 Conference**
**Practising Law Institute (PLI)**
**San Francisco, CA**

**July 12, 2002**

Good morning. I want to thank Joe Murphy, Herb Zinn, and the Practicing Law Institute for giving me this opportunity to share with you the Antitrust Division's perspective on the critical importance antitrust compliance programs play in deterring antitrust crimes. I worked on my first internal investigation 25 years ago for a company based here in San Francisco, so it's a particular joy to be back here again talking about this important subject today.

The need for effective corporate compliance programs has never been more evident. It seems that almost every day we read of another case of flagrant disregard of the law by the top executives of yet another large and previously well respected company. These nearly daily disclosures of widespread accounting fraud, self-dealing, and just plain greed threaten to undermine confidence in our financial markets and jeopardize our economic recovery. Given my responsibilities for our relations with other antitrust authorities worldwide, I also fear that these disclosures will undermine our credibility abroad, weakening our ability to serve as a model for the rest of the world, and providing ammunition for those who do not share our commitment to free markets and economic democracy.

During the time I've been at the Antitrust Division, as I've visited our field offices which do the bulk of our criminal enforcement, one consistent theme I've heard is that the companies we investigate rarely have effective antitrust compliance programs. Our staffs tell me they have been surprised at how sloppy many large, publicly traded companies have become about antitrust compliance. It appears that as companies have down-sized their legal and auditing staffs, and turned their attention more and more to deal-making, one of the first places they cut is antitrust (and, I suspect, other) compliance. And we've all now seen the results. It's time for in-house counsel to return to practicing preventive law.

My task today is to talk about how to design a compliance program to prevent and detect antitrust crimes. David and Phil will discuss the role compliance programs can play in preventing environmental crimes and fraud. But in focusing only on criminal misconduct, I do not want us to lose sight of the equally important role compliance programs can play in preventing civil antitrust offenses. As all of you know, violations of the antitrust laws, be they civil or criminal, can expose your companies and clients to hundreds of millions, if not billions, of dollars in treble damage liability. A well-designed compliance program can reduce the risk of this civil exposure as well.

I want to begin by telling you a little bit about our criminal antitrust enforcement program and the important role our leniency program plays in it. Second, I want to share with you some of the common characteristics of the cartels we've prosecuted. Third, I will describe the essential elements of an effective antitrust compliance program. Finally, I will identify some of the common red flags you should be looking for as you counsel your clients and conduct antitrust audits.

## I. The Antitrust Division's Criminal Enforcement Program

As I've said in other speeches,[2] investigating and prosecuting hard core cartels has always been, and remains, our number one enforcement priority. Cartels — whether in the form of price fixing, output restrictions, bid rigging, or market division — raise prices and restrict supply, enriching producers at consumers' expense and acting as a drag on the entire economy. In our view, these are crimes, pure and simple, and those who perpetrate them are criminals who belong in jail.

As commerce has become more global, so too have cartels. Over the last five years, we have successfully prosecuted sixteen major multinational cartels in industries as diverse as animal feed additives, vitamins, graphite electrodes for steel mills, and fine arts auction houses. These cartels affected over $55 billion in commerce worldwide and resulted in mark-ups as high as 100 percent in some cases. We have collected nearly $2 billion in fines and sentenced some 20 senior corporate executives to jail terms of more than one year, the maximum sentence being ten years. In the last few years, the European Union has joined our battle against cartels with a vengeance. Last year alone, the European Commission imposed fines in the aggregate of 1.9 billion Euros on some 40 companies for engaging in illegal multinational cartels.

Our expanded corporate leniency program has been the key to our uncovering and successfully prosecuting these cartels.[3] This program offers any company that comes forward and blows the whistle on a cartel in which it has been participating, and which then cooperates fully with our investigation, complete amnesty from prosecution, so long as it meets the conditions set forth in the program.[4] Amnesty is automatic if the company comes forward before we have opened an investigation, but may still be available if the company is the first to agree to cooperate in an ongoing investigation. A grant of amnesty protects not only the company, but also all of its directors, officers, and employees who also agree to cooperate.

Since the current version of this program was put in place in 1993, it has been instrumental in most of the major cartel cases we have prosecuted. In the last several years, we have received an average of one amnesty application per month. So successful has our program been that many other jurisdictions around the world, including the European Union, are now copying it.

It should be obvious that our amnesty program substantially increases the importance of having an effective antitrust compliance program that is designed to prevent antitrust violations and to detect them quickly when they occur. The existence of the amnesty program dramatically increases the likelihood that the cartel will be detected and punished. Only a company with an effective antitrust compliance program can hope to be in a position to be the first company in the door.

## II. Common Characteristics of Multinational Cartels

Designing an effective antitrust compliance program requires knowing what it is you are trying to prevent. What I want to talk about next, therefore, are the common characteristics of the multinational cartels we've prosecuted. I'm hopeful that this will assist you in counseling your clients about what conduct to avoid and in designing an effective program for assuring they do not engage in unlawful cartel activity.

### A. Brazen Nature of Cartels

The most startling characteristic of the multinational cartels we have prosecuted is how cold blooded and bold they are. The members of those cartels showed utter contempt for antitrust enforcement. The cartels invariably involved hardcore cartel activity -- price fixing, bid-rigging, and market- and customer-allocation agreements. Without exception, the conspirators were fully aware they were violating the law in the United States and elsewhere, and their only concern was avoiding detection. The conspirators openly discussed, and even joked about, the criminal nature of their agreements; they discussed the need to avoid detection by antitrust enforcers in the United States and abroad; and they went to great lengths to cover-up their actions -- such as using code names with one another, meeting in secret venues around the world,

creating false "covers" -- *i.e.* facially legal justifications -- for their meetings, using home phone numbers to contact one another, and giving explicit instructions to destroy any evidence of the conspiracy. In one cartel, the members were reminded at every meeting -- "No notes leave the room."

B. Involvement of Senior Executives

The second most startling characteristic of these cartels is that they typically involve the most senior executives at the firms involved -- executives who have received extensive antitrust compliance counseling, and who often have significant responsibilities in the firm's antitrust compliance programs. For example, the vitamin cartel was led by the top management at some of the world's largest corporations, including one company -- F. Hoffmann-La Roche -- which continued to engage in the vitamin conspiracy even as it was pleading guilty and paying a fine for its participation in the citric acid conspiracy.

These executives are not only disdainful of their customers and of the law, but also show equal contempt for their own company's rules -- rules adopted to protect the company and them from criminal conduct. They will, therefore, go to great lengths to make sure that you, as inside or as outside counsel, don't find out about their criminal activity.

A good example is the extent to which one executive of a corporation we recently prosecuted went to frustrate the efforts of the company's general counsel to enforce the company's antitrust compliance program. This general counsel had instituted a comprehensive antitrust compliance program, and had made sure that the senior executives were well schooled on the antitrust laws. He had laid out specific rules to follow and adopted stiff penalties for failure to follow those rules. When a top executive at his firm arranged a meeting with his chief

foreign competitor to discuss exchanging technological information, the executive, as required by the policy, notified the general counsel's office of the meeting. The general counsel (perhaps suspecting the worst) insisted on accompanying the executive to the meeting and remaining at his side throughout the meeting -- never letting him out of his sight even when the executive went to the bathroom. He was certain that this way there could be no chance conversation between the company executive and his competitor, and the general counsel would be a witness to everything said. Surely no antitrust problems could arise in such a setting. And the general counsel must have taken some comfort when he, the executive, and the executive from the competitor firm greeted one another at the start of the meeting and the two executives introduced themselves to each other, exchanged business cards, and engaged in small talk about their careers and families that indicated that the two had never met each other before. Imagine how that general counsel must have felt when he learned, during the course of our investigation, that the introduction between the two executives had been completely staged for his benefit -- to keep him in the dark. In fact, the two executives had been meeting, dining, socializing, playing golf, and participating together and with others in a massive worldwide price-fixing conspiracy for years. Furthermore, other employees at the company knew of this relationship and were instructed to keep the general counsel in the dark by referring to the competitor executive by a code name when he called the office and the general counsel was around.

C. Fear Of Detection By U.S. Enforcers

While cartel members know full well that their conduct is illegal under the antitrust laws of many countries, they have a particular fear of U.S. antitrust authorities. For that reason, international cartels try to minimize their contacts in the United States by conducting their

meetings abroad. This has been particulary true since 1995, when the lysine investigation became public. In fact, cooperating defendants in several recent cases have revealed that the cartels changed their practices and began avoiding contacts in the United States at all costs once the Division began cracking and prosecuting international cartels. Some cartel members go so far as to try to keep their cartel activity secret from all U.S.-based employees, even those responsible for carrying out their instructions as to the firm's output and prices. However, the cartel members continue to target their agreements at U.S. businesses and consumers; the only thing that has changed is that they conduct nearly all of their meetings overseas.

D. Using Trade Associations As Cover

International cartels frequently use trade associations as a means of providing "cover" for their cartel activities. In order to avoid arousing suspicion about the meetings they attended, the lysine conspirators actually created an amino acid working group or subcommittee of the European Feed Additives Association, a legitimate trade group. The sole purpose of the new subcommittee was to provide a false, but facially legitimate, explanation as to why they were meeting. Similarly, the citric acid cartel used a legitimate industry trade association to act as a cover for the unlawful meetings of the cartel. The cartel's so-called "masters," *i.e.*, the senior decision-makers for the cartel members, held a series of secret, conspiratorial, "unofficial" meetings in conjunction with the official meetings of ECAMA, a legitimate industry trade association based in Brussels. At these unofficial meetings, the cartel members agreed to fix the prices of citric acid and set market share quotas worldwide. A former ADM executive testified that the official ECAMA meetings provided a "combination of cover and convenience" for the citric acid cartel. As he explained it, ECAMA provided "cover" because it gave the citric acid

conspirators "good cause" to be together at the particular location for the official meetings -- which were held in Belgium, Austria, Israel, Ireland, England, and Switzerland. Since the cartel members were all attending those meetings anyway, it was convenient to meet secretly, in an "unofficial capacity" for illegal purposes, during the time period set aside for the industry association gathering.

E. Fixing Prices Globally

Another common characteristic of an international cartel is its power to control prices on a worldwide basis effective almost immediately. Prosecutors got an unprecedented view of the incredible power of an international cartel to manipulate global pricing in the lysine videotapes. Executives from around the world can be seen gathering in a hotel room and agreeing on the delivered price, to the penny per pound, for lysine sold in the United States, and to the equivalent currency and weight measures in other countries throughout the world, all effective the very next day. Our experience with the vitamin, citric acid, and graphite electrode cartels, to name a few, shows that such pricing power is typical of international cartels and that they similarly victimize consumers around the globe. Cartel members often meet on a quarterly basis to fix prices. In some cases the price is fixed on a worldwide basis, in other cases on a region-by-region basis, in still others on a country-by-country basis. The fixed prices may set a range, may establish a floor, or may be a specific price, fixed down to the penny or the equivalent. In every case, customer victims in the United States and around the world pay more because of the artificially inflated prices created by the cartel.

F. Worldwide Volume-Allocation Agreements

The members of most cartels recognize that price-fixing schemes are more effective if the cartel also allocates sales volume among the firms. For example, the lysine, vitamin, graphite electrode, and citric acid cartels prosecuted by the Division all utilized volume-allocation agreements in conjunction with their price-fixing agreements. Cartel members typically meet to determine how much each producer has sold during the preceding year and to calculate the total market size. Next, the cartel members estimate the market growth for the upcoming year and allocate that growth among themselves. The volume-allocation agreement then becomes the basis for (1) an annual "budget" for the cartel, (2) a reporting and auditing function, and (3) a compensation scheme -- three more common characteristics of international cartels.

G. Audits And The Use Of Scoresheets

Most cartels develop a "scoresheet" to monitor compliance with and enforce their volume-allocation agreement. Each firm reports its monthly sales to a co-conspirator in one of the cartel firms -- the "auditor." The auditor then prepares and distributes an elaborate spread sheet or scoresheet showing each firm's monthly sales, year-to-date sales, and annual "budget" or allocated volume. This information may be reported on a worldwide, regional, and/or country-by-country basis and is used to monitor the progress of the volume-allocation scheme. Using the information provided on the scoresheet, each company will adjust its sales if its volume or resulting market share is out of line.

H. Compensation Schemes

Another common feature of international cartels is the use of a compensation scheme to discourage cheating. The compensation scheme used by the lysine cartel is typical and worked as

follows. Any firm that had sold more than its allocated or budgeted share of the market at the end of the calendar year would compensate the firm or firms that were under budget by purchasing that quantity of lysine from any under-budget firms. This compensation agreement reduced the incentive to cheat on the sales volume-allocation agreement by selling additional product, which, of course, also reduced the incentive to cheat on the price-fixing agreement by lowering the price on the volume allocated to each conspirator firm.

I. Budget Meetings

Cartels nearly always have budget meetings. Like division managers getting together to work on a budget for a corporation, here senior executives of would-be competitors meet to work on a budget for the cartel. Budget meetings typically occur among several levels of executives at the firms participating in the cartel; their frequency depends on the level of executives involved. The purpose of the budget meetings is to effectuate the volume-allocation agreement -- first, by agreeing on the volume each of the cartel members will sell, and then periodically comparing actual sales to agreed-upon quotas. Cartel members often use the term "over budget" and "under budget" in comparing sales and allocations. Sales are reported by member firms on a worldwide, regional, and/or country-by-country basis. In our experience, the executives become very proficient at exchanging numbers, making adjustments, and, when necessary, arranging for "compensation."

J. Retaliation Threats -- Policing The Agreement

As is often said, there is no honor among thieves. Thus, cartel members have to devise ways -- or even make threats -- to keep their co-conspirators honest, at least with respect to maintaining their conspiratorial agreements. It is common for cartel members to try to keep their

co-conspirators in line by retaliating through temporary price cuts or increases in sales volumes to take business away from or financially harm a cheating co-conspirator. Excess capacity in the hands of leading firms can be a particularly effective tool for punishing cheating and thereby enforcing collusive agreements. In lysine, ADM, which had substantial excess capacity, repeatedly threatened to flood the market with lysine if the other producers refused to agree to a volume allocation agreement proposed by ADM. In another case where competitors bought from one another, the cartel member with the extra capacity threatened to not sell to a competitor who was undercutting the cartel.

K. The Structure of Cartels

We have found that cartels can involve a surprisingly large number of firms. The number of participants in several of the cartels we prosecuted were surprisingly high. Five or six members were not uncommon and occasionally we have uncovered cartels with 10 or more members. This appears to be due in part at least to fringe players in the market feeling they will profit more by going along with the cartel than by trying to take share away from the larger firms by undercutting their prices. Nevertheless, industry concentration does matter. As economic theory predicts, the industries in which we have detected cartels are usually highly concentrated with the largest firms acting as ringleaders and the fringe players following along. In one case, there was evidence that the industry had attempted unsuccessfully to coordinate prices for several years before the cartel finally got off the ground after the industry consolidated down to approximately six players.

We have also found that a single cartel will often involve multiple forms of agreement. Just as George Stigler observed,[5] cartels can take many forms, with the choice of form being determined in part at least by balancing the comparative cost of reaching and enforcing the

collusive agreement against the risk of detection. The vitamin cartel, for example, included price-fixing, bid-rigging, customer and territorial allocations, and coordinated total sales.

These cartels also tended to be more durable than is sometimes thought. After the ADM plea, the Wall Street Journal stated "If colluders push prices too high, defectors and new entrants will set things right." Our experience has shown that this is not the case. Several of the cartels we prosecuted had been in existence for over ten years, including one (sorbates) that lasted 17 years, from 1979 to 1996.

We also found that while product homogeneity and high entry barriers may facilitate cartel behavior, they are not essential to it. While the products in our cartel cases tend to be fungible, there are sometimes exceptions. One case we prosecuted involved bid rigging on school bus bodies. School bus bodies have many options, but the conspirators were able to work out a formula that incorporated the options and trade-in value to determine a price at or below which the designated winning bidder was supposed to bid. Similarly, while most of our cartel cases involve industries in which entry tends to be difficult, there are notable exceptions, such as in the Division's many bid-rigging cases in the road building industry. The road building industry, at least at the time of the conspiracies, was not difficult to enter, yet the Division turned up numerous cartels.

L. Large, sophisticated buyers can still be victims.

In merger analysis, some assume that large purchasers in the market will provide sufficient discipline to prevent cartels. Our experience shows to the contrary that many successful cartels sell to large, sophisticated buyers. In the lysine cartel, the buyers included Tysons Foods and Con Agra; in citric acid, the buyers included Coca-Cola and Procter & Gamble; and in graphite

electrodes, the victims included every major steel producer in the world. It is particularly ironic that one of the largest victims of the vitamins cartel had itself been one of the perpetrators of the citric acid cartel.

M. Cartel members include large, publicly traded companies

Our cases have turned up hard-core cartel activity top management at some of the world's largest corporations and most respected corporations including Christies/Sotheby's, ADM, Hoffmann-La Roche, BASF, ABB, and a host of others. We have repeatedly found that even the largest companies have become sloppy about their antitrust compliance programs and that they are not doing all they should to educate managers about the risks at which they put themselves and their companies by engaging in cartel activity.

N. Cartel participants tend to be recidivists

Finally, we have found that cartel participants tend to be recidivists. The most notorious example is Hoffmann-La Roche, which continued its participation in the vitamin conspiracy even as it was entering into a plea agreement for its participation in the citric acid cartel. Another example was a domestic building materials industry, where one generation of executives engaged in cartel activity during the mid-1980s and their sons did likewise after they took over the reins of the businesses in the 1990s.

## III. Designing an Effective Compliance Program

Now that you know what an illegal cartel looks like, let's talk about how to design an antitrust compliance program that can deter cartel activity by your company's executives.

A. The goals of a successful compliance program

A sound antitrust compliance program should have two principal objectives: prevention and detection. From our perspective, the true benefit of compliance programs is to prevent the commission of antitrust crimes, not to enable organizations that commit such violations to escape punishment for them. This should be true for the company as well. A corporate compliance program generally will not protect the company from prosecution and certainly will not protect it from potentially devastating treble damage liability. Therefore, every company's first objective in its compliance program should be to prevent wrongdoing.

A second important objective of a compliance program is to detect wrongdoing as early as possible, while the damages are still small. Early detection of antitrust crimes will give a company a head start in the race for amnesty. But, equally important, it will enable it to nip the wrongdoing in the bud before the damages from the cartel become so large that they would be material to the company's bottom-line.

A well-designed compliance program may also, in some circumstances, help your company qualify for sentence mitigation under the sentencing guidelines. I want to emphasize that once a violation occurs, a compliance program can do little, if anything, to persuade the Division not to prosecute. Organizational liability, both civil and criminal, is grounded on the theory of *respondeat superior*. We have rarely, if ever, seen a case where an employee who committed an antitrust violation was acting solely for his own benefit and not the company's. A strong corporate compliance program can, however, help at the sentencing stage, so long as the employees who committed the violation were not "high-level personnel" of the organization. Again, however, it is important to emphasize that in our experience most antitrust crimes are

committed by just such high-ranking officials, which would disqualify the company from receiving any sentence mitigation, no matter how good its corporate compliance program. This again shows why it is so important if a company learns of a violation that it report it promptly and seek to qualify for our amnesty program. Finally, a strong compliance program may help your company avoid suspension and debarment, so long as the company takes aggressive steps to discipline the wrongdoers, make the victims whole, and assure that future violations do not occur.

B. Minimum requirements for an effective compliance program

The sentencing guidelines set forth seven minimum requirements that a compliance program must satisfy in order to qualify for sentence mitigation.[6] These are:

Clearly established compliance standards;

Assigning overall responsibility to oversee compliance to high-level executives within the company;

Exercising due care not to delegate responsibility to employees who have a propensity to engage in illegal conduct;

Taking reasonable steps to communicate standards and procedures effectively to all employees;

Taking reasonable steps to achieve compliance with standards;

Consistent enforcement of standards through appropriate disciplinary mechanisms; and

Taking reasonable steps when an offense occurs to respond and to present future violations.

It's important to stress that these are minimum requirements. To be truly effective, a

compliance program must be customized to fit the firm's business, organization, personnel, and culture. The first three requirements are reasonably self-explanatory. I want, therefore, to focus my attention on the last four requirements.

*a.* *Effective communication*. Every compliance program should include a clear statement of the company's commitment to comply with the antitrust laws, accompanied by a set of practical do's and don'ts written in plain English so that every employee can understand them. A policy statement is, however, only the beginning. The company should have an active training program that includes in-person instruction by knowledgeable counsel. The in-person training sessions can be supplemented by video and Internet training tools, but these are no replacement for some personal instruction. The instruction should be as practical as possible, including case studies drawn from the company's actual experiences. The instruction should also include education as to the consequences of antitrust violations, both for the company and the individual employee. You could, for example, tell your employees that in the last several years, the Division has sentenced more than 20 senior executives to serve one year or more of jail time for antitrust crimes. One of these executives, who compounded his antitrust offenses with bribery and money laundering, is now serving a ten-year sentence. And, as Alfred Taubman recently learned, an executive's stature in the community and record of community service will not save him or her from prison. You might also tell your employees about the magnitude of the criminal fines and treble damage violators have had to pay. Hoffman LaRoche alone has paid more than $1 billion in fines and damages for its involvement in the vitamins price-fixing conspiracy.

*b.* *Steps to achieve compliance*. While training is important, it is not sufficient to assure compliance with the antitrust laws. To achieve that goal, a company must have a proactive

law department that is dedicated to practicing preventive law. It is critical that the company's lawyers regularly attend management meetings and regularly visit the company's facilities so that employees know whom to call if they have a question or a problem. It is also critical that the lawyers win the respect of their clients by responding quickly to questions with sound legal advice that takes full account of the practical business issues the client faces. A company also needs to have in place and to publicize a reporting system so that employees know to whom to report possible misconduct. Many companies establish ombudsmen and hot lines for this purpose, while others require their employees to report possible wrongdoing to the law department. Whatever system is in place should assure employees seeking to report misconduct confidentiality and protection from retaliation. Finally, a company should conduct regular antitrust audits, preferably unannounced, to monitor compliance. These audits can be kept informal, but should include a review of both the paper and computer files (especially e-mails) of employees with competitive decision-making authority or sales and marketing responsibilities. It is important also to interview employees about their business and their contacts with competitors.

*c.* *Enforcement of standards through appropriate discipline.* It is absolutely critical that the company establish a record of consistently disciplining employees who disregard the company's antitrust compliance policy or who fail to report misconduct by others. In so doing, it is equally critical that the company discipline the chiefs, not just the Indians. The company should discipline senior managers who failed adequately to supervise or who created a climate of disrespect for antitrust principles in their organizations, even if they did not have actual knowledge of the particular wrongdoing.

*d.* *Reasonable steps to respond to violations.* When the worst happens and you

discover that your company has committed a possible antitrust crime, it is also critical that the company respond promptly and energetically. This includes initiating an immediate investigation and reporting promptly to the agency. Remember: qualifying for amnesty can sometimes become a race with the first company in the door receiving the most lenient treatment. In addition to disciplining the employees responsible, the company should also take steps to make restitution to its customers, either through settling the inevitable treble damage actions or through commercial arrangements directly with the customers. The company should also re-examine its compliance program in order to learn from its mistakes and should make whatever modifications are necessary to assure that future violations do not occur.

As important these steps are, nothing is more important than senior management commitment and leadership. A culture of competition must begin at the very top of the company. Respect for the law is a necessary, but not sufficient, condition. Senior management must value competition and must be vocal in making that commitment known to employees. In the cases we prosecute, we find almost invariably that in companies that violate the antitrust laws, the tone of disrespect for the law and for competition permeated the entire company, usually starting at the very top. Look at some of the people we have prosecuted: Alfred Taubman, the chairman and principal shareholder of Sotheby's; Mick Andreas, son of the long-time chairman and CEO, Dwayne Andreas, who was himself being groomed to take over the reins. In fact, ADM is a particularly good illustration of the kind of corporate culture that breeds antitrust crimes. It was a culture that believed, as one senior executive put it, that, "Our competitors are our friends. Our customers are the enemy." Both in representing defendants in criminal investigations in private practice and now as a prosecutor, this is exactly the attitude I've found in almost every company

that commits antitrust crimes. And it's an attitude that can be changed only if the company's senior officers and directors all believe in the value of competition and communicate to their employees.

In addition to strong, positive leadership, it is important also that a company have sound incentive structures in place. There should be strong negative incentives against violating the antitrust laws and strong positive incentives for reporting and deterring violations. But companies should also have incentives that reward tough competition, not collusion. You want your sale force, for example, to have an incentive to sell more, not less at a higher price.

## IV. Important Red Flags

In counseling your clients and in conducting antitrust audits, there are any number of common red flags to look for. Here are five.

*Trade association activity.* Look to see whether the positions of attendees at trade association meetings match the ostensible purpose of the meeting. Look for a pattern of meetings outside the United States. Look at whether the association is gathering detailed industry data, especially specific transaction data or forward-looking pricing and output data. Look to see whether meetings are attended by counsel and whether there is an agenda for the meetings and a record of what was discussed.

*Sales transactions between your company and its competitors, particularly around the end of the year.* While there are many legitimate reasons for competitors to buy from one another, such transactions can be used to "true up" a market allocation scheme.

*Data on market shares.* Look at your company's market shares to see if they are more stable than you would expect in a competitive market. Market shares that are stable over a long

period of time are a strong indicator of collusion.[7]

*Executives receiving calls at home or from callers giving fictitious names or refusing to identify themselves.* When conducting audits, therefore, talk not only to the executives, but to their assistants.

*Sudden, unexplained price increases and copies of competitor price announcements in your company's files.* If you find any, look at the fax footprints or the cover e-mail to see where they came from.

## V. Conclusion

The stakes have never been higher. An effective antitrust compliance program can literally mean the difference between survival and possible extinction to a corporation whose responsible officers or employees are tempted to engage in -- or are engaging in -- an antitrust conspiracy. In today's enforcement environment, a multinational firm, and its executives, engaged in cartel activity face enormous exposure: criminal convictions in the United States; massive fines for the firm and substantial jail sentences for the individuals; proceedings by other, increasingly active antitrust enforcement agencies around the world where fines may be, individually or cumulatively, as great as or greater than in the United States; private treble damage actions in the United States; damage actions in other countries; and debarment. Given this exposure, it would be difficult to overstate the value of a compliance program that prevented the violation in the first place. And if a violation does occur, it again would be difficult to overstate the value of a compliance program in detecting the offense early because amnesty is available to only one firm, the first to successfully apply in each cartel investigation. I hope my remarks today will serve their intended

purpose of persuading you when you get back to your companies to make it your first priority to assure that your compliance program is up to the task.

1. Deputy Assistant Attorney General for International Enforcement. The material in this paper draws heavily from materials developed and prepared by James M. Griffin, the Deputy Assistant Attorney General for Criminal Antitrust Enforcement, who in turn drew on materials prepared by his predecessor, Gary R. Spratling. I particularly want to thank Rebecca Meiklejohn of our New York Field Office for being the first to alert me to the neglect of corporate compliance the Division has found in several of its investigations and Donna Peel of our Chicago Field Office for contributing several of the common characteristics of multinational cartels. The views expressed in this article reflect those of the author and not necessarily those of the Division and the author accepts full responsibility for any errors.

2. *See, e.g., U.S. and EU Competition Policy: Cartels, Mergers, and Beyond*, An Address Before the Council for the United States and Italy Bi-Annual Conference, New York, N.Y., January 25, 2002, at http://www.usdoj.gov/atr/public/speeches/9848.htm.

3. U.S. Department of Justice, Antitrust Division, Corporate Leniency Policy, at http://www.usdoj.gov/atr/public/guidelines/lencorp.htm.

4. The six conditions for obtaining automatic leniency are: (1) At the time the corporation comes forward, the Division has not received information about the illegal activity from any other source; (2) The corporation, upon its discovery of the illegal activity, takes prompt and effective actions to terminate its part in the activity; (3) The corporation reports the wrongdoing with candor and completeness and provides full cooperation to the division throughout the investigation; (4) The confession of wrongdoing is truly a corporate act; (5) Where possible, the corporation makes restitution to the injured parties; and (6) The corporation did not coerce another party to participate in the illegal activity and was not the leader or originator of the activity. If condition one is not met, but the others are, the company may still qualify if (1) it is the first corporation to come forward, and (2) the Division at that point does not yet have evidence likely to result in a sustainable conviction against the firm.

5. *See* Stigler, George J., "A Theory of Oligopoly," *Journal of Political Economy*, Vol. 72, pp. 44-61 (1964).

6. U.S. Sentencing Guidelines, Chapter 8 (effective Nov. 1, 1991).

7. *See, e.g.,* U.S. International Trade Commission, *Report to the President on Global Steel Trade: Structural Problems and Future Solutions* 65-84 (July 2000)(citing stable market shares in Japanese steel industry as evidence that the industry is cartelized).