# EXHIBIT 18
# PART ONE

# INTERNATIONAL COMPETITION POLICY ADVISORY COMMITTEE

TO THE ATTORNEY GENERAL
AND ASSISTANT ATTORNEY GENERAL
FOR ANTITRUST

# FINAL REPORT

2000

**Co-Chairs:**
James F. Rill
Senior Partner, Collier, Shannon, Rill & Scott, PLLC

Paula Stern
President, The Stern Group, Inc.

***Executive Director:***
Merit E. Janow
Professor in the Practice of International Trade
School of International and Public Affairs, Columbia University

***Members:***
Zoë Baird
President, The Markle Foundation

Thomas E. Donilon
Senior Vice President, General Counsel and Corporate Secretary, Fannie Mae

John T. Dunlop
Lamont University Professor, Emeritus, Harvard University

Eleanor M. Fox
Walter J. Derenberg Professor of Trade Regulation, New York University School of Law

Raymond V. Gilmartin
Chairman, President and Chief Executive Officer, Merck & Company, Inc.

Vernon E. Jordan, Jr.
Senior Managing Director, Lazard Frères & Co. LLC
Of Counsel, Akin, Gump, Strauss, Hauer & Feld, L.L.P.

Steven Rattner
Deputy Chairman, Lazard Frères & Co. LLC

Richard P. Simmons
Chairman, Allegheny Technologies Incorporated

G. Richard Thoman
President and Chief Executive Officer, Xerox Corporation

David B. Yoffie
Max and Doris Starr Professor of International Business Administration, Harvard Business School

***Advisory Committee Counsel:***
Cynthia R. Lewis
Andrew J. Shapiro
Stephanie G. Victor

This document is also available in PDF (comparable to original document formatting).
To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site.

*Chapter 4*

# International Anticartel Enforcement and Interagency Enforcement Cooperation

In the United States, cartel behavior (including price-fixing; volume, customer, and market allocation; and bid-rigging) can be a criminal violation of antitrust laws that may result in high fines for conspiring corporations and key corporate executives, and incarceration for individual defendants.(1) Conspirators may also be liable in private civil suits, in which their conviction in a preceding criminal case may serve as *prima facie* evidence of the alleged civil wrongdoing(2) and prevailing plaintiffs are entitled to treble damages and litigation costs.(3)

During the 1990s the U.S. Department of Justice Antitrust Division aggressively and successfully prosecuted a number of large, complex, and geographically diverse international cartels in a broad spectrum of commerce, including food and feed additives, chemicals, vitamins, graphite electrodes (used in manufacturing steel), and marine construction and transportation services.(4) Antitrust Division calculations of the volume of commerce affected by such cartels point to their costly consequences for the U.S. market. At the same time, it is clear that their adverse impact is global and has affected markets and consumers in other countries as well.(5)

Evidence suggests that recent U.S. prosecutorial successes are catching the attention of multinational businesses,(6) and that cartel conspirators are consequently arranging to meet outside of the United States.(7) But it is also clear that knowledge of the risks involved alone may not be sufficient to deter a company from engaging in cartel behavior that it perceives as advantageous. U.S. authorities have already successfully prosecuted one company for its participation in two different cartel arrangements.(8)

Further, U.S. cases against international cartels participants have sparked considerable interest among antitrust enforcement agencies in other countries, despite earlier experiences in which U.S. anticartel enforcement efforts against foreign conspirators was a sometime source of friction with many of these same jurisdictions. Antitrust investigations today are taking place in an environment of greater international enforcement cooperation, and the recent U.S. enforcement successes appear to be occurring amidst a heightened degree of international consensus among enforcers that cartels should be detected and prosecuted. Indeed, some competition authorities are enforcing their domestic laws against many of the same cartels that the United States has successfully prosecuted.

At the same time, the number and magnitude of the international cartels prosecuted by the United States gives rise to several questions. For example, it is not clear whether the surge in U.S. prosecutions indicates that more cartels are operating than ever before or simply that U.S. abilities at detecting them have improved. Nor is it clear how much harm international cartels may be inflicting on economies throughout the world. The Advisory Committee considered these and other questions, discussed in detail below, in its deliberations. Many of these cannot yet be resolved definitively. Nonetheless, it seems likely that greater cooperation and coordination among antitrust enforcement authorities are key to answering these questions.

To better understand these issues, this chapter first reviews the record of U.S. enforcement actions against international cartels. Second, it considers a number of key questions regarding this enforcement record, such as possible explanations for the recent successes, the importance of international assistance, and trends in anticartel enforcement by enforcement authorities around the world. The chapter then discusses issues arising over the use and management of confidential business information in anticartel and other antitrust enforcement efforts. And finally, the chapter concludes by considering positive incentives that U.S. antitrust authorities may use to encourage other competition authorities to make the prosecution of international cartels a priority and to expand their cooperation with the United States.

**The U.S. Enforcement Record**

History has shown that cartels with effects in the United States are not just a matter of domestic activity. While the number and importance of successful international cartel prosecutions brought by the Antitrust Division have increased significantly since the early 1990s, these matters follow on a long history of prosecuting international cartels. The first major case with an international dimension was *U.S. v. American Tobacco*, brought in 1907. In that case, the Department of Justice filed charges against 94 U.S. firms and individuals and two British firms, challenging the creation of a private tobacco monopoly in the United States. One part of the illegal conduct was an agreement between the British tobacco firms and the U.S. firms to stay out of one another's home markets and divide up the rest of the world. Those adversely affected included U.S., British, and other consumers. The British firms argued that their conduct was not covered by the Sherman Act but the U.S. Supreme Court disagreed, holding that the conduct of defendants, American and British alike, was illegal.(9)

Some scholars have estimated that international cartels controlled as much as 40 percent of world trade between 1929 and 1937, and that the majority of their members were from Europe and, to a lesser extent, North America.(10) From the 1940s through the beginning of the 1950s, the U.S. antitrust agencies began to file significant numbers of international antitrust cases -- some criminal, some civil -- against a wide range of international cartels that affected transborder trade. The terms of the challenged cartel agreements varied from case to case, although many were along the lines of the facts in *American Tobacco*: U.S. firms agreeing not to sell in Europe; European firms agreeing not to sell in the United States; and other collusive arrangements made to limit competition in third-country markets.

Indeed, during that period, the Department of Justice filed charges against a wide range of international cartels involving U.S. and European firms and a diversity of products, including: aluminum, dyes, incandescent lamps, nylon, titanium, tungsten carbide, roller bearings, military optical equipment, and aircraft instruments, among other things.(11) The relief obtained against these cartels varied from prohibiting further implementation of the cartels in U.S. markets to imposition of significant criminal fines sometimes on individuals as well as firms.

From the early 1950s through the early 1990s, U.S. antitrust agencies filed relatively fewer international cases than in previous decades, while enforcement efforts were more actively engaged in bringing domestic price-fixing and bid-rigging cases. Some of the international actions filed, for example, involved products such as quinine, uranium, potash, ball bearings, and wire rod.(12)

**Surge in U.S. International Cartel Prosecutions**

Since 1993, the Antitrust Division has made international antitrust enforcement and cooperation a priority,(13) and since 1995 has given top priority to aggressive enforcement against international cartels.(14) In the process the Antitrust Division has built a record of successful prosecutions of nearly 20 international cartels, charging more than 80 corporate and 60 individual defendants in the process.(15)

Statistically, approximately twenty-five percent of the more than 625 criminal antitrust cases filed by the Department of Justice since fiscal year 1990 were international in scope. This marks a departure from trends in immediately preceding years, when prosecutions of international cartel were not much more than a footnote in Antitrust Division enforcement statistics, at least in terms of numbers if not importance.(16)

U.S. investigations into international cartels today are uncovering a geographically diverse group of participants, located on at least 5 continents and more than 20 different countries. Moreover, participants have conducted cartel business in at least 100 cities in 35 countries, including most of the Far East and nearly every country in Western Europe.(17)

The upswing in prosecutions is traced in part to the decision in 1995 by the Antitrust Division to reallocate its resources to concentrate on large or complex international cartels. In the ensuing years, the Antitrust Division has filed an unprecedented number of grand jury investigations and criminal prosecutions against foreign corporate and individual defendants engaged in private international cartel activities.(18) Antitrust officials reported that since 1997 between 25 and 35 grand juries have been active at any given time, all looking into suspected international cartel activities. This represents about one-third of the Division's criminal investigations during the time period, according to U.S. antitrust officials. (19)

The underlying volume of commerce affected by international cartels is also

very significant. The Antitrust Division has estimated that this figure is more than $1 billion a year in the U.S. alone in some investigations and, in others, more than $500 million a year. In more than half the criminal investigations, the volume of affected commerce has exceeded $100 million over the term of the conspiracy.[(20)] Anecdotally, U.S. antitrust authorities report that those cartels prosecuted over the past several years represent just the tip of the iceberg.[(21)]

Perhaps the best-known and most distinctive feature of the Antitrust Division's recent anticartel program has been an exponential increase in the level of fines imposed in cartel cases, as depicted in Annex 4-A hereto. Since fiscal year 1997, international cartel prosecutions have accounted for more than 90 percent of the fines imposed in criminal antitrust cases annually. To illustrate the significance of this statistic, consider that in the decade between fiscal year 1987 and fiscal year 1996, the total amount of fines imposed in anticartel cases equaled slightly more than $295 million, whereas the sum of fines imposed during the subsequent two fiscal years was roughly $472 million, and the total amount of fines imposed in fiscal year 1999 exceeded $1.1 billion. In fiscal year 1999 alone, fines imposed in criminal cases exceeded $1.1 billion -- more than the sum of all fines previously secured in over a century of Sherman Act enforcement.[(22)]

One key factor in the level of criminal penalties being imposed today was an act of Congress in 1990, urged by then-Assistant Attorney General James F. Rill, to increase the maximum fine for price-fixing and other cartel activities ten-fold, from $1 to $10 million for corporations, and from $100,000 to $350,000 for individual defendants.[(23)] A second important factor was the 1991 amendment of the Federal Sentencing Guidelines permitting fines to be calculated in excess of the $10 million cap for violations of Section One of the Sherman Act, depending on the volume of commerce affected, and establishing the "alternative sentencing guideline" under which maximum fines for antitrust criminal defendants can be calculated at twice the gross pecuniary gain derived from the crime or twice the gross pecuniary loss caused to the victims of the crime.[(24)] At the time of these changes, a fine of $10 million had never been imposed. Indeed, as recently as fiscal year 1992, the highest corporate fine for a criminal price-fixing violation was $2 million.

In 1996, Archer Daniels Midland (ADM), a U.S. firm, agreed to pay $100 million for the impact that its role had on the U.S. market in both the *Lysine* ($70 million fine) and *Citric Acid* ($30 million fine) cartels.[(25)] Since then, fines of $10 million or more have become commonplace in international cartel cases, as the chart in Annex 4-A hereto shows,[(26)] and has even lead one Antitrust Division official to dub the growing numbers of corporations paying fines at these levels members of "the $10,000,000 Club."[(27)] Twenty-one of the 26 firms fined $10 million or more are foreign companies or U.S. subsidiaries of foreign-based parents. These experiences have led the Antitrust Division to urge Congress once again to increase the maximum statutory fine ten-fold, to $100 million.[(28)]

Prison terms and fines for individual defendants in cartel cases since 1990 have also set new precedents. In the 1995 *Disposable Plastic Dinnerware* case,

seven individual defendants pleaded guilty and received jail sentences from 4 to 21 months; among the seven were two Canadians, the first foreign executives ever to agree to serve time in U.S. prisons for violations of the Sherman Act. After a jury trial, three former officials of ADM were sentenced to jail periods ranging from 24 to 36 months and to pay fines of up to $350,000 for their roles in the conspiracies. Two former executives from the U.S. firm involved in the *Graphite Electrodes* cartel agreed to serve jail terms of 9 and 17 months and to pay fines of $1 million and $1.25 million, respectively, while a German executive of the German firm entered into a plea agreement under which he was fined $10 million for a two-count violation of the Sherman Act -- the largest fine against any individual in the history of U.S. criminal antitrust enforcement. Furthermore, all of the individual defendants charged in the ongoing investigation into the *Vitamins* cartel, including two Swiss citizens, will serve or are facing potential prison terms as well as significant fines. This marks the first time that European nationals will voluntarily serve time in U.S. prisons for violating U.S. antitrust laws.

**Examples of Recent International Cartels**

A hallmark of international cartel activity is the degree of sophistication with which these conspiracies operate and the recent cartels are no exception. That sophistication is reflected in the level of detail at which cartel agreements are forged, the mechanisms participants employ to monitor and police adherence to agreements, and the ability of participants to travel in and out of diverse jurisdictions for meetings while largely avoiding gathering in jurisdictions such as the United States, where the risk of being detected and prosecuted is deemed too high.(29) An examination of the workings of several recently prosecuted international cartels demonstrates the scope and complexity of the cartel arrangements as well as their geographical diversity.(30)

*Citric Acid and Lysine Cartels (Food and Feed Additives Cartels)*

In August 1996, the Antitrust Division began its prosecution of two related cartels in the food and feed additives industries. In the *Citric Acid* cartel, five firms -- a U.S. firm (ADM); a German-based firm; two Swiss firms; and a French-based, Dutch firm -- as well as several foreign nationals all pleaded guilty to fixing prices and allocating sales volumes in the United States and elsewhere for citric acid, an organic food additive used in beverages, cosmetics, medicine, detergents, chemicals, and textiles, from July 1991 to June 1995. Annual sales of citric acid exceeded $1.2 billion worldwide when the prosecutions were filed, and list prices were raised to U.S. customers by more than 30%, resulting in hundreds of millions of dollars in added revenue for the conspirators.

In the *Lysine* cartel, five firms and six individuals conspired from June 1992 to June 1995, to fix prices and allocate sales of lysine, a livestock feed additive. Corporate participants included ADM, two Japanese firms, a Korean-based firm with U.S. operations, and a separate Korean firm. During the first months alone of this conspiracy, prices went up about 70% in a market with roughly $600 million in annual sales worldwide.

Operations in the *Citric Acid* cartel included secret meetings by high-level

executives from the conspiring firms at locations throughout the world, where they agreed on the broad terms of the conspiracy and left lower-ranking executives to work out the details and implementation of the agreement. The cartel members developed a sophisticated enforcement system to police their agreement that involved setting the prices they would charge for citric acid and the percentage -- to a tenth of a decimal point -- of the total market share that each participant was allowed to sell worldwide; sharing monthly figures for worldwide sales with their co-conspirators so that they could see whether each company was staying within its allotted sales volume percentage; and reviewing the sales of each conspirator at the end of the year. Any company that sold more than its allotted share was required in the following year to purchase the excess from another conspirator that had not reached its volume allocation target.

In the *Lysine* cartel, similarly clandestine meetings took place. Participants established a legitimate-looking "cover" industry organization to disguise their meetings to fix prices and set up a system of sales volume allocations. That system required participants to file reports with a central auditor to implement the allocation agreement and ensure enforcement of the price-fixing agreement and the sales and volume agreements. The scheme also featured a compensation arrangement in case a firm exceeded its quota.

The *Citric Acid* and *Lysine* cases raised the visibility of several important aspects of the recent U.S. anticartel enforcement program. They marked the first time a defendant was fined above the statutory $10 million maximum based on calculations under the Federal Sentencing Guidelines for a single-count violation of the Sherman Act. Additionally, the prosecutions were characterized by unusually detailed evidence, including video and audio taping of meetings and conversations. This evidence resulted from close cooperation between the Antitrust Division and the FBI, much of which was obtained through a government informant. These materials were introduced at trial to convict three former officials of ADM. A fourth indicted individual defendant, a Japanese national, remains a fugitive. One of the important results of this trial is that it enables other antitrust authorities to access materials made public through the trial process and use them in determining the impact of these cartels in their own jurisdictions.

*Graphite Electrodes Cartel*

Graphite electrodes, large columns used in the electric arc furnace "mini-mill" method of steelmaking, are essential to 50 percent of steel manufactured in the U.S. The electrodes generate the intense heat necessary to melt scrap and further refine steel, and are consumed in the process. Six firms -- one U.S., one German, and four Japanese or Japanese-based -- along with a German national and two U.S. individuals, have pleaded guilty to date to conspiring to fix and raise the price of graphite electrodes in the United States and abroad, resulting in higher prices to steel makers. The conspiracy lasted from approximately 1992 to 1997 and during this period total U.S. sales were approximately $1.7 billion. Indictments have also been issued against a fifth Japanese firm and a third U.S. executive.

The cartel involved a complex set of interactions through which participants

attended meetings in the Far East, Europe, and the United States in which the prices and volume of sales of graphite electrodes in the United States and elsewhere were discussed. As described in the plea agreements entered by defendants, cartel participants agreed to increase and maintain prices; eliminate discounts; allocate among themselves the volumes of graphite electrodes to be sold; and divide the world market among themselves, designating on a region-by-region basis, including the United States, who would act as lead in fixing prices for the others to follow. They also exchanged sales and customer information in order to monitor and ensure compliance with the agreements. To safeguard the cartel, the participants restricted access of manufacturing technology to their members and, to evade detection, even used code names in their communications.

The ability of the government to advance its investigation and prosecute members of the *Graphite Electrodes* cartel hinged on cooperation from a U.S. conspirator obtained through a grant of amnesty under the Antitrust Division's Corporate Leniency Policy. Cooperation from the amnesty applicant led to the simultaneous execution of search warrants in the United States and the EU.

The pervasiveness of this cartel and the success of U.S. prosecutors has prompted interest from antitrust authorities abroad in considering the matter. Canada has an investigation underway that already generated one prosecution by the end of 1999 for violations of the Canadian Competition Act.(31) Additionally, the Japan Fair Trade Commission (JFTC) investigated six companies -- four Japanese, one U.S., and one German -- for conspiring to cartelize the Japanese graphite electrodes markets in violation of the Japanese Anti-Monopoly Act. Ultimately, however, the JFTC did not make a formal finding of a violation but instead issued a warning to the Japanese companies to cease the activities in question.(32) Moreover, the European Union has indicated that it is investigating the graphite electrodes cartel and its impact in Member State markets.

*Vitamins Cartel*

This long-lived conspiracy -- self-labeled "Vitamins, Inc."(33) -- carved up the worldwide markets for its products, recruiting big manufacturers to join the coalition, and involved a succession of meetings of high level executives to set world prices of different vitamins, exchange sales and market share data, and enforce their agreements. All seven corporate defendants -- two Swiss, one Canadian and one German, and three Japanese -- have pleaded guilty. The Antitrust Division also has thus far also prosecuted seven U.S. and foreign executives who participated in the cartel. Each of these individuals, including the foreign defendants, has also pleaded guilty and is either already serving time in federal prison, awaiting sentencing, or facing potential jail sentences as well as heavy fines.

This cartel lasted almost a decade, from 1990 until 1999, and involved a highly sophisticated and elaborate conspiracy to control everything about the worldwide sales of vitamins A, $B_2$, $B_4$ (choline chloride), $B_5$, C, E, beta carotene, and vitamin premixes. The premixes are used by food and beverage makers, pharmaceutical and cosmetics companies, and animal feed operations. Executives from cartel

members held annual meetings to allocate market share, supply contracts, and sales volume among themselves, as well as to fix and raise the prices of vitamins around the world. Additionally, they agreed to divide contracts to supply vitamin premixes to customers in the United States by rigging the bids for those contracts. Cartel participants held frequent interim meetings to monitor and enforce the agreed-upon prices and market shares.

The *Vitamins* conspiracy is significant on a number of fronts. It is the largest cartel -- international or domestic -- uncovered or prosecuted by antitrust authorities in the United States or elsewhere and resulted in a fine of $500 million from one of the cartel's leaders, F. Hoffmann-La Roche, a Swiss firm. Other significant penalties imposed to date include commitments from two, Swiss nationals, former top executives of F. Hoffmann-La Roche, to serve jail sentences in U.S. prisons, and a fine of $225 million imposed on BASF, a German co-conspirator. The fine imposed on F. Hoffmann-La Roche is the largest in the history of *all* U.S. criminal enforcement; and the commitments from its two European former top executives to serve U.S. jail terms is also unprecedented.

The Antitrust Division's ability to crack the conspiracy turned on cooperation from a conspirator, a French firm, which qualified for amnesty under the Corporate Leniency Policy. In addition, once firms such as F. Hoffmann-La Roche and BASF decided to step forward and accept responsibility for their actions, their cooperation was "nothing less than exemplary."(34) This cartel prosecution has caught the attention of antitrust authorities in several other important jurisdictions. Canada has already prosecuted several corporate and individual participants in the *Vitamins* cartel, while antitrust authorities in Europe, Japan, and Australia all indicate interest in investigating the impact of the cartel in their respective jurisdictions. U.S. officials also state that the *Vitamins* cartel prosecution has galvanized a consumer movement around the world that has added a degree of public pressure on governments to detect and eliminate cartels affecting local prices.(35)

### Key Issues before the Advisory Committee

The Advisory Committee has considered several important questions regarding recent developments. For example, what accounts for the surge in recent U.S. investigation and prosecutions of international cartels? Does this upswing reflect an increase in international cartel activity affecting the United States; an increase in successful detection, investigation and prosecution by U.S. antitrust authorities; or some combination of these factors? What Antitrust Division policy changes, if any, may be responsible for the recent successful U.S. enforcement record? How important is international cooperation to successful U.S. antitrust enforcement and how can it be usefully expanded? What effect have the recent U.S. enforcement efforts had on other countries? Several of these questions simply cannot be answered in a definitive fashion. Some preliminary observations are possible, however.

#### An Increase in Cartels or in Detection?

The Advisory Committee recognizes that scholarship on the incidence of international cartels is divided. Some have argued that price-fixing attempts never declined after World War II, but simply went underground.(36) Others have argued that effective international collusion has declined since its apparent heyday in the first half of the 20th century.(37) And some industries have shown a pattern of recurring cartel activity over the years. Certainly the recent U.S. cartel record indicates that the incidence of detected international cartel activity may be increasing, and some scholarship supports this interpretation of events.(38) The clandestine nature of cartels may make it impossible to determine the truth, but the record shows that international cartels remain a real problem at this time.

The Advisory Committee invited several economists to consider the recent record of prosecution. The resulting comments suggest that increased globalization can work in both directions, and not surprisingly the assessment will be very case specific. For example, alliances between competitors may make communication easier, which in turn tends to support more collusive market outcomes. The increasing ease and speed of communication, however, can also help buyers gain information on pricing from a variety of competitors, a fact that would tend to undermine pricing discipline and collusive behavior. Similarly, some markets have become vastly more competitive, while others have gradually become more concentrated and perhaps more susceptible to collusive activity.(39)

A more complete assessment of the incidence of private international cartels is beyond the capabilities of this Advisory Committee. Nonetheless, this Advisory Committee believes that the scope and incidence of international cartels are important matters for further examination and recommends further consideration of this issue by governments and other experts.(40)

**Changes in U.S. Enforcement Policy**

Although it cannot be conclusively determined whether the number of international cartels has increased during the past decade, there is no doubt that the outcome of U.S. antitrust enforcement efforts against international cartels has improved. Greater detection and access to information necessary for prosecution appears to be attributable at least in part to several shifts in U.S. enforcement policy, including revisions of the Antitrust Division's leniency policies;(41) the enhanced capacity to preadjudicate the immigration status of potentially cooperating foreign individual defendants;(42) and a heightened emphasis on cooperation and coordination of efforts with other U.S. government authorities, including the FBI.

The Corporate Leniency Policy, as revised in 1993 (also known as the"Amnesty Program"), contains three significant aspects. First, *automatic amnesty* from prosecution and criminal penalties is available to a company that meets the program's requirements and comes forward before an investigation is begun. Automatic amnesty guarantees a grant of amnesty and eliminates any possible exercise of prosecutorial discretion. Second, possible *alternative amnesty*

is available to companies meeting certain requirements even if cooperation begins after an investigation is underway. Third, *corporate directors, officers, and employees will receive automatic amnesty* if the corporation qualifies for the same. Amnesty remains unavailable to corporate "ring-leaders."[(43)] The automatic and alternative amnesty provisions are detailed in Annex 4-B hereto.

Moreover, under the Amnesty Program, the Antitrust Division's policy is to treat as confidential the identity of amnesty applicants and any information obtained from the applicant. Thus, it will not disclose an amnesty applicant's identity absent prior disclosure by or agreement with the applicant, unless authorized by court order. Consistent with this policy, and in order to protect the integrity of the Corporate Amnesty Program, the Antitrust Division has adopted a policy of not disclosing to foreign authorities, pursuant to cooperation agreements, information obtained from an amnesty applicant unless the amnesty applicant agrees first to the disclosure. These are important inducements for firms to seek amnesty and provide full cooperation to the Antitrust Division, especially because international cartels are under increasing scrutiny by antitrust authorities in other jurisdictions as well as the United States.[(44)]

These revisions have proved instrumental in the Division's recent successes and the Antitrust Division has taken many steps to publicize widely how they can increase opportunities for cartel participants to report on their own role in criminal antitrust activities and cooperate with the Antitrust Division.[(45)] Under the previous policy, which had been in effect for 14½ years, the grant of amnesty was not automatic. Rather, it was dependent upon prosecutorial discretion based on a series of seven factors and it was available only to those who came forward before the Division had initiated an investigation. Commenting on the revisions, then-Assistant Attorney General Anne Bingaman declared that she thought that the longstanding policy of denying amnesty to any corporation once an investigation was underway was too rigid and might be depriving the Antitrust Division of additional cooperation that would, on balance, serve the public interest.[(46)]

After the revised program was announced, the number of amnesty applications quickly increased from approximately one a year to more than one a month. By 1998, the Antitrust Division reported it was receiving approximately two applications a month. The violations reported through the Amnesty Program led to some of the Division's largest prosecutions, including the *Graphite Electrodes* and *Vitamins* cartels discussed above. In tandem with the recognizable threat of steep fines resulting from prosecutions, the revised Corporate Leniency Policy is providing important incentives for multinational firms involved in international cartels to approach the Antitrust Division early and reveal their own wrongdoing and that of their co-conspirators.[(47)] Members of the private bar also give credit to these factors for the recent surge in international cartel prosecutions.[(48)] Moreover, it appears that the voluntary nature of the amnesty policy is particularly relevant in the international context, where history teaches that tensions over issues of sovereignty might otherwise potentially arise if U.S. assertions of jurisdiction in cartel investigations were perceived as overreaching.

In 1999, the Antitrust Division formally announced that the Corporate Leniency Policy had been extended to include a new "Amnesty Plus" provision. This development occurred because over half of the Antitrust Division's international cartel investigations were initiated when cooperating witnesses in an ongoing investigation into cartel activities in an unrelated industry.(49) The new policy is designed to build on this experience by proactively attracting amnesty applications from targets of ongoing antitrust investigations, encouraging them to consider whether they may qualify for amnesty in other markets where they operate when they apply for favorable treatment in exchange for cooperation through a plea agreement with the Antitrust Division in an ongoing investigation . If a corporation meets the seven mandatory factors for amnesty eligibility in the subsequent investigation, including the "first in" test, it will receive amnesty protection. Additionally, the Division will credit the corporation for its cooperation by giving it a substantial additional discount in calculating the fine recommended in the initial investigation.

The large U.S. anticartel prosecutions of the last five years also are distinguished by heavy reliance by Antitrust Division on plea agreements with firms and their key executives who do not qualify for amnesty (including situations where the firm is not "first in"). In light of the steep fines secured in the majority of recent international anticartel prosecutions, a firm that qualifies for amnesty and therefore pays no fines clearly gains substantial cost savings in addition to protection from prosecution for all corporate executives. A firm that enters into a plea agreement and cooperates early in an investigation may also face significantly reduced fines. Department of Justice agreements to recommend reduced sentences in these and other circumstances, such as when it applies the amnesty-plus policy, appear to have been successful in encouraging cooperation from individual defendants.(50) Reduced sentencing agreements have also been used where the cooperating defendant plays a substantial role in securing the cooperation of other co-conspirators as well as providing substantial assistance in the investigation.(51) To protect cooperating firms from possible treble-damage suits lodged by private litigants in the United States, the Antitrust Division as a matter of general policy will accept foreign-located information as produced in response to an applicable grand jury subpoena, thus subjecting it to the same strict safeguards applied to grand jury materials under Rule 6(e) of the Federal Rules of Criminal Procedure.(52)

Moreover, to ensure that a criminal conviction does not result in deportation and permanent exclusion from the United States of a cooperating individual defendant, in 1996 the Antitrust Division also obtained the ability to offer cooperating individuals an opportunity for the Immigration and Naturalization Service (INS) to reach a final adjudication on their immigration status prior to before they enter into a plea agreement in the underlying antitrust prosecution. The Antitrust Division reports that the options made possible under this memorandum of understand (MOU) are instrumental in every international antitrust matter before the Division since the MOU was signed, as considerations of freedom to travel in and out of the United States are important to every foreign individual defendant's decision to cooperate with the U.S. government, as well as to decisions by foreign corporate defendants about whether to seek plea agreements.(53)

Further, the Antitrust Division credits its increased cooperation with other branches of the government as another important factor in the recent success record of international anticartel prosecutions. In 1995, the Division announced its "Generating Quality Criminal Cases Initiative," a policy to revitalize cooperation and coordination with other U.S. government authorities, including the FBI, and as a result to obtain more referrals of possible antitrust crimes from other investigative and prosecutorial agencies.(54)

**Interagency Anticartel Enforcement Cooperation**

Over the past decade, U.S. antitrust authorities have publicly acknowledged the important role of interagency enforcement cooperation in several criminal cartel matters. Further, even when U.S. agencies do not receive any overt cooperation from an another jurisdiction, they have been relatively unhindered during the last two or more decades by application of blocking statutes and other affirmative tools in opposition to U.S. international investigations. Indeed, other jurisdictions are beginning to investigate and take actions against a number of the same cartels that the United States has prosecuted, as described more fully below. In this sense, a spirit of cooperation appears to be growing, at least between the United States and the EU, as well as with several individual nations, including Australia, Canada, and some EU Member States including Germany, and the United Kingdom (UK), Israel, and Japan, with respect to hard core cartel cases that are seen as causing consumer harm in the U.S. and abroad.

As a general matter, while enforcement assistance is available under the bilateral antitrust agreements that the United States has signed with Brazil, Canada, the European Union, Germany, Israel, and Japan,(55) it is also limited in scope and does not extend the ability of U.S. antitrust authorities to compel production of information from overseas corporations or individuals, or to access confidential information held by sister competition authorities. The only formal antitrust-specific agreements under which such material may be obtained are those negotiated under the International Antitrust Enforcement Assistance Agreement of 1994 (IAEAA).(56) Mutual legal assistance treaties in criminal matters (MLATs) offer a separate formal treaty mechanism under which assistance in criminal antitrust matters may be available, including assistance in compelling production of materials and obtaining access to confidential investigative information from sister antitrust authorities.(57) Finally, in limited circumstances, U.S. antitrust agencies may obtain such information through traditional international law means, such as diplomatic channels or court-to-court letter rogatory requests.(58)

Below are several public examples of interagency assistance that the Antitrust Division has received in connection with its recent international cartel investigations. The sensitive nature of criminal investigations limits the amount of information that the Antitrust Division can publicize about them. Accordingly, these illustrations can be understood to reflect only part of the full amount of assistance U.S. antitrust authorities are receiving from overseas enforcement authorities.

*U.S. Antitrust Enforcement Cooperation Through MLATs*

There are only three instances of publicly disclosed details about international cooperation provided to U.S. antitrust authorities pursuant to MLAT requests, all involving requests to Canada. Antitrust Division officials describe their successes using the MLAT and other enforcement assistance agreements with Canada as illustrating the extent to which cross-border cooperation can enhance enforcement of domestic antitrust laws.(59)

In two examples, *Thermal Fax Paper* and *Disposable Plastic Dinnerware*, U.S. antitrust enforcers relied on evidence obtained through assistance from Canadian authorities in bringing these cases to their final disposition. In the *Thermal Fax Paper* case, the United States and Canada conducted joint interviews of potential witnesses and coordinated their subpoena efforts. The United States was also able to access Canada's database of documents and information.(60) In the *Disposable Plastic Dinnerware* investigation, pursuant to an MLAT request from the United States and through execution of domestic search warrants, simultaneous raids took place on conspirators' offices in Montreal, by the Royal Canadian Mounted Police, and in California, Massachusetts and Minnesota, by the FBI. In the *Ductile Pipe* cartel, again, the U.S. and Canadian antitrust authorities conducted parallel investigations resulting in the Division receiving Canadian-located evidence from the Canadian government, pursuant to an MLAT request. This evidence was in the files of the Canadians after having been obtained in the course of their own investigation, pursuant to a Canadian warrant-based search of corporate premises in that country. Ultimately, however, The Division concluded that it did not have sufficient evidence to prosecute under U.S. law.(61)

*Antitrust Enforcement Assistance Through Traditional International Law Mechanisms*

There are similarly only a few public examples of U.S. antitrust investigations benefiting from assistance received through traditional international law mechanisms. In 1994 the Antitrust Division used diplomatic channels to ask the Government of Japan for investigative assistance in obtaining evidence located in that country in connection with *Thermal Fax Paper* investigation(62) In keeping with a domestic law permitting assistance to foreign authorities in certain criminal matters,(63) the Japanese Prosecutor's Office raided and seized documents from the Tokyo headquarters of two Japanese companies, secured the cooperation of other Japanese companies from which the United States sought additional documents, and questioned representatives of Japanese thermal fax paper manufacturers in the presence of representatives of the Antitrust Division.(64)

In the *Industrial Diamonds* criminal price-fixing case against General Electric and DeBeers,(65) the Belgian Judicial Police agreed to carry out a search and conduct a witness interview in Brussels, although the putative witness (who was eventually indicted) moved to France just before the interview. In addition, two Belgian judicial police officers traveled to Ohio in 1994 to testify for the United States at the trial of defendant General Electric regarding certain relevant activities that had occurred in Belgium.

One significant hurdle that continues to confront U.S. antitrust authorities is that only a limited number of jurisdictions have legal systems that enable them to allow foreign antitrust authorities access to confidential law enforcement or statutorily protected information, or to exercise compulsory powers to obtain evidence for use in another jurisdiction's antitrust actions. Canada may provide such assistance to the United States under the U.S.-Canada MLAT. Australia is one of the few jurisdictions with a law in place that empowers its antitrust authorities to participate in enforcement cooperation on this level, under specific conditions (that law enabled the Australian Competition Commission to enter into its 1999 IAEAA agreement with U.S. antitrust authorities).[(66)]

At the same time, competition officials in a number of countries appear to be interested in expanding the number of bilateral antitrust agreements to which they are a party and deepening the range of areas of coverage, at least with the United States.[(67)] At ICPAC hearings in November 1998, for example, Canadian, EU, and other officials indicated their interest in exploring possibilities for IAEAA agreements with the United States; the EU also expressed interest in an MLAT.[(68)]

The Antitrust Division also indicates that it has received assistance through MLAT requests in criminal antitrust investigations that have not been made public and, further, that it has used informal mechanisms on a case by case basis to elicit aid from foreign governments in its enforcement efforts. Despite this assistance, U.S. antitrust acknowledge that significant obstacles remain to U.S. antitrust investigatory efforts.

Based on the evidence, recent U.S. achievements in prosecuting international cartels suggest that while foreign assistance has and can facilitate antitrust enforcement efforts, only periodically does it prove crucial to their outcome. At the same time, the Antitrust Division asserts that while international cooperation has been important in a number of investigations -- many of which involve huge amounts of commerce -- it is the *unavailability* of cooperation that has stalled investigations temporarily or permanently because the Antitrust Division is unable to otherwise access information located overseas.[(69)] Given the history of barriers to U.S. antitrust enforcement efforts and the fact that, even though more jurisdictions are recognizing the legitimacy of such efforts, only a handful have legal or judicial mechanisms in place through which extensive assistance can be made available, it stands to reason that U.S. investigative efforts to obtain necessary or timely access to information from abroad will be hindered from time to time.

One mechanism to overcome any such impediments is to encourage voluntary cooperation from targets of investigations. In cartel prosecutions, the Antitrust Division's leniency policies have provided U.S. antitrust authorities with a virtual longpole -- enabling it to vault a number of the more traditional barriers to its international enforcement efforts. Significantly, this has occurred without offending the sovereign interests of other jurisdictions to the same degree that can arise in the context of extraterritorial enforcement. Some of the persistent concerns associated with international enforcement are sidestepped when a firm or an individual cooperates pursuant to a leniency policy, including issues of personal

jurisdiction, service of process, and access to foreign-located evidence and individuals, as well as the possibility of witnesses who provide voluntary cooperation outside a grant of leniency actually delivering the full amount of cooperation pledged. In sum, it appears that unilateral policy measures undertaken by U.S. antitrust authorities, most prominently through the Corporate Leniency Policy and the MOU with the INS, are succeeding in overcoming traditional barriers to international law enforcement, at least as long as cartel participants consider the benefits to outweigh the potential costs of prosecution.

**Anticartel Enforcement in Other Countries**

Recent U.S. cartel cases show that the adverse effects of international cartels are felt by markets around the world, leading to a shift in the way that overseas antitrust authorities react to U.S. antitrust efforts. For many decades, the United States stood almost alone in the world in its commitment to antitrust enforcement, especially when the defendants were located in other countries. In fact, until quite recently, U.S. antitrust investigations into international cartels were met with chilly receptions from other governments.

Over time cartels have been condemned in several fora. For instance, in 1980 the United Nations Conference on Trade and Development (UNCTAD) released of a set of nonbinding recommendations for the control of restrictive business practices that include a provision condemning cartels (the Set).[(70)] While the Set is not a source of international law, it highlights the importance of prohibitions against cartels to those countries that have developed competition laws in the ensuing years. Scores of jurisdictions have adopted competition laws in the last decade, and despite significant differences in the scope of these laws, they demonstrate clear consensus that hard core cartels are pernicious and should be uncovered and stopped.

In 1998 the 29 members of the OECD adopted the Recommendation of the Council Concerning Effective Action Against Hard Core Cartels,[(71)] the first consensus statement on an approach to international hard core cartels.[(72)] For the purposes of the Recommendation, a hard core cartel is "an anticompetitive agreement, anticompetitive concerted practice, or anticompetitive arrangement by competitors to fix prices, make rigged bids (collusive tenders), establish output restrictions or quotas, or share or divide markets by allocating customers, suppliers, territories, or

lines of commerce ... ."[(73)] Some, however, argue that this meaning is too permissive of state-supported cartels and should be revised to remove the requirement that cartel activity be anticompetitive.

The Recommendation encourages member countries to adopt competition laws that effectively prohibit and deter hard core cartels and provide for effective sanctions, enforcement procedures, and enforcement institutions, among other things. It states that OECD countries have a common interest in preventing hard

core cartels and should cooperate with each other in enforcing their own laws against such cartels, to the extent consistent with each member's laws, regulations, and important interests. Moreover, the Recommendation encourages member countries to enter into mutual assistance agreements that would permit the sharing of evidence with foreign antitrust authorities, to the extent permitted by national laws, and encourages members to take another look at provisions in their own laws that stand in the way of these cooperative efforts.

Anticartel laws vary from jurisdiction to jurisdiction and differences between them reflect differences in national legal systems. Many provide for administrative or civil remedies rather than criminal penalties, while others -- including the United States -- criminalize some competition offenses, usually including bid-rigging, price-fixing, and allocation of markets, sales and customers. The fact remains, however, that overall anticartel enforcement levels around the world remain fairly low outside the United States, and that penalties differ significantly in those jurisdictions that have active anticartel programs. Annex 4-B hereto provides a comparison of penalties in selected jurisdictions.

Several jurisdictions have established their own record of anticartel enforcement actions, some of which have followed the United States' prosecutorial lead against international cartels in addition to pursuing a domestic anticartel agenda. Still others are now toughening their existing laws and enforcement programs. Jurisdictions as diverse as Canada, the EC, France, Germany, Israel, Korea, Japan, Mexico, and Spain have brought significant actions against domestic and/or international cartels. Several other countries, including the Netherlands, South Africa, and the UK have recently enacted strong new antitrust laws and are putting anticartel enforcement policies in place. Others, such as Ireland, have issued public notifications that they intend to engage in criminal prosecution of cartel behavior, while some, such as Norway, have begun such a process. Moreover, if imitation is an indication of success, it appears that the Antitrust Division's successes under its Corporate Leniency Policy are being studied to model comparable programs in other jurisdictions; the EC, Canada, and the UK are promulgating and improving their own corporate leniency programs. (74)

A closer look at the anticartel enforcement actions in Canada and the EU -- two of the most active regimes outside the United States in investigating and prosecuting cartels, including international cartels -- might be instructive.[(75)] Canada has developed a track record over the past several years of pursuing large, international, hard core cartel cases. Since the early 1990s, the Attorney General of Canada has prosecuted a number of firms and their key executives for participating in such activities. These prosecutions -- *Thermal Fax Paper, Citric Acid, Lysine, Sodium Gluconate, Graphite Electrodes, Sorbates, Vitamins (Bulk Vitamins and Choline Chloride ($B_4$)); Ductile Pipe,* and *Insecticides* (all but the last two cases involve products first prosecuted by U.S. antitrust authorities)[(76)] -- have resulted in the imposition of increasingly steep fines, including the highest ever Canadian fine at CDN$50.9 million against F. Hoffmann-La Roche in the *Vitamins* and *Citric Acid* proceeding and the first-ever sentencing of an individual to incarceration for involvement in an international cartel.[(77)] Canada has had an

amnesty program since 1991 (first implemented as the Whistle Blower Program in the *Insecticides* case), which was revised and circulated for comment in 1999. A new policy statement, designed to increase predictability and to enhance the program's attractiveness to applicants, is expected to be released at about the same time as this Report.(78) Canadian policy has been heavily influenced by the U.S. Corporate Leniency Policy, particularly by its provision for automatic amnesty.(79) Like its U.S. counterparts, Canadian antitrust authorities have identified their ability to seek investigative and other assistance from the United States under the 1991 antitrust assistance agreement, the MLAT, and the extradition treaty with the United States as important to recent developments in the Canadian antitrust enforcement program.(80)

The EU, working through the European Commission, has developed a strong history of enforcing its anticartel laws and has prosecuted at least 20, mostly internal, cartels since the late 1980s. During this time, the level of fines imposed in these matters has increased sharply. In five matters, total fines imposed were roughly ECU 100 million: *Seamless Steel Tubes* (1999); *Pre-Insulated Pipe* (1999); *Carton Board* (1994), *Steel Beam* (1994), and *Cement* (1994). Further, large fines of ECU 20 million or more have been imposed since 1990 on at least 10 firms for their roles in European cartels.(81) In its *Pre-Insulated Pipe* decision, the EC imposed a fine of ECU 70 million against a single defendant, the largest fine ever in a cartel matter.(82) During the 1990s, the EC instituted several policies to build up its anticartel program. In July 1996 the EC announced its leniency policy notice.(83) The policy is intended to discourage firms from participating in cartels while encouraging them to denounce such activities to the Commission, and follows the lead of the United States.(84) It had been applied in five cartel cases as of the end of 1999, each time resulting in downward adjustments of fines.(85) In January 1998, the EC published Guidelines on the method of setting fines imposed for infringements of competition laws.(86) While publication of the Guidelines was intended to improve the transparency and effectiveness of the Commission's decisionmaking practice in applying its leniency policy, they have proved controversial and provoked concern about less-than-predictable results, particularly because determinations of whether and to what extent to provide leniency are not made until the conclusion of the EC's proceeding in a matter.(87) While it is notable that the EC has a very low incidence of prosecuting cartels outside its borders, this may be changing.(88) For example, the EC issued a decision in December 1999 in the *Seamless Steel Tubes* matter which involved four firms from Member States and four Japanese firms. Moreover, the Commission is currently investigating some of the same international cartels as prosecuted in the United States and Canada, including the *Graphite Electrodes* and *Vitamins* conspiracies.

*Assessment of Recent Trends*

In a word, it appears that interest in enforcement is growing in many jurisdictions around the world and that U.S. experiences are receiving close scrutiny. The scrutiny is prompting a favorable response in at least a few jurisdictions who are also publicly considering follow-on investigations of some

of the international cartels prosecuted in the United States, as mentioned in the discussion above. It is interesting to note that a number of jurisdictions are putting information regarding their enforcement programs and policies (including their leniency policies) on their Internet websites in an effort to increase the transparency of their practices. Moreover, several jurisdictions are including translations into other languages, particularly English, for key materials posted on their websites.(89)

Additional efforts will doubtless be necessary to foster discussion and awareness among enforcement authorities and, equally important, corporations and consumers in their home markets. A recent initiative by the Antitrust Division to host a two-day International Cartel Enforcement Workshop in Washington D.C., appears instructive as a mechanism for fostering discussion and awareness about the far-reaching deleterious effects of international cartels and the advantages that cooperation may offer to enforcement authorities. Panelists from more than a dozen different enforcement agencies led discussions on topics ranging from leniency policies, to investigatory and prosecutorial mechanisms and policies, to cooperation among antitrust agencies in cartel cases, to methods of building an anticartel enforcement program.(90)

**Greater Cooperation Through Increased Awareness**

The recent record shows that international cartels are a serious problem with pernicious effects on the U.S. and foreign markets. The adverse effects of these arrangements are being felt not only by consumers around the world, but also by the businesses and governments that rely on the cartelized inputs. Accordingly, the Advisory Committee recommends that the United States expand its efforts to increase public knowledge and awareness, at home and abroad, of the deleterious consequences of cartels. Moreover, U.S. enforcement actions against cartels appear to be generating considerable interest among enforcement officials around the world, and the climate has improved significantly for cooperation. The Advisory Committee hopes that the United States will be able to build on the prevailing climate favoring international antitrust enforcement cooperation by sharing its recent experiences with foreign authorities in informal fora -- like its 1999 International Cartel Enforcement Workshop, or the annual Fordham Corporate Law Institute Conference on International Law and Policy that is regarded as an institution in its own right. The United States should also take advantage of opportunities for cooperation building offered in formal settings, such as at the OECD or at conferences on point organized by the World Trade Organization (WTO) or antitrust bar associations. All of these efforts to ensure that U.S. enforcement policies are well understood abroad will enhance the credibility of the U.S. enforcement effort and promote cooperation at the same time.

## The Use and Management of Confidential Information

The U.S. and international business communities have long expressed concerns about exchanges of confidential information between competition authorities.(91) Several issues have repeatedly surfaced, including agency accountability for safeguarding confidential material from unauthorized disclosure

or use, notice to firms that such information is being provided to a foreign governmental authority, and transparency in the processes involved. These concerns were expressed by U.S. and international private bar associations and business groups in the course of Advisory Committee hearings and outreach efforts, and echo concerns raised at the time that passage of the IAEAA was under consideration. While concerns about the exchange and use of confidential information extend to all areas of antitrust enforcement, this chapter considers the topic as it applies to anticartel enforcement and civil nonmerger matters.(92)

**Agency Accountability in Safeguarding Information**

Concerns about the possibility of "leaks" by competition agencies to competitors or to other enforcement agencies persist, despite the absence of any cited evidence of leaks.(93) One of the most often cited worries is that confidential information transmitted from one jurisdiction to another in an enforcement action will be disclosed to competitors.(94) American firms tend to fear that competition authorities in other jurisdictions may intentionally disclose confidential information from U.S. firms to competitor companies, perhaps even companies that are state-owned in part or full, with resultant harmful effects. Foreign firms tend to believe that U.S. antitrust authorities are unable to protect confidential information from disclosure to private third parties, through either litigation and the related discovery process or requests under the Freedom of Information Act. They appear particularly concerned that their own information might be used against them in private U.S. legal actions, including antitrust actions seeking treble damages.

Senior Antitrust Division officials have stated that there have been no leaks of information received from non-U.S. firms and, moreover, that the same protections under law apply to information received from domestic and foreign sources. They assert also that investigations of hard core cartel activity rarely focus on business information of the sort produced in connection with premerger reviews, including materials on sensitive trade secrets or prospective business plans. Thus, business concerns about interagency cooperation in the sharing of confidential or protected information are far less germane in cartel enforcement matters than they are in multijurisdictional merger reviews.(95) Furthermore, concern about possible leaks appears to stem from fears about prospective interagency exchanges with jurisdictions that have limited experience with competition law and policy and less established safeguards in place, or between jurisdictions that have disparate access to confidential and business sensitive material in the course of enforcing their anticartel laws.(96)

**Transparency**

A policy of transparency in anticartel investigations is necessary to provide a measure of predictability about the potential use and disclosure of information produced by the targets of investigations should they decide to cooperate with investigators.(97) The experiences of antitrust enforcers in the United States and other jurisdictions with leniency policies indicate that transparency in the process employed when applying such policies is critical to obtaining necessary

cooperation from cartel participants. Cooperation is an important component in the successful investigation and prosecution of international cartels because some important materials are often likely to be located outside the jurisdiction investigating an international cartel. Revisions to the U.S. Corporate Leniency Policy were prompted by such considerations and, accordingly, incorporated provisions for automatic amnesty, including the nondisclosure of identifying information about parties who qualify for amnesty. Today, U.S. antitrust officials repeatedly attribute much of their success in obtaining cooperation from targets of cartel investigations to the Antitrust Division's readiness to provide transparency throughout its anticartel enforcement program.[(98)]

It is in the interest of sound competition policy and its enforcement that all competition authorities apply a policy of transparency concerning standards applying in anticartel enforcement matters to ensure that they and members of the public are aware of applicable domestic laws and policies governing the management, use, and exchange of confidential information. This is important whether or not concerns about agency accountability are fully warranted by the record. Continuing efforts to increase transparency are necessary to instill greater business confidence that exchanges will not result in adverse commercial consequences.

**Notice**

Another recurring concern from some members of the business community and the private bar is that competition authorities have refused to commit to provide notice, either before or after the fact, when interagency disclosure of confidential information takes place. European firms in particular have expressed apprehension that they may not be notified before information produced voluntarily to EU competition authorities -- for the purpose of informal discussion, say, or to obtain exemption or clearance for commercial agreements that are not in violation of EU law -- is transferred to U.S. antitrust authorities.[(99)] Consequently, some European firms advocate a system providing notice before such material is transmitted to another jurisdiction, so that they may object or request that safeguards for its protection be secured before the transfer.[(100)]

The Advisory Committee recognizes that enforcement authorities may not be in a position to provide notice when doing so would violate applicable treaty terms or a court order or jeopardize an ongoing criminal investigation. Despite these constraints, U.S. antitrust enforcers have stated they are willing to provide notice after the fact in appropriate circumstances.[(101)] Moreover, there are other circumstances when constructive notice will be provided: for instance if a U.S. antitrust authority seeks information from a U.S. firm for use in responding to a request for assistance from a sister antitrust authority. Further, in situations where information is voluntarily provided to U.S. antitrust enforcers, the producing party can include terms for notice or restrictions on use or disclosure of its information.

The Advisory Committee recommends that U.S. antitrust authorities consider providing *notice* -- either before or after the fact -- of their intent to disclose information to antitrust authorities in other jurisdictions unless such notice would

violate a treaty obligation of the United States, or a court order, or jeopardize the integrity of any U.S., state or foreign investigation.(102) The U.S. antitrust agencies must, of course, assess requests to share confidential information by taking into consideration, among other things, their history of enforcement cooperation with the requesting jurisdiction as well as whether they are confident that the jurisdiction is able to and does protect confidential information under its own laws.

**Transparency and Notice Issues in Civil Nonmerger Matters**

Concerns about transparency in the use and management of confidential business information and about notice cut across all areas of U.S. antitrust enforcement. Chapter 2 discusses these issues as they apply in multijurisdictional merger reviews. The subject is considered briefly here as it arises in civil nonmerger matters. In the civil nonmerger context, an approach that may sometimes be useful to antitrust authorities from different jurisdictions who are conducting investigations of similar facts is to ask a party under investigation to sign voluntary written waivers allowing the agencies to share information. This approach can benefit the subject of an investigation as well as the cooperating antitrust agencies. It provides the waiving party with an understanding of the information-sharing process, control over the type of information that the investigating agencies may exchange, and notice of both their general intent to do so and to collaborate broadly in their respective investigations. For antitrust authorities, use of waivers can enable them to proceed jointly in pursing their investigations and in fashioning remedies.(103) The recent U.S. record, including the *Microsoft I* and *A.C. Nielsen* cases, supports this policy.(104)

At the same time the Advisory Committee recognizes that incentives to provide waivers for subjects of nonmerger investigations will differ somewhat from those for parties to a merger (who are focused on "getting the deal done"), so there may be fewer opportunities for waivers to be used to enhance interagency cooperation in civil nonmerger matters. Nonetheless, subjects of civil nonmerger investigations are more likely to provide waivers in those instances when they understand the information-sharing process and can determine that they will benefit from interagency cooperation pursuant to waivers. The Advisory Committee believes that both transparency and accountability can be enhanced through such use of waivers in the civil nonmerger context, without adding unnecessary burden on the reviewing competition agencies.

**Other Confidentiality Proposals Considered**

Some experts have suggested imposing limitations on the use of confidential information. Specifically, it has been proposed that the Antitrust Division should commit not to make information obtained for one purpose available for use in other matters, such as using information received in a civil nonmerger investigation in an unrelated criminal investigation. After considering this proposition, the Advisory Committee concluded that it may be attractive to foreign firms and authorities, but would not clearly enhance interagency cooperation enough to warrant the potentially significant policy constraints the proposal would place on U.S. enforcement agencies.

The Advisory Committee has also considered a number of specific proposals aimed at improving cooperation with foreign authorities through certain adjustments in U.S. legal procedures or fines, including treble damages in private antitrust litigation. The Advisory Committee considers elements such as treble damages, right of private (including class-action) suits, and broad rights of discovery to be among the strongest features of the U.S. enforcement system, even though they are often particularly unpopular abroad. Accordingly, the Advisory Committee concludes that, notwithstanding the potential benefits from increased cooperation from foreign authorities and firms, modifications of these core features of the U.S. system are not recommended. The Advisory Committee believes that sanctions directed at hard core cartel conduct should not be weakened.

**The Importance of Positive Incentives**

The Advisory Committee has discussed the importance of providing specific positive incentives to extend and deepen cooperation between U.S. and foreign competition authorities. Positive incentives should aim to further develop a shared culture of sound competition policy around the world, instill greater public confidence in the value of interagency enforcement cooperation, and reduce tensions associated with U.S. enforcement. To this end, the Advisory Committee recommends that the U.S. government expand its ability to provide technical assistance designed to enhance international cooperation and promote sound competition policy regimes. While the Antitrust Division and Federal Trade Commission have built a record of technical assistance during the 1990s,[(105)] the Advisory Committee recommends that this work be expanded with support from more and consistent funding, and that its focus be enlarged. For instance, funds could be allocated in at least two directions. One would focus on traditional core functional areas, such as anticartel enforcement activities and premerger reviews; the other could be designed to fund new initiatives, including those considered in Chapters 5 and 6 herein. As part of the first emphasis, the United States should enhance its coordinated technical assistance efforts with programs organized by international organizations, such as the OECD, which provides a model for deepening programming through its use of seminars and the case study method.

The second category might extend to funding support to advance basic concerns, such as the operating needs and capabilities of authorities that are beginning to introduce or to enhance competition law and policy regimes. At a time of tight budgets and many worthwhile programs, funding is always an issue. One idea that the Advisory Committee has considered would allocate a small percentage of funds obtained through antitrust fines in cartel prosecutions to further these institution building objectives.[(106)] There are precedents under U.S. law for making such allocations,[(107)] including examples of alternative sentences of this nature being imposed on defendants in domestic cartel litigations.[(108)]

The Advisory Committee has also considered the positive role that bilateral antitrust enforcement agreements can play in fostering cooperation with antitrust authorities in other jurisdictions.[(109)] Such agreements create opportunities for the United States to encourage new competition agencies in their development. The

1999 agreement between the U.S. and Israel is a good case in point.[(110)] The U.S.-Brazil agreement is another recent example.[(111)] It was the first bilateral antitrust agreement to include provisions for technical cooperation and the second agreement, after the U.S.-Israel agreement, signed with a young antitrust authority. Technical assistance programs enable U.S. antitrust authorities to develop interagency relationships through which sister antitrust authorities can develop familiarity with the U.S. antitrust laws and enforcement system. While this process is time consuming and necessitates drawing upon the resources of U.S. antitrust agencies as they provide assistance to the developing antitrust agencies, it appears to act over time as a positive incentive to establishing necessary building blocks to deepen cooperation.[(112)] The Advisory Committee supports efforts of the U.S. Antitrust Division to expand the number of jurisdictions with which it has entered into bilateral cooperation agreements in order to include newer systems as well as jurisdictions with developed antitrust laws and policies. The Committee recommends that the Division continue to pursue the negotiation and implementation of modern antitrust agreements, including those that feature more detailed provisions regarding positive comity.

## Summary of Recommendations

### Improving Knowledge about International Cartels

Whether the surge in U.S. prosecutions means that there are more international cartels in operation than ever before is unclear. What is clear is that international cartels present a serious problem with adverse effects on U.S. and foreign consumers, businesses, and governments. With U.S. anticartel enforcement actions generating considerable interest around the world, the time is opportune for U.S. antitrust agencies not only to expand cooperation with antitrust authorities in other jurisdictions, but also to increase public awareness about the detrimental effects of international cartels. The Advisory Committee recommends:

1. A complete assessment of the incidence of private international cartels is beyond the capabilities of the Advisory Committee. Nonetheless, the Advisory Committee believes that the scope and incidence of international cartels are important matters for further examination and recommends that governments and other experts take up this issue;

2. The Advisory Committee also recommends that the United States expand its efforts to increase public knowledge and awareness at home and abroad of the deleterious effects of cartels for consumers, businesses, and governments; and

3. To take advantage of the improved environment for international cooperation on rooting out and prosecuting international cartels, the Advisory Committee hopes that the United States will use all opportunities, both formal and informal, to share its recent experiences with foreign enforcement authorities. Actions to ensure that U.S. anticartel enforcement policies are well understood abroad will enhance the credibility of U.S. enforcement efforts and promote interagency cooperation at the same time.

### Increasing Transparency in Handling Confidential Business Information

The exchange of confidential information between competition authorities is an important feature of deepening cooperation. The U.S. and international business communities have expressed concerns about agency accountability and transparency in connection with such information exchanges, particularly with respect to cross-border joint investigations into cartel activities (similar concerns in the context of multijurisdictional merger reviews have also been pressed and are addressed in Chapter 3). Another recurring concern of some members of the business community and the private bar is that competition authorities do not provide *notice* when they transfer confidential information or other protected information in their agency files to another enforcement agency. In the view of the Advisory Committee:

1. Cooperation between competition authorities should feature appropriate safeguards for confidential information. Competition authorities should ensure the transparency of standards applied in their enforcement efforts. Continuing efforts are necessary to instill greater business confidence that exchanges will not result in adverse commercial consequences;

2. U.S. antitrust authorities should consider providing notice -- either before or after the fact -- of their intent to disclose information to antitrust authorities in other jurisdictions unless such notice would violate a treaty obligation of the United States or a court order or jeopardize the integrity of any U.S., state, or foreign investigation; and

3. The U.S. agencies should assess requests to share confidential information by taking into consideration, among other things, their history of enforcement cooperation with the requesting jurisdiction as well as their confidence that the jurisdiction is able to and does protect confidential information under its own laws.

## The Importance of Positive Incentives

The United States should attempt to identify positive incentives that can deepen cooperation between the U.S. antitrust authorities and competition authorities in other jurisdictions, instill greater public confidence in the value of such cooperation, reduce tensions associated with U.S. enforcement, and further develop a shared culture of sound competition policy around the world. To this end, the Advisory Committee recommends that:

1. The U.S. government should expand its ability to provide technical assistance, both bilaterally and in coordination with international organizations, to develop traditional core functional areas such as anticartel enforcement activities and premerger reviews, as well as new initiatives (such as those discussed in Chapters 5 and 6) to support the operating needs and capabilities of authorities that are beginning to introduce or to enhance competition law and policy regimes; and

2. U.S. antitrust authorities are encouraged to expand the jurisdictions with which they have modern antitrust cooperation agreements, including those that

feature more detailed provisions regarding positive comity. The U.S. authorities should seek cooperative arrangements with qualified jurisdictions that have newer competition systems as well as with those with more established competition laws.

---

**FOOTNOTES**

1. Section 1 of the Sherman Act, 15 U.S.C. §1.

2. [2] Section 4(a) of the Clayton Act, 15 U.S.C. §15.

3. [3] Section 5(a) of The Clayton Act, 15 U.S.C. §16.

4. One member of the private bar predicts that "the most significant and enduring antitrust enforcement initiative of this era will be the aggressive criminal enforcement of international cartels by the Antitrust Division. Donald C. Klawiter, *Criminal Antitrust Comes to the Global Market*, 13 St. John's J. Legal Comment. 201 [hereinafter Klawiter, *Criminal Antitrust*]. A list of the Antitrust Division's international cartel prosecutions appears in Annex 4-A hereto.

5. For instance, the size of the markets affected by some of the recent international cartels under U.S. investigation is described as "involv[ing] hundreds of millions, or even billions, of U.S. dollars in annual sales worldwide." Joel I. Klein, Assistant Attorney General for Antitrust, U.S. Department of Justice, Anticipating the Millennium: International Antitrust Enforcement at the End of the Twentieth Century, presented at Fordham Corporate Law Institute 24th Annual Conference on International Law and Policy 3 (Oct. 16, 1997).

6. A. Paul Victor, *The Growth of International Criminal Enforcement*, 6 Geo. Mason L. Rev. 493, 501; Klawiter, *Criminal Antitrust* at 221. (Cautioning corporations doing business globally, particularly foreign corporations and their key executives, about the need to be educated in U.S. antitrust law and made aware of their heightened exposure to U.S. antitrust enforcement actions.)

7. Gary R. Spratling, then-Deputy Assistant Attorney General for Antitrust, U.S. Department of Justice, International Cartels: The Intersection Between FCPA Violations and Antitrust Violations, presented before the American Conf. Institute 7th Natl. Conf. on Foreign Corrupt Practices Act (Dec. 9, 1999) 10 [hereinafter, Spratling, FCPA].

8. [8] In the *Vitamins* matter, F. Hoffmann-La Roche Ltd. agreed to plead guilty and pay a fine of $500 million in 1999. Two years earlier, in 1997, when it pled guilty and paid a fine of $14 million for its involvement in the *Citric Acid* cartel the corporation decided, nonetheless, to continue its role in the *Vitamins* conspiracy. David Barboza, *Tearing Down The Facade of 'Vitamins Inc.'*, N.Y. Times, October 10, 1999 at Sec. 3 at 1 [hereinafter Barboza, *Vitamins Inc.*] (describing how F. Hoffmann-La Roche, "had gone this route before. Roche's antitrust problems date to the early 1970's, when it was fined by antitrust officials