# EXHIBIT 18
# PART TWO

in Europe for engaging in anticompetitive behavior in the sale of two [drugs] ... . Roche also faced [European antitrust] litigation over the vitamin market in 1973."). *Id.* at Sec. 3 at 11.

9. [9] United States v. American Tobacco Co., 221 U.S. 106, 184 (1911).

10. [10] Helga Nussbaum, *International Cartels and Multinational Enterprises* in Multinational Enterprises in Historical Perspective , (Alice Teichova et al. eds. 1986) 131, 134. There are a variety of other estimates of the number of cartels in the years leading up to WWII that are within the range identified by Professor Nussbaum. For example, a German scholar provided estimated that about 112 international cartels were in existence in 1912, George W. Stocking and Myron R. Watkins, Cartels or Competition? (1948) 31, *cited in* Kurt R. Mirow & Harry Maurer, Webs of Power: International Cartels and World Economy (1982) 22 and n. 23 [hereinafter Mirow and Maurer, Webs of Power]. Another estimate is that some 114 international cartels were in existence prior to World War I and their participants were, for the most part, continental European in scope and origin and largely territorial extensions of or annexes to national cartels. William F. Notz, Representative International Cartels, Combines and Trusts, (U.S. Department of Commerce, Bureau of Foreign and Domestic Commerce, Trade Promotion Series No. 81, 1929) 4. A study done for the Department of Justice in 1944 found that a total of 179 international cartels were in existence at the outset of World War II, and that U.S. firms participated in 109 of these. Corwin D. Edwards, "International Cartels as Obstacles to International Trade" (AER Supp., March 1944), *cited in* James Rahl, *International Cartels and their Regulation* in Competition in International Business (Oscar Schacter and Robert Hellawell eds. 1981) 240, 244 and n. 13.

11. [11] For a lengthier treatment, *see generally,* Wilbur L. Fugate, 1 Foreign Commerce and the Antitrust Laws §2.21 (5th ed. 1996); Barry Hawk, United States, Common Market and International Antitrust: A Comparative Guide 1-28 (2d ed. 1996); Spencer Weber Waller, 1 Antitrust and American Business Abroad §§2:13-2:16 (3d ed. 1997).

12. [12] The *Quinine* cases in the mid-1970s provide one illustration of the scope of these cases, U.S. v. Nederlandsche Combinatie Voor Chemische Industrie, 68 Cr. No. 8770 (S.D.N.Y. 1968) (indictment filed), 70 Civ. No. 2080 (S.D.N.Y. 1970) (complaints filed), 1970-1979 Trans. Bind.- U.S. Antitrust Case Summaries Trade Reg. Rep. (CCH) ¶45,070, Cases 2023, 2102, 2103 (involving both an arrangement among the European producers that only one conspirator would bid on the purchase of part of the U.S. government quinine stockpile but would share the purchase with the producers who refrained from bidding, and an alleged market division and a price-fixing agreement applying to the United States, among other things). Also, the much-discussed *Uranium* cartel cases, In re Westinghouse Elec. Corp. Uranium Contracts, 405 F. Supp. 316 (J.P.M.L. 1975). Some other examples include the *Singer* cases, which involved a conspiracy through patent pooling between U.S. and Swiss sewing machine producers to eliminate competing Japanese imports into the United States. United States v. Singer Mfg. Co., 374 U.S. 174 (1963); the *Canadian Radio Patents* case, in which U.S. and

Dutch firms were charged with restraining U.S. exports of radios and televisions to Canada, through the anticompetitive use of patent pools United States v. General Electric Co., 1962 Trade Cas. (CCH) (S.D.N.Y. 1962); and the *Addison-Wesley Publishing* case, a civil action in which U.S. and British book publishers allocated world markets among themselves, United States v. Addison Wesley Publ. Co., 1976-2 Trade Cas. (CCH) 61,225 (S.D.N.Y. 1976).

13. [13] Anne K. Bingaman, then-Assistant Attorney General for Antitrust, U.S. Department of Justice, Change and Continuity in Antitrust Enforcement, presented to the Fordham Corporate Law Institute, Fordham Law School (Oct. 21, 1993) 1-5 [hereinafter Bingaman, Change and Continuity](explaining that prioritizing international issues responds to the impact made by an increasingly global economy on the U.S. economy and is in keeping with priorities of the prior administration and then-Assistant Attorney General for Antitrust, James F. Rill).

14. Anne K. Bingaman, then-Assistant Attorney General for Antitrust, U.S. Department of Justice, The Clinton Administration: Trends In Criminal Antitrust Enforcement, address before the Corporate Counsel Institute (Nov. 30, 1995). Vigorous enforcement against international cartels continues to be a top priority because international cartels typically pose a greater threat to U.S. businesses and consumers than do domestic cartels since they tend to be highly sophisticated and extremely broad in their geographic reach and economic impact. Prepared statement of Joel I Klein, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, Before the Senate Judiciary Committee, Antitrust, Business Rights and Competition Subcommittee (May 4, 1999) at 8 [hereinafter Klein 1999 Senate Testimony].

15. [15] See Annex 4-A. Dates are expressed in fiscal years, which run from October 1 through September 30. As noted in Chapter 1, the Antitrust Division has not historically maintained separate data for "international" and "domestic" matters and there is no single set of methodologically compiled statistics on how many "international" cartel matters are or have been filed. Until very recently, there was no single articulation of how to define an "international" matter for such purposes. To calculate the international cartel statistics in this and the next paragraph, ICPAC used the definition for "international matters" developed in FY 1997 by the Antitrust Division for data collection associated with its performance measurement efforts:

An international matter -- that is, investigation or case -- is so defined if it involves possible anticompetitive impact on U.S. domestic or foreign commerce, and if any one of the following criteria is met, leading to increased complexity and greater resource requirements than would otherwise be the case: one or more involved parties* is not a U.S. citizen or a U.S. business; one or more involved parties* is not located in the U.S.; potentially relevant information is located outside the U.S.; conduct potentially illegal under U.S. law occurred outside the U.S.; or substantive foreign government consultation or coordination is undertaken in connection with the matter. [* ... where "involved party" may be an individual or corporation that is the subject or target, or potential subject or potential target, of a criminal or civil non-merger investigation or case; a party to a merger or an acquisition; or otherwise a participant or potential participant in an investigation or

case].

(Emphasis omitted). U.S. Department of Justice, Antitrust Division, Executive Office (December 1999).

16. [16] From 1987 through 1990, the Antitrust Division did not file a single criminal cartel case against a foreign-based corporation or individual. In 1991, only 1 percent of corporate defendants and no individual defendants in the Antitrust Division's cartel prosecution were foreign-based. By 1997, the figures had surged so that 32 percent of corporate defendants and the same number of individual defendants were foreign-based. Prepared statement of Joel I Klein, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, Before the Senate Judiciary Committee, Antitrust, Business Rights and Competition Subcommittee (Oct. 2, 1998) at 8 -9 [hereinafter Klein 1998 Senate Testimony]. The figures continued to escalate so that in 1998 and again in 1999, nearly 50% of corporate defendants in criminal cartel cases were foreign-based. Spratling, FCPA, at 2.

17. [17] Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, The War Against International Cartels: Lessons From the Battlefront, Address before the Fordham Corporate Law Institute 26th Annual Conference on International Antitrust Law and Policy (Oct. 14, 1999) 8-9 [hereinafter, Klein, Lessons From the Battlefront], Appendix "Locations of International Cartel Meetings Affecting United States Commerce (rev'd. June 1999)." The data here includes only information from cases that the Department of Justice has already filed or where prosecution is imminent. Antitrust Division officials indicate that there are other cities that are not listed because information on meetings held there derives from other ongoing nonpublic investigations. Testimony of Gary R. Spratling, then-Deputy Assistant Attorney General for Antitrust, U.S. Department of Justice, ICPAC Meeting, Feb. 26, 1998 at 54.

18. The increased number of foreign targets and defendants in U.S. cartel matters reflects the fact that international cartels will likely consist of one U.S. firm and several firms from other jurisdictions, rather than any U.S. government policy to target foreign firms. *See* Spratling, FCPA at 4.

19. [19] These statistics are updated regularly in speeches and testimony by Division officials, *see e.g.,* Klein, Lessons From the Battlefront, Appendix "Status Report: International Cartel Enforcement."

20. [20] Klein 1999 Senate Testimony, at 8; Gary R. Spratling, then-Deputy Assistant Attorney General for Antitrust, U.S. Department of Justice, Are the Recent Titanic Fines in Antitrust Cases Just the Tip of the Iceberg?, presented at the American Bar Assoc. Criminal Justice Sec. 12th Annual Natl. Inst. on White Collar Crime (Mar. 6, 1998) 3 [hereinafter, Spratling, Titanic].

21. [21] Most recently, Assistant Attorney General Joel Klein stated, "After *Graphite Electrodes, Vitamins*, and a few other recent cases, we can say that we've now seen quite a bit more of the iceberg. But there's still an awful lot of illegal

activity below the waterline. We have, for example, uncovered an international cartel operating in a manufacturing industry affecting over $1 billion in U.S. commerce; it would appear that the conspirators agreed to raise prices by over 60% to customers in the U.S. and abroad during the term of the conspiracy. The Division also is investigating an alleged international cartel operating in a metals industry; the suspected conspiracy apparently affected roughly $750 million of U.S. commerce, and prices are believed to have increased by over 20% as a result of the alleged cartel agreement. I can't say any more about these matters at this time because they are under investigation. But suffice it to say, there is more to come." Klein, Lessons From the Battlefront, at 8.

22. Joel I. Klein, Assistant Attorney General for Antitrust, U.S. Department of Justice, Luncheon Address before the International Anti-Cartel Enforcement Conference 3 (Sept. 30, 1999).

23. 15 U.S.C. § 1. Individual defendants may also receive a maximum three year prison term, either alone or in addition to a fine. Moreover, criminal antitrust acts were elevated to felonies from misdemeanors in 1975. *Id.* Under the U.S. Sentencing Guidelines, fines for criminal antitrust defendants may be increased to twice the gain derived from the crime or twice the loss suffered by the victims of the crime, if either of those amounts is greater than the statutory maximum fine. 18 U.S.C. § 3571(d).

24. *Id.* The Sentencing Guidelines provide for a base fine for corporate antitrust offenders, foreign or domestic, of 20 percent of the volume of commerce affected by the conspiracy, but not less than 15 percent in antitrust cases. Reductions in the base fine are possible if certain mitigating factors are present, although only if the court determines to use a reduced base fine level in its calculations. When calculating a defendant's Sentencing Guidelines fine range, a court will normally use the volume of U.S. commerce affected by the defendant's participation in a conspiracy. However, a court may consider the defendant's worldwide (U.S. *and foreign*) sales in the calculation when the amount of U.S. commerce affected by a defendant in an international cartel understates the seriousness of the defendant's role in the offense and, therefore, the impact of the defendant's conduct on American businesses and consumers. United States Sentencing Guidelines Manual §§ 2R1.1, 8C2.1 *et seq.* (1998).

25. *See* U.S. Department of Justice Press Release 96-0508, "Archer Daniels Midland Co. to Plead Guilty and Pay $100 Million for Role in Two International Price-Fixing Conspiracies" (Oct. 15, 1996). ADM paid a $70 million fine for its part in the *Lysine* cartel and a fine of $30 million for participating in the *Citric Acid* cartel.

26. Because of the magnitude of the volume of commerce affected by these cartels, fines in most of these cases are calculated pursuant to the "alternative sentencing guidelines" of the Federal Sentencing Guidelines rather than by applying maximum allowable fines established in the Sherman Act. One member of the private antitrust bar observed that this alternative enables the United States to "make the punishment fit the crime" in prosecutions involving substantial volumes of commerce, "a feat that could not be accomplished by imposing only

the Sherman Act's maximum fine of $10 million." Klawiter, *Criminal Antitrust* at 205. The Antitrust Division frequently publicizes details about how these calculations are reached, using examples from a number of actual cartel prosecutions. *See e.g.,* Gary R. Spratling, then-Deputy Assistant Attorney General for Antitrust, U.S. Department of Justice, Transparency in Enforcement Maximizes Cooperation From Antitrust Offenders, Address before the Fordham Corporate Law Institute 26th Annual Conference on International Antitrust Law and Policy, Appendix 22 (Oct. 15, 1999) (Fine Calculation - Summary Sheets for defendants in several recent international cartel cases) [hereinafter, Spratling, Transparency].

27. Gary R. Spratling, The Trend Towards Higher Corporate Fines: It's a Whole New Ball Game, presented at the American Bar Assoc. Criminal Justice Sec. 11th Annual Natl. Inst. on White Collar Crime (Mar. 7, 1997) 1 [hereinafter Spratling, Ball Game].

28. [28] *See*, Klein 1998 Senate Testimony.

29. [29] U.S. antitrust authorities report that members of international cartels have stated that they avoid meeting in the United States for two key reasons: because the United States is very aggressive in investigating and prosecuting cartel activity and the sanctions are severe; and because foreign antitrust authorities may lack the resources to detect and investigate cartel activity and, even assuming the conduct is discovered, the potential sanctions abroad are not serious as compared to the potential gain. U.S. Department of Justice, Antitrust Division Office of Criminal Enforcement.

30. Details on these and other U.S. international cartel prosecutions are available on the Antitrust Division's website, at <http://www.usdoj.gov/atr/>.

31. The U.S. firm UCAR Inc. pleaded guilty to participating in price-fixing in the graphite electrodes market and agreed to pay a record Canadian fine of CDN$11 million and restitution in excess of CDN$19 million. The Competition Bureau's investigation into the graphite electrodes industry continues. Competition Bureau News Release, "Record $30 Million Fine and Restitution by UCAR Inc. for Price Fixing Affecting the Steel Industry" (Mar. 18, 1999), at <http://strategis.ic.gc.ca/SSG/ct01478e.html>. See Annex 4-C for a complete list of Canadian Competition Bureau international cartel prosecutions.

32. *See* JFTC "Press Release Concerning Warning Involving Graphite Electrodes Producers" [unofficial translation of title] (Mar. 18, 1999), at <http://www.jftc.admix/go.jp/pressrelease/99.march/990318.html>. Warnings of this sort are provided informally by the JFTC when, after an investigation, it does not find sufficient evidence to take formal enforcement measures but believes the activities under review threaten to violate the Anti-Monopoly Act. As in this instance, a warning is usually accompanied by administrative guidance that the practice in question be discontinued.

33. Barboza, *Vitamins Inc.*, at Sec. 3 at 1.

34. U.S. Department of Justice Press Release 99-196, "F. Hoffmann-La Roche and BASF agree to Pay Record Criminal Fines for Participating in International Vitamin Cartel" (May 20, 1999) at 2.

35. Klein, Lessons From the Battlefront, at 11.

36. *See* Mirow and Maurer, Webs of Power, at 8-9.

37. One scholar notes that examples of international cartels "still turn up" but there is no comparison with the extent of such activity before World War II, explaining:

During 1945-55, many U.S. MNEs [multinational enterprises] were successfully prosecuted under the antitrust laws for their earlier collusive behavior. ... After World War II many countries passed antitrust laws, and if these varied in toughness and degree of enforcement, they were still tougher than nothing at all. Partly in response to antitrust prosecutions, partly seizing the opportunity opened by the wartime destruction of their European competitors, U.S. MNEs shifted from cooperative behavior to aggressive behavior during 1955-65 and rapidly expanded the number of standardized product lines (i.e., not intensive in R&D) that they produced in Europe. With the successful recovery of Europe and Japan, far more 'significant' companies ... came to operate worldwide in most countries than before World War II, and seller concentration measured at the world level probably declined in many of the more concentrated industries. Finally, the mix of important industries has shifted from those producing homogeneous primary materials (wherein the gap between collusive and rivalrous profit is apt to be large) toward those producing differentiated or heterogeneous goods (in which the differentiation supplies natural insulation to the individual seller while complicating the maintenance of collusion).

Richard Caves, Multinational Enterprise and Economic Analysis (2d ed. 1996) 92-93.

38. Some experts argue that cartels continue to flourish and prosper. Maurice Guerrin and Georgios Kyriazis, *Cartels: Proof and Procedural Issues*, 16 Fordham Intl L. J. 266, 269. Others maintain that cartels or cartel-like behavior is reappearing, although the forms may be different than in earlier periods. *See* Isaiah Litvak and Christopher Maule, *Cartel Strategies in the International Aluminum Industry*, 2 Antitrust Bull. 641-663. While the World Trade Organization focused on a separate point, asserting that, "[w]hile the extent of cartel activities is intrinsically difficult to assess ... there are some indications that a growing proportion of cartel agreements are international in scope." *Chapter Four: Special Study on Trade and Competition Policy*, WTO Annual Report for 1997, at 12

39. [39] *See* Panel on International Cartels in a Global Economy, ICPAC Hearings (Nov. 4, 1998), Hearings Transcript at 7-72 [hereinafter Cartel Panel, ICPAC Hearings]; Simon J. Evenett & Valerie Y. Suslow, The Empirics of Private Restraints and International Trade: What can Policymakers Learn from the Economic Literature (draft), submitted by the authors for inclusion in the Advisory Committee record (Sept. 23, 1999).

40. Such a course of inquiry has precedents. Both the U.S. and the British governments have undertaken studies of this kind in the past. For example, the U.S. Department of Justice and the U.S. Department of Commerce both undertook studies 1929 and 1944, respectively, on cartels and their impact on U.S. commerce. *See supra,* fn. 10. The British government, for its part, undertook a study that attempted to cover all private international industrial price-fixing agreements to which British firms were members. The authors assembled a sample of cartel activity across 125 products. Great Britain Board of Trade, 1 Survey of International Cartels and Internal Cartels (London: Central Library, Department of Industry, 1944 and 1946) xiii, xxxi. There have also been quite a few empirical studies undertaken by economists and other experts. In the U.S., Richard Posner's pathbreaking study examined the characteristics of firms prosecuted for price-fixing by the Antitrust Division. Posner, *A Statistical Study of Antitrust Enforcement*, 13 J.L. & Econ. 365-419 [hereinafter Posner, *Statistical Study*]. So do subsequent analyses by: George A. Hay and Daniel Kelly, *An Empirical Survey of Price Fixing Conspiracies*, 17 J.L. & Econ. 13 (1974); Peter Asch and Joseph J. Seneca, *Characteristics of Collusive Firms* 23 J.L. & Econ. 223 (1975); and Arthur G. Fraas and Douglas F. Greer, *Market Structure and Price Collusion: An Empirical Analysis,* 26 J.L. & Econ. 21, among others. Clearly, because cases produce a great deal of data, even these economists note that many of these cartel data sets are plagued with measurement error, unobservable variables, and sample bias (e.g., whether samples of firms are collusion-prone or prosecution prone). *See* Posner, *Statistical Study*.

41. U.S. Department of Justice Antitrust Division, Corporate Leniency Policy (August 10, 1993) [hereinafter Corporate Leniency Policy]; U.S. Department of Justice Antitrust Division, Individual Leniency Policy (August 10, 1994).

42. Memorandum of Understanding Between The Antitrust Division, U.S. Department of Justice and The Immigration and Naturalization Service, U.S. Department of Justice (March 15, 1996) to establish a protocol whereby the immigration status of a cooperating alien can be pre-adjudicated before the witness pleads to a criminal violation of the U.S. antitrust laws.

43. *See* Corporate Leniency Policy Part "A" (setting forth terms for automatic amnesty); Corporate Leniency Policy Part "B" (setting forth terms for alternative amnesty).

44. Gary R. Spratling, Negotiating the Waters of International Cartel Prosecutions: Antitrust Division Policies Relating to Plea Agreements in International Cases, presented at the American Bar Assoc. Criminal Justice Sec., 13th Annual National Inst. on White Collar Crime (Mar 4. 1999) 10-12 [hereinafter Spratling, Negotiating the Waters]. Some corporations, mostly publicly traded companies, have made public the fact of their participation in international cartel activities and their receipt of amnesty under the Corporate Leniency Policy. In such circumstances the Antitrust Division might identify these firms (although not the specific cooperation received) in subsequent public statements. In situations where a corporate defendant does not receive amnesty and instead enters into a plea agreement, its identity and the terms of the plea agreement will be public. The confidentiality of materials produced by a defendant

pursuant to a plea agreement hinges on the applicability of those safeguards and statutory protections available to all materials the Antitrust Division or a grand jury receives in the course of a criminal investigation.

45. [45] Further, Antitrust Division officials report that , "[t]oday, the Amnesty Program is the Division's most effective generator of large cases." Gary R. Spratling, Making Companies an Offer They Shouldn't Refuse: The Antitrust Division's Corporate Leniency Policy -- An Update, speech before the Bar Assoc. of D.C.'s 35th Annual Symposium on Associations and Antitrust, (Feb. 16, 1999) 2 [hereinafter, Spratling, Corporate Leniency (Update)].

46. Bingaman, Change and Continuity.

47. Spratling, Corporate Leniency (Update) at 1 ("companies have come to understand that acceptance into the Amnesty Program can potentially save a firm tens of millions of dollars in fines and can eliminate the threat of prosecution and incarceration for the firm's culpable executives.")

48. [48] Cartel Panel, ICPAC Hearings, at 22-70.

49. [49] Spratling Corporate Leniency (Update), at 6-7.

50. [50] At the Advisory Committee's 1998 Hearings, members of the private bar praised the effectiveness and usefulness of the Amnesty Program. *See* Cartel Panel, ICPAC Hearings, at 7-72.

51. *See, e.g., U.S. v. Haarmann & Reimer Corporation*, No. CR 97-00019 THE (D.C. N.D. Cal., 1997) (Firm's cooperation in securing the cooperation of other citric acid cartel participants and in the investigation resulted in Antitrust Division requesting a downward departure for the firm's fine, calculated under the U.S. Sentencing Guidelines.) Gary R. Spratling, then-Deputy Assistant Attorney General for Antitrust, U.S. Department of Justice, Criminal Antitrust Enforcement Against International Cartels, before the Advanced Criminal Antitrust Workshop: A Practical Approach to Criminal Investigations (February 21, 1997) at 12 (describing the Antitrust Division's new policy in this regard and cautioning that "there is a maximum of only one such 'extra credit' per investigation, and it goes to the firm that takes the lead in securing multi-firm cooperation.") *Id.*

52. [52] Spratling, Negotiating the Waters, at 5-6. A similar policy is applied by U.S. antitrust authorities in multijurisdictional merger review matters in which the parties sign a voluntary waiver of confidentiality protections to permit the U.S. authorities access to relevant information in the possession of another antitrust authority. In order to bring the information under the Hart-Scott-Rodino Act, 15 U.S.C. §15a, §7a of the Clayton Act, protections against disclosure, where applicable, the United States will seek to have the party produce to it a duplicate of the information in the files of the other antitrust authority.

53. U.S. Department of Justice, Antitrust Division, Office of Criminal Enforcement; *See* Spratling, Titanic.

54. These agencies include the U.S. Attorneys' Offices, the Fraud Section of the Criminal Division, the Federal Bureau of Investigation and the Inspector Generals' Offices of federal agencies, as well as the Border Watch section of the INS. These organizations, often obtain evidence of conduct that amounts to criminal antitrust violations in the course of investigations in their particular areas of responsibility,, and the Initiative established a liaison procedure whereby these offices refer leads or information concerning possible antitrust violations to the Antitrust Division. In addition, the Division's field offices have conducted training sessions for U.S. Attorneys and FBI offices, and an FBI agent is detailed to work in most Antitrust Division field offices at all times. Moreover, FBI agents now serve as case agents in every international matter. *See* Spratling Titanic at 9-10.

55. Described in detail in Annex 1-C hereto. As of December 31, 1999, the agreements with Israel and Brazil were signed but not yet in force.

56. Pub. L. No. 103-438 (1994), 108 Stat. 4597, 15 U.S.C. §§6200-6212. Congress enacted the IAEAA in 1994, to address statutory limitations on the U.S. antitrust authorities' ability to request assistance in obtaining access to and otherwise exchanging confidential information, among other things. Under the IAEAA, U.S. antitrust authorities can negotiate written agreements under which they can exchange confidential information during the course of civil or criminal antitrust investigations subject to certain conditions, including a requirement that the requesting authority be able to reciprocate to a U.S. request for assistance. Much of the IAEAA is concerned with protection for information such as confidential investigatory or law enforcement material, as well as business confidential and statutorily or otherwise privileged information. One consequence is that confidential information obtained in a Hart-Scott-Rodino premerger notification process is protected from disclosure under any IAEAA agreement. A fuller description appears in Annex 1-C hereto.

57. As of January 1, 2000, the United States had 30 MLATs in place and while another 21 were awaiting entry into force. Many of these treaties apply to criminal antitrust matters.

58. Letters rogatory are traditional interjurisdictional court-to-court requests for assistance (available for use in criminal or civil matters). 28 U.S.C. §1781 (Transmittal of letter rogatory or request), §1782 (Assistance to foreign and international tribunals and to litigants before such tribunals). (West, 1999).

59. Treaty on mutual legal assistance in criminal matters, Jan. 24, 1990, U.S.-Can., TIAS. Other agreements include the 1995 U.S-Canada bilateral antitrust agreement, which includes positive comity provisions (superceding a 1984 agreement and several other prior arrangements), Agreement Between the Government of The United States of America and The Government of Canada Regarding the Application of Their Competition and Deceptive Marketing Practices Laws (1995), *reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13,503A; and the Treaty on Extradition, Mar. 22, 1976, U.S.-Can., TIAS 8237, as amended by Protocol and exchange of notes, Jan, 11, 1988, 27 I.L.M. 422.

60. [60] The nature of the assistance received by the Division from Canada was

set out in detail in a U.S. filing in one of the *Thermal Fax Paper* cases, concerning the government's obligations under *U.S. v. Brady* with respect to Canadian documents received by the United States during its investigation. United States' Petition for Clarification And/or Reconsideration of the Court's Order Regarding Further Discovery , filed in United States v. Nippon Paper Industries Co., Criminal No. 95-10388-NG (D.Mass.)

61. [61] The Canadian authorities, however, assembled a different body of evidence that was sufficient to obtain a guilty plea in September 1995 from a Canadian subsidiary of a U.S. firm to a charge of conspiring to cut off supplies of U.S.-made ductile iron pipe to a Canadian rival. The defendant paid a then-record criminal fine of CDN$2.5 million.

62. [62] The Government of Japan described its assistance in its brief of amicus curiae in opposition to jurisdictional arguments made by U.S. antitrust authorities in United States v. Nippon Paper Industries Co., No. 96-2001 (1st Cir., filed Nov. 18, 1996) at 4.

63. [63] Japanese Law for International Assistance in Investigation (Law No. 69 of 1980), *repub'd. in* Criminal Justice Legislation of Japan (United Nations Asia and Far East Institute for the Prevention of Crime and the Treatment of Offenders) (translation) 303.

64. [64] Brief of amicus curiae of the Government of Japan, United States v. Nippon Paper Industries Co., No. 96-2001 (1st Cir., filed Nov. 18, 1996), at 4.

65. [65] United States v. General Elec. Co., 869 F. Supp. 1285 (S.D. Ohio 1994).

66. Described in detail in Annex 1-C. Mutual Assistance in Business Regulation Act 1992 and the Mutual Assistance in Criminal Matters Act 1987, and Regulations made pursuant to those Acts. *See* Article I "Definitions" of the Mutual Antitrust Enforcement Assistance Agreement Between the Government of the United States of America and the Government of Australia and Annex (Apr. 27, 1999). In addition, the Netherlands has recently enacted legislation under which its antitrust authorities are empowered to enter into cooperation agreements with other jurisdictions akin to those contemplated by the IAEAA. Chapter 11, Art. 91 of The Dutch Competition Act (*Wet economische mededinging*) of May 22, 1997, at < www.nma-org.nl>.

67. [67] Some jurisdictions other than the United States have their own active bilateral cooperation agenda. The EC is the most noteworthy example, having entered into bilateral cooperation agreements with the United States, described in Annex 1-C, and with Canada, Agreement between the European Communities and the Government of Canada regarding the application of their competition laws (June 17, 1999). Within the Community, several cooperation agreements between Members States are in place. Additionally, Australia has been active on this front, signing agreements with the United States and providing for competition law cooperation in its 1994 agreement with New Zealand and in a bilateral competition

assistance agreement with Taiwan (1996). New Zealand has also entered into a bilateral antitrust cooperation agreement with Taiwan (1997).

68. Panel on Current U.S. Bilateral Agreements, ICPAC Hearings (Nov. 2, 1998), Hearings Transcript at 106-160.

69. U.S. Dep't. of Justice, Antitrust Division, Office of Criminal Enforcement.

70. "Set of Multilaterally Agreed Equitable Principles and Rules for the Control of Restrictive Business Practices" UNCTAD, UN Doc. TD/RBP/Cons/10 (May 2, 1980) Section D.3., adopted by the U.N. General Assembly on Nov. 12, 1980, UN Doc. A/C.2/35/L.75. *See* further discussion on UNCTAD in Chapter 5, p. 67.

71. OECD Document No. C(98) 35/FINAL [hereinafter "OECD Hard-Core Cartel Recommendation"]. Additional details on this Recommendation are set forth in Annex 1-C hereto.

72. A number of considerations led to adoption and issuance of this Recommendation, including the recognition that, "hard core cartels are the most egregious violations of competition law and that they injure consumers in many countries by raising prices and restricting supply, thus making goods and services completely unavailable to some purchasers and unnecessarily expensive for others; and ... that effective action against hard core cartels is particularly important from an international perspective -- because their distortion of world trade creates market power, waste, and inefficiency in countries whose markets would otherwise be competitive -- and particularly dependent upon co-operation -- because they generally operate in secret, and relevant evidence may be located in many different countries." OECD Hard-Core Cartel Recommendation, introductory recitals.

73. OECD Hard-Core Cartel Recommendation at § I.A. This language provides a framework definition which, as the subsequent provision in the Recommendation makes clear, will be understood in keeping with the definition of cartel activity under local law in each jurisdiction:

For purposes of this Recommendation ... b) the hard core cartel category does not include agreements, concerted practices, or arrangements that (i) are reasonably related to the lawful realization of cost-reducing or output-enhancing efficiencies, (ii) are excluded directly or indirectly from the coverage of a Member country's own laws, or (iii) are authorized in accordance with those laws. However, all exclusions and authorizations of what would otherwise be hard core cartels should be transparent and should be reviewed periodically to assess whether they are both necessary and no broader than necessary to achieve their overriding policy objectives. ...

*Id.* at § I.B.

74. *European Commission:* Commission notice on the non-imposition or reduction of fines in cartel cases, [1996] O.J C207/4; Commission Guidelines on the method for the setting of fines [1998] O.J. C9/3. *Canada*: "Cooperating Parties

Program," Canadian Competition Bureau (draft for comment, May 7, 1999). A new policy statement is expected to be released by the Competition Bureau early in 2000. Both are posted on the Competition Bureau's Web Site, at <http://competition.ic.gc.ca>. *United Kingdom* The UK issued a draft corporate leniency program that it proposes instituting in March 2000, when revisions to the UK competition law go into effect. This program departs from the EC model and is based instead on the U.S. Corporate Leniency Policy. Penalties Under New Competition Law, Office of Fair Trading (May 1999); Competition Act 1998: proposed procedural rules under s.51, Office of Fair Trading. Both are posted on the OFT's Web Site, at <http://www.oft.gov.uk>.

75. In addition, Japan provides an illustration of a jurisdiction that has had anticartel laws in force since after World War II but that has only begun to pursue an active program of anticartel enforcement since 1990. Japan has brought anticartel enforcement actions against domestic cartels during this period, typically for engaging in bidrigging or price-fixing arrangements. Annex 4-C hereto contains charts prepared by the JFTC that illustrate its anticartel activities since the late 1980s: "Japan Fair Trade Commission Enforcement Statistics"; and "Japan Fair Trade Commission Surcharge Statistics." Notably, Japan does not have any program in place like the U.S. Corporate Leniency Program to encourage cartel participants to self-report violations of Japanese anticartel laws.

76. *See* Annex 4-C hereto, "Canadian Competition Bureau Penalties Imposed in Cases Against International Cartels for Violations of the Competition Act International Cartel Fines" prepared by the Competition Bureau. *See*, A. Neil Campbell, *Canada Gets Serious About Cartels*, 2 intl. antitrust bull. 21 (1999).

77. H.M.R. v. Russell Cosburn (Sup. Ct. of J., Ontario Eastern Reg. File No.: 99/G30978) (Sept. 13, 1999) (sentencing a former Vice President of a Canadian conspirator in the *Vitamins/Choline Chloride* ($B_4$) cartel to nine months imprisonment; term ordered to be served in the community rather than jail).

78. The new information bulletin will be available on the Canadian Competition Bureau's website upon release, at <http://strategis.ic.gc.ca>.

79. In Canada, the Competition Bureau cannot unilaterally implement amnesty. Its policy statement explains the circumstances under which it recommends immunity to the Attorney General of Canada who, as the prosecuting agency for cartel offenses, retains sole discretion to grant immunity. *See* <http://strategis.ic.gc.ca>.

80. Harry Chandler, Deputy Director of Investigation and Research (Criminal Matters), Canadian Bureau of Competition Policy, Getting Down to Business: The Strategic Direction of Criminal Competition Law Enforcement in Canada, speech before Insight and The Globe and Mail Conference "Emerging Issues in Competition Law" 4-5 (Mar. 10, 1994), at <http://strategis.ic.gc.ca>.

81. In its 1998 Guidelines on the method for the setting of fines, the EC set forth its method for determining the level of fines pursuant to Article 15 (2) of the Treaty of Rome. Infringements are categorized as "minor," "serious" or "very

serious," with price-fixing arrangements generally captured by the latter category and the anticipated fine levels for such violations *above* ECU 20 million. [1998] O.J. C9/3.

82. This fine was imposed on ABB Asea Brown Boveri. Commission decision of 21 Oct. 1998, Case No. IV/35.691/E-4, *Pre-Insulated Pipe Cartel*, O.J 1999 L 24/1 (fining 10 companies a total of ECU 92 million for engaging in a secret cartel engaged in price-fixing, market allocation, and bid-rigging).

83. Commission notice on the non-imposition or reduction of fines in cartel cases, [1996] O.J C207/4.

84. Testimony of Karel Van Miert, then-EC Competition Commissioner, ICPAC Hearings (Nov. 2, 1998), Hearings Transcript at 154 (describing how the EC was inspired to institute its policy by the advantages evident from the United States' experience with its Corporate Leniency Policy).

85. *Seamless Steel Tubes, Stainless Steel, Pre-Insulated Pipes, British Sugar*, and *Greek Ferries*. Nonetheless, it remains unclear whether firms will increasingly seek leniency under the program for a number of reasons, especially because the program does not provide for a resolution up front of the degree of leniency a cooperating firm will receive. The Leniency Notice identifies three different levels of cooperation from firms involved in a cartel that may lead to reductions in fines, with the most substantial reductions for firms that self-report and then cooperate prior to the Commission instituting an investigation. Commission notice on the non-imposition or reduction of fines in cartel cases, [1996] O.J C207/4. While reductions for such cooperation may be as high as 100 percent, the Commission will not give any indication of the rate of reduction while it conducts its investigation and proceeding, and insists that the leniency is distinct from plea bargaining. Accordingly, firms are left in the potentially difficult position of deciding whether self-incrimination is actually worthwhile. *See* Mercedes Garcia Perez, *Too fine a line? Commission fining policy in competition cases considered*, 31 EU Focus 2, 4 1999) (discussing these and other concerns firms have in contemplating self-reporting under the EC Leniency program).

86. [1998] O.J. C9/3.

87. *See* Paul Spink, *Recent Guidance on Fining Policy*, 2 E.C.L.R. 101 (1999) (offering a summary of a number of these concerns)

88. With its 1988 decision in the Wood Pulp Case, the EC established application of Community anticartel law to offshore conduct. A. Ahlstrom Osakeyhtio v. Commission, [1988] E.C.R. 5193.

89. A few examples include websites of the competition authorities in Israel, The Netherlands, Switzerland, and Turkey.

90. Assistant Attorney General Klein commented on this event shortly after it took place, saying, "there is a separate and critical role for programs like this one -- programs devoted to the real nitty gritty of law enforcement against international

cartels, where frontline enforcers can meet one another and try to solve common practical problems." Klein, Lessons From the Battlefront, at 14.

91. There are a number of different types of information that may be described as "confidential," and these can be generally categorized according to the means by which such information is obtained, that is, by compulsory means or voluntary means. Material that a party is *compelled* to produced may be specifically protected under statute. For instance, in criminal matters disclosure of compelled information in matters occurring before a grand jury is only possible pursuant to a court order, pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure (West, 1999). In the civil nonmerger context, information compelled from a party by a civil investigative demand (CID) under the Antitrust Civil Process Act, 15 U.S.C. §1312 or analogously under the Federal Trade Commission Act, 15 U.S.C. §46 is confidential and its use and disclosure permitted in only narrow circumstances. And the Hart-Scott-Rodino Act, 15 U.S.C. §18a, accords protection from disclosure to merger-related materials produced thereunder. Material produced *voluntarily* to antitrust enforcers conducting an investigation, criminal or civil -- whether from parties under investigation or third parties -- and materials otherwise obtained by antitrust investigators are considered confidential investigatory materials and protected from disclosure in keeping with applicable laws and policies.

92. In the following discussion, confidential information is intended to mean information produced under compulsory process and protected by statute, voluntarily produced and protected as agency investigatory material pursuant to applicable laws and policies, or otherwise categorized as confidential investigative material obtained or created by agency staff in the course of an antitrust investigation. The discussion in this chapter does not address concerns arising or the definition of confidential information in the context of multijurisdictional mergers. Chapter 3 of this report contains an extensive assessment of such issues.

93. [93] Antitrust enforcers discussed the track record of their agencies with respect to leaks, and indicated that they have had no such occurrences. Panel on Current U.S. Bilateral Agreements, ICPAC Hearings (Nov. 2, 1998), Hearings Transcript at 106-160.

94. *C.f.* Prepared Testimony of Stephen D. Bolerjack, Counsel, Antitrust and Trade Regulation, Ford Motor Company, on behalf of the National Association of Manufacturers, ICPAC Hearings (Apr. 22, 1999) (reiterating reservations expressed at the time the IAEAA was enacted over the sharing of data and other proprietary information furnished to U.S. antitrust enforcers that could be useful to another country's domestic industry)

95. *See e.g.,* Spratling, A Practical Approach, at 5 (discussing reasons why the possibility for an OECD Recommendation on hard core cartels might be ripe for progress); *Accord*, Peter M.A.L. Plompen, *Panel Discussion: Japan & U.S. Competition Issues*, in 1998 Fordham Corp. L. Inst. 83, 102 (B. Hawk ed. 1998).

96. U.S. antitrust authorities consider requests for disclosure of confidential information on a cases-by-case basis. Certain considerations will be at the core of

any agency determination to share information protected either under law or policy, regardless of the vehicle under which a request is made (MLAT, IAEAA agreement, or assistance request under traditional legal channels). Core considerations include, among other things, confidence in the requesting authority's legal authority and practice to safeguard confidential treatment of such information and to make only authorized use or disclosure of the information for purposes set forth in their assistance request. It necessarily follows that a determination by U.S. antitrust authorities to share confidential information will reflect a degree if confidence in the requesting authority based upon a sufficient history of enforcement coordination and cooperation. Section 8 of the IAEAA, 15 U.S.C. § 6207, and all U.S. MLATs include provisions for such an assessment.

97. A policy of transparency in anticartel investigations is intended to mean being clear about the standards that an antitrust authority applies. For the U.S. Department of Justice, examples of how a policy of transparency applies include the way in which the Antitrust Division considers and resolves issues, for instance, in applying the Corporate Leniency Policy and in negotiating plea agreements with cooperating defendants. *See* Spratling, Transparency.

98. Former Deputy Assistant Attorney General Gary Spratling made transparency a theme in nearly all of his official speeches. *See, e.g.*, Spratling, Transparency and handout thereto (enclosing Division speeches on the workings of the criminal enforcement program, the Corporate and Individual Leniency Programs, and excerpts of relevant Federal Sentencing Guidelines, and Antitrust Division policies).

99. Of course this will be affected in the future by proposed EC reforms to the notification process under Article 81(3) of the EC Treaty (formerly designated as Art. 85(3)). White Paper on the Modernisation of the Rules Implementing Articles 85 and 86 of the EC Treaty, Commission Programme 99/027. A separate but related issue for both U.S. and European firms extends to materials that are protected as privileged within their respective jurisdictions: particularly material protected by attorney-client privilege. European firms argue that because the EC and the United States hold different views on whether this privilege extends to corporate communications with in-house legal counsel, it is possible that such information will being conveyed to U.S. antitrust enforcement authorities through international agency cooperation, thereby potentially placing European firms at a disadvantage to their U.S. competitors in any U.S. antitrust investigation.

100. [100] *See e.g.*, EU Committee of the American Chamber of Commerce in Belgium, "EU Committee position paper on international cooperation between Anti-Trust Authorities" (May 13, 1996) at 2-3; *see generally*, Union of Industrial and Employers Confederations of Europe, "UNICE Preliminary Comments: US/European Union Draft Antitrust Cooperation Agreement," (29 November 1994 ) at 1-2.

101. [101] *See* Antitrust Division Manual at III:46-47 (1998); Spratling, Negotiating the Waters at 12-13 United States v. Showa Denko Carbon Inc., Crim. No. 98-85 (E.D. Pa. 1998) (graphite electrodes) (an example of a plea agreement provision affording after-the-fact notice for disclosure to foreign enforcement

authorities); *See also* Antitrust Civil Procedure Act § 3, 15 U.S.C. § 1312 (providing a right to object to a Civil Investigative Demand (CID) that orders production of information that came into the CID-recipient's possession through discovery from another person in order to prevent or condition production of otherwise protected or privileged information. Also provides a minimum time to object. This right extends to both (1) the person receiving the CID *and* (2) the relevant third party).

102. Business groups advocate such disclosure, and the Antitrust Division has issued a consistent policy position in criminal matters with respect to after the fact notice, assessed on a case by case basis. Specifically, the Antitrust Division has explained that in negotiating plea agreements with cooperating targets of investigations, although it will *not* agree either to provide notice before disclosing information to foreign law enforcement authorities that was obtained from cooperating defendants or to blanket commitments to provide notice to cooperating defendants either before or after disclosing information to foreign sovereigns, it *may* agree to provide notice after disclosing information, unless such notice would violate a treaty obligation of the United States, or a court order, or may jeopardize the integrity of any U.S., state or foreign investigation. Spratling, Negotiating the Waters, at 12-13.

103. Annex 2-D contains several model waivers of confidentiality protections proposed for use in multijurisdictional merger reviews. These may prove models for use in civil nonmerger matters as well.

104. Both of these cases involved U.S. and EU simultaneous review of allegedly anticompetitive activities; they are discussed more fully in Annex 1-C and Chapter 5 of this report.

105. *See* Annex 6-A for details on these technical assistance programs and their funding.

106. This use -- which can be seen as ultimately benefitting victims of anticompetitive conduct -- is also in the spirit of the current practice, under which all fines obtained in criminal antitrust cases are deposited with the Department of Justice Office of Victims of Crime.

107. The doctrine of *cy pres*, or fluid recovery, is applied in civil cases -- typically in antitrust and consumer class actions -- to redirect unclaimed funds to their next best use, and with the intention of benefitting persons who are *not* identical to the aggrieved class of plaintiffs. See Superior Beverage Co. v. Owens-Ill., 827 F.Supp. 477 (D.C.N.D. Ill. 1993) (where unclaimed funds remained after settlement, court applied doctrine of *cy pres* and court's own equitable powers to use funds for public interest purposes as "seed money" that was ultimately used to establish the Institute of Consumer Antitrust Studies at Loyola U. Law School); *see also*, In re Corrugated Container Antitrust Litigation, MDL 310, 53 Antitrust & Trade Reg. Rep. 711 (S.D. Tex. 1987) (awarding funds remaining in settlement for division among six law schools, National Association of Attorneys General, and two packaging industry foundations).

108. See e.g., United States v. Mrs. Baird's Bakeries (D.C. N.D. Tex. Crim No.: 3-95CR-294-R) (D.C. N.D. TEX. 1996) (domestic cartel prosecution for price fixing of bread and bread products. After conviction by jury trial, court sentenced corporate defendant to a $10,000,000 fine and 5 years probation with a condition of "release" that it perform 2500 hours of community service); *see also* United States v. McDowell Contractors, Inc., 668 F.2d 256 (6th Cir. 1982) (domestic defendant in bid-rigging scheme sentenced after plea agreement accepted, court imposed and suspended a fine on condition that defendant repair bridges). *But see* U.S. v. Missouri Valley Construction Co., 741 F.2d 1542 ( 8th Cir. 1984) (holding that a federal district court may not impose on a willing corporation as a condition of probation, in lieu of a fine, the requirement that it contribute money to a charitable organization that has not suffered actual damages or loss from corporation's criminal offense. Corporation convicted of bid-rigging in the road construction industry and had been ordered to endow a chair in ethics at the University of Nebraska Foundation in lieu of paying same sum as a fine).

109. A detailed description of the bilateral antitrust agreements into which U.S. antitrust authorities have entered appears in Annex 1-C, hereto.

110. Agreement Between the Government of the United States of America and the Government of the State of Israel Regarding the Application of Their Competition Laws, March 15, 1999, *reprinted in* 4 Trade Reg. Rep. (CCH) ¶13,506.

111. Agreement Between the Government of the United States of America and the Government of the Federative Republic of Brazil Regarding Cooperation Between Their Competition Authorities In the Enforcement of Their Competition Laws, October 26, 1999.

112. This is true even though, as described in detail in Annex 1-C hereto, bilateral agreements that are not negotiated under the IAEAA still remain limited instruments in many respects, because they do not alter existing law or otherwise expand the powers of antitrust authorities.

# EXHIBIT 19

# FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT

## HEARINGS

BEFORE THE

SUBCOMMITTEE ON
MONOPOLIES AND COMMERCIAL LAW

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

NINETY-SEVENTH CONGRESS

FIRST SESSION

ON

## H.R. 2326

FOREIGN TRADE ANTITRUST
IMPROVEMENTS ACT

MARCH 26, APRIL 8, AND JUNE 24, 1981

**Serial No. 77**

LIBRARY OF CONGRESS
APR 4 1983
COPY
EXCHANGE AND GIFT DIVISION

Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE
99-996 O WASHINGTON : 1983

COMMITTEE ON THE JUDICIARY

PETER W. RODINO, Jr., New Jersey, *Chairman*

JACK BROOKS, Texas
ROBERT W. KASTENMEIER, Wisconsin
DON EDWARDS, California
JOHN CONYERS, Jr., Michigan
JOHN F. SEIBERLING, Ohio
GEORGE E. DANIELSON, California
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
SAM B. HALL, Jr., Texas
MIKE SYNAR, Oklahoma
PATRICIA SCHROEDER, Colorado
BILLY LEE EVANS, Georgia
DAN GLICKMAN, Kansas
HAROLD WASHINGTON, Illinois
BARNEY FRANK, Massachusetts
ROBERT McCLORY, Illinois
TOM RAILSBACK, Illinois
HAMILTON FISH, Jr., New York
M. CALDWELL BUTLER, Virginia
CARLOS J. MOORHEAD, California
JOHN M. ASHBROOK, Ohio
HENRY J. HYDE, Illinois
THOMAS N. KINDNESS, Ohio
HAROLD S. SAWYER, Michigan
DAN LUNGREN, California
F. JAMES SENSENBRENNER, Jr., Wisconsin
BILL McCOLLUM, Florida

Alan A. Parker, *General Counsel*
Garner J. Cline, *Staff Director*
Franklin G. Polk, *Associate Counsel*

---

SUBCOMMITTEE ON MONOPOLIES AND COMMERCIAL LAW

PETER W. RODINO, Jr., New Jersey, *Chairman*

JACK BROOKS, Texas
DON EDWARDS, California
JOHN F. SEIBERLING, Ohio
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
BILLY LEE EVANS, Georgia
ROBERT McCLORY, Illinois
M. CALDWELL BUTLER, Virginia
TOM RAILSBACK, Illinois
CARLOS J. MOORHEAD, California
HENRY J. HYDE, Illinois

Warren S. Grimes, *Counsel*
George E. Garvey, *Assistant Counsel*
Franklin G. Polk, *Associate Counsel*
Charles E. Kern II, *Associate Counsel*

# CONTENTS

## HEARING HELD


| | Page |
|---|---|
| March 26, 1981 | 1 |
| April 8, 1981 | 67 |
| June 24, 1981 | 123 |


## WITNESSES


| | |
|---|---|
| Atwood, James R., partner, Covington & Burling | 83 |
| Prepared statement | 86 |
| Baldrige, Hon. Malcolm, Secretary, Department of Commerce | 6 |
| Prepared statement | 9 |
| Connor, Martin F., Washington corporate counsel, General Electric Co | 105 |
| Prepared statement | 106 |
| Emery, Fred, independent consultant on regulatory matters | 125 |
| Prepared statement | 136 |
| Fox, Eleanor, professor of law, New York University | 26 |
| Prepared statement | 28 |
| Goldweig, David, Esq., office of general counsel, General Motors Corp | 26 |
| Prepared statement | 37 |
| Johnson, Gordon, chairman of the board, Logetronics, Inc., Springfield, Va | 131 |
| Prepared statement | 132 |
| Rahl, James A., professor of law, Northwestern University | 26 |
| Prepared statement | 42 |
| Rees, Hon. Thomas M., attorney and businessman, and former Member of Congress | 125 |
| Prepared statement | 129 |
| Shenefield, John, partner, Milbank, Tweed, Hadley & McCloy | 68 |
| Prepared statement | 70 |
| Victor, A. Paul, Esq., Weil, Gotshal & Manges | 26 |
| Prepared statement | 32 |


## ADDITIONAL MATERIAL


| | |
|---|---|
| American Bar Association, prepared statement | 213 |
| Fox, Lawrence A., vice president, National Association of Manufacturers: | |
| Letter from | 184 |
| Prepared statement | 185 |
| McDermid, John F., general counsel, International Business Government Counsellors, Inc., prepared statement | 193 |
| National Machine Tool Builders' Association, prepared statement | 151 |
| Text of H.R. 2326 | 3 |
| Victor, A. Paul, chairman, International Trade Committee, letter from | 211 |

then you can attack it. But you will weaken the ability of the Justice Department to work on that.

Now, my point is that the result of largely destroying the world cartels that dominated foreign trade prior to World War II was to open the channels for American exports which had theretofore been substantially closed as a result of the market division agreements that world cartels characteristically enter into.

"You sell in Europe; we'll keep the American market"—this is the kind of agreement that you had. And the result was that we did not export to foreign countries nearly as much as these companies are now free to do.

If either of these bills is passed, although they work in different ways, I fear very much that participation in world cartels will be stimulated. It may be authorized by the Secretary, or allowed under the other bill, and I think that this will remove benefits that antitrust has been having for our foreign trade and probably do a good deal more harm than good.

Thank you, Mr. Chairman.

[The complete statement follows.]

STATEMENT OF JAMES A. RAHL* ON INTERNATIONAL APPLICATION OF U.S. ANTITRUST LAWS

At the invitation of Chairman Rodino I am testifying concerning application of American antitrust laws to our foreign trade, and concerning the bills being considered by you. I appear in my capacity as a law professor and practitioner in the field, and not representing anyone. A major part of my work as a student of antitrust law and as an antitrust lawyer has been focused for the past 20 years on international and foreign antitrust policy, and I have devoted much time to the question of the impact of American antitrust on business abroad.

From that background, I have observed with increasing concern the rising popularity of demands for relaxation of antitrust policies in foreign commerce. This is not the first time that such a movement has occurred. Although one of the express goals when the Sherman Act was passed in 1890 was to combat the trusts and cartels which, as Senator Sherman put it, were "imported from abroad,"[1] faith in antitrust periodically wanes.

IS THERE A NEED FOR EXEMPTIONS

After World War I, Congress was induced to pass the Webb-Pomerene Act to provide an exemption for export trade associations. The argument for this was that the still young nation might increase its trade and combat powerful foreign cartels abroad by using cartel methods, especially where small businesses were concerned.

The Webb-Pomerene experiment in retrogression from the competition philosophy of the Sherman Act has been tried for over 60 years, and has been a failure for most of the time. At present, only about 1.5 percent of our exports are "assisted" by Webb-Pomerene associations.[2] Worse, the example set has been used as an excuse by other nations less devoted to free market principles than the United States to continue their own export cartels which sell to us at cartel prices.

Meanwhile, exports have increased with little help from Webb-Pomerene to the point where the United States is the world's biggest exporter, with 14 percent of the free world's exports in 1979, compared with 11.5 percent for West Germany, 6.9 percent each for Japan and France, and 6.1 percent for the United Kingdom.[3] For a

---

*Owen L. Coon, Professor of Law, Northwestern University; counsel, Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago.

[1] 21 Cong. Rec. 2460, 51st Cong. 1st sess., March 21, 1890.

[2] Federal Trade Commission Staff Analysis, Webb-Pomerene Associations: Ten Years Later, 15 (Nov. 1978).

[3] "Study of U.S. Competitiveness," study of export trade policy as mandated in section 1110 of the Trade Agreements Act of 1979, (1110b) conditions of competition study, submitted to the Economic Trade Policy Staff Committee, July 15, 1980, table III-4.

time in the 1950's and 1960's, complaints about antitrust injury to American business abroad were revived as antitrust enforcement against international cartels was stepped up. But these complaints were swept under by a tide of American business success overseas, combining increased exports with a great wave of "direct investment" abroad in plants and facilities. This reached phenomenal proportions in the 1960's and 1970's, leading to popular books entitled such things as "The American Challenge" and "The American Takeover of Britain." [4]

Thus treated by the United States to a strong lesson in competition principles, European nations enacted their own antitrust laws, and, with encouragement from us the Common Market moved to build competition policies rivaling ours in scope, with gradually increasing enforcement tempo. (None abandoned their export cartels, however often citing the Webb-Pomerene example as an excuse, without noting also its dismal record.) Ultimately, beginning eight years ago in 1973, spurred by an increasingly vocal and large group of developing nations, the United Nations sponsored discussions seeking international rules and principles against restrictive practices in world trade. With the United States actively participating, and with remarkable cooperation among developed, developing and Communist nations, a set of such principles were agreed to. They are cast along antitrust lines familiar to us—indeed mostly developed in our own statute and case law. They were endorsed by resolution of the General Assembly in December 1980. [5]

But in two of the bills before you today, H.R. 2326 and H.R. 1648, you are considering legislation which would fly directly in the face of these principles. Although the principles are "non-binding" in the sense that they are not enforcible law as to either nations or individuals, they are principles to which this nation has just agreed. If Congress and the Administration go in the opposite direction now it would be anomalous, to say the least.

What has happened, and what is the case for this desire to repeat a mistake of 60 years ago, compromise again our principles of competition, and abrogate our own agreement within the United Nations? The argument seems to be only the same one made in 1918—that we need to repeal or avoid the antitrust laws in our foreign, or export, commerce in order to remove obstacles or discincentives to exports. Little evidence exists that this is either necessary or desirable. And there is reason to believe that it would be counter-productive and harmful to our foreign trade and our domestic economy, as well as to our reputation.

Two principal arguments for such legislation are made: (1) that American "competitiveness" abroad has seriously declined, and (2) that our antitrust laws impede needed improvement in export performance. Neither proposition is self-evident and the facts in my opinion are to the contrary. While it may be true that the American percentage share of total world exports has declined in recent years, as stated in section 202(a)(3) of H.R. 1648; [6] this is due to many factors. In absolute terms, and also relative to our domestic economy, our export performance has been excellent. The volume of our exports has steadily increased, as has the percentage of the GNP accounted for by exports. A detailed analysis by Assistant Treasury Secretary C. Fred Bergsten last July found "growing international competitiveness of the U.S. economy." [7] A litany of news stories based on recent data have been telling us for months, in the words of the N.Y. Times, of "The Rise of American Exports" (Jan. 25, 1981); of "The Myth of Declining American Trade" (Dec. 11, 1980); of the lowest trade deficit since 1976 (Sept. 27, 1980); and now of trade surpluses for 1980 (March 20, 1981).

The fact is that our export performance is significantly outperforming the economy as a whole, and is one of the few bright aspects of the picture. The problems of competitiveness lie in our economic difficulties at home, not abroad, and that is where the solutions must be found.

## DOES ANTITRUST IMPEDE EXPORTS

Although the nation's export performance is actually quite good, it may be thought that present antitrust rules prevent its being significantly better. I doubt very much that antitrust really acts as a substantial barrier in very many export situations, though it may be in a few, and as I point out below, antitrust encourages

4 By J. J. Servan-Schreiber (1968) and J. McMillan & B. Harris (1968) respectively.

5 United Nations Conference on Restrictive Business Practices, The Set of Multilaterally Agreed Equitable Principles and Rules for the Control of Restrictive Business Practices, TD/RBP/Conf/10 (U.N. 1980) sec. D, par. 3 and 4.

6 See "Study of U.S. Competitiveness," supra note 3, table III–4.

7 Remarks by Hon. C. Fred Bergsten before National Foreign Trade Council, New York, July 1980 (mineo. Dep't Treas. News).

export competition and is a major factor in preventing serious reductions in exports. This is my overall judgment, and I am confident of that judgment. But the subject is complex and calls for a great deal of study and analysis. Obviously, many people are unconvinced. For this reason, as well as because there are a number of other important questions of law and policy concerning international antitrust, I favor passage of H.R. 2459 to provide for a commission to study these questions and to make recommendations for future action.

Pending such a study, I would like to point out some considerations which should, I believe, at least cause Congress to refrain from taking exemptive action until the problem is thoroughly studied. First, after many years of complaints about antitrust, there is still little specificity as to what the problems are, and even less proof that the problems identified actually prevent export sales. Perhaps for this reason, the emphasis lately has tended to shift from identifiable specific problems to statements that the antitrust deterrent consists of a "perception," and a feeling of too much "uncertainty."

I do not doubt that these thoughts are genuine, but they do not differentiate antitrust in foreign commerce from antitrust in general, nor from legal problems in general. Business itself is uncertain, legal risks are seldom fully covered, and of course business abroad has its own risks and uncertainties. Moreover, there indeed are antitrust rules which must be observed, and which do impinge upon freedom to do as one please in foreign trade. These typical aspects of economic life take on greater apparent force when put in a foreign setting, especially when foreign competitors are perceived to play by different rules, as they often undoubtedly do. There is no time to go into detail, but I believe, from considerable experience, that American antitrust involves far less restriction of American business in foreign commerce than in domestic commerce, and that there are few activities which will increase exports which cannot safely be done insofar as American law is concerned.

Two of the activities most often mentioned as raising problems are joint ventures for export purpose, and joint selling agencies. Joint venture companies formed by competitors do give rise to antitrust questions, and the same kind of problem could arise in connection with formation of an export trading company, if formed by competitiors. Where non-competitors are involved, however, formation raises no major problem. Where the operation of the company is confined to exports, it is unlikely that Section 7 of the Clayton Act would apply, even if competitors are involved, because of the requirement of proof of anti-competitive effect in a section of the United States. But the Sherman Act certainly can apply. The Department of Justice Antitrust Guide for International Operations takes the position that if the only effects are in foreign markets, however, the Sherman Act should not apply, and the Department has recently given clearance to a large consortium of American firms for a foreign hydraulic engineering project.[8] I believe they were correct in ruling that there would be no violation in that instance, because there would be no unreasonable effect on competition, although subject matter jurisdiction may be present.

The Justice Department, to my knowledge, has never attacked a consortium or joint venture formed for exports or to do business abroad. Careful legal advice can identify those ventures in which antitrust risks are unacceptable, and those in which they are as minimal as those accepted in normal transactions at home. With that, some joint ventures might not pass the test, but many would. Where genuine uncertainty exists, one can ask the Department of Justice for a business review. While in the past, these reviews have sometimes been slow, complex and costly, so that lawyers frequently advise against it, the Department some time ago adopted an expedited procedure for foreign trade activities.[9] I understand, however, that in over a year only one proposal has been submitted under the new procedure. Until this is given a better test than that, the uncertainty argument lacks considerable force.

As for joint selling agencies, the question is similar to that of joint ventures, but in some respects even more difficult. Such arrangements usually involve agreements among other wise independent sellers, and where the agent can set the price, or allocate territory or customers among the sellers, problems of possible per se violation of the Sherman Act arise. As a lawyer, I would certainly not minimize the antitrust risk in this instance. There do not appear to be doctrinal developments in case law occurring which may result in greater use of reasonableness tests as to some of these arrangements in the future. The *Appalachian Coals* case is still alive.[10] More-

---

[8] Department of Justice, Antitrust Guide for International Operations, Case C., n. 39 at 21 (Jan. 26, 1977).

[9] CCH Trade Reg. Rep. par. 8559.40 (announced Dec. 6, 1978).

[10] *Appalachian Coals, Inc.* v. *United States*, 288 U.S. 344 (1933), upholding joint selling agency found to lack power to control the market.

over, the recent Supreme Court decision, and later decision by the Court of Appeals on remand in the CBS cases against ASCAP and BMI,[11] may support outright legality of joint selling arrangements where member-sellers are free to sell outside the agency on terms of their own choice. If I were asked for advice today on an export selling agency among competitors, subject to further facts, I would be inclined to call it an acceptable legal risk if it met the latter conditions. If it did not, I would advise against it, subject to the possibility of a Webb-Pomerene exemption.

THE CONTRIBUTION OF ANTITRUST TO EXPORT PERFORMANCE

The question of whether antitrust impedes exports is always put in terms of individualized situations. But this is not the only relevant question. One must also ask whether antitrust laws do not benefit our foreign trade far more than they interfere with it. When this question is asked as to domestic law, the answer has generally been that the competition protected by antitrust benefits commerce by stimulating it and by preventing the restrictions on production and the higher prices associated with monopoly. The same question should be put for foreign commerce. The question is not, as sometimes stated, whether we want to use antitrust to benefit foreign buyers in foreign markets. This fails to focus on the real policy of antitrust which is not to protect businesses or customers as such, but to stimulate trade by providing a free and dynamic climate and by preventing monopoly and restrictive practices.

The main impact of American antitrust law on foreign trade, including exports, has been decidedly beneficial to that trade. This is most evident in the events beginning with and following World War II. I have recently made a substantial study of international cartels, largely rediscovering something that was once well-understood but which we are now in danger of overlooking.[12] In a major assault on international cartels which governed trade to and from the United States, involving about 60 cases between 1940 and 1950, the Justice Department largely destroyed the leading world cartels, and made them sufficiently hazardous that similar cartels appear only rarely now. This effect came about for two reasons: (1) when American firms left these cartels and began to compete abroad, the cartels were rendered largely ineffective as a practical matter since they could no longer control competition in their markets; and (2) foreign firms, despite complaints that we were applying our laws extraterritorially, were forced to abandon cartel activity in the U.S. domestic market and in our imports.

The result had to be a dramatically beneficial effect on our trade, and, as a by-product, on world trade generally. This is because almost all international cartels follow a pattern of dividing world markets among themselves. Such divisions customarily not only excluded foreign competitors from the U.S. market, but as a quid pro quo kept American firms out of designated foreign markets, thus directly excluding or limiting U.S. exports. The dimensions of this must have been enormous, though largely lost to view because of the general upheaval caused by World War II. The dimensions are indicated by several serious studies that show that upwards of half of world trade, between 1929 and the start of the war, was controlled or "influenced" by international cartels. Some of these cartels not only seriously restricted American trade, but by virtue of agreements dividing fields and restricting technology evidently seriously retarded American war-preparedness in such vital materials as synthetic rubber for tires.

Removal of most of these cartels undoubtedly contributed greatly to the surge in American exports and direct foreign investment which followed the war. There is no basis for thinking that antitrust laws are no longer needed to continue to provide such important protection. The mere fact that all nations, including our own, continue to cling to some form of legalization of export cartels shows that the tendencies have not disappeared. Antitrust enforcement experience in the United States, the Common Market and many other individual nations continues to show interest in cartels which may need only the encouragement of a major power like the United States to risk another round of such damaging activity as preceded World War II. The fact that foreign governments today occasionally form or defend cartels in particular fields, from OPEC oil to uranium, shows that the impulse to cartelize is not gone. The very resistance of other governments to the extraterritor-

[11] *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979), on remand, 620 F. 2d 930 (2d Cir. 1980), cert. denied, March 2, 1981.

[12] J. A. Rahl, International Cartels and Their Regulation (Paper presented at Conference on International Restrictive Business Practices, Nov. 9, 1979, sponsored by Columbia University Center for Law and Economic Studies, at Airlie House, Va.; to be published by Columbia University Press, Fall 1981).

ial application of American and EEC antitrust is probably in part influenced by similar motivations.

In this world context and in light of this history, passage of legislation to authorize American combinations of competitors to restrain competition in world trade, with the risk that these combinations will form linkage with foreign competitors and start the whole dismal cycle again, is a dangerous game to play with our exports, our trade, our domestic economy and our general welfare.

### COMMENTS ON BILLS

I have already indicated above the opinion that neither of the antitrust exemption bills, H.R. 2326 and H.R. 1648, should be passed. I would favor H.R. 2459 to provide for a study commission.

The following are some specific comments on the bills without attempting a comprehensive analysis of each.

### H.R. 2326

This bill, as an amendment to the Sherman and Clayton Acts, has the virtue of being a fairly simple, straightforward approach, in contrast to the highly complex and involved Export Trading Company bill. It is far more sweeping, however, in potential scope. It would raise most seriously the problems of increased cartel activity and long-run damage to trade discussed above. I believe it would be counter-productive to the goals sought by its sponsors, because it is likely in the long-run to restrict exports more than it aids them. It also contains some serious ambiguities. My reasons are as follows:

1. Section 2 really repeals the whole "foreign commerce" clause of the Sherman Act, saving only the final clause on "excluding a domestic person. . . ."

2. The section is so broad that it would permit agreements which restrict or even prohibit exports of particular goods and services, contrary to the goal of promoting exports.

3. Section 2 also is so broad that it would exempt restraints of trade applied to imports, as well as to exports, and there seems to be no argument in favor to doing that. While the Wilson Tariff Act prohibition of import restrictions is not directly repealed, it is a weaker law than the Sherman Act, and it is almost repealed by implication because of its great inconsistency with this exemption.

4. The saving clause for conduct having a "direct and substantial" effect on trade within the United States does little more than existing law, i.e., a restraint on foreign trade causing an effect on interstate commerce is covered now. A possible exception is that the new phrase would apply even if the effect were limited to one state. On the other hand, the new phrase is narrower than existing law in the sense that present law reaches restraints which either: (1) substantially affect interstate commerce, or (2) occur "in the course of" such commerce regardless of effect. Substantial effect need not also be "direct" under present law.

5. The phrase on "excluding a domestic person" is not traditional antitrust doctrine, and might be interpreted to prohibit simple exclusive dealing or individual refusal to deal activities which would not violate the present Sherman Act. Also, "domestic" person is ambiguous.

6. Perhaps most unfortunate of all is the risk that this provision would encourage American firms not only to form cartels among themselves, but to participate in foreign and international cartels. An agreement between American and foreign firms dividing markets throughout the world except for the U.S. market would be exempt under this provision. Past experience indicates that a serious risk would then arise of a secret agreement to include the United States in the market allocation to round things out.

7. Section 3, amending Section 7 of the Clayton Act to permit export joint ventures, would have a clarifying effect, but is probably unnecessary because Section 7 would not be likely to apply anyway. The Sherman Act will not apply either if Section 2 of the Act is adopted.

### H.R. 1648

Title I permitting banks to invest in export trading companies may be a very good idea, and I offer no criticism of this idea.

Title II amends the Webb-Pomerene Act to provide antitrust exemption for both trading companies and export associations, to include "services" as well as "goods," within the exemption, and to provide an entirely new procedure for granting and removing the exemption.

As long as we have a Webb-Pomerene Act, it makes no sense to limit it to goods, and the addition of services is a reasonable step. Also, although I see not very much need for an antitrust exemption for formation of trading companies to the entities which can obtain a Webb-Pomerene exemption. It is not entirely clear to me that they would not come within existing provisions, but I have not studied that question.

The revised criteria and conditions under Section 204 to be applied to determine eligibility for an exemption appear to include those now found in the Webb-Pomerene Act together with some useful additions. I have no specific comment about these, except to note that they appear to be as strict as those found under existing law. It is that strictness which has often been asserted as a main reason why firms do not apply for Webb-Pomerene exemption now. Accordingly, I wonder what the new law adds and whether it will not be every bit as ineffectual as the old law.

The answer to that question, if there is an anwer, must lie in the new procedure. This provides for a certificate granted by the Secretary of Commerce under Section 206 after a determination by him that the applicant meets the criteria of Section 204, and shows a "specified need" to engage in exempt activities to promote export trade. The certifcate lists the activities which may be engaged in, and presumably thereby limits what the exempt firm or association may do. A limited time is given for the Secretary to make his determination, and it is predictable that if he has very many applications, he will either be bogged down by this procedure, or will end up administering it superficially. He must consult with the Attorney General and Federal Trade Commission, hoping that they will agree to let one or the other handle the matter. If they object to a certificate, a short delay occurs within which they can seek an injunction in a de novo court trial involving whether the criteria of Section 204 are being met. After the certificate takes effect, either agency may also bring an action to revoke it on the same basis. Private persons may not bring such an action.

During the time a certificate is in effect, the association or company is exempt for activities and methods specified in the certificate carried out in conformity with such provisions, terms and conditions as the Secretary has prescribed in the certificate, and cannot be made liable later for such activities and methods in the event of revocation or invalidation of the certificate. Thus, it appears that the terms of the certification give absolute protection. Even if a court should later hold that the Secretary has allowed the company or association to do something which goes beyond or violates the Act, there can be no liability for conduct during that period.

I would be opposed to this certification procedure. Not only is it extraordinarily cumbersome and complex, but it delegates to the Secretary of Commerce great power to abrogate the antitrust laws insofar as exports are concerned. It seems to me unwise to lodge such power in an authority having no other responsibility for maintaining a coherent antitrust policy and lacking experience and expertise in this area.

Although the antitrust enforcement agencies may object, and may also seek an injunction, they would be placed in the position of launching a court attack on a decision of the head of a coordinate executive branch, and would either be reluctant to do so, or would thereby present a rather awkward spectacle. The effort thereby to guard the public interest may be laudable in spirit, but the mechanics seem extremely clumsy, if not unworkable.

Most important of all, I do not see any safeguard against the Secretary's allowing the applicant for a certificate to enter into international cartel or other arrangements, in the name of promoting exports. This portends the same long-run dangers that I have discussed above.

**H.R. 2459**

I support passage of this bill, which provides for a commission composed of persons from Congress, the Executive Branch, and the private sector to study the problems of international application of U.S. antitrust laws. It is clear to me that such a study should be made before any exemption or similar legislation is adopted, and this bill should be protected by a moratorium on other bills in this area.

In October 1979, I testified in favor of the similar bill, S. 1010, sponsored by Senators Javits and Mathias, in hearings before the Senate Committee on Governmental Affairs (96th Cong., 1st Sess., pp. 92–106). I have also written a detailed article on issues and proposals which may be considered by such a commission.[13]

---

[13] J. A. Rahl, International Application of American Antitrust Laws: Issues and Proposals, to be published in 1981 in vol. 2, No. 2 of Northwestern Journal of International Law and Business.

I have two concerns about the work of the commission. The first is that it not begin with an a prior presumption that given exemptions or other changes are to be made. It should be as open and objective as humanly possible, and its membership should be chosen with that goal in mind. Second, the bill requires that the commission complete its work and report within one year. This appears to me too short a time in which to complete some of the studies which should be made, and I would suggest that the bill be revised to permit an interim report within one year, and a further report within a later stated period, if considered necessary.

Mr. RAILSBACK. Mr. Chairman.

Mr. RODINO. The gentleman from Illinois.

Mr. RAILSBACK. I am not going to preempt anybody's time except to say I am delighted to see my former law school professor from Northwestern Law School and formerly, I might add, the dean of the Northwestern Law School. I am very happy to have him here. And I may not agree with his views in this particular instance—somebody is saying I'd better. But in any event, I thought he did an outstanding job. It is a treat for me to see him again.

Mr. RAHL. Thank you very much, Congressman Railsback. I appreciate that.

Mr. MCCLORY. Let me extend another warm welcome from another Illinois member to you, Professor Rahl, and say the student learned very well.

Mr. RAHL. Apparently, except on one point. [Laughter.]

Mr. RODINO. I want to thank each of you very much. And I would like to advise you that the committee members would hope to be able to send questions through the staff to each of you if there are questions they'd like to submit. And we would hope that you would have the time and inclination to reply to them in writing, those questions that we may not get to this afternoon.

Is that all right with the panel?

[Affirmative response.]

Mr. RODINO. Professor Fox, Professor Rahl indicated he feels that the language of H.R. 2326—and I believe that I correctly understood this—might generate an atmosphere that would lead to the establishment of large international cartels. Do you have any opinion on that? Do you believe that that concern is one that should really give us some pause?

Ms. FOX. I do have an opinion on it. I certainly share Professor Rahl's concern that we should do nothing that would facilitate such worldwide cartels.

I also have some concern that the proposed language of 2326 could tilt toward allowing such a result because of the language, "unless such conduct has a direct and substantial effect on trade and commerce within the United States."

Language that cuts back U.S. antitrust to cases of "direct and substantial effect," could tie our hands in attacking U.S. companies' participation in foreign cartels that have a very substantial effect, but, arguably a somewhat less than direct effect on trade and commerce within the United States.

Language designed only to make it clear that the law does not protect foreign buyers, suppliers, competitors, or consumers injured by breakdown in foreign trade would not have the result of condoning of foreign cartels that hurt U.S. consumers.

Mr. RODINO. Mr. Victor.

Mr. VICTOR. Yes, sir. I can sympathize with the comments made both by Professor Rahl and Professor Fox. On the other hand, I am not so sure that I agree that the language proposed would necessarily have the impact that they are suggesting. The question would be: What is a direct, substantial, foreseeable effect on U.S. commerce or on export opportunities from the United States? And if there is some conduct abroad in which we could find American participation which would satisfy those criteria, then I am somewhat less inclined to think that this amendment would affect our ability to challenge that conduct.

I might add that these questions that are now being generated are difficult questions and require precise responses, and even then they probably won't be responses that everybody would agree with. And again that is why I think this is an important subject to await consideration by the study commission contemplated by H.R. 2459.

Mr. RODINO. Mr. Goldsweig.

Mr. GOLDSWEIG. Mr. Chairman, I would suggest that the language appearing in 2326 does not move the law away from the very adequate standards, the very adequate protection suggested by the Justice Department in their international guidelines.

I don't believe that there is any intent to move away from the standards of the international guidelines, and therefore I feel that since we have not yet seen the negative result under these guidelines suggested by Professor Rahl, we will not see it in the future.

Mr. RODINO. Do you want to add anything, Mr. Rahl?

Mr. RAHL. Please, Mr. Chairman; thank you.

I think it's been too short a time to know what the effect of the Department of Justice guide is, though I think in general it is very helpful and very good.

Let me explain a couple of points about what I said that the others have mentioned. In your bill, H.R. 2326, you say that the Sherman Act shall not apply to activities involving commerce with foreign nations.

That does two very broad things. One is that it says it shall not apply to restraint of competition in American exports. And it also says it shall not apply to restraint of competition in imports—it covers imports, and we haven't even talked about that. That is why I said it repeals the whole foreign commerce laws.

Now, you can bring either one within the Sherman Act if it has a direct and substantial effect on domestic commerce. But what this bill will clearly permit is an export cartel, for instance—not only one which seeks to improve exports but an export cartel which will reduce exports or even agree not to export. That is the first step toward building a world cartel.

The second step is also not reached by the bill. If that same group agreeing not to export either entirely or to a given country does so on a quid pro quo basis with a foreign company as to a third country—let's say a French and American group agree not to compete as to South America—you have something this bill will not reach even though it stops the flow of our exports to South America.

Now, what about to the American market? There the "direct and substantial" test will provide some protection. I don't deny that.