# EXHIBIT 20

LEXSEE 51 FORDHAM L. REV. 201

Copyright (c) 1982 Fordham Law Review
Fordham Law Review

November, 1982

*51 Fordham L. Rev. 201*

**LENGTH:** 24258 words

ARTICLE: INTERNATIONAL ANTITRUST POLICY AND THE 1982 ACTS: THE CONTINUING NEED FOR REASSESSMENT.

**NAME:** BARRY E. HAWK *

**BIO:**

* Professor of Law, Fordham University School of Law; A.B. 1962, Fordham University; L.L.B. 1965, University of Virginia.

The author gratefully acknowledges the research assistance of Amy A. Marasco.

This article is based in part on the author's report on the Seven Springs Symposium entitled *United States Antitrust Laws and Multinational Business.*

**SUMMARY:**
... A compelling need exists for a comprehensive reassessment of the enforcement of the United States antitrust laws in international trade. ... A national commission should be established, therefore, to provide a comprehensive and fundamental study of United States antitrust enforcement in international trade. ... Greater foreign surveillance of restrictive and monopolistic practices arguably permits a relaxation of United States antitrust enforcement in international trade. ... In 1979 Senators Javits and Mathias, and again in 1981 Senator Mathias, proposed legislation to create a national commission to study antitrust enforcement in international trade. ... (D) antitrust policy implications of foreign government intervention international trade; and ... These interests should then be integrated as much as possible into a coherent policy framework in which to place antitrust enforcement in international trade. ... The protection of American consumers (primarily through antitrust prohibitions on import restraints) and the protection of American export and investment opportunities (primarily through antitrust prohibitions on export restraints) are the two major economic interests underlying United States antitrust enforcement in international trade. ... Less persuasive than the economic and political interests above is an asserted moral interest in United States antitrust enforcement in international trade. ... *Antitrust Policy Implications of Foreign Government Participation in International Trade* ... First, numerous unresolved substantive issues peculiar to antitrust law are not present under the other laws. ...

**TEXT:**

[*201] INTRODUCTION

A compelling need exists for a comprehensive reassessment of the enforcement of the United States antitrust laws in international trade. This need is demonstrated by the myriad of significant economic and legal issues and the international conflicts arising out of that enforcement. Many of the issues and conflicts are not new. But recent

economic and legal developments in international trade, and in the position of the United States and American business within that trade, make a reassessment particularly timely.

These changed circumstances include: the increased importance of international trade to the United States; the decline of United States industrial preeminence; the growing demands for a more comprehensive and unified United States export policy; the exponential increase in enforcement of foreign competition laws, particularly in Western Europe; the increased resistance to United States enforcement that affects foreign interests; the growing demands by developing countries for codes governing multinationals; and last, the increased involvement of United States firms with foreign governments and foreign state-owned or mixed enterprises.

These changed circumstances have already triggered a variety of proposals n1 and actions, ranging from suggested minor alterations in institutional enforcement (such as Justice Department amicus intervention in private actions involving foreign commerce) to the recent [*202] legislative changes in the application of the antitrust laws in international trade. n2

Many of these proposals fail to examine sufficiently the underlying national interests that should guide the formulation and implementation of United States antitrust policy as part of a larger United States policy in international trade. A national commission should be established, therefore, to provide a comprehensive and fundamental study of United States antitrust enforcement in international trade. The passage in October 1982 of the Export Trading Company Act of 1982, n3 and the Foreign Trade Antitrust Improvements Act of 1982, n4 in no way moots the desirability of a commission. These Acts are narrow in scope and address very few of the numerous issues requiring commission scrutiny. Indeed, continued piecemeal change in United States antitrust policy in international trade compels even more strongly the establishment of a commission. This Article proposes an agenda of items to be studied by such a commission.

I. CHANGED CIRCUMSTANCES REQUIRE COMPREHENSIVE REASSESSMENT

*A. From 1890 to 1976*

In 1890 Congress paid little or no attention to the Sherman Act's n5 application in international trade.Though the Act expressly applies to restraints of United States trade "with foreign nations," the legislative history provides no effective guidance as to either the application of the Sherman Act in international trade or the policies and national interests that should inform that application. n6 The same ambiguity exists with respect to subsequently enacted antitrust laws, such as the Clayton n7 and Federal Trade Commission [FTC] n8 Acts, which also apply in varying degrees to United States foreign commerce. It is not surprising, therefore, that the history of the antitrust laws in international trade is uneven and controversial. In 1909 Justice Holmes narrowly interpreted the Sherman Act in *American Banana Co. v. United Fruit Co.*, n9 largely limiting the Act to conduct occurring within the United States and not involving "acts of state" of a foreign government. n10 This narrow interpretation was gradually eroded over [*203] the years as courts expanded the application of the Sherman Act to reach conduct occurring outside the United States and conduct involving foreign governments. n11 This trend culminated in the 1945 *Alcoa* n12 decision in which Judge Learned Hand held that the Sherman Act applies to conduct outside the United States, even when engaged in by foreign citizens or firms, if there is both an *intent* to affect and an actual *effect* on United States foreign commerce. n13

During the next thirty years, courts and commentators struggled with the intent-effect jurisdiction test of *Alcoa*. While couching the test in a variety of forms, the courts were consistent in almost invariably exercising jurisdiction and concluding that the Sherman Act applied to the challenged conduct. n14

Concurrent with this expansion of jurisdiction coverage, courts enunciated, albeit often in dictum, substantive principles that raised among antitrust counsellors doubts about the validity of commercially significant arrangements such as international joint ventures, n15 export agreements n16 and the world-wide operation of multinational businesses formed as wholly-owned subsidiaries in different countries. n17 During the same period, judicial statements appeared that can be read as giving the antitrust laws and policies paramount importance among the possible national interests existing in connection with United States international trade. For example, the Supreme Court in *Timken Roller Bearing Co. v. United States* n18 rejected the contention that a challenged arrangement was lawful because it had a favorable effect on United States foreign commerce. n19

[*204]

B. *The "Modern Era"*

The "Modern era" of United States antitrust in foreign commerce began in 1976 with the *Timberlane* n20 decision by Judge Choy in the Ninth Circuit. *Timberlane* announced a new approach to so-called "extraterritorial" antitrust jurisdiction, which significantly departed from the *Alcoa* intent-effect test. The *Timberlane* court formulated a three-part test:

Does the alleged restraint affect, or was it intended to affect, the foreign commerce of the United States? Is [the alleged restraint] of such a type and magnitude so as to be cognizable as a violation of the Sherman Act? As a matter of international comity and fairness, should the extraterritorial jurisdiction of the United States be asserted to cover [the alleged restraint]? n21

The heart of *Timberlane* is the third question, which grows out of the court's explicit recognition of such international comity considerations as respect for foreign sovereignty and foreign national interests. The question requires the court to balance a number of factors or interests. These include, among others, "the degree of conflict with foreign law or policy, the nationality or allegiance of the parties [and] the relative significance of effects on the United States as compared with those elsewhere." n22 Most of the decisions since *Timberlane* have followed its balancing or comity approach with some modifications. n23

[*205] At first glance the *Timberlane* balancing approach, given its greater explicit sensitivity to foreign interests and its potential for narrowing antitrust jurisdiction, provides hope that it might resolve or mitigate some of the problems arising in connection with the application of United States antitrust laws in international trade. Any adverse impact on United States export trade, for example, might be reduced by the narrowing of jurisdiction. The *Timberlane* approach might also lessen conflicts with foreign nations. But as seen below, n24 this optimism may be misplaced and it remains to be seen whether *Timberlane* and its progeny will be successful in furthering international harmony in the antitrust world. The courts that have adopted a *Timberlafne* approach are inconsistent both in their laundry list of factors to be balanced n25 and in their balancing of those factors. n26 This raises serious questions whether the *Timberlane* approach, or any conflict of laws approach, has the requisite specificity to ensure counselability and principled decisions.

C. *The Changed Circumstances of the Present Day*

The decisions constituting the highwater mark of antitrust enforcement in United States foreign commerce -- *Alcoa,* n27 *Timken* n28 and *United States v. Minnesota Mining & Manufacturing Co.* n29 -- were [*206] rendered in a period of domestic and international circumstances far different from those of today. These changed circumstances compel a reassessment of United States international antitrust policy.

1. The Dramatically Increased Importance of International Trade to the United States

Imports such as automobiles and consumer electronic equipment now constitute a sizable percentage of the market in many industries. n30 Export of goods and services also constitutes an important and increasing proportion of the United States economy. This "internationalization" of the United States economy contrasts vividly with the relatively isolated trade position of the United States in 1890 and before World War II. It can be seen in both seller and buyer markets. For example, economies of scale in the aircraft industry dictate that United States suppliers not only face competition from foreign competitors but also negotiate with powerful foreign buyers.

2. The Relative Decline of United States Industrial Preeminence in the World

Neither the United States economy in the aggregate nor United States-based firms generally enjoy the high share of participation and power in markets that they enjoyed in the years immediately following World War II. n31 Thus, while international trade is becoming more important to the United States and United States-based firms, these firms face increasing foreign competition in both domestic and foreign markets. The implications of just these two changed circumstances on United States international economic policy in general, and on antitrust policy in particular, are enormously significant. For example, analysis of geographic and product markets might place greater emphasis on the growing importance of foreign competition, n32 and the [*207] operation of per se rules of illegality might give way to the more lenient rules of reason. n33

3. The Significant Increase in Enforcement of Foreign Competition Laws

West Germany n34 and the European Economic Community [EEC or Common Market] n35 now have broad pro-competition regimes. n36 Competition laws also exist on the books of many other countries, n37 although they are enforced far less vigorously. The implications of this increase in foreign enforcement on United States antitrust

policy are not entirely clear. Greater foreign surveillance of restrictive and monopolistic practices arguably permits a relaxation of United States antitrust enforcement in international trade. Foreign antitrust enforcement may also indicate a growing international convergence of views with respect to restrictive practices and monopolistic conduct by private firms operating within the domestic market of the enforcing country. To the extent that such an international convergence is taking place, it might reduce some of the conflicts engendered by zealous enforcement of the United States antitrust laws in international trade.

[*20]

4. The Increasingly Hostile Foreign Reaction to Recent United States Antitrust Efforts

Hostile reaction to United States antitrust enforcement efforts is not new; diplomatic protests and strong foreign government objections have occured in the past. n38 What is new, and potentially far more troublesome, is the resort by foreign governments to "blocking" legislation and "claw back" provisions, which are intended to deter or block United States antitrust investigations and actions involving foreign parties and/or governments, n39 particularly when the challenged conduct takes place outside United States territory and, most importantly, within the territory of the objecting foreign government. n40 Australia, n41 Canada, n42 France, n43 the Netherlands, n44 and the United [*209] Kingdom, n45 among others, n46 now have statutes that block enforcement of United States pretrial orders to produce documents and/or obtain information in antitrust actions. For example, France has made it a criminal offense to seek or disclose information that "would threaten the sovereignty, security, or essential economic interests of France or public order." n47

The British Protection of Trading Interests Act n48 goes further than any of the other "blocking" statutes. Its now notorious "claw back" provision creates a cause of action in the British courts for recovery of the punitive portion of a foreign multiple damage judgment (e.g., private treble damages under United States antitrust laws) under certain conditions, notably when the non-British judgment concerned [*210] activities outside the enforcing nation's territory (e.g., "extraterritorial" jurisdiction under the United States antitrust laws). n49

[*211] The British claw back provision and the recent enactment or strenthening of blocking statutes in other nations reflect the serious foreign concern with United States antitrust enforcement in international trade when that enforcement touches on the interests of foreign nations. Resolution of these conflicts with foreign nations is an important item on any agenda to reassess United States antitrust enforcement. n50 While the recent cooperation agreement between the United States and Australia n51 offers some hope that discovery conflicts can be [*212] moderated in the future, these conflicts will continue and they remain a suitable subject for commission study.

5. The Growing Demand by Developing Countries for International Regulation of Restrictive Business Practices, Monopolies and Multinational Firms

Developing countries have been motivated in their demand for international regulation not so much by traditional antitrust concerns as by concerns about the economic, social and political power of multinationals and by a desire to transfer technology on more favorable terms than have existed in the past. n52 Many of these demands are based, in whole or in part, on economic and social considerations inconsistent with the premises and goals underlying American antitrust enforcement. Partially in response to these demands, the industrialized nations comprising the Organization for Economic Cooperation and Development [OECD] in 1976 adopted Guidelines for Multinational Enterprises, which contain provisions on restraints of trade and monopoly abuses. n53

The United Nations has become the chief forum for the presentation of developing countries' demands. In 1980, after several years of deliberations, the United Nations Conference on Trade and Development [UNCTAD] adopted a Restrictive Business Practices Code. n54 The UNCTAD Code, entitled "The Set of Multilaterally Agreed Equitable Principles and Rules for the Control of Restrictive Business Practices," was subsequently approved by the United Nations General Assembly. n55

The Code is a set of voluntary guidelines. In general, it exhorts firms to refrain from engaging in restrictive agreements and from abusing a dominant position of market power. The Code is to be applied on a non-discriminatory basis to all enterprises whether multinational or domestic and whether private or state-owned. It [*213] generally does not apply, however, to transactions between affiliated members of a single multinational firm. The Code recognizes the need to promote the establishment and development of domestic industries in developing countries and to encourage the economic development of these nations. Although the Code is drafted in traditional antitrust language, n56 non-competition and protectionist policies underline the developing countries' approval of the Code. The Code's implications for United States antitrust policy are as yet unclear. Commission review of the UNCTAD Code and of the

proposed UNCTAD Code on Technology Transfers, n57 against the more general background of United States antitrust enforcement in international trade, is necessary.

6. The Increased Commercial Role of

Foreign Governments and State-Controlled Instrumentalities in International Trade

The mercantilist element differentiates international trade from United States domestic trade. The domestic market is largely free from the kinds and degrees of mercantilism seen in international trade. This difference in the conditions of trade may require that different substantive antitrust rules should apply in international trade. For example, antitrust rules governing predatory pricing and other forms of predation by foreign competitors should perhaps differ significantly from those applied to domestic predators. n58

Given the increase in foreign government participation in international trade, private plaintiffs, not surprisingly, have begun to challenge foreign government or mixed conduct under the antitrust laws. One example is the action in which a United States manufacturer of golf carts alleged that a state-owned Polish manufacturer of competing carts violated the antitrust laws by offering carts at subsidized prices in the United States lower than plaintiff's prices. n59 Another example is the unsuccessful action by a United States trade Union against OPEC and its member states for price fixing. n60 United States government and private challenges to foreign government intervention in the potash and uranium markets have resulted in acrimonious conflicts with trading partners. The increased frequently and complexity [*214] of dealings between foreign governments and private business also raise numerous issues concerning the antitrust liability of those private firms in connection with foreign government involvement. These issues concern primarily the act of state doctrine, n61 the foreign sovereign compulsion defense n62 and the application abroad of the *Noerr-Pennington* doctrine. n63

Until these legal issues are more precisely delineated and resolved, American firms dealing with foreign governments will continue to incur significant antitrust exposure. To cite but one example, the compulsion defense under American antitrust law may be overly rigid in its requirement of government "compulsion." Indeed, the very requirement could actually increase foreign government intervention in the marketplace.

Resolution of the many legal issues surrounding foreign government involvement in international trade would be enhanced by placing those issues in the broader relevant context of foreign government involvement rather than continuing the present judicial practice of [*215] isolated adjudication of each doctrine or defense. A commission would be ideally suited to conduct a broad inquiry sensitive to the interrelated aspects of each doctrine or defense.

II. THE 1982 ACTS

The last several years have witnessed a proliferation of bills to amend the antitrust laws as applied in international trade. n64 In 1979 Senators Javits and Mathias, n65 and again in 1981 Senator Mathias, n66 proposed legislation to create a national commission to study antitrust enforcement in international trade. While most of the proposed bills remain pending, on October 8, 1982 President Reagan signed into law a major piece of legislation n67 consisting of the Export Trading Company Act of 1982 n68 and the Foreign Trade Antitrust Improvements Act of 1982. n69 As seen below, the Foreign Trade Antitrust Improvements [*216] Act is broader in scope, and perhaps greater in its antitrust significance, than the Export Trading Company Act.

A.*Export Trading Company Act of 1982*

Title I of the Export Trading Company Act lists eleven Congressional "findings" relating to the importance of export trade to the American economy and states that the Act's purpose is to "increase United States exports of products and services by encouraging more efficient provision of export trade services to United States producers and suppliers." n70 Title I also establishes an "office of export trade" within the Department of Commerce to promote the formation of trading companies and associations. n71 Finally, Title I is broader than the Webb-Pomerene Act n72 exemption for export cartels, for Title I defines "export trade" to include the exportation of services as well as goods. n73

Title II, separately entitled the "Bank Export Services Act," provides financing incentives to encourage the formation of export trading companies and the participation of banks in those companies by amending the banking laws to reduce restrictions on trade financing provided by financial institutions. n74

Title III establishes a new certification procedure under which the Secretary of Commerce has the power to grant an exemption certificate of review to export trading companies that meet specified criteria. n75 This exemption supplements and does not replace the existing Webb-Pomerene exemption. An application received by the Commerce

Department will be forwarded to the Justice Department within seven days of its receipt. Within 90 days the Secretary of Commerce, with the concurrence of the Justice Department, will issue a certificate if the applicant's activities would:

(1) result in neither a substantial lessening of competition or restraint of trade within the United States nor a substantial restraint of the export trade of any competitor of the applicant,

(2) not unreasonably enhance, stablize, or depress prices within the United States of the goods, wares, merchandise, or services of the class exported by the applicant,

(3) not constitute unfair methods of competition against competitors engaged in the export of goods, wares, merchandise, or services of the class exported by the applicant, and

[*214]

(4) not include any act that may reasonably be expected to result in the sale for consumption or resale within the United States of the goods, wares, merchandise, or services exported by the applicant. n76
The certificate shall specify:

(1) the export trade, export trade activities, and methods of operation to which the certificate applies,

(2) the person to whom the certificate of review is issued, and

(3) any terms and conditions the Secretary or the Attorney General deems necessary to assure compliance with the standards of [section 303(a)]. n77
The Commerce Department, with the concurrence of the Justice Department, is empowered to issue guidelines describing specific types of conduct falling within the section 303(a) standards. n78

Certificate may be revoked or modified when either the Commerce or the Justice Department determines that, among other things, the export trade, export trade activities or methods of operation of a certificate holder no longer comply with the standards set forth in section 303(a). n79 Annual reports must be submitted to the Commerce Department by certificate holders. n80

A certificate also provides a limited exemption from the antitrust laws. Private actions by injured parties for injunctive relief and *single* damages only may be brought for failure to comply with the section 303(a) standards, which are the exclusive standards in the action. n81 Disincentives to private actions are provided, however. For example, the burden of proof is greater because conduct that is specified in and complied with in a certificate presumptively complies with the section 303(a) standards. n82 Further, attorney's fees and costs will be assessed against unsuccessful plaintiffs. n83

The Commerce Department, with the concurrence of the Justice Department, is empowered to issue rules and regulations necessary under the Act. n84 Sections 302 and 303, concerning the application and issuance of certificates, will not take effect until 90 days after the effective date of the first rules and regulations. n85

[*218] Several aspects of the Export Trading Company Act merit special attention. First, the Justice Department will continue to play an active role through its participation in the certification process and its investigatory power over export trading companies. n86 The Federal Trade Commission, which has jurisdiction over Webb-Pomerene associations, has been supplemented by the Commerce Department. n87 Second, while the thrust of the Act is to provide an exemption broader than Webb-Pomerene Act exemption, the Act expands antitrust coverage in one respect -- the creation of a private claim against export competitors n88 for "unfair methods of competition." n89 Moreover, the four conditions or standards for certification set forth in section 303(a) may actually be more stringent than the statutory conditions under the Webb-Pomerene Act. For example, the third and fourth standards in section 303(a) (unfair methods of competition and the sale or resale of the exported goods in the United States) seem to go beyond the statutory conditions set forth in the Webb-Pomerene Act. n90 Third, the certification procedure has been critized as "cumbersome" and a potential "deterrent" to small and medium-sized companies that wish to engage in joint export activity. n91 The procedure will require companies to disclose sensitive information to the government and may require undesirable expenditures of firm time and money. In addition, the terms of the certificate may not be flexible enough for the company to face unforseen market changes.

The principal question, of course, is whether the Export Trading Company Act will succeed in increasing United States exports. In answering that question, a distinction must be made between the banking or financial aspects of the Act and the antitrust aspects. The Act primarily concerns the participation of banks in export trading companies. The

antitrust provisions are secondary and were included [*219] to meet a legislative perception that the antitrust laws have been inhibiting the formation of export trading companies and thus have been inhibiting exports. n92 Whether this preception is well-based is itself questionable. If it is not, then the antitrust provisions in the Export Trading Company Act may not significantly change the United States export picture. Indeed, if the history of the Webb-Pomerene Act provides any guidance, it is doubtful that exports will surge as a result of the apparently broader antitrust exemption and cumbersome certification procedure in the 1982 Act. The Act may defuse, however, some of the contriversy about antitrust's asserted adverse impact on American business in international trade. But, as seen below, numerous and significant issues remain with respect not only to the impact issue but more importantly to other international antitrust issues that should be studied by a commission. Thus, the Export Trading Company Act does not moot the need for a national commission.

B. *Foreign Trade Antitrust Improvements Act of 1982*

The Foreign Trade Antitrust Improvements Act of 1982 incorporates two sections of H.R. 5235, which took a so-called "generic" approach to amending the antitrust laws. The Sherman Act and section 5(a) of the FTC Act are amended directly, n93 as contrasted with the indirect approach taken by the Export Trading Company Act, which establishes an antitrust exemption in addition to the Webb-Pomerene Act exemption for export cartels. Like the Export Trading Company Act, however, the Foreign Trade Antitrust Improvements Act deals only with jurisdiction over United States export transactions and purely foreign transactions. The Act is not intended to affect jurisdiction with respect to import transactions. n94 The Act amends the broad and general jurisdictional provisions of the Sherman Act and section 5 of the FTC Act by inserting specific language requiring, as a jurisdictional threshold, a "direct, substantial, and reasonably foreseeable" effect on United States domestic commerce or on the export commerce of a United States resident. n95 In the latter case, the acts apply to conduct only for injury to export business in the United States. n96 Accordingly, the Sherman Act is amended to provide that:

This Act shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless --

[*220] (1) such conduct has a direct, substantial, and reasonably foreseeable effect --

"(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

"(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

"(2) such effect gives rise to a claim under the provisions of this Act, other than this section.

"If this Act applies to such conduct only for injury to export business in the United States." n97

It is essential to keep in mind that this Act, like the Export Trading Company Act, arose from a congressional desire to facilitate United States exports. n98 Thus, the Act is carefully drafted to affect jurisdiction only over conduct primarily involving *exports*. Importantly, the Act is not intended to affect jurisdiction over foreign conduct affecting *imports* into the United States. The Sherman Act's application to United States and foreign participation in international cartels remains unchanged, as the House Report expressly recognizes. n99 The Act, therefore, is not as sweeping as it first might appear. It does resolve the debate in the literature whether the Sherman Act applies to alleged restraints on exports that have harmful competitive effects only in foreign markets; for example, the fixing by United States exporters of a common price through a joint sales agency for goods sold only in a [*221] foreign market. n100 The Act resolves the issue in the negative, unless there is an adverse effect on the export business of a United States resident. Without such an advere effect on United States firms, the Sherman and FTC Acts do not apply. n101 With one qualification, this result is consistent with the case law n102 and with the International Antitrust Guidelines. n103 The Act does not change the existing case law in the following respect. Courts have upheld Sherman Act jurisdiction once foreclosure of United States exporters has been established even though the plaintiff is not a United States exporter but a foreign firm seeking to recover damages incurred in a foreign market. n104 The Act expressly precludes such recovery by limiting the claim to "injury to export business in the United States." n105

Interestingly enough, the conference committee dropped a section in the earlier bill (H.R. 5235), which had provided that section 7 of the Clayton Act does not apply to foreign joint ventures. n106 The Act does not clarify, therefore, the many issues surrounding the application of section 7 to foreign joint ventures. n107

Analysis of the new specific "effect" test in the Act is beyond the scope of this Article. Several preliminary observations are offered, however. First, the addition of the adjectives "direct, substantial, and reasonably foreseeable" n108 probably adds little practical guidance in [*222] either counseling or litigation. The same adjectives appear, albeit in inconsistent fashion, in many decisions interpreting the *Alcoa* "intent-effect" test. n109 The Act does confirm, however, a congressional intent that the Sherman Act not reach all conduct, anywhere in the world, which has some traceable effect on United States domestic commerce, exports or imports. Far less clear, however, is whether the language of the Act will successfully provide operable criteria to determine where to draw the line between Sherman Act coverage and non-coverage.

Second, it is also not clear whether the specific effect test set forth in the Act is limited to determining whether export transactions or purely foreign transactions have the requisite effect on United States trade. The test might also be used in determining whether *import* transactions (for example, an international cartel as in *Alcoa* and *Uranium* ) have the requisite effect on United States trade.

Third, it would be unfortunate if courts interpreted the Act as eliminating entirely the intent element of the *Alcoa* "intent-effect" test. The House Report states that foreseeability rather than intent was chosen to make the standard an objective one and to avoid -- at least at the jurisdictional stage -- inquiries into the defendant's subjective motives. n110 "Reasonably" was also inserted to connoted an objective standard: "The test is whether the effects would have been evident to a reasonably person making practical business judgments, not whether actual knowledge or intent can be shown." n111 While the courts since *Alcoa* have properly emphasized *effect,* evidence of an intent to affect United States trade should remain relevant if only to show the likelihood and extent of the effect on trade.

Fourth, the Act will probably not avoid or reduce antitrust conflicts with Foreign nations. Most of those conflicts have resulted from United States antitrust actions involving foreign conduct and international cartels having an alleged effect on United States imports or domestic commerce, such as *Uranium* and *OPEC.* n112 These situations would appear to be excluded from the Act. Indeed, conflicts will more likely increase as a result of the legislation as a whole. The Export Trading Company Act's creation of a second exemption for export cartels may result in increased foreign antitrust enforcement against United States export trading companies whose conduct adversely affects competition in foreign countries. n113

Fifth, the Foreign Trade Antitrust Improvements Act should not be interpreted as a rejection of the *Timberlane* balancing or comity [*223] approach to jurisdiction. This is clear from the House Report on H.R. 5235, which adopts a neutral position toward the courts' reliance on comity factors. n114 The Act should be viewed, therefore, simply as a refinement of the first step of the *Timberlane-Mannington Mills* analysis.

Sixth, the House Report adopts the *National Bank of Canada v. Interbank Card Association* n115 definition of the requisite effect on United States domestic commerce. n116 *National Bank* limits effects to those "of the type that the antitrust laws prohibit." n117 The House Report states:

For example, a plaintiff would not be able to establish United States antitrust jurisdiction merely by proving a beneficial effect within the United States, such as increased profitability of some other company or increased domestic employment, when the plaintiff's damage claim is based on an extra-terratorial effect on him of a different kind. n118

Th eForeign Trade Antitrust Improvement Act also fails to moot the establishment of a national commission. The Act, because of its narrow emphasis on export transactions, resolves few of the legal and factual issues outlined below as meriting commission study.

III. COMMISSION AGNEDA

In light of the recent developments in international trade, and the failure of the recent legislation to address adequately the issues raised by these developments, a commission should examine the following agenda items:

(A) United States national interests in international antitrust and trade policy;

(B) impact of the antitrust laws on United States business;

(C) means for avoidance and resolution of conflicts with other nations; [*224]

(D) antitrust policy implications of foreign government intervention international trade; and

(E) relationships between antitrust laws and unfair trading laws.

A. *National Interests*

The first task of a commission is to identify the United States national interests in enforcing its antitrust laws in international trade. These interests should then be integrated as much as possible into a coherent policy framework in which to place antitrust enforcement in international trade. It must be recognized, however, that various economic and political interests arguably underlie the application of United States antitrust laws in international trade. Furthermore, a general identification of these interests is far easier to accomplish than precisely defining them, assessing their comparative importance or analyzing the relationship among them in the formulation and operation of specific antitrust rules. The difficulties in implementing the various policy interests in antitrust enforcement are compounded when one attempts to integrate antitrust policy into a broader foreign economic policy, which might include balance of payment and national security considerations, among many others. This makes unlikely a complete integration of antitrust into general foreign policy. It also makes antitrust enforcement authorities unlikely or inappropriate candidates for the formulation of such a general policy. Despite this pessimism, the important role enjoyed by antitrust dictates that the hard fundamental questions about the relationship of antitrust to other national interests and policies must continue to be asked even though it is recognized that enduring answers cannot be given.

A commission, divorced from the constraints of particular disputes and composed of members with different perspectives and expertise, would be best placed to ask these broad questions and to attempt to answer them. That attempt would certainly help to clarify the interests underlying antitrust policy in international trade. This section is intended both to provide a tentative outline of the more important national interests and to serve as an illustration of the type of general interests that a commission might examine.

A variety of sometimes competing national interests have been advanced to support enforcement of United States antitrust laws in foreign commerce. Antitrust policy is but one of many elements that should go into the formulation of foreign economic policy. Other policies and national interests are involved, some of which, on a few occasions, have been given greater weight than antitrust policies. These can include national security, military and diplomatic considerations; monetary, balance of payment and fiscal policies; and tariff, import quotas and other protectionist policies.

Merger control policy in many foreign countries is an excellent example of a blending of "competition" policies and other national [*225] policies such as balance of payment and export enhancement. n119 For example, an increased emphasis on antitrust enforcement may increase efficiency and lower consumer prices in an inflationary, low-growth period on the national level. When the international economy is stagnant, however, countries with balance of trade deficits may seek to protect their domestic industries from foreign competition.

The initial question is to what extent is it in the United States interest to apply its antitrust laws in international trade? The United States as a highly developed country might conclude that American-based firms can operate more efficiently than foreign rivals and thus decide, other things being equal, to encourage competition in international trade through enforcement of antitrust laws. As seen earlier, n120 however, the declining competitive position of many American firms and the increasing "internationalization" of the United States economy makes that conclusion less certain than it would have been thirty years ago. A developing country, on the other hand, might prefer protection of its domestic traders against more established and "efficient" foreign competitors. Such a preference does not necessarily lead to rejection of antitrust laws, however, as evidenced by the UNCTAD Code on Restrictive Business Practices. n121 The UNCTAD Code, like domestic antitrust laws, can be given a protectionist construction by officials who are concerned more with protecting local interests than with world free trade or free market principles. The effect of such construction would be, however, to subordinate certain goals of antitrust enforcement (such as efficient allocation of resources) to nationalist interests (such as development of local manufacturing capacity and employment).

1. Economic Interests

The protection of American consumers (primarily through antitrust prohibitions on import restraints) and the protection of American export and investment opportunities (primarily through antitrust prohibitions on export restraints) are the two major economic interests underlying United States antitrust enforcement in international trade. These two goals were explicitly recognized by the Justice Department in its 1977 International Antitrust Guide. n122 The 1982 legislation reflects these two interests as well. n123 Thus, they should continue to inform the application of the antitrust laws in international trade.

[*226] A third possible economic interest is the protection of competition for its own sake in international trade. This interest emphasizes the value of the competitive process itself to United States commerce irrespective of the short-

run effect on American consumers or exporters. This third economic interest is broader than the first two and arguably supports the application of United States antitrust laws to restrictive arrangements that injure foreign competitors or customers primarily in foreign markets even without substantial adverse effect on American consumers or exporters. One example would be a tying arrangement imposed by an American supplier on a Brazilian buyer that forecloses only foreign competing suppliers from selling the tied product to the Brazilian buyer. n124 In this example, the first two economic interests do not support application of United States antitrust coverage. The Foreign Trade Antitrust Improvements Act makes it clear that the Sherman Act does not apply in this situation unless United States suppliers are also foreclosed, and then only to the extent of injury to United States export trade. n125 Thus, the Act reflects a rejection of a United States Interest in the protection of international competition per se. This interest rests largely on the notion that competition best promotes the most efficient allocation of world resources, a notion not accepted by all nations. Moreover, a national interest in competition at the domestic level does not necessarily imply a concomitant national interest in competition at the international level.

Because of the ambiguities and the difficulties attendant with this general interest of protection of competition per se, the two economic interests specifically articulated in terms of protection of American consumers and exporters provide firmer guidance to the decision-maker in applying United States antitrust laws in international trade.

A fourth asserted economic interest, "inward investment," might require relaxation or at least modification of present antiturst rules in international trade. Increasingly, the United States will have to rely on access to foreign sources of capital, natural resources and perhaps technology as well. The antitrust implications of this growing national interest in inward investment and the historical shift from self-dependence to reliance on foreign natural resources could be significant. The need for foreign capital could require relaxation of antitrust merger and joint venture rules in order to facilitate foreign entry or participation in United States markets. Access to natural resources may require more lenient treatment of foreign-based joint ventures, mergers and other arrangements among competitors. Antitrust rules [*227] on technology transfers through licensing of patents and knowhow may require modification to permit United States firms to gain quicker and more advantageous access to foreign technology. The 1982 legislation provides no response to this increasingly important national interest.

2. Political and Moral Interests

Political interests also have played a role in international antitrust enforcement. A major political interest is the minimization of conflicts with trading partners. The Justice Department notifies and, to some extent consults with, foreign governments whose interests are affected by proposed or pending United States civil and criminal antitrust actions. n126 For example, the Justice Department's practice is to notify in advance foreign governments in whose territory the Department intends to gather information pursuant to an antitrust investigation. n127 As seen below, the policy of minimization of conflicts frequently has been deemphasized in favor of the United States national interest in enforcing the antitrust laws to protect domestic consumers or exporters. A recent example was the conviction of, and imposition of over $ 6 million in fines on, European ocean shipping carriers in connection with liner agreements in the North Atlantic trade. n128 On the other hand, there have been prosecutorial compromises between the economic interests above and the political interest of minimization of conflicts. The most recent public example concerned the uranium cartel investigation, in which only the United States-based participant was indicted, after which it tendered a nolo contendere plea and was fined $ 40,000. n129

[*228] Other political interests may also exist. First, the United States has an interest in encouraging regimes and economic regulation based on rules of law rather than on the discretionary power of government officials. It is not clear, however, to what extent enforcement of United States antitrust laws in international trade furthers this policy objective , other than by providing a rule of law example to other nations. For example, American antitrust enforcement, with its emphasis on the judicial process, adversarial decision-making and punitive fines and damages, may be considered too rigid, costly and time-consuming to serve as an appropriate model for many foreign nations.

Second, the United States has a political interest in encouraging the adoption of free trade and free market principles throughout the world. As with some of the other political interests, the role of antitrust enforcement is not free from ambiguities. On the one hand, antitrust enforcement can promote acceptance of free market principles by setting a successful example and by achieving the economic benefits associated with free market principles. On the other hand, antitrust enforcement that antagonizes foreign nations because of their differing political or economic views of market regulation or because of perceived infringements of sovereignty is a doubtful vehicle for persuading those nations to adopt free market principles.

Third, the antitrust laws might be relaxed to help United States firms complete in world markets. The exemptions for export cartels found in the Webb-Pomerene Act n130 and the Export Trading Company Act n131 are examples. The courts and enforcement authorities have largely resisted, however, a mercantilist use of United States antitrust laws by, for example, narrowly interpreting the Webb-Pomerene exemption. n132 The Export Trading Company Act indicates, however, greater congressional willingness to relax the antitrust laws in order to promote exports.

Less persuasive than the economic and political interests above is an asserted moral interest in United States antitrust enforcement in international trade. The United States is said to have a moral interest in applying its antitrust laws to prohibit "immoral" business conduct, even when that conduct occurs outside the United States; for example, fraudulent bidding by United States-based firms in connection with a foreign construction project.

[*229] The issue whether moral interests should underline antitrust enforcement is a controversial one, even in the domestic context. For example, courts disagree as to whether the commission of a state-law business tort (such as inducement of a breach of contract) also constitutes a federal antitrust violation when it has little or no anticompetitive effect on the market. The trend is toward rejection of an antitrust claim in this situation, n133 partially on the rationale that ethical or fairness considerations should be accorded little or no weight in antitrust analysis. n134 At the least, such consideration should not result in antitrust liability when the challenged conduct has only minimal anticompetitive effects. It is submitted that this rationale applies a fortiori in foreign markets where the "injured" foreign government can apply its own moral values through its laws to conduct that it finds reprehensible.

Once the United States interests in enforcing its antitrust laws in international trade have been identified, important questions remain about their implementation. One framework for this implementation is to base the jurisdictional scope of the antitrust laws on three of the interests outlined above: the two economic interests of protection of American consumers and protection of American export and investment opportunities, and the political interest of minimization of conflicts. This formulation has the merit of some consistency with the Foreign Trade Antitrust Improvements Act n135 and those recent decisions n136 that establish a two-part test for coverage: effect on United States imports or exports *and* balancing of United States and foreign interests.

B. *Impact of Antitrust Laws on American Business*

The impact of the antitrust laws of American business, particularly in export trade, has been a controversial subject for many years. For example, several years ago the National Association of Manufacturers issued a report which concluded that the antitrust laws were significantly hampering the competitive ability of American firms to do business abroad. n137 Justice Department officials, on the other hand, [*230] consistently have denied this charge. n138 The controversy continues. n139 In congressional hearings in 1981 a number of trade experts testified that the United States export performance has declined in recent years and that the antitrust laws are a major cause of this decline. n140 Antitrust laws are almost certainly not as important, however, as other export disincentives such as the Foreign Corrupt Practices Act of 1977, n141 control regulations and taxation policies. n142

The Export Trading Company and the Foreign Trade Antitrust Improvements Acts of 1982 are legislative responses to the perceived concern that the antitrust laws are hampering United States export efforts. The creation of a second export cartel exemption and the "clarification" of Sherman Act jurisdiction with respect to export arrangements is intended to reduce any adverse antitrust impact on exporting. Whether any reduction will result from the 1982 legislation remains unclear for several reasons. First, the history of the Webb-Pomerene exemption and the cumbersome certification procedure in the 1982 Act belie optimism that firms will rush to form export trading companies. Second, the "clarification" of the Sherman Act may prove to have little effect on the impact issue primarily because it fails to "clarify" the perceived antitrust uncertainty surrounding many business arrangements, such as foreign-based joint ventures, technology transfers and involvement with foreign-based, government-in-spired cartels.

[*231] Unfortunately, therefore, the impact issue will probably continue to provoke debate despite the 1982 legislation. Given that Congress has recently examined the impact issue and has attempted to deal with it, a national commission should probably assign the impact issue a low priority on its agenda, at least until experience under the 1982 legislation is obtained. With that qualification in mind, this section provides a summary of the impact issue together with suggestions of the kinds of problems and questions meriting commission study.

The impact of antitrust enforcement on United States export performance is unclear for several reasons. First, empirical data is scanty at best and andcdotal in nature. Second, it is difficult to isolate antitrust considerations from the frequently numerous set of variables that go into a business decision. Moreover, antitrust constraints often are offered to prospective business partners as reasons for decisions that rest more on other commercial or financial considerations.

Third, the entire controversy is frequently clouded by the failure to distinguish between antitrust's impact on United Stated national interests (such as export performance and balance of payments) and impact on individual firms or industries. Despite these qualifications an adverse impact of the United States antitrust laws on American business can be documented with respect to certain types of situations. The frequency and significance of those situations, and the effect on United States national interests, are harder to measure.

First, American firms may be hampered in their efforts to complete in American markets by having to comply with stringent United States antitrust laws to which foreign competitors are not subject, n143 either because similarly strict foreign antitrust laws do not exist or because United States jurisdiction is lacking over the foreign firms. This problem is aggravated, of course, by the "extraterritorial" scope given to the United States antitrust laws. There are many examples of adverse impact in this situation. American firms are frequently subject to stricter antitrust rules when competing for foreign projects that require joint bidding, despite the rules suggested in the International Antitrust Guide. n144 The Foreign Trade Antitrust Improvements Act of 1982 should alleviate some of the concerns here, at least when the joint bidders are United States residents and no other American firm is otherwise involved in the project. Joint exploration and resource development projects, and joint fund projects are other situations in which American firms can suffer a competitive disadvantage because [*232] of United States Antitrust laws. n145 Increase in foreign antitrust enforcement might reduce, to some extent, any adverse impact on American business resulting from United States antitrust enforcement. Firms now face competition rules in Western Europe that are in some instances stricker than American rules. For example, the Common Market's rules on vertical territorial restrictions and on abuses of dominant position or monopolization are stricter in many respects than current United States antitrust rules. n146 Thus, the charge that United States firms, unlike their foreign competitiors, face the world's thoughest antitrust laws has less weight today than thirty years ago. On the other hand, inconsistent foreign antitrust rules can aggravate any adverse impact of United States antitrust by placing American firms in a position in which compliance with one set of laws results in breach of another set of laws. n147 For example, the Export Trading Company Act's creation of a second exemption for export cartels will not change the EEC's condemnation of export cartels that affect EEC trade.

The effect of foreign antitrust laws on the impact issue is not clear for several reasons. Enforcement of such laws varies considerably and the mere existence of antitrust legislation does not necessarily imply serious enforcement.Moreover, foreign antitrust laws can have mixed and even favorable effects on the operations of American firms. For example, foreign laws reduce any adverse impact of United States antitrust enforcement when the foreign rules are consistent with [*233] United States rules and both American and foreign competitors operate under the same legal constraints. n148

The second situation in which an adverse impact can occur is when American business is subject to conflicting foreign laws or policies. For example, United States antitrust laws may prohibit, or at least place in doubt, import restrictions in connection with foreign joint ventures or American-owned foreign subsidiaries. In such cases, import restrictions may be requested by the host government when it views the United States subsidiary as a vehicle for the foreign government's development plans. The American firm in turn views the foreign subsidiary as a vehicle for United States exports into that country. The host government may tell the American firm that it will impose import restraints on products for which a local manufacturing capability is being developed, but that it will cooperate on the import of those products for which there is no local capability. Agreement to such an arrangement creates some antitrust risk for the American firm because it would involve cooperation with competitors in the host country. The business problem is aggravated by the fact that competing foreign firms not subject to United States antitrust laws will frequently enjoy a competitive advantage in this situation. For example, stricter United States antitrust rules against ancillary restrictions in joint ventures n149 (such as territorial restrictions) may make a United States firm a less attractive partner to a foreign firm or a foreign government that either desires such restrictions or is neutral toward them. The 1982 legislation fails to clarify the antitrust status of these kinds of restrictions.

A third situation in which adverse impact can occur is when a United States firm is subject to antitrust enforcement and prosecution in more than one jurisdiction and runs the risk of a double penalty. The probability of this risk increases with expansion of the territorial scope of the enforcing jurisdictions. Thus, broad "extraterritorial" application of United States and other nations' antitrust laws increases the risk that double penalties will be imposed on American firms. In addition, the same business conduct may bring a firm under the eye not only of the Justice Department and Federal Trade Commission, but also the International Trade Commission n150 and the Commerce [*234] Department. n151 This fragmentation of American antitrust enforcement with the accompanying variation in goals and procedures adds further uncertainty.

A fourth situation in which adverse impact could occur is when foreign nations threaten reprisals against United States firms because of foreign resentment against United States antitrust enforcement that is perceived as infringing foreign sovereignty and interests. While actual examples of such reprisals are hard to document, the threat is probably not illusory.

Fifth, United States antitrust laws might have an adverse impact on foreign investment in the United States. Strict American antitrust laws, together with disclosure and other duties which could operate outside the United States, may inhibit foreign firms from investing in the United States through mergers, acquisitions, joint ventures or licensing. This interferes with the United States interest in gaining access to foreign capital, resources and technology. Moreover, foreign reluctance to enter the United States market because of antitrust risks could increase as that market shrinks relative to the rest of the world, thus reducing potential rewards to the foreign investor or technology holder. The 1982 legislation does not address this issue of inward investment and commission scrutiny remains desirable.

Sixth, the perceived uncertainty of the antitrust laws as applied in foreign commerce is frequently asserted as inhibiting American firms in their conduct of business. This uncertainty is detrimental, not only to American firms, but to United States national interests as well. Again, trade experts and antitrust counsel disagree strongly both as to the existence and extent of the uncertainty and its inhibitory impact. n152 For example, Martin F. Conner testified in 1981 on behalf of the Business Roundtable that:

[I]t is not difficult to pinpoint the general classes of international business transactions that are restricted by the threat of antitrust problems, but from which that threat should be eliminated. These would include joint ventures or other arrangements among exporters that may involve the allocation of territorial responsibilities or the establishment of common prices or other terms of trade, technology licenses that restrict sales by the contracting parties to particular countries or regions, and offshore acquisitions that permit U.S. firms to enter foreign markets. n153

The causes of the uncertainty are ambiguous and multifold.First, the frequent complexity of the fact situations and the generality of the [*235] legal rules render "certain" antitrust counsel imprudent if not impossible. For example, application of the muddled domestic antitrust rules on joint ventures to foreign joint ventures calls more for creative counseling than simple yes-no answers to business clients. Second, some antitrust counsel may have tended to be overly "conservative" in interpreting judicial decisions so as to cast doubt on certain business arrangements in international trade, notably joint ventures and export activities. Third, uncertainty unquestionably exists with respect to significant unresolved legal issues that arise in the international context. These include, among many others: 1) the application abroad of the *Noerr-Pennington* doctrine's sanction of joint effort to influence governmental action; 2) the definition and scope of the act of state doctrine in antitrust cases; and 4) market definition in connection with mergers and joint ventures that cross national lines.

Finally, desirable patent and knowhow licensing by American firms may have been inhibited by overly strict and uncertain United States antitrust laws, although recent judicial decisions n154 and recent official Justice Department positions toward licensing n155 have both relaxed the antitrust rules and made them more certain.

The Justice Department, through its Antitrust Division, has made large strides towards reducing the uncertainty surrounding the application of the Antitrust laws in international trade. In 1977 the Department issued an International Antitrust Guide. n156 The Guide sets forth enforcement policy not only in abstract terms but courageously also in terms of specific responses to fairly detailed case hypotheticals. n157 Despite the significant benefits to the business world and to the antitrust [*236] bar, the Guide cannot eliminate uncertainty entirely or lay to rest all reasonable doubts about the operation of antitrust in the international area. For one, the Guide does not bind courts and, in fact, has rarely controlled the outcome of cases.

The Department has also argued that its Business Review Clearance procedure n158 removes most uncertainty. Again, for a variety of reasons, such as the fact that clearance is not binding in private litigation, businesses and their counsel have not seen fit to use this procedure as it is presently constituted. n159 Consequently, the Business Review Clearance procedure has not significantly reduced uncertainty.

The 1982 legislation should help to remove some of the uncertainty. Its narrow emphasis on export arrangements indicates, however, that many of the uncertainties outlined above will remain. For example, the legislation provides little or no guidance with respect to the following arrangements and issues, among others: foreign-based joint ventures; territorial restrictions in patent and knowhow technology licences (such as restrictions on imports to the United States); foreign acquisitions by United States firms; and the act of state doctrine, foreign compulsion defense and the *Noerr-Pennington* doctrine.

American antitrust enforcement has also had in some instances a favorable impact on United States business. For example, the consent decree obtained in *United States v. Addison-Wesley Publishing Co.*, n160 in which the government charged that American and British book publishers had divided world markets, resulted in the opening to American publishers of foreign markets previously closed to them. Extensive American enforcement against international cartels forty years ago also probably facilitated the entry of American firms into foreign markets. n161

A commission would provide a valuable service if it carefully examined the impact issue. Its main work would lie in the gathering of empirical data, most efficiently obtained not through anecdotal testimony but through delegated empirical studies.

C. *Means for Avoiding and Resolving Conflicts*

Enforcement of laws involving economic regulation of any sort against conduct or parties outside the enforcing country frequently causes conflicts with the perceived interests and policies of other sovereign nations. As was stated in the hearings in connection with the [*237] 1961 amendments to the Shipping Act: n162 "The foreign commerce of our own Nation is likewise the foreign commerce of many other nations, each having as much right to regulate it as is assumed by the United States." n163 But while enforcement of United States securities laws, n164 export control regulations n165 and foreign boycott rules n166 are recent illustrations of international conflicts, antitrust has been the chief focus of foreign complaints that application of American laws to foreign conduct and persons is inappropriate, if not unlawful.

The flavor of much of the foreign outrage at American antitrust enforcement is well-illustrated by the Canadian reaction to injunctions issued in the *Potash* litigation. n167 A former Deputy Premier of the Saskatchewan provincial government stated that the provincial administrator had set the price for potash, that Saskatchewan had every right to do so and that the price had been set in the belief that the industry was being mismanaged. He went on:

It is a piece of arrogant stupidity on the part of the Government of the United States to try to interfere in what has happened and is happening in Canada and the Province of Saskatchewan. n168

Foreign outrage has not been limited to strident comments to the press. Formal diplomatic notes objecting to American antitrust enforement have been sent to the State Department. Less diplomatic steps have increased in number. Foreign blocking statutes (which prohibit under varying circumstances production of documents and other discovery and testimony for use in foreign proceedings like American antitrust actions) have been enacted in many foreign countries. n169 Most of these statutes were passed in reaction to American antitrust enforcement. Moreover, while the conflicts engendered by these statutes are not new, they have become aggravated recently as a [*238] result of private and government attempts to obtain information concerning alleged anticompetitive activities involving foreign governments; for example, the *Uranium Litigation.* n170 Foreign government response has significantly escalated the conflict, as exemplified in the British Protection of Trading Interests Act, n171 which goes further than any of the other "blocking" statutes. n172 Several factors explain this foreign reaction to United States antitrust enforcement.

First, differing economic philosophies or policies may exist. Despite a trend toward the adoption of domestic and regional antitrust laws among our trading partners (particularly in Western Europe), wide divergences continue to exist between the United States' strong policy favoring competition at the international level and the mercantilist and protectionist policies of many of our allies. British attitudes toward ocean shipping and Canadian attitudes toward natural resource development contrast sharply with American attitudes. For example, the British fundamentally disagree with the traditional United States position that the economics of ocean shipping requires a modestly competitive market structure. n173

Second, differing economic interests exist and can conflict. For example, Australian and French economic and national security interests in regulating the production and marketing of essential natural resources like uranium and uranium products can conflict (or at least be difficult to reconcile in the short term) with the United States interest in lower prices and expanded supply of uranium and uranium products for American users. These differences in economic interests can be more intractable than philosophical differnces. The former are both harder to reconcile and more immune from the conciliatory effects of any world-wide convergence toward the acceptance of antitrust laws and policies.

Third, differing political interests and jurisprudential notions underlie many of the conflicts that have resulted from American antitrust enforcement. Some foreign nations strongly object to so-called "extraterritorial" application of United States antitrust laws on the political ground of unwarranted interference with the sovereignty of the foreign nation. n174 The objection to extraterritorial application is [*239] also frequently voiced in legal terms as a violation

of international law. n175 Many nations also object to the broad discovery rules available in United States actions. n176 The American willingness to use legal rules embodying economic regulation in order to achieve essentially political ends is also objectionable to many trading partners. Examples include the pipeline dispute concerning export control regulations and the government -*Bechtel* antitrust action to prohibit compliance with the Arab boycott. n177

It should also be noted that the increase in foreign antitrust enforcement is a double-edged sword. On the one hand, it provides a constituency composed of foreign enforcement officials generally sympathetic to a strong American antitrust policy. On the other hand, the potential for conflict increases as broader geographical jurisdiction is taken under foreign antitrust laws. One recent example is the EEC's competition proceeding against American pulp paper suppliers who are also members of a Webb-Pomerene association. n178 The irony is [*240] that it is the United States government that has voiced concern that the EEC's proceeding may interfere with American interests. Similarly, the EEC's pending competition proceeding against IBM has given rise to at least one United States diplomatic note.

Existing mechanisms to avoid or resolve international conflicts resulting from American antitrust enforcement have obviously not been successful. OECD notification and consultation have taken place, but conflicts continue. n179 OECD conciliation mechanisms have never been invoked. It is doubtful whether the UNCTAD consultation procedures will be any more effective. Bilateral cooperation agreements between [*241] the United States and Canada and between the United States and West Germany have been more successful at coordinating antitrust enforcement than at resolving conflicts. n180 The Australian agreement was initialed only in June 1982 and it is premature to predict its success.

International law principles have also been largely unsuccessful in resolving antitrust conflicts. Decisions like *Timberlane*, which have increasingly relied on comity considerations in determining whether jurisdiction exists or should be exercised, offer some hope that the courts themselves will alleviate some of the problems. n181 That the large majority of courts employing a *Timberlane* approach nevertheless have exercised jurisdiction, n182 however, restrains exuberant optimism.

The 1982 legislation also provides little basis for optimism that conflicts will lessen in the future. The legislation creates a second exemption for export cartels and is likely, therefore, to heighten the risk of conflicts with trading partners who have active antitrust regimes of their own, like the EEC. Also, the "clarification" of the Sherman Act is limited to United States export trade, while most foreign conflicts have arisen in connection with United States antitrust actions involving foreign conduct having effects on United States imports. For example, the 1982 legislation would not have avoided or resolved the conflicts raised by the *Uranium*, OPEC and shipping cases.

The seriousness of the conflicts and the failure of existing mechanisms to resolve them call for serious consideration of new strategies. A commission, sensitive to foreign concerns as well as to United States interests, would be well suited to such a task.

As to government actions, comity and/or foreign policy issues could be considered in the exercise of prosecutorial discretion. n183 Consultation with other agencies in the Executive Branch, particularly the State Department, might be required. It is unclear, however, whether or to what extent foreign policy issues are appropriate considerations in the exercise of prosecutorial discretion, at least below cabinet level.

A more radical mechanism would be bilateral (or multilateral) agreements with foreign governments establishing inter-governmental procedures in connection with government antitrust actions that implicate the other government's interests and policies. The recent agreement [*242] with Australia is the most far-reaching example to date. This agreement differs from the earlier cooperation agreements with Canada and West Germany in that the Australia agreement requires mutual notification and consultation with respect to antitrust investigations and proceedings that may have implications for the other party's laws, policies and national interests. During the consultations both parties agree to avoid a possible conflict between their respective laws, policies and national interests and for that purpose each agrees to give due regard to the other's sovereignty and to considerations of comity. n184 The Australia-United States agreement is not only a significant [*243] step toward cooperation between enforcement officials but also a potential vehicle to resolve international conflicts. n185

A bilateral (or multilateral) agreement might go further than the Australian-United States agreement. For example, it might provide for the following:

1) notification and consultation;

2) enumerated criteria governing the appropriateness of unilateral antitrust enforcement; these criteria might incorporate some or all of the comity factors listed in *Timberlane* and *Mannington Mills*; n186 and

3) binding arbitration if the governments cannot agree as to the appropriateness of the antitrust action; for example, a panel of three arbitrators might be chosen, one by each party and the third by the two previously chosen arbitrators; this panel would apply the enumerated criteria and render a written opinion explaining their decision. n187

This proposal has the additional advantage of providing sources of law that could be useful to courts in private actions when determining whether antitrust jurisdiction is appropriate. Careful attention would have to be given to the identification and formulation of the criteria governing that determination. For example, foreign policy factors (as opposed to traditional conflict of laws factors) are more appropriate here than in the exercise of unilateral prosecutorial discretion. The precision and operability of the criteria are also crucial. n188

Private treble damage actions have created the most serious conflicts with foreign nations. Thus, conflict-resolving mechanisms that affect only government actions are insufficient. A variety of mechanisms in the private action area should be examined by a commission. First, Justice Department monitoring and amicus intervention n189 in [*244] private litigation have been suggested. The scope and aim of an amicus intervention could vary considerably, including: 1) simply alerting the court to foreign policy and/or comity considerations; 2) recommending whether jurisdiction is appropriate, relying upon a comity or similar analysis that would be expressed to the court; or 3) requesting that the court stay the proceedings for a period of time to allow consultation between the United States and the foreign government, after which the results of the consultation would be transmitted to the court. This last alternative raises the tantalizing possibility that arbitration decisions under bilateral agreements involving the appropriateness of jurisdiction in government actions, as suggested above, might be made binding on courts in private actions. Constitutional obstacles would have to be overcome, however, notably the article III n190 requirement for a justiciable case or controversy. n191

Second, the treble damage provisions could be eliminated or modified in private actions in which conflicts with foreign governments arise. For example, there might be a presumption in favor of single damages (possible with attorneys' fees to the winner). The court would balance a variety of factors, such as nationality of the parties, location of the conduct at issue and whether the conduct was lawful where it occurred, to determine whether the presumption is rebutted. A slightly different alternative would leave the decision to treble with the court, except in the most egregious cases in which automatic trebling would apply. These modifications might have two desirable effects: 1) reduction of friction with foreign governments through elimination of the punitive portion of the award; and 2) reduction of friction because fewer private actions would be brought. The principal weakness with the single damage proposal and its variants lies with the political and administrative difficulties of treating foreigners differently under the antitrust laws. Another problem concerns the definition of those "conflict" cases in which only single damages can be awarded.

This outline of diverse possible strategies to the conflicts problem illustrates well the need for a comprehensive and in-depth study by a commission whose breadth of expertise and political prestige would command congressional and executive attention to any recommendations for legislative action.

[*245] D. *Antitrust Policy Implications of Foreign Government Participation in International Trade*

As seen above, one highly significant changed circumstance since 1945 has been increased foreign government participation in international trade with a concomitant increase in dealings between private firms and foreign governments. n192 Two significant antitrust policy implications merit study. First, domestic antitrust substantive rules may have to be modified in international trade. Second, the rules governing the antitrust liability of private firms in connection with their dealings with foreign governments are sorely in need of clarification if they are not to unduly constrain United States business. The 1982 legislation does not address these issues or implications.

As to the first implication, two timely situations come immediately to mind: "subsidization" of foreign competition and foreign "predation" of firms in United States markets. Both have been the subject of antitrust litigation and both can be expected to appear more frequently as United States antitrust claims.

The issue of foreign government "subsidization" as an antitrust claim has arisen in the *Polish Golf Cart* n193 litigation in which a United States manufacturer of golf carts alleged that a state-owned Polish manufacturer of competing carts (Pezetel) violated the Sherman Act, the Wilson Tariff Act and the antidumping provision of the 1916 Revenue Act. n194 Pezetel allegedly offered subsidized prices in the United States lower than those offered by the plaintiff, and used territorial restraints in the distribution of its carts. n195 The court, recognizing that claims of

unlawful foreign "subsidization" raised extremely complex legal and economic issues, held that the plaintiff failed to state an antitrust claim:

Plaintiffs do not allege that the prices charged by Pezetel, although described as predatory and unfair, are less than Pezetel's manufacturing cost, however determined, but merely that they are 'less than the cost of production of most domestic golf carts.' . . . Rather plaintiff simply avers that most American manufacturers are unable to produce a product competitive in price to that offered by its foreign competition. That Pezetel's competitive advantage results from a government subsidy by a controlled economy that permits defendant to offer virtually identical products at a cheaper price is not actionable under Sherman Act § 2 . . . . Certainly a firm that exploits the opportunity through technology, cheap labor [*246] or a government subsidy to offer the same product at a reduced price can be said to be responding normally to market opportunities. As such defendant's use of low prices appears to fall within the *Grinnell* exception and therefore is not considered mischievous conduct from which § 2 intent can be inferred. n196

Whether or not the court was correct in its ultimate conclusion, it was certainly correct in its assessment of the complexities of the issue.If the antitrust laws do or should apply, these complexities may well require different substantive rules from those applied in purely domestic cases. n197

International predation, through predatory pricing or otherwise, is presently at issue in several antitrust cases. n198 Again, the question arises whether domestic predation rules (such as the Areeda-Turner cost-based rules) n199 should be modified when international or foreign predation is alleged.

The issue of international predation may arise more frequently in the next few years, in light of the increasing competition faced by many United States industries. With respect to unilateral predation, the first question is whether predatory pricing is more or less likely in international markets than in domestic markets. There is substantial disagreement among commentators as to the extent, if any, of predatory pricing in United States domestic markets. n200 The issue at the international level is even more complicated. On the one hand, several [*247] factors suggest that predatory pricing and other predation may be more likely in international markets. For example, foreign producers may be in a more advantageous position than domestic producers because of foreign government subsidies and trade policies. Or a foreign producer may have access to greater resources through its participation in a number of separate foreign national markets, which arguably permits it more safely to "cross-subsidize" predatory pricing campaigns in the United States. n201 The argument here is that the foreign producer is better positioned than a domestic United States predator who does business in different domestic markets (e.g., East Coast and Middle West) because the foreign markets in which the foreign predator is doing business can more easily be fragmented, thus permitting more successful cross-subsidization.

This possibility of fragmentation of national markets touches upon another fundamental issue or problem -- access to national markets of foreign producers. Many countries restrict access not only through direct barriers like tariffs and quotas but also through non-tariff barriers like national purchasing policies. All these barriers can be used to insulate national producers from foreign competition and in effect "subsidize" the export trade of these producers through higher domestic prices. Thus, the issue of international predation is bound closely to the problem of governmental trade barriers that restrict access to national markets.

There are, however, a number of consideration indicating that international predation is less likely to occur than domestic predation. First, it can be argued that one might intuitively expect a foreign predator to have a more difficult job of destroying domestic producers than a domestic predator because of domestic political and protectionist policies. Second, the foreign predator may face higher barriers to entry and concomitantly, the domestic victims may have lower reentry and barriers vis-a-vis the foreign predator as compared with a domestic predator. Third, many of the dynamic or strategic considerations may work to the relative disadvantage of a foreign predator. For example, the argument that predation is unlikely given the possibility that buyers will be willing to aid the intended victims (their suppliers) through long-term contracts n202 may apply a fortiori to a foreign predator who may be endangering the existence of local suppliers, particularly where local (or national) suppliers are especially desired. Fourth, some of the factors asserted in favor of a greater likelihood of international predation are possibly flawed. For example, the assertedly [*248] greater access of foreign predators to resources arguably rests upon relative capital market imperfections in the United States and abroad. Whether such capital imperfections exist is open to question.

The second question in connection with unilateral predation is whether domestic predation rules are appropriate. For example, most courts have adopted cost-based rules to evaluate domestic pricing; that is, only prices below some cost (marginal cost, average variable cost, etc.) are deemed predatory. n203 A number of differences between alleged domestic and international predation suggest caution before domestic rules are blindly applied to alleged international

predation. For example, most of the proposed cost-based rules on domestic predation rest on efficiency grounds (short-term or long-term). Given the widely differing governmental policies and trading conditions in various countries, it is unclear whether one can make the same efficiency judgments in international markets. Moreover, the greater difficulties in determining costs of a foreign producer may significantly weaken or alter cost-based rules developed in a purely domestic context. Strategic considerations or rules, on the other hand, may be more appropriate in the international context. n204

As to predatory cartels at the international level, the question again arises whether they are more likely to occur than purely domestic cartels. International cartels may be more likely because foreign firms may find it easier to collude after a successful predatory campaign because of less stringent foreign antitrust laws in their home market or because of foreign government cooperation. n205 Even those foreign countries or regional groups with relatively strict antitrust laws (such as the EEC and West Germany) may give little enforcement attention to predation outside their territories for jurisdictional or case selection reasons. This enforcement lacuna is widened by the neutral, and in many instances the positive, position taken toward export cartels that can engage in foreign predation. Finally, predatory cartels composed of foreign producers may be more frequent in developing countries where local cartel bans may be inadequate and home country bans are inapplicable. One recently alleged example concerns predation of the Brazilian electrical equipment market by Japanese and European producers. n206 [*249]

The second implication for antitrust policy arising from foreign government involvement in international trade concerns the substantive rules governing the antitrust liability of private firms, particularly United States-based firms. A number of defenses or doctrines are available to preclude liability of private firms, notably: act of state doctrine, foreign sovereign compulsion, sovereign immunity and the application abroad of *Noerr-Pennington*. n207 But a host of unresolved issues exist with respect to each defense or doctrine, creating undue uncertainty on the part of firms that must interact with foreign governments instrumentalities if they are to remain competitive. A few of the many significant unresolved issues are:

1) whether the act of state doctrine precludes inquiry into the motivation of foreign government actions as well as their validity; n208

2) whether the compulsion defense covers conduct outside the territory of the compelling foreign state; n209 and

3) whether *Noerr-Pennington* applies to foreign governments in the first place. n210

These doctrines and defenses have evolved over many years and to a certain extent largely outside the antitrust area. Their present-day application in an antitrust context should be reexamined. Moreover, each doctrine has evolved separately and courts have continued to apply each independently in a particular case. This can result in a situation in which separate analysis under each defense or doctrine leads perhaps inappropriately to imposition of liability on private firms in connection with foreign government-involved conduct. That is, jurisdiction may be found and each defense rejected for failure to meet the conditions or elements of each defense.

The *Uranium* litigation provides an interesting hypothetical. If a court were to employ by analogy the jurisdictional test specified in the 1982 legislation ("direct, substantial, and reasonably foreseeable effect" [*250] on United States domestic commerce, import trade or export trade n211 ), it might very well find that the foreign-based cartel would have the requisite effect. If a *Timberlane* comity approach were then used, there would be a high likelihood that jurisdiction would also be found, for it is doubtful that United States courts would balance in favor of the foreign national interest. This would be particularly true if United States consumers had been hurt, and if it would be against the United States interest in enforcing the Sherman Act, which has been described by the Supreme Court as the "comprehensive chater of economic liberty." n212 Having found jurisdiction, a court would then proceed to examine separately each "defense." Probably, no act of state would be present because the foreign governments (for example, France) would not have taken sufficient legislative or administrative action to constitute an "act of state." The French authorities may simply have encouraged the formation of a cartel composed of private firms. Thus, even though the cartel would be in France's interest, and even though there would be very serious French government involvement, a court probably would decline to find an act of state.

As to the foreign government compulsion defense, there is a high probability that this defense would fail because there would be no compulsion. The French government may not have "compelled" the firms to participate in the cartel.

There is no sovereign immunity defense because that defense is available only to the foreign governments. There is no *Noerr-Pennington* defense because no one is challenging the firms' inducement of the French government to form the cartel.

Given the intimate foreign government involvement and the strong foreign interests, it is not entirely clear that United States anititrust liability should be imposed on private firms in cases like the hypothetical posed. Nonetheless, this may well be a situation in which a pinched analysis under each legal defense or doctrine, with attention paid exclusively to the technical conditions of each, results in liability. n213

The growing involvement of United States firms with foreign governments and state enterprises heightens the incidence and significance of antitrust risks with concomitant restraints on United States business. Thus, a general reassessment of the foreign compulsion defense, the act of state doctrine and the application of *Noerr-Pennington* [*251] doctrine aboard would be useful in order to determine whether the interpretation of those doctrines and defenses are furthering United States interests or unduly inhibiting United States firms in doing business aboard. A reassessment would also be useful to determine whether the independent operation of each doctrine and defense makes sense when the doctrines and defenses are viewed together under the general issue of private firm liability in connection with non-"compulsive" foreign government action. Such a reassessment might be better accomplished by a commission unencumbered by the judicial tendency to examine each doctrine or defense separately.

E. Relationship Between Antitrust Laws and Unfair Trading Laws

A veritable plethora of legislation, agencies and courts have overlapping and sometimes conflicting jurisdiction over international trade issues. There are, of course, the "traditional" domestic antitrust or unfair competition laws: Sherman, Clayton and Federal Trade Commission Acts. There are also a number of other laws concerning unfair trade practices in international trade: the Wilson Tariff Act, n214 section 337 of the Tariff Act of 1930 as amended, n215 the antidumping provisions in new Subtitle IV of the Trade Act of 1930, n216 section 301 of the Trade Act of 1974 as amended, n217 and section 303 of the Tariff Act of 1930 as amended. n218 Allegations of "unfair" trade practices can also arise in "escape clause" n219 and "market disruption" proceedings. n220

[*252] The relationship between the traditional antitrust laws (like the Sherman Act) and the unfair trading laws has been subject to much dispute. Again, a coherent United States trade policy requires a comprehensive examination of that relationship and the overlapping and conflicting enforcement bodies involved. n221

One can easily hypothesize a situation in which the same conduct can be challenged under many if not most of the statutes mentioned above, thus placing the parties in a variety of fora and involving several agencies and departments. For example, a contention that foreign suppliers are hurting American firms through "predatory" prices in the United States could be translated into claims or proceedings under sections 1 and 2 of the Sherman Act, n222 section 3 of the Robinson-Patman Act, n223 section 303 and 337 of the Tariff Act of 1930, n224 the antidumping provisions of the Revenue Act of 1916 n225 and new Subtitle IV of the Tariff Act of 1930, n226 and perhaps even section 301 of the Trade Act of 1974. n227 This could entail participation of the Justice Department, Commerce Department, Special Trade Representative, Federal Trade Commission, International Trade Commission and private party actions in federal courts. As mentioned above, claims of "international predation" and "foreign subsidization" can be expected to increase. The hypothesis, therefore, is a realistic one.

This panoply of differing statutory standards and institutional machinery can deservedly be labeled Byzantine. That Byzantium endured for a millenium with such complexities offers no basis for concluding that the United States and its trade policy shall so long endure. While a comprehensive commission study of this American Byzantium may not ensure the continued existence of the Republic, it would provide a sorely needed review of the relationship between antitrust policy and unfair trade policy.

Conclusion

An in-depth and comprehensive reassessment of the application of United States antitrust laws is timely and necessary. Such a reassessment should be undertaken independent of any particular dispute. The plethora and diversity of unresolved policy and more specific [*253] legal issues discussed throughout this Article confirm the need for a commission and provide a working agenda for its study.

The need for a commission has not been mooted by recent legislation. As seen above, the Export Trading Company Act is quite narrow and deals only with the tip of the international iceberg. The Foreign Trade Antitrust Improvements Act, which amends the foreign commerce jurisdiction of the Sherman Act, also fails to address most of the important issues that merit commission study.Moreover, the jurisdictional or "territorial" scope of the antitrust laws is intimately related to issues that may not have been adequately addressed in the legislative decision to clarify the jurisdictional reach of the Sherman Act. Thus, an extensive examination by a commission would provide a more comprehensive analysis of the policy reasons for any clarification of the jurisdictional scope of the antitrust laws. It

would also provide a comprehensive analysis of an amendment's effects on other issues not considered in the narrower context of simply defining jurisdiction in order to meet a legislative concern about the inhibitory impact of the antitrust laws on United States exports. International antitrust may not be a seamless web whose existence is shattered with the removal of a single thread. But its threads are connected to a significant degree and the resultant web is appropriately viewed by the United States spider as promoting important national policies, while American firms and foreign governments occasionally voice justifiable concerns at their entrapment within the antitrust web.

A final reason supporting a commission is its ability to gather empirical data. Such data is sorely needed before many of the issues outlined above can be resolved with any degree of confidence. For example, the commission, as comtemplated in section 5(d) of S. 432, would authorize the collection of empirical data. Indeed, much of the commission's work may well lie in the initial formulation of problems and issues, followed by study and discussion of data in the form of reports rather than in the form of oral testimony.

Finally, the mandate of the commission should be limited to antitrust and unfair trade laws. The current tempest raised by the pipeline sanctions should not prompt a broadening of the mandate to other "extraterritorial" legislation such as export controls and securities laws, for several reasons. First, numerous unresolved substantive issues peculiar to antitrust law are not present under the other laws. Second, the United States and foreign antitrust interests and policies differ sufficiently from the national policies and interests underlying export controls and other laws so that it is highly questionable whether a single operable jurisdictional rule can be formulated. n228 [*254] Third, broadening the mandate probably would result in inattention to many of the significant antitrust issues because of time constraints and the interests and expertise of the commission members. Simply put, enough needs to be done in the antitrust field by a hard-working commission without saddling its members with the task of rewriting all of international law.

**FOOTNOTES:**

n1 The bodies that have put forth this potpourri of proposals include, among others, the Justice Department, the Commerce Department, the Office of the Special Trade Representative, various sections of the American Bar Association (notably the Antitrust Section and the International Law Section), the Association of the Bar of the City of New York, the American Law Institute, the National Association of Manufacturers and other business groups, and international conferences (such as the 1978 Ditchley Conference). Indeed, the risk of listing here is the inadvertent exclusion of prestigious groups that have proposed significant changes in U.S. antitrust enforcement in the international area.

n2 Pub. L. No. 97-290, [July-Dec] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 719 (Oct. 7, 1982).

n3 *Id.* tit. I.

n4 *Id.* tit. IV.

n5 *15 U.S.C. § § 1*-2 (1976).

n6 *See* Kintner & Griffin, *Jurisdiction over Foreign Commerce Under the Sherman Antitrust Act, 18 B.C. Indus. Com. L. Rev. 199, 201-02 (1977).*

n7 *15 U.S.C. § 15* (1976).

n8 *15 U.S.C. § 45*(a)(1) (1976).

n9 *213 U.S. 347 (1909).*

n10 *Id. at 357.*

n11 *See, e.g., United States v. Sisal Sales Corp., 274 U.S. 268 (1927); United States v. American Tobacco Co., 221 U.S. 106 (1911).*

n12 *United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir. 1945).*

n13 *Id at 444.*

n14 The *Alcoa* test has been reformulated in various ways; for example, courts sometimes require a "direct" or "substantial" effect. The courts have used a variety of verbal expressions. *See, e.g., Timberlane Lumber co. v. Bank of Am., 549 F.2d 597, 601 (9th Cir. 1976)* (reversing district court requiring a "direct and substantial effect"); *United States v. Imperial Chem. Indus., 100 F. Supp. 504, 592 (S.D.N.Y. 1951)* ("a conspiracy . . . which affects American commerce"); *United States v. Timken Roller Bearing Co., 83 F. Supp. 284, 309 (N.D. Ohio 1949)* ("a direct and influencing effect on trade"), *modified, 341 U.S. 593 (1951).* The differences among these formulations are more apparent than real, for each signifies a legal conclusion that the connection between the restraint and U.S. commerce is sufficient to justify a finding of jurisdiction. Griffin, *A Critique of the Justice Department's Antitrust Guide for International Operations, 11 Cornell Int'l L.J. 215, 224-25 (1978).*

n15 *See Timken Roller Bearing Co. v. United States, 341 U.S. 593, 597-98 (1951).*

n16 *See United States v. Minnesota Mining & Mfg. Co., 92 F. Supp. 947, 951-53 (D. Mass. 1950).*

n17 *Timken Roller Bearing Co. v. United States, 341 U.S. 593, 599 (1951).*

n18 *341 U.S. 593 (1951).*

n19 *Id. at 599; accord United States v. Minnesota Mining & Mfg. Co., 92 F. Supp. 947, 962 (D. Mass. 1950)* (advantages to American balance of payments held "irrelevant").

n20 *Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597 (9th Cir. 1976).*

n21 *Id. at 615.* While *Timberlane* was the first decision expressly to use a balancing approach, the idea had an almost twenty-year gestation period, dating back to Kingman Brewster's suggestion of a "jurisdictional rule of reason." *See* K. Brewster, Antitrust and American Business Abroad 446 (1958).

n22 *549 F.2d at 614.* The remaining factors are: "the extent to which enforcement by either state can be expected to achieve compliance . . . the extent to which there is explicit purpose to harm or affect American

commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad." *Id.*

n23 *See, e.g., Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 494 F. Supp. 1161, 1187-89 (E.D. Pa. 1980); Dominicus American Bohio v. Gulf & Western Indus., 473 F. Supp. 680, 688 (S.D.N.Y. 1979). But see A.G.S. Elecs., Ltd. v. B.S.R., Ltd., 460 F. Supp. 707, 711-12* (S.D.N.Y.), *aff'd mem 591 F.2d 1329 (2d Cir. 1978).* The most important decision is *Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287 (3d Cir. 1979),* in which the Third Circuit adopted a two-step approach under which the court first decides whether "jurisdiction" exists and second, whether that jurisdiction should be exercised in the light of comity considerations. *Id. at 1292, 1296.* The court specified 10 factors that should be weighed in analyzing the comity issue because the "individual interests and policies of each of the foreign nations differ and must be balanced against our nation's legitimate interest in regulating anticompetitive activity." *Id. at 1298.* Despite the strong trend toward a balancing approach and its apparently greater sensitivity to foreign interests, it remains to be seen whether the results on the jurisdictional issue will change. Indeed, U.S. courts are continuing to exercise jurisdiction. *See, e.g., Industrial Inv. Dev. Corp. v. Mitsui & Co., 671 F.2d 876, 884-85 (5th Cir. 1982); Daishowa Int'l v. North Coast Export Co., 1982-2 Trade Cas. (CCH) P64,774, at 71,789-90 (N.D. Cal. 1982).* This raises the question whether U.S. courts are realistically in a position to "balance" in favor of foreign interests and against enforcement of the U.S. antitrust laws. Moreover, not all courts have adopted *Timberlane. E.g., National Bank of Can. v. Interbank Card Ass'n, 666 F. 2d 6, 8-9 (2d Cir. 1981).*

An approach similar to *Timberlane* is taken in the Second Tentative Draft of the revised Restatement of the Foreign Relations Law of the United States. Restatement of the Foreign Relations Law of the United States (Revised) § § 402-403, 415 (Tent. Draft No. 2, 1981).

n24 See *infra* notes 38-51 and accompanying text.

n25 See *supra* note 23.

n26 For example, the Seventh Circuit in *In re Uranium Antitrust Litigation, 617 F.2d 1248 (7th Cir. 1980),* while purporting to adopt a *Timberlane* balancing approach, failed to look to the kinds of comity factors enumerated in *Timberlane* and *Mannington Mills.* In a not overly pellucid opinion, the court exercised jurisdiction over nine foreign defendants who had defaulted by failing to appear. The court cited three factors: 1) complexity of the action; 2) seriousness of the charges; and 3) recalcitrance of the defaulting defendants. *Id. at 1255.* Despite the references to *Timberlane* and *Mannington Mills*, it is difficult to understand how these three factors either fall within the approaches of those decisions or can be considered part of a comity approach. The aberrant approach taken in *Uranium* may be explained by the default judgment aspect of the case.

n27 *148 F. 2d 416 (2d Cir. 1945).*

n28 *341 U.S. 593 (1951).*

n29 *92 F. Supp. 947 (D. Mass. 1950).*

n30 *See* I. Magaziner & R. Reich, Minding America's Business: The Decline and Rise of the American Economy 29-39 (1982).

n31 *See* Subcomm. on Int'l Fin., Senate Comm. on Banking, Housing, and Urban Affairs, 96th Cong., 1st Sess., Report on U.S. Export Policy 1-2, 6-8 (Comm. Print 1979).

n32 This might be accomplished by including some foreign production in the relevant market. *See* Landes & Posner, *Market Power in Antitrust Cases, 94 Harv. L. Rev. 937, 965-67 (1981).* For criticisms of Landes & Posner's analysis, see Symposium, *95 Harv. L. Rev. 1787 (1982).*

The Justice Department in its new Merger Guidelines recognizes that geographic market definition may differ in the international trade context. U.S. Dep't of Justice, Merger Guidelines, *reprinted in* 1 *Trade Reg. Rep. (CCH) P 4502, at 6881-10* to - 11 (Aug. 9, 1982). Although the guidelines do not announce any special rules with respect to international mergers, they do caution that:

In general, the standards stated above will govern geographic market definition, whether domestic or international. The Department, however, will be somewhat more cautious, both in expanding market boundaries beyond the United States and in assessing the likely supply response of specific foreign firms. Although firms located outside the United States may exert an important competitive influence on domestic prices, they may be subject to additional constraints not present in the purely domestic context. For example, changes in exchange rates, tariffs, and general political conditions may limit the ability of such firms to respond to domestic price increases.
*Id.* at 6881-11.

n33 Members of a Business Advisory Panel to the 1978 National Commission made a similar suggestion in connection with the Webb-Pomerene Act, *15 U.S.C. § § 61*-66 (1976). Nat'l Comm'n for the Review of Antitrust Laws and Procedures, Report to the President and the Attorney General 295 (1979).

n34 *See generally* Unit B [Vol. 5] K. Stockman & V. Strauch, World Law of Competition (J. von Kalinowski gen. ed. 1979).

n35 *See generally* B. Hawk, United States, Common Market and International Antitrust: A Comparative Guide (1979).

N36 The significant increase in enforcement is particularly notable in Western Europe. *See generally* Unit B, World Law of Competition (J. von Kalinowski gen. ed. 1979); Organization for Economic Cooperation and Development [OECD], Annual Reports on Competition Policy in OECD Member Countries (1977).

n37 The United Nations Conference on Trade and Development [UNCTAD] has begun preparing annual summaries of antitrust developments in member countries. *See, e.g.*, UNCTAD Annual Report 1981 on Legislative and other Developments in Developed and Developing Countries in the Control of Restrictive Business Practices, U.N. Doc. TD/B/RBP/9 (1982).

n38 See *infra* notes 167-71 and accompanying text. Justice Department enforcement is active in the shipping area and has caused considerable international controversy. Following an extensive investigation of liner conferences in U.S. trade, the Justice Department in 1979 brought indictments under section 1 of the Sherman Act against seven major European and U.S. ocean carriers and 13 of their executives. *In re Ocean Shipping Antitrust Litigation, 500 F. Supp. 1235 (S.D.N.Y. 1980).* The district court imposed fines of $ 6.1 million against the defendants pursuant to plea agreements, the largest settlement ever in a criminal case under the Sherman Act. B. Hawk, *supra* note 35, at 4 & n.48-2 (Supp. 1981). The shipping indictments prompted the British government to enact the Protection of Trading Interests Act, 1980, ch. 11, *reprinted in* [Jan.-June]

Antitrust & Trade Reg. Rep. (BNA) No. 959, at F-1 (Apr. 10, 1980). As seen below, this Act blocks discovery and limits enforcement of judgments. See *infra* notes 48-49 and accompanying text.

Despite this strong foreign adverse reaction, the Justice Department has continued its antitrust efforts. In June 1980 it demanded documents from one U.S. and six foreign shipping lines in connection with container trade between the United States and Australia and New Zealand. The investigation has resulted in several decisions involving discovery requests by both the Justice Department and the carriers involved. *See, e.g. Australia Eastern U.S.A. Shipping Conference v. United States, 1981-1 Trade Cas. (CCH) P63,943 (D.D.C. 1981); Associated Container Transp. (Australia) Ltd. v. United States, 502 F. Supp. 505 (S.D.N.Y. 1980).*

n39 *See generally* Note, *Compelling Production of Documents in Violation of Foreign Law: An Examination and Reevaluation of the American Position, 50 Fordham L. Rev. 877 (1982)* [hereinafter cited as Compelling Production].

n40 See *infra* notes 167-71 and accompanying text.

n41 Foreign Proceedings (Prohibition of Certain Evidence) Act, 1976 Austl. Acts 1125, *amended by* 1976 Austl. Acts 1743.

n42 Uranium Information Security Regulations, Can. Stat. O. & Regs. 76-644 (1976), *amended by* Can. Stat. O. & Regs. 77-836 (1977).

n43 Law Relating to the Communication of Economic, Commercial, Industrial, Financial or Technical Documents or Information to Foreign Natural or Legal Persons, 1980 Journal Official de la Republique Francaise Recueil Dalloz [J.O.] 1799, 1980 Bulletin legislatif Dalloz [B.L.D.] 285 (English translation at *75 Am. J. Int'l L. 382 (1981)).*

n44 Economic Competition Act, 1956 Staatsblad van het Koninkrijk der Nederlanden [Stb.] 401, *amended by* Act of July 16, 1958, Stb. 413 (English translation at 5 OECD, Guide to Legislation on Restrictive Business Practices 1, 18-19 (June 1972)); *see* Smith, *International Aspects of American and Netherlands Antitrust Legislation*, 5 Neth. Int'l L. Rev. 274 (1958).

n45 The British provisions were formerly found in the Shipping Contracts and Commercial Documents Act, 1964, ch. 87. In 1980 more comprehensive blocking legislation was enacted in the Protection of Trading Interests Act, 1980, ch. 11, *reprinted in* [Jan.-June] Antitrust & Trade Reg. Rep. (BNA) No. 959, at F-1 (Apr. 10, 1980). The British statute was enacted in reaction to a 1960 investigation of multinational shipping conferences. *See generally In re Grand Jury Investigation of the Shipping Indus., 186 F. Supp. 298 (D.D.C. 1960)* (investigation of ocean shipping industry for possible antitrust violations).

n46 The Business Records Protection Act, Ont. Rev. Stat. ch. 54 (1970) (Ontario), was passed in reaction to subpoenas issued to several Canadian paper and pulp companies by a New York grand jury. *See generally In re Grand Jury Subpoenas Duces Tecum Addressed to Canadian Int'l Paper Co., 72 F. Supp. 1013 (S.D.N.Y. 1947), discussed in Vanity Fair Mills v. T. Eaton Co., 133 F. Supp. 522, 529 n.2 (S.D.N.Y. 1955);* Comment, *Judicial Cooperation in the Taking of Evidence Abroad -- The Canada and Ontario Evidence Acts, 8 Tex. Int'l L.J. 57 (1973).* Legislation has also been enacted in Quebec, South Africa and West Germany. Business Concerns Records Act, Que. Rev. Stat. ch. 278 (1964); Atomic Energy Act, 1967, No. 90 § 30A, *amended by* Atomic

Energy Amendment Act, 1978, No. 46 (S. Afr.); Law of May 24, 1965, Bundesgesetzblatt, Teil II [BGB 2] 833 (W. Ger.).

n47 Law Relating to the Communication of Economic, Commercial, Industrial or Financial or Technical Documents or Information to Foreign Natural or Legal Persons, 1980 J.O. 1799, 1980 B.L.D. 285 (English translation at *75 Am. J. Int'l L. 382 (1981)).*

One French official has taken the position that the primary purpose of the 1980 amendment was to ensure that foreign counsel comply with the judicially-supervised French discovery procedures rather than to block production of documents. *See* Address by G. Guillaume, Director of Legal Affairs of the French Ministry of External Affairs, Chambre de Commerce Internationale, Paris (Apr. 1981) (on file with the *Fordham Law Review); see also* Advisory Opinion of the French Ministry of Justice, 1981 J.O. 373 Question 35.893. For a summary of the French legislation, see Toms, *The French Response to the Extraterritorial Application of United States Antitrust Laws, 15 Int'l Law. 585 (1981).*

n48 1980, ch. 11, *reprinted in* [Jan.-June] Antitrust & Trade Reg. Rep. (BNA) No. 959, at F-1 (Apr. 10, 1980).

n49 Section 6 provides:

(1) This section applies where a court of an overseas country has given a judgment for multiple damages within the meaning of section 5 (3) above against --

(a) a citizen of the United Kingdom and Colonies; or

(b) a body corporate incorporated in the United Kingdom or in a territory outside the United Kingdom for whose international relations Her Majesty's Government in the United Kingdom are responsible; or

(c) a person carrying on business in the United Kingdom, (in this section referred to as a "qualifying defendant") and an amount on account of the damages has been paid by the qualifying defendant either to the party in whose favor the judgment was given or to another party who is entitled as against the qualifying defendant to contribution in respect of the damages.

(2) Subject to subsections (3) and (4) below, the qualifying defendant shall be entitled to recover from the party in whose favour the judgment was given so much of the amount referred to in subsection (1) above as exceeds the part attributable to compensation; and that part shall be taken to be such part of the amount as bears to the whole of it the same proportion as the sum assessed by the court that gave the judgment as compensation for the loss or damage sustained by that party bears to the whole of the damages awarded to that party.

(3) Subsection (2) above does not apply where the qualifying defendant is an individual who was ordinarily resident in the overseas country at the time when the proceedings in which the judgment was given were instituted or a body corporate which had its principal place of business there at that time.

(4) Subsection (2) above does not apply where the qualifying defendant carried on business in the overseas country and the proceedings in which the judgment was given were concerned with activities exclusively carried on in that country.

(5) A court in the United Kingdom may entertain proceedings on a claim under this section notwithstanding that the person against whom the proceedings are brought is not within the jurisdiction of the court.

(6) The reference in subsection (1) above to an amount paid by the qualifying defendant includes a reference to an amount obtained by execution against his property or against the property of a company which (directly or indirectly) is wholly owned by him; and references in that subsection and subsection (2) above to the party in whose favour the judgment was given or to a party entitled to contribution include references to any person in whom the rights of any such party have become vested by succession or assignment or otherwise.

(7) This section shall, with the necessary modifications, apply also in relation to any order which is made by a tribunal or authority of an overseas country and would, if that tribunal or authority were a court, be a judgment for multiple damages within the meaning of section 5 (3) above.

(8) This section does not apply to any judgment given or order made before the passing of this Act. Protection of Trading Interests Act, 1980, ch. 11, § 6, *reprinted in* [Jan.-June] Antitrust & Trade Reg. Rep. (BNA) No. 959, at F-2 (Apr. 10, 1980).

n50 A commentator has suggested recently the following approach to resolving discovery conflicts:

First, the court should determine that an actual conflict with the nondisclosure law exists. . . Second, the court should employ letters rogatory to enlist the aid of the foreign government in securing the documents. . . If the foreign nation declines to enforce the letters rogatory, the court must then decide whether to compel production. Three basic principles should guide the court's inquiry: (1) that nondisclosure [or blocking statutes] often are designed to protect legitimate foreign policies which are deserving of judicial respect; (2) that it should not lightly compel acts that violate the laws of another country; and (3) that its assertion of enforcement jurisdiction must be based on reasonableness. With these principles guiding the inquiry, the court should consider the following five factors:

(1) Importance of the documents to the resolution of key issues in the litigation . . .

(2) Alternative means of obtaining the information contained in the documents . . .

(3) Importance of the underlying interests . . .

(4) Identity of the party resisting production . . .

(5) Where the acts giving rise to the cause of action occured.
*Compelling Production, supra* note 39, at 903-06 (footnotes and emphasis omitted).

n51 In 1982 the United States and Australia entered into a bilateral agreement which provides for consultation and cooperation with respect to discovery and other antitrust enforcement matters. The Australian Government agreed not to block automatically compliance by Australian firms with subpoenas from U.S. agencies and private litigants. The relevant provisions follow:

ARTICLE 5

Cooperation in Antitrust Enforcement

1. When a proposed investigation or enforcement action under the antitrust laws of one nation does not adversely affect the laws, policies or national interests of the other, each Party shall cooperate with the other in regard to that investigation or action, including through the provision of information and administrative and judicial assistance to the extent permitted by applicable national law.

2. The mere seeking by legal process of information or documents located in its territory shall not in itself be regarded by either Party as affecting adversely its significant national interests, or as constituting a basis for applying measures to prohibit the transmission of such information or documents to the authorities of the other Party, provided that in the case of United States legal process prior notice has been given of its issuance. Each Party shall, to the fullest extent possible under the circumstances of the particular case, provide notice to the other before taking action to prevent compliance with such legal process. Agreement Relating to Cooperation of Antitrust Matters, June 29, 1982, United States-Australia, *reprinted in* [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1071, at 36 (July 1, 1982).

n52 *See* B. Hawk, *supra* note 35, ch. 14.

n53 Annex to the OECD, Declaration on International Investment and Multinational Enterprises, OECD Doc. 21 (76) 04/1 (1976), *reprinted in* Inst. for Int'l and Foreign Trade Law, The OCED Guidelines for

Multinational Enterprises: A Business Appraisal 252 (1977). *See generally* Hawk, *The OECD Guidelines for Multinational Enterprises: Competition, 46 Fordham L. Rev. 241 (1977).*

n54 UNCTAD, The Set of Multilaterally Agreed Equitable Principles and Rules for the Control of Restrictive Business Practices, U.N. Doc. TD/RBP/CONF/10 (1980).

n55 G.A. Res. 35/63, 35 U.N. GAOR Supp. (No. 48) at 123, U.N. Doc. A/35/48 (1980). For the text of the Code and a critique of its provisions, see B. Hawk, *supra* note 35, ch. 14.

n56 The Code is not entirely consistent, however, with either U.S. or Western European antitrust law.

n57 UNCTAD, Draft International Code of Conduct on the Transfer of Technology, U.N. Doc. TD/CODE TOT/33 (1981).

n58 See *infra* notes 192-206 and accompanying text.

n59 *Outboard Marine Corp. v. Pezetel, 461 F. Supp. 384 (D. Del. 1978).* For further details, see*infra* notes 193-96 and accompanying text.

n60 *International Ass'n of Machinists & Aerospace Workers v. OPEC, 649 F.2d 1354 (9th Cir. 1981), cert. denied, 102 S. Ct. 1036 (1982).*

n61 The classic formulation of the doctrine was set forth in *Underhill v. Hernandez, 168 U.S. 250 (1897):*

Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Id. at 252; see, e.g., Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 689-90 (1976);* First National City Bank v. Banco nacional *de Cuba, 406 U.S. 759, 762-63 (1972); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416-20 (1964); Hunt v. Mobil Oil Corp., 550 F.2d 68, 72-73* (2d Cir.), *cert. denied, 434 U.S. 984 (1977).*

n62 This defense precludes antitrust liability for private conduct compelled by a foreign government. *See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 706-08 (1962); Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597, 606 (9th Cir. 1976); Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291, 1298 (D. Del. 1970).*

n63 This doctrine derives primarily from three decisions, *California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508 (1972); United Mine Workers v. Pennington, 381 U.S. 657 (1965); Eastern R.R. Presidents Conference v. Noerr Moter Freight, Inc., 365 U.S. 127 (1961),* and protects the collective exercise of the right of political expression from Sherman Act liability, even when such "[j]oint efforts to influence public officails," *381 U.S. at 670,* are anticompetitive. The Supreme Court's decision in *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962)* is usually proffered as the basis for application of *Noerr-Pennington* abroad. Several lower courts have rejected this extension. *See, Associated Container Transp. Ltd. v. United States, 502 F.Supp. 505, 507-08 (S.D.N.Y. 1980); Occidental Petroleum Corp. v. Buttes Gas & Oil*

*Co., 331 F. Supp. 92, 107-08 (C.D. Cal. 1971), aff'd per curiam, 461 F.2d 1261* (9th Cir.), cert. denied, *409 U.S. 950 (1972).* The Justice Department in the International Antitrust Guide takes the position that the *Noerr-Pennington* doctrine does apply abroad. U.S. Dep't of Justice, Guide on Antitrust and International Operations Case N, *reprinted in* Trade Reg. Reports (CCH) No. 266, pt. II, at 61-62 (Feb. 1, 1977).

n64 For example, two pending Senate bills would strengthen the 1916 Antidumping Act, which makes it unlawful "commonly and systematically" to dump articles into the United States "with the intent" of 1) destroying or injuring an industry in the U.S., 2) preventing the establishment of an industry in the U.S., or 3) restraining or monopolizing any part of trade and commerce in such articles in the U.S. *15 U.S.C. § 72* (1976). The bills would eliminate the need to prove that an importer intended to injure U.S. markets and would make dumpers liable for treble damages by making dumping an antitrust offense, enforceable by private action. S. 2517, 97th Cong., 2d Sess. (1982); S. 2167, 97th Cong., 2d Sess. (1982).

The International Rule of Law Act would limit the act of state doctrine, and would allow U.S. courts to hear cases alleging that the foreign government act in question violates international law. S. 1434, 97th Cong., 1st Sess. (1981).

The Pfizer bills would amend the Clayton Act to prevent a foreign government or an instrumentality of a foreign government from maintaining a civil action except under certain conditions. S. 816, 97th Cong., 1st Sess. (1981); H.R. 2812, 97th Cong., 1st Sess. (1981).

n65 S 1010, 96th Cong., 1st Sess. (1979).

n66 S. 432, 97th Cong., 1st Sess. (1981).

n67 Pub. L. No. 97-290, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 719 (Oct. 7, 1982).

n68 *Id.* tits. I-III. Although tilte II of the new legislation is separately entitled the "Bank Export Services Act," this Article will treat title II, as well as title III, as part of the Export Trading Company Act of 1982. Titles I, II and III derive from the same Senate Banking Committee bill, the Export Trading Company Act of 1981, S. 734, 97th Cong., 2d Sess. (1982), which permitted the establishment of export trading companies by banks and other firms and provided a partial antitrust exemption for their operations.

n69 Pub. L. No. 97-290, tit. IV, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982). The Foreign Trade Antitrust Improvements Act of 1982 largely derives from a House Judiciary Committee bill, H. 5235, 97th Cong., 2d Sess. (1982), which an mended the foreign commerce jurisdiction provision of the Sherman, Clayton and FTC Acts. For an analysis of earlier versions of the Foreign Trade Antitrust Improvements Act, see Garvey, *The Foreign Trade Antitrust Improvements Act of* 1981, *14 Law & Pol'y Int'l Bus. 1 (1982).*

n70 Pub. L. No. 97-290, § 102(b), [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 719 (Oct. 7, 1982).

n71 *Id.* § 104.

n72 The Webb-Pomerene Act of 1918 exempts export cartels from the Sherman Act under certain limited conditions. *15 U.S.C. § § 61*-66 (1976); *see* B. Hawk, *supra* note 35, at 96-111.

n73 Pub. L. No. 97-290, § 103(a)(1), [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 719 (Oct. 7, 1982).

n74 *Id.* tit.II.

n75 *Id.* § 303(a).

n76 *Id.*

n77 *Id.* § 303(b).

n78 *Id.* § 307.

n79 *Id.* § 304.

n80 *Id.*

n81 *Id.* § 306(b)(1).

n82 *Id.* § 306(b)(3).

n83 *Id.* § 306(b)(4).

n84 *Id.* § 310.

n85 *Id.* § 312(b).

n86 *Id.* § 304(b)(3).

n87 *Id.* § 301.

n88 *Id.* § 306(b)(1).

n89 *Id.* § 303(a)(3). Section 5 of the FTC Act also prohibits "unfair methods of competition," but it does not provide a private right of action. *15 U.S.C. § 45*(a)(1) (1976).

n90 *See 15 U.S.C. § 62* (1976); B. Hawk, *supra* note 35, at 97.

n91 *E.g., Export Trading Company Act of 1981: Hearings on S. 144 Before the Subcomm. on Int'l Finance and Monetary Policy of the Senate Comm. on Banking, Housing, and Urban Affairs*, 97th Cong., 1st Sess. 340-44 (1981) (statement of Ky P. Ewing, Jr.); *Foreign Trade Antitrust Improvements Act: Hearings on S. 795 Before the Senate Comm. on the Judiciary*, 97th Cong., 1st Sess. 92-93 (1981) (statement of A. Paul Victor); *see also* 127 Cong. Rec. H779 (daily ed. Mar. 4, 1981) (remarks of Reps. Rodino and McClory). Similarly, te EFC exempotion procedure has been heavily critized on a number of procedural and substantive grounds. The Commission itself recognizes some of the defects and is moving to correct some of them. *See* Comm'n of the European Communities, Eleventh Report on Competition Policy 27-28 (1982). *See generally* B. Hawk, *supra* note 35, ch. 8.

n92 See *infra* notes 98-99 and accompanying text.

n93 Pub. L. No. 97-290, § 402, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982).

n94 H.R. Report No. 686, 97th Cong., 2d Sess. 9-10 (1982).

n95 Pub. L. No. 97-290, § 402, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982).

n96 *Id.*

n97 *Id.*

Section 403 amends section 5(a) of the FTC Act and provides: Section 5(a) of the Federal Trade Commission Act *(15 U.S.C. 45*(a)) is amended by adding at the end thereof the following new paragraph:

(3) This subsection shall not apply to unfair methods of competition involving commerce with foreign nations (other than import commerce) unless --

"(A) such methods of competition have a direct, substantial, and reasonably foreseeable effect --

"(i) on commerce which is not commerce with foreign nations, or on important commerce with foreign nations, or

"(ii) on export commerce with foreign nations, of a person engaged in such commerce in the United States; and

"(B) such effect gives rise to a claim under the provisions of this subsection, other than this paragraph. If this subsection applies to such methods of competition only because of the operation of subparagraph (A)(ii), this subsection shall apply to such conduct only for injury to export business in the United States." *Id.* § 403.

n98 *See generally* H.R. Rep. No. 686, 97th Cong., 2d Sess. (1982).

n99 *Id* at 13.

n100 *See* B. Hawk, *supra* note 35, at 46-51. *Compare* Address by D. Rosenthal, *Subject Matter Jurisdiction in U.S. Export Trade*, before the American Soc'y of Int'l L. (Apr. 23, 1977) (Sherman Act does not apply when effects are only in foreign markets), *partially reprinted in* American Soc'y of Int'l L., Proceedings of the 71st Annual Meeting of the American Society of International Law 214, 215 (1977) *with* Rahl, *A Rejoinder, 8 Cornell Int'l L.J. 42 (1974)* (Sherman Act may apply when effects are only in foreign markets).

n101 *See* Pub. L. No. 97-290, § 402, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982).

n102 *See, e.g., Waldbaum v. Worldvision Enters., 1978-2 Trade Cas. P 62,378 (S.D.N.Y. 1978); Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research and Eng'g Co., 1977-1 Trade Cas. P 61,256 (S.D.N.Y. 1977); Todhunter-Mitchell & Co. v. Anheuser-Busch, Inc., 375 F. Supp. 610* (E.D. Pa.), *modified, 383 F. Supp. 586 (E.D. Pa. 1974).*

n103 U.S. Dep't of Justice, Guide on Antitrust and International Operations (1977), *reprinted in Trade Reg. Rep. (CCH) No. 266,* pt. II, at 7 (Feb. 1, 1977).

n104 *See Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research and Eng'g Co., 1977-1 Trade Cas. P61,256, at 70,783 (S.D.N.Y. 1977).*

n105 Pub. L. No. 97-290, § 402, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982). The House Report is not entirely unambiguous. *See* H.R. Rep. No. 686, 97th Cong., 2d Sess. 11-12 (1982).

n106 *Compare* H.R. 5235, 97th Cong., 2d Sess. § 3 (1982) (amending § 7 of Clayton Act) *with* Pub. L. No. 97-290, § 402 (retaining § 7 of Clayton Act), [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982).

n107 *See* B. Hawk, *supra* note 35, ch. 3(G).

n108 Pub. L. No. 97-290, § 402, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982).

n109 See *supra* note 14 and accompanying text.

n110 H.R. Rep. No. 686, 97th Cong., 2d Sess. 9 (1982).

n111 *Id.*

n112 See *supra* notes 26, 60 and accompanying text.

n113 See *infra* note 178 and accompanying text.

n114 The House Report states:

[T]he bill is intended neither to prevent not to encourage additional judicial recognition of the special international characteristics of transactions. If a court determines that the requirements for subject matter jurisdiction are met, this bill would have no effect on the courts' ability to employ notions of comity . . . or otherwise to take account of the international character of the transaction. Similarly, the bill is not intended to restrict the application of American laws to extraterritorial conduct where the requisite effects exist or to extraterritorial pursuit of evidence in appropriate cases.
H.R. Rep. No. 686, 97th Cong., 2d Sess. 13 (1982) (citation omitted).

n115 *666 F.2d 6 (2d Cir. 1981).*

n116 H.R. Rep. 686, 97th Cong., 2d Sess. 11 (1982).

n117 *666 F.2d at 8.*

n118 H.R. Rep. 686, 97th Cong., 2d Sess. 11 (1982).

n119 *See generally* B. Hawk, *supra* note 35, at 241-73.

n120 See *supra* notes 31-33 and accompanying text.

n121 UNCTAD, The Set of Multilaterally Agreed Equitable Principles and Rules for the Control of Restrictive Business Practices, U.N. Doc. TD/RBP/CONF/10 (1980). See *supra* notes 54-56 and accompanying text.

n122 U.S. Dep't of Justice, Guide on Antitrust and International Operations, *reprinted in Trade Reg. Rep. (CCH) No. 266,* pt. II, at 4-5 (Feb. 1, 1977).

n123 *See* Pub. L. No. 97-290, tit. IV, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982).

n124 *See generally* B. Hawk, *supra* note 35, at 188-97.

n125 *See* Pub. L. No. 97-290, tit. IV, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982).

n126 The United States has had bilateral consultation and cooperation procedures with Canada since 1959, including exchange of information provisions. *See generally* Stanford, *The Application of the Sherman Act to Conduct Outside the United States: A View From Abroad, 11 Cornell Int'l L.J. 195 (1978).* In 1976 the United States and West Germany entered into a cooperation agreement. Agreement on Restrictive Business Practices, June 23, 1976, United States-West Germany, *27 U.S.T. 1956,* T.I.A.S. No. 8291. "Good working relations" also

exist with the British and Japanese antitrust authorities. Flexner, *Foreign Discovery and U.S. Antitrust Policy -- the Conflict Resolving Mechanisms*, Fifth Annual Fordham Corp. L. Inst. 380, 384 (B. Hawk ed. 1979). And in 1982 a significantly broader cooperation agreement was made with Australia. See *supra* note 51 and accompanying text.

n127 M. Egan, Address before the International Bar Association 9-10 (Nov. 3, 1977) (on file with the *Fordham Law Review*), *see* B. Hawk, *supra* note 35, at 320-21.

n128 See *supra* note 38.

n129 United States v. Gulf Oil Corp., [U.S. Antitrust Cases Summaries, Complaints, Indictments, Developments 1970-1979 Transfer Binder] *Trade Reg. Rep. (CCH) P 45,078, at 53,722-23 (W.D. Pa. 1978).*

n130 *15 U.S.C. § 62* (1976); *see* B. Hawk, *supra* note 35, ch. 3(B).

n131 Pub. L. No. 97-290, § 103, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 719 (Oct. 7, 1982).

n132 *See* B. Hawk, *supra* note 35, ch. 3(B). The Supreme Court has stated: "[I]n the Webb-Pomerene Act . . . Congress has provided a narrow and carefully limited exception for export activity that would otherwise violate the antitrust laws." *Pfizer, Inc. v. Government of India, 434 U.S. 308, 314 n.12 (1978).*

n133 *See Franklin Music Co. v. ABC, 616 F.2d 528, 546 (3d Cir. 1979); Northwest Paper Prods., Inc. v. Omark Indus., 576 F.2d 83, 90-91 (5th Cir. 1978), cert. denied, 439 U.S. 1116 (1979).*

n134 *See Northwest Paper Prods., Inc. v. Omark Indus., 576 F.2d 83, 88-89 (5th Cir. 1978), cert. denied, 439 U.S. 1116 (1979).*

n135 Pub. L. No. 97-290, § 402, [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982).

n136 *See, e.g., Industrial Inv. Dev. Corp. v. Mitsui & Co., 594 F.2d 48, 52-53* (5th Cir.) *cert. denied. 445 U.S. 903 (1982); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1291-92 (3d Cir. 1979); Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597, 613 (9th Cir. 1977).*

n137 National Ass'n of Mfrs., The International Implications of U.S. Antitrust Laws, *reprinted in International Aspects of Antitrust Law: Hearings on the Present State, Current Theory and Trends of International Antitrust Laws Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary*, 93d Cong., 1st & 2d Sess. 1416 (1973-1974).

n138 For example, William F. Baxter, Assistant Attorney General in charge of the Antitrust Division, testified in 1981:

Concern that joint export activities would violate the antitrust laws, or at least generate costly litigation, has been cited as a deterrent to such activities and as an inhibiting factor in export trade. . . I would like to repeat again the firm view of the Department of Justice that these concerns are largely unfounded . . .
*Foreign Trade Antitrust Improvements Act: Hearings on S. 795 Before the Senate Comm. on the Judiciary*, 97th Cong., 1st Sess. 12 (1981) (statement of William F. Baxter).

n139 *Compare* Ongman, *Is Somebody Crying "Wolf"?: An Assessment of Whether Antitrust Impedes Export Trade, 1 Nw. J. Int'l L. & Bus. 163 (1979)* (little or no adverse impact) *with* Schwechter & Schepard, *The Effects of United States Antitrust Laws on the International Operations of American Firms, 1 Nw. J. Int'l L. & Bus. 492 (1979)* (significant adverse impact).

n140 *See generally Export Trading Company Act of 1981: Hearings on S. 144 Before the Subcomm. on Int'l Fin. and Monetary Policy of the Senate Comm. on Banking, Housing and Urban Affairs*, 97th Cong., 1st Sess. (1981).

n141 *15 U.S.C. § § 78a* note, 78m, note, 78m, 78dd-1, 78dd-2, 78ff (Supp. IV 1980).

n142 *See generally Foreign Trade Antitrust Improvements Act: Hearings on S. 795 Before the Senate Comm. on the Judiciary*, 97th Cong., 1st Sess. (1981).

n143 *See* President's Message to Congress Reporting on United States Export Promotion Policies, 1980-1981 [Vol. II] Pub. Papers 1689, 1689-92 (Sept. 9, 1980).

n144 U.S. Dep't of Justice, Guide on Antitrust and International Operations Case C, *reprinted in Trade Reg. Rep. (CCH) No. 266,* pt. II, at 19-22 (Feb. 1, 1977).

n145 The growth of foreign national petroleum marketing firms may have been accelerated by the refusal or hesitation of American firms to pursue joint marketing ventures with foreign national producing firms because of U.S. antitrust fears.

n146 The EEC's Regulation 67/67 creates an almost per se rule against absolute territorial restrictions, at leasst when the territories are coincident with member state boundaries. Regulation No. 67/67/EEC of the Comm. of March 22, 1967, 10 J.O. Comm. Eur. 849 (1967), *reprinted in* B. Hawk, *supra* note 35, at 834.

Article 86 of the EEC Treaty parallels § 2 of the Sherman Act and prohibits abuses of a dominant position. Treaty Establishing the European Economic Community, March 25, 1957, art. 86, 298 U.N.T.S. 3. While the monopoly power element of § 2 actual monopolization is usually measured in terms of market share in the neighborhood of 60 to 70 percent, its counterpart "dominant position" under article 86 has been based more directly on non-market share factors (such as patent position and access to capital) with the result that a "dominant position" has been found with a market share well under that usually required for monopoly power under § 2. *See, e.g.*, United Brands Co. v. Comm'n, 1978 E. Comm. Ct. J. Rep. 207, 421, [1977-1978 Transfer Binder] Common Mkt. Rep. (CCH) P 8429 (40-45 percent market share sufficient to constitute a "dominant position"). *See generally* B. Hawk, *supra* note 35, ch. 12; Hawk, *EEC and U.S. Competition Policies -- Contrasts and Convergence,* in Enterprise Law of the 80's, at 39 (1980).

n147 The mere existence of inconsistent foreign rules, without more, would not preclude U.S. antitrust liability. Some form of foreign government compulsion is necessary. *See* B. Hawk, *supra* note 35, at 148-56.

n148 One example will suffice. Prior to British entry into the Common Market, British firms often questioned the motives of American joint venture partners who insisted on "open door" clauses permitting competitors access to jointly-held facilities. The American firms' insistence rested on antitrust concerns. Following British accession to the Common Market and to its stricter antitrust rules, the British firms became less suspicious with the result that business operations and planning between British and American firms were facilitated.

n149 *See Yamaha Motor Co. v. Federal Trade Comm'n, 657 F.2d 971, 981 (8th Cir. 1981), cert. denied, 102 S. Ct. 1768 (1982).*

n150 *19 U.S.C. § 1337* (1976 & Supp. IV 1980).

n151 *19 U.S.C. § 1671* (Supp. III 1979).

n152 See *supra* notes 138-39 and accompanying text.

n153 *Foreign Trade Antitrust Improvements Act: Hearings on S. 795 Before the Senate Comm. on the Judiciary*, 97th Cong., 1st Sess. 121 (1981).

n154 *See, e.g.*, United States v. Studiengesellschaft Kohle, m.b.*H., 670 F.2d 1122, 1128-30 (D.C. Cir. 1981); United States v. Westinghouse Elecs. Corp., 648 F.2d 642, 646-48 (9th Cir. 1981).*

n155 In 1981 the Justice Department announced a far more tolerant position toward licensing practices. The Department rejected the "nine no-no's," which was a list of licensing practices the Department had viewed as per se unlawful in the early 1970's. For example, tie-ins, resale restraints, exclusivity and packaging are now viewed under the more lenient rule of reason. In May 1982 one spokesman announced the Department's present position. If the intent and effect of licensing restrictions are not to stifle competition but to efficiently exploit the technology being transferred, the restrictions are likely to pass antitrust muster. Remarks by C. Stark, Chief of the Foreign Commerce Section, *A View of Current International Antitrust Issues* at the World Trade Institute Seminar (May 20, 1982).

For the most recent statement of official policy, see Baxter, *Technology Transfers Under U.S. Antitrust Law -- An Official View*, in Ninth Annual Fordham Corp. L. Inst. (B. Hawk ed. 1983) (to be published).

n156 U.S. Dep't of Justice, Guide on Antitrust and International Operations, *reprinted in Trade Reg. Rep. (CCH) No. 266,* pt. II (Feb. 1, 1977).

n157 *Id.*

n158 *28 C.F.R. § 50.6* (1981).

n159 *See* 2 J. Atwood & K. Brewster, Antitrust and American Business Abroad 184-86 (2d ed. 1981).

n160 *1976-2 Trade Cas. (CCH) P61,225 (S.D.N.Y. 1976).*

n161 *See* Rahl, *International Cartels and their Regulation*, in Competition in International Business: Law and Policy on Restrictive Practices 252-54 (1981).

n162 *46 U.S.C. § § 801*-842. (1976 & Supp. IV 1980).

n163 *Ocean Common Carriers -- Dual Rate Contracts: Hearings on H.R. 6775 Before the House Comm. on Merchant Marine and Fisheries*, 87th Cong., 1st Sess. (1961).

n164 Securities Act of 1933, *15 U.S.C. § § 77a*-77bbbb (1976); Securities Exchange Act of 1934, *15 U.S.C. § § 78a*-78kk (1976); *see, e. g., IIT v. Cornfeld, 619 F.2d 909 (2d Cir. 1980); Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull, 606 F.2d 5 (2d Cir. 1979).*

n165 15 C.F.R. § § 368-399 (1982). The dispute over the export of technology for use in the construction of the Western Siberia-European Natural Gas Pipeline provides the most current example.

n166 15 C.F.R. § 369 (1982); *see* [Oct.-Mar.] U.S. Export Weekly (BNA) No. 279, at A-1 (Oct. 23, 1979); [Apr.- Sept.] U.S. Export Weekly (BNA) No. 271, at A-4 (Aug. 28, 1979).

n167 *United States v. AMAX, Inc., 1977-1 Trade Cas. (CCH) P 61,467 (N.D. Ill. 1977).*

n168 N.Y. Times, Aug. 31, 1976, at 37, col. 2.

n169 See *supra* notes 41-49 and accompanying text.

n170 *In re Westinghouse Elecs. Corp. Uranium Contracts Litig., 563 F.2d 992 (10th Cir. 1977); Rio Tinto Zinc Corp. v. Westinghouse Elecs. Corp., [1978] 2 W.L.R. 81.*

n171 1980, ch. 11, *reprinted in* [Jan-June] Antitrust and Trade Reg. Rep. (BNA) No. 959, at F-1 (Apr. 10, 1980). See *supra* note 45 and accompanying text.

n172 See *supra* notes 48-49 and accompanying text.

n173 *See* Hawk, *Application of Competition Laws to Ocean Shipping*, Eighth Annual Fordham Corp. L. Inst. (J. Sweeney ed. 1982) (to be published).

n174 This objection underlies the 1980 French statute. *See* Address by G. Guillaume, Director of Legal Affairs of the French Ministry of External Affairs, Chambre de Commerce Internationale, Paris (Apr. 1981) (on file with the *Fordham Law Review*).

n175 Most nations accept the following theories (or variations thereof) to support prescriptive jurisdiction: 1) territoriality (acts within the enforcing country), Restatement (Second) of Foreign Relations Law of the United States § 30 (1965); 2) the nationality of the actor, *id.*; 3) the protective principle (criminal acts threatening the security of the enforcing state or the operation of its governmental functions), *id.* § 33; and 4) the "universality" principle (based on the custody of the actor with respect to criminal acts universally condemned as a matter of international public policy, such as piracy and perhaps traffic in women). *Id.* § 34. The so-called "effects" doctrine of "extraterritorial jurisdiction" as defined in *United States v. Aluminum Co. of Am., 148 F.2d 416, 443-44 (2d Cir. 1945),* has been criticized as inconsistent with these international standards. *See, e.g.*, Haight, *International Law and Extra-territorial Application of the Antitrust Laws, 63 Yale L.J. 639 (1954);* Jennings, *Extraterritorial Jurisdiction and the United States Antitrust Laws, 1957 Brit. Y.B. Int'l L. 146.*

n176 *See, e.g., Rio Tinto Zinc Corp. v. Westinghouse Elecs. Corp., [1978] 2 W.L.R. 81.* The issue before the House of Lords was "whether any 'blue-pencil' approach is appropriate in relation to [Westinghouse's] request or whether the whole request is so far-reaching and so far of the nature of 'fishing' that, even though a portion of it can be saved it ought to be rejected out of hand." *Id. at 88; see also* Lever, *Aspects of Jurisdictional Conflict in the Field of Discovery*, Fifth Annual Fordham Corp. L. Inst. 358 (B. Hawk ed. 1979).

n177 *United States v. Bechtel Corp., 648 F.2d 660, 662 (9th Cir. 1981), cert. denied, 102 S. Ct. 638 (1982);* Response of Justice Department to Comments, *43 Fed. Reg. 12,953, 12,955* (Mar. 28, 1978); Proposed Consent Decree and Competitive Impact Statement, *42 Fed. Reg. 3716* (Jan. 19, 1977).

n178 In 1981 the EC Commission sent a statement of objection to a number of North American, Scandinavian and other non-Common Market firms charging them with participating in a concerted practice to fix selling prices of pulp within the Common Market. In response to the United States' request for consultations in order to clarify those parts of the statement of objections dealing with the Webb-Pomerene association defendants, the Director-General of the Commission's Directorate-General for Competition assured United States officials that:

The EC had no intention to proceed automatically against any Webb-Pomerene association engaged in export trade in Europe, either on the basis of their status as Webb associations or because of information exchange activities of the type that do not facilitate price fixing. The EC case against world wood pulp exporters is for price-fixing among a multinational group of producers; it is specifically aimed at an alleged pattern of price announcements and other price communications for wood pulp involving North American and European producers. The involvement of the [Webb-Pomerene association] is significant in the Commission's view, because it provides a mechanism for price collusion which might otherwise be impossible in a market with so large a number of sellers.

. . .

[T]he EC will carefully scrutinize the use of joint selling agents where it does not contribute to competition by facilitating access to the market by smaller firms which do not have the ability to market independently;

. . .

The Commission considers that export associations whose activities have substantial anticompetitive effects in the Common Market may violate Community competition law, even if the activities are authorized in the association's home country.

U.S. Dep't of Justice, U.S.-EC Consultations on the EC's Proceeding Against Wood Pulp Producers (Jan. 14, 1982), *see* [Jan.-June] Antitrust & Trade Reg. Rep. (BNA) No. 1050, at 267-68 (Feb. 4, 1982).

n179 In 1973 the OECD adopted a resolution calling for consultation and conciliation procedures among members. OECD, Recommendation of the Council Concerning Consultation and Conciliation Procedure on Restrictive Business Affecting International Trade, OECD Doc. C(73)99 (1973). In 1979 the OECD adopted a more specific recommendation establishing a framework for consultation and cooperation among antitrust enforcement authorities. OECD, Recommendation of the Council Concerning Co-operation Between Member Countries on Restrictive Business Practices Affecting International Trade, OECD Doc. C(79)154 (1979).

Paragraph (4) of the Competition section of the 1976 OECD Guidelines for Multinationals exhorts multinationals to

be ready to consult and co-operate, including the provision of information, with competent authorities of countries whose interests are directly affected in regard to competition issues or investigations. Provision of information should be in accordance with safeguards normally applicable in this field.
OECD, Declaration on International Investment and Multinational Enterprises, OECD Doc. 21 (76)04/1 (1976), *reprinted in* Inst. for Int'l and Foreign Trade L. The OECD Guidelines for Multinational Enterprises: A Business Appraisal 257 (1977).
Paragraph (4) has several flaws that greatly weaken its usefulness. *See* B. Hawk, *supra* note 35, at 809-11.

n180 *See* B. Hawk, *supra* note 35, ch. 16.

n181 See *supra* notes 20-26 and accompanying text.

n182 See *supra* note 23.

n183 The Justice Department generally takes into account comity considerations in exercising prosecutorial discretion. *See* U.S. Dep't of Justice, Guide on Antitrust and International Operations (1977), *reprinted in Trade Reg. Rep. (CCH) No. 266,* pt. II, at 6-7 (Feb. 1, 1977).

n184 More particularly, Australia agrees to give the fullest consideration to modifying any aspect of its policy that has or might have implications for the United States in relation to the enforcement of American antitrust laws and to give the fullest consideration to any harm that may be caused by the implementation or continuation of its policy to the interest protected by the United States antitrust laws. On the other side, the Justice Department and the Federal Trade Commission agree to give the fullest consideration to modifying or discontinuing existing or contemplated antitrust investigations or proceedings. In that regard, both agencies agree to consider Australian interests with respect to those proceedings, including without limitation, Australia's interest in circumstances in which challenged conduct:

(1) was undertaken for the purpose of obtaining a permission or approval required under Australian law for the exportation from Australia of Australian natural resources or goods manufactured or produced in Australia;

(2) was undertaken by an Australian authority, being an authority established by law in Australia, in the discharge of its functions in relation to the exportation from Australia of Australian natural resources or goods manufactured or produced in Australia;

(3) related exclusively to the exportation from Australia to countries other than the United States, and otherwise than for the purpose of re-exportation to the United States, of Australian natural resources or goods manufactured or produced in Australia; or

(4) consisted of representations to, or discussions with, the Government of Australia or an Australian authority in relation to the formulation or implementation of a policy of the Government of Australia with respect to the exportation from Australia of Australian natural resources or goods manufactured or produced in Australia.

Agreement Relating to Cooperation of Antitrust Matters, June 29, 1982, United States-Australia, art. 2, *reprinted in* [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1071, at 36-37 (July 1, 1982). The parties also agree that documents and information provided in the course of notification or consultation shall be treated confidentially by the receiving party unless the providing party consents to disclosure or disclosure is compelled by law. The United States also agrees not to use any information or documents as evidence in any judicial or administrative proceeding under the United States antitrust laws. The United States would not be foreclosed from pursuing an investigation of any conduct that is the subject of notification or consultation or from initiating a proceeding based on evidence obtained from sources other than the Australian Government. When consultations do not resolve a conflict, each party is free to protect its interests as it deems necessary. In another significant departure from the bilateral agreement with Canada and West Germany, the Australian agreement provides that if the Australian Government so requests, the Justice Department will participate in private actions challenging conduct encouraged by the Australian Government. In the event of such a request, the Justice Department will disclose to the court the substance of consultations between the two governments. *See generally id.*

n185 See *supra* notes 50-51 and accompanying text.

n186 See *supra* notes 20-23 and accompanying text.

n187 The idea of binding arbitration through bilateral agreements has been discussed in several fora. A similar idea was discussed at a Ditchley Conference in 1979. More recently, Monroe Leigh urged at a meeting of the International Law Association in 1981 that Congress empower the Executive to negotiate bilateral agreements along the lines suggested here. M. Leigh, Address at the Annual Meeting Luncheon of the American Branch of the International Law Association (Nov. 14, 1981), *reprinted in* Am. Branch of the Int'l L. Ass'n, Proceedings and Committee Reports of the American Branch of the International Law Association 44, 50 (1981-1982).

n188 In a future article, the author will argue that a bilateral (or multilateral) agreement with binding arbitration provides the most desirable solution to the antitrust conflicts problem. That article will discuss the advantages and disadvantages of such a solution, as well as the specifics of a model agreement.

n189 Amicus intervention is provided for in the U.S.-Australia agreement. Agreement Relating to Cooperation of Antitrust Matters, June 29, 1982, art. 6, United States-Australia, *reprinted in* [July-Dec.] Antitrust & Trade Reg. Rep. (BNA) No. 1071, at 37 (July 1, 1982).

n190 U.S. Const. art. III, § 2.

n191 *Cf. Yakus v. United States, 321 U.S. 414, 443-44 (1944)* (fragmentation of action held constitutional; however, each court may be required to be an art. III court).

n192 See *supra* note 58 and accompanying text.

n193 *Outboard Marine Corp. v. Pezetel, 461 F. Supp. 384 (D. Del. 1978).*

n194 *Id. at 388.*

n195 *Id. at 390-91.*

n196 *Id. at 400, 404-05.* In 1982 the district court in *Pezetel* granted plaintiff's motion to amend the complaint to add a claim of predatory pricing based on an allegation that defendants' golf carts were sold at prices below cost. *Outboard Marine Corp. v. Pezetel, 535 F. Supp. 248, 250 (D. Del. 1982).* The court noted that plaintiff had argued in 1978 that it was impossible to determine any Polish cost and, therefore, the plaintiff had urged the court to adopt an alternate predatory pricing model for use in cases in which defendant was an agency or instrumentality of a state-controlled economy. *535 F. Supp. at 251.* The court went on to state that the 1978 opinion did not question plaintiff's assertion that Polish costs are not determinably; the 1978 opinion simply held that any such alternative model must be adopted by Congress rather than the court. *535 F. Supp. at 252.*

n197 For a decision involving the effect of domestic government subsidization on antitrust claims, see *Local 1330, United Steel Workers v. United States Steel Corp., 631 F.2d 1264 (6th Cir. 1980).*

n198 *E.g., Outboard Marine Corp. v. Pezetel, 535 F. Supp. 248 (D. Del. 1982); Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 513 F. Supp. 1100, 1148 (E.D. Pa. 1981), appeal docketed,* No. 81-2331 (3d Cir. Apr. 3, 1981).

n199 Areeda & Turner, *Predatory Pricing and Related Practices under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697 (1975).*

n200 *Compare* McGee, *Predatory Pricing Revisited, 23 J.L. & Econ. 289, 292 & n.15 (1980)* ("attempts at predation have been rare, and . . . successful attempts will be found to be still rarer") *with* Scherer, *Predatory Pricing and the Sherman Act: A Comment, 89 Harv. L. Rev. 869, 890 (1976)* (a comprehensive test is necessary to determine that pricing is predatory).

n201 *See* Ordover, Sykes & Willig, *Unfair International Trade Practices,* 15 N.Y.U. J. Int'l L. & Pol. (to be published 1983).

n202 *See* Easterbook,*Predatory Strategies and Counter Strategies, 48 U. Chi. L. Rev. 263, 270-71 (1981).*

n203 For a survey of the decisions, see Hurwitz, Kovacic, Sheehan & Lande, *Current Legal Standards of Predation*, in Federal Trade Commission, Strategy, Predation and Antitrust Analysis 101 (S. Salop ed. 1981).

n204 For example of strategic rules, as compared with cost-based rules, see Scherer, *supra* note 200; Williamson, *Predatory Pricing: A Strategic and Welfare Analysis, 87 Yale L.J. 284 (1977).*

n205 *See* Ordover, Sykes & Willig, *supra* note 201.

n206 *See* K. Mirow & H. Maurer, Webs of Power: International Cartels and the World Economy 36 (1982).

n207 See *supra* notes 61-63 and accompanying text.

n208 The circuits are divided. *Compare Industrial Inv. Dev. Corp. v. Mitsui & Co., 594 F.2d 48, 53 (5th Cir. 1979)* (inquiry into foreign government's motivation held improper), *cert. denied, 445 U.S. 903 (1980) with Hunt v. Mobil Oil Corp., 550 F.2d 68, 73-75* (2d Cir.) (foreign government's motivation considered), *cert. denied, 434 U.S. 984 (1977). See generally* B. Hawk, *supra* note 35, ch.3(C).

n209 One decision can be read to reject such a limitation. *See Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291, 1297 & n.13 (D. Del. 1970).* The Justice Department embraces such a territorial limitation. *See* U.S. Dep't of Justice Guide and International Operations Case L. *reprinted in Trade Reg. Rep. (CCH) No. 266,* pt. II, at 53 (Feb. 1, 1977). *See generally* B. Hawk, *supra* note 35, ch. 3(C).

n210 *See* B. Hawk, *supra* note 35, ch. 3(C).

n211 Pub. L. No. 97-290, § 402, Antitrust & Trade Reg. Rep. (BNA) No. 1084, at 722 (Oct. 7, 1982). The Foreign Trade Antitrust Improvements Act purports to clarify the effects test only with respect to export transactions, while the *Uranium* hypothetical largely concerns import transactions. Courts might be expected, however, to apply the 1982 clarification to import transactions as well as export transactions.

n212 *Nothern Pac. Ry. v. United States, 356 U.S. 1, 4 (1958).*

n213 *See* Comment, *Defenses to International Antitrust Suits: An Aggregate Approach, 5 Fordham Int'l L.J. 441, 461-67 (1982).*

n214 *15 U.S.C. § § 8*-11 (1976).

n215 *19 U.S.C. § 1337* (1976 & Supp. IV 1980).

n216 *19 U.S.C. § § 1671*-1677g (Supp. IV 1980).

n217 *19 U.S.C. § § 2411*-2416 (Supp. IV 1980).

n218 *19 U.S.C. § 1303* (1976 & Supp. IV 1980).

n219 Section 201 of the Trade Act of 1974 provides an "escape clause" procedure for obtaining temporary import relief and adjustment assistance to industries, firms and employees injured as a result of increased imports into the United States. *19 U.S.C. § 2251* (1976 & Supp. 1980). The International Trade Commission [ITC] makes the injury determination and recommends the type(s) of relief to the President. The President has the discretion in most situations of denying relief or of specifying relief different from the ITC's recommendations, subject to congressional override. *See generally* Adams & Dirlam, *Import Competition and the Trade Act of 1974: A Case Study of Section 201 and its Interpretation by the International Trade Commission, 52 Ind. L.J. 535 (1977);* Ris, *"Escape Clause" Relief Under the Trade Act of 1974: New Standards, Same results,* 16 Colum. J. transnat'l L 297 (1977); Note, *Interpretive History of the Escape Clause under the Trade Act of 1974,* 12 J. Int'l L. & Econ. 531 (1978). Although Section 201 proceedings do not require a

showing of "unfair" trade practices, the issue has been raised. *See generally*, Applebaum, *Escape Clause and Market Disruption Proceedings -- A Private View*, Fifth Annual Fordham Corp. L. Inst. 249 (B. Hawk ed. 1979).

n220 Section 406 of the Trade Act of 1974 provides for import relief from "market disruption" caused by imports from Communist bloc countries. *19 U.S.C. § 2436* (1976 & Supp. IV 1980); *see* Applebaum, *supra* note 219, at 258.

n221 To cite but one of many examples, the "traditional" antitrust enforcement agencies (Justice Department and the FTC) have on a number of occasions intervened before the ITC to argue that the ITC lacked "antitrust" jurisdiction. *See* B. Hawk, *supra* note 35, ch. 6.

n222 *15 U.S.C. § § 1*-2 (1976).

n223 *Id.* § § 13a-13b, 21a.

n224 *19 U.S.C. § § 1303*, 1337 (1976 & Supp. IV 1980).

n225 *15 U.S.C. § 72* (1976).

n226 *19 U.S.C. § § 1671*-1677g (Supp. IV 1980).

n227 *Id.* § § 2411-2416.

n228 *See Commission on the International Application of the U.S. Antitrust Laws Act: Hearings on* S. 432 *Before the Sen. Comm. on the Judiciary*, 97th Cong., 1st Sess. 58-59 (1981) (statement of Kingman Brewster):

The priority which our national interest urges will differ in each instance. The conflicting interests of other States which must be dealt with will also be quite different in the case of export control or antiboycott legislation than they will be in antitrust. I think it is illusory to hope that a single jurisdictional rule can be found which will cover all.

The Justice Department in 1981 opposed S. 432 on the ground that its mandate covered only antitrust and not other "extraterritorial" legislation. *See id.* at 35 (statement of William F. Baxter, Ass't Attorney General, Antitrust Div., U.S. Dep't of Justice).