# EXHIBIT 21

**ASPEN LAW & BUSINESS**

**U.S. COMMON MARKETS**
**& INTERNATIONAL ANTITRUST LAWS**
**1996-1 SUPPLEMENT**

**By Barry E. Hawk**

**FILING INSTRUCTIONS–page 1**

| Delete old pages: | Insert new pages: |
| --- | --- |
| Volume I | |
| Half title page to xiv.ii | Title page to xiv.iv |
| 3 to 6.1 | 3 to 6.1 |
| 61 to 62.3 | 61 to 62.4 |
| 75 to 78.3 | 75 to 78.3 |
| 87 to 88.2 | 87 to 88.2 |
| 132.3 to 132.5 | 132.3 to 132.5 |
| 141 to 146 | 141 to 146.1 |
| 152.1 to 152.10 | 152.1 to 152.4 |
| 176.1 to 182.6 | 176.1 to 182.5 |
| 187 to 188.5 | 187 to 188 |
| 191 to 200.1 | 191 to 200.2 |
| 207 to 214 | 207 to 214 |
| 219 to 220 | 219 to 220 |
| 251 to 254 (Retain 254.1) | 251 to 254 |

accounting for a substantial share of the domestic market agree on the level of their exports in order to reduce supply and raise prices in the United States.[48D]

The 1995 International Antitrust Guidelines also take the position that exports more than half financed by the U.S. government should not be considered "exports" for the purpose of Title IV but rather as sales to the U.S. government.[48E] To determine whether more than half the cost of a transaction is borne by the U.S. government, the Agencies apply the eligibility standards for certification under the Export Trading Company Act. *See infra* section D. The U.S. government involvement could include the actual purchase of goods for shipment abroad, a U.S. grant to a foreign government specifically earmarked for the transaction, or a U.S. government loan specifically earmarked for the transaction that is made on such generous terms that it amounts to a grant.[48E1] Not covered would be a transaction funded by an international agency for which the U.S. government does not supply a major portion of funding or a transaction in which the foreign government receives non-earmarked funds from the United States as part of a general government-to-government aid program.[48E2]

Illustrative Example F demonstrates the Agencies' analysis. A combination of U.S. firms and local firms in country Beta create a U.S.-based joint venture for the purpose of building a major pollution control facility for Beta's Environmental Control Agency ("BECA"). The venture has received preferential funding from the U.S. Government, which has the effect of making the present value of expected future repayment of the principal and interest on the loan less than half its face value. Once the venture has begun work, it appears that its members secretly have agreed to inflate the price quoted to BECA, in order to secure more funding.

The Guidelines indicate that in general, the Agencies will not challenge a joint venture or even outright bid-rigging by U.S. firms on the basis of competitive effects in a foreign market. However, jurisdiction would lie in the above case: the U.S. government is substantially funding the project through a non-commercial-rate loan, since the present value of expected future repayment of the loan is less than half the value of the transaction and thus

48D. *Id.* Spillover from a joint bidding arrangement is discussed in Case 5. *See infra* subsection 2b.

48E. Section 3.13. In 1989 the Justice Department alleged that numerous Japanese construction companies rigged bids in connection with the construction of a U.S. navy base in Japan. A civil investigation was settled with the payment of over $30 million to the U.S. government. *See* Trade Reg. Rep. (CCH) ¶ 50,028. The settlement fund for the alleged rigging of bids for telecommunications contracts by Japanese electronics companies at a different U.S. naval base had reached almost $37 million in 1992. *See* 62 Antitrust & Trade Reg. Rep. (BNA) 269 (Feb. 27. 1992).

48E1. *Id.* fn. 66.

48E2. *Id.*

more than half the cost of the transaction would be borne by the U.S. government. This is consistent with Justice Department past and recent enforcement,[48F] as well as the Supreme Court decision in *Concentrated Phosphate*.[48G] The Justice Department position is questionable given the language of Title IV which fails to make an exception for U.S. government-financed exports in its definition of export trade and commerce.

The second jurisdictional predicate—foreclosure of U.S. export trade—is consistent with prior case law[49] and Title IV thus expressly reflects the second policy objective of the Sherman Act.

Title IV's distinction between import and non-import transactions raised the question whether a different jurisdictional standard or test now applies to each kind of transaction. The Supreme Court appeared to answer this question in the affirmative in *Hartford Fire Insurance Co. v. California*,[50] when, instead of applying Title IV's "direct, substantial, and reasonably foreseeable effect" test, the court held that with respect to import commerce, "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."[50A] The 1995 International Antitrust Guidelines similarly espouse the position that separate

[*Next page is 177.*]

48F. *See, e.g.*, United States v. The Standard Tallow Corp., 1988-1 Trade Cas. (CCH) ¶ 67,913 (S.D.N.Y. 1988) (consent decree settling charges that defendants conspired to fix prices of shipments of tallow to Egypt financed by U.S. foreign aid).

48G. United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199 (1968). *See also* Pacific Seafarers, Inc. v. Pacific Far East Line, Inc., 404 F.2d 804 (D.C. Cir. 1968), *cert. denied*, 393 U.S. 1093 (1969).

49. *See, e.g.*, Zenith Radio Corp. v. Hazeltine Research, Inc. 395 U.S. 100 (1969); Todhunter-Mitchell & Co. v. Anheuser-Busch, Inc., 375 F. Supp. 610 (E.D. Pa. 1974), *modified*, 383 F. Supp. 586 (E.D. Pa. 1974). In *Todhunter-Mitchell* defendant U.S. brewer unlawfully restrained its Miami wholesale distributor from selling to plaintiff in the Bahamas where plaintiff would have resold in competition with defendant's exclusive Bahamian distributor. The court held that although the purpose and ultimate result of the conspiracy was elimination of competition in a foreign market, that result was achieved by restricting the trade of domestic distributors with the foreign market and thus the restriction "directly affected the flow of commerce out of the country." 383 F. Supp. at 587. Jurisdiction could have been based simply on the finding that the plaintiff New Orleans beer distributor was foreclosed from exporting beer from New Orleans to the Bahamas. Thus the broad reading of the court's language that jurisdiction rested on the fact that a restraint was imposed on goods in export commerce was not necessary. This broad reading was implicity rejected in Title IV.

50. 113 S.Ct. 2891 (1993).

50A. *Id.* at 2909.

jurisdictional tests are to be applied to foreign import commerce and foreign commerce other than imports.[50B]

The Supreme Court's opinion is likely correct as Title IV was not intended to affect jurisdiction over conduct affecting imports into the United States. Title IV, like the Export Trading Company Act, arose from a congressional desire to facilitate United States exports. It was drafted to affect jurisdiction only over export transactions and purely foreign transactions (such as restraints on trade between two foreign countries). More specifically, Sherman Act jurisdiction over international cartels that affect imports and harm domestic competition remains unchanged, as the House Report expressly recognizes.[51] This concern about international cartels affecting U.S. imports partially explains Title IV's awkward language where exports and

50B. International Antitrust Guidelines § 3.1.

51. *See* House Report, *supra* note 40, at 9-10:

Imports and Purely Foreign Transactions

Some observers raised questions about the status of import transactions under H.R. 2326 and urged the Subcommittee to make clear that the legislation had no effect on the application of antitrust laws to imports. As Mr. Atwood stated, "it is important that there be no misunderstanding that import restraints, which can be damaging to American consumers, remain covered by the law." Prepared Statement of Mr. James R. Atwood, dated April 8, 1981. ("Atwood Statement") at 14; *see* Rahl Statement at 10; Antitrust Section Report at 31. To remove any possible doubt, the Subcommittee amendment (H.R. 5235, as introduced) modified the legislation to make clear that it applied only to "export" trade.

The desirability of another change soon became apparent. The Subcommittee's "export" commerce limitation appeared to make the amendments inapplicable to transactions that were neither import or export, i.e., transactions within, between, or among other nations. See, e.g., Pacific Seafarers, Inc. v. Pacific Far East Line, Inc., 404 F.2d 804 (D.C. Cir. 1968), *cert. denied*, 393 U.S. 1093 (1969).

A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws. Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions—that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor. The Committee amendment therefore deletes references to "export" trade, and substitutes phrases such as "other than import" trade. It is thus clear that wholly foreign transactions as well as export transactions are covered by the amendment, but that import transactions are not.

With these changes, H.R. 5235 achieves an important objective of freeing American-owned firms that operate entirely abroad or in United States export trade from the possibility of dual and conflicting antitrust regulation. When their activities lack the requisite domestic effects, they can operate on the same terms, and subject to the same antitrust laws that govern their foreign-owned competitors. To be sure, if the foreign state in question has an antitrust regimen, American-owned firms must still comply. But no longer is there any possibility that, because of uncertainty growing out

purely foreign transactions are defined only by negative implication, i.e. conduct involving "other than import trade or commerce."[52]

As a practical matter, the different standards for import and export commerce are unlikely to yield greatly disparate results. The Title IV test—"direct, substantial, and reasonably foreseeable effect" on U.S. commerce—is largely consistent with prior case law. Many decisions have required direct and substantial effect on U.S. commerce. The addition of the "reasonably foreseeable" requirement is intended to provide an objective practical standard. "Reasonably" connotes practicality, i.e. "whether the effects would have been evident to a reasonable person making practical business judgments and not whether the actual knowledge or intent can be shown."[53] Title IV's reasonably foreseeable, requirement parallels decisions that require objective intent. Title IV's formulation apparently rejects, however, a specific intent test[54] and parallels more recent decisions which emphasize effect on commerce over intent to affect commerce.[55] Thus Title IV and the case law both support the same as a necessary or minimum condition a *direct, substantial, and reasonably foreseeable (anticompetitive) effect on U.S. domestic or foreign*

---

of American ownership, such firms will be subject to a different and perhaps stricter regimen of antitrust than their competitors of foreign ownership.

The House Report states further that, *id.* at 13:

The Committee . . . does not believe the legislation will result in a rejuvenation of international cartels. Any major activities of an international cartel would likely have the requisite impact on United States commerce to trigger United States subject matter jurisdiction. For example, if a domestic export cartel were so strong as to have a "spillover" effect on commerce within this country—by creating a world-wide shortage or artificially inflated world-wide prices that had the effect of raising domestic prices—the cartel's conduct would fall within the reach of our antitrust laws. Such an impact would, at least over time, meet the test of a direct, substantial, and reasonably foreseeable effect on domestic commerce. The Committee would expect the Department of Justice and the Federal Trade Commission to continue their vigilance concerning cartel activity and to use their enforcement powers appropriately.

52. For a discussion of the confused legislative history, see Rosenthal & Yale-Loehr, *The Export Trading Company Act of 1982: Implications for International Antitrust Enforcement*, in Private Investors Abroad 73, 82-84 (1983).

53. House Report, *supra* note 40, at 9. The House Report continues:

This [reasonably foreseeable] provision should free businessmen and their advisors from having to worry unduly about effects that are highly unlikely, but it does not permit them effectively to turn from the reasonably foreseeable consequences of their actions.

Once the effects of a course of conduct are felt, the test remains an objective one, but a defendant confronted with evidence that his past conduct has had direct and substantial effects within this country could not argue that continued effects of this type flowing from similar future conduct were not "reasonably foreseeable." *Id.*

54. *Alcoa* can be read as requiring a specific intent. *See* Chapter 2.

55. *See id.*

# EXHIBIT 22

LEXSEE 60 ANTITRUST L.J. 593

Copyright © American Bar Association, 1991.

Antitrust Law Journal

Issue 2 1991 Annual Meeting, Altanta, Georgia

August 11, 1991/August 14, 1991

*60 Antitrust L.J. 593*

**LENGTH:** 2588 words

**SECTION:** ANTITRUST IN A GLOBAL ENVIRONMENT: CONFLICTS AND RESOLUTIONS: HARMONIZATION OF LAW AND PROCEDURES IN A GLOBALIZED WORLD: WHY, WHAT, AND HOW?

**AUTHOR:** Eleanor M. Fox *

* Professor of Law, New York University School of Law, and a Member of the New York Bar. The author served as Reporter to the ABA Antitrust Section's Special Committee on International Antitrust.

**TEXT:**

I. INTRODUCTION

Disharmonies of law and procedure are costly and bothersome. As the world becomes increasingly interdependent the costs of different rules of law and different procedures that apply to the same transaction mount. People begin to wish for harmonization in order to tidy up a messy world; they wish everyone would adopt the "ideal" standard, which is the one they like the best.

But when one takes a longer view of what is "best" and respects cultural and contextual differences among nations and the fit of a nation's laws to its own needs, the problem of "ideal" law becomes more elusive and the problem of harmonization becomes more complex. One realizes that not all law needs to be harmonized; one searches for the problems that most demand attention and for solutions that are feasible because they draw upon shared goals or because enforcing nations can devise modes of enforcement and forms of relief proportional to their own interests.

The ABA Special Committee on International Antitrust took a tailored approach to the global problem of disharmonies. It identified several problems, two of which I will emphasize and use as examples. These two examples are especially interesting because the problems that cry out for solutions are utterly different from one another and the solutions are, accordingly, almost diametrically opposed. The examples are drawn from the fields of cartel law and merger law. Cartels are virtually always harmful to society and the problem internationally is that law and enforcement are too weak and deference (nonenforcement) in view of foreign firm involvement is too tempting. Mergers, on the other hand, are most often not anticompetitive and often hold positive benefits for society. Freedom to merge or to engage in joint ventures is normally a positive freedom. The problem internationally is that a multitude of enforcers applying different procedures and standards are likely to descend upon the same transaction, imposing unnecessarily high costs on transnational mergers and joint ventures. The Committee, accordingly, made quite different recommendations to meet the cartel problem on the one hand (stronger law and enforcement) and to meet the merger problem on the other (more coordination and more deference).

© ABA, Antitrust Law Journal, August 11, 1991

II. WHY WE MAY NEED OR WANT TO HARMONIZE

Harmonization may address three different problems. The first is externalities. Firms or countries may engage in activities that impose costs on others for which the actor does not have to pay. Pollution is the paradigm example offered by economists. If firms pollute the atmosphere and do not have to pay the costs of cleanup they will engage in an inefficiently large amount of the polluting activity and by definition will hurt others in the process. Hard core export cartels pose a similar problem. If the firms of one nation would, combined, have monopoly power in world markets, that nation and its firms will have a strong incentive to promote export cartel activity, increasing national wealth at the expense of foreigners.

The second problem harmonization may address is unnecessary transactions costs. Transactions costs include the costs of compliance with law. If the same merger, for example, is subject to the different law and procedures of five or ten nations and if compliance procedures are complex, transactions costs can be very high. (In addition, with five or ten enforcers, there may be greater likelihood of error in enjoining procompetitive transactions, thus increasing the costs of error.) Because of the extra costs, some transactions that would have taken place will not take place.

The third is interdependence. Transactions may be so integrated into international commerce that a variety of national standards no longer make economic and practical sense. Indeed, if any one nation can enjoin an entire transnational merger transaction, or require a given high level of disclosure to trade on a stock exchange, or require revelation of trade secrets to continue doing business, the most restrictive national standard will tend to be the international standard and will have significant transnational effects. Accordingly, business people and policymakers may desire a harmonization process as a way to think out and bring nations towards the "best" standard of law that is politically acceptable. n1 In the tightest form of harmonization, law would be international, as under a mandatory world code, and new institutions for enforcement and dispute resolution would be established. n2

n1 If nations can tailor relief to avoid extraterritorial impacts, substantive harmonization may not be necessary. But whether tailored relief that avoids extraterritorial impacts is sufficient to cure the harm in the enforcing nation is often a fact-specific question that must be decided case by case. *See* COMMISSION OF THE EUROPEAN COMMUNITIES, FOURTEENTH REPORT ON COMPETITION POLICY § 6, points 94-95 (1985) (*IBM* case); *IBM Settles Antitrust Suit with Common Market; Rivals Welcome Concessions, but Hoped for More,* Wall St. J., Aug. 3, 1984, at 2, col. 2; Consolidated Gold Fields PLC v. Anglo American Corp., 698 F. Supp. 487 (S.D.N.Y. 1988), *aff'd,* 871 F.2d 252 (2d Cir.), *on remand,* 713 F. Supp. 1457 (S.D.N.Y.), *cert. dismissed,* 492 U.S. 939 (1989).

n2 See ABA ANTITRUST SECTION REPORT OF THE SPECIAL COMMITTEE ON INTERNATIONAL ANTITRUST [hereinafter REPORT], ch. 11, A World Antitrust Code (forthcoming 1992).

Pressure for harmonization will be the most obvious when interdependence is at a very high level such that standards in one nation directly impact other nations and standards that are too high or too low in the regulating state may significantly harm the people of other nations. Pollution is again a good example. The air over Poland will not stay in Poland. If Poland has high pollution and no obligation of cleanup and Germany has low pollution and obligations of cleanup, the two systems cannot exist comfortably side by side because of spillover and porousness; Germany might be willing to accept a standard that it regards as lower than optimal in order to raise the level of obligations imposed by Poland and its eastern neighbors on their businesses. The benefits of an international code could in theory be very great; but political difficulties of reaching agreement could be insurmountable, at least unless industrialized nations agree to pay industrializing nations not to pollute.

There is a fourth reason why harmonization is advocated. A nation may give guidance, sometimes solicited as it is now, on "best" paths for development of another nation's law. Usually the guidance-giver urges harmonization towards its own law. Usually the guidance-giver believes that its own law is best and holds lessons of importance to the guidance-seeker (and perhaps it is and it does). Or the guidance-giver may recognize that a single standard will facilitate transactions and deter harmful conduct and may believe its own law provides a creditable standard of what is good and what is bad. Or the guidance-giver may associate leadership and power with being the standard-setter. Moreover if a community of nations is being built, as it is in Europe, harmonization towards a single community standard will facilitate a more integrated community. The European Economic Community is well advanced in harmonizing the law and policy of its member states. Moreover, the EEC is negotiating association agreements with the

© ABA, Antitrust Law Journal, August 11, 1991

Eastern European nations and is requiring as a term of these agreements that the nations approximate their laws to the law of the EEC. n3

n3 See REPORT, ch. 10, Competition Policy, Eastern Europe and Other Newly Emergent Market Economies.

III. FACTORS AGAINST HARMONIZATION

While these several reasons may favor or explain harmonization, several other factors may point against harmonization, especially when interdependence and porousness do not cry out for one common standard. First among these factors is context and the benefits of diversity. One is appropriately skeptical of the claim that there is one "right" law for a given nation. One should be even more skeptical of the claim that the one "right" law is the same for all nations, let alone for all nations at the same point in time. n4

n4 In the United States at this time there are those who urge that there is one natural principle from which all economic law ought to be deduced; that this principle is allocative efficiency with static price/output theory as the sole indicator of anticompetitiveness; and that this principle is good and right for all nations, industrialized, newly democratized, and developing alike. *See* Fox & Sullivan, *Antitrust -- Retrospective and Prospective: Where Are We Coming From? Where Are We Going?,* 62 N.Y.U. L. REV. 936 (1987).

The presumptuousness of the claim of one "right answer" might lead one to prefer a principle of respect for each nation and its historical and contemporary context, and respect for what the people of the nation want for themselves.

A second factor is a power factor. Stronger nations are likely to have the power to steer harmonization towards their standards, whether or not their standards are superior to or appropriate for weaker nations.

A third factor is feasibility and practicability. Harmonization is difficult unless nations already converge around one commonly accepted standard. But if nations already subscribe to one common standard, harmonization is unnecessary. Large scale harmonization is even more difficult. The more ambitious the project the more surely harmonizing nations will be obliged to compromise.

A harmonization effort itself may have benefits even if no agreement is reached; it would have the usual benefits that flow from sustained dialogue -- greater understanding and even gradual convergence of law through better appreciation of costs and benefits of different standards. But efforts for substantial, broad scale harmonization, such as a world antitrust code project, are costly; they consume the time of busy officials; as they evolve they can be more rhetorical and political than substantive; and they can start momentum towards initially undesired compromise. The benefits of the process do not necessarily exceed its costs.

IV. THE WORK OF THE SPECIAL COMMITTEE IN CONTEXT

The work of the Special Committee fits nicely into the framework laid out above. The first problem -- that of externalities -- informed the recommendation on export cartels. Export cartels allow nations and their firms to exploit persons in other nations. No nation should facilitate exploitation of foreigners. The Committee recommended that nations and their firms agree to eliminate export exemptions and that home nations of cartelists should assist victim nations' enforcement. n5

n5 See REPORT, ch. 3, Export Cartels.

The second problem, unnecessary transactions costs, informed the recommendations on merger jurisdiction and coordination of enforcement efforts. Nations should tailor and attempt to conform their notification and information requests. Potentially enforcing nations should consult immediately, and those with lesser interests and inability to carry out relief should defer to those with direct and immediate interests and ability to enforce a judgment. n6

n6 *Id.,* ch. 7, Conflicts in International Merger Enforcement.

© ABA, Antitrust Law Journal, August 11, 1991

The transactions costs problem also informed recommendations on government involvement defenses and comparative merger standards. Unclarity and lack of transparency of law increases costs of doing business and may chill salutary transactions. Accordingly, the Committee recommended that nations should attempt to reach and apply a common definition of act of state and of the commercial act exception from the act of state doctrine. n7

n7 *Id.,* ch. 5, Special Doctrines and Defenses.

The Committee dealt also with the opaqueness of substantive merger standards. It attempted to increase clarity by conveying information about disparate standards. Moreover, it recommended that nations should adopt merger enforcement guidelines specifying modes of analysis and identifying all relevant factors including those other than competition factors. n8

n8 *Id.,* ch. 8, International Mergers: A Comparative Analysis of Substantive Law.

Third, the problem of interdependence prompted virtually all recommendations. In this increasingly interdependent world the transnational cartel problem is critical; almost all nations agree that cartels are harmful and all major industrialized countries and many others have laws against cartels. But often the law is weak and unenforced. Accordingly, nations must raise the level of their anticartel enforcement and should use and strengthen both antitrust and trade remedies to attack cartels at home and, where feasible and reasonable, abroad. n9 Also because of interdependence and the danger that antitrust enforcement efforts may intrude unreasonably on other nations, nations should respect other nations' interests and exercise restraint, while remaining aware that cartelists from other than the enforcing nation often seek shelter behind a cloak of alleged conflict with foreign law and policy; courts should critically scrutinize such assertions. n10

n9 *Id.,* ch 2, Deterring Cartel Behavior; ch. 4, Import Limitation Arrangements.

n10 *Id.,* ch. 6, Subject Matter Jurisdiction and Scope of Application of Law.

Fourth, on the opportunity for guidance, the Committee made recommendations that could help to strengthen the developing law in Eastern Europe, where, in the wake of the spectacular democratization movements, one nation after another has adopted an antitrust statute. The Committee urged not only a strengthening of cartel law but also respect for the freedom of enterprise. It expressed concern that over-enthusiastic intervention against single firm acts and distribution arrangements, including pricing decisions and exclusive dealership contracts, could remove basic incentives important to a free enterprise market system. n11 The Committee offered similar suggestions that could inform the law of the European Economic Community: nations should give owners of intellectual property the freedom to use their property rights (where no cartel is concerned); and constraining this freedom threatens to impair critical incentives to invent. n12

n11 *Id.,* ch. 10, Competition Policy, Eastern Europe and Other Newly Emergent Market Economies.

n12 *Id.,* ch. 9, Intellectual Property Issues.

The Committee considered the possibility of a more ambitious project: an attempt to harmonize all antitrust law particularly in regard to transnational transactions. Mindful, however, of the difficulties of harmonization, the inevitability of pressures to compromise, the lack of need for harmonization of all of antitrust law, and the benefits that will surely flow from the focused proposals of the Committee, the Committee recommended against a world code project at this time. n13

n13 See *id.,* ch. 11, A World Antitrust Code.

Nonetheless, the Committee's proposals are pragmatically harmonizing. If implemented, they should increase the competitiveness of business and the welfare of the citizens of the world by lowering the costs of competing and by raising the costs of cartels.

# EXHIBIT 23

# DEPARTMENT OF JUSTICE

## ANTI-CARTEL ENFORCEMENT: THE CORE ANTITRUST MISSION

**R. HEWITT PATE**
**Acting Assistant Attorney General**
**Antitrust Division**
**U.S. Department of Justice**

**Before the**
**British Institute of International and Comparative Law**
**Third Annual Conference on**
**International and Comparative Competition Law**
**The Transatlantic Antitrust Dialogue**
**London, England**

**May 16, 2003**

## I. Introduction

I am greatly honored to have been asked to address this prestigious conference, in the company of many distinguished friends and colleagues from the antitrust community. The British Institute of International and Comparative Law has organized a truly outstanding conference, and I appreciate the opportunity to take part in it.

My subject this afternoon is cartels. You may well ask, why is this fellow talking about that subject today, when it was on the agenda yesterday? There are two reasons. First, because I was told I could speak about what I thought was most important in the work of the Antitrust Division of the Department of Justice. Our sustained law enforcement effort against cartels, domestic and international, fits that description. And second, the topic is appropriate because this is a time when you in the United Kingdom have chosen – very soundly, in our view – to give Dr. John Vickers and his dedicated staff at the Office of Fair Trading both a mandate and the tools to implement an effective anti-cartel enforcement policy.

For decades, there were vigorous disputes in international fora about whether it made sense to prohibit cartel behavior by private firms. That debate has been resolved, in this country and elsewhere. As the Organization for Economic Co-operation and Development has recognized, cartels are "the most egregious violations of competition law."[1] Anti-cartel enforcement should therefore be a primary priority for every antitrust agency.

Cartels are an attack against free market economies. Modern history has shown the great economic harms and large-scale competitive disadvantages suffered by economies that are based

---

[1] OECD COUNCIL, RECOMMENDATION OF THE COUNCIL CONCERNING EFFECTIVE ACTION AGAINST HARD CORE CARTELS (1998).

on a cartel mentality. Cartels inflate prices, restrict supply, inhibit efficiency, and reduce innovation. Today, governments around the world accept the principle that "industrial progress [is] best . . . obtained in a free market, where prices are fixed by competition and where success depends on efficiency rather than market control."[2]

The antitrust laws act as the "most effective brake against the cartelization of industry."[3] Here, in the United Kingdom, the British government recently has taken significant steps to increase the braking power of its antitrust laws. The introduction of a new cartel offense, a leniency program, a new fining scheme, and expanded investigative powers under the 1998 Competition Act provide important tools to British antitrust enforcers in the fight against cartels in the United Kingdom. Moreover, in recognition of the pernicious effects of cartels, the 2002 Enterprise Act has criminalized cartel offenses for individuals – a very sound policy choice from our perspective. As Dr. Vickers recently explained: "Since hard-core cartels are like theft, criminalisation makes the punishment fit what is indeed a crime."[4]

As many of you know, the United States and the United Kingdom have not always seen eye-to-eye on the subject of cartels. But at this point in history, we can confidently say that we have come to share a common aversion to cartels and a common determination to eradicate them,

---

[2] THURMAN ARNOLD, FAIR FIGHTS AND FOUL 121 (Harcourt, Brace & World, Inc. 1951).

[3] *Id.* at 120.

[4] John Vickers, Policy for Markets and Enterprise, Speech Before the British Chamber of Commerce 4 (Mar. 31, 2003). The Office of Fair Trading has recently published a detailed consultation paper on how the criminal provisions of the Enterprise Act 2002 will work in practice. OFFICE OF FAIR TRADING, POWERS FOR INVESTIGATING CRIMINAL CARTELS (Apr. 2003). This paper and others relating to the Enterprise Act are available on the OFT's website at http://www.oft.gov.uk/enterpriseact.htm.

in the interest of our consumers and of keeping our respective economies competitive in this age of globalization.

**II. Current Antitrust Division Anti-Cartel Enforcement Program**

Since 1890, the Sherman Act has reflected the United States' "abiding faith that the elimination of competition in business [is] morally and economically wrong."[5] Today, all aspects of our enforcement program against cartels are robust. We currently have approximately 100 grand juries investigating suspected cartel activity, with about 40 of those investigating suspected international cartel activity.

Our rate of amnesty applications is at an all time high – in the first six months of this fiscal year, we have averaged three applications per month. With the increase in amnesty applications we have seen an increase in the quality and quantity of the evidence of a cartel and a corresponding increase in the rates of conviction in our cases. Cartel members who hope to get away with their illegal conduct increasingly are finding that the odds are against them.

Once convicted, defendants are paying a heavy price for their illegality. Over the past six years, the Division has obtained more than $2 billion in fines against corporations convicted of engaging in cartel conduct. Individual cartelists also have paid a heavy price for their illegal conduct. In the last fiscal year, the average jail sentence imposed in Antitrust Division cases was over 18 months – a Division record.

---

[5] ARNOLD, *supra* note 2, at 129.

Our cooperation with foreign antitrust authorities in cartel matters has never been better or more effective. In February of this year, for the first time ever, coordinated searches and drop-in interviews were conducted in an international cartel investigation by enforcement authorities from the United States, the European Union, Canada, and Japan. I want to emphasize that, over the past decade or so, we have developed a particularly excellent cooperative relationship with British government agencies on antitrust policy issues. With the enactment of an international law enforcement cooperation provision in the Enterprise Act, and the May 2001 decision of our two governments to apply the U.S.-U.K. mutual legal assistance treaty to antitrust matters in appropriate situations,[6] we also look forward to creating a close cooperative relationship on enforcement matters. This relationship is based – as sustainable relationships must be – on the principle of reciprocal benefit.

## III. Recent Antitrust Division Cartel Cases

I will take just a few moments to discuss some of our recent cartel cases. These prosecutions involve both individual and corporate defendants.

One of our more notable enforcement actions against an individual – at least one that has garnered a significant amount of media attention – is the prosecution of Alfred Taubman, the former chairman of Sotheby's auction house.[7] Taubman's trial was the first that involved testimony from a witness protected by amnesty, in this case, Christie's CEO. The defendant

---

[6] *See* OFFICE OF FAIR TRADING, THE OVERSEAS DISCLOSURE OF INFORMATION (Apr. 2003); DEPARTMENT OF TRADE AND INDUSTRY, CO-OPERATION WITH COMPETITION AUTHORITIES WORLDWIDE, *at* http://www.dti.gov.uk/ccp/ topics2/internationalpolicy.htm.

[7] *United States v. A. Alfred Taubman*, Cr. No. 01 CR 429 (S.D.N.Y. 2001), *aff'd*, 297 F.3d 161 (2d Cir. 2002).

fielded an antitrust "dream team" for the trial against our New York field office prosecution team. Mr. Taubman was convicted of fixing prices with Sotheby's supposed archrival Christie's. He was sentenced to serve a one-year jail term, which he currently is serving, and pay a $7.5 million fine.

We also have had several investigations and cases recently in which cartelists have taken advantage of government programs to aid disadvantaged areas. In the Cairo international waterworks construction case, the cartelists rigged bids for water treatment construction projects in Egypt that were funded by the U.S. Agency for International Development.[8] The defendants saw this humanitarian effort as an opportunity to fatten their own pockets by getting together to decide which company should win which project, to inflate bid amounts, and to pay cartel members "loser fees" to bid high or not bid at all on certain projects. Four companies ultimately pled guilty to participating in the cartel,[9] and fines of over $140 million were imposed. One cartel member was convicted after trial in February 2002 of bid-rigging and conspiring to defraud USAID and received a three year sentence.[10]

---

[8]The U.S. government agreed to fund Egyptian projects to improve the treatment of drinking and waste water as part of the Camp David Peace Accords in order to promote public health and foster stability in the Middle East.

[9] *United States v. Bilhar International Establishment*, No. CR-01-PT-302-S (N.D. Ala. 2001); *United States v. ABB Middle East & Africa Participations AG*, No. CR-01-N-0135-S (N.D. Ala. 2001); *United States v. Philipp Holzmann Aktiengesellschaft*, No. CR-00-N-0285-S (N.D. Ala. 2000); *United States v. American International Contractors, Inc.*, No. CR-00-N-0298-S (N.D. Ala. 2000).

[10] The Anderson conviction was recently affirmed by the Eleventh Circuit Court of Appeals. *United States v. Elmore Roy Anderson*, No. 01-00302-CR-PT-S, 2003 WL 1860516 (Apr. 11, 2003). Another individual defendant, Peter Schmidt, a member of the management board of cartel member Philipp Holzmann AG, also was indicted and remains an international fugitive. *United States v. Peter W. Schmidt*, No. CR-01-J-0303 (N.D. Ala. 2001).

Another investigation involving taxpayer-funded projects was our prosecution of bid-rigging of typhoon repair projects in Guam. In December 1997, Super Typhoon Paka hit the island of Guam, leaving an estimated 5,000 persons homeless.[11] Instead of fulfilling his duties to get the best price for the projects, Austin "Sonny" Shelton, a government official responsible for overseeing the repair projects, orchestrated bid-rigging schemes and demanded bribes so that he and his co-conspirators could benefit personally from Guam's efforts to recover from Typhoon Paka. Five individuals ultimately pled guilty to rigging bids for these emergency repair contracts,[12] and Shelton was convicted and sentenced to serve ten years in prison, the longest jail sentence ever imposed in an Antitrust Division case.[13]

Cartels victimize not only disadvantaged groups but also frequently victimize large businesses. These victims have included some of the biggest names in business – Coca-Cola, Proctor & Gamble, Tyson Foods, Kellogg, and Nestle, just to name a few. Large manufacturers were some of the most directly impacted victims of cartels in the vitamins, sorbates, citric acid, graphite electrode, and lysine industries. Of course, these five international cartels likewise

---

[11] Steve Harris and Rob Philbrick, *Typhoon Paka*, ¶ 3 (Dec. 1997), *at* http://www.eqe.com/publications/paka/paka4pg.html; *see also Super Typhoon Paka*, ¶ 1, *at* http://www.npmoc.navy.mil/jtwc/atcr/1997atcr/ch3/05cw.htm.

[12] *United States v. Jessie S. Pendon*, Criminal Case No. 01-00071 (D. Guam 2001); *United States v. Il Young Cho*, Criminal Case No. 01-00008 (D. Guam 2001); *United States v. Primitivo Duque Carlos*, Criminal Case No. 00-00123 (D. Guam 2000); *United States v. Young Soo Yoon*, Criminal Case No. 00-00092 (D. Guam 2000); *United States v. Kenneth Koo Lee*, Criminal Case No. 00-00091 (D. Guam 2000).

[13] *United States v. Austin J. "Sonny" Shelton*, Criminal Case No. 01-00007 (D. Guam 2001).

cheated consumers in the U.S., U.K., and elsewhere out of hundreds of millions of dollars, and implicated over $10 billion in commerce.

**IV. Increased International Prosecutions**

Today reports of cartel prosecutions come not only from the United States but from authorities around the world. Governments are building up their antitrust programs to detect and prosecute cartels that collude in secret to set prices, allocate contracts, and cheat and defraud consumers, businesses, and government programs. Many of the international cartels prosecuted by the United States have been prosecuted by multiple enforcement authorities, including the EC, Canada, Australia, Korea, Brazil and Mexico. Recent headlines have noted the EC's imposition of fines on six associations for fixing beef prices,[14] the Korea Fair Trade Commission's prosecution of six vitamin producers for their participation in the international vitamin cartel,[15] the Canadian Competition Bureau's prosecution of Rhone-Poulenc for its role in an international conspiracy to fix prices of the chemical methylglucamine used to record X-ray images,[16] and the prosecution by the Netherlands Competition Authority of shrimp wholesalers and producers for fixing shrimp prices.[17]

---

[14] Press Release, Eur. Comm'n, "Commission Imposes Fine on French Federations for Unlawful Agreement in the Beef Sector" (Apr. 2, 2003), *available at* http://europa.eu.int/rapid/start/cgi/guesten.ksh?p_action.gettxt=gt&doc=IP/03/479|0|RAPID&lg=EN&display=.

[15] Press Release, Korea Fair Trade Comm'n, "The KFTC Imposes Surcharges on the International Cartel of Vitamin Companies" (Apr. 25, 2003), *available at* http://ftc.go.kr/eng/.

[16] Press Release, Can. Competition Bureau, "Rhône-Poulenc Biochimie S.A. Sentenced to $500,000 Fine Following Competition Bureau Price Fixing Investigation" (Feb. 27, 2003), *available at* http://strategis.ic.gc.ca/SSG/ct02507e.html.

[17] Press Release, Neth. Competition Authority, "NMa Fines Shrimp Wholesalers and Shrimp Fishery Industry due to Price Agreements" (Jan. 14, 2003), *available at*

In light of this increased enforcement around the world, cartel members have come to recognize that the cost of getting caught is on the rise. Hopefully, this will result in the deterrence of cartel formation or continuation in many cases. In some other cases, however, we have seen cartel members taking a different approach to the threat of increased penalties – some have sought to obstruct our investigations.

In one recent investigation, we uncovered an elaborate plot to obstruct not only our investigation of price fixing in the carbon brush industry but also a potential EC investigation. Executives of Morgan Crucible gave the Division false information in an attempt to convince us that their price-fixing meetings with competitors were legitimate business meetings. They provided their co-conspirator with a written "script" containing this false information, requested that it follow the script when questioned by the Division, and warned its co-conspirator that if the U.S. investigation proceeded, the price-fixing investigation would spread to the EC. The Division charged The Morgan Crucible Company PLC, a British firm, with obstruction of justice arising from this witness tampering. Morgan Crucible pled guilty to the obstruction charges and its U.S. subsidiary, Morganite, Inc., pled guilty to price fixing. The companies were fined a total of $11 million.

---

http://www.nmanet.nl/en/nieuws_en_publicaties/persberichten/03-02.asp.

**V. International Cooperation**

Cooperation among antitrust authorities will remain an essential means of detecting and prosecuting international cartel activity. The key evidence of international cartels often is located abroad, and thus the investigation of such cartels requires investigative assistance from foreign authorities. Many of our recent cartel prosecutions were substantially aided by international investigative assistance. In the Cairo investigation, German authorities devoted over 100 German police officers to search multiple locations in Germany. The searches induced cooperation from subjects of the investigation, which previously had been lacking. This was critical to the cases we later brought. In our carbon fiber investigation, the Japanese government conducted searches for us, and discovered a document in Tokyo regarding pricing contacts among carbon fiber manufacturers that had been removed from the United States in order to conceal the documents from the grand jury. The discovery of this document and others ultimately resulted in our prosecution of two companies and one individual for obstruction of justice.[18]

As I mentioned at the beginning of my remarks, earlier this year the Antitrust Division, the EC Directorate-General for Competition, the Canadian Competition Bureau, and the Japanese Fair Trade Commission coordinated searches and drop-in interviews in an unprecedented level of cooperation in an international cartel investigation in the plastic additives industry.[19] It is no longer uncommon for international antitrust authorities to discuss

---

[18] *United States v. Toho Carbon Fibers, Inc.; Toho Tenax Co. f.k.a. Toho Rayon Co.; and Jinnosuke Takeda*, Cr. No. 02-281 (C.D. Cal. 2001).

[19] *See* Press Release, Eur. Comm'n, "Statement on Inspections at Producers of Heat Stabilisers as well as Impact Modifiers and Processing Aids - International Cooperation on

investigative strategies and to coordinate searches, service of subpoenas, drop-in interviews, and the timing of filing of charges in order to avoid the premature disclosure of an investigation and the possible destruction of evidence. We in the U.S. appreciate this international assistance with our efforts, and likewise hope wherever possible to assist our colleagues abroad with their own important efforts.

## VI. International Jurisdictional Issues

Before concluding today, I would like to discuss an important legal issue involving international cartels that may have particular resonance in this country: whether foreign plaintiffs can obtain treble damages in private lawsuits in United States courts for damages suffered solely in foreign markets. As many of you know, the availability of treble damages in U.S. private antitrust cases has long been a subject of horrified fascination in some circles in Britain. This is so despite the fact that – or perhaps *because* of the fact that – Congress' decision to permit such damage recoveries in antitrust cases traced its roots to a long tradition of multiple-damage statutory remedies in English law, dating at least as far back as the reign of King Edward I in the late thirteenth century.[20]

In any event, this issue has arisen precisely because of the successful detection and prosecution of international cartels by the Division and other antitrust agencies in recent years. With some frequency, foreign plaintiffs have sued in United States courts to recover treble damages arising out of foreign purchases of conspiratorially price-fixed items. They have sought

---

Inspections" (Feb. 13, 2003), *available at* http://europa.eu.int/rapid/start/cgi/guesten.ksh?p_action.gettxt=gt&doc=MEMO/03/33|0|RAPID&lg=EN&display=.

[20] *See* MICHAEL PRESTWICH, EDWARD I 271-272 (Yale University Press 1988).

to base jurisdiction on other sales to other victims by other conspirators that had an effect on United States commerce. These cases raise the issue of whether our Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), which is an amendment to the Sherman Act, allows such suits.

The U.S. Supreme Court has not yet ruled on this issue, and federal appellate courts are divided. Our Fifth Circuit, in the *Statoil* case,[21] read the FTAIA as requiring that the plaintiff's injury arise from the conspiracy's domestic anticompetitive effects. It dismissed the lawsuit because the plaintiff Norwegian oil corporation was injured in its North Sea operations, while the anticompetitive effect on U.S. commerce was felt in the Gulf of Mexico. But the Second Circuit, in *Kruman v. Christie's*,[22] and a panel of the District of Columbia Circuit in *Empagran v. Hoffman-LaRoche*,[23] ruled for the plaintiffs in comparable situations. In these two cases, involving foreign purchases from the fine arts and vitamin cartels respectively, the appellate courts held that if the global conspiracy has the necessary "direct, substantial, and reasonably foreseeable effect" on the U.S. domestic market under the statute, then the defendants fall within the reach of the antitrust laws without any requirement that the particular plaintiff actually suffered any injury from the conspiracy's effect in the U.S.

As the split among our appeals courts shows, this question of statutory construction is not easy. The Department of Justice and Federal Trade Commission, while recognizing this difficulty, nonetheless believe that the Fifth Circuit in *Statoil* got the better of the debate. In

---

[21] *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 427-28 (2001).

[22] *Kruman v. Christie's International PLC*, 284 F.3d 384, 399-401 (2002), *petition for cert. pending*, No. 02-340 (filed Sept. 3, 2002).

[23] *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 315 F.3d 338, 357 (D.C. Cir. 2003).

March, we and the FTC filed a brief *amicus curiae* before the D.C. Circuit in *Empagran*. We stated our view that the correct reading of the text and history of the statute, as well as concepts of antitrust injury and standing that Congress incorporated into the FTAIA, require that the particular plaintiff must have a "claim" under the Sherman Act. That is, the plaintiff's claim must arise from the domestic effects of the challenged conduct. We are also very sensitive to the admonition of our Supreme Court that "American antitrust laws do not regulate the competitive conditions of other nations' economies."[24] In our view, the FTAIA was never intended to alter that fundamental principle.

We also believe that an overly broad reading of the FTAIA could adversely affect the Division's leniency program and hence adversely affect U.S. criminal law enforcement against foreign cartels. Permitting suits for treble damages by foreign plaintiffs whose injuries arise from foreign conduct could well create a disincentive for corporations and individuals to report antitrust violations and seek leniency from the Antitrust Division, out of a fear that voluntary disclosure of wrongdoing would expose them to unbounded and unpredictable civil liability. We say this not out of sympathy for the cartelists. To the contrary, we use leniency grudgingly. But we are also realistic about the considerations that make our program work. Our leniency program is a critical component of our criminal enforcement program and our greatest source of leads regarding international cartels. We appreciate the additional deterrent value provided by civil lawsuits. But we must guard against the possibility that broader civil remedies might diminish the effectiveness of our public mission of detection and enforcement.

---

[24] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986).

This debate over the jurisdictional reach of antitrust laws has spilled over onto this side of the Atlantic. In the just the past few days, I have read with some interest press accounts of a recent English High Court decision that declined to dismiss on jurisdictional grounds private antitrust claims relating to the ongoing vitamin cartel litigation. The proceeding apparently includes claims, based on Article 81 of the European Treaty, that have been made on behalf of a German subsidiary that purchased vitamins from a German subsidiary of one of the cartel members. The defendants argued that the U.K. courts had no jurisdiction to decide any claims relating to transactions between these two German subsidiaries. The Court, however, ruled that plaintiffs could sue a U.K. subsidiary of the defendant cartel member for the damages alleged to have been suffered in Germany, even though the damages relate to trade with the German subsidiary of the defendant. It appeared to do so on the grounds that the plaintiffs had sufficiently alleged that the defendant English subsidiary helped operate the cartel in England. I am sure many competition lawyers will follow the case with interest as they have been following our own FTAIA line of cases.

I thank you for providing me with this opportunity to discuss the important topic of anti-cartel enforcement. I am confident that the commitment of the Antitrust Division and authorities around the world to vigorous anti-cartel enforcement will result in continued successful prosecutions of this harmful conduct and deterrence of cartel activity.

# EXHIBIT 24

LEXSEE 28 GW J. INT'L L. & ECON. 315

Copyright (c) 1995 George Washington University
George Washington Journal of International Law & Economics

1995

*28 GW J. Int'l L. & Econ. 315*

**LENGTH:** 12822 words

ARTICLE: FOREIGN BLOCKING STATUTES AND THE GATT: STATE SOVEREIGNTY AND THE ENFORCEMENT OF U.S. ECONOMIC LAWS ABROAD

**NAME:** R. Edward Price *

**BIO:**

* B.A. 1991, University of Massachusetts; J.D. 1994, The George Washington University Law School; LL.M. 1995, Cambridge University. I am grateful to Professor Ralph Steinhardt of The George Washington University Law School and Dr. A.V. Lowe of Corpus Christi College, Cambridge, for their helpful comments on earlier drafts of this Article.

**SUMMARY:**
... Their content, however, can at least reveal current opinion toward concepts that underlie the way international law is created. ... "Sovereignty," without an examination of its substantive content in each case, is not such a norm. ...

**TEXT:**

[*315] The International System itself is nothing other than a structure of ideas; and it has been made nowhere else than in the human mind. The international order forms the minds of those who make the international order. The masters of the world of tomorrow are the slaves of yesterday's ideas. n1

I. INTRODUCTION

Foreign blocking statutes exist largely as a response to attempts by the United States to enforce its antitrust law abroad. n2 Several countries have enacted a variety of such statutes, which often require specific approval of discovery requests by foreign parties, prohibit discovery with respect to certain domestic industries, or block the enforcement of foreign judgments within their country. n3 The application of U.S. law abroad, particularly with its comparatively wide scope of discovery, may be seen as intrusive and in violation of the sovereignty of foreign nations. n4 Foreign blocking statutes, however, are harmful in their own right and may be an overreaction to the problems of U.S. antitrust enforcement abroad. Although foreign governments justify blocking statutes with sovereignty concerns, n5 many of these statutes tend to be legal devices that shield industries from competitive outside forces. n6

[*316] International law traditionally did not allow application of a country's domestic law abroad against foreign nationals. n7 This practice began to change for the United States in the area of antitrust law during the late 1920s. In *United States v. Sisal Sales Corporation,* n8 the Supreme Court allowed jurisdiction over conduct that occurred both inside and outside the territorial boundaries of the United States. n9 Arguably, international law has evolved to allow application of a nation's domestic law abroad where the effects of certain foreign behavior are felt in that nation n10 -- an expansion of the so-called jurisdiction to prescribe. n11 These two developments, [*317] and the continuing globalization of markets and economic behavior, have yielded a legally complicated, yet rather predictable result:

Private businesses in the United States litigate against foreign competitors to enforce rights under aggressive U.S. economic laws, n12 particularly antitrust statutes n13 that provide for treble damages. n14

Attempts to enforce aggressive U.S. antitrust laws against anticompetitive behavior abroad have caused some foreign governments to claim that their sovereignty has been violated. n15 To protect this sovereignty from outside incursion, many of these governments enacted blocking statutes to prevent compliance with U.S. discovery orders within their borders. n16 Some countries have also enacted statutes that block the enforcement of certain judgments in their country. n17

[*318] Although sovereignty arguments are frequently used to justify these measures, one should not overlook the economic benefit that blocking statutes confer on industries within the countries that have enacted them: the ability to reap the benefits of sales in U.S. markets, while having the freedom to act on the fringes or outside of U.S. antitrust law with substantial impunity. When cast in these terms, blocking statutes can be seen as a form of protectionism cloaked in legal arguments that invoke sovereign prerogative and comity among nations, but that fail to acknowledge their substantive protectionist motivation and result.

Sovereignty concerns that underlie blocking statutes become less significant when one considers the obstacles U.S. plaintiffs must overcome in order to assert jurisdiction over foreign businesses in U.S. courts. There is a general presumption in the United States that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." n18 The Foreign Trade Antitrust Improvements Act explicitly requires a "direct, substantial, and reasonably foreseeable effect" on domestic commerce before extraterritorial jurisdiction may be obtained under the Sherman Act. n19 The extent to which U.S. courts will allow private enforcement of the Sherman Act abroad is also subject to the existence of personal jurisdiction over the defendant n20 and, in some federal circuits, to a jurisdictional "rule [*319] of reason" that requires a balancing of several factors. n21 Prudential and separation-of-powers considerations, such as the act of state doctrine, n22 require judicial abstention from adjudicating matters [*320] where the conduct of a foreign sovereign is at issue. n23 Additionally, the use of U.S.-style discovery practices, often characterized by other countries as free-wheeling, unsupervised "fishing expeditions" by the parties, n24 is subject to a balancing of the interests at hand. n25 U.S. courts thus consider the interests of foreign sovereigns and international comity to be important in the application of U.S. law to foreign actors.

Even when U.S. litigants can overcome this domestic legal threshold, a blocking statute may erect an impassable barrier, either by preventing the discovery of essential evidence, n26 or by preventing the enforcement of a U.S. judgment. n27 In these instances, sovereignty arguments justifying blocking legislation are substantially weakened because a U.S. court balancing all of the interests involved, including that of international comity, which itself encompasses sovereign equality, has decided that fairness dictates the foreign party's acceptance of U.S. jurisdiction and discovery practices. n28 The foreign government, however, frequently [*321] asserts a sovereign prerogative in continuing to protect its domestic industry, even though the industry's involvement in U.S. markets has reached a level encompassed by U.S. law and its sovereign interests were considered by U.S. courts in determining the extent to which evidence might be taken in its country.

Although determinations by U.S. courts should not always be the final arbiters that bind foreign governments vis-a-vis the United States, the persistent shielding of foreign industries from the enforcement of U.S. economic law is not simply an act of sovereignty, but an act of economic protectionism. This conclusion is supported by two distinct trends: the General Agreement on Tariffs and Trade (GATT), n29 including its Uruguay Round agreements, and the trend toward international cooperation in antitrust enforcement. The GATT contains broad language regarding the general prohibition of subsidies. n30 The Uruguay Round bolsters this prohibition with its Agreement on Subsidies and Countervailing Measures n31 and more effective dispute resolution measures. n32 A recent trend toward international cooperation in the [*322] enforcement of banking, securities, and antitrust law is also relevant to the issue of blocking statutes. This trend highlights the increasing importance of enforcing laws against anticompetitive behavior as world trade and the global economy grow. It also weakens sovereignty arguments that may thwart this enforcement.

This Article discusses the history and varieties of foreign blocking statutes and the U.S. concerns that surround them. It will then discuss the GATT, recent developments in the Uruguay Round, and the trend toward international cooperation in antitrust enforcement. This Article investigates whether recent GATT provisions favor economic fairness by prohibiting an exercise of sovereignty with possible protectionist tendencies, such as the enactment of certain blocking statutes, when a country's industries compete in foreign markets. Finally, the Article evaluates the prospects for challenging a blocking statute under the GATT as a "subsidy" and whether foreign sovereignty arguments should prevail in spite of a pronounced trend in favor of open trade and efficient markets. If nothing else, this Article attempts

to place blocking legislation in its proper conceptual context. By changing the way we think about this phenomenon, we take the first step in alleviating some of these statutes' negative effects.

II. FOREIGN BLOCKING STATUTES

A. *History*

Statutes that prohibit compliance with foreign discovery orders have been in existence for a large portion of this century. n33 Many of these fall into the category of bank secrecy laws enacted to encourage foreign investment and are thereby distinguished from statutes aimed against the enforcement of U.S. antitrust law. n34 This [*323] latter variety of blocking statute arose principally in response to private attempts to enforce U.S. law in *Uranium Antitrust Litigation,* n35 an antitrust suit brought by Westinghouse Electric against domestic and foreign uranium producers, including those from Canada, Australia, Switzerland, and South Africa, for an alleged conspiracy to fix prices in the uranium market. n36

When Westinghouse attempted to discover evidence in these countries, the foreign producers' governments reacted by passing blocking statutes, n37 filing diplomatic protests, n38 and appearing as amici curiae to argue against the assertion of jurisdiction for reasons of sovereignty and international comity. n39 Canada's diplomatic protest, filed in response to a possible court order to produce information in violation of its blocking statute, is illustrative of the legal, political, and economic concerns raised by these countries when the United States attempted to enforce its antitrust laws against their companies. It states, in part:

> A situation in which courts of the United States imposed sanctions for failure to produce documents or information located in Canada where such production would violate Canadian laws and regulations would be a matter of serious concern to the Government of Canada because it would subordinate to the procedures of U.S. courts the authority of the Government of Canada to prohibit the disclosure of certain information in Canada relating to the production and marketing of Canadian uranium. Such a failure on the part of courts in the United States to recognize the authority of the Canadian Government to prohibit such disclosure would be contrary to generally accepted principles of international law and would have an adverse impact on relations between the U.S.A. and Canada.
>
> . . . The participation of all Canadian uranium producers in certain uranium marketing arrangements was a matter of Canadian Government policy.
>
> [*324] . . . The policy was adopted following action by the United States Government which effectively closed the large U.S. market to Canadian and other foreign uranium producers, with severe adverse consequences for the Canadian uranium mining industry . . . . *The Canadian Government . . . was convinced that preservation of a viable uranium producing industry was essential to the Canadian national interest . . . .* n40

This protest displays Canada's sovereign interests in preventing U.S. judicial intervention in the form of sanctions for noncompliance with a discovery order. Indeed, the negative reactions of most governments to such attempts indicate that no international norm currently exists that would allow U.S. discovery practices to cross borders without considering other countries' sovereign prerogative. n41 The last sentence of the quoted portion of this protest, however, betrays the motivation behind the blocking statutes: the preservation of a viable industry, in this instance uranium, threatened by outside forces. Where such forces are simply a function of the market, this type of legislation is known as protectionism. n42 The legal insulation provided by blocking statutes thus [*325] functions in a subsidy-like manner because it encourages affected industries to continue to operate as cartels and thereby charge artificially high (or low) prices to maintain their profitability or existence.

B. *Varieties of Blocking Statutes*

Four varieties of blocking statutes have been passed in response to the extraterritorial application of U.S. law. The first of these "prohibit[s] any disclosure of documents or other information in connection with foreign discovery orders, unless the orders are passed through appropriate foreign governmental channels." n43 The second vests authority in a government agency to prohibit domestic compliance with certain foreign discovery orders. n44 The third type of blocking statute

> contain[s] either automatic prohibitions against disclosure of information regarding particular industries, or grants of administrative discretion to prohibit such disclosures. Representative examples of this type of statute include bank secrecy laws, statutes enacted to prohibit disclosure of information regarding

uranium production, and laws forbidding disclosure of information concerning the shipping industry. In almost all cases, these statutes were enacted in response to specific U.S. extraterritorial discovery efforts or investigations that were perceived abroad as threatening a particular foreign industry. n45

Finally, there is a type of blocking statute that prohibits the enforcement of certain foreign judgments. n46

All of these statutes in some way thwart the enforcement of U.S. antitrust laws; some, however, are more damaging than others. Those simply requiring litigants to lodge their discovery requests with a central authority in the foreign country may slow the discovery process, but are not an obvious hindrance to the litigation itself. Those vesting an authority with the power to deny discovery requests may have a greater impact, depending on how the power is exercised. Statutes that flatly prohibit disclosure of information regarding certain industries are ipso facto in place to protect those industries from the threat of litigation, and erect the most obvious barriers to U.S. antitrust actions. The protectionist function of this type of blocking statute is apparent. The last category, statutes that [*326] block the effect of foreign judgments, has largely the same protectionist result as the third.

The extent to which a given statute hinders parties in the United States from enforcing domestic antitrust laws deeply affects U.S. interests vis-a-vis that statute. It also determines that statute's market-distorting effects and the extent to which one may ultimately argue it is a subsidy-like device for the purposes of the GATT. n47

C. U.S. Concerns Regarding Foreign Blocking Statutes

Although countries have sovereign interests in protecting information within their borders, such an exercise of governmental power evokes sovereign interests in the United States over its economy and over litigation. As one U.S. circuit court has stated:

> The United States admittedly has a "national interest" of its own[,] . . . [that of] making certain that any litigant in its courts is afforded adequate discovery to the end that he may fully present his claim, or defense, as the case may be. Such is an understandable and legitimate interest. n48

Another U.S. circuit court characterized U.S. antitrust laws as "cornerstones of this nation's economic policies . . . ." n49 The desire to preserve competition and to deter anticompetitive forces, which is essential to a market economy, undoubtedly underlies these sentiments. n50 Further, former U.S. Attorney General Griffin Bell said the following:

> When we assert antitrust jurisdiction in United States foreign commerce we are not saying that no other nation may have legitimate interests, nor would we deny that sometimes those interests may conflict with our own. What we do say is that we have seen too often situations in international trade where failure to enforce our law against private antitrust conspiracies formed outside our jurisdiction to affect our markets, would have created gaping immunities from compliance with our law. By applying our antitrust laws to foreign persons who seek to do [*327] business in our markets, we are merely saying you are welcome in our markets if you abide by our rules of competition. n51

The extent to which this U.S. interest is characterized as "sovereign" provides a legal argument, based on sovereignty over activity with substantial effect within the United States, n52 that can logically counter the arguments posited by countries with blocking statutes based on sovereignty over documents within their borders. n53

Any discussion of U.S. interests, or of possible international legal ramifications, regarding foreign blocking statutes should include a consideration of both their demonstrated, practical effects on litigants and their larger macroeconomic effects. The former is an empirical analysis, while the latter invokes the logical economic result of blocking legislation. Both types are examined below.

1. The Effects of Blocking Statutes on Litigants

One legal commentator interviewed several international lawyers who had direct experience with blocking statutes to gain an understanding of their everyday effects on litigants. n54 Interestingly, this commentator concluded that blocking statutes seem to pose problems for foreign defendants as well as domestic plaintiffs. n55 For instance, a blocking statute might deter domestic plaintiffs from seeking preliminary injunctions due to the need for early discovery. n56 Ironically, however, the same statute might also encourage defendants to settle the case quickly; the prospect of sanctions for not producing documents in the United States, on the one hand, and sanctions for otherwise violating the foreign defendant's own blocking statute, on the other, make settlement an attractive option. n57 A

blocking statute may also work against defendants who would benefit by producing documents favorable to their position. n58

[*328] Aside from effects on individual parties, blocking statutes simply tend to make litigation more expensive and tedious. n59 The United States certainly has an interest in preventing unneeded complexities and expense in litigation. As the commentator who undertook this study wrote:

> Because blocking statutes have had adverse effects on antitrust litigation in the United States, the United States has an interest in seeing these blocking statutes repealed. Blocking statutes create tensions between the United States and the other country whose resident corporation is a defendant in an antitrust suit brought in the United States. . . . Moreover, the foreign hostility created by U.S. antitrust decisions can have spillover effects in areas having nothing to do with antitrust law. Finally, while the executive branch can decrease the likelihood that a country will implement its blocking legislation through its exercise of prosecutorial discretion, it cannot control a private litigant's decision to sue. n60

Another indication of the negative effects of blocking statutes is contained in a report of a statement by Assistant U.S. Attorney General Anne K. Bingaman regarding antitrust enforcement attempts by the U.S. Justice Department:

> "It is absolutely essential to crack the wall of discovery," she declared. The Division currently suffers "a terrible handicap" in prosecuting extraterritorial antitrust violations. Although there are a "shocking" number of cartels, largely in Europe and including one or two American firms, that disrupt competition in world markets, the Division is precluded from discovering relevant documents of foreign firms because of blocking statutes in those countries. n61

Blocking statutes, then, not only pose increased costs for private litigants, but they also prevent effective enforcement of antitrust laws by public authorities seeking to deter foreign cartels with operations in the United States.

2. The Macroeconomic Effects of Blocking Statutes

Because antitrust laws are in place to prevent anticompetitive economic behavior, which artificially raises prices to the detriment of consumers or lowers them to the detriment of the domestic industry, the extent to which foreign blocking statutes protect such anticompetitive behavior encourages artificial prices contrary to an [*329] efficient market. This statement of the negative economic effects of blocking statutes may be rather general, but it is nonetheless useful in examining the macroeconomic effects of blocking statutes.

A recent Canadian Supreme Court case highlights the political and economic problems that blocking statutes can cause. *Hunt v. Lac D'Amiante du Quebec Ltee* n62 involved a Quebec provincial blocking statute ostensibly passed to avoid discovery in U.S. antitrust cases, n63 yet applied in this case to domestic Canadian litigation arising in the courts of British Columbia. n64 The defendant in this tort case hid behind Quebec's blocking statute to prevent the discovery of documents in Quebec by a provincial court in British Columbia. n65 The Canadian Supreme Court struck down this domestic application of the provincial blocking statute, asserting it was contrary to Canadian federalism, to the common market that federalism was intended to create, and to principles of comity in general. n66 In its revealing opinion, the Canadian court stated:

> Everybody realizes that the whole point of blocking statutes is not to keep documents in the province, but rather to prevent compliance, and so the success of litigation outside the province that that province finds objectionable. This is no doubt part of sovereign right, but it certainly runs counter to comity. In the political realm it leads to strict retaliatory laws and power struggles. And it discourages international commerce and efficient allocation and conduct of litigation. It has similar effects on the interprovincial level, effects that offend against the basic structure of the Canadian federation.
>
> . . . .
>
> . . . The resultant higher transactional costs for interprovincial transactions constitute an infringement on the unity and efficiency of the Canadian market-place, as well as unfairness to the citizen. n67

One can logically conclude that the interprovincial effects of blocking statutes in Canada are the same as their international effects from country to country. If the Canadian Supreme Court's premise, that blocking legislation results in higher transaction costs and discourages international commerce, is accepted, then blocking legislation should be

viewed no differently than a number of [*330] nontariff barriers that arose around the same time in the 1970s. n68 Others have commented on the trade-distorting effects of such barriers. On the benefits of foreign trade and the maladies of nontariff barriers, one writer stated:

> Foreign trade connects national price systems into an international price system. Economics cannot even estimate how much of our present prosperity we owe to the ability to buy abroad what would cost more to produce at home. . . . The international price system as an information system is indispensable for its efficiency. . . . Quantitative restriction of imports severely impairs the operation of the price system, and therefore the quantitative estimates of trade under restriction are wholly inadequate. . . . In this context, the estimates of restricted trade take no account of subsidies, which are at present an almost equally important cause of price distortion in international trade. n69

This juxtaposition of the Canadian Supreme Court's characterization of blocking statutes and these comments about the deleterious effects of nontariff barriers provides new insight into the way blocking legislation should be considered in the future. It erodes the conception that blocking statutes are simply a way for certain countries to protect documents within their borders. Such statutes also impede types of litigation that these countries find particularly threatening; n70 and to the extent this impediment acts like a subsidy and discourages international trade, it causes distortions in the market efficiencies that set prices worldwide.

Because conflicts over foreign antitrust enforcement have been costly for all parties concerned, there has been a recent trend toward cooperation among countries in enforcement procedures. n71 It is worth noting the value of such cooperation as anecdotal evidence which counters suggestions that antitrust enforcement creates market inefficiencies and diplomatic strife. This cooperation highlights the need for a different solution that allows for better U.S. antitrust enforcement, but protects notions of [*331] sovereignty propounded by the foreign countries affected. The next section examines the GATT's usefulness as a regime of international law that reflects the value of open and efficient markets. In this way, the GATT may serve as a persuasive tool to encourage more cooperation in this area. It may also serve to highlight the undesirable effects of blocking statutes and their function of shielding anticompetitive behavior.

III. THE GENERAL AGREEMENT ON TARIFFS AND TRADE (GATT)

The GATT was established after the Second World War as a means of reducing tariffs and nontariff barriers among many of the developed, industrialized nations. n72 "In the years immediately after World War II, it was generally agreed that economic recovery from wartime destruction and dislocation depended on restoring former levels of international trade and, if possible, expanding them." n73 The GATT attempted to accomplish this purpose by prohibiting "internal restrictions," including taxes or other measures that discriminate against imports, n74 and by establishing the Most Favored Nation principle, which requires that trade advantages given by one GATT Member to any country be given to all GATT Members. n75 The GATT also discouraged the use of subsidies by Members to protect their domestic industries from competition abroad by requiring notification and consultations in the event of serious prejudice. n76 This section discusses GATT provisions on subsidies relevant to the application of foreign blocking statutes.

A. *GATT Article XVI -- Subsidies*

GATT Article XVI contains broad language on subsidies which generally prohibits their use. n77 It states:

> [*332] If any contracting party grants or maintains any subsidy, including any form of income or price support, which operates directly or indirectly to increase exports of any product from, or to reduce imports of any product into, its territory, it shall notify the Contracting Parties in writing of the extent and nature of the subsidization, of the estimated effect of the subsidization on the quantity of the affected product or products imported into or exported from its territory and of the circumstances making the subsidization necessary . . . .
>
> . . . .
>
> The contracting parties recognize that the granting by a contracting party of a subsidy on the export of any product may have harmful effects for other contracting parties, both importing and exporting, may cause undue disturbance to their normal commercial interests, and may hinder the achievement of the objectives of this Agreement. n78

A subsidy has been defined as "any advantage that distorts the market behavior of the recipient in favor of the subsidized transaction." n79 A country that shields its domestic industries from the economic laws of foreign countries where its exports are purchased implements a subsidy-like measure: Shielded industries are thereby able to collude and possibly engage in predatory pricing in the export market. n80 Proving this claim, however, becomes difficult when moving from theory to reality.

The original clause 4 of GATT article XVI prohibited an export subsidy only when it resulted "in the sale of such product for export at a price lower than the comparable price charged for the like product to buyers in the domestic market." n81 Proving this "bilevel" price effect required two showings: "(1) that the export price of the subsidized product is lower than its domestic price, and (2) that the difference is the 'result' of the subsidy." n82 It was quite difficult, then, under this original provision, to show that a product's price was lower as a result of the subsidy. n83 This requirement was removed, however, in 1979 when GATT's Contracting Parties opted for an unqualified subsidy provision that states: "signatories shall not grant export subsidies on products other than certain primary products." n84

[*333] Although there have been successful subsidy claims made under the GATT in the past involving a direct financial payment to an exporting industry n85 and tax relief for industries based on their level of exports, n86 the amorphous nature of the protection afforded by blocking statutes n87 makes concrete action under GATT Article XVI against them rather difficult. The GATT's strong and broad language regarding subsidies is nonetheless valuable in this context: GATT's Members have accepted the idea that protecting their own industries from market forces in foreign countries has unfair effects on prices and should not be done without substantial justification. n88 Blocking statutes, then, seem to violate the spirit of the GATT, if not its express terms.

It is difficult to determine whether more concrete action is available in this area after the Uruguay Round. The next subsection describes certain Uruguay Round changes regarding subsidies, with an eye toward predicting whether an expanded notion of "subsidy" may be enforced in the future.

B. *The Uruguay Round's Agreement on Subsidies and Countervailing Measures*

The Uruguay Round, concluded in late 1993, includes an Agreement on Subsidies and Countervailing Measures (Agreement on SCM). n89 This Agreement on SCM defines "subsidy" with more specificity than the original GATT, prohibits certain kinds of subsidies, and provides for countervailing measures in response. n90 A subsidy is deemed to exist under the Agreement on SCM if:

> [*334] (a)(1) there is a financial contribution by a government or any public body within the territory of a Member . . . i.e. where:
>
> (i) Government practice involves a direct transfer of funds (e.g., grants, loans, and equity infusion), potential direct transfers of funds or liabilities (e.g., loan guarantees);
> (ii) government revenue that is otherwise due, is foregone or not collected (e.g., fiscal incentives such as tax credits);
> (iii) a government provides goods or services other than general infrastructure, or purchases goods;
> (iv) a government makes payments to a funding mechanism, or entrusts or directs a private body to carry out one or more of the type of functions illustrated in (i) to (iii) above which would normally be vested in the government and the practice, in no real sense, differs from practices normally followed by governments; or
>
> (a)(2) there is any form of income or price support in the sense of Article XVI of the GATT 1994; and
> (b) a benefit is thereby conferred. n91

Under the Agreement on SCM, a given subsidy is either "prohibited," "actionable," or "non-actionable." n92 Prohibited subsidies are those contingent upon export performance or upon the use of domestic over imported goods. n93 "Actionable subsidies" include those which have "adverse effects to the interests of other Members, i.e.: . . . injury to the domestic industry of another Member . . . [or] serious prejudice to the interests of another Member." n94 "Serious prejudice" is deemed to exist in the case of, among others, "subsidies to cover operating losses sustained by an industry . . . ." n95 Also, to be actionable, a subsidy must be "specific to an enterprise [*335] or industry or group of enterprises or industries." n96 Blocking statutes would appear to fit more appropriately under the "actionable" category since none is contingent on export performance or use of domestic goods, which would otherwise place them in the "prohibited" category. Whether legislation like blocking statutes can constitute a "financial contribution," "income," or

"price support" as the Agreement on SCM requires, awaits the interpretation that should result from the strengthened dispute resolution mechanisms. n97

The question remains whether any of the foreign blocking statutes might meet the Agreement on SCM's criteria for an actionable subsidy. The four varieties of blocking statutes discussed above are: (1) those requiring litigants to go through appropriate governmental channels to obtain documents; (2) those vesting a government agency with power to prohibit domestic compliance with foreign discovery; (3) those prohibiting disclosure (or vesting discretionary prohibiting power in an agency) regarding particular industries; and (4) those prohibiting enforcement of certain foreign judgments. n98 The first two types of blocking statutes, as well as the fourth, do not appear to be industry specific enough on their face to be actionable under the Agreement on SCM. Without evidence [*336] that they are predominantly used by certain enterprises, n99 they would likely fall outside of the realm of subsidy prohibited by the Agreement. The third variety, however, appears to satisfy the Agreement's specificity requirement because it is aimed at particular industries. The complaining Member would have to prove that its domestic industry is harmed by the blocking statute or that it suffers serious prejudice. n100

Some type of calculation of the insulation afforded to the foreign industry by the blocking statute would be necessary for the showing of harm required under the Agreement. n101 A more modest alternative, however, might be a calculation of the damage award that would likely have resulted from litigation that the particular blocking statute was able to thwart. Where the statute's macroeconomic effects on a certain industry are too difficult to quantify, perhaps the damages asked for by the U.S. plaintiff, for which there is enough evidence, would be an adequate showing of harm under the Agreement on SCM. One must bear in mind, however, that the resolution of this issue is contingent upon a determination that a trade-distorting blocking statute qualifies as a "financial contribution," "income," or "price support" which is itself difficult to predict.

C. *Dispute Resolution After the Uruguay Round*

The Uruguay Round agreements contain an Understanding on Rules and Procedures Governing the Settlement of Disputes. n102 This Understanding applies except where it is superseded by dispute provisions in the individual agreements that comprise the Uruguay Round. n103 Although a detailed analysis of these newer dispute resolution procedures is beyond the scope of this Article, a brief discussion of the Uruguay Round's overall dispute resolution [*337] framework sheds light on the potential effectiveness of a subsidy claim against foreign blocking statutes.

Dispute settlement begins with consultations, n104 where Members are exhorted to "attempt to obtain satisfactory adjustment of the matter." n105 For disputes regarding actionable subsidies, the complaining party must include with its request for consultations "a statement of available evidence with regard to (a) the existence and nature of the subsidy in question, and (b) the injury caused to the domestic industry, or the nullification or impairment, or serious prejudice caused to the interests of the Member requesting consultations." n106 If the parties fail to settle the actionable subsidy dispute within sixty days, a party may request that a panel be established. n107 Panels may be comprised of either governmental or nongovernmental individuals. n108 This is a departure from the GATT's former preference for governmental officials and could lead to greater impartiality. n109 The Panel must issue a report on an actionable subsidy dispute within 120 days of the establishment of its terms of reference. n110 The Dispute Settlement Body (DSB) must adopt the Panel's report within thirty days, unless one of the parties appeals or the DSB decides by consensus not to adopt the report. n111 In the case of an appeal, the Appellate Body must issue a decision within sixty days. n112 The appellate report must be [*338] adopted by the DSB and unconditionally accepted by the parties, unless the DSB decides by consensus not to adopt the report within twenty days following its issuance. n113

The Agreement on SCM then provides for action against GATT Members with damaging, actionable subsidies:

> Where a panel report or an Appellate Body report is adopted in which it is determined that any subsidy has resulted in adverse effects to the interests of another Member . . ., the Member granting or maintaining such subsidy shall take appropriate steps to remove the adverse effects or shall withdraw the subsidy.
>
> In the event the Member has not taken appropriate steps to remove the adverse effects of the subsidy or withdraw the subsidy within six months . . ., and in the absence of agreement on compensation, the DSB shall grant authorization to the complaining Member to take countermeasures, commensurate with the degree and nature of the adverse effects determined to exist, unless the DSB decides by consensus to reject the request. n114

GATT dispute resolution procedures after the Uruguay Round are faster, particularly in the area of subsidies, n115 and more likely to result in a decision that is adopted, possibly allowing some form of countervailing measures. Whereas the older dispute procedures generally required a consensus for the adoption of panel reports, thereby giving the accused party in the dispute the ability to block an adverse panel report, n116 the newer procedures require a consensus for a report *not* to be adopted. n117 Invoking GATT dispute procedures is therefore likely to have greater potential for success in countering damaging behavior by the Members. The special provisions for even speedier resolution of subsidy disputes n118 evidences the GATT's concern over the damaging effects of subsidies and the large extent to which GATT Members, since the Uruguay Round, now view subsidies as trade-distorting tools that must be eliminated [*339] where damage and serious prejudice result in foreign markets. The GATT, therefore, exhibits a spirit that is contrary to the use of trade-distorting blocking statutes.

IV. THE RECENT TREND TOWARD COOPERATION IN ANTITRUST ENFORCEMENT

One last factor in the political milieu of blocking statutes that must be considered is the recent trend toward international cooperation in the enforcement of antitrust laws. Many commentators feel that cooperation is the only way to avoid increasing conflict in this area. n119 Such sentiments also exist in the areas of banking n120 and securities n121 regulation.

In the area of antitrust, an agreement between France and the United States is currently being negotiated and officials say that "the political will to conclude an agreement now exists in both countries." n122 The United States has executive agreements with Australia, Canada, and Germany that "have brought the enforcement authorities closer and have increased their ability to forestall problems through common approaches and more detailed notifications . . . ." n123 An agreement signed in 1991 between the United States and the European Community is "designed to promote cooperation and avoid conflicts in their antitrust enforcement activities." n124 Another development toward greater cooperation is [*340] a U.S. Justice Department proposal that was passed into law to enable its Antitrust Division to "negotiate with other countries' enforcement agencies, on a case-by-case basis, for document and witness exchanges." n125

Agreements of this kind may not only alleviate specific antitrust conflicts as they arise, but may also reduce the diplomatic tensions and legal questions raised by the use of blocking statutes. Additionally, they manifest a desire among many governments to enforce their antitrust laws effectively against businesses operating outside their borders.

V. BLOCKING STATUTES AND THE CONTINUING STATUS OF SOVEREIGNTY IN INTERNATIONAL LAW

A number of factors seem to provide the impetus for the enactment of blocking statutes in certain countries. These factors include: (1) the ability of governments to legislate based on the effects of foreign behavior within their borders; n126 (2) the scope and style of U.S. discovery practices; n127 (3) international legal notions about state sovereignty and comity; n128 and, most importantly, (4) the protectionist impulse to shield domestic industry from the sometimes painful effects of another country's economic laws. n129 One might therefore conclude that blocking statutes will continue to operate in the foreseeable future as long as these factors remain. But these are not the only trends at work in international law, economics, and politics. As we have seen, the GATT and its recent Uruguay Round agreements present a strong international norm that values the existence of efficient and growing markets and deters most practices that hinder these goals. n130 The recent trend toward cooperation, not confrontation, in the area of antitrust enforcement is also relevant. n131 All of these phenomena must be considered in order to gain an accurate conception of [*341] blocking statutes and the future of state sovereignty arguments that have heretofore justified them.

The creation of rules of international law that bind nations depends on the development of a custom that can be described as a norm. n132 When nations (or people, for that matter) act pursuant to a norm, they do so ipso facto out of a sense of obligation n133 -- hence, the requirement that states' practice is a norm of international law only if it is obeyed out of their sense of opinion juris. n134 The obligation out of which nations act may arise simply from a perceived positive requirement to do so or possibly from the fact that nations *value*, in the moral sense, the behavior constituting the norm. n135 In determining international law, we might therefore look to the values and ideas that underlie certain patterns of behavior in addition to the behavior itself.

In the area of extraterritorial enforcement of U.S. antitrust laws, states display conflicting kinds of behavior. One might conclude that only chaos exists and that no coherent direction will eventually emerge to bind states in the same way as established norms of international law. The GATT, however, suggests a different conclusion due to its consistent support for certain values. First, its strong antisubsidy and dispute resolution regimes may eventually be concrete

provisions the United States could use to repeal blocking statutes with the threat of countervailing measures. Second, the GATT embodies a general consensus among its Members that efficient international markets are to be valued and that anticompetitive national laws and practices should not prevail. The Uruguay Round strengthened these convictions and is, therefore, part of a long trend toward open and efficient markets and away from state practices that balkanize the world economy.

International agreements, unlike customary norms, do not necessarily create customary international law which is binding on nonsignatories. Their content, however, can at least reveal current opinion toward concepts that underlie the way international law is created. n136 The GATT and its recent agreements serve this function through their advancement of open trade and their limitations, in some areas, on state sovereignty.

[*342] For these reasons, pure state sovereignty arguments are bound to be chipped away by more substantive values held by the world legal order. Although the political will continues to exist for some types of trade barriers, n137 including those embodied in blocking statutes, protectionism has faced a steady decline since the GATT's inception. State sovereignty, as a norm of international law, has at the same time been the subject of competing ideas and practices -- indicated by phenomena such as the GATT, extraterritoriality, and blocking statutes. International society has demonstrably endorsed substantive values such as open markets, nondiscrimination in international trade, and the idea that subsidies are generally to be avoided. The idea of state sovereignty that some countries have erected as a shield to justify blocking statutes, however, turns a blind eye to these values and indeed suggests that international society should value nothing except countries' monopoly of force within their own borders.

Immanuel Kant wrote, "I ought never to act except in such a way that I can also will that my maxim should become a universal law." n138 Such a statement may be instructive in this context and one ought to question whether sovereignty qualifies as such a maxim. Because it has the potential for blindly endorsing a wide variety of state practices, both positive and negative, it is reasonable to conclude that a simplistic notion of state sovereignty is not a universal principle that should guide international legal thinking, particularly in the law that governs states' economic activities with one another. As Hans Kelsen wrote:

> In the sphere of international relations the view that the state is essentially sovereign is an individualistic philosophy, based on the individuality of the state. The dogma of sovereignty is not the result of scientific analysis of the phenomenon of the state, but the assumption of a philosophy of values. Consequently it cannot be contradicted scientifically. One can only show that an interpretation which proceeds from another assumption -- namely, from that of the sovereignty of the international legal community -- is just as possible, and that positive international law itself, so far as its validity is admitted, requires this interpretation. n139

[*343] Law, international or otherwise, implies obligation. Only that which proceeds from values logically held can be worthy of commanding our respect and compliance. "Sovereignty," without an examination of its substantive content in each case, is not such a norm. Trade-distorting blocking statutes that result from an antiquated notion of state sovereignty are evidence of the problems that doctrines of this kind can cause. A synthesis of the competing notions of sovereignty based on the values contained in the GATT seems to be the fairest and most beneficial way for a rethinking of sovereignty to emerge in this context.

VI. CONCLUSION

Claims of sovereignty have traditionally justified foreign blocking statutes that discourage enforcement of U.S. economic laws against foreign actors, despite the tremendous effects that anticompetitive conduct abroad can have on the U.S. economy and the world economy as a whole. The logical necessity of provisions deterring anticompetitive conduct argue powerfully against hollow assertions of sovereignty that run counter to efficient markets. The GATT's provisions discouraging all forms of protectionism and the trend toward international cooperation in enforcing antitrust laws jointly evidence the international order's increasing preference for efficient and open trade. Because sovereignty arguments fail to examine these values and the substance of the sovereign exercise at issue, they will continue to weaken as these trends further develop. A newer version of sovereignty based on the GATT and a recognition of competing values will take their place -- in today's ideas and tomorrow's reality.

**FOOTNOTES:**

n1 PHILIP ALLOTT, EUNOMIA: NEW ORDER FOR A NEW WORLD xv-xvi (1990).

n2 *See infra* notes 34-41 and accompanying text.

n3 *See infra* notes 16-17, 43-46 and accompanying text.

n4 *See* Gary B. Born, *A Reappraisal of the Extraterritorial Reach of U.S. Law, 24 LAW & POL'Y INT'L BUS. 1, 67 (1992).*

n5 *See infra* notes 37-41 and accompanying text.

n6 *See infra* note 42 and accompanying text.

n7 *See, e.g., American Banana Co. v. United Fruit Co., 213 U.S. 347, 356-57 (1909)* (holding the Sherman Act inapplicable to anticompetitive conduct occurring outside U.S. territorial jurisdiction).

n8 *United States v. Sisal Sales Corp., 274 U.S. 268 (1927).*

n9 *Id. at 276.* Jurisdiction was first asserted over conduct occurring *entirely* outside of the United States by the Second Circuit in *United States v. Aluminum Co. of Am., 148 F.2d 416, 443-44 (2d Cir. 1945).* The Supreme Court had certified the case, *United States v. Aluminum Co. of Am., 320 U.S. 708, 708-09 (1943),* to the Second Circuit due to an absence of a quorum of six Justices. As of 1993, the Supreme Court's most recent pronouncement on this issue came in *Hartford Fire Ins. Co. v. California, 113 S. Ct. 2891, 2909-10 (1993),* where the Court upheld jurisdiction over conduct occurring in Britain that had effects in the United States and was illegal therein, but was legal in Britain. The Court stated that comity principles did not block U.S. jurisdiction. *Id. at 2910.*

n10 *See, e.g., Increased Use of Extraterritoriality Could Threaten International Business, 53 Antitrust & Trade Reg. Rep. (BNA) No. 1322, at 532* (July 2, 1987) [hereinafter *Increased Use of Extraterritoriality*] (noting the widespread international practice of justifying application of domestic laws abroad with the "effects doctrine").

n11 Jurisdiction to prescribe "refers to 'the authority of a state to make its law applicable to persons or activities'." *Hartford, 113 S. Ct. at 2918* (citing the RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES 235 (1986) (Subchapter A: Principles of Jurisdiction to Prescribe)). The Restatement defines jurisdiction to prescribe as follows:

> Subject to § 403, a state has jurisdiction to prescribe law with respect to
> (1) (a) conduct that, wholly or in substantial part, takes place within its territory;
> (b) the status of persons, or interests in things, present within its territory;
> (c) *conduct outside its territory that has or is intended to have substantial effect within its territory*;
> (2) the activities, interests, status, or relations of its nationals outside as well as within its territory; and
> (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests.

*RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 402* (1986) [hereinafter RESTATEMENT] (emphasis added).

As one commentator has said:

> The U.S. position on extraterritoriality has ultimately won a substantial measure of acceptance in the international community. Other nations have increasingly abandoned territorial limits on their legislation in the post-War years. The competition laws of the Federal Republic of Germany expressly apply to any conduct that has unlawful effects within German territory, and have been so interpreted by German authorities. Likewise, although there is still debate over their precise reach, the competition law provisions of articles 85 and 86 of the Treaty of Rome apply extraterritorially to conduct outside the Community. Similar developments have occurred in other nations, including France, Switzerland, and Japan.

Born, *supra* note 4, at 67-68 (footnotes omitted). *But cf.* N.A. MARYAN GREEN, INTERNATIONAL LAW 186-87 (3d ed. 1987) (asserting that extraterritorial jurisdiction is "contrary to international law"); A.V. Lowe, *The Problems of Extraterritorial Jurisdiction: Economic Sovereignty and the Search for a Solution, 34 INT'L & COMP. L.Q. 724, 726-28 (1985)* (delineating legal and diplomatic conflicts that have arisen over the exercise of extraterritorial jurisdiction).

n12 *See Increased Use of Extraterritoriality, supra* note 10, at 532.

n13 The antitrust laws generally involved are the Sherman Act, *15 U.S.C. § § 1*-7 (1988 & Supp. V 1988), and the Clayton Act, partially codified at *15 U.S.C. § § 12*-18 (1988 and Supp. V 1988). *See, e.g., Hartford, 113 S. Ct. at 2909* (applying the Sherman Act to conduct occurring in Britain).

n14 *15 U.S.C. § 15*(a) (1988 & Supp. V 1988).

n15 *See infra* notes 37-41 and accompanying text.

n16 The following are examples of discovery-blocking statutes that affect compliance with certain foreign discovery orders: Foreign Proceedings (Prohibition of Certain Evidence) Act, 1976, Austl. Acts No. 121, § § 4-5 (allowing the Australian Attorney-General to restrict document production in response to a foreign tribunal exercising jurisdiction in a manner inconsistent with international law or comity in proceedings relating to Australia), *amended by* Foreign Proceedings (Prohibition of Certain Evidence) Amendment Act, 1976, Austl. Acts No. 202, *repealed by* Foreign Proceedings (Excess of Jurisdiction) Act, 1984, Austl. Acts No. 3, § § 6-7, 9 (1984) (allowing the Australian Attorney-General to prohibit certain evidence production and to reduce foreign antitrust judgments); Protection of Trading Interests Act, 1980, ch. 11, § 2 (Eng.) (allowing the British Secretary of State to prohibit certain document production requests from foreign tribunals); Evidence Amendment Act, 1980, N.Z. Stat. No. 6, § 48I (amending the Evidence Act of 1908 to allow New Zealand's Attorney-General to prohibit document production requests by foreign authorities if such requests infringe or prejudice the sovereignty of New Zealand). *See also* Deborah A. Sabalot, Comment, *Shortening the Long Arm of American Antitrust Jurisdiction: Extraterritoriality and the Foreign Blocking Statutes, 28 LOY. L. REV. 213, 276-79 (1982)* (providing a compilation of blocking statutes enacted by various nations).

n17 The following are examples of judgment-blocking statutes: Competition Act, 1985 S.C., ch. C-34, § 82(c) (Can.); Economic Competition Act of June 28, 1956, § 39(1) (Neth.), *as amended by* the Act of July 16, 1958, the Act of June 30, 1967, the Act of February 18, 1971, and the Act of December 15, 1971, *reprinted in* COMPETITION LAW IN WESTERN EUROPE AND THE USA NL.L.I-12 (D.J. Gijlstra ed., Supp. 38, Nov. 1982); Protection of Trading Interests Act, 1980, ch. 11, § 5 (Eng.). *See also* Sabalot, *supra* note 16, at 276-79 (providing a compilation of judgment-blocking statutes enacted by various nations). The British blocking statute

even contains a "clawback" provision, which gives losing British defendants in foreign proceedings a cause of action in British courts for return of that part of the foreign judgment which exceeded compensatory damages, i.e., multiple damage portions. Protection of Trading Interests Act, 1980, ch. 11, § 6 (Eng.).

n18 *Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949).* For a recent application of this presumption by the Supreme Court, see *EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 258 (1991)* (holding against extraterritorial application of Title VII of the 1964 Civil Rights Act without a "clear statement" from Congress that it intends such a result). Congress subsequently provided the requisite clear statement of its intent to protect U.S. citizens employed in foreign countries in the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1077 (codified at *42 U.S.C. § 2000e*(f) (Supp. V 1993)). Born argues that the territoriality presumption increasingly has been replaced by more expansive doctrines. *See* BORN, *supra* note 4, at 70-71.

n19 Foreign Trade Antitrust Improvement Act, *15 U.S.C. § 6a* (1988).

n20 *Id.* In order to have personal jurisdiction over a foreign business, absent service of process within the forum (transitory jurisdiction), *see Burnham v. Superior Court of Cal., 495 U.S. 604 (1990),* due process requires that the defendant have "minimum contacts" with the forum. *International Shoe, 326 U.S. at 316; see also World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980)* (requiring that jurisdiction not be asserted unless the defendant "purposefully availed" itself of the benefits of the forum's law and that the exercise of jurisdiction over the defendant be "reasonable"). These jurisdictional prerequisites weaken sovereignty arguments seeking to justify judgment-blocking statutes because the required level of involvement in the United States before jurisdiction attaches to the foreign industry is necessarily at a point where the courts deem it "fair" that the industry be subject to U.S. laws and be answerable to U.S. courts.

n21 *See, e.g., Timberlane Lumber Co. v. Bank of Am., N.T. & S.A., 549 F.2d 597, 613-14 (9th Cir. 1976)* (vacating a dismissal based exclusively on the effects test). The Ninth Circuit formulated the following test:

> A tripartite analysis seems to be indicated. . . . The antitrust laws require in the first instance that there be *some* effect -- actual or intended -- on American foreign commerce before the federal courts may legitimately exercise subject matter jurisdiction under those statutes. Second, a greater showing of burden or restraint may be necessary to demonstrate that the effect is sufficiently large to present a cognizable injury to the plaintiffs and, therefore, a civil *violation* of the antitrust laws. Third, there is the additional question which is unique to the international setting of whether the interests of, and links to, the United States -- including the magnitude of the effect on American foreign commerce -- are sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority.
>
> . . . .
>
> The elements to be weighed [in applying this third factor] include the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Id.* (citations and footnotes omitted).

Some other circuits have also adopted a jurisdictional rule of reason based on a balancing of interests. *See, e.g., O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 452-54 (2d Cir. 1987)* (upholding the district court's dismissal of antitrust suit on comity grounds), *cert. denied, 488 U.S. 923 (1988); Montreal Trading Ltd. v. Amax Inc., 661 F.2d 864, 869-71 (10th Cir. 1981)* (upholding a dismissal for lack of jurisdiction on comity grounds), *cert. denied, 455 U.S. 1001 (1982); Mannington Mills, Inc. v. Congoleum*

*Corp., 595 F.2d 1287, 1297-98 (3d Cir. 1979)* (holding the district court in error for dismissing an antitrust complaint without adequate preparation of a record to allow a balancing test to determine jurisdiction). The Restatement cites this rule of reason as the current rule of law. RESTATEMENT, *supra* note 11, § 403. *But cf. Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 952-53 (D.C. Cir. 1984)* (refusing to adopt a jurisdictional rule of reason); *In re Uranium Antitrust Litig., 480 F. Supp. 1138 (N.D. Ill. 1979), modified, 617 F.2d 1248, 1255 (7th Cir. 1980)* (allowing consideration of additional factors only after determining jurisdiction).

n22 In *Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964)*, the Supreme Court explained the act of state doctrine:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Banco Nacional de Cuba, 376 U.S. at 416* (quoting *Underhill v. Hernandez, 168 U.S. 250, 252 (1897))*.

n23 *See, e.g., id.* at 439 (concluding the act of state doctrine proscribes a challenge to a Cuban expropriation decree); *Oetjen v. Central Leather Co., 246 U.S. 297, 303 (1918)* (holding action by Mexico against a Mexican citizen unreviewable). *But see Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 706 (1976)* (refusing to extend the act of state doctrine to purely commercial business done by Cuban officials).

n24 *See* GARY B. BORN & DAVID WESTIN, INTERNATIONAL CIVIL LITIGATION IN UNITED STATES COURTS: COMMENTARY AND MATERIALS 349-50 (2d ed. 1992); James H. Carter, *Existing Rules and Procedures, 13 INT'L LAW. 5, 5 (1979)*.

n25 *Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct., 482 U.S. 522, 546 (1987)*. The alternative is the use of the Hague Convention on the Taking of Evidence Abroad, which may itself require a lesser degree of discovery, compared to U.S. law, due to the exceptions of several civil law countries to common law-style discovery under the Convention. *See* Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened for signature* Mar. 18, 1970, arts. 9, 11, *23 U.S.T. 2555, 2561-62*, 847 U.N.T.S. 241, 243. For a proposed analytical framework that achieves the goals stated in *Aerospatiale*, see David J. Gerber, *International Discovery After Aerospatiale: The Quest for an Analytical Framework, 82 AM. J. INT'L L. 521 (1988)*.

n26 *See infra* notes 43-45 and accompanying text.

n27 *See infra* note 46 and accompanying text.

n28 In *Societe Internationale* the Supreme Court considered the following factors in determining whether a U.S. court should order discovery abroad: (1) U.S. public policy; (2) the importance of the evidence subject to the order; and (3) the nationality of the party ordered to provide the evidence. *See* Societe Internationale pour *Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 204-05*. The Court, however, did not adopt this as a general rule applicable in all cases. *Id. at 205-06*. Subsequent to this decision, several circuit courts have adopted approaches that balance several factors, including the interests of the foreign party's state, when determining whether it is appropriate to order discovery abroad. *See United States v. Davis, 767 F.2d 1025, 1034-35 (2d Cir. 1985); United States v. First Nat'l Bank of Chicago, 699 F.2d 341, 345 (7th Cir. 1983): United States v. Bank of Nova Scotia, 691 F.2d 1384, 1389-90 (11th Cir. 1982), cert. denied, 462 U.S. 1119*

*(1983); In re Grand Jury Proceedings, 532 F.2d 404, 407* (5th Cir.), *cert. denied, 429 U.S. 940 (1976); United States v. First Nat'l City Bank, 396 F.2d 897, 901-02 (2d Cir. 1968).*

The Restatement also adopts a balancing approach:

> In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into account the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

RESTATEMENT, *supra* note 11, § 442(1)(c).

The Supreme Court itself has held that U.S. courts should respect international comity and the foreign sovereign's interest in determining what types of discovery procedures should be ordered. The Court stated:

> American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. . . . American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state.

*Aerospatiale, 482 U.S. at 546.*

n29 General Agreement on Tariffs and Trade, *opened for signature* Oct. 30, 1947, 61 Stat. A3, 55 U.N.T.S. 187 [hereinafter GATT].

n30 *See id.* art. XVI, 61 Stat. at A51-52, 55 U.N.T.S. at 182-84.

n31 *Agreement on Subsidies and Countervailing Measures*, Dec. 15, 1993, Hein's No. KAV 3778, GATT Doc. MTN/FA II-13 [hereinafter Agreement on SCM].

n32 *See* Understanding on Rules and Procedures Governing the Settlement of Disputes, Dec. 15, 1993, *33 I.L.M. 112 (1994)* [hereinafter DS Understanding]; Agreement on SCM, *supra* note 31, part X, at 35.

The dispute resolution measures have evolved from a conciliatory approach to one that is rule-oriented or legalistic. *See* Judith H. Bello & Alan F. Holmer, *U.S. Trade Law and Policy Series No. 16: Settling Disputes in the GATT: The Past, Present, and Future, 24 INT'L LAW. 519 (1990);* Eric Canal-Forgues & Rudolph Ostrihansky, *New Developments in the GATT Dispute Settlement Procedures*, 24 J. WORLD TRADE 67 (1990); Robert P. Parker, *Dispute Settlement in the GATT and the Canada-U.S. Free Trade Agreement*, 23 J. WORLD TRADE 83 (1989).

n33 *See, e.g.*, Jorg Schwarz, *Swiss Banking Secrecy: Not a Legend*, ECON. & FIN. PROSPECTS, Oct.-Nov. 1992, at 3 (containing an unofficial translation of article 47 of Switzerland's 1934 Federal Law on Banks and Savings Banks reserving regulations concerning "the obligation to testify and to furnish information to a government authority").

n34 *BORN & WESTIN, supra* note 24, at 371; Mark Brodeur, Note, *Court Ordered Violations of Foreign Bank Secrecy and Blocking Laws: Solving the Extraterritorial Dilemma, 1988 U. ILL. L. REV. 563, 569 (1988).*

> Secrecy and blocking laws differ significantly. Secrecy laws, unlike blocking statutes, do not distinguish between foreign and domestic requests for discovery, and are generally waivable on an individual basis by bank customers. These laws act not only to protect customer confidentiality, but also to attract foreign capital and create business in international banking and finance. Many countries with bank secrecy laws impose low tax rates on foreign funds and do not recognize evasion of foreign taxes as a crime. Conversely, blocking statutes are designed solely to prohibit disclosure to foreign sources and are not waivable by bank customers.

*Id. at 569* (footnotes omitted).

n35 *In re Uranium Antitrust Litig., 480 F. Supp. 1138 (N.D. Ill. 1979), modified, 617 F.2d 1248 (7th Cir. 1980).*

n36 *Uranium Antitrust Litig., 480 F. Supp. at 1143, 617 F.2d at 1254.*

n37 *See supra* notes 16-17 and accompanying text.

n38 *See, e.g., infra* note 40 and accompanying text (quoting Canada's diplomatic protest).

n39 *Uranium Antitrust Litig., 617 F.2d at 1253-55.*

n40 M.D. Copithorne, *Canadian Practice in International Law During 1978 as Reflected Mainly in Public Correspondence and Statements of the Department of External Affairs*, 17 CAN. Y.B. INT'L L. 334, 336-37 (1979) (emphasis added) (quoting Canada's secretary of state for external affairs' Nov. 8, 1978 diplomatic note to the U.S. Ambassador); *see BORN & WESTIN, supra* note 24, at 367.

n41 *See* RESTATEMENT, *supra* note 11, § 442, n.1; *BORN & WESTIN, supra* note 24, at 349-50; INTERNATIONAL L. ASS'N, REPORT OF THE FIFTY-FIRST CONFERENCE 565-92 (1964).

n42 The use of the word "protectionism" here is not meant to imply that states do not have a reasonable interest in economic autonomy. *See generally* Lowe, *supra* note 11, at 724 ("the right to control certain elements of economic activity is an essential component of sovereignty"). It is used to point out the trade-distorting effects that blocking statutes cause by insulating certain industries.

Traditional methods of protectionism have been described in this way:

> Governments typically impose a number of barriers to, and controls on, foreign trade transactions. The most common barrier is a tariff, a tax levied on imported goods at the time they cross the border. Another very common barrier is a quantitative restriction, which limits the quantity of specified goods allowed to cross the border during a given time period . . . . Governments also exercise a variety of other prohibitions and controls at the border for what might be called public policy purposes -- health, safety, morals, conservation, national security, and the like. . . .
>
> Governments commonly apply . . . [an]other type[] of trade . . . measure for the purpose of affecting foreign transactions[:] . . . a subsidy to national producers to help them sell at lower prices in competition with foreign goods.

ROBERT E. HUDEC, ENFORCING INTERNATIONAL TRADE LAW: THE EVOLUTION OF THE MODERN GATT LEGAL SYSTEM 3-4 (1993). Because many governments have the same motivation in enacting blocking statutes, *see supra* notes 33-40 and accompanying text, and the tradedistorting effects are

identical, *see infra* notes 62-69 and accompanying text, legislative measures that shield certain exporting industries from the antitrust laws of an importing country, i.e., blocking statutes, should be added to the list of protectionist measures taken by governments.

n43 *BORN & WESTIN, supra* note 24, at 372. "Recently enacted French blocking legislation contains this sort of automatic, blanket prohibition against compliance with foreign discovery orders." *Id.*

n44 *Id.; see supra* note 16 and accompanying text.

n45 *BORN & WESTIN, supra* note 24, at 372-73 (footnotes omitted).

n46 *See supra* note 17 and accompanying text.

n47 *See infra* notes 72-101 and accompanying text.

n48 *In re Westinghouse Elec. Corp. Uranium Contracts Litig., 563 F.2d 992, 999 (10th Cir. 1977).*

n49 *United States v. First Nat'l City Bank, 396 F.2d 897, 903 (2d Cir. 1968).*

n50 *See, e.g., United States v. Topco Assoc., 405 U.S. 596, 610 (1972)* (discussing the critical role of U.S. antitrust laws in the preservation of a free and competitive economy). *See generally* A.D. NEALE, THE ANTITRUST LAWS OF THE UNITED STATES OF AMERICA: A STUDY OF COMPETITION ENFORCED BY LAW 427-32 (1970) (discussing the motivations behind U.S. antitrust laws).

n51 *Address by United States Attorney General Griffen Bell to the Law Council of Australia, 17 July 1978 (extract), reprinted in* A.V. LOWE, EXTRATERRITORIAL JURISDICTION: AN ANNOTATED COLLECTION OF LEGAL MATERIALS 4-5 (1983).

n52 *See* RESTATEMENT, *supra* note 11, § 402(1)(c); *supra* note 11 and accompanying text.

n53 *See supra* note 40 and accompanying text.

n54 *See* Note, *Reassessment of International Application of Antitrust Laws: Blocking Statutes, Balancing Tests, and Treble Damages*, 50 L. & CONTEMP. PROBS. 197, 211-13 (1987).

n55 *Id.* at 211-12.

n56 *Id.* at 212.

n57 *Id.*

n58 *Id.* at 211.

n59 *Id.* at 211-12.

n60 *Id.* at 212-13.

n61 *Federal and State Officials Outline Priorities for Antitrust Enforcement, 65 ANTITRUST & TRADE REG. REP. (BNA) No. 1639, at 619* (Nov. 11, 1993).

n62 *Hunt v. Lac D'Amiante du Quebec Ltee, 109 D.L.R.4th 16 (1993).*

n63 *Id. at 24-26.*

n64 *Id. at 20.*

n65 *Id. at 21-22.*

n66 *Id. at 45.*

n67 *Id. at 43-45* (citation omitted).

n68 *See generally* JAGDISH BHAGWATI, PROTECTIONISM 43-59 (1988) (discussing the rise of trade barriers in the 1970s); JAN TUMLIR, PROTECTIONISM: TRADE POLICY IN DEMOCRATIC SOCIETIES 3-10 (1985) (examining the costs to the world economy caused by the growth of nontariff barriers during the 1970s). Nontariff barriers include voluntary export restrictions, countervailing duties, and anti-dumping provisions. BHAGWATI, *supra* at 43-53.

n69 TUMLIR, *supra* note 68, at 3.

n70 *See generally United Kingdom -- United States: Correspondence Concerning the British Protection of Trading Interests Bill, 1979, reprinted in* LOWE, *supra* note 51, at 183-86 (stating the United Kingdom's objections to the private treble damage action under U.S. antitrust law and its intention to introduce legislation to render such judgments unenforceable by its courts).

n71 *See* Lowe, *supra* note 11, at 726-32; *infra* part IV.

n72 HUDEC, *supra* note 42, at 3-4.

n73 *Id.* at 4.

n74 *Id.* at 3-4; *see* GATT, *supra* note 29, art. III, 61 Stat. at A18, 55 U.N.T.S. at 204-06.

n75 HUDEC, *supra* note 42, at 6; *see* GATT, *supra* note 29, art. I, 61 Stat. at A12, 55 U.N.T.S. at 196-98. GATT article I, cl. 1 states that "any advantage, favour, privilege or immunity granted by any contracting party to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other contracting parties." *Id.* cl. 1.

n76 GATT, *supra* note 29, art. XVI, 61 Stat. at A51-52, 55 U.N.T.S. at 250.

n77 GATT art. XVI, cl. 4 states:

> As from 1 January 1958 or the earliest practicable date thereafter, contracting parties shall cease to grant either directly or indirectly any form of subsidy on the export of any product other than a primary product which subsidy results in the sale of such product for export at a price lower than the comparable price charged for the like product to buyers in a domestic market.

GATT, *supra* note 29, art. XVI, cl. 4, *8 U.S.T. at 1777,* 278 U.N.T.S. at 184.

n78 GATT, *supra* note 29, art. XVI, cl. 1, 61 Stat. at A51-52, 55 U.N.T.S. at 250, art. XVI, cl. 2, *8 U.S.T. 1776,* 278 U.N.T.S. at 182-84.

n79 HUDEC, *supra* note 42, at 62.

n80 *See supra* notes 51, 61 and accompanying text.

n81 GATT, *supra* note 29, art. XVI, cl. 4, *8 U.S.T. at 1777,* 278 U.N.T.S. at 184.

n82 HUDEC, *supra* note 42, at 63.

n83 *Id.* at 64.

n84 *Id.* at 64 & n.12.

n85 *See* United States v. European Community: Payments and Subsidies on Oilseeds and Animal-Feed Proteins, 22 Apr. 1988 (L/6328), *summarized in* HUDEC, *supra* note 42, at 558-61 (subsidy payments made to EC oilseed processors for processing EC oilseeds, but not for processing foreign oilseeds). Another claim has resulted in a panel finding an export subsidy for certain canned fruits from the EC. *See* United States v. European Community: Production Aids on Canned Peaches, Canned Pears, Canned Fruit Cocktail and Dried Grapes, 19 Mar. 1982 (L/5306), *summarized in* HUDEC, *supra* note 42, at 496-98. The EC, the defendant, blocked the adoption of the panel's report, but the dispute was eventually settled. HUDEC, *supra* note 42, at 496-98.

n86 *See* European Community v. United States: Income Tax Legislations "Domestic International Sales Corporation" [DISC], 1 May 1973 (L/3851), *summarized in* HUDEC, *supra* note 42, at 456-57.

n87 *See supra* notes 43-46 and accompanying text (describing the discretionary nature of some blocking statutes, the application of others only to certain industries, and the varying application of blocking statutes to either discovery requests or judgments).

n88 *See* GATT, *supra* note 29, art. XVI, cl. 2, *8 U.S.T. at 1776, 278* U.N.T.S. art. 182-84.

n89 *See* Agreement on SCM, *supra* note 31.

n90 *See id.* parts I-II, V, at 1-5, 14-29.

n91 *Id.* art. 1, at 1 (footnote omitted).

n92 *Id.* arts. 2-4, at 3-14.

n93 *Id.* art. 3, cl. 1(a)-(b), at 3.

n94 *Id.* art. 5, cl. 1(a), (c), at 5 (footnotes omitted).

n95 *Id.* art. 6, cl. 1(b), at 6.

> Serious prejudice . . . may arise in any case where one or several of the following apply:
> (a) the effect of the subsidy is to displace or impede the imports of like product into the market of the subsidizing Member;
> (b) the effect of the subsidy is to displace or impede the exports of a like product of another Member from a third country market;
> (c) the effect of the subsidy is a significant price undercutting by the subsidized products as compared with the price of a like product of another Member in the same market or significant price suppression, price depression or lost sales in the same market;
> (d) the effect of the subsidy is an increase in the world market share of the subsidizing Member in a particular subsidized primary product or commodity as compared to the average share it had during the previous period of 3 years and this increase follows a consistent trend over a period when subsidies have been granted.

*Id.* art. 6, cl. 3(a)-(d), at 6-7 (footnote omitted).

n96 *Id.* art. 2, cl. 1, at 2.

> (a) Where the [subsidy] granting authority, or the legislation pursuant to which the granting authority operates, explicitly limits access to a subsidy to certain enterprises, such subsidy shall be specific.
>
> (b) Where the granting authority . . . establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, specificity shall not exist, provided that the eligibility

is automatic and that such criteria and conditions are strictly adhered to. The criteria and conditions must be clearly spelled out in law, regulation, or other official document, so as to be capable of verification.

(c) If, notwithstanding any appearance of non-specificity resulting from the application of the principles laid down in subparagraphs (a) and (b) above, there are reasons to believe that the subsidy may in fact be specific, other factors may be considered. Such factors are: use of a subsidy programme by a limited number of certain enterprises, predominant use by certain enterprises, the granting of disproportionately large amounts of subsidy to certain enterprises, and the manner in which discretion has been exercised by the granting authority in the decision to grant a subsidy. In applying this subparagraph, account shall be taken of the extent of diversification of economic activities within the jurisdiction of the granting authority, as well as of the length of time during which the subsidy programme has been in operation.

*Id.* art. 2, cl. 1(a)-(c), at 2 (footnotes omitted).

n97 *See infra* notes 102-118 and accompanying text.

n98 *See supra* notes 43-46 and accompanying text.

n99 *See supra* note 96 and accompanying text.

n100 *See supra* notes 94-96 and accompanying text.

n101 *See supra* notes 94-95 and accompanying text.

n102 DS Understanding, *supra* note 32.

n103 DS Understanding, *supra* note 32, art. 1, cl. 2, at 114. The following portions of the Agreement on SCM supersede the DS Understanding: art. 4, cls. 2-12 (concerning remedies for prohibited subsidies), art. 6, cl. 6 (requiring any member accused of having a subsidy causing serious prejudice to share all relevent information about market shares and prices of products with other members), art. 7, cls. 2-10 (concerning remedies for actionable subsidies), art. 8, cl. 5 (concerning binding arbitration for non-actionable subsidy disputes), n.33 (defining existing facilities), art. 25, cls. 3-4 (concerning notification of subsidies), art. 28, cl. 6 (regarding transitional arrangements), and Annex V (procedures for developing information concerning serious prejudice). *Id.* app. 2, at 132.

n104 *See id.* art. 4, at 116-17.

n105 *Id.* art. 4, cl. 5, at 116.

n106 Agreement on SCM, *supra* note 31, art. 7, cl. 2, at 8 (footnote omitted).

n107 *Id.* art. 7, cl. 4, at 8. If a prohibited subsidy is in dispute, a party may request the establishment of a panel only 30 days after the request for consultations. *Id.* art. 4, cl. 4, at 116. Note that the remedies for actionable and prohibited subsidies in the Agreement on SCM supersede the DS Understanding. *See supra* note 103. The DS Understanding requires a complaining party to wait 60 days before requesting a panel. DS Understanding *supra* note 32, art. 5, cl. 4, at 117.

n108 DS Understanding, *supra* note 32, art. 8, cl. 1, at 118.

n109 *See* Canal-Forgues & Ostrihansky, *supra* note 32, at 74.

n110 Agreement on SCM, *supra* note 31, art. 7, cl. 5, at 9. A panel resolving a prohibited subsidy must deliver its report within 90 days. *Id.* art. 4, cl. 6, at 4. "The composition of the Panel and its terms of reference shall be established within fifteen days from the date when it is established." *Id.* art. 7, cl. 4, at 8.

> Panels shall have the following terms of reference unless the parties to the dispute agree otherwise within twenty days from the establishment of the panel:
>
> "To examine, in the light of the relevant provisions in (name of the covered agreement/s cited by the parties to the dispute), the matter referred to the DSB [Dispute Settlement Body] by (name of party) in document DS/ . . . and to make such findings as will assist the DSB in making the recommendations or in giving the rulings provided for in that/those agreement/s."

DS Understanding, *supra* note 32, art. 7, cl. 1, at 118.

n111 Agreement on SCM, *supra* note 31, art. 7, cl. 6, at 9.

n112 *Id.* art. 7, cl. 7, at 9.

n113 *Id.*

n114 *Id.* art. 7, cls. 8-9, at 9.

n115 *See supra* notes 104-113 and accompanying text.

n116 *See* Ernst Ulrich-Petersmann, *Proposals for Improvements in the GATT Dispute Settlement System: A Survey and Comparative Analysis, reprinted in* 4 FOREIGN TRADE IN THE PRESENT AND A NEW INTERNATIONAL ECONOMIC ORDER 340, 367 (Detlev Chr. Dicke & Ernst-Ulrich Petersmann eds., 1988); Canal-Forgues & Ostrihansky, *supra* note 32, at 78; *see, e.g.*, United States v. European Community: Production Aids on Canned Peaches, Canned Pears, Canned Fruit Cocktail and Dried Grapes, 19 Mar. 1982 (L/5306) *summarized in* HUDEC, *supra* note 42, at 496-98 (panel report favorable to the plaintiff, the United States, blocked by the defendant, the European Community).

n117 *See supra* note 111 and accompanying text.

n118 *See supra* note 107 and accompanying text.

n119 *See, e.g.*, Robert Rice, *Anti-trust Extension 'Could Increase Conflict with UK'*, FIN. TIMES, Oct. 14, 1993, at 6 (describing the comments of Mr. Edmund Hosker, based at the British Embassy in Washington, D.C., regarding the possible negative effects of the U.S. Supreme Court's ruling in *Hartford Fire Insurance Co. v. California, 113 S. Ct. 2891 (1993),* on international cooperation with U.S. antitrust enforcement); *Steiger Lauds Recent Efforts Toward International Convergence of Antitrust, 9 Int'l Trade Rep. (BNA) No. 21, at 902* (May 20, 1992) ("International antitrust cooperation, rather than antitrust confrontation, offers 'the best hope of achieving a global economy where all companies are playing by similar rules and all countries are enforcing similar, if not identical, laws,' according to Federal Trade Commission Chairman Janet D. Steiger.").

n120 *See* Peter Blackman, *The BCCI Problem: System's Flaws Stymie Probes of Foreign Banks*, N.Y.L.J., Aug. 26, 1993, at 5.

n121 *France and U.S. Approach Agreement on Antitrust Cooperation and Assistance, 65 Antitrust & Trade Reg. Rep. (BNA) No. 1641, at 741* (Nov. 25, 1993).

n122 *Id.*

n123 *Id.*

n124 Joseph P. Griffin, *EC/U.S. Antitrust Cooperation Agreement: Impact on Transnational Business, 24 LAW & POL'Y INT'L BUS. 1051, 1055-56 (1993); see* Agreement Between the Government of the United States of America and the Commission of the European Communities Regarding the Application of Their Competition Laws, Sept. 23, 1991, *30 I.L.M. 1491 (1991).* The European Court of Justice recently overturned this agreement because it was concluded by the European Commission and not, as is required, by the Council. *Re* the E.C.-USA Competition Laws Co-Operation Agreement: France v. E.C. Commission [1994] 5 C.M.L.R. 517. The Commission, however, has submitted an identical agreement to the Council for approval. *EU/US: Antitrust Pact Sent to Council for Approval*, European Rep., Oct. 15, 1994, *available in* LEXIS, Europe Library, Alleur File.

n125 *Federal and State Officials Outline Priorities for Antitrust Enforcement, 65 Antitrust & Trade Reg. Rep. (BNA) No. 1639, at 619 (1993);* International Antitrust Enforcement Assistance Act of 1994, *15 U.S.C.A. § 6201* (West Supp. 1995).

n126 *See supra* notes 7-14 and accompanying text.

n127 *See supra* notes 24-25 and accompanying text.

n128 *See supra* notes 35-41 and accompanying text.

n129 *See supra* notes 40-42, 62-69 and accompanying text.

n130 *See supra* part III.

n131 *See supra* part IV.

n132 *See* RESTATEMENT OF FOREIGN RELATIONS LAW OF THE UNITED STATES (REVISED) pt. I, ch. I, intro. n. at 18 (Tentative Draft No. 1, 1980).

n133 *Id.* § 102(2).

n134 *Id.* cmt. c.

n135 *See id.* n.2.

n136 *See id.* cmt. i.

n137 TUMLIR, *supra* note 68, at 1 ("a very large proportion of international trade is under some kind of nontariff restraint").

n138 IMMANUEL KANT, GROUNDWORK OF THE METAPHYSIC OF MORALS 70 (H.J. Paton trans., 1950) (1785).

n139 Hans Kelsen, *The Pure Theory of Law and Analytical Jurisprudence, 55 HARV. L. REV. 44, 69 (1942).*