UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

In re: MONOSODIUM GLUTAMATE ANTITRUST LITIGATION

Civil 00-MD-1328 (PAM)

This Document Relates to:

---

Inquivosa S.A.; Petbowe Chemtrade Corp.; Plus Sun Co., Ltd.; and MCC Menssing Chemiehandel & Consultants GmbH, and Newco Trading Co., on behalf of all others similarly situated,

Civil 03-2997 (PAM)

Plaintiffs,

v.

Ajinomoto Co., Inc.; Ajinomoto USA, Inc.; Orsan S.A.; Cheil Jedang Corp.; C.J. America, Inc.; Miwon Co., Ltd.; Daesang America, Inc.; Takeda Chemical Industries, Ltd.; Kyowa Hakko Kogyo Co., Ltd.; Vedan Enterprises Group, f/k/a/ Tung Hai Fermentation Industrial Corp.; Archer Daniels Midland Co.; Ve Wong Corp.; Wei Chuan Foods Corp.; Yamasa Corp.; and Asahi Kasei Corp.,

Defendants.

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND STANDING**

---

## INTRODUCTION AND SUMMARY

Plaintiffs, all foreign purchasers in foreign commerce, provide this Court with no persuasive reason to ignore the principles of Empagran, antitrust standing requirements, the history of the FTAIA and the Sherman Act, the positions of the executive and legislative branches of the U.S. government, and the comity interests of foreign nations. The Court would have to set aside all of that, and forego the roadmap for making a decision here that the Supreme Court provided in its Empagran analysis, to allow this case to proceed. Instead, to come to the correct result, the Court need only follow the rules of construction that the Supreme Court has made clear govern when interpreting the FTAIA. The first "rule of statutory construction" is prescriptive comity – the courts should construe the FTAIA "to avoid unreasonable interference with the sovereign authority of other nations." F. Hoffman-La Roche Ltd. v. Empagran S.A., 124 S. Ct. 2359, 2366 (2004). The second rule of construction is Congress's intent – "Congress designed the FTAIA to clarify, perhaps to limit, but not *to expand* in any significant way, the Sherman Act's scope as applied to foreign commerce." Id. at 2369 (emphasis in original).

Plaintiffs dismiss the heart of Empagran and these rules of construction as mere "policy concerns." Pl. Mem. at 18, 20. They attempt to convince this Court to open its doors to a type of foreign purchaser class action never litigated in the U.S. before Congress's passage of the FTAIA in 1982. Nor have such cases been successful since 1982. Plaintiffs cite not a single case, over the century since the Sherman Act's passage, where foreign purchasers in foreign commerce, claiming an international price-fixing conspiracy tied to anticompetitive effects on U.S. commerce only by the potential of arbitrage, have been allowed to go forward in a U.S. courtroom. In light of Congress's purpose not to expand U.S. jurisdiction, the FTAIA cannot be read to allow such cases.

Moreover, Plaintiffs' approach toward international comity amounts to the kind of "legal imperialism" that, as the Supreme Court emphasized, Congress could not have intended in passing the FTAIA. 124 S. Ct. at 2366-69. U.S. and foreign antitrust enforcement authorities unanimously agree that cases like Plaintiffs', if allowed to go forward, would constitute an unreasonable and unnecessary encroachment upon other nations' sovereignty. Indeed, those same enforcement authorities emphasize that recognizing jurisdiction here would harm, rather than help, the deterrence and punishment of international price-fixing conspiracies. Congress has established an antitrust enforcement scheme that focuses on U.S. commerce and that creates the deterrents it deems appropriate. Plaintiffs, five foreign companies, cannot usurp U.S. lawmaking and foist their simplistic view that "more U.S. treble damages suits equals better deterrence" on this country's courts and on the commerce of every other nation in the world.

## PLAINTIFFS CONSTRUE THE FTAIA WITHOUT REGARD TO THE RULES OF EMPAGRAN AND TRY TO EVADE ANTITRUST STANDING REQUIREMENTS; UNDER THE GOVERNING LAW, THE COMPLAINT IS LEGALLY INSUFFICIENT

Plaintiffs plead only one purported link between the alleged U.S. effects of this conspiracy and their asserted harm from purchases solely in foreign commerce – the indirect link that fixed U.S. prices allegedly prevented arbitrage and thus were one necessary, "but for" condition for fixed prices overseas. Am. Com. ¶¶ 40-44, 55-56. At issue now is whether that sole alleged link is legally sufficient to meet the requirements of the FTAIA, confer subject matter jurisdiction on this Court, and provide antitrust standing for foreign purchasers. It is not.

### A. Plaintiffs' Case, With Only An Indirect, Potential Arbitrage Link To U.S. Commerce, Is Without Historical Precedent And For That Reason Alone Fails

The most glaring hole in Plaintiffs' presentation – a determinative one – is their inability to point to a single historical precedent for foreign purchase suits, in the context of international price-fixing schemes, being litigated in U.S. courts under U.S. law. This hole is clearly not

because international cartels are new, but because U.S. law does not police foreign commerce; it is only where direct, immediate causation exists between harms in U.S. commerce and harms abroad that American law and courts might have the power to intervene. Indeed, Plaintiffs cannot even find any analogous, non-cartel cases, where companies engaged in exclusively foreign commerce have alleged some similar, indirect tie between U.S. harms and their claims to gain jurisdiction and standing here. As the Supreme Court found in Empagran, the FTAIA was a clarifying enactment that did not seek to expand the application of U.S. law to foreign commerce, and thus it must be read to remain consistent with pre-1982 case law. 124 S. Ct. at 2369-71. That case law reflects no U.S. involvement in foreign disputes like Plaintiffs'.

Plaintiffs refer to only two cases in asserting that "pre-FTAIA case law supports Plaintiffs' claims," Pl. Mem. at 21-22, neither of which does so. The only appellate decision, Pfizer, Inc. v. Government of India, 434 U.S. 308, 311 (1978), decided a narrow, certified question: whether a foreign nation could be a "person" under Section 4 of the Clayton Act. The Pfizer decision stated explicitly that it did "not involve any novel concept of the jurisdiction of the federal courts." Id. at 318. It did not rule on whether any particular claim was justiciable. Rather, all it decided was that "[w]hen a foreign nation enters our commercial markets as a purchaser of goods or services, it can be victimized by anticompetitive practices just as surely as a private person or a domestic State"; "[w]e hold today only that a foreign nation otherwise entitled to sue in our courts is entitled to sue for treble damages under the antitrust laws to the same extent as any other plaintiff." Id. at 318, 320 (emphasis added).

The FTAIA House Report cited Pfizer for this unremarkable holding, but there did not discuss (as Plaintiffs imply) purchases wholly in foreign commerce or find domestic connections "wholly irrelevant," Pl. Mem. at 22 & n.21. Rather, the Report carefully referred not to

purchases abroad but to "tak[ing] title abroad or suffer[ing] economic injury abroad" and emphasized the necessary grounding in "the domestic marketplace":

> Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do. . . . H.R. 5235 preserves antitrust protections in the domestic marketplace for all purchasers, regardless of nationality or the situs of the business . . . .

H.R. Rep. No. 97-686 at 10, reprinted in 1982 U.S.C.C.A.N. 2487, 2495 (emphasis added); see also id. (noting that this result is consistent with international treaties and thus comity, and aids deterrence based on "a substantial nexus to this country").

Plaintiffs' reliance on Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research and Engineering Co., No. 75 Civ. 5828-CSH, 1977 WL 1353 (S.D.N.Y. Jan. 18, 1977), is similarly misplaced. In that case, the plaintiff Italian corporation entered the U.S. marketplace to purchase design and engineering services and was choosing between two U.S. firms for those services. Although one U.S. corporation significantly underbid the second (Exxon Research and Engineering), the plaintiff alleged that Exxon illegally coerced it to hire Exxon's engineering arm, and simultaneously limited competition in U.S. commerce, by entering into a reciprocal dealing agreement with the plaintiff that coupled the engineering work with oil refining services. The court viewed the plaintiff's injury as occurring, at least in part, in domestic commerce:

> Plaintiff is not precluded from raising this domestic restraint of trade in support of its own case because its "injury" in defendants' view can in a theoretical sense be confined to Italy. Such is not the case. As previously stated, when coercion is present in a reciprocal relationship, the antitrust injury experienced by the buyer-victim is comprised of both the foreclosure [of domestic competition] and imposition aspects of that anticompetitive practice, and consequently, the foreign plaintiff is not without standing to cite the deleterious domestic effects in support of his own antitrust complaint.

Id. at *11 (emphasis added). The court explained that "where duress is present in a reciprocal transaction, the evils of foreclosure and imposition merge into a single antitrust injury." Id. (emphasis added). The claim in Industria Siciliana is obviously not at all like plaintiffs' claim

here: the Italian plaintiff purchased services in the United States; the case involved a single, coercive agreement between plaintiff and defendants that, in one action, simultaneously diminished U.S. competition and raised the plaintiff's price for services from a U.S. firm; and, in that very specific reciprocal dealing context, the court found a single injury that "inextricably bound up" the imposition of a higher price on plaintiff with "domestic restraints of trade." Id.[1]

**B. The FTAIA Requires A Direct And Fundamental Causal Relationship Between U.S. Anticompetitive Effects And A Claim Based On Foreign Transactions**

Plaintiffs' citation to cases far afield from antitrust law, and with more passive and diffuse language than the FTAIA, says nothing about the causal relationship that is needed to satisfy the FTAIA and antitrust standing principles. Cf. Pl. Mem. at 13-14 & n.7.[2] In its "gives rise to a claim" language, the FTAIA requires that Defendants' "direct, substantial, and reasonably foreseeable effect" on U.S. commerce caused Plaintiffs to have a claim, with the requisite standing, under the Sherman Act. 15 U.S.C. § 6a; see Def. Mem. at 8-14, 22-25. A mere "but for," indirect relationship – what Plaintiffs at most allege here – is not enough. Id. Nor are all forms of "proximate causation" sufficient. The active "gives rise to" language in the antitrust context, and the requirement of a viable antitrust "claim," indicate more fundamental and original causation than some of the relationships that might be encompassed within tort ideas

---

[1] In contrast to the single injury and single plaintiff situation in Industria Siciliana, moreover, here there are two distinct (not "inextricable") classes of persons – those whose injuries arose from domestic purchases and those whose injuries were foreign. The former group has already sued and appropriately pursued U.S. civil remedies.

[2] Plaintiffs reference to MM Global Services, Inc. v. Dow Chemical Co., 329 F. Supp. 2d 337, 342 (D. Conn. 2004), also is not helpful, because that opinion considers only whether the plaintiffs there had made a bare, conclusory allegation of a connection between U.S. effects and their claim, and does not analyze whether the facts pled alleged a legally sufficient connection. Cf. Def. Mem. at 3-4. But if one reviews the previous opinion in MM Global Services, 283 F. Supp. 2d 689 (D. Conn. 2003), the dispositive differences between that case, which has been allowed to go forward for now, and this one are apparent. MM Global involves contractual arrangements whereby the plaintiffs (a Texas corporation and three foreign corporations) bought in the United States products from a Delaware corporation with its principal place of business in Singapore and "title and risk of loss" passed in the United States; plaintiffs are complaining about diminished competition in "the sale and resale of [Union Carbide] products in and from the United States" in a scheme that allegedly also aimed at maintaining resale prices in India. Id. at 693-96 (emphasis added). The MM Global decisions make clear that plaintiffs there were participants in U.S. commerce and their claims were directly caused by U.S. harms.

of proximate cause. Plaintiffs wish otherwise, but this is a stringent, antitrust standard of causation. See Def. Mem. at 8-14, 22-25; cf. Pl. Mem. at 13-14.

The post-1982 case law uniformly confirms that more than Plaintiffs' allegations are required to satisfy the FTAIA and establish subject matter jurisdiction. No extant ruling finds jurisdiction on as weak a connection to U.S. commerce as asserted here – the U.S. effects merely preventing potential arbitrage while Defendants directly caused plaintiffs' injuries through solely foreign transactions.

For example, contrary to Plaintiffs' representations, Pl. Mem. at 14-15 & n.10, the plaintiff Statoil in Den Norske Stats Oljeselskap As v. Heeremac Vof, 241 F.3d 420, 425 (5th Cir. 2001), asserted the very same kind of pricing interrelationship as Plaintiffs assert here. Statoil argued that defendants had to maintain their fixed, monopolistic pricing in the U.S. in order to sustain that pricing in the North Sea, and vice versa. The Fifth Circuit squarely rejected that type of "but for" relationship as insufficient under subsection 2 of the FTAIA, explaining that while purchasers of heavy barge services in U.S. commerce could sue for their injuries under the alleged global scheme, those injured in foreign commerce could not. Id. at 427. Indeed, the Den Norske ruling endorsed exactly the result Defendants urge here, rejecting a dissenting view:

> The dissent notes with disapproval that our interpretation of the FTAIA means that "a foreign cartel that fixes prices worldwide will be subject to suit under the Clayton Act only from plaintiffs injured in American commerce." However, our reading produces the precise result intended by Congress—that "[f]oreign purchasers should enjoy the protection of our antitrust laws *in the domestic marketplace*, just as our citizens do." H.R.Rep. No. 97-686, at 10-11.

214 F.3d at 427 n.23 (emphasis in original).[3]

[3] In trying to distinguish Den Norske and to obscure the large number of cases that would come to the U.S. if their interpretation prevails, Plaintiffs pretend as if the FTAIA's application depends upon the anticompetitive activity involving "fungible, easily transportable goods." Pl. Mem. at 14, 25. The FTAIA contains no such distinction. Rather, the FTAIA exempts foreign behavior from scrutiny under the U.S. antitrust laws except where there is a sufficiently direct causal relationship between anticompetitive harms in the U.S. and the plaintiff's claim. The statute does not turn on the type of goods or services at stake, or the form of anticompetitive activity. As Den

Because Plaintiffs' "but for" connection to U.S. effects fails to adequately support jurisdiction and standing, Plaintiffs imply other purported connections to U.S. commerce. Although Plaintiffs say otherwise in their brief, there is no allegation anywhere in the Amended Complaint that Defendants' "purposefully and directly prevented Plaintiffs from buying MSG and Nucleotides from the United States." Cf. Pl. Mem. at 6, 12 & n.6, 30-31 & n.29. Indeed, there is no allegation that Plaintiffs ever sought or attempted to buy from the U.S. Nor can they claim that they knew trying to buy here would be futile, because they have alleged that the claimed conspiracy was hidden from them. Am. Com. ¶¶ 58-67; cf. Pl. Mem. at 12. Plaintiffs simply operated outside U.S. commerce.

Moreover, Plaintiffs made-up export connection to the U.S. does not help their case. The FTAIA explicitly states that restraints on U.S. export commerce can provide the basis for jurisdiction only for American competitors of the exporters. 15 U.S.C. § 6a (if U.S. effect is on exports, the Sherman Act "shall apply to such conduct only for injury to export business in the United States"); Empagran, 124 S. Ct. at 2367 ("Congress sought to *release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm") (emphasis in original); cf. Pl. Mem. at nn. 6, 29, 31.

As the foregoing point shows, and as Empagran held, the Sherman Act and the FTAIA within it "can apply and not apply to the same conduct, depending upon other circumstances." 124 S. Ct. at 2371-72. That the overarching conduct is an alleged worldwide conspiracy, just as it was in Empagran, does not answer whether the FTAIA allows jurisdiction over claims involving particular transactions and harms – here direct transactions in foreign commerce, where the U.S. effects of the conspiracy did not "give rise to" the claims. Cf. Pl. Mem. at 15-18.

Norske demonstrates, there are many contexts in which plaintiffs in foreign commerce might argue that U.S. pricing and foreign pricing for goods or services are related and that both sustain an anticompetitive scheme. That mere "but for" condition, however, is not sufficient for jurisdiction and standing in the U.S.

These Plaintiffs cannot sue under U.S. antitrust law not simply because given transactions took place overseas, but because those transactions were wholly in foreign commerce and the U.S. commerce effects that our law targets had an insufficient causal relationship with Plaintiffs' harms. See 15 U.S.C. § 6a.

### C. The FTAIA Must Be Construed To Respect International Comity

Plaintiffs brush aside comity, which dictates a long-standing U.S. rule of statutory construction, by complaining that Defendants cite an 1804 case. Pl. Mem. at 23. The Supreme Court, citing the same case and emphasizing the importance of prescriptive comity, directs otherwise. Empagran, 124 S. Ct. at 2366. To the extent that the FTAIA's "gives rise to a claim" language leaves any ambiguity, it must be construed to "take account of the legitimate sovereign interests of other nations." Id. Similarly, the Supreme Court has already rejected Plaintiffs' contention that because nations differ on remedies for price-fixing cartels, rather than on whether price-fixing should be permissible, there is no comity issue here. Id. at 2368.[4]

Neither the United States nor foreign nations agree with Plaintiffs that their expansive interpretation of the FTAIA can be squared with comity obligations. As the United States wrote in its amicus brief to the D.C. Circuit on remand in Empagran:

> Plaintiffs' theory is stunning in its sweep: it invites foreign consumers to sue their local suppliers in U.S. courts, alleging only an international conspiracy, a worldwide market, and a *theory* of arbitrage. . . . [I]t encompasses all international cartels. . . .
>
> Opening U.S. courts to antitrust class actions from around the world . . . would interfere with the sovereign decisions of other nations about the appropriate remedies to offer their consumers, their ability to regulate their commercial affairs, and their antitrust amnesty programs.

[4] Instead of recognizing that "gives rise to a claim" must be construed in a stringent fashion, so that American courts respect comity and are not stepping into what is properly the jurisdiction of other sovereigns, Plaintiffs suggest that the U.S. courts distort other doctrines to try, post hoc, to address the damage done to foreign relations by an incorrect result here. Pl. Mem. at 25 & n.26 (suggesting personal jurisdiction, discovery, or convenience rulings).

> . . . [In addition, it] is well known . . . that our trading partners disapprove of treble damages and other features of U.S. private antitrust litigation, and the foreign government amicus briefs filed in the Supreme Court described the "blocking" and "claw back" statutes, refusals to enforce U.S. court judgments, and other measures taken by foreign governments in the past. The government is concerned that if our foreign counterparts fear that the fruits of their cooperation will be used to support follow-on treble damages actions in U.S. courts that they perceive as inappropriate, cooperation will be strained, to the overall detriment of international cartel enforcement.

Bf. for the U.S. and the Fed. Trade Comm'n at 4-5, 26, Affidavit of Joseph T. Dixon, Jr., Ex. A. The recent Empagran brief by foreign nations concurs, explaining that "[n]o other country has adopted the United States' 'bounty hunter' approach that permits a private plaintiff to present an antitrust claim to a jury and to 'recover threefold the damages.'" Bf. of the Fed. Republic of Germany, et al., at 9, Dixon Aff., Ex. B. Plaintiffs' reading of the FTAIA "would apply U.S. law by fiat and make United States courts the forum of choice; it would ignore the domestic laws applicable where the primary injuries occurred and would fail to require a substantial connection" between U.S. effects and any U.S. jurisdiction over foreign transactions. Id. at 12.

**D. These Foreign Plaintiffs Cannot Supersede The U.S. Government's And Their Home Countries' Judgments About Deterrence By Coming Here To Sue**

Plaintiffs audaciously downplay many of the consequences of their argument. They now assert, for example, after outlining massive discovery and pointing to the need for expert testimony, that the domestic purchaser case is "overwhelmingly the same" and that "no special inquiry into foreign economic conditions" would have to ensue if this case or another case like it proceeds to a factual subject matter jurisdiction hearing. Pl. Mem. at 26.[5] Perhaps the most radical result sought by Plaintiffs, however, is that the deterrence ideas of five foreign

---

[5] In truth, such a hearing would concern transportation costs, prices, production capacity, demand, duties, taxes, and so forth in each and every country whose purchasers Plaintiffs contend should be swept within the jurisdiction of this Court, with the ultimate question being whether Plaintiffs can prove that (absent U.S. price-fixing) arbitrage would have occurred in all those places during the alleged class period. Def. Mem. at 19-22. Even taking Plaintiffs' jurisdictional theory as valid, without proof that arbitrage would have occurred – a very different question than those at issue in the domestic purchaser cases or criminal prosecutions – there would be no jurisdiction. Congress, however, did not intend for jurisdiction to be so uncertain, with a cumbersome and intrusive process that itself offends international comity even if a case is ultimately dismissed. See Empagran, 124 S. Ct. at 2369.

companies, or other private parties, should trump the deterrence and penalty decisions made by Congress and by their home countries.

Whereas Congress has established a system that allows treble damages for injuries directly connected with U.S. commerce, Plaintiffs say that remedy should sweep worldwide, increasing potential civil damages in U.S. courts to 9 or 10 times U.S. effects. Whereas their home countries have rejected even treble damages for injuries there, Plaintiffs come here to try to avoid that legislative determination. Whereas U.S. and international enforcement authorities emphasize that detection, amnesty programs, prosecutions and prison sentences are as important, if not more so, than private civil damages recoveries in combating cartels, and oppose Plaintiffs' jurisdictional theory, Dixon Aff., Ex. A & B, Plaintiffs urge this Court to rule based on their deterrence and remedy views instead. As the U.S. explains, "the assumption that increasing the number of private civil suits will improve deterrence is wrong because it considers only the amount of potential punishment. Deterrence depends critically on *detection* of cartels" through government exposure – as in this case. Dixon Aff., Ex. A at 22-23. Moreover, "in the government's experience, the primary deterrent to cartel activity is *criminal* penalties." Id. at 23. In fact, Congress's statute and its intent govern here, and improving deterrence within that legal framework is left to enforcement authorities, not plaintiffs or courts. Empagran, 124 S. Ct. at 2372. Private civil suits clearly play a role, but Plaintiffs cannot expand that role contrary to law.

In pushing their views of punishment, Plaintiffs go so far as to contend that this Court should expand standing to protect the interests of "overseas consumers" and "indirect purchasers" in other countries, Pl. Mem. at 31-32, when such claims are vastly beyond any ever before litigated under American antitrust law. Def. Mem. at 22-25. Indeed, a central purpose of the FTAIA was to clarify companies' "freedom of action" overseas, without worry of Sherman

Act liability. H.R. Rep. No. 97-686 at 7, 1982 U.S.C.C.A.N. at 2492. Congress made this explicit in the requirement that U.S. effects "gives rise to a claim" for all cases and in the last sentence of the FTAIA – which categorically excludes any claims by overseas consumers even if they were directly hurt by the effects of anticompetitive activity among U.S. exporters. Cf. Pl. Mem. at 2, 30-32.

Plaintiffs' allegations fail to establish that their injuries are of concern under U.S. law and that they have standing to sue in this country. The only way that their case could proceed is with a drastic rewriting of the Sherman Act, the FTAIA, and judicial precedent. These Plaintiffs must seek remedies at home – and not be allowed to disregard their own countries' laws and to create unnecessary tension between the United States and our international enforcement partners.

## CONCLUSION

For all the foregoing reasons and for the reasons stated in Defendants' opening brief, Plaintiffs' Amended Complaint should be dismissed.

Dated: March 31, 2005

HENSON & EFRON, P.A.

By: s/Joseph T. Dixon, Jr.
Joseph T. Dixon, Jr. (#23139)
Scott A. Neilson (#239951)
220 South Sixth Street, Suite 1800
Minneapolis, Minnesota 55402-4503
Telephone: (612) 339-2500
Telecopier: (612) 339-6364

- and -

William L. Greene (#198730)
Douglas R. Boettge (#237292)
LEONARD STREET AND DEINARD
Professional Association
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
Telephone: (612) 335-1500
Telecopier: (612) 335-1657

- and -

A. Paul Victor
James F. Lerner
Christopher V. Roberts
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Telecopier: (212) 310-8007

Attorneys for Kyowa Hukko Kogyo Co., Ltd.

Lawrence Byrne
Lance Croffoot-Suede
Ruth E. Harlow
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Telecopier: (212) 354-8113

Attorneys for Takeda Pharmaceutical Company Limited f/k/a Takeda Chemical Industries, Ltd.

Michael A. Lindsay (#163466)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-7819
Telecopier: (612) 340-2868

- and -

Michael R. Lazerwitz
Steven Kaiser
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 974-1500
Telecopier: (202) 974-1999

Attorneys for Ajinomoto Co., Inc. and Ajinomoto U.S.A., Inc