# EXHIBIT A

ORAL ARGUMENT SCHEDULED FOR APRIL 20, 2005

**No. 01-7115**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

EMPAGRAN, S.A., ET AL.,
Plaintiffs-Appellants,

v.

F. HOFFMANN-LAROCHE, LTD., ET AL.,
Defendants-Appellees.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES
AND ON APPEAL FROM
THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

# BRIEF FOR THE UNITED STATES AND THE FEDERAL TRADE COMMISSION AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES IN RESPONSE TO COURT ORDER OF NOVEMBER 22, 2004

JOHN D. GRAUBERT
*Acting General Counsel*
*Federal Trade Commission*
*Washington, D.C. 20580*

R. HEWITT PATE
*Assistant Attorney General*

MAKAN DELRAHIM
*Deputy Assistant Attorney General*

ROBERT B. NICHOLSON
STEVEN J. MINTZ
*Attorneys*
*U.S. Department of Justice*
*Antitrust Division*
*Washington, D.C. 20530-0001*
*(202) 353-8629*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## (A) Parties and Amici

Except for the United States, the Federal Trade Commission, and foreign government *amici*, the parties appearing before the district court and in this court are listed in the Brief for Appellants, dated January 10, 2005. The United States and Federal Trade Commission previously participated in this court as *amici curiae*.

## (B) Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants, dated January 10, 2005.

## (C) Related Cases

The case on review was previously before this Court (No. 01-7115) and the Supreme Court of the United States (No. 03-724).

______________________
Steven J. Mintz

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

STATEMENT OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I. Plaintiffs' "Alternative Theory" Cannot Establish Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Plaintiffs' Claim Cannot Be Reconciled With the Supreme Court's Reasoning in *Empagran* . . . . . . . . . . . . . . . . . . 6

B. Plaintiffs' "But For" Theory Has No Basis in Antitrust Law . . . . . 14

C. Plaintiffs' Fallback Proximate Cause Argument is Unsound . . . . . 17

II. Plaintiffs' Theory Will Undermine Deterrence and the Government's Anti-Cartel Enforcement . . . . . . . . . . . . . . . . . . . 19

III. Plaintiffs Lack Antitrust Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**

*Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000) . . . . . . . . . . 15

**Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) . . . . . . . . . . 15, 27, 28, 29

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) . . . . . . . . . . 16

**Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) . . . . . . . . . . 14, 15

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless, PLC*, 148 F.3d 1080 (D.C. Cir. 1998) . . . . . . . . . . 13

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62 (3d Cir. 2000) . . . . . . . . . . 12

*Den Norske Stats Oljeselskap AS v. HeereMac Vof*, 241 F.3d 420 (5th Cir. 2001) . . . . . . . . . . 11

*Dominicus Americana Bohio v. Gulf & Western Indus., Inc.*, 473 F. Supp. 680 (S.D.N.Y. 1979) . . . . . . . . . . 10

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) . . . . . . . . . . 8

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 2001 WL 761360 (D.D.C. June 7, 2001) . . . . . . . . . . 2

Authorities upon which we chiefly rely are marked with asterisks.

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*,
315 F.3d 338 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*,
388 F.3d 337 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

**F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*,
542 U.S. ___, 124 S. Ct. 2359 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Foley Brothers v. Filardo*, 336 U.S. 281 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Industria Siciliana Asfalti, Bitumini, S.p.A. v. Exxon Research & Engineering Co.*, 1977 WL 1353 (S.D.N.Y. Jan. 18, 1977) . . . . . . . . . . . . . . . . 9

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) . . . . . . . . 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . 28

*Motive Parts Warehouse v. Facet Enter.*, 774 F.2d 380 (10th Cir. 1985) . . . . . . 16

*Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978) . . . . . . . . . . . . . . . . . 13

*United States v. Nippon Paper Indus. Co.*, 109 F.3d 1 (1st Cir. 1997) . . . . . . . . 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) . . . . . . . 16

**FEDERAL STATUTES AND RULES**

15 U.S.C. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. 6a(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. 6a(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

15 U.S.C. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Antitrust Criminal Penalty Enhancement and Reform Act of 2004,
Pub. L. No. 108-237, 118 Stat. 665 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**MISCELLANEOUS**

1A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2000) . . . . 28

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2000) . . . . . . 16

150 Cong. Rec. H3658, June 2, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

John M. Connor, GLOBAL PRICE FIXING (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.R. Rep. No. 97-686, *reprinted in* 1982 U.S.C.C.A.N. 2487 . . . . . . 10, 16, 25, 29

4 Trade Reg. Rep. (CCH) ¶ 13,113 (Aug. 10, 1993) . . . . . . . . . . . . . . . . . . . . . . 20

## STATEMENT OF INTEREST

The United States and the Federal Trade Commission, which previously participated *amici curiae* before this Court and the Supreme Court, have primary responsibility for enforcing the federal antitrust laws, and therefore have a strong interest in the correct application of those laws.

## STATEMENT

1. In 1997, the Department of Justice opened a grand jury investigation into price fixing in bulk vitamins. The investigation bore fruit in 1999 when one of the price fixers entered the Department's antitrust amnesty program and exposed a world-wide price-fixing and market division conspiracy among domestic and foreign makers of bulk vitamins. The Department's subsequent prosecution of the cartel led to prison sentences for eleven corporate officials and criminal fines exceeding $900 million. Large civil penalties by European Union, Canadian, Australian, and Korean antitrust authorities followed, as did successful private treble damage actions under Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. 1, 15, by vitamin purchasers injured in the United States.

Plaintiffs in the present case are foreign nationals who bought vitamins from foreign firms for delivery outside the United States, but seek treble damages under U.S. antitrust law. The district court dismissed their suit for lack of subject matter

jurisdiction because the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. 6a ("FTAIA"), makes the Sherman Act inapplicable to non-import foreign conduct unless it has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce and "such effect gives rise to a claim" under the Sherman Act. The court held that the plaintiffs had not alleged that the conduct's effect on the United States gave rise to their claims. *Empagran S.A. v. F. Hoffmann-LaRoche Ltd.*, 2001 WL 761360, at 2-4 (D.D.C. June 7, 2001).

2. This Court reversed in a 2-1 decision, holding that the phrase "gives rise to a claim" requires only that "the conduct's harmful effect on United States commerce must give rise to 'a claim' by someone, even if not the foreign plaintiff who is before the court." *Empagran S.A. v. F. Hoffmann-LaRoche Ltd.,* 315 F.3d 338, 341 (D.C. Cir. 2003). It found support for this reading in the FTAIA's legislative history, and it concluded that asserting jurisdiction would maximize deterrence of international cartels. *See id.* The Court further held that plaintiffs have antitrust standing to seek treble damages under Section 4 of the Clayton Act. *See id.* at 357-59. Judge Henderson dissented. The Court denied en banc rehearing by a 4-3 vote.

3. The Supreme Court unanimously (Justice O'Connor not participating) vacated this Court's judgment, holding that the FTAIA does not allow antitrust

claims arising solely out of a foreign injury that is independent of the domestic effects of the challenged anticompetitive conduct. *F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. ___, 124 S. Ct. 2359 (2004). The Court offered "two main reasons" for its conclusion, *id.* at 2366: the importance of "constru[ing] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations" (prescriptive comity), *id.*; and fidelity to Congress' intent "not *to expand* in any significant way, the Sherman Act's scope as applied to foreign commerce," *id.* at 2369 (emphasis in original).

The Court declined to accept plaintiffs' suggestion that comity can be evaluated case-by-case, because it "is too complex to prove workable." *Id.* at 2368. District courts must be able to determine whether the Sherman Act reaches a plaintiff's claim "simply and expeditiously," without a "legally and economically technical . . . enterprise" that "means lengthier proceedings, appeals, and more proceedings." *Id.* at 2369. The Court also rejected plaintiffs' assertion that their construction of the FTAIA would help to deter cartels, noting the "important experience-backed arguments (based upon amnesty-seeking incentives)" raised by the defendants, the United States, and foreign governments. *Id.* at 2372.

Because this Court had not addressed it, the Supreme Court declined to consider plaintiffs' alternative theory that their foreign injury was not independent,

so that "the anticompetitive conduct's domestic effects were linked to that foreign harm." *Id.* The Court remanded the case for this Court to determine whether this argument was properly preserved and, if so, to consider it. *See id.*[1]

## SUMMARY OF ARGUMENT

The government continues to participate in this case because of its core mission of *criminal* investigation and prosecution of international cartels. Plaintiffs' alternative argument would diminish the deterrence of cartels by weakening the Department of Justice's antitrust amnesty program, which is the most effective means of detecting cartels, and which Congress sought to bolster in recent legislation. Plaintiffs' approach also threatens to disrupt coordinated international anti-cartel enforcement.

Plaintiffs' theory is stunning in its sweep: it invites foreign consumers to sue their local suppliers in U.S. courts, alleging only an international conspiracy, a worldwide market, and a *theory* of arbitrage. Despite plaintiffs' post-Complaint attempts to limit the scope of their theory, it encompasses all international cartels. Plaintiffs' proof of even "but for" linkage between domestic and foreign injury, when challenged factually at the jurisdictional stage, will be complex, and

---

[1] This Court subsequently ruled that plaintiffs adequately raised and preserved their alternative argument, and that it should be decided here and now. *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 388 F.3d 337 (D.C. Cir. 2004).

determining which cartels might meet their arbitrage test cannot be done "simply and expeditiously," as the Supreme Court directed.

Opening U.S. courts to antitrust class actions from around the world also would interfere with the sovereign decisions of other nations about the appropriate remedies to offer their consumers, their ability to regulate their commercial affairs, and their antitrust amnesty programs. 124 S. Ct. at 2366-68. Moreover, it would negate the Supreme Court's reasoning that Congress, in enacting the FTAIA, did not intend "*to expand* in any significant way, the Sherman Act's scope as applied to foreign commerce." *Id.* at 2369 (emphasis in original). The Supreme Court could not have intended that the FTAIA's domestic injury exception would swallow its rule.

Plaintiffs' "but for" causation also fails because the established standard for causation in antitrust law is the more rigorous "proximate cause," and Congress intended to preserve the pre-existing law in the FTAIA. Plaintiffs' current attempt to show proximate causation is unavailing: their theory, in substance, is only "but for" causation, and in any event it is doubtful that they alleged proximate causation, and the Supreme Court did not remand that question.

Finally, even if the Court finds jurisdiction under the FTAIA, the Complaint nevertheless should be dismissed because plaintiffs lack antitrust standing. The

Court should re-examine its prior standing holding in light of the Supreme Court's opinion, which undermines its reasoning.

## ARGUMENT

### I. Plaintiffs' "Alternative Theory" Cannot Establish Subject Matter Jurisdiction

Plaintiffs argue that the particular facts of this case – fungible products easily shipped long distances at a low cost relative to value – establish that "defendants' cartel would have been unsustainable if the United States had been excluded from it," because plaintiffs either would have purchased in the United States or from "arbitrageurs selling vitamins imported from the United States." Br. 10, 20. Thus, they assert, their injuries would not have occurred "but for" the fact that the cartel included the United States, and the U.S. effect of the cartel "gives rise" to their claim as required by the FTAIA. This sweeping argument is in fundamental conflict with the Supreme Court's reasoning and well-established principles of causation in antitrust cases.

#### A. Plaintiffs' Claim Cannot Be Reconciled With the Supreme Court's Reasoning in *Empagran*

The Supreme Court unanimously rejected a construction of the FTAIA granting foreign plaintiffs a treble damage remedy under U.S. antitrust law for the foreign effects of conduct that also happens to injure U.S. commerce. The Court

found that the statute is ambiguous and that plaintiffs' reading was "not consistent with the FTAIA's basic intent." *Id.* The Court's conclusion was based on two fundamental principles, both of which also point to rejection of plaintiffs' alternative claim.

First, the Supreme Court emphasized that an ambiguous statute like the FTAIA should be construed "to avoid unreasonable interference with the sovereign authority of other nations." *Id.* at 2366. The Court asked: "Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct . . . ?" *Id.* at 2367. Plaintiffs' alternative theory does not change the reality that the subject of this suit is sales in foreign countries by foreign sellers to foreign purchasers, nor the principle that foreign countries have the primary role in protecting their consumers. The Supreme Court emphasized that application of U.S. antitrust law to foreign conduct is consistent with principles of prescriptive comity insofar as it reflects "a legislative effort to redress *domestic* antitrust injury," *id.* at 2366 (emphasis in original), but plaintiffs' injuries are not domestic.

Plaintiffs' theory invites foreigners overcharged on purchases from foreign firms abroad to seek redress under U.S. law, rather than the law of their home

countries. This would constitute precisely the kind of "legal imperialism," 124 S. Ct. at 2369, that the Supreme Court declined to attribute to Congress.[2] The Court repeatedly has held that statutes, unless unambiguous, are not read to embody a congressional intent to regulate conditions that are the primary concern of foreign countries. *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 255 (1991); *Foley Brothers v. Filardo*, 336 U.S. 281, 286 (1949).

Plaintiffs argue, Br. 15, 53-59, that there are no significant comity concerns in this case because international cartels violate the laws of every industrialized nation. The Supreme Court emphasized, however, that "even where nations agree about primary conduct, say price fixing, they disagree dramatically about appropriate remedies." 124 S. Ct. at 2368. Converting U.S. courts into magnets that draw foreign plaintiffs' cartel suits away from their own judicial systems, based on speculative connections between the foreign injuries and effects on U.S. commerce, would undermine the sovereign decisions of foreign governments about remedies and procedures. *See id.* at 2367-68.

Plaintiffs' argument for opening U.S. courts to foreign plaintiffs seeking

---

[2] The Court did not limit its application of prescriptive comity to construction of the word "a" in 15 U.S.C. 6a(2), as plaintiffs suggest, Br. 53. *See* 124 S. Ct. at 2366 (referring to "ambiguous statutes" and the FTAIA as a whole). It addressed the broader issue of how the FTAIA's domestic exception applies to foreign conduct causing foreign harm independent of domestic effects.

redress of foreign antitrust injury based on a theoretical "but for" connection to the conduct's effects on U.S. commerce also ignores the Supreme Court's second "main reason" for its conclusion: that Congress' intent was "to clarify, perhaps to limit, but not *to expand* in any significant way, the Sherman Act's scope as applied to foreign commerce." *Id.* at 2369 (emphasis in original). Indeed, it noted, Congress sought to *"release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm." *Id.* at 2367 (emphasis in original). The Court thus emphasized the absence of any "significant indication that at the time Congress wrote this statute courts would have thought the Sherman Act applicable in these circumstances," *id.* at 2369, as a reason to reject plaintiffs' construction of the statute. Similarly, there was no established pre-FTAIA (pre-1982) recognition of the proposition that a foreign plaintiff who was injured in a foreign market could establish jurisdiction on the basis of a "but for" connection between the allegedly inflated price paid by the plaintiff and allegedly inflated prices charged by the defendant for the same product in the United States.

Plaintiffs cite *Industria Siciliana Asfalti, Bitumini, S.p.A. v. Exxon Research & Engineering Co.*, 1977 WL 1353 (S.D.N.Y. Jan. 18, 1977), which did involve foreign antitrust harm. But that case was based on a tying or reciprocal dealing

*contract*, not simply an alleged relationship between domestic and foreign cartel prices. As a non-cartel case, it does not support any anticipation by Congress that class action cartel cases could be brought in U.S. courts. Moreover, Congress was critical even of that case. *See* H.R. Rep. No. 97-686, at 5 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2490 (House Report).[3]

The Supreme Court's reasoning therefore precludes acceptance of the sweeping alternative theory of jurisdiction plaintiffs now assert. Classes of foreign plaintiffs would be able to establish jurisdiction and proceed to discovery under that theory simply by *alleging* a *theory* of arbitrage that some economists have put forward in this case as a general rule, but which is not necessarily applicable in particular cases. Plaintiffs' proposed approach would make the Supreme Court's unanimous decision meaningless. It is difficult to imagine a foreign antitrust plaintiff who could not allege some theoretical connection

---

[3] Plaintiffs also cite *Dominicus Americana Bohio v. Gulf & Western Indus., Inc.*, 473 F. Supp. 680 (S.D.N.Y. 1979) as an example "of cases rejecting the view defendants advance (the requirement that claims arise 'in U.S. commerce')." Br. 50. But the court did not rule on subject matter jurisdiction in that case. To the extent that it discussed the facts, it noted that "many of the defendants as well as the plaintiffs are United States corporations, that the services said to be affected by the antitrust violations are used by Americans, and that some of the anticompetitive conduct is alleged to have occurred in this country." 473 F. Supp. at 688. The court thereby intimated that the claims did arise, at least in part, in U.S. commerce.

between the U.S. effects of a cartel and the overcharge paid by the plaintiff.

Plaintiffs' assertions that their theory of jurisdiction need not sweep so broadly, and that it can be limited to a "small subset of potential international antitrust claims," Br. 59, are unpersuasive. Foreign plaintiffs challenging virtually any international cartel could allege that "the cartel raised prices around the world in order to keep prices in equilibrium with United States prices." *Empagran*, 315 F.3d 338, 341. Plaintiffs' arbitrage theory is not the only one in which a class of foreign plaintiffs could allege that the foreign restraints that harmed them would not have come about "but for" a broader worldwide agreement.[4] Thus, plaintiffs' theory, even if it plausibly could be applied in this case, opens the door to a potential flood of "but for" claims.[5]

---

[4] Contrary to the implication of plaintiffs' citation to *Den Norske Stats Oljeselskap AS v. HeereMac Vof*, 241 F.3d 420 (5th Cir. 2001), Br. 30 n.7, even in that case, which involved services not subject to arbitrage, the plaintiffs claimed that the barges were mobile and the cartel allocated them, thereby alleging in substance "but for" causation. Petition for Certiorari at 4 ("[b]ecause of the limited number of such [heavy lift] barges and their mobility, there exists a unified, world-wide market for heavy lift services").

[5] Mere "but for" causation sweeps far beyond the limited circumstances that plaintiffs describe. Consider plaintiffs' own merger hypothetical, in which a European plaintiff challenges the merger of two European companies, which has anticompetitive effects in the United States. Br. 59. Contrary to plaintiffs' assertion, this plaintiff could have a stronger "but for" causation argument than the plaintiffs do here. If the two merging companies were the only worldwide producers of a product consumed primarily in the United States, it would be

Further, plaintiffs' arbitrage theory at best raises a complex question of fact, perhaps requiring expert testimony, that cannot be decided by district courts "simply and expeditiously" at the jurisdictional stage. The United States apparently imported much of its consumption of the vitamins listed in ¶ 6 of the Complaint, and all of its consumption of other vitamins. *See* John M. Connor, GLOBAL PRICE FIXING 296-99 (2001). Hence, plaintiffs' argument is that a price fixing conspiracy that did not apply to U.S. sales would have been undermined by the resale and reshipment of vitamins imported into the United States. If challenged factually, plaintiffs will have to prove that the defendants could not identify, and discontinue selling to, any U.S. customers significantly increasing their purchases, as arbitrage sufficient to undermine the cartel would have required.[6] *See, e.g.*, *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000) (plaintiff has burden of proof on subject matter jurisdiction, once it is put in dispute). Plaintiffs' proposed rule thus fails to

---

impossible for the European plaintiff to be injured by the merger unless there was injury to U.S. consumers.

[6] There is no significance in the alleged fact that vitamin prices "promptly collapsed" when the Chinese entered the market. Br. 19. The Chinese presumably sold vitamins outside the United States, and even if they did not, as non-participants in the cartel, they would have made no attempt to prevent resale and reshipment of vitamins sold in the United States.

provide a trial court with a readily administrable means of distinguishing, at the threshold stage of litigation, between claims to which the antitrust laws apply and claims as to which they do not.

Rejecting plaintiffs' theory does not mean that all foreign antitrust plaintiffs will be barred from U.S. courts. *Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978), indicates that foreign plaintiffs may invoke U.S. antitrust remedies when they "enter our commercial markets as a purchaser of goods or services." *Id.* at 318. *See also Caribbean Broadcasting System, Ltd., v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998).[7] It does not follow, however, that foreign plaintiffs are automatically entitled to invoke such U.S. remedies when an antitrust violation causes injury outside the scope of U.S. commerce, as the Supreme Court's failure even to cite *Pfizer* in its *Empagran* decision attests. The Court made clear in *Empagran* that would-be plaintiffs who suffer injury when they purchase goods or services "entirely outside U.S. commerce," 124 S. Ct. at 2364,

[7] Plaintiffs, Br. 35 n.11, misunderstand the government's reference to *Caribbean Broadcasting* in its Supreme Court brief. The government cited that case only to show, like *Pfizer*, that foreign plaintiffs can sue, regardless of where they are located, if they are injured in U.S. commerce. This Court made clear in *Caribbean Broadcasting* that the plaintiff in that case was a participant in U.S. markets and that, under the peculiar facts at issue, "it appears that antitrust injury [to the foreign plaintiff] is ultimately a harm to U.S. purchasers of radio advertising." 148 F.3d at 1087.

are in a different position for purposes of subject matter jurisdiction than plaintiffs who are overcharged in U.S. commerce, regardless of their nationality. Plaintiffs' effort to limit the scope of that ruling to cases in which the plaintiff fails to allege any theoretical connection between the U.S. and foreign effects of conduct should be rejected.

### B. Plaintiffs' "But For" Theory Has No Basis in Antitrust Law

Plaintiffs' alternative theory is not legally sufficient for another reason: "but for" is not the traditional legal standard for causation in antitrust law and therefore is inconsistent with the "gives rise to a claim" language of 15 U.S.C. 6a(2). Rather, the proper test is proximate causation.

Causation issues arise most frequently in antitrust cases when determining whether private plaintiffs have standing to sue under Section 4 of the Clayton Act, which allows lawsuits by any person injured "by reason of anything forbidden in the antitrust laws." 15 U.S.C. 15(a). "But for" causation never has been considered sufficient in this context. In *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477 (1982), the Supreme Court held that "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action." Since the early twentieth century, courts have developed various tests for evaluating "remoteness," such as "directness" and the "target area test," *see id.* at

476 n.12, which were designed to bar the claims of plaintiffs whose injuries were not, as a matter of policy, sufficiently connected to the antitrust violation. All of these tests were more rigorous than "but for" causation. The Court analogized them to the common law test of proximate cause, and then applied proximate causation to the facts before it. *See id.* at 477-78.

After *McCready*, the Court continued to reject "but for" causation under Section 4. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) (*"AGC")*, the Court reiterated that "the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing," *id.* at 536, i.e., a "but for" connection, and again compared the test for private plaintiffs' antitrust standing to proximate causation, *see id.* at 535-36. In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), the Court expressly rejected a "but for" reading of RICO, which was modeled on Section 4, saying that "[in *AGC*] we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.* at 268. *See also Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 435 (3d Cir. 2000) ("Whether the Hospitals have [antitrust] standing depends on whether the Tobacco Companies' alleged conspiracy proximately caused the Hospitals' injuries.").

The courts similarly find "but for" causation inadequate in deciding whether an antitrust plaintiff has proved that his injury was caused by the defendant. Courts have used several verbal formulations, including "material cause of the injury," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969); injury "not shown to be attributable to other causes," *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946); and "substantial" cause of the injury, *Motive Parts Warehouse v. Facet Enter.*, 774 F.2d 380, 389 (10th Cir. 1985). But regardless of the precise formulation, the test always is more rigorous than simple "but for" causation. *See* 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 338a, at 317-21 (2d ed. 2000) (antitrust violation must be "substantial" and "material cause" of the plaintiff's injury).[8]

The FTAIA did not amend the Clayton Act, and there is no evidence that Congress intended to depart from well-established principles of causation in antitrust cases. Indeed, the legislative history is explicit that Congress did "not intend to alter existing concepts of antitrust injury or antitrust standing." House Report at 11. And as the Supreme Court emphasized, Congress' purpose was "not

---

[8] Plaintiffs' cited cases outside the antitrust context construing "arising out of" or "arising from" as allowing a "but for" connection, Br. 22-23 & n.2, are irrelevant. Because the antitrust laws are potentially so open-ended, it is essential that courts limit the range of potential plaintiffs. In *McCready* and *AGC*, the Court explained that this limitation takes the form of a proximate cause requirement.

*to expand*, in any significant way, the Sherman Act's scope as applied to foreign commerce." 124 S. Ct. at 2369 (emphasis in original). Accordingly, there is no justification for interpreting the FTAIA to incorporate an expansive "but for" test of causation.

### C. Plaintiffs' Fallback Proximate Cause Argument is Unsound

Plaintiffs contend in the alternative that their claims satisfy a proximate cause standard. But the FTAIA, by focusing on the *domestic effect* rather than the challenged conduct as the basis for the plaintiff's claim, requires a specialized application of the principles of proximate causation – an application that turns on the concepts of directness and remoteness. The direct cause of the plaintiffs' injuries was simply the purchase of vitamins from the defendants at prices elevated by the defendants' cartel. Plaintiffs attempt to look behind that transaction for less proximate, and increasingly remote, causes. But anything that may have helped the cartel raise prices to the plaintiffs could contribute in some way to the plaintiffs' injuries, but plainly is not the direct cause of those injuries.[9]

---

[9] Plaintiffs hint that this Court already has found the directness required for proximate causation in holding that plaintiffs have standing. Br. 26 (quoting 315 F.3d at 358-59). This Court, however, was referring to the causal link between the defendants' unlawful conduct and the plaintiffs' injuries, not to the link between the effect of those unlawful activities in the United States and the plaintiffs' injuries. *See* Part III, *infra*.

Accordingly, at most plaintiffs' arbitrage theory alleges only "but for" causation.

Plaintiffs argue that their injuries were proximately caused by the U.S. effect of the cartel because defendants "expressly *intended*" to injure them by fixing prices in the United States, and because that kind of foreseeability is the "most common formulation" of proximate causation, Br. 24-25. Defendants' intent to injure the plaintiffs, however, has nothing to do with the causation issue raised by the FTAIA: whether the *effect of the cartel in the United States* "gives rise" to a claim under the Sherman Act.

Finally, it is doubtful that plaintiffs even alleged proximate causation. The Supreme Court did not discern a proximate cause allegation; it framed the issue for remand as whether a "'but for' condition is sufficient to bring the price-fixing conduct within the scope of the FTAIA's exception." 124 S. Ct. at 2372. This Court saw the remand issue similarly:

> The [Supreme] Court expressly declined to decide whether this 'but for' condition is sufficient to bring the contested price-fixing conduct within the scope of the FTAIA's exception. The case was remanded to this court for further proceedings on *this* issue.

*Empagran*, 388 F.3d at 339 (emphasis added).

## II. Plaintiffs' Theory Will Undermine Deterrence and the Government's Anti-Cartel Enforcement

Since 1993, under administrations of both political parties, the primary engine of the government's anti-cartel enforcement has been the Antitrust Division's criminal amnesty program. The majority of the Division's major international investigations, including the investigation of the vitamin cartel, have been advanced through cooperation of an amnesty applicant. The program has been responsible for cracking more international cartels than all of the Division's search warrants, secret audio or videotapes, and FBI interrogations *combined.* Cooperation from amnesty applications has resulted in several dozen sentences of imprisonment imposed on defendants from roughly ten countries.[10]

The amnesty program works because it offers incentives to cartel members who voluntarily disclose their criminal conduct and cooperate with prosecutors. In particular, the program offers automatic (not discretionary) amnesty to corporations that come forward prior to an investigation and meet the program's other requirements and, if a corporation qualifies for automatic amnesty, all

---

[10] Plaintiffs' contention that defendants' conduct so far has "paid off" because estimated cartel profits exceeded criminal fines and civil damages, Br. 14, neglects the fact that as a result of the government's investigations, eleven high-level executives from the vitamin companies to date have *gone to prison*. The government doubts that these key actors in the conspiracy would agree that their conduct "paid off."

directors, officers, and employees who come forward and agree to cooperate also receive automatic amnesty. 4 Trade Reg. Rep. (CCH) ¶ 13,113 (Aug. 10, 1993). Since amnesty is available only to the first conspirator to break ranks with the cartel and come forward, the program sets up a "winner take all" dynamic that encourages defection from the cartel.

In the government's experience, potential amnesty applicants weigh their civil liability exposure when deciding whether to come forward and seek amnesty. To date, the amnesty program has been effective because the inducements that it offers outweigh the disincentives to cooperating with the government, particularly the private treble damage actions that inevitably follow the admission of wrongdoing.

Plaintiffs' theory threatens to upset the balance of incentives and disincentives that drives the amnesty program. If consumers from around the world suddenly could bring class action suits in U.S. courts against international cartels – suits that the federal courts have not previously entertained and that cartel members never had reason to anticipate – the massive increase in potential civil liability would radically tilt the scale of incentives for conspirators against seeking amnesty. And when cartel members forgo, or hesitate to seek, amnesty, the government loses its most potent weapon for cracking international cartels.

This Court's prior decision in this case was based in significant part on the policy judgment that international cartels are under-deterred and the assumption that deterrence would be maximized by expanding the number of private antitrust suits against cartels in U.S. courts. *See* 315 F.3d at 355-57. The government agrees, notwithstanding its criminal enforcement successes since 1993, that the level of deterrence is sub-optimal. But the government respectfully submits that the assumption that deterrence would be improved by increasing the number of private civil suits in U.S. courts is untenable.

First, the Supreme Court said that whether application of the Sherman Act to plaintiffs' claims would increase deterrence is an empirical issue, and "the answer to the dispute is neither clear enough, nor of such likely empirical significance, that it could overcome the considerations we have previously discussed and change our conclusion." 124 S. Ct. at 2372. In short, plaintiffs' deterrence argument is neither self-evidently correct nor sufficient to support a decision in their favor.

Second, the Supreme Court did not consider the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, 118 Stat. 665 (2004), which became law after the Court's decision. The statute codifies and seeks to strengthen the Antitrust Division's amnesty program and confirms the

government's longstanding experience that potential amnesty applicants carefully weigh the advantages to be gained from amnesty against their potential civil liability exposure. The statute reflects Congress' understanding that cartel members are deterred from seeking amnesty by high civil damages and seeks to reduce that disincentive by de-trebling civil damages for amnesty applicants who meet certain requirements. Congress made a policy judgment that the amnesty program is a critical element of anti-cartel enforcement – because it triggers the *exposure* and *criminal prosecution* of cartels – and that damages in private civil suits against cartels should be *decreased*, not increased, in order to motivate conspirators to seek amnesty. That policy judgment is entitled to deference.

Plaintiffs' claims here conflict with the purposes of the new statute. The prospect of facing unprecedented class actions for foreign injuries in U.S. courts, even with single damages, will weaken the incentive to seek amnesty provided by de-trebling and discourage cartel members who do not qualify for amnesty but otherwise may want to cooperate with the government, e.g., by plea agreement. Expanded civil liability also risks undermining foreign amnesty programs (*see* 124 S. Ct. at 2366-68), which are not affected by the new statute, and thereby interferes again with the sovereign authority of other nations.

Third, the assumption that increasing the number of private civil suits will

improve deterrence is wrong because it considers only the amount of potential punishment. Deterrence depends critically on *detection* of cartels; a secret cartel cannot be punished until it is exposed.[11] And as a practical matter, plaintiffs' claims here, and the vast majority of private suits against cartels, are follow-on actions triggered by the government's exposure of a cartel. The government is not aware of a single international cartel criminal prosecution that was spurred by allegations in a class action lawsuit.[12]

Fourth, the interest in better deterrence does not compel the conclusion that the means to that end is more *civil* suits in *U.S.* courts. Since, in the government's experience, the primary deterrent to cartel activity is *criminal* penalties, we submit that the best way to increase deterrence is the method recently chosen by Congress: increasing criminal penalties and otherwise strengthening government criminal enforcement. While imprisonment is the best deterrent, criminal fines provide a stronger deterrent than civil damages because they are more immediate, certain, and are within the scope of the amnesty program, which motivates

---

[11] *See* 150 Cong. Rec. H3658 (June 2, 2004) (legislative history of Antitrust Criminal Penalty Enhancement and Reform Act quoting Sen. Kohl, co-sponsor, saying that removing the disincentive to seeking amnesty "should result in a substantial increase in the number of antitrust conspiracies being detected").

[12] In the case of vitamins, the government's covert investigation began before the filing of any suits by the victims and was not helped by those suits.

conspirators to defect from cartels to avoid fines.[13]

Plaintiffs would treat the United States as the world's antitrust policeman, as if all private antitrust litigation must be filed here. But this is "legal imperialism," 124 S. Ct. at 2369, and the foreign governments that participated in the Supreme Court as *amici* properly believe their enforcement capabilities and methods of compensation to injured consumers to be appropriate. To the extent that other countries offer remedial schemes that differ from U.S. antitrust laws, the Supreme Court indicated that those sovereign choices are entitled to respect.[14] While some countries' antitrust regimes fairly can be described as developing, this is no reason to circumvent and stunt them by drawing private antitrust litigation away to U.S. courts. Indeed, Congress indicated in the legislative history of the FTAIA that clarifying the reach of U.S. antitrust law "could encourage our trading partners to take more effective steps to

---

[13] Our reading of the FTAIA will not limit the government's enforcement efforts. The United States brings criminal prosecutions only when foreign conduct is meaningfully connected to harm to U.S. consumers, even when the conduct is wholly foreign. *E.g.*, *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1 (1st Cir. 1997). If a cartel does not harm U.S. consumers, there would be no jurisdiction under 15 U.S.C. 6a(1), regardless of how subsection 6a(2) is read.

[14] Of the class plaintiffs' home countries, we understand that Australia, Panama, and Ukraine prohibit price fixing and permit suits by those who suffer damages from cartel activity. Although it does not yet have a comprehensive antitrust statute, Ecuador appears to make cartel behavior illegal and make damages available in the form of consumer protection and contract suits.

protect competition in their markets." House Report at 14.

Plaintiffs' reading of the FTAIA also would create problems for coordinated international law enforcement, which is essential in "today's highly interdependent commercial world." 124 S. Ct. at 2366. Effective prosecution of an international cartel requires coordination of investigative strategies among enforcement agencies of many nations because conspiratorial meetings frequently take place in more than one country and witnesses and documentary evidence may be scattered around the world. The United States therefore has made increasing use of Mutual Legal Assistance Treaties with foreign nations, which can be used for evidence gathering in criminal antitrust investigations. Since the 1990s, the United States has entered antitrust cooperation agreements with the European Community and six other countries. The Antitrust Division organized the International Anti-Cartel Enforcement Workshop, which has become an annual event involving enforcers from more than twenty countries. And foreign governments have looked to the United States for leadership in drafting and implementing their own amnesty programs.

Because of the United States' leading role in promoting tougher anti-cartel enforcement around the world, the government is concerned that a decision that weakens the U.S. amnesty program will jeopardize the trend toward rigorous enforcement that the United States has worked hard to foster. In addition, the

dialogue and network of cooperation that the United States has developed with foreign authorities depend on mutual good will and reciprocity. It is well known, as the Supreme Court noted, *id.* at 2368, that our trading partners disapprove of treble damages and other features of U.S. private antitrust litigation, and the foreign government *amicus* briefs filed in the Supreme Court described the "blocking" and "claw back" statutes, refusals to enforce U.S. court judgments, and other measures taken by foreign governments in the past. The government is concerned that if our foreign counterparts fear that the fruits of their cooperation will be used to support follow-on treble damages actions in U.S. courts that they perceive as inappropriate, cooperation will be strained, to the overall detriment of international cartel enforcement.

## III. Plaintiffs Lack Antitrust Standing

Because the Court lacks subject matter jurisdiction, it need not consider plaintiffs' antitrust standing. If, however, the Court finds FTAIA jurisdiction, it should re-examine its prior standing ruling, which derived in significant part from its reading of the FTAIA. *See* 315 F.3d at 358 ("the arguments that have already persuaded us that . . . FTAIA allows foreign plaintiffs . . . [to sue] similarly persuade us that the antitrust laws intended to prevent the harm that the foreign plaintiffs suffered here"). But the Supreme Court's intervening decision rejected that

interpretation of the FTAIA and held that the antitrust laws do not intend to prevent foreign harm that is independent of domestic effects.

The Supreme Court's decision also casts doubt on this Court's other bases for granting standing. First, this Court relied on the point that "[t]he foreign purchasers of vitamins here were injured by conduct that violated the Sherman Act – a global price-fixing conspiracy." 315 F.3d at 358. But the Supreme Court emphasized the lack of pre-FTAIA cases supporting plaintiffs' "independent harm" claim; similarly, because no court before the FTAIA ever considered plaintiffs' "but for" theory, as explained above, there is no basis for concluding that the antitrust laws meant to prevent plaintiffs' injuries in the context of their "but for" claim. *See also AGC*, 459 U.S. at 537 ("the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry").

Second, this Court considered foreign purchasers to be proper antitrust plaintiffs here because their claimed injuries suffered none of the defects mentioned in *AGC*. *See* 315 F.3d at 358. While the factors cited by this Court persuaded the Supreme Court that the plaintiffs in that particular case lacked standing, the Court also stated that "[a] number of other factors may be controlling" in determining antitrust standing. 459 U.S. at 538.

*AGC* looked first to the central policies of the Sherman Act as an important

factor in determining antitrust standing. *See* 459 U.S. at 538. The paramount purpose of the antitrust laws is to protect consumers, competition, and commerce *in the United States*. *See* 1A Areeda & Hovenkamp, *Antitrust Law* ¶ 272h2, at 358 (2d ed. 2000) ("the concern of the antitrust laws is protection of *American* consumers and *American* exporters, not foreign consumers or producers") (emphasis in original); *Matsushita Elec. Indus. Co. v. Zenith Radio* Corp., 475 U.S. 574, 584 n.7 (1986) (conspiratorial conduct in Japan "cannot have caused" injury cognizable by U.S. antitrust law). Here, the Supreme Court emphasized that Congress did not intend "*to expand*" the Sherman Act's scope as applied to foreign commerce, 124 S. Ct. at 2369 (emphasis in original); instead, the FTAIA sought to facilitate joint U.S. export activities.

*AGC* also considered whether "massive and complex damages litigation" will "burden[] the courts." 459 U.S. at 545. Opening up U.S. courts to plaintiffs all over the world who claim to have purchased a price-fixed product in their home countries from a foreign seller can only invite a substantial increase in filings in our federal courts of antitrust cases that are "massive" in terms of their numbers of potential plaintiff-class members and the potential scope of their foreign evidence. The Supreme Court implied this in *Empagran* when it agreed with the Areeda and Hovenkamp treatise that opening U.S. courts to claims of foreign injury raises the spectre of our courts "provid[ing] worldwide subject matter jurisdiction to any

foreign suitor wishing to sue its own local supplier, but unhappy with its own sovereign's provisions for private antitrust enforcement." 124 S. Ct. at 2367.

In the context of international antitrust it is also appropriate to consider whether granting a category of plaintiffs standing to sue will create conflicts between the laws or interests of the United States and the laws or interests of other countries. Thus, the Supreme Court devoted several pages of its opinion to explaining how plaintiffs' claim of "independent harm" would interfere with the interests of our trading partners. *See* 124 S. Ct. at 2367-68. The drafters of the FTAIA also sought to avoid interfering with foreign antitrust authorities. *See* House Report at 13-14 (bill "in no way limits the ability of a foreign sovereign to act under its own laws against an American-based export cartel having unlawful effects in its territory"). As explained above, plaintiffs' position here threatens to generate conflicts with other countries, and this factor accordingly weighs in favor of denying standing.

Finally, this Court suggested that the foreign plaintiffs "have been injured just as directly as the domestic plaintiffs" and "play an important role in the deterrence of the global conspiracy." 315 F.3d at 359. But the foreign plaintiffs are not efficient enforcers of the antitrust laws because of the complexity of establishing jurisdiction over their claims and the need for foreign evidence, and the Supreme Court reasoned that plaintiffs' effect on deterrence is inconclusive and not sufficient to overcome

more important considerations.

## CONCLUSION

Plaintiffs' "alternative theory" is legally insufficient to establish subject matter jurisdiction. Alternatively, plaintiffs lack antitrust standing. The Complaint should be dismissed.

Respectfully submitted.

JOHN D. GRAUBERT
*Acting General Counsel*
*Federal Trade Commission*
*Washington, D.C. 20580*

R. HEWITT PATE
*Assistant Attorney General*

MAKAN DELRAHIM
*Deputy Assistant Attorney General*

ROBERT B. NICHOLSON
STEVEN J. MINTZ
*Attorneys*
*U.S. Department of Justice*
*Antitrust Division*
*Washington, D.C. 20530-0001*
*(202) 353-8629*

February 16, 2005

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7), Fed. R. App. P. 29(d), and Local Rule 32(a)(1) because it has been prepared in a proportionally spaced typeface using WordPerfect 10 in 14-point Times New Roman and contains 6,859 words.

________________________
Steven J. Mintz

Dated: February 16, 2005

**CERTIFICATE OF SERVICE**

I certify that on February 16, 2005, two true and correct copies of the foregoing Brief for the United States and the Federal Trade Commission as *Amici Curiae* In Support of Defendants-Appellees in Response to Court Order of November 22, 2004, were served, by Federal Express, next day service, on:

Arthur F. Golden, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
*Counsel for Defendants-Appellees*

Thomas C. Goldstein, Esq.
Goldstein & Howe, P.C.
4607 Asbury Place, NW
Washington, D.C. 20016
*Counsel for Plaintiffs-Appellants*

____________________________
Steven J. Mintz