# EXHIBIT B

ORAL ARGUMENT SCHEDULED FOR APRIL 20, 2005

**01-7115**

**IN THE**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**EMPAGRAN, S.A., *et al.*,**

***Plaintiffs-Appellants,***

**v.**

**F. HOFFMAN-LA ROCHE LTD, *et al.*,**

***Defendants-Appellees.***

---

**ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES (CASE NO. 03-724) AND ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA (CASE NO. 1:00 CV 1686)**

## BRIEF OF THE FEDERAL REPUBLIC OF GERMANY, UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND, JAPAN, THE SWISS CONFEDERATION, AND THE KINGDOM OF THE NETHERLANDS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES

**Ernest Gellhorn**
**Ann Weymouth**
**LAW OFFICE OF ERNEST GELLHORN**
**Suite 100**
**2907 Normanstone Lane, N.W.**
**Washington, D.C. 20008-2725**
**(202) 319-7104**
***Counsel for Amici Curiae***

**February 16, 2005**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. Parties and Amici

Except for the United States, the Federal Trade Commission, the Federal Republic of Germany, the United Kingdom of Great Britain and Northern Ireland, Japan, the Swiss Confederation, and the Kingdom of the Netherlands all of which are appearing as *amicus curiae* before the United States Court of Appeals for the District of Columbia, the parties appearing before the district court and in this court are listed in the Brief for Appellants, dated January 10, 2005.

B. Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants, dated January 10, 2005.

C. Related Cases

The case on review was previously before this Court of Appeals (No. 01-7115) and the Supreme Court of the United States (No. 03-724).

## CERTIFICATE OF COUNSEL
## REGARDING THE FILING OF A SEPARATE AMICUS BRIEF

Pursuant to Circuit Rule 29(d), the Governments of the Federal Republic of Germany, the United Kingdom of Great Britain and Northern Ireland, Japan, the Swiss Confederation, and the Kingdom of the Netherlands hereby certify that a separate *amicus curiae* brief is necessary because their interests markedly diverge from those of other *amici* filing in this case. This *amicus* brief expresses the views of foreign governments on the effects of United States extraterritorial jurisdiction on their sovereignty, on the enforcement of their antitrust laws, and on recognized principles of international comity. These views are distinct from those expressed by the parties or the United States Government.

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... iii

TABLE OF AUTHORITIES .......... iv

INTERESTS OF *AMICI* .......... 1

INTRODUCTION .......... 5

ARGUMENT .......... 7

A.Fundamental Principles of International Law and Prescriptive Comity Limit U.S. Cou

B.An Expansive Interpretation of United States Court Jurisdiction Would Shift Private (

C.Expanding United States Court Jurisdiction Would Undermine the Effectiveness of O

D.Cooperation And Coordination, Which Are Essential To Effective Global Antitrust E

E.Domestic Effects Are Not "Inextricably Bound" With Foreign Injuries Where The Efi

CONCLUSION .......... 28

# TABLE OF AUTHORITIES

CASES

*F. Hoffman-LaRoche Ltd. v. Empagran, S.A.*, 124 S. Ct. 2359 (2004) ........... *passim*

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993)..................................... 11

*In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980)............................... 23

*Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co.*, 1977 WL 1353 (S.D.N.Y. Jan. 18, 1977) ........................................................... 27

*International Ass'n of Machinists and Aerospace Workers v. OPEC*, 477 F. Supp. 553 (C.D. Cal. 1979), *aff'd o.g.*, 649 F.2d 1354 (9th Cir. 1981), *cert. denied*, 454 U.S. 1163 (1982) ................................................................................................ 24

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984) ....................................................................................................... 10, 24

*Rio Tinto Zinc Corp. v. Westinghouse*, [1978] W.L.R. (H.L. 1977)....................... 24

*Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 (2004) .................................................. 15

*The Antelope*, 23 U.S. 66 (1825) ........................................................................ 10

*Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951) ........................ 26

*United States v. American Tobacco Co.*, 221 U.S. 106 (1911)............................... 26

*United States v. National Lead Co.*, 332 U.S. 319 (1947)...................................... 26

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, 124 S.Ct. 872 (2004)........................................................................................................... 15

UNITED STATES STATUTES AND AGREEMENTS

Antitrust Criminal Penalty and Reform Act of 2004, Pub. L. No. 108-237, 118 Stat. 666 (June 22, 2004) .......... 17

Clayton Act §4, 15 U.S.C. §15 .......... 11

Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. §6a .......... 5

*Agreement Between the Government of the U.S. and the Commission of the E.C. Regarding the Application of Their Competition Laws* (Sept. 23, 1991) (available at http://www.usdoj.gov/atr/public/international/docs/ec.htm) as modified by the *Agreement Between the Government of the United States of America and the European Communities on the Application of Positive Comity Principles in the Enforcement of Their Competition Laws* (June 4, 1998) (available at http://www.usdoj.gov/atr/public/international/1781.htm) .......... 23

*Agreement Between the Government of the U.S. and the Government of the Federal Republic of Germany Relating to Mutual Cooperation Regarding Restrictive Business Practices*, 27 U.S.T. 1956, T.I.A.S. No. 8291 (June 23, 1976)23

*Exchange of Notes Between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America Amending the Treaty on Mutual Legal Assistance in Criminal Matters done at Washington on 6 January 1994* (May 1, 2001). (available at http://195.166.119.99/Files/kfile/CM5375.PDF) .......... 22

FOREIGN STATUTES AND TREATISES

British Protection of Trading Interests Act of 1980, ch. 11 .......... 24, 25

Federal Republic of Germany, Act Against Restraints of Competition (available at http://www.bundeskartellamt.de/wEnglisch/index.shtml?navid =68) .......... 1, 12

Japan Antimonopoly Act (available at http://www2. jftc.go.jp/e-page/legislation/ama/ama.pdf) .......... 2, 13

Japan Civil Code, MINPŌ, art. 709 .......... 13

Netherlands, Competition Act (available at http://www.nmanet.nl/en/ Images/14_26063.pdf) .......... 2

Switzerland, Federal Act on Cartels and Other Restraints on Competition (available at http://www.weko.admin.ch/imperia/md/images/weko/40.pdf)...... 2, 14

Treaty of Amsterdam, Articles 81 & 82 .......... 3

United Kingdom, Competition Act of 1998, 1998 ch. 41 §2(3) .......... 2

United Kingdom, Enterprise Act of 2002, 2002 ch. 40 §190(3) .......... 2

MISCELLANEOUS

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (Supp. 2004) & (Supp. 2005) .......... *passim*

Donald I. Baker, *The Use of Criminal Law Remedies to Deter and Punish Cartels and Bid-Rigging*, 69 Geo. Wash. L. Rev. 693 (2001) .......... 16

Terry Calvani, *Enforcement of Cartel Law in Ireland*, in International Antitrust Law & Policy: Fordham Corp. Law Inst. 2003 (Barry Hawk ed. 2004) .......... 19

Deputy Assistant Attorney General Makan Delrahim, *Department of Justice Perspectives on International Antitrust Enforcement: Recent Legal Developments and Policy Implications* (Nov. 18, 2003) (available at http://www.usdoj.gov/ atr/public/speeches/201509.htm) .......... 20

*European Commission Notice on Immunity From Fines and Reduction of Fines in Cartel Cases*, OJ C45 (Feb. 19, 2002) (available at http://europa.eu.int/comm/ competition/antitrust/leniency) .......... 18

Federal Republic of Germany, Leniency Programme (available at http://www. bundeskartellamt.de/wDeutsch/download/pdf/Merkblaetter/Merkblaetter _englisch/00_Bonusregelung_e.pdf) .......... 17

*The Fight Against Cartels* (available at http://europa.eu.int/comm/competition/ citizen/cartel_ stats.html) .......... 4

*Global Competition Review* (June 2004) .................................................................... 3

Scott D. Hammond, *Lessons Common to Detecting and Deterring Cartel Activity* (Sept. 12, 2000) (Remarks at the 3rd Nordic Competition Policy Conference) (available at http://www.usdoj.gov/atr/public/speeches/6487.htm)........................ 17

*Information Leaflet on Domestic Effects* (available at http://www.bundes kartellamt.de/wDeutsch/download/pdf/Merkblaetter/Merkblaetter_englisch/99_Inla ndsauswirkung_e.pdf ) ........................................................................................ 1-2

Japan Fair Trade Commission (available at http://www2.jftc.go.jp/e-page/ aboutjftc/role/q-3.htm)........................................................................................ 2

Japan Fair Trade Commission Statistics (available at http://www2.jftc.go. jp/e-page/aboutjftc/role/statis.htm)..................................................................... 3

Japan Fair Trade Commission, Press Release, Main Features of the Bill to Amend the Antimonopoly Act (October 14, 2004) (available at http://www2.jftc.go.jp /e-page/pressreleases/2004/october/ 041014.html) ................................................ 18

Raymond Krauze & John Mulcahy, *Antitrust Violations*, 40 Am. Crim. L. Rev. 241 (2003)................................................................................................................ 19

Otto Graf Lambsdorff, *Antitrust Law as a Regulatory Factor in a Globalized Market Economy*, Lecture at the XI International Cartel Conference of the Federal Cartel Office, Bonn, Germany (June 19, 2003) ................................................. 20

Vaughan Lowe "Jurisdiction" in *International Law* 329 (Malcolm D. Evans ed., 2003) ............................................................................................................... 9

Mario Monti, *Competition Enforcement Reforms in the EU: Some Comments by the Reformer* (April 4, 2003) (speech presented at Georgetown University by European Union Competition Commissioner and available at http://europa.eu.int/rapid/press ReleasesAction.do?reference=SPEECH/03/200& format=HTML&aged=0&language=EN&guiLanguage=en) ................................ 21

Mario Monti, *The Fight Against Cartels*, Speech presented at EMAC (Sept. 11, 2002) (available at http://europa.eu.int/rapid/pressReleasesAction.do?reference= SPEECH/02/384&format=HTML&aged=0&language=EN&gui Language=en) ........ 19-20

Netherlands Annual Report 2002 (available at http://www.nmanet.nl/en/service_ and_contact/downloaden/) ........ 3-4

Netherlands Fact Sheet 2003 (available at http://nmanet.nl/nl/Images/11_ 15943.pdf) ........ 3

Netherlands Leniency Guidelines (unofficial translation available at http://www. nmanet.nl/en/Images/ 14_8180.pdf) ........ 18

NMa Starts Accelerated Sanctions (available at http://www.nmanet.nl/en/nieuws _en_ publicaties/persberichten/0424.asp) ........ 4

Office of Fair Trading, Guidance as to the Appropriate Amount of a Penalty (available at http://www.oft.gov.uk/nr/rdonlyres/4546166b-0413-45e4-8c8f-208cc3cdc325/0/oft423.pdf) ........ 18

Office of Fair Trading, *Annual Report and Resource Accounts* 2003-2004 (available at http://www.oft.gov.uk/NR/rdonlyres/66C1FDA3-B75D-44A5- AF9E-0D3A0B4725DE/0/objective3.pdf) ........ 3

*Oppenheim's International Law* (Sir Robert Jennings & Sir Arthur Watts, eds., 9th ed. 1992) ........ 9

R. Hewitt Pate, *Anti-Cartel Enforcement: The Core Antitrust Mission* (May 16, 2003) (available at http://www.usdoj.gov/atr/public/speeches/201199.htm) ........ 21

R. Hewitt Pate, *International Anti-Cartel Enforcement*, Speech presented at 2004 ICN Cartels Workshop (Nov. 21, 2004) (available at http://www.usdoj.gov/atr/ public/speeches/206428.htm) ........ 19

Kenneth S. Reinker, *Case Comment: Roche v. Empagran*, 28 Harvard L.J. & Publ Pol'y 297 (2004) ........ 26

*Restatement (Third) of Foreign Relations Law of the United States* §§402(1) & 442 (1987) .................... 9, 10-11, 24

Switzerland Annual Report (available at http://www.weko.admin.ch/ publikationen/00188/index.html?lang=en) .................... 4

Switzerland Ordinance regarding the Sanctions for Unlawful Restrictions of Competition (available at http://www.weko.admin.ch/imperia/md/images/ weko/46.pdf.) .................... 18

Akinori Uesugi, *Where Japanese Competition Policy is Going - Prospect and Reality of Japan*, (October 7, 2004) (speech before Fordham Corporate Law Institute, The 31st Annual Conference on International Antitrust Law and Policy, available at http://www2.jftc.go.jp/e-page/policyupdates/speeches/ 041007uesugi.pdf) .................... 21

United Kingdom Dept. of Trade & Industry, *A World Class Competition Regime*, (Government White Paper Cm 5233, July 2001) .................... 12

United States Department of Justice, *Corporate Leniency Policy* (available at http://www.usdoj.gov/atr/public/guidelines/0091.htm) (issued Aug. 10, 1993) .................... 17

United States Department of Justice, *Leniency Policy for Individuals* (available at http://www.usdoj.gov/atr/public/guidelines/0092.htm) (issued Aug. 10, 1994) .................... 17

John Vickers, *Competition Economics,* Royal Economic Society Annual Public Lecture (Dec. 4, 2003) (available at http://www.oft.gov.uk/NR/rdonlyres/ 882FDED2-B562-4D10-92F5-D23C58E4D493/0/spe0503.pdf) .................... 19

# BRIEF OF THE FEDERAL REPUBLIC OF GERMANY, THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND, JAPAN, THE SWISS CONFEDERATION, AND THE KINGDOM OF THE NETHERLANDS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEES

## INTERESTS OF *AMICI*

The Governments of Germany, the United Kingdom, Japan, Switzerland and the Netherlands are committed to strict compliance with their antitrust laws. However, they strongly oppose the assertion of extraterritorial jurisdiction that would unreasonably interfere with sovereign authority and violate fundamental principles of international law. Each country's antitrust laws prohibit price-fixing cartels, impose substantial penalties for antitrust violations, and may provide specific private remedies. The differences in these legal systems and, in particular, the damages remedies awarded to private plaintiffs, reflect deliberate policy choices that should be respected by the United States' commitment to international comity.

The Governments' legal systems regulate competition within their boundaries. *See* Germany, Gesetz gegen Wettbewerbsbeschränkungen ( available at http://www.bundeskartellamt. de/wEnglisch/index.shtml?navid =68; Information Leaflet on Domestic Effects at 1, available at http://www.bundeskartellamt.de/w

Deutsch/download/pdf/Merkblaetter/Merkblaetter_englisch/99_Inlandsauswirkung_e.pdf (ARC applies within the territorial boundary of Germany); UK, Competition Act of 1998, 1998 ch. 41 §2(3) ("only if the agreement, decision or practice is . . . implemented in the United Kingdom"); UK, Enterprise Act of 2002, 2002 ch. 40 §190(3) (criminal cartel offense only applicable to agreements implemented, in whole or in part, in the United Kingdom); Japan, Antimonopoly Act, "tentative translation," available at http://www2.jftc.go.jp/e-page/legislation/ ama/ama.pdf; Japan Fair Trade Commission, available at http://www2.jftc.go.jp/ e-page/aboutjftc/role/q-3.htm (regulates "trade between Japan and foreign countries if such trade restrains competition in the Japanese market"); Switzerland, Federal Act on Cartels and Other Restraints on Competition ("LCart") of 1995, including 2004 amendments, unofficial translation available at http://www.weko. admin.ch/imperia/md/images/weko/40.pdf ("applies to private or public enterprises that are party to cartels or to other agreements affecting competition, have market power or take part in mergers"); the Netherlands, Competition Act, as amended in 2004, available at http://www. nmanet.nl/en/Images/14_26063.pdf (prohibit undertakings which "prevent[], restrict[] or distort[] . . . competition on the Dutch market, or part thereof"); Articles 81 & 82 of the European Community Treaty.

Each Government vigorously enforces its laws prohibiting unreasonable restraints of trade. *See, e.g.*, Global Competition Review, 1-7 (June 2004) (Germany's enforcement efforts are second only to those of the United States). Violations of these acts may result in substantial penalties. During 2003-04, the Bundeskartellamt (Germany's Federal Cartel Office) reviewed more than 2,770 mergers and imposed fines of more than □750 million against cartels. From April 1, 2003 through March 31, 2004, the United Kingdom's Office of Fair Trading ("OFT")

"opened 1,140 complaint cases under the [Competition] Act, of which 46 involved possible cartel activity," launched 41 investigations and "imposed total penalties of £19.6m (£18.9 after leniency)." Office of Fair Trading, *Annual Report and Resource Accounts* 2003-2004, Objective 3, available at http://www. oft.gov.uk/NR/rdonlyres/66C1FDA3-B75D-44A5-AF9E-0D3A0B4725DE/0/objective3.pdf. The Japan Fair Trade Commission issued ¥8,517 million in surcharge payment orders during 2000 and ordered surcharge payments totaling ¥10.4 billion during the 2001-2003 period, available at http://www2.jftc.go.jp/e-page/ aboutjftc/role/statis.htm. In 2002, the Dutch Competition Authority imposed fines totaling □99.6 million and, in 2003, imposed fines totalling □135.5 million. Annual Report 2002, available at http://www.nmanet.nl/en/service_and_contact/ downloaden/; fact sheet 2003 available at http://nmanet.nl/nl/Images/11_ 15943.pdf. The Dutch Competition Authority is also vigorously investigating a major cartel in the Netherlands involving the majority of construction companies in the earthworks, roadworks and hydraulic engineering sector and is preparing to impose heavy fines. NMa Starts Accelerated Sanctions, available at http://www. nmanet.nl/en/nieuws_en_ publicaties/persberichten/0424.asp. During 2003, Switzerland initiated 46 preliminary investigations and carried out 23 full investigations and 46 from the previous year. While anticompetitive practices were declared unlawful by the LCart of 1995, Switzerland's Competition Commission may impose direct fines for first time infringements after March 31, 2005 due to recent changes in the law. Annual Report available at http://www.weko.admin.ch/ publikationen/00188/index.html?lang=en. The EU imposed fines equaling □855 million against some of the Defendant-Appellees in the case at bar. The total amount of fines imposed by the EU in cartel cases between 1986 and 2002 is □3.788 billion. *See* The Fight Against Cartels,

available at http://europa.eu.int/ comm/competition/citizen/cartel_ stats.html. The EU and ten of its member states may impose fines of up to 10% of an entity's cartel profits.

The Governments of Germany, the United Kingdom, Japan, the Netherlands and Switzerland have established penalties and private rights of action for antitrust violations. However, instead of adopting the United States system of treble damages, each has opted for a single damages regime. The Governments have substantial interests in protecting the integrity of their legal systems.

## INTRODUCTION

This case raises fundamental questions critical to the worldwide enforcement of antitrust law. Plaintiffs advocate that U.S. courts are authorized to exercise jurisdiction over foreign anticompetitive conduct involving foreign transactions that cause foreign harm, even when the effects on U.S. domestic commerce are indirect and do not play a substantial role in bringing about that foreign harm. They argue that because foreign purchasers could not avoid harm from defendant's global cartel by buying products in the U.S. at lower prices, plaintiffs' harm in the foreign market from the price-fixing cartel "depended" on prices being raised in the U.S. market (*i.e.*, the domestic effects).

However, this expansive interpretation of the "domestic-injury exception" to the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. §6a ("FTAIA"), would obliterate its general rule that foreign antitrust harm arising from foreign transactions by foreign purchasers is not recoverable in a U.S. court. It would reinterpret U.S. antitrust court jurisdiction to encompass every international cartel and nearly every other antitrust claim affecting markets in more than one country or region; it would interfere with the enforcement of competition laws in

every country, particularly those with significant leniency programs; and it would override the policies of each of the *amici* and most other countries because their laws do not provide for private treble damages recovery. International cooperation, so central to effective global antitrust enforcement, would be adversely affected and worldwide antitrust enforcement would suffer from this undermining of foreign leniency programs.

The Supreme Court's decision in *F. Hoffman-LaRoche Ltd. v. Empagran, S.A.*, 124 S. Ct. 2359 (2004) ("*Empagran*"), recognized that basic norms of international comity are integral to the interpretation of U.S. court jurisdiction over private antitrust claims for foreign transactions causing foreign harm. This Court should ensure that U.S. court jurisdiction is limited to those rare situations where the foreign conduct creates a domestic effect that is directly and inextricably bound to the foreign harm. Merely identifying a domestic effect or proclaiming it to be a byproduct of the anticompetitive conduct is not sufficient. Otherwise, U.S. court jurisdiction over foreign-based claims would be unlimited and the legal systems of approximately 100 nations would be overridden to include treble damages and attorneys fees for private actions.

Past disputes over expansive applications of U.S. antitrust jurisdiction have led to serious disagreements between the United States and other governments, and the Supreme Court expressed deep concern that these mistakes not be repeated. In this spirit, we respectfully request that this Court consider our argument.

## ARGUMENT

We applaud the decision of the Supreme Court in *Empagran* that generally denies antitrust jurisdiction of United States courts over private claims for foreign injuries to foreign

plaintiffs participating in foreign markets. At most, the Court left open the possibility that such claims could be asserted in a narrow set of cases where the "foreign injury was *'inextricably bound up with . . . domestic restraints of trade' and the plaintiff 'was injured . . . by reason of an alleged restraint of our domestic trade.'"* *Empagran*, 124 S. Ct. at 2370 (emphasis in original, quoting Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co., 1977 WL 1353 (S.D.N.Y. Jan. 18, 1977) ("*Industria Siciliana*")).

Plaintiffs-appellants would overturn that ruling by having this Court conclude that their injuries resulted in part from elevated U.S. prices. Plaintiffs' theory would give U.S. courts jurisdiction over private treble damages claims by foreign purchasers without regard to any other contact with U.S. markets. Surely, this cannot be what the Supreme Court meant when it emphasized the rule of statutory construction which assumes that "legislators take account of the legitimate sovereign interests of other nations" and that a "reasonableness" test should be applied to avoid "serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." 124 S.Ct. at 2366 & 2367. Indeed, it is these concerns that caused the Court to quote approvingly from Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶273 (Supp. 2004) ("*Antitrust Law Treatise*") that the FTAIA must not be read so that "[e]ffectively, the United States courts would provide worldwide subject matter jurisdiction to any foreign suitor wishing to sue its own local supplier." Congress, the Court said, did not seek to "impose" its antitrust policies on the international marketplace by "an act of legal imperialism[] through legislative fiat." 124 S.Ct. at 2369.

### A. Fundamental Principles of International Law and Prescriptive Comity Limit U.S. Court Jurisdiction Over Foreign Injuries

Interpreting the FTAIA as authorizing United States jurisdiction over foreign injuries to foreign parties whose only U.S. connection is that the same or similar conduct produced an effect on U.S. commerce would upset the basic concept of jurisdiction in international law. *See generally* Oppenheim's International Law 457-58 (Sir Robert Jennings & Sir Arthur Watts, eds., 9th ed. 1992) ("right to exercise jurisdiction depends on there being between the subject matter and the State exercising jurisdiction a sufficiently close connection to justify that State in regulating the matter and perhaps also to override any competing rights of other States"). Every sovereign state has an equal right to prescribe and enforce its law in accordance with the principles of international law regarding jurisdiction. *See* Vaughan Lowe "Jurisdiction" in *International Law* 329, 330 (Malcolm D. Evans ed., 2003) ("The legal rules and principles governing jurisdiction have a fundamental importance in international relations, because they are concerned with the allocation between States . . . of competence to regulate daily life – that is, the competence to secure the *differences* that make each State a distinct society.") (emphasis in original); *see also* Restatement (Third) of Foreign Relations Law of the United States §402(1)(1987) ("*Restatement* (*Third*)").

The primary basis for jurisdiction in international law is "territoriality." In accordance with this principle, a state may exercise its authority to prescribe and enforce its law over all persons and things within its territory. A state's authority to exercise jurisdiction extraterritorially generally is limited to very few situations. The most widely recognized and accepted exercises of such jurisdiction are (i) a state's power to extend the application of its law to its nationals wherever they may be (the "nationality principle"), and (ii) a state's power to

protect its own safety and vital interests when threatened by the serious crimes of foreigners outside its territory (the "protective principle").

These international principles of nationality, territoriality and protectiveness have long been accepted in United States law. *See, e.g.,* The Antelope, 23 U.S. 66, 122 (1825) ("No principle is more universally acknowledged, than the perfect equality of nations . . . . It results from this equality, that no one can rightfully impose a rule on another."); Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 921 (D.C. Cir. 1984) (territoriality is "the most pervasive and basic principle underlying the exercise by nations of prescriptive regulatory power"). Recognizing these norms, the Supreme Court's *Empagran* opinion instructed that in construing ambiguous statutory commands such as the domestic-injury exception in the FTAIA, a court "ordinarily . . . [should] avoid unreasonable interference with the sovereign authority of other nations." 124 S. Ct. at 2366. Thus, the Court referenced the *Restatement* (*Third*)'s interpretation of U.S. law as holding that even where there is a basis for extraterritorial jurisdiction in international law, "a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state *when the exercise of such jurisdiction is unreasonable*." *Id.* §403(1) (emphasis added) (cited in *Empagran*, 124 S. Ct. at 2366); *accord* Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 (1993).

**B. An Expansive Interpretation of United States Court Jurisdiction Would Shift Private Claims To United States Courts And Interfere With The Policy Choices Made By Other Jurisdictions**

No other country has adopted the United States' "bounty hunter" approach that permits a private plaintiff to present an antitrust claim to a jury and to "recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." Clayton Act §4, 15 U.S.C. §15. Under United Kingdom law, private claims for breaches of competition law (either that of the UK or the EC) are brought as actions for a breach of statutory duty. United Kingdom law generally provides for only single damages.[1] The usual UK cost rule, in which attorneys' fees are paid by the losing party, applies. Such claims are heard by judges rather than juries. The United Kingdom recently enacted a statute to encourage the use of private actions for competition law violations, but expressly chose to do so on a limited basis.[2] The Government White Paper that led to this statute noted that many U.S. commentators "view the number of private antitrust cases in the US as too high" particularly because of "unscrupulous lawyers . . .

---

[1]In exceptional cases the law in the United Kingdom (except Scotland) allows for exemplary damages.

[2]These amendments to UK competition law (i) allow private claimants to rely on a finding of infringement of the Competition Act or Articles 81/82 of the EC Treaty in pursuing a damages action in the civil courts; (ii) expand the role of the Competition Appeal Tribunal to hear private damages claims; and (iii) enable class actions by consumer groups to be brought before the Competition Appeal Tribunal.

quick to file vexatious actions – attracted by the prospect of treble damages." It therefore recommended "a system in the UK where private actions are less inhibited than at present – but in doing so . . . [were careful to] guard against the risks of the US system." UK Dept. of Trade & Industry, *A World Class Competition Regime*, "Real Redress for Harmed Parties" ch. 8 at 47-48 (Government White Paper Cm 5233, July 2001).

The German ARC similarly allows for private rights of action according to the general rules of German civil law. It provides that a person who violates a section of the ARC or a decision of the cartel authority which "serves to protect another" is "liable for the damages arising from the violation." ARC §33. In reaction to German judicial decisions restricting claims for private damages under the ARC, the German Government has proposed an amendment that would allow those who make direct purchases from cartels to file damages claims; it also would eliminate the bar to recovery by a participant and broaden the category of persons who may obtain injunctive relief.[3] Associations, including consumer associations, are given extended rights to "skim off" the benefits gained through a violation of competition law in private law suits. Under the ARC, private damages are based on actual harm and the proposed amendments make this calculation simpler (by excluding "passing-on-deference"). Additional

---

[3]The Bundestag heard the first reading of the 7th Amendment to the ARC on September 10, 2004. One purpose of the amendment is to strengthen civil law sanctions.

criminal and administrative sanctions under German law may be imposed only in a state prosecution.

Under Japan's Antimonopoly Act, a private party may recover single damages from any entity which violates the Act. Private actions may be brought under two theories, "absolute liability" and "liability through fault." The Act provides for strict liability by mandating that any entity which violates the act "shall be liable to indemnify the person injured." Antimonopoly Act §25(1). However, prior to filing a claim for damages under absolute liability, the private party must wait for a final and conclusive decision from the Japan Fair Trade Commission. *Id.* at 26(1). That prior approval does not apply to fault-based claims where private actions may be pursued under the Civil Code. Minpō, art. 709. Like Germany, Japan views treble damages as a sanction and does not use its civil laws as a tool to impose sanctions. Such enforcement is left to criminal and administrative processes.

The Netherlands allow a private damages action to be brought in their Civil Courts. The Civil Court will accept the decision of the Netherlands' National Competition Authority as proof of anticompetitive behavior. The Civil Court, therefore determines only the amount of damages which should be imposed in a particular case. The Netherlands also limits recovery to single damages.

Chapter 3 of Switzerland's LCart does allow for private rights of action. Pursuant to this chapter, a person may claim (i) removal or cessation of the activity

in question, (ii) damages or reparation, or (iii) return of illicitly earned profits. Private recoveries are limited to single damages.

A broad reading of the domestic-injury exception to the FTAIA expanding the jurisdiction of the United States private claim system, as plaintiffs urge, would ignore the laws of these sovereign nations and override their deliberate policy decisions not to adopt a liberal, jury-based private treble damages system. It would apply U.S. law by fiat and make United States courts the forum of choice; it would ignore the domestic laws applicable where the primary injuries occurred and would fail to require a substantial connection between the U.S. and the foreign jurisdiction. Enlarging the prescriptive jurisdiction of the United States to provide a U.S. antitrust remedy to foreign buyers with only a limited U.S. nexus would attract even more litigants and increase the number of private antitrust claims filed in United States courts. As the Supreme Court recently noted in another context, "[j]udicial oversight under the Sherman Act" should not be expanded without clear direction from Congress lest it "distort investment and lead to a new layer of interminable litigation, atop the variety of litigation routes already available to and actively pursued by" private litigants. Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, 124 S.Ct. 872, 883 (2004); *see also* Sosa v. Alvarez-Machain, 124 S.Ct. 2739, 2782 (2004) (Breyer, J. concurring) (necessity for "respect[ing] the sovereign rights of other

nations by limiting the reach of its laws and their enforcement"). The same rationale reinforces the basic principle that the policy choices of foreign countries limiting the scope of private antitrust actions should be respected.

### C. Expanding United States Court Jurisdiction Would Undermine the Effectiveness of Other Countries' Leniency Programs

The Supreme Court in *Empagran* also recognized "that a decision permitting independently injured foreign plaintiffs to pursue private treble-damages remedies would undermine foreign nations' own antitrust enforcement policies by diminishing foreign firms' incentive to cooperate with antitrust authorities in return for prosecutorial amnesty." 124 S.Ct. at 2368 (citing *amici* briefs of Germany, Canada and the United States). Price-fixing and other cartels are elusive and dangerous; they operate in secret and severe penalties make voluntary disclosure perilous. These problems are compounded when the cartel operates in international commerce because evidence of the existence of the cartel often is difficult to collect and the participants often are scattered among several jurisdictions.

Prior to the 1990s, traditional tactics such as plea bargains had only limited success in discovering and punishing international cartels. Cartels were not uniformly prohibited, enforcement practices varied widely, and potential whistle-blowers were unwilling to reveal themselves without formal assurances of protection. *See generally* Donald I. Baker, *The Use of Criminal Law Remedies to Deter and Punish Cartels and Bid-Rigging*, 69 Geo. Wash. L. Rev. 693, 707-09 (2001).

To counteract these limitations, enforcement authorities developed leniency programs offering amnesty, cooperated on collecting evidence, and shared leads and information to the extent compatible with their respective laws to prosecute cartels operating across borders. The United States Department of Justice formalized and expanded its corporate leniency program in 1993.[4] In 2004 Congress revised the criminal standards and procedures to permit companies and

---

[4]*See* Scott D. Hammond, *Lessons Common to Detecting and Deterring Cartel Activity* (Sept. 12, 2000) (Remarks at the 3rd Nordic Competition Policy Conference) (available at http://www.usdoj.gov/atr/public/speeches/6487.htm)Scott D. Hammond, *Lessons Common to Detecting and Deterring Cartel Activity* (Sept. 12, 2000) (Remarks at the 3rd Nordic Competition Policy Conference), available at http://www.usdoj.gov/atr/public/speeches/6487.htm; *see also* U.S. Department of Justice, *Corporate Leniency Policy* (available at http://www.usdoj.gov/atr/public/guidelines/0091.htm) (issued Aug. 10, 1993)U.S. Department of Justice, *Corporate Leniency Policy*, available at http://www.usdoj.gov/atr/public/guidelines/0091.htm (issued Aug. 10, 1993);U.S. Department of Justice, *Leniency Policy for Individuals* (available at http://www.usdoj.gov/atr/public/guidelines/0092.htm) (issued Aug. 10, 1994) U.S. Department of Justice, *Leniency Policy for Individuals*, available at http://www.usdoj.gov/atr/public/guidelines/0092.htm (issued Aug. 10, 1994).

their employees to obtain immunity for being the first to reveal a conspiracy and for cooperating with the government in its prosecution of other conspirators. Antitrust Criminal Penalty and Reform Act of 2004, Pub. L. No. 108-237, 118 Stat. 666 (June 22, 2004). Significantly, these 2004 amendments to the Clayton Act not only granted immunity from criminal prosecutions but also limited leniency participants' private liability to single damages.

Germany, the United Kingdom, the Netherlands, Switzerland and European Community as well as other countries now have specific leniency programs.[5] *See* Germany's Leniency Programme;[6] the United Kingdom's leniency policy set forth in the OFT's Guidance as to the Appropriate Amount of a Penalty;[7] the Netherlands' Leniency Guidelines;[8] Switzerland's

---

[5]Seventeen of the 25 EU member states currently have leniency programs in place.

[6]Federal Republic of Germany Leniency Programme (available at http://www.bundeskartellamt.de/wDeutsch/download/pdf/ Merkblaetter/Merkblaetter_englisch/00_Bonusregelung_e.pdf)Available at http://www.bundeskartellamt.de/wDeutsch/download/pdf/ Merkblaetter/Merkblaetter_englisch/00_Bonusregelung_e.pdf.

[7]Available at http://www.oft.gov.uk/nr/rdonlyres/4546166b-0413-45e4-8c8f-208cc3cdc325/0/oft423.pdf.

Ordinance regarding the Sanctions for Unlawful Restrictions of Competition;[9] *European Commission Notice on Immunity From Fines and Reduction of Fines in Cartel Cases*, OJ C45, at 3-5 (Feb. 19, 2002).[10] The Japanese Government has introduced a bill in the Diet to amend the Antimonopoly Act and create a leniency program. *See* Main Features of the Bill to Amend the Antimonopoly Act, Japan Fair Trade Commission Press Release (October 14, 2004).[11]

Typically, a leniency applicant receives total or substantial immunity from criminal and civil antitrust penalties by being the first to present credible or material evidence of a cartel before the enforcement authority has knowledge of the cartel or has begun an investigation. The terms of these programs vary with each country's assessment of the mix of incentives and penalties that comport with its economy and policy objectives. These programs are a deliberate effort to balance interests of disclosure, deterrence and punishment. *See* John Vickers, *Competition Economics,* Royal Economic Society Annual Public Lecture (Dec. 4, 2003) (UK Chairman of the Office of Fair Trading) (the "carrot of leniency" creates "a potential competition

---

[8]Unofficial translation available at http://www.nmanet.nl/en/Images/ 14_8180.pdf. The 2004 amendments introduced, *inter alia*, this leniency program.

[9]Available at http://www.weko.admin.ch/imperia/md/images/weko/46.pdf.

[10]Available at http://europa.eu.int/comm/competition/antitrust/ leniency.

[11]Available at http://www2.jftc.go.jp/e-page/pressreleases/2004/october/ 041014.html.

– a race to the competition authorities – for those contemplating the illegally agreed suspension of price competition").[12]

There is widespread concurrence that leniency programs have been "spectacularly successful." Terry Calvani, *Enforcement of Cartel Law in Ireland*, in International Antitrust Law & Policy: Fordham Corp. Law Inst. 2003, 8 (Barry Hawk ed. 2004). They are the basis for a majority of cartel prosecutions in the United States. *See* Raymond Krauze & John Mulcahy, *Antitrust Violations*, 40 Am. Crim. L. Rev. 241, 270-71 (2003); R. Hewitt Pate, *International Anti-Cartel Enforcement*, Speech presented at 2004 ICN Cartels Workshop (Nov. 21, 2004) (U.S. leniency program is "the cornerstone of [its] international anti-cartel enforcement program").[13] The European Commission's experience is similar. *See* Mario Monti, *The Fight Against Cartels*, Speech presented at EMAC (Sept. 11, 2002) (the "leniency scheme has proved a formidable tool for encouraging firms to cooperate").[14]

The Governments, however, are concerned that an expansion of U.S. court jurisdiction over foreign claims from foreign anticompetitive conduct would make the leniency programs

---

[12]Available at http://www.oft.gov.uk/NR/rdonlyres/882FDED2-B562-4D10-92F5-D23C58E4D493/0/spe0503.pdf.

[13]Available at http://www.usdoj.gov/atr/public/speeches/206428.htm.

[14]Available at http://europa.eu.int/rapid/pressReleasesAction.do?reference=SPEECH/02/384&format=HTML&aged=0&language=EN&guiLanguage=en.

less attractive to whistle-blowers. Expanding the scope of U.S. treble damages liability for participants in foreign amnesty programs – an inevitable byproduct if this Court exercises subject matter jurisdiction – would "jeopardize[] the success of the corporate leniency program in Europe since the incentive to disclose information to the authorities voluntarily will be reduced if companies must fear private class actions in the United States brought by plaintiffs from all over the world."[15] An expansion of U.S. private actions to encompass injuries suffered abroad by

---

[15]Otto Graf Lambsdorff, *Antitrust Law as a Regulatory Factor in a Globalized Market Economy*, Lecture at the XI International Cartel Conference of the Federal Cartel Office, Bonn, Germany (June 19, 2003) (former German Minister of the Economy)Otto Graf Lambsdorff, *Antitrust Law as a Regulatory Factor in a Globalized Market Economy*, Lecture at the XI International Cartel Conference of the Federal Cartel Office, Bonn, Germany (June 19, 2003) (former German Minister of the Economy); *accord* Deputy Assistant Attorney General Makan Delrahim, *Department of Justice Perspectives on International Antitrust Enforcement: Recent Legal Developments and Policy Implications* (Nov. 18, 2003) (available at http://www.usdoj.gov/atr/public/speeches /201509.htm)Deputy Assistant Attorney General Makan Delrahim, *Department of Justice Perspectives on International Antitrust Enforcement: Recent Legal Developments and Policy Implications* (Nov. 18, 2003) (exposure to massive judgments in United States courts that are based on foreign injuries to foreign plaintiffs

foreign consumers will require cartel participants to pay unpredictable and unbounded damages, whereas they face no damages if the cartel otherwise had not been detected. Under these circumstances, cartel detection and deterrence is likely to be diminished and consumer welfare will not be served.

### D. Cooperation And Coordination, Which Are Essential To Effective Global Antitrust Enforcement, Could Be Jeopardized By Needless Conflicts Over Jurisdiction

Effective antitrust enforcement in an increasingly global economy depends on close governmental cooperation and coordination as well as respect for the decisions of other nations. Neither commercial transactions nor anticompetitive behavior by private firms is constrained by national boundaries. Antitrust enforcement officials throughout the world have placed a high priority on closely knit international investigations[16] and on formalized international procedures

---

will create "a major disincentive" to "companies who are contemplating exposing cartel activity") (available at http://www.usdoj.gov/atr/public/speeches /201509.htm).

[16] *See* Mario Monti, *Competition Enforcement Reforms in the EU: Some Comments by the Reformer* (April 4, 2003) (speech presented at Georgetown University by European Union Competition Commissioner and available at http://europa.eu.int/rapid/start/cgi/guesten.ksh?p _action.gettxt+gt&doc=SPEECH/03/200|0|RAPID&1g=EN&display=)Mario Monti, *Competition Enforcement Reforms in the EU: Some Comments by the Reformer* (April 4, 2003) (speech presented at Georgetown University by European Union Competition Commissioner and

for gathering information and prosecuting anticompetitive acts with transnational effects. Seven countries (Australia, Brazil, Canada, Germany, Israel, Japan and Mexico) and the European

---

available at http://europa.eu.int/rapid/pressReleasesAction.do?reference=SPEECH/03/200&format=HTML&aged=0&language=EN&guiLanguage=en); *accord* R. Hewitt Pate, *Anti-Cartel Enforcement: The Core Antitrust Mission* (May 16, 2003) (available at http://www.usdoj.gov/atr/public/speeches/201199.htm)R. Hewitt Pate, *Anti-Cartel Enforcement: The Core Antitrust Mission* (May 16, 2003) (head of Antitrust Division, U.S. Department of Justice) ("Cooperation among antitrust authorities will remain an essential means of detecting and prosecuting international cartel activity.") (available at http://www.usdoj.gov/atr/public/ speeches/ 201199.htm); Akinori Uesugi, *Where Japanese Competition Policy is Going - Prospect and Reality of Japan*, (October 7, 2004) (speech before Fordham Corporate Law Institute, The 31st Annual Conference on International Antitrust Law and Policy, available at http://www2.jftc.go.jp/e-page/policyupdates/speeches/ 041007uesugi.pdf) Akinori Uesugi, *Where Japanese Competition Policy is Going - Prospect and Reality of Japan*, 28 (October 7, 2004) (speech before Fordham Corporate Law Institute, The 31st Annual Conference on International Antitrust Law and Policy, available at http://www2.jftc.go.jp/e-page/policyup dates/speeches/041007uesugi.pdf) ("there is a real need for competition authorities throughout the world to come together to develop closer cooperation").

Union have adopted memoranda of understanding with the United States[17] that allow competition authorities to assist each other, allocate enforcement responsibility, and commit each country to refrain from infringing on the other's actions. The law of the United Kingdom permits its enforcement authorities to arrange for the exchange of information with other countries to assist their civil and criminal law investigations. For example, the U.K./U.S. Mutual Legal Assistance Treaty provides that the United Kingdom will "offer assistance in respect of requests from the United States of America made pursuant to the Treaty for assistance in anti-trust and competition law investigations." Exchange of Notes Between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America Amending the Treaty on Mutual Legal Assistance in Criminal Matters done at Washington on 6 January 1994 (May 1, 2001).[18]

---

[17]These Memoranda Of Understanding are available at http://www.usdoj.gov/atr/public/international/int_arrangements.htm.

[18]Available at http://195.166.119.99/Files/kfile/CM5375.pdf. *See also Agreement Between the Government of the U.S. and the Commission of the E.C. Regarding the Application of Their Competition Laws* (Sept. 23, 1991) (available at http://www.usdoj.gov/atr/public/international/docs/ec.htm) as modified by the *Agreement Between the Government of the United States of America and the European Communities on the Application of Positive Comity Principles in the*

But such cooperation depends on reciprocal respect for the enforcement practices, priorities and jurisdiction of the other country. This would be undermined by jurisdictional actions that could, as the Supreme Court noted, be viewed as "legal imperialism." One high profile example of international concern is illustrated by the *Uranium Cartel* case. In re Uranium Antitrust Litig., 617 F.2d 1248 (7th Cir. 1980). It involved private antitrust litigation in the United States that "outraged" foreign governments because the defendant foreign cartel had been supported by foreign governments when they responded to "anticompetitive" actions by the U.S. Government that had closed its market to foreign producers. Indeed, the British House of

---

*Enforcement of Their Competition Laws* (June 4, 1998) (available at http://www.usdoj.gov/atr/public/international/int_arrangements.htm)Agreement Between the Government of the U.S. and the Commission of the E.C. Regarding the Application of Their Competition Laws (Sept. 23, 1991) (available at http://www.usdoj.gov/atr/public/international/docs/ec.htm) as modified by the *Agreement Between the Government of the United States of America and the European Communities on the Application of Positive Comity Principles in the Enforcement of Their Competition Laws* (June 4, 1998) (available at http://www. usdoj.gov/atr/public/international/1781.htm); *Agreement Between the Government of the U.S. and the Government of the Federal Republic of Germany Relating to Mutual Cooperation Regarding Restrictive Business Practices*, 27 U.S.T. 1956, T.I.A.S. No. 8291 (June 23, 1976). Cooperation between competition authorities in international organizations such as OECD and ICN (International Competition Network) complement these agreements.

Lords earlier denied discovery requests from U.S. courts. *See* Rio Tinto Zinc Corp. v. Westinghouse, [1978] W.L.R. (H.L. 1977); *see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984) (private U.S. action contrary to permanent injunction issued by the U.K. Court of Appeal). Nor are these mere isolated examples. *See, e.g.*, *International Ass'n of Machinists and Aerospace Workers v. OPEC*, 477 F. Supp. 553 (C.D. Cal. 1979), *aff'd o.g.*, 649 F.2d 1354 (9th Cir. 1981), *cert. denied*, 454 U.S. 1163 (1982) (private action challenging OPEC, *i.e.*, government oil pricing cartel).

These cases are noteworthy because they generated intense reaction and retaliation against the United States which affected intergovernment cooperation. The private actions in the *Uranium Cartel* case caused several countries to enact statutes blocking discovery of documents and other information needed to prosecute foreign defendants. *See Restatement* (*Third*) at §442, n.4 (1987) (listing acts and their amendments). For example, the British Protection of Trading Interests Act of 1980, ch. 11, still authorizes the Secretary of State for Trade and Industry to prohibit compliance with laws or orders issued by "any overseas country" for regulating international trade "insofar as [the laws] apply or would apply to things done . . . outside the territorial jurisdiction of that country by persons carrying on business in the United Kingdom, are damaging or threaten to damage the trading interests of the United Kingdom." *Id.* §1. This statute also restricts enforcement of treble damages judgments and allows both firms and persons conducting business in the United Kingdom to sue in the UK to "claw back" the penal portion of the foreign judgment when they are forced to pay more than compensatory damages. *Id.* §§5-6.

### E. Domestic Effects Are Not "Inextricably Bound" With Foreign Injuries Where The Effect In The U.S. Market Is Indirect and Insubstantial and "Does Not Bring About" The Foreign Injury

Principles of international comity and the practical realities of international enforcement of the antitrust laws warn against expansively interpreting the FTAIA's "domestic-injury exception" to justify U.S. antitrust jurisdiction without fully comprehending the consequences. In the case at bar, plaintiffs' injuries occurred in foreign nations and plaintiffs are foreign nationals.

Plaintiffs argue that anticompetitive conduct raised prices in the U.S. and that foreign buyers could not avoid supracompetitive prices in foreign markets by shifting their purchases to the U.S. market. This attempt to link domestic and foreign effects through the domestic-injury exception would obliterate the FTAIA's rule limiting antitrust jurisdiction of foreign claims for harms in foreign markets because such a "linkage" would be present in every cartel where the relevant market crosses international boundaries.[19] *See* Kenneth S. Reinker, *Case Comment: Roche v. Empagran*, 28 Harvard L.J. & Publ Pol'y 297, 304 (2004) ("[S]ince markets are not completely independent, the harm caused by foreign price fixing can never be completely separable from harm done to the domestic economy. Thus, there will almost always be some domestic harm caused by international price fixing.") As the *Antitrust Law Treatise* (Supp. 2005) correctly observes:

---

[19]A typical incident of every cartel is to prevent arbitrage whereby buyers can purchase the product at noncartel prices. *See Antitrust Law Treatise* S-12 (Supp. 2005).

> To interpret "linkage" of foreign and domestic injury this broadly would have undermined the entirety of the Court's opinion, which unambiguously held that foreign plaintiffs injured by a conspiracy that also injured American purchasers could not sue under the Sherman Act. Clearly the Court did not have this conception of linkage in mind because it repeatedly asserted its assumption that the conspiracy was worldwide and that it resulted in higher prices in *both* the United States and abroad. (p. S-12) (emphasis in original).

Plaintiffs presented a similar argument to the Supreme Court in *Empagran* when they relied on three cases involving world-wide market division as the basis for asserting jurisdiction over foreign harms that had some identification with domestic effects. In each of those territorial allocations, one effect of the cartel was to protect each member from competition in its home territory. *See* Timken Roller Bearing Co. v. United States, 341 U.S. 593, 595 (1951); *United States v. National Lead Co.*, 332 U.S. 319, 325-28 (1947); United States v. American Tobacco Co., 221 U.S. 106, 171-72 (1911). Like a global price-fixing cartel, the foreign harm in a market allocation cartel depends on the other members staying out of the "home" market of U.S. participants. However, the Supreme Court in *Empagran* distinguished each of these market division cases from the claims therein because the plaintiff in each of the earlier cases was the U.S. government for whom different rules applied regarding jurisdictional availability, public interest motives and remedial scope. The *Empagran* Court, therefore, expressly doubted that "this Court would have awarded similar relief at the request of private plaintiffs." 124 S. Ct. at 2370. The inevitable relationship between domestic and foreign *effects* of foreign

anticompetitive conduct is not enough to establish domestic jurisdiction over a foreign-based claim.

The *Empagran* Court made clear that a significant connection between the domestic effects and foreign injuries must be shown by the plaintiff before jurisdiction over the latter arguably can be found in a U.S. court. Even then, the effect in the U.S. market must be directly and inextricably linked to the foreign harm. *See Industria Siciliana*. As the *Antitrust Law Treatise* explains, "[u]nder the court's holding, a foreign plaintiff injured by either an export transaction or in a purely foreign transaction cannot obtain subject matter jurisdiction under the Sherman Act." (S-11) The mere fact that both United States purchasers and foreign purchasers paid more for a product because of a global price-fixing cartel is too indirect and insubstantial to create jurisdiction over the foreign purchasers' claims. Any other result would fail to give proper respect to prescriptive comity and the authority of a foreign sovereign to apply its law to transactions between foreign purchasers in its territory.

## CONCLUSION

For the foregoing reasons, we urge that the Court find that it does not have subject matter jurisdiction over plaintiffs' claims for foreign harm and affirm the judgment of the district court.

Respectfully submitted,

Ernest Gellhorn
Ann Weymouth
Law Office of Ernest Gellhorn
Suite 100
2907 Normanstone Lane, N.W.
Washington, D.C. 20008-2725
(202) 319-7104

February 16, 2005

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)**

This brief complies with the type-volume limitations for Fed. R. App. P. 32(a)(7)(B) because it contains 5850 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) & 6 because it was prepared in Times New Roman 14 point typeface in WordPerfect.

Dated: Washington, D.C.
February 16, 2005

______________________________

Ann Weymouth